IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.     JAYSON JEFFREY PENN,
2.     MIKELL REEVE FRIES,
3.     SCOTT JAMES BRADY,
4.     ROGER BORN AUSTIN,
5.     TIMOTHY R. MULRENIN,
6.     WILLIAM VINCENT KANTOLA,
7.     JIMMIE LEE LITTLE,
8.     WILLIAM WADE LOVETTE,
9.     GARY BRIAN ROBERTS, and
10.    RICKIE PATTERSON BLAKE,

    Defendants.

### DEFENDANTS MIKELL FRIES' AND SCOTT BRADY'S JOINT MOTION TO DISMISS SUPERSEDING INDICTMENT

Defendants Mikell Reeve Fries and Scott James Brady, by and through undersigned counsel and pursuant to Rules 7(c)(1) and 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure, respectfully request that the Court enter an Order dismissing the Superseding Indictment for failure to state an offense and for lack of specificity against Messrs. Fries and Brady. Because their legal positions are aligned on this matter, Messrs. Fries and Brady file this motion jointly. In support of said Motion, Defendants state as follows:

1

### I. FACTUAL BACKGROUND

On October 6, 2020, the Grand Jury returned a Superseding Indictment (hereinafter, "Superseding Indictment") against Messrs. Fries and Brady, and eight codefendants, charging them with a single count of violating Section 1 of the Sherman Act, 15 U.S.C. § 1. (Dkt. 101). Two additional counts are alleged against codefendant Jimmie Lee Little (Dkt. *Id.*. ¶¶ 1, 147, 151). The Superseding Indictment differs from the original Indictment returned against Messrs. Penn, Fries, Brady and Austin on June 2, 2020 (Dkt. 1) in that it alleges a broader price-fixing and bid-rigging conspiracy over a longer period of time. In the Superseding Indictment, the government alleges a conspiracy between 2012 and at least 2019, involving numerous suppliers of broiler chicken products and their customers, and inconsistent price and cost components. (Dkt. 101 at ¶¶ 1, 3, 47-50.) While the Superseding Indictment identifies eight customers and one distributor (*Id.* ¶¶ 36-44), it does not specify whether the conspiracy is limited to those individuals or entities.

The Superseding Indictment describes fourteen separate incidents ("episodes") that allegedly constitute the "means and methods of the conspiracy" (*Id.* ¶¶ 51-143), yet it argues a broader and seemingly more wide-reaching conspiracy than these fourteen incidents. (*Id.* ¶¶ 47-50.) The Superseding Indictment alleges a conspiracy whose purpose was "to suppress and eliminate competition through rigging bids and fixing prices and price-related terms for broiler chicken products sold in the United States." (*Id*. ¶ 47.) It contends that the acts alleged in the indictment formed only "part" of the conspiracy alleged. (("It was part of the conspiracy ...."); *Id*. ¶ 48 ("It was further part of the conspiracy ...."); *Id*. ¶¶ 49, 50 (same).) In addition, the Superseding Indictment alleges the coconspirators utilized their "continuing network" to reach agreements and understandings to submit "aligned" bids, participate in conversations and

2

communications relating to non-public information, and to monitor bids. (*Id.* ¶ 48(a)-(c).)

As to Mr. Fries, his name is substantively referenced in only *eight* paragraphs of the 151-paragraph Superseding Indictment. Even then, but for two phone calls, Mr. Fries is alleged only to have communicated with one person, Scott Brady, the Vice President of his own company, Claxton Poultry, for which Mr. Fries serves as President. The relevant paragraphs naming Mr. Fries (paragraphs 56, 65, 74, 86, 99 and 100) list internal communications between the two. Paragraphs 101 and 105 state, without context or substance, that Mr. Fries called two individuals, both of whom are employees of another supplier, and neither of whom are indicted coconspirators. The Superseding Indictment fails to elucidate how these routine communications, among thousands of such routine communications, are sufficient to support Mr. Fries' involvement in the alleged conspiracy.

As to Mr. Brady, he makes an appearance in only *eight* of fourteen of the government's episodes (*See, e.g.*, Super. Ind., Dkt. 101, ¶¶ 66-70, 77-83, 108-112, 113-116, 117-119, 127-128). The relevant paragraphs naming Mr. Brady reference his submission of bids to Claxton's customers or signing of contracts about the same, which was part of his employment, calls with employees of other suppliers pulled from telephone records, and text messages between Mr. Fries and Mr. Brady.

