IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.     JAYSON JEFFREY PENN,
2.     **MIKELL REEVE FRIES,**
3.     SCOTT JAMES BRADY,
4.     ROGER BORN AUSTIN,
5.     TIMOTHY R. MULRENIN,
6.     WILLIAM VINCENT KANTOLA,
7.     JIMMIE LEE LITTLE
8.     WILLIAM WADE LOVETTE,
9.     GARY BRIAN ROBERTS,
10.   RICKIE PATTERSON BLAKE,

      Defendants.

## DEFENDANT MIKELL FRIES' TRIAL BRIEF

Defendant Mikell Fries, by and through his counsel, respectfully submits his trial brief. Defendants have contemporaneously filed a Joint Trial Brief, and Mr. Fries incorporates those arguments herein by reference.

## INTRODUCTION

In the Superseding Indictment, the government alleges a sweeping and amorphous price fixing conspiracy between 2012 and 2019 involving numerous employees of broiler chicken product suppliers, including Defendant Mikell Fries. From 2004 to 2016, Mr. Fries was a sales manager at Claxton Poultry Farms ("Claxton"). In 2016, Mr. Fries became the President of

1

Claxton. Defendant Scott Brady is the National Accounts Sales Manager at Claxton. Mr. Brady started working at Claxton in 2012.

It is apparent that the Government's case against Mr. Fries is based on nothing more than scattered circumstantial evidence in the form of communications between employees of suppliers, the vast majority of which do not even involve Mr. Fries. While inferences can be made from circumstantial evidence, the Government's case will ask the jury to do more – to make inferences upon inferences, to the point that the jury will simply need to resort to conjecture regarding whether Mr. Fries knowingly and voluntarily agreed to join a vast, continuing network to fix prices. The Government will ask the jury to speculate that Mr. Brady operationally reported to Mr. Fries, and therefore, Mr. Fries must have been a participant in a conspiracy, despite an obvious lack of evidence proving the same.

In short, the purely circumstantial and attenuated nature of the Government's evidence will be insufficient to prove beyond a reasonable doubt that Mr. Fries knowingly entered a price fixing conspiracy or agreed to the same. It is well settled that a mere exchange of pricing information between competitors is perfectly legal absent an agreement to actually fix prices. Here, Mr. Fries' limited communications demonstrate nothing more than acceptable and economically justifiable business conduct.

This Trial Brief addresses key evidentiary issues and legal matters that Mr. Fries anticipates will arise during the trial.

## I.     MR. FRIES CANNOT BE CONVICTED FOR THE ACTIONS OF MR. BRADY.

Mr. Fries was a participant in only a small fraction of the communications that form the basis of the Government's case. It is apparent, therefore, that the Government will seek a determination from the jury that Mr. Fries is responsible for the conduct of Mr. Brady. The

Government has proposed a jury instruction that blurs the distinctions between the conduct of Mr. Fries and Mr. Brady. *See* Doc. 585, p.43 (a "person who is a manager or supervisor of a corporation is also responsible for the acts of his subordinates if he authorizes, encourages, directs, orders, or consents to the participation in the conspiracy of someone he manages or supervises").

In order to prove its case against Mr. Fries, the Government must show that he knowingly and intentionally entered an agreement with one or more individuals at different companies to unreasonably restrain trade through price fixing. The Government's proposed jury instruction would permit the jury to convict Mr. Fries without a finding that he <u>personally entered</u> into an agreement, had <u>personal knowledge</u> of an agreement, or <u>personally participated</u> in a conspiracy. This is inconsistent with the required elements for a conviction under the Sherman Act as well as Mr. Fries' due process rights. *See United States v. Record*, 873 F.2d 1363, 1368 (10th Cir. 1989) (for a conspiracy, it is "essential to determine that kind of agreement or understanding existed *as to each defendant*" (quotation omitted; emphasis added); *United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991) ("We are mindful to guard against the mass application of guilt when conspiracy charges are involved because guilt is always dependent on personal and individual conduct, not on mere association or unknowing involvement."); *United States v. Kendall*, 766 F.2d 1426, 1432 (10th Cir. 1985) (neither knowledge alone nor mere association with conspirators enough to convict of conspiracy); *United States v. McMahon*, 562 F.2d 1192, 1196 (10th Cir. 1977) ("Defendants may not be convicted of a conspiracy charge without proof of their knowledge of a conspiracy and their participation in it.").

