1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 20-CR-00152-PAB
3

UNITED STATES OF AMERICA,
4

     Plaintiff,
5

vs.
6

JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
   GAR BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12      Defendants

13 _____

                   REPORTER'S TRANSCRIPT
14                 Excerpt of Trial to Jury
              Testimony of Robert Bryant, Vol. 3
15 _____

16         Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 8:45 a.m., on the 3rd day of November,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A257, Denver, Colorado, 80294, (303) 335-2106

1                       APPEARANCES

2           Michael Koenig, Carolyn Sweeney, Heather Call and Paul

3   Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of

4   Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing

5   for Plaintiff.

6           Anna Tryon Pletcher and Michael Tubach of

7   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

8   San Francisco, CA 94111-3823;

9           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

10  N.W., Washingon, DC 20006, appearing for Defendant Penn.

11          David Beller, Richard Kornfeld and Kelly Page of

12  Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

13  CO 80202, appearing for Defendant Fries.

14          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,

15  LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

16           Laura Kuykendall and Megan Rahman of Troutman Pepper

17  Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,

18  appearing for Defendant Brady.

19          Michael Felberg of Reichman, Jorgensen, Lehman,

20  Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21  10017;

22

23

24

25

1    APPEARANCES (Continued)

2         Laura F. Carwile of Reichman, Jorgensen, Lehman,

3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4    CA 94065; appearing for Defendant Austin.

5         Elizabeth B. Prewitt of Latham & Watkins, LLP,

6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7         Marci Gilligan LaBranche of Stimson, Stancil,

8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9    80218, appearing for Defendant Mulrenin.

10        James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12        Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14        Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16        Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19        John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

1              APPEARANCES (Continued)

2              Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5              Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8              Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11             Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                     PROCEEDINGS

16        *THE COURT:*  We are back on the record in 20-152.  We

17   have Mr. Byrne back.  Good to see you, Mr. Byrne.  And we have

18   all of the defendants and counsel are present.  Anything to

19   take up before we begin?

20        *MR. KORNFELD:*  Just very briefly.

21        *THE COURT:*  Go ahead.

22        *MR. KORNFELD:*  Your Honor, at 8:31 this morning the

23   government filed Document 780 pertaining to the Markman notes.

24   It's effectively captioned as a notice of an alternative way to

25   try to get these notes in because under the Court's prior

1    ruling the government wasn't able to do so.  And I haven't had

2    time and I don't think any of my colleagues have had time to

3    digest it, but I would express some concern on behalf of

4    defendants of sort of a pattern.

5           I mean, this isn't captioned as a motion to

6    reconsider.  It effectively is.  At a certain point we are

7    relying, as is the government, on the Court's rulings to

8    fashion our presentation, to fashion our case and to do our

9    jobs on behalf of our respective clients.  So, you know, I

10   understand in a long trial all of us probably have a list of

11   rulings that we may respectfully disagree with the Court's

12   ruling, but you got to live with them.  And to paraphrase

13   former Defense Secretary Rumsfeld, you've got to fight with the

14   Army you have, not with the Army that you want.

15          So on behalf of defendants, I would just ask the Court

16   not to entertain what are effectively motions to reconsider,

17   particularly on in-court trial rulings that have been made.

18          THE COURT:  Well, I've been entertaining the numerous

19   motions from the defendants which are in effect motions for

20   reconsideration, so I don't know why I would all of the sudden

21   stop.  I don't know what 730 is.  It's a motion?

22          MR. KORNFELD:  It's 780 and it's captioned as a

23   notice.

24          THE COURT:  I don't know.  I haven't seen it.

25          MR. KORNFELD:  I am not asking for relief.  I am just

1   expressing I think on behalf of all of us some concern about

2   this and just alerting the Court to that concern.

3           THE COURT:  Okay.  Well, we'll see.

4           MS. PREWITT:  Your Honor, just to add to that -- thank

5   you -- for Mr. Mulrenin, as part of that motion, I skimmed

6   through it very quickly they are attempting to elicit testimony

7   from the agent in connection with their attempt to, you know,

8   to authenticate Exhibit No. 1030.  Now, that is a witness that

9   we understand will be testifying on direct today possibly.  In

10  addition to all the changes in exhibits that we've been seeing

11  over the last several days, this is something that defendants

12  are concerned about.

13          THE COURT:  Okay.  Is it handwriting authentication?

14  Sorry, that was a question to Mr. Koenig.  Mr. Koenig, what is

15  the testimony going to be?

16          MR. KOENIG:  Actually, Ms. Call is probably --

17          THE COURT:  Sorry.  Ms. Call, go ahead.

18          MS. CALL:  Yes, Your Honor.  I believe all the notice

19  said is it would be offered into evidence during the testimony

20  of the agent.  There will be no handwriting analysis.  The

21  government's intention is to offer it as just a document that

22  was provided by Mar-Jac, a document of Mar-Jac as you will see

23  when you do see the notice, but we don't intend to offer proof

24  through the agent that this is actually handwriting of Pete

25  Martin necessarily.  It's essentially an unknown

Robert Bryant - Cross

1  co-conspirator.

2         MR. TUBACH:  Briefly, we just got a few minutes ago I

3  think a 10-page filing.  It's also been the subject of some

4  briefing already.  Before any agent testifies about this, we

5  would like an opportunity to respond.  We are be happy to do so

6  in writing.  I have someone already working on a response, but

7  obviously it was filed 10 minutes ago.

8         THE COURT:  It's premature to take up right now.

9         MR. TUBACH:  Thank you.

10         THE COURT:  Let's bring the jury in.

11         (Jury present.)

12         THE COURT:  Good morning, ladies and gentlemen.  I

13  guess a couple of you had some traffic issues.  I suppose

14  that's not all together uncommon.  As you will recall, we were

15  perhaps almost finished with Mr. Kornfeld's cross-examination,

16  so we will do that now.  Mr. Kornfeld, go ahead.

17         MR. KORNFELD:  Thank you, Your Honor.

18      (**Robert Bryant** was previously sworn.)

19                    **CROSS-EXAMINATION CONTINUED**

20  BY MR. KORNFELD:

21  Q.  Good morning, Mr. Bryant.

22  A.  Good morning.

23  Q.  Sir, you were asked I think both on your direct examination

24  by the government and also perhaps by Mr. Feldberg and maybe

25  others about your understanding that the Federal Government,

Robert Bryant - Cross

1   the Department of Justice, is not intending to prosecute you.

2   Do you recall those general questions?

3   *A.*   Yes.