## II.     LEGAL STANDARD

An indictment that does not set forth all of the elements of the alleged crime is deficient. *United States v. Hathaway*, 318 F.3d 1001, 1009 (10th Cir. 2003) (dismissing indictment that failed to allege a required and essential element of the crime for which the defendant was convicted). At a minimum, the indictment must (1) "contain the elements of the offense charged and fairly inform a defendant of the charge against which he must defend"; and (2) "enable him

to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117; *see also United States v. Washington*, 653 F.3d 1251, 1259 (10th Cir. 2011); *United States v. Fitapelli*, 786 F.2d 1461, 1463-64 (11th Cir. 1986) (reversing convictions for violation of 15 U.S.C. § 1 where indictment failed to allege element of the offense). "This test is embodied in Fed. R. Crim. P. 7(c)(1), which requires that an indictment be 'a plain, concise and definite written statement of the essential facts constituting the offense charged.'" *United States v. Salazar*, 720 F.2d 1482, 1486 (10th Cir. 1983).

"[W]hile an indictment parroting the language of a federal criminal statute is often sufficient, there are crimes that must be charged with greater specificity." *United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007); *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988) ("An indictment is 'generally sufficient if it sets forth the offense in the words of the statute so long as the statute adequately states the elements of the offense.'") (quoting *Salazar*, 720 F.2d. at 1486). "'In an indictment upon a statute, it is not sufficient to set forth the offense in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.'" *Russell v. United States*, 369 U.S. 749, 765 (1962) (quoting *United States v. Carll*, 105 U.S. 611, 612 (1881)).

To establish a violation of the Sherman Act, the government must allege and prove each of the following elements beyond a reasonable doubt: (1) an agreement, (2) that unreasonably restrains trade, (3) affecting interstate commerce, and (4) that was knowingly and intentionally entered into by the defendant. 15 U.S.C. § 1; *Shaw v. United States*, 371 F. Supp. 2d 265, 272 (E.D.N.Y. 2005); AM. BAR ASS'N, MODEL JURY INSTRUCTIONS IN CRIMINAL ANTITRUST CASES (2016 ed.); *Gypsum*, 438 U.S. 422, 430, 443 n.20.

Although a conspiracy can be established by direct or circumstantial evidence of an express or implied agreement, the parties must have a meeting of the minds in the common design, purpose, or objects of the conspiracy. *United States v. Zang*, 703 F.2d 1186, 1191 (10th Cir. 1982). Association with conspirators is insufficient to sustain a conviction for conspiracy. *United States v. Lopez*, 576 F.2d 840, 844 (10th Cir. 1978). Likewise, mere knowledge or approval of or acquiescence in the object and purpose of a conspiracy, without an agreement to cooperate in achieving such object or purpose, does not make one a party to a conspiracy. *Lopez*, 576 F.2d at 844.

### III.  ARGUMENT

The Superseding Indictment fails against Messrs. Fries and Brady since it does not allege: 1) an agreement among the coconspirators; 2) an attendant restraint on trade; and, perhaps most importantly, that: 3) Messrs. Fries and Brady knowingly and intentionally entered into an illegal agreement to restrain trade. In fact, the Superseding Indictment merely presents fourteen disjointed and unrelated episodes not involving all of the Defendants or buyers and whether the factual allegations in the episodes are taken as a whole or grouped together provides no semblance of an agreement let alone how any activity contained in the episodes had any restraint of trade. Most importantly, no matter how the factual allegations of the Superseding Indictment are viewed, there is a complete absence of how Mr. Fries or Mr. Brady knowingly and intentionally entered into an illegal agreement.

#### A.  Failure to allege an agreement

Rather than set forth a straightforward allegation of an illegal agreement, the Superseding Indictment instead amorphously alleges that Defendants participated in a "continuing network," and utilized that network to reach unspecified agreements and understandings at an unspecified

time to submit aligned bids; participated in conversations and communications relating to non-public information; and monitored bids. *Id.* ¶ 48(a)-(c). Mr. Fries, for instance, is alleged to have "participated in a continuing network," an "understood purpose of which" was to rig bids and fix prices and "price-related terms" for broiler chicken, Super. Ind. ¶¶ 1, 2, from 2012-2015, during a period of time that does not encompass the temporal parameters of the entire Superseding Indictment. While the government's allegations comprising the fourteen episodes are detailed and specific when viewed individually (e.g., charts of telephone calls and excerpts of e-mails), the Superseding Indictment remains opaque as to the nature of Defendants' "continuing combination" and "continuing agreement, understanding, and concert of action." (*Id.* ¶¶ 1, 2.) In other words, Messrs. Fries and Brady cannot feign to guess (much less prepare a meaningful defense against) the essential string binding these disparate events, timelines, customers, and Defendants together.