The Government should not be permitted to invoke corporate hierarchy as a substitute for proving the elements of the crime that it has charged. The Court, therefore, should reject

3

attempts by the Government to skirt its burden of showing that Mr. Fries engaged in each element required for a conviction by contending that Mr. Fries is responsible for the conduct of Mr. Brady, or directed the same, without producing evidence of this theory.

## II. THE COURT SHOULD EXCLUDE CERTAIN EVIDENCE RELATED TO FIESTA RESTAURANT GROUP ("POLLO TROPICAL").

The Government has included Joseph Brink, the Chief Procurement Officer for Fiesta Restaurant Group, Inc. ("FRG"), on its witness list. As the Chief Procurement Officer, Mr. Brink was responsible for purchasing broiler chicken products for Pollo Tropical quick service restaurants ("QSRs"). "Pollo Tropical" is a brand name for FRG. Suppliers for FRG included Claxton and Mar-Jac Poultry, Inc. ("Mar-Jac"). FRG used Kelly Foods, Inc., a distributor, to deliver fresh chicken to its QSRs.

The Government may attempt to elicit testimony from Mr. Brink stating that: (1) pricing was "imperative" for Pollo Tropical customers; (2) following "horrendous price increases" from suppliers, Pollo Tropical received "pushback" from its customers regarding its prices; (3) FRG entered nondisclosure agreements with its suppliers; (4) it was "not acceptable" for suppliers to talk to each other; and (5) FRG did not permit its distributors to receive rebates from suppliers.

The Government has represented to the Court that it does not intend to introduce evidence of harm to end-use consumers. [*See* Doc. 603, at p.8]. Any testimony that pricing was "imperative" for Pollo Tropical customers, and that following price increases from suppliers, Pollo Tropical received "pushback" from its customers is inconsistent with this representation. As set forth in Defendants' Joint Motion In Limine To Exclude Evidence Of Consumer Loss Or Harm [Doc. 528], such evidence is irrelevant, unfairly prejudicial, and would violate Defendants' due process rights to confrontation and a fair trial.

4

Any evidence of a nondisclosure agreement between FRG and Claxton and any testimony from Mr. Brink that it was "not acceptable" for suppliers to talk to each other is irrelevant under Fed. R. Evid. 401 and would be unfairly prejudicial, cause confusion regarding the issues, mislead the jury, and cause undue delay and a waste of time under Fed. R. Evid. 403. It also would constitute unnoticed Fed. R. Evid. 404(b) other wrongs or acts evidence. The issue to be determined by the jury is whether the Defendants entered a conspiracy to fix prices for the sale of broiler chicken products, not whether Claxton breached a non-disclosure agreement with FRG. Testimony regarding any nondisclosure agreement, therefore, is entirely irrelevant to the issues in the case and would be unduly prejudicial and cause undue delay at trial.

Any such testimony also will confuse and mislead the jury regarding the elements of a conspiracy under the Sherman Act, resulting in unfair prejudice to Mr. Fries. Mr. Brink may testify that FRG's nondisclosure agreements "forbid" suppliers, including Claxton, from discussing Pollo "business matters" with any third parties. However, communications and meetings between competitors – even if those communications and meetings include discussions about common aims or objectives – are not sufficient to establish a defendant's illegal agreement under the Sherman Act. *See United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 475 (10th Cir. 1990). Any testimony by Mr. Brink that Claxton breached a nondisclosure agreement with FRG could lead the jury to believe that a breach of contract by Claxton resulted in an illegal agreement under the Sherman Act.

In addition, such testimony would constitute 404(b) other wrongs or acts evidence that has not been noticed by the Government. *See* Fed. R. Evid. 404(b)(3) (requiring notice of other wrongs or acts evidence). Nor would the testimony meet the requirements for admission of 404(b) evidence. For the reasons described above, it is entirely irrelevant to the issues in the

5

case, there is no proper purpose for its admission. Even if there was some probative value offered by the testimony, it would be substantially outweighed by its potential for unfair prejudice. *See U.S. v. Cushing*, 10 F.4th 1055, 1075 (10th Cir. 2021) (discussing requirements for admission of 404(b) evidence).