4   *Q.*   And it is true, is it not, that that is your understanding;

5   i.e., the folks sitting at this table or any of their

6   colleagues at the Department of Justice are not going to

7   prosecute you.

8   *A.*   Not that I'm aware of.

9   *Q.*   Okay.  And they are not going to prosecute you for anything

10  to and including your admission under oath in this courtroom

11  that you lied to them on numerous occasions; isn't that true?

12  *A.*   That's my understanding.

13  *Q.*   And I think you -- well, you understand that the Department

14  of Justice, including counsel to my right, these are the folks

15  that could set that in motion, correct?

16  *A.*   I believe so.

17  *Q.*   And, in fact, you also understand that they are not shy,

18  the Department of Justice is not shy about prosecuting people

19  for lying to them.

20          *MR. KOENIG:*  Objection.

21          *THE COURT:*  Sustained.  No foundation.

22  *BY MR. KORNFELD:*

23  *Q.*   Sir, I think you testified on cross-examination that you

24  understand that Mr. Little is charged with lying to the Federal

25  Government, correct?

Robert Bryant - Cross

1   *A.*  I don't know the foundation for that.  I know he has an

2   additional charge.  I don't know what led to that charge.

3   *Q.*  Fair enough.  But when you met with the government at least

4   at the beginning of the 20 or so times you met with them, it's

5   true, is it not, that they informed you that lying to a federal

6   agent or lying to a federal prosecutor is, in fact, a federal

7   crime, correct?

8   *A.*  I believe they did.

9   *Q.*  And so you would agree with me that the folks that informed

10  you of that fact, that it is a federal crime to lie to the

11  government, are the very people that could initiate the process

12  of prosecuting you for the felony that you have admitted to

13  under oath in this courtroom; isn't that right?

14  *A.*  I don't know that process myself.  I understand that they

15  have judgment in those matters.

16  *Q.*  All right.  Well, you don't want to be charged maybe at the

17  risk of stating the obvious, do you?

18  *A.*  I would prefer not to be charged.

19  *Q.*  You don't want to go to jail, do you?

20  *A.*  I would prefer not to go to jail.

21  *Q.*  And you do not want to have a felony on your record, do

22  you?

23  *A.*  I would prefer not to have a felony on my record.

24  *Q.*  And most fundamentally you would prefer to be sitting in

25  the seat you're sitting in rather than at the defense table;

Robert Bryant - Cross

1   isn't that right?

2   *A.*   That's correct.

3   *Q.*   All right.   Now, sir, it's true, is it not, that you have

4   no personal knowledge that Mr. Fries, my client, exchanged

5   pricing information with any other supplier; isn't that right?

6   *A.*   That's correct.

7   *Q.*   And it's similarly correct, is it not, that you have no

8   personal knowledge that Mr. Fries entered into an agreement to

9   rig bids or fix prices; isn't that right?

10  *A.*   That's correct.

11  *Q.*   And it's similarly correct, is it not, you have no personal

12  knowledge that Mr. Fries told anyone else to enter into an

13  agreement to rig bids or fix prices.

14  *A.*   That's correct.

15  *Q.*   And, sir, you have no personal knowledge, do you, that

16  Mr. Fries knew of anyone rigging bids or fixing prices; isn't

17  that correct?

18  *A.*   That's correct.

19          *MR. KORNFELD:*   Thank you, sir.

20          Nothing further, Your Honor.

21          *THE COURT:*   Thank you, Mr. Kornfeld.

22          Additional cross?

23          Yes, Mr. Gillen.

24                        **CROSS-EXAMINATION**

25  *BY MR. GILLEN:*

441

Robert Bryant - Cross

1    Q.   Good morning.

2    A.   Good morning.

3    Q.   I represent Mr. Brian Roberts.   Just a few questions.

4         On direct and also on cross you talked about being in

5    a room or an office of Mr. Austin and listening to telephone

6    calls.

7    A.   That's correct.

8    Q.   His side of the telephone call.   You couldn't hear what was

9    said on the other side, correct?

10   A.   Correct.

11   Q.   Now, to be clear you were not present in any room listening

12   to anybody talk to anyone from Tyson, correct?

13   A.   Not that I can remember.

14   Q.   Not that you can remember.   You never sat in a room whether

15   it was Mr. Austin or anybody else listening to somebody talk

16   from Tyson, correct?

17   A.   Not that I can recall.

18   Q.   Now, you also indicated on direct examination that you had

19   a conversation with Jason McGuire, correct, about the 2014

20   negotiations for Kentucky Fried Chicken.

21   A.   That's correct.

22   Q.   Now, in that you said that Mr. McGuire indicated to you

23   that the competitors of the companies were going to be raising

24   their prices, something to that effect, correct?

25   A.   Yes, something to that effect, yes.

Robert Bryant - Cross

1   Q.  Now, what he did not say to you is he did not name any

2   specific companies, did he?

3   A.  I don't recall him giving me a list of names, no.

4   Q.  So there were no specific names of any other suppliers

5   stated by Mr. McGuire to indicate to you that they were going

6   to be raising their prices, correct?

7   A.  Not that I can remember, no.

8   Q.  Okay.  In addition, during your examination you were asked

9   about the Otis strategy, correct?

10  A.  I was, yes.

11  Q.  And the Otis strategy is a strategy -- first of all, the

12  Otis is Tyson, right?

13  A.  Not necessarily Tyson.  It turned out to be Tyson quite a

14  bit of times, but it was not just -- in my opinion it was not

15  just one company, no.

16  Q.  Not exclusive to Tyson, but it turned out, as you say just

17  a moment ago, that it happened to be Tyson on many occasions,

18  correct?

19  A.  That's correct.

20  Q.  And when you talk about the Otis strategy, what you're

21  talking about is that Pilgrim's was upset that competitors like

22  Tyson would take away some business from them by selling

23  chicken more cheaply and then need help to try to cover their

24  loads, right?

25  A.  Not exactly, no.  I mean, that could be one scenario, but

Robert Bryant - Cross

1    in general it was like I said yesterday that if a customer was

2    short, not to fill in the short, just try to convert the

3    business to us.

4    Q.   Okay.  But a subset of that would be, for example, if Tyson

5    took away -- and I believe on cross-examination you went over a

6    number of companies where in some instances Tyson had taken

7    business away from Pilgrim's and others where Pilgrim's had

8    taken business away from Tyson, correct?

9    A.   That's correct.

10   Q.   So the ongoing competition between Tyson and Pilgrim's

11   where Tyson is trying to take business from Pilgrim's and

12   Pilgrim's is trying to take business from Tyson, that's what

13   you were talking about, correct?