Here, the government alleges the following as to the indicted Defendants, illustrating the incongruence in conspiratorial purpose:

1. In 2013, Messrs. Fries and Brady conspired with Defendants 1, 4, 6, 8, and 10 for QSR-1's dark meat, wing, and 8-piece chicken supply. Defendants 5, 7, and 9 did not participate.

2. In 2013, Messrs. Fries and Brady conspired with Defendant 4 for QSR-1's chicken at a reduced weight. Defendants 1, 5, 6, 7, 8, 9, and 10 did not participate.

3. In 2013, Defendants 5, 6, 7, and 9 conspired about QSR-4's freezing charge. Messrs. Fries, Brady, and Defendants 1, 5, and 8 did not participate.

4. In 2014, Messrs. Fries and Brady conspired with Defendants 1 and 4 for QSR-1's dark meat supply. They did not conspire for 8-piece chicken supply, or wing supply.

6

   Defendants 5, 6, 7, 8, 9, and 10 did not participate.

5. In 2014, Defendants 5, 6, 7, and 9 conspired on costs for quality assurance for QSR-4. Messrs. Fries, Brady, and Defendants 1, 8, and 10 did not participate.

6. In 2014, Messrs. Fries and Brady conspired with Defendant 5 on setting a price for antibiotic free chicken for QSR-5. Defendants 1, 4, 6, 7, 8, 9, and 10 did not participate.

7. In 2015, all Defendants conspired to fix the price for 8-piece chicken for QSR-1. They did not, apparently, conspire on price for dark meat, or wings, or other buyers and costs not otherwise mentioned.

8. In 2015, Defendants 1 and 8 conspired to inflate the price for 8-piece chicken for QSR-3. Messrs. Fries, Brady, and Defendants 4, 5, 6, 7, 9, and 10 did not participate. No Defendants, apparently, conspire on price for dark meat, or wings, or other buyers.

9. In 2015, Defendant 8 conspired with other, unindicted coconspirators to fix the price for boneless chicken to Brand-1. Messrs. Fries and Brady, and Defendants 1, 2, 3, 4, 5, 6, 9, and 10 did not participate.

10. In episode 10, the government alleges Defendants 1 and 8 conspired to protect the purpose of effectiveness of the conspiracy. Messrs. Fries, Brady, and Defendants 4, 5, 6, 7, 9, and 10 did not participate.

11. In 2015, Mr. Brady conspired with Defendants 1, 6, and 10 regarding a promotional discount for bone-in chicken for QSR-2. Mr. Fries, and Defendants 4, 5, 7, 8, and 9 did not participate.

12. In episode 12, the government alleges Defendant 8 conspired with other unindicted

coconspirators regarding Distributor-1's line of credit. Messrs. Fries and Brady, and Defendants 1, 4, 5, 6, 7, 9, and 10 did not participate.

13. In 2018, Mr. Brady conspired with Defendant 4 to fix the price for chicken products for QSR-1. Mr. Fries, and Defendants 1, 5, 6, 7, 8, 9, and 10 did not participate. Further, no Defendant conspires to fix any price in 2016 or 2017 as to any customer.

14. In 2018, Mr. Brady conspired with Defendants 5 and 10 to fix the 8-piece price of chicken for QSR-2 for 2018 and 2019. Mr. Fries, and Defendants 1, 4, 6, 7, 8, and 9 did not participate. Further, no Defendant conspires to fix any price in 2018 or 2019 as to any other product or customer.

These vague and unspecified allegations as to Messrs. Fries and Brady do not pass Constitutional muster as they fail to articulate an essential element of the crime: the nature of the illegal agreement. There is nothing inherently illegal, in the antitrust context or otherwise, in maintaining an ongoing network of chicken suppliers in the chicken industry to service the fast-food chicken industry, and to effectuate the ongoing chicken supply chain of those customers. Indeed, not only does the Superseding Indictment fail to allege the specifics of the illegal agreement, oddly, in a price fixing case, it similarly fails to allege the setting of specific – or even anticompetitive - chicken prices. Moreover, there is no indication of how and when each individual defendant entered into the alleged agreement. Instead, the government employs a scattershot approach wherein certain Defendants participate in certain episodes, over different time periods, with different customers (some of whom are not even customers of Claxton Poultry), and with different products, and different parts of a chicken, without even attempting to quilt together the incidents or allege how the Defendants' alleged objectives and/or conduct were interdependent.