Mr. Brink may testify that FRG did not permit its distributors to receive rebates from suppliers. In addition, the Government has included CLAXTON_0022760 on its exhibit list. CLAXTON_0022760 is an August 27, 2015, email exchange between Mikell Fries and Chris Sharp from Kelly Foods which the Government included in its *James* document list (Document No. 213). In the email exchange, Mr. Sharp discusses a "small rebate" that Kelly Foods was receiving from Mar-Jac for deliveries to Pollo Tropical QSRs. This Court has already determined in its *James* Order that the Government failed to show that the statements in the Sharp/Fries email exchange were made in furtherance of a conspiracy. [Doc. 559, p.38].[1]

Moreover, in its October 7, 2021 Order, this Court ruled that evidence relating to theories of liability not charged in the superseding indictment would unfairly prejudice the Defendants. [Doc. 603, p.6]. The Government has not charged the Defendants with providing or receiving unlawful rebates or kickbacks. Any rebate that Kelly Foods received from Mar-Jac has absolutely nothing to do with Claxton or Mr. Fries (or any of the Defendants for that matter). Such evidence, therefore, is inadmissible because it is irrelevant, unfairly prejudicial, would be confusing and misleading to the jury, cause undue delay and a waste of time, and violate the Defendants' due process rights to a fair trial.[2]

---

[1] The Court also determined that Mr. Sharp joined the alleged conspiracy in October of 2016, after the date of the email exchange. *Id*. p.20.
[2] For the same reasons, MJPoultry-0000459942 (*James* Document No. 182), which relates to Mar-Jac rebates, should be excluded from evidence.

6

**III. THE COURT SHOULD EXCLUDE CERTAIN TESTIMONY OF GOVERNMENT WITNESS JAMES OLSON.**

The Government has included James Olson, the former CEO of Harman Management Corporation ("HMC"), on its witness list. Mr. Olson retired from his CEO position in 2016. According to Mr. Olson, HMC had financial interests in numerous Kentucky Fried Chicken ("KFC") franchises in the western United States and worked with a buyer representative, Restaurant Supply Chain Solutions ("RSCS"), for procurement of all products for HMC's KFC stores. The Government may attempt to elicit testimony from Mr. Olson stating that: (1) KFC customers are "price sensitive"; (2) "increasing [KFC's] menu price could result in lost customers"; and (3) "many" managers left KFC because of "lost income and low returns on stock" after suppliers raised prices in 2015.

Any testimony from Mr. Olson stating that KFC customers are "price sensitive" and that increasing KFC's menu prices "could result in lost customers" should be excluded because it relates to end-use customers and implies that customers were harmed by Defendants' alleged conduct. Moreover, as discussed above, the Government has represented to the Court that it does not intend to introduce evidence of harm to end-use consumers. [*See* Doc. 603, at p.8]. For the reasons set forth in Defendants' Joint Motion In Limine To Exclude Evidence Of Consumer Loss Or Harm [Doc. 528], end-use consumer evidence is irrelevant, unfairly prejudicial, and would violate Defendants' due process rights to confrontation and a fair trial. Any such testimony by Mr. Olson, therefore, should be excluded from evidence.

The Government may attempt to elicit testimony from Mr. Olson that "many" managers left KFC because suppliers raised their prices in 2015. The Court should exclude any such testimony under Fed. R. Evid. 401 and 403. Admission of such testimony would also violate the Defendants' due process rights to confrontation and a fair trial.

7

The Government has taken the position that alleged conduct of Defendants is a *per se* violation of the Sherman Act. [Doc. 415, p.12]. It has asserted that the jury can "condemn categorically price-fixing conspiracies among competitors as unlawful restraints *without further inquiry*." [Doc. 415, p.31] (emphasis added). Evidence regarding alleged harm to third party managers of QSRs, therefore, is irrelevant. Such testimony also would be unduly prejudicial, confusing, and misleading. Because third party harm is not an element of the charged offense, the testimony could only be designed to engender the sympathy of the jurors for the third party managers at the expense of a fair trial for the Defendants. The jury could be misled to believe that something illegal must have happened because managers left KFC QSRs as a result of broiler chicken pricing.

The Government also has not identified any of the managers who allegedly left KFC QSRs. The Defendants, therefore, have no practical way to rebut this remote and speculative claim of harm. Defendants have due process rights to confront witnesses and present a complete defense which would be violated by admitting such testimony. The Court, therefore, should exclude from evidence any third-party harm to KFC managers.

Respectfully submitted this 18th day of October, 2021,

        *s/ Richard K. Kornfeld*
        Richard K. Kornfeld
        RECHT KORNFELD, P.C.
        Attorney for Defendant Mikell Reeve Fries
        1600 Stout Street, Suite 1400
        Denver, Colorado 80202
        (303) 573-1900
        rick@rklawpc.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of October, 2021, I electronically filed the foregoing **Defendant Mikell Fries' Trial Brief** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.


*s/ Erin Holweger*
Erin Holweger