14   A.   The Otis strategy, it was more -- like I say, it was more

15   about shortages, right, not filling in the shortage and trying

16   to convert business.

17   Q.   Going back to my question, my question was yesterday when

18   you talked about the ongoing relationship between Tyson and

19   Pilgrim's, there would be a situation where in some instances

20   Tyson is taking away business from Pilgrim's and Pilgrim's is

21   taking away business from Tyson; yes or no?

22   A.   That would be correct.

23   Q.   Okay.  And so in that situation what Pilgrim's wanted to do

24   if someone had taken their business away, the last thing in the

25   world they wanted to do was to help them out by selling them

444

Robert Bryant - Cross

1  some truckloads to help them over shorts, correct?  That's

2  fair, isn't it?

3  A.  Most of the time businesses converted service and quality

4  which shortage would fall into that or price.  So if you don't

5  fill in on a shortage, then there is a higher probability you

6  could convert that business.

7  Q.  Yeah.  So the bottom line is that in plain English that

8  would be, hey, we're not going to help them out because we want

9  to end up taking that client back or taking it over, correct?

10  A.  That's correct.

11  Q.  And that's called competition, isn't it?

12  A.  Yes.

13  Q.  Last question.  Were you aware -- you talked about the 2017

14  Kentucky Fried Chicken negotiation.  Remember that?

15  A.  Yes.

16  Q.  Now, were you aware that Brian Roberts left Tyson in

17  February of 2016?

18  A.  I'm not aware of when he left.

19          MR. KOENIG:  Objection.

20          MR. GILLEN:  That's all I have, Your Honor.

21          THE COURT:  Thank you, Mr. Gillen.

22          Any additional cross?

23          Redirect?

24          MR. KOENIG:  Your Honor, may we have a brief side bar?

25          THE COURT:  You may.

Robert Bryant - Cross

1    (At the bench:)

2         THE COURT:  Can you hear me, Mr. Koenig?

3         MR. KOENIG:  Yes.

4         THE COURT:  Go ahead.

5         MR. KOENIG:  Your Honor, it's the government's

6    position that Mr. Kornfeld yesterday opened the door to

7    inquiries into some of the litigation events that were going on

8    in 2017.  In particular he elicited from Mr. Bryant testimony

9    that there were other things going on that may have contributed

10   to the -- what I think he said was essentially, you know, why

11   things in 2017 weren't going as well as they had in 2014.  And

12   Mr. Bryant said, well, there were other things, but I don't

13   think I can talk about those.  And so now that's sitting there

14   on the record without any explanation and without the United

15   States being able to rebut.

16        And what I would propose is not necessarily to bring

17   up any civil litigation, but just be able to ask him if there

18   had been -- if there came a time in 2017 where there was

19   increased scrutiny.  And it would help explain, you know, not

20   only it would help explain the no comp names in e-mail --

21        THE COURT:  I am sorry, the what in e-mail?

22        MR. KOENIG:  The text message where Tim Stiller said

23   to Robbie Bryant no comp names, competitor names in e-mails,

24   and that the reason for that was the increased scrutiny.  We

25   had stayed away from that earlier because of Your Honor's

Robert Bryant - Cross

1    rulings, but now that Mr. Feldberg has elicited testimony that,

2    you know, essentially there was other things happening during

3    the time frame that Mr. Bryant said he couldn't talk about, we

4    think it only be fair that we be able to mention there was some

5    increased scrutiny in that time frame and that's why they had

6    to start being more careful.

7         THE COURT:  Okay.  Did you identify those questions as

8    coming from Mr. Feldberg or Mr. Kornfeld?

9         MR. KOENIG:  Mr. Feldberg.

10        THE COURT:  Oh, okay.  Mr. Feldberg, response?

11        MR. FELDBERG:  Your Honor, respectfully, I don't

12   recall asking questions that elicited testimony about other

13   things happening in 2017 that would create any opening.  I

14   don't have the transcript fully digested in my head, but if

15   there is a particular question and answer that counsel can

16   identify, I would be happy to look at it, but at this point I

17   can't identify anything that would open the door to that kind

18   of inquiry.

19        THE COURT:  Well, here is my comment, and that is I

20   can vaguely recall something to that effect.  But despite my

21   vague recollection even with your description, Mr. Koenig, it's

22   so subtle, I just don't think that it would -- the jury would

23   have understood it in any way to cause prejudice to the United

24   States.

25             Moreover, your suggestion about being able to go into

Robert Bryant - Cross

1    it I think would then cause the jury to speculate about, you

2    know, exactly what was going on.  In short, I don't see any

3    prejudice to the United States by Mr. Bryant's answer.  I don't

4    see any prejudice to the United States from the question, but I

5    think that we would be opening up a can of worms were you to

6    attempt to clarify that.  And moreover, I'm just not sure that

7    the witness would really know what he could say in response.

8    And there is a real danger that he might go into something that

9    would then cause greater problems, so I will reject the notion

10   that the door has been opened.

11           Anything else?

12           MR. KOENIG:  If I may, Your Honor, can we have an

13   opportunity to just perhaps bring to you an application to sort

14   of limit what the defendants are able to do with that on, say,

15   closing pointing out that he said that there were other things,

16   but he never answered the question or he never explained that

17   further?

18           THE COURT:  If anyone had time in closing to talk

19   about that, I think that they would have totally lost track of

20   the fundamentals of persuasion because it would be a confusing

21   off point attempt to make something out of nothing, so I think

22   that the probability of that is very low.

23           MR. KOENIG:  Okay.  Well, very well, Your Honor.

24           THE COURT:  I mean, we'll see if it happens and if it

25   does -- but it would be just such a slim read to hang anything

Robert Bryant - Cross

1   on.

2       (In open court:)

3   BY MR. KOENIG:

4   Q.  Good morning, Mr. Bryant.

5   A.  Good morning.

6   Q.  Mr. Bryant, do you recall yesterday being asked about your

7   handwritten notes in a government exhibit?

8   A.  I do.

9   Q.  And that was government Exhibit 1919.  Do you remember

10  that?

11  A.  I don't remember the exhibit number, but I do remember

12  my -- my notes.

13  Q.  Okay.  Do you recall being asked if those were actually --

14  well, what did you say that those notes represented?

15  A.  Those notes represented what I -- what I thought were

16  future bids.

17       MR. KOENIG:  Can we please bring up 1919?  Permission

18  to publish Page 12 to the jury?