B.  **Failure to allege a restraint on trade**

Nowhere in the Superseding Indictment does the government allege that Messrs. Fries or Brady intended to or actually did restrain trade, an essential element of the Sherman Act. The government merely implies that the communications participated in by Messrs. Fries and Brady somehow had the *effect* of restraining trade. Messrs. Fries and Brady are left to guess as to how exactly their alleged amorphous agreement restrained trade in the chicken industry. This is not sufficient.

As this Court is well aware, the mere exchange of pricing information is not *per se* illegal. As the Supreme Court explained in *Gypsum*, exchanges "of price data and other information among competitors do not invariably have anticompetitive effects" and "do not constitute a *per se* violation of the Sherman Act," precisely because they "can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." 438 U.S. 422, 441 n.16; *see also Mitchael*, 179 F.3d at 859 ("Mere exchanges of information, even regarding price, are not necessarily illegal"); *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 475 (10th Cir. 1990) ("[I]t is not unlawful for competitors to meet and exchange information necessary to preparation of a bid or . . . exchange information on independently derived prices.").[1] Similarly, parallel pricing—intentionally setting the same price as a competitor without an agreement to do so—is not *per se* unlawful. *See, e.g.*, *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993); *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988) (Breyer, J.) (noting near uniformity

---

[1] *See also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 124, 137 (3d Cir. 1999) (affirming holding that evidence of interseller price verification and parallel pricing did "not support an inference of a conspiracy to fix prices but portrayed nothing more than intense efforts on the part of three large and strong competing companies in the baby food industry to ascertain[] 'what their competitors would be doing with regard to pricing, promotions and products'").

9

among courts in concluding that parallel conduct without prior agreement is lawful).

Indeed, all the government really alleges is that "an understood purpose" of the so-called "continuing network" "was to suppress and eliminate competition through rigging bids and fixing prices and price-related terms …" Dkt. 101 ¶ 47; *see also Id.* ¶¶ 1, 2, 48. But that vague and conclusory language is insufficient - the government merely has repackaged with a flourish of synonyms the elements of a Sherman Act offense.

### C. Failure to establish Messrs. Fries and Brady knowingly joined the conspiracy

The Superseding Indictment overtly fails to allege when and how Messrs. Fries and Brady joined the alleged conspiracy and does not explicitly allege the "knowingly and intentionally" element of the charged offense. Defendants are left to assume that the government alleges that by participating in certain communications, it can be inferred that Messrs. Fries and Brady knowingly joined the alleged conspiracy. The mere fact of communicating does not establish, even circumstantially, that Messrs. Fries and Brady knowingly joined a conspiracy. Importantly, the Superseding Indictment does not provide evidence or factual allegations that Messrs. Fries and Brady were even aware of the "continuing network," let alone that they knowingly joined it and its illegal purposes. Normal business communications and practices cannot constitute circumstantial evidence of illegal intent in the absence of more specific allegations and/or evidence. Here, the government has failed to establish the requisite *mens rea* and the indictment is insufficient as a matter of law.

### IV.  CONCLUSION

For the foregoing reasons, Defendants Fries and Brady respectfully request that the Court dismiss the charges against them contained in the Superseding Indictment.

July 26, 2021

Respectfully Submitted,

s/ *Richard K. Kornfeld*

Richard K. Kornfeld
Recht Kornfeld, P.C.
1600 Stout Street, Suite 1400
Denver, CO  80202
303-573-1900
Fax: 303-446-9400
Email: rick@rklawpc.com
*Attorney for Defendant Mikell Reeve Fries*

s/ *Bryan B. Lavine*

Bryan B. Lavine
Troutman Pepper Hamilton Sanders LLP
600 Peachtree Street, N. E., Suite 3000
Atlanta, Georgia 30308
404-885-3170
Fax: 404-962-6613
Email: bryan.lavine@troutman.com
*Attorney for Defendant Scott James Brady*

### CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of July, 2021, I electronically filed the foregoing **DEFENDANTS MIKELL FRIES' AND SCOTT BRADY'S JOINT MOTION TO DISMISS SUPERSEDING INDICTMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

*s/ Erin Holweger*
Erin Holweger