19       THE COURT:  You may.

20       MR. KOENIG:  Ms. Pearce, if you could just blow up the

21  bottom.

22  BY MR. KOENIG:

23  Q.  All right.  If you could just remind the jury what you

24  believed to be future pricing.

25  A.  Yes.  I believe this to be future pricing for the 2017 bid.

Robert Bryant - Cross

1  Q.  Okay.  Do you recall being asked if those were actually the

2  Pilgrim's competitors' current prices?

3  A.  I do.

4  Q.  Now, is there another example from around this time frame

5  where price information that you exchanged with a competitor

6  could not possibly have been competitor -- or, I mean, current

7  pricing information?

8       MR. TUBACH:  Objection, leading and beyond the scope

9  of cross-examination, Your Honor.

10      THE COURT:  Overruled.

11 BY MR. KOENIG:

12 Q.  Let me point you -- what information was exchanged in the

13 Mar-Jac, US Foods conduct that we talked about?

14 A.  That was future pricing.

15 Q.  Why do you know it was future pricing?

16 A.  Because at the time we hadn't submitted the pricing to US

17 Foods.  And I was -- I do not think US Foods was even aware we

18 were going to ask for a price increase at that time.

19 Q.  And what was the nature of the information exchanged?  Was

20 it an absolute price or was it a price increase?

21 A.  It was a price increase and it was a range, so to speak,

22 not an exact price.  A similar price I think is the word that

23 was used.

24 Q.  Right.  So you didn't actually exchange the current pricing

25 with Mar-Jac.

Robert Bryant - Cross

1          *MR. TUBACH:*  Leading, Your Honor.

2          *THE COURT:*  Sustained.

3     *BY MR. KOENIG:*

4     *Q.*  Is that the extent of what was exchanged?

5     *A.*  Yes.  It was just the items and the amount of increase that

6     we were seeking.

7     *Q.*  Thank you.  And again that's future pricing?

8     *A.*  That's correct.

9     *Q.*  Even if -- going back to 1919, Page 12, did you have an

10    understanding of whether current prices could help in

11    formulating Pilgrim's price bid submissions?

12    *A.*  Yes.

13    *Q.*  What was that -- what was the basis for your understanding?

14    *A.*  I had seen that information before and how those -- that

15    information could be used to know if you were behind a

16    competitor or ahead of a competitor.

17    *Q.*  All right.  So if you could just explain to the jury what's

18    your understanding how current pricing of the competition could

19    help formulate your bid.

20    *A.*  If you know, for instance, that your price was a nickel

21    behind your competitor's price, then when the bid came due and

22    say market conditions were stagnant, like there is not an

23    increase really sought, I mean, in theory you could raise your

24    price equal to your competitor's and still be equal without

25    losing business.  On the other side, if you were higher than,

451

Robert Bryant - Cross

1    you know that you could be at risk and you may want to offer a

2    little bit of a price decrease to protect business.

3    Q.  All right.  And I believe you testified earlier that in the

4    2017 time frame the agreement between competitors was to limit

5    the downside.

6    A.  That's correct.

7    Q.  Okay.  And would exchange of current pricing information

8    have facilitated that agreement?

9    A.  It could help.

10   Q.  And help -- just to be clear, help resist together going

11   down in price?

12          MR. FELDBERG:  Objection, leading.

13          THE COURT:  Sustained.

14   BY MR. KOENIG:

15   Q.  Mr. Bryant, do you recall saying that you were testifying

16   here under an agreement where you will not be prosecuted?

17   A.  I do.

18   Q.  Have you read that agreement?

19   A.  I have.  It's been some time ago, but yes, I have.

20   Q.  All right.

21          MR. KOENIG:  Your Honor, permission to hand Mr. Bryant

22   through your clerk --

23          THE COURT:  Yes, you may.

24          MR. KOENIG:  Could we pull up Exhibit 9671, not for

25   publication to the jury?

Robert Bryant - Cross

1   *BY MR. KOENIG:*

2   *Q.* If you could just take a minute to read through it,

3   Mr. Bryant.

4   *A.* Okay.

5   *Q.* Do you recognize the text on Government Exhibit 9671?

6   *A.* Yes.

7   *Q.* What is it?

8   *A.* It's basically the cooperation agreement that I have with

9   the government.

10          *MR. KOENIG:* All right. The government would then

11  offer 9671 into evidence?

12          *THE COURT:* Any objection to the admission of

13  Exhibit 9671? Mr. Feldberg?

14          *MR. FELDBERG:* Can I have a moment, Your Honor?

15          *THE COURT:* You may.

16          *MR. FELDBERG:* No objection, Your Honor.

17          *THE COURT:* Exhibit 9671 will be admitted.

18          *MR. KOENIG:* Permission to publish to the jury?

19          *THE COURT:* You may. And that's a multi-page exhibit,

20  right?

21          *MR. KOENIG:* Yes.

22          *THE COURT:* All right. Go ahead.

23  *BY MR. KOENIG:*

24  *Q.* Could I draw your attention to Paragraph 1(d)?

25  *A.* Okay.

Robert Bryant - Cross

1   Q.  All right.  What is your understanding --

2         MR. KOENIG:  Actually, can we first go to the intro to

3   Paragraph 1, the very top, and starting with the testimony?

4   There you go.

5   BY MR. KOENIG:

6   Q.  All right.  If you could please read that to the jury.

7   A.  The testimony of Robert Bryant is pursuant to the following

8   terms of immunity:  The full, truthful and continuing

9   cooperation of Bryant will be subject to the procedures and

10  protections of this paragraph, and will include, but not be

11  limited to:

12  Q.  Now please look at Paragraph (d).  That's a fairly long

13  sentence, but what is your understanding of Paragraph (d)?

14  A.  That I need to comply with the Department of Justice or the

15  United States Government in their efforts to prosecute this

16  case, and that in doing so I need to be truthful and honest and

17  bring forth even things that they haven't asked me about.

18  Q.  And what is -- well, let's go to now Paragraph 2 and the

19  first sentence of Paragraph 2, just so you see where it says:

20  The United States agrees to the following?

21  A.  I do.  Do you want me to read that sentence?

22  Q.  Yes, please, 2(a), yes.

23  A.  The United States agrees that it will not bring criminal

24  charges against Bryant for any act or offense committed before

25  the date of this signature of this agreement and while Bryant

Robert Bryant - Cross

1    was acting as director, officer, or employee of Pilgrim's Pride

2    Corporation that was undertaken in furtherance of an antitrust

3    conspiracy involving the sale of broiler chicken products in

4    the United States.

5    Q.   Now let's look at Paragraph (b).  Could you read that,

6    please?

7    A.   If Bryant fails to comply fully with his obligations under

8    Paragraph 1, then the terms of this agreement and the agreement

9    not to prosecute Bryant granted in this agreement will be

10   rendered void, and the United States may prosecute Bryant

11   criminally for any federal crime of which the United States has

12   knowledge, including, but not limited to, any relevant offense.

13   Q.   What is your understanding of those two paragraphs?

14   A.   If I don't fully cooperate, that this agreement would be

15   void.

16   Q.   And what could happen as a result?

17   A.   Then the United States could choose to indict and charge me

18   for any offense that they have knowledge of.

19   Q.   And is part of your obligation to testify truthfully at

20   this trial?

21   A.   It is.

22   Q.   So it's your understanding you could be prosecuted if you

23   don't testify truthfully at this trial.

24   A.   That's correct.

25   Q.   Thank you.  Do you recall testifying I believe it was

455

Robert Bryant - Cross

1   yesterday that Pilgrim's and its competitors had an agreement

2   in 2014 to raise prices?

3   A.   Yes.

4   Q.   And do you recall saying that George's was one of those

5   competitors?

6   A.   Yes.

7   Q.   Mar-Jac?

8   A.   Yes.

9   Q.   Claxton?

10  A.   Yes.

11  Q.   Koch?

12  A.   Yes.

13  Q.   Pilgrim's?

14  A.   Yes.

15  Q.   Do you recall that you left Tyson out of the list?

16  A.   I did not recall that.

17  Q.   If you did leave Tyson out, was that intentional?

18  A.   No, it was not intentional.

19          MR. GILLEN:   Objection, Your Honor, leading.  Move to

20  strike his answer.

21          THE COURT:   Sustained as to leading.  The jury is

22  instructed to ignore that last answer.

23          You can reask the question.

24  BY MR. KOENIG:

25  Q.   So what was your understanding of the competitors that had

Robert Bryant - Cross

1   an agreement that you testified to in 2014 to raise prices to

2   KFC?

3           MR. GILLEN:  Objection, Your Honor, as to his

4   understanding.  He gave his testimony about what he heard,

5   period, and we would object to his "understanding."

6           THE COURT:  Overruled.  He can answer.

7   A.  So, I mean, I made that list several times and, you know,

8   it's several names and I tried to repeat those, but obviously

9   Tyson, George's, Koch, Claxton, Mar-Jac, Pilgrim's.  You know,

10  I don't have that list in front of me, but I can recite those

11  names, but, you know, I did view those, all those as

12  competitors.

13  BY MR. KOENIG:

14  Q.  And as part of the agreement in 2014?

15          MR. FELDBERG:  Objection, leading.  He just testified

16  he viewed them all as competitors.

17          THE COURT:  Sustained.  If you can ask a new question.

18  BY MR. KOENIG:

19  Q.  Of those competitors you just named, which ones were part

20  of the 2014 agreement to raise prices to KFC?

21  A.  All of those.

22  Q.  Thank you.  Do you recall yesterday defense counsel asking

23  you about plant conversions?

24  A.  I do.

25  Q.  And to be clear, were you testifying about two different

Robert Bryant - Cross

1   plant conversions?

2   A.  Yes, that was two different plant conversions yesterday.

3   Q.  And I guess regardless of whether there were any confusion

4   over which plant conversion you were talking about, was there

5   any real dispute about the fact that there were supply issues

6   in 2014?

7   A.  There were definitely supply issues in 2014.

8   Q.  And what was Pilgrim's and its competitors doing with those

9   supply issues?  How was it using those with respect to

10  customers?

11  A.  Using it to --

12      MS. HENRY:  Objection, lack of foundation with regard

13  to the competitors.

14      THE COURT:  Overruled both.

15  A.  We were using those to -- the supply issues were part of

16  our justification to increase prices.

17  BY MR. KOENIG:

18  Q.  Okay.  And I believe you testified if you recall that you

19  believed some price increase was warranted.

20  A.  That's correct, yes.

21  Q.  But yet you also testified that you were nervous about the

22  price increases that you were requesting, right?

23  A.  That's correct, yes.

24  Q.  And why was that?

25  A.  Because I had not seen a price increase that large before

Robert Bryant - Cross

1    and I was concerned we were going to lose business.

2    Q.   Okay.  And how -- so just if you could explain to the jury

3    the -- how it is that you thought there was a justification for

4    some price increase, but not -- but you were concerned about

5    the size of this one at the same time.

6         MR. TUBACH:  Asked and answered multiple times.

7         THE COURT:  Overruled.

8    A.   Like I said before, I was monitoring pricing and, you know,

9    before I got into that divisional role and seeing the pricing

10   change year to year and just not seeing a price increase this

11   large and was -- initially I was concerned that the industry or

12   all of our competitors wouldn't do a similar price increase,

13   and if we asked for one that large, that we would lose business

14   and not be in a very good shape.

15   BY MR. KOENIG:

16   Q.   Okay.  Can you remind the jury, what was the size price

17   increase you were going after?

18   A.   It was between 15 and 20 cents.

19   Q.   And that was in conjunction with the competition as well.

20   A.   That's correct, yes.

21   Q.   With the supply issues that you believed existed, what size

22   price increase approximately did you think would be warranted?

23        MR. TUBACH:  Objection, lacks foundation, calls for

24   speculation.

25        THE COURT:  Overruled.  He has got foundation and

459

Robert Bryant - Cross

1   basis for knowledge.  Go ahead.

2   *A.*  You know, in the past what I had seen was price increases

3   of a few cents up or down.  And if my manager would have told

4   me that he was seeking a nickel price increase, I wouldn't have

5   been concerned.  I would have felt like he could have gotten

6   that done fairly easily.

7   *BY MR. KOENIG:*

8   *Q.*  Okay.  So could you explain -- could you explain how you

9   were using market conditions to get what you described as a

10  historic price increase?

11  *A.*  You know, we've talked a lot about supply and demand and

12  supply is one side of that.  And just because supply decreases,

13  that doesn't necessarily warrant a price increase because if

14  demand matches, then the supply chain is still in balance.  But

15  this particular year there was a supply crunch, but there was

16  also demand that goes along with it.  So there were shortages.

17  When your customer feels those shortages, then they know that

18  there is a supply problem.  We have talked a lot about

19  shortages, so they actually felt that supply crunch in 2014.

20  *Q.*  But you said you were worried, though, that the price

21  increase wasn't -- of that magnitude wasn't warranted?

22          *MR. FELDBERG:*  Objection, leading.

23          *THE COURT:*  Overruled.

24          *MR. KORNFELD:*  Your Honor, a separate objection is

25  this is beyond -- this isn't redirect.  This is putting in

Robert Bryant - Cross

1   direct testimony again.  We're just rehashing the same stuff

2   over and over.  I don't even know what this pertains to in the

3   cross-examination.

4        THE COURT:  That objection is overruled as well.

5   A.  Can you ask it again?  Sorry.

6        MR. KOENIG:  There were a number of objections.  I

7   can't remember exactly how I phrased it.  Could it be read

8   back?

9        (The record was read by the court reporter.)

10  A.  That's correct.

11  BY MR. KOENIG:

12  Q.  Did you have an understanding as to whether Pilgrim's and

13  competitors were taking advantage of the market conditions to

14  get the historic price increases?

15  A.  I don't know if -- if we were or not, I don't know that.  I

16  know it was discussed internally with Pilgrim's.

17  Q.  What was discussed?

18  A.  That the shortages to the customers were a good thing for

19  us helping to get those price increases.

20  Q.  Thank you, Mr. Bryant.

21        Do you recall defense counsel showing you what they

22  had characterized as excerpts of writeups from a few of the

23  interviews you had with the government?

24  A.  I recall that, yeah.

25  Q.  And do you recall having a document put in front of you and

461

Robert Bryant - Cross

1   being asked questions about an interview that occurred on

2   September 8th, 2021?

3   *A.* I remember the document being put in front of me and some

4   questions about it, yes.

5   *Q.* About the interview on that date?

6   *A.* Yes.

7   *Q.* If you recall, and I know you didn't probably have a stop

8   watch going, but about how long was that interview?

9   *A.* I don't remember.

10  *Q.* How long were your typical interviews?

11  *A.* One hour to two hours.

12          *MR. KOENIG:* Okay. I don't have this on our screen,

13  but can we pull up the defense exhibit that you were shown, not

14  for publication to the jury. I believe it was defense Exhibit

15  H-753? Is that something you can pull up? I am asking Your

16  Honor, could one of the defendants pull it up?

17          *THE COURT:* It's here. It's been pulled up.

18          *MR. KOENIG:* Oh, there it is.

19  *BY MR. KOENIG:*

20  *Q.* All right. Can you take a look at Defense Exhibit H-753,

21  please?

22          *MR. POLLACK:* Your Honor?

23          *THE COURT:* Yes.

24          *MR. POLLACK:* I am going to object. There has been no

25  lack of recollection. There is no reason to be showing this

Robert Bryant - Cross

 1   document to the witness.  There is not a pending question.

 2           THE COURT:  Response?

 3           MR. KOENIG:  I am just establishing what he was shown.

 4   And I think this goes to the completeness objection that we

 5   raised yesterday and Your Honor I believe said that, you know,

 6   that's basically in essence what redirect was for.

 7           THE COURT:  He can be shown it pursuant to 613 in

 8   order to bring out whether it was a prior statement of his.

 9   Overruled.

10           MR. KOENIG:  All right.  Thank you.

11           And can we go to the second page?

12   BY MR. KOENIG:

13   Q.  All right.  Do you see that, Mr. Bryant?

14   A.  I do.

15   Q.  How many sentences would you say are on that page?

16   A.  Five.

17   Q.  All right.  And do those five sentences recap the sum and

18   substance of what you said in your two-hour interview?

19           MR. POLLACK:  Objection, Your Honor.  Can we have a

20   side bar?

21           THE COURT:  Yes.

22           Mr. Pollack, can you hear me?

23      (At the bench:)

24           THE COURT:  Mr. Pollack, can you hear me?

25           MR. POLLACK:  I can, Your Honor.

1          THE COURT:  Mr. Koenig?  Can you hear me, Mr. Koenig?

2     I can't hear you.

3          MR. KOENIG:  Yes.

4          THE COURT:  Mr. Pollack, go ahead.

5          MR. POLLACK:  Your Honor, this document is not in

6     evidence.  It wasn't shown to the jury.  I think that

7     Mr. Koenig can certainly ask Mr. Bryant did you also say the

8     following in the interview, but the number of sentences that

9     are on a document that's not in evidence just strikes me as

10    wholly irrelevant and improper examination.

11         THE COURT:  Mr. Koenig, response?

12         MR. KOENIG:  Well, I think that the fact that there

13    was a one or two-hour interview and they showed him a selection

14    of five sentences goes to the issue of completeness.  It really

15    shows that there was an attempt to get Mr. Bryant to say

16    something that he really didn't say.

17         THE COURT:  Yeah, I agree with Mr. Pollack.  While a

18    document like this could be used perhaps to point out to the

19    witness that what was recounted to him on cross is somehow

20    inaccurate or it wasn't -- what he didn't say, the fact that a

21    memo is long or he made statements is too far afield.  And as a

22    result, he shouldn't be shown a document for that purpose.  It

23    would really only be to clarify some statement that he

24    allegedly made and was suggested on cross-examination that he

25    did make, but that perhaps the document itself would help the

Robert Bryant - Cross

1    witness recall that he didn't say it.  But your question did

2    not go to that issue, all right?

3            MR. KOENIG:  Thank you, Your Honor.

4         (In open court:)

5            THE COURT:  The objection will be sustained.

6            MR. KOENIG:  Your Honor, may I pass up for Ms. Grimm

7    Government Exhibit 9635?

8            THE COURT:  9635?

9            MR. KOENIG:  Yes.

10            THE COURT:  Yeah.

11   BY MR. KOENIG:

12   Q.  All right, Mr. Bryant.  No need to look through it right

13   now at this point.  Do you recall yesterday being asked by

14   defense counsel whether you had said in this interview that

15   competitors discussed and knew what consensus prior -- I am

16   sorry.  I got lost on my lines here.  Do you recall being asked

17   that there was no agreement in place that prevented a supplier

18   from arriving at a different price point?

19   A.  I don't really recall that exchange.

20   Q.  Can I direct your attention to -- is there something I

21   could do to refresh your recollection?

22   A.  Yes.

23   Q.  Let's point you to Page 3.

24            MR. POLLACK:  Your Honor, objection, his lack of

25   recollection is about what defense counsel asked him.  He can't

Robert Bryant - Cross

1  refresh his recollection from this 302 on what defense counsel

2  asked him.

3          MR. KOENIG:  Your Honor, I believe that defense

4  counsel was, in fact, using the word quotes in asking about

5  this document to which we objected several times, so I think

6  it's only fair that we could elicit the exact question he was

7  asked.

8          THE COURT:  Well, I think you may be able to figure

9  out the exact question that he was asked from the transcript,

10  but I do agree that he doesn't need his recollection refreshed

11  as to what he was asked.

12          MR. KOENIG:  He does not need it?  Respectfully, he

13  just said he doesn't remember the exact exchange.

14          THE COURT:  Right.  But the problem is that what he is

15  looking at now is not necessarily the exact question that he

16  was asked.  You could quote him through your question the exact

17  question that was asked.

18          MR. KOENIG:  Okay.  May I have a minute to bring that

19  up?

20          THE COURT:  Yes.

21  BY MR. KOENIG:

22  Q.  All right, Mr. Bryant.  Do you recall being asked by

23  Mr. Feldberg -- I will just quote the question:  Mr. Bryant, do

24  you see the excerpt at the top of the page, "The competitors

25  discussed and knew what each other were doing though there was

Robert Bryant - Cross

1   no agreement in place that prevented a supplier from arriving

2   at a different price point."

3           Do you recall that?

4   A.  Yes, I recall that, yes.

5           MR. KORNFELD:  Your Honor, I am going to object to the

6   extent that this is a prior consistent statement and therefore

7   has nothing to do with 613.  That's not proper rehabilitation.

8           THE COURT:  We don't know that yet.  Mr. Koenig is

9   just asking him about something he was asked yesterday, so we

10  will see what follows.

11          Go ahead, Mr. Koenig.

12  BY MR. KOENIG:

13  Q.  Now, do you recall in that interview if you provided any

14  additional context around that purported statement?

15  A.  I believe I did.

16  Q.  All right.  Did you provide context about what years that

17  comment related to?

18  A.  I don't -- I believe that was probably for 2017.

19  Q.  Do you recall any additional context that you provided for

20  that statement, purported statement?

21  A.  I mean, I remember giving more context than that one

22  statement, yes.

23  Q.  But you don't remember specifically the content -- context?

24          MR. POLLACK:  Objection, Your Honor, leading.

25          THE COURT:  Overruled.

Robert Bryant - Cross

1   *A.*  I mean, yes, I remember additional context that I gave

2   regarding that statement, yes.

3   *BY MR. KOENIG:*

4   *Q.*  And what context did you give?

5   *A.*  I believe I said something to the effect that the

6   competitors would agree on a range of price, that yes, they

7   could adjust their price inside that range.  And I think the

8   example I was using was in 2017 when I wanted to be second in

9   price after I had the handwritten note, but later on we

10  adjusted our price to be more middle of the pack.

11       *MR. POLLACK:*  Your Honor, I believe that the witness

12  may be reading from the document which is not appropriate at

13  this point.

14       *THE COURT:*  Let's take the document down for now.  It

15  doesn't seem to have a use right now.

16       *MR. POLLACK:*  The witness has a hard copy, I believe.

17  It's not on the screen.

18       *THE COURT:*  Right.  Mr. Bryant, if you don't mind, if

19  you can turn that upside down.

20       *THE WITNESS:*  I hadn't opened it.

21       *THE COURT:*  We will do that just for extra measure of

22  comfort.

23       Go ahead.

24  *BY MR. KOENIG:*

25  *Q.*  All right.  So you do recall the question, though, that

Robert Bryant - Cross

1    there was no agreement in place, that question that we just

2    read from the transcript?

3    A.   Yes.

4    Q.   Do you recall saying during the interview words to the

5    effect that suppliers were free to make independent decisions?

6    A.   Possibly.

7    Q.   Do you recall saying during the interview that you couldn't

8    recall that ever happening?

9            MR. FELDBERG:  Objection, leading.

10           THE COURT:  Sustained.

11   BY MR. KOENIG:

12   Q.   Do you recall testifying -- or not testifying, saying in

13   your interview your opinion?  If you gave an opinion about

14   independent decision making by competitors, what was that

15   opinion, if you recall?

16           MR. FELDBERG:  Objection, Your Honor.  The witness is

17   not qualified to give opinions.

18           THE COURT:  Well, I don't think that that is exactly

19   what he intended by that.  That objection is overruled.  He can

20   answer.

21   A.   Yes, I remember.

22   BY MR. KOENIG:

23   Q.   What do you remember?

24   A.   I remember giving a statement to the effect that, you know,

25   once there was this range, that I didn't recall a competitor

Robert Bryant - Cross

1    stepping outside that range.

2    Q.  Okay.  Thank you.

3         Do you recall yesterday being asked about -- asked by

4    defense counsel about Roger Austin?

5    A.  I do.

6    Q.  Do you recall being shown a calendar invite?

7    A.  I do.

8    Q.  What did that calendar invite relate to?

9    A.  I was shown several.  Are you talking about the Popeye's

10   meeting in 2014?

11   Q.  Do you recall seeing an invitation about that?

12   A.  I do.

13   Q.  And do you recall whether defense counsel asked you to --

14   whether Roger Austin was on the invite?

15   A.  That's correct.

16   Q.  And was he on the invite?

17   A.  I don't remember -- he was not that I can remember, no.

18   Q.  But you testified that you remember him being at the

19   Popeye's meeting, right?

20        MR. FELDBERG:  Objection, that's not what he

21   testified.  He testified he didn't recall one way or the other.

22        MR. KOENIG:  I believe on direct he did.

23        THE COURT:  If you could ask a nonleading question

24   about that.  Sustained.

25   BY MR. KOENIG:

Robert Bryant - Cross

1   Q.  How certain were you that Mr. Austin was at that meeting?

2   A.  Fairly certain.

3   Q.  Okay.

4        MR. FELDBERG:  I just didn't hear it.

5   A.  I said fairly certain, yes.

6   BY MR. KOENIG:

7   Q.  And can you tell the jury what it is you remember

8   Mr. McGuire saying to Mr. Austin?

9   A.  Yes.  I am certain on the statement.  I remember the

10  statement clearly that Jason McGuire told Roger to put it out

11  to the industry.  I do remember that clearly.

12  Q.  What was it?

13  A.  It was the information or the justification that we were

14  presenting to customers on price increases.

15  Q.  Okay.  So is it fair to say, then, that your recollection

16  of the statement -- how would you characterize how sure you are

17  that that statement happened at a customer meeting?

18  A.  Certain.

19  Q.  Okay.  And by industry, what did you understand that to

20  mean?

21  A.  Our competitors.

22  Q.  Okay.  Do you recall saying that Austin was an advocate for

23  his customers?

24  A.  I do.

25  Q.  Did you also testify previously on direct that as you

Robert Bryant - Cross

1  understand the term price-fixing, that Roger Austin had engaged

2  in that conduct?

3          MR. FELDBERG:  Objection, leading, just repeating

4  direct.

5          THE COURT:  Overruled.

6  A.  That was my understanding, yes.

7  BY MR. KOENIG:

8  Q.  Okay.  And do you have an understanding as to whether

9  engaging in price-fixing as you understand that term, do you

10 have an understanding of whether that is being an advocate for

11 the customer?

12         MS. HENRY:  Objection, relevance.

13         MR. TUBACH:  And Your Honor additional objection to

14 the continued use of the word price-fixing.  It's a misleading

15 term.

16         THE COURT:  I am going to sustain it as to the use of

17 the term price-fixing.  We talked about that earlier.  If you

18 could rephrase.

19 BY MR. KOENIG:

20 Q.  The activity that's the subject matter of the agreement we

21 just looked at, do you recall that activity?

22 A.  Yes.

23 Q.  And did you testify that Roger Austin engaged in that

24 activity?

25 A.  I did.

Robert Bryant - Cross

1   Q.  All right.  And do you have an understanding as to whether

2   engaging in that activity is being an advocate for the

3   customer?

4   A.  That is not.

5   Q.  Thank you.  Finally, do you recall being asked whether

6   there is nothing wrong with Pilgrim's being in the middle of

7   the pack with respect to the 2017 negotiations?

8   A.  I do.

9   Q.  And what was your answer?

10  A.  I don't recall exactly.  I think I said no or you're

11  average or something to that effect.

12  Q.  How would your answer have changed, if at all, if the

13  question had been phrased:  Is there anything wrong with

14  Pilgrim's coordinating bids with its competitors to be in the

15  middle of the pack?

16      MR. TUBACH:  Your Honor, speculation, lacks

17  foundation.

18      THE COURT:  Overruled.

19  A.  It would have been different, yes.

20  BY MR. KOENIG:

21  Q.  And how so?

22  A.  I would have said that was wrong.

23      MR. KOENIG:  No further questions.

24      THE COURT:  I am going to make an exception to the no

25  recross.  If anyone wants to ask Mr. Bryant a few questions

1    about Exhibit 9671.  If you need a little time to confer, you

2    certainly can.

3              MR. TUBACH:  If we can have just five minutes.

4              MR. KORNFELD:  Two minutes.

5              THE COURT:  I don't think we will recess, but you can

6    huddle up if you need to.

7              MR. KOENIG:  Your Honor, just about 9671?

8              THE COURT:  Yes, just about 9671.

9                        **RECROSS-EXAMINATION**

10   BY MR. FELDBERG:

11   Q.  Mr. Bryant, with respect to Government Exhibit 9671 --

12   A.  Which exhibit is that?

13   Q.  That's the immunity agreement.

14   A.  Okay, sorry.

15   Q.  Do you understand, sir, that the protection that's provided

16   to you in this agreement for antitrust issues can be pulled and

17   your immunity withdrawn if someone decides that you have not

18   testified truthfully?

19   A.  Yes.

20   Q.  And who is the decider?

21   A.  The Department of Justice, I assume.

22   Q.  The Department of Justice, the folks at this table,

23   correct?

24   A.  That's my understanding.

25             MR. FELDBERG:  Thank you, sir.

1          *THE COURT:*  Thank you, Mr. Feldberg.

2               Additional recross?

3               All right.  Mr. Bryant, then you are excused.  Thank

4    you very much.

5               I am sorry, Mr. Feldberg?

6          *MR. FELDBERG:*  Can I have an issue at side bar before

7    the witness is excused?

8          *THE COURT:*  You may.

9               One second, Mr. Bryant.

10     (At the bench:)

11         *THE COURT:*  Mr. Feldberg, go ahead.

12         *MR. FELDBERG:*  Your Honor, it's quite clear from the

13   first series of questions that were asked on redirect about

14   Government Exhibit 1919 that the prosecution has now realized

15   that those handwritten notations that list prices for various

16   companies are current prices.  They match up exactly to the

17   period two pricing information that's current pricing that we

18   offered yesterday.  Your Honor determined we hadn't yet

19   established a foundation.  We will be attempting to offer it

20   through another witness.  But it's quite clear from the

21   questions that they now realize from the testimony that

22   Mr. Bryant gave that Mr. Austin told him future bids was not

23   correct.

24              And I think that should be corrected.  I don't think

25   it should be -- testimony that's clearly wrong should not be

1    permitted to stand.  And they know it's wrong at this point.

2    They know that those prices in his handwritten notes match up

3    to current prices, not future.

4            THE COURT:  Well, that's what trials are for.  The

5    witness doesn't know that.  In fact, he testified just the

6    opposite.  He assumed that they were true.  And logically it

7    would seem, you know, he had a logical basis to assume that.

8    Whether or not the government feels otherwise or whether or not

9    the government has some obligation in the search for the truth

10   to disabuse the jury's view is something that I can't talk

11   about, but certainly the defendants in the course of their case

12   or through cross-examination of other witnesses may be able to,

13   so I am not sure why we are holding the witness up for that

14   reason now.

15           MR. FELDBERG:  Understood, Your Honor.  Thank you.

16           THE COURT:  Thank you very much, Mr. Bryant.  You are

17   excused.

18           MR. KOENIG:  Your Honor, is he subject to recall?

19           THE COURT:  Is he?  Hearing none, no.

20           (The remainder of the proceedings was not

21   transcribed.)

22

23

24

25

1                                    INDEX

2      WITNESSES

3         Robert Bryant

4             Cross-Examination Continued By Mr. Kornfeld       437

5             Cross-examination By Mr. Gillen                   440

6             Recross-examination By Mr. Feldberg               473

7                                  EXHIBITS

8      Exhibit       Offered  Received  Refused  Reserved  Withdrawn

9      9671                   452

10                           REPORTER'S CERTIFICATE

11         I certify that the foregoing is a correct transcript from

12     the record of proceedings in the above-entitled matter.   Dated

13     at Denver, Colorado, this 21st day of November, 2021.

14

15                                  S/Janet M. Coppock

16

17

18

19

20

21

22

23

24

25