1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 20-CR-00152-PAB
3
UNITED STATES OF AMERICA,
4
     Plaintiff,
5
vs.
6
JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
GAR BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12     Defendants

13 _____

                    REPORTER'S TRANSCRIPT
14                 Excerpt of Trial to Jury
               Testimony of Michael Ledford, Vol. 1
15 _____

16        Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 3:50 p.m., on the 8th day of November,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24 Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Janet M. Coppock, 901 19th Street,
25     Room A257, Denver, Colorado, 80294, (303) 335-2106

```
1                           APPEARANCES

2           Michael Koenig, Carolyn Sweeney, Heather Call and Paul

3    Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of

4    Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing

5    for Plaintiff.

6           Anna Tryon Pletcher and Michael Tubach of

7    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

8    San Francisco, CA 94111-3823;

9           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

10   N.W., Washington, DC 20006, appearing for Defendant Penn.

11          David Beller, Richard Kornfeld and Kelly Page of

12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

13   CO 80202, appearing for Defendant Fries.

14          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,

15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

16           Laura Kuykendall and Megan Rahman of Troutman Pepper

17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,

18   appearing for Defendant Brady.

19          Michael Felberg of Reichman, Jorgensen, Lehman,

20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21   10017;

22

23

24

25
```

| 1 | APPEARANCES (Continued) |
|---|---|
| 2 | Laura F. Carwile of Reichman, Jorgensen, Lehman, |
| 3 | Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores, |
| 4 | CA 94065; appearing for Defendant Austin. |
| 5 | Elizabeth B. Prewitt of Latham & Watkins, LLP, |
| 6 | 555 11th Street, N.W., Suite 1000, Washington, DC 20004; |
| 7 | Marci Gilligan LaBranche of Stimson, Stancil, |
| 8 | LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO |
| 9 | 80218, appearing for Defendant Mulrenin. |
| 10 | James A. Backstrom, Counselor at Law, 1515 Market |
| 11 | Street, Suite 1200, Philadelphia, PA 19102-1932; |
| 12 | Roxann E. Henry, Attorney at Law, 5410 Wilson Lane, |
| 13 | Bethesda, MD 20814, appearing for Defendant Kantola. |
| 14 | Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth |
| 15 | Street, Suite 1100, Los Angeles, CA 90017; |
| 16 | Dennis J. Canty, Canty Law Corporation, |
| 17 | 1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596, |
| 18 | appearing for Defendant Little. |
| 19 | John Anderson Fagg, Jr. and James McLoughlin of |
| 20 | Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700, |
| 21 | Charlotte, NC 28202-4003, appearing for Defendant Lovette. |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1          APPEARANCES (Continued)

2          Craig Allen Gillen and Anthony Charles Lake of

3     Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4     Atlanta, GA 30339;

5          Richard L. Tegtmeier of Sherman & Howard, LLC,

6     633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7     for Defendant Roberts.

8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

9     & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10    DC 20006;

11          Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12    5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13    for the Defendant Blake.

14

15                    PROCEEDINGS

16    *MR. TORZILLI:*  The United States calls Michael

17    Ledford.

18    (**Michael Ledford** was sworn.)

19          *THE WITNESS:*  Yes.

20          *COURT DEPUTY CLERK:*  Please state your name and spell

21    your first and last name for the record.

22          *THE WITNESS:*  Michael Ledford, M-I-C-H-A-E-L,

23    L-E-D-F-O-R-D.

24          *MR. TORZILLI:*  Your Honor, with the assistance of

25    Ms. Grimm, may I approach?

Michael Ledford - Direct

1       *THE COURT:*  You may.

2                        **DIRECT EXAMINATION**

3   *BY MR. TORZILLI:*

4   Q.   Good afternoon, sir.

5   A.   Good afternoon.

6   Q.   Where do you work?

7   A.   I work for Chick-fil-A.

8   Q.   What's Chick-fil-A?

9   A.   Chick-fil-A is a restaurant company.

10  Q.   How long have you worked for Chick-fil-A?

11  A.   About seven and a half years.

12  Q.   Approximately when did you start?

13  A.   May of 2014.

14  Q.   What's your current position at the company?

15  A.   I am senior director of supply continuity.

16  Q.   Could you briefly describe what your main responsibilities

17  are in that role?

18  A.   It's really like a three-legged stool.  The first one would

19  be I am responsible for all sourcing of all food, beverage,

20  equipment, anything that it takes to run a Chick-fil-A

21  restaurant.  The next part of that responsibility would be

22  something that we call the launch team, which is program

23  management of all test and roll-outs of new menu items or

24  limited time flavors, limited time offers, things like that,

25  and then the supply planning and logistics part of the supply

6

Michael Ledford - Direct

1   chain.

2   *Q.*   Can you explain what the last part of the three parts

3   involves a little bit, please?

4   *A.*   Yes.   Supply planning and logistics would be the forecast

5   for all of our promotions, safety stock level saying on how

6   much we carry of inventory of each item and where we store that

7   at; also our redistribution points that we have that moves the

8   low moving volume items, like a kids' meal premium toy that you

9   don't move as much of as chicken or waffle fries or something

10   like that; and then all the transportation, the trucking to get

11   product from the suppliers to the distribution centers.

12   *Q.*   How long have you had your current position?

13   *A.*   In its current form, about three years.

14   *Q.*   And prior to those three years, what was your position at

15   Chick-fil-A?

16   *A.*   I was same title, but the responsibilities were all of

17   sourcing, just the food and nonfood sourcing piece of that, the

18   sourcing part, not the logistics or the launch team.

19   *Q.*   Do you know approximately how much chicken Chick-fil-A

20   sells on an annual basis?

21   *A.*   This year we will do around 640 million pounds a year.

22   *Q.*   Is your position at Chick-fil-A the first job that you've

23   had in the chicken business?

24   *A.*   No.

25   *Q.*   When did you first start working in the chicken business?

Michael Ledford - Direct

1    *A.*  1996.

2    *Q.*  What was your position in 1996?

3    *A.*  In 1996 I was a management trainee for a fully integrated

4    chicken processor called Gold Kissed.

5    *Q.*  Does Gold Kissed still exist?

6    *A.*  No, they do not.

7    *Q.*  What happened to Gold Kissed, if you know?

8    *A.*  Gold Kissed was bought by Pilgrim's Pride.

9    *Q.*  At what point in time did you leave the job at Gold Kissed?

10   *A.*  I left in early 2007, I believe.  That was after Pilgrim's

11   had bought it.

12   *Q.*  Where did you work next?

13   *A.*  Then I went to the purchasing co-op for Popeye's, Supply

14   Management Services or SMS.

15   *Q.*  What did you do at SMS?

16   *A.*  I was director of protein purchasing.

17   *Q.*  And could you describe what the director of protein

18   purchasing job entailed?

19   *A.*  I was responsible for purchasing all chicken and seafood

20   for all of the Popeye's restaurants in the U.S.

21   *Q.*  Did you have any occasion to negotiate contracts with

22   chicken suppliers?

23   *A.*  Yes.

24   *Q.*  Where did you work after you -- well, when did you leave

25   SMS?

Michael Ledford - Direct

1   A.   I left SMS in 2008.

2   Q.   And where did you work after you left SMS?

3   A.   I went to the purchasing co-op for Yum Brands which at the

4   time was UFPC.  They later changed their name to RSCS.

5   Q.   Can you remind us what UFPC stands for?

6   A.   Unified Food Service Purchasing Co-op.

7   Q.   Can you remind us what RSCS stands for?

8   A.   Restaurant Supply Chain Solutions.

9   Q.   When you got to RSCS, what was your job position?

10  A.   I was senior director of protein purchasing.

11  Q.   What did that job entail?

12  A.   It entailed -- I was responsible for all the purchasing for

13  all chicken for all of the Yum Brands concepts, which at that

14  time was KFC, Pizza Hut, Taco Bell, Long John Silvers and A&W.

15  Q.   As part of your job responsibilities, did you negotiate

16  contracts with chicken suppliers?

17  A.   Yes.

18  Q.   When did you leave RSCS?

19  A.   I left RSCS in May of 2014.

20  Q.   Did you have any role in negotiating contracts at RSCS with

21  chicken suppliers in calendar year 2014 before you departed?

22  A.   No, I did not.

23  Q.   I want to direct your attention to the years 2012 and 2013

24  now.

25          Did you work as part of a team at RSCS?

Michael Ledford - Direct

1   A.   Yes.

2   Q.   Who were the individuals who were the members of your team

3   during that time period?

4   A.   Mary Hester, Mark Oechsli, Steve Campisano, Carol Knight.

5   That was the chicken team when I left RSCS.

6   Q.   What was Ms. Hester's role during that time frame?

7   A.   She was director of poultry purchasing.

8   Q.   And what was her scope or responsibilities?

9   A.   She was overall responsible for all of what we called

10  further processed items.

11  Q.   How about Mr. Oeschli?  And if you could spell that name

12  for the record, it would be greatly appreciated.

13  A.   Okay.  I believe it is O-E-C-H-S-L-I, something close to

14  that.  I might have butchered that a little bit.  Mark was

15  responsible for some of the further processed products and

16  reported to Mary Hester.  He had a subset of the further

17  processed chicken products.

18  Q.   Can you give us some examples of what further processed

19  chicken products are?

20  A.   Yes.  So like KFC hot wings, they were par-fried, KFC

21  bites, popcorn chicken, things like that that weren't what we

22  would consider fresh chicken.  They were things that had been

23  further processed or an additional step made to them to make

24  them ready to be cooked in a restaurant.

25  Q.   Can you give us some examples of fresh chicken products?

Michael Ledford - Direct

1   A.   Yes.  Fresh chicken products would have been like COB which

2   is short for chicken on the bone, eight-piece chicken that you

3   would normally get at a KFC or a Popeye's-type restaurant.

4   Q.   Going back to the team that you worked with in 2012, 2013

5   at RSCS, what was Mr. Campisano's responsibilities?

6   A.   Back then Mr. Campisano was in charge of all of the fresh

7   poultry distribution.

8   Q.   And how about Ms. Knight, her responsibilities?

9   A.   Ms. Knight was responsible for a lot of our reporting and a

10  lot of the pricing.  She would receive the pricing in from the

11  suppliers and make sure it was entered into the system

12  properly, make sure everything was entered for the distribution

13  centers and made sure everybody had basically a lot of clerical

14  and administrative work to get the pricing correct in the

15  system and billed out through the distribution partners and the

16  suppliers.

17  Q.   During the 2012, 2013 time frame, approximately how much

18  chicken was purchased through contracts RSCS handled?

19  A.   On average we were doing about 1 billion pounds of chicken

20  a year.

21  Q.   Mr. Ledford, during your time at RSCS and in particular the

22  2012, 2013 time frame, when you and your team were negotiating

23  contracts with chicken suppliers, what were the most important

24  factors you were taking into account?

25  A.   Yes.  So first there would have to be a supplier that could

1   do volumes in a large quantity to meet our needs and also meet

2   our high and rigid quality standards.  You know, I would call

3   those -- both of those would have been table stakes to even get

4   invited to do business with Yum Brands.  And then once you have

5   those and you had an approved supplier, price was -- in my time

6   at RSCS and UFPC was the most important.

7   Q.  You mentioned in your previous answer the term table

8   stakes.

9   A.  Yes.

10  Q.  Can you explain what that means or what you are referring

11  to?

12  A.  Yes.  So when I say table stakes, I mean you have got to

13  have those qualifiers to even be involved in the process.  If

14  you can't produce a large enough quantity for somebody that's

15  buying 1 billion pounds of chicken a year and if you don't have

16  a high enough quality to meet the quality standards, then you

17  are not going to be involved at all.

18  Q.  And were there any other important factors besides volume

19  and quality that you took into account?

20  A.  Well, of course price.

21  Q.  Okay.  And can you explain what you mean by price and how

22  it factored in?

23  A.  So typically speaking, at Yum Brands we were -- at the time

24  I was there in particular KFC margins were very low, if not

25  negative.  They closed I believe 1200 restaurants, somewhere

Michael Ledford - Direct

1   around that in my time period there, so certainly price was

2   very important.  And cutting cost, cost savings measures,

3   things like that were paramount as we were going through a

4   negotiation process.

5   Q.  You mentioned in your previous answer that margins were low

6   or negative.  Whose margins were low and negative?

7   A.  The franchisees.

8   Q.  And how did you develop an understanding that their margins

9   were low or negative?

10  A.  We had reports that you would see that got disseminated

11  amongst the company on how margins were doing for all of the

12  different brands on a holistic level.  We wouldn't see

13  individual franchisee's numbers, but you certainly would see

14  the average numbers.  And, you know, we as a purchasing co-op,

15  in essence you work for the franchisees, so you know them very

16  well.  You have conversations with them on a regular basis.

17  And they would tell you what their individual numbers.  They

18  would tell you how many restaurants they were closing.  And

19  also in my time there some of the franchisees were filing

20  bankruptcy and going out of business and selling the

21  restaurants, so it was widely known.

22  Q.  So it was a regular part of business in RSCS to have a

23  handle on how the KFC restaurants and other Yum Brand stores

24  were performing?

25  A.  That's correct.

Michael Ledford - Direct

1          *MR. BELLER:*  Objection, leading.

2          *THE COURT:*  Sustained.

3     *BY MR. TORZILLI:*

4     *Q.*  Was one of your goals with regard to price when you were

5     conducting contract negotiations to -- or what were your goals

6     with regard to price when you were conducting contract

7     negotiations with chicken suppliers?

8     *A.*  I mean, in particular on chicken on the bone we always had

9     a goal to have a tight range from lowest to highest supplier,

10    that certainly would have been one of our top goals, and then

11    like I said earlier, to try to get any cost savings initiatives

12    we could or to get a low price.

13    *Q.*  Why did you try to get suppliers into a tight range on

14    prices?

15    *A.*  It was really a matter of -- so in the Yum system,

16    especially KFC, you had a lot of operators who had multiple

17    stores.  You had operators that had hundreds of restaurants.

18    So across that they may get chicken from one supplier for one

19    of the restaurants and another supplier for another handful of

20    the restaurants.  Also the franchisees in the KFC system would

21    talk and talk regularly amongst each other and share what their

22    price was that they were getting on chicken.

23          Obviously, chicken was their highest input cost.  And

24    if you didn't have a tight range, you being the purchasing

25    co-op, we would have franchisees that would often say I don't

Michael Ledford - Direct

1   want chicken that you're sending me from supplier X.  I want

2   from supplier Y because I talked to John Smith and their price

3   is a lot cheaper than mine.

4           Well, supplier Y only has so much product to go

5   around, and you can't ship every franchisee one supplier's

6   product if he is the cheapest supplier.  So therefore to keep

7   that noise to a minimum amongst franchisees and keep them

8   happy, in my time we always had a goal to keep that range as

9   tight as we could.

10  Q.  Mr. Ledford, did you ever ask chicken suppliers to

11  communicate with one another for purposes of getting their

12  prices into a tighter range?

13          MR. BELLER:  Objection, calls for hearsay.

14          THE COURT:  Overruled.

15  A.  No, I did not.

16  BY MR. TORZILLI:

17  Q.  Why not?

18          MR. BELLER:  Relevance, and it's asking him to

19  speculate on a fact that didn't occur.

20          THE COURT:  Overruled.

21  BY MR. TORZILLI:

22  Q.  You can answer, sir.

23  A.  I didn't want them talking about what my price should be

24  amongst each other.  I wanted the best price from each of them

25  and a fair price, not folks getting together and talking,

15

Michael Ledford - Direct

1    deciding what my price should be.

2    *Q.*  Did chicken suppliers need to be qualified in order to sell

3    chicken products to ultimately KFC restaurants?

4    *A.*  They would have had to have been approved by the quality --

5    by the QA department, yes.

6    *Q.*  Could you briefly describe your understanding of how that

7    process worked?

8    *A.*  Typically speaking, when you are adding a new supplier,

9    it's going to first start with a general food safety audit.

10    And they are going to go to that facility and perform an audit

11    of just their general practices of food safety that they

12    follow.  That would have been the first step.

13         Then typically you are going to do what's called an

14    animal welfare audit to make sure that those live chickens

15    throughout their process from their farms as they come into the

16    processing plant are treated with care.  And then if they pass

17    those first two steps, then you are actually going to get into

18    the supplier running product, having QA there during the run,

19    approving the run.  And then typically speaking, they would

20    ship product back to the corporate office at Yum Brands or KFC

21    and have them look at the product, do an evaluation, sometimes

22    do sensory taste testing against controlled product before you

23    have an official approval.

24    *Q.*  In calendar year 2012, did you and your team conduct

25    contract negotiations with chicken suppliers?

Michael Ledford - Direct

1    A.   Yes, we did.

2    Q.   Can you identify which chicken suppliers were involved in

3    that process?

4    A.   Well, we would have used every -- we had, I think, in 2012,

5    we had roughly about 14 or 15 chicken suppliers, and we would

6    have included all of them.  And we would have called those

7    incumbent suppliers.  And then I believe in 2012 we also

8    included a few nonincumbent suppliers that year.

9    Q.   How about for fresh chicken?

10   A.   Yeah, for fresh chicken we would have included all of the

11   incumbent suppliers.  In 2012 I do not recall if we had any

12   nonincumbents that year in fresh chicken.

13   Q.   Could you identify the fresh -- the incumbent fresh chicken

14   suppliers that you recall participating in contract

15   negotiations with RSCS in calendar year 2012?

16   A.   Yes.  It would have been George's, Tyson, Pilgrim's,

17   Mar-Jac, Marshall Durbin, Koch Foods -- and I think I am

18   leaving one off -- Claxton.

19   Q.   Were those -- was there also in calendar year 2013 a

20   contract negotiation process that you and your team undertook?

21   A.   Yes.

22   Q.   And were the chicken suppliers that were invited to

23   participate in that process the same as the suppliers that

24   participated in 2012 with the exception of Marshall Durbin?

25   A.   Yes.  And I believe there would have been one additional

Michael Ledford - Direct

 1   supplier that year.

 2   Q.  Who was --

 3   A.  I believe we added Case Farms that year.

 4   Q.  Thank you.  Were those companies you just identified

 5   competitors in 2012 and in 2013 for RSCS contracts?

 6   A.  Yes.

 7   Q.  Can you describe in what ways they were competing against

 8   each other for RSCS contracts?

 9   A.  Yes.  They were competing against each other for the same

10   products and volume that we would be giving out our awards on

11   both of those years.

12   Q.  And when they were competing with each other for those

13   contracts, what in particular were you looking for from them?

14   A.  We were looking for their best price.  And typically what

15   that meant at RSCS and in particular those two years was a low

16   price.

17   Q.  Who at -- was there someone at Pilgrim's who was the

18   primary person for your contract negotiations with them?

19   A.  Yes.

20   Q.  Who was that person?

21   A.  I mainly dealt with Roger Austin.

22   Q.  Do you see Mr. Austin in the courtroom today?

23   A.  Yes.

24   Q.  Can you identify him, please?

25   A.  Yes.

Michael Ledford - Direct

1        *MR. FELDBERG:*  His identity is conceded, Your Honor.

2        *THE COURT:*  Do you accept the concession?

3        *MR. TORZILLI:*  I accept it, Your Honor, if the record

4   will reflect that the witness has identified the defendant.

5        *THE COURT:*  Well, rather it was conceded.

6        *MR. TORZILLI:*  Then I would prefer that the witness do

7   the in-court identification.

8        *THE COURT:*  He may.

9   *A.*  Yes, Roger is at the table in front of you wearing a dark

10  suit, blue shirt and yellow tie.

11       *MR. TORZILLI:*  May the record reflect that the witness

12  identified Roger Austin?

13       *THE COURT:*  It shall.

14  *BY MR. TORZILLI:*

15  *Q.*  Was there anyone at Claxton that was the primary person for

16  your contract negotiations with that company?

17  *A.*  I really personally dealt with two different folks at

18  Claxton.

19  *Q.*  Who were the two different folks you dealt with at Claxton?

20  *A.*  Scott Brady and Mikell Fries.

21  *Q.*  Do you see Mr. Brady in the courtroom today?

22  *A.*  Yes, I do.

23  *Q.*  Can you pick him out, please?

24  *A.*  Yes.  He is at the table directly behind you in the blue

25  suit, red tie, blue shirt with glasses.

Michael Ledford - Direct

1      *MR. TORZILLI:*  Your Honor, may the record reflect the

2  identification of Defendant Scott Brady?

3      *THE COURT:*  It shall.

4  *BY MR. TORZILLI:*

5  *Q.*  And can you identify or do you see Mikell Fries in the

6  courtroom?

7  *A.*  I do.

8  *Q.*  Can you pick him out, please?

9  *A.*  He is at that same table behind you standing up right now

10  wearing a gray suit and a pink and blue tie.

11      *MR. TORZILLI:*  Your Honor, may I ask the record

12  reflect the witness has identified Defendant Mikell Fries?

13      *THE COURT:*  It shall.

14  *BY MR. TORZILLI:*

15  *Q.*  You said you dealt with Tyson as well in contract

16  negotiations both in 2012 and 2013?

17  *A.*  Yes.

18  *Q.*  Was there a primary person at Tyson that you dealt with in

19  those contract negotiations?

20  *A.*  Yes.  I dealt with both Tim Mulrenin and Brian Roberts.

21  *Q.*  Do you see Defendant Tim Mulrenin in the courtroom today?

22  *A.*  Yes, I do.

23  *Q.*  Can you pick him out, please?

24  *A.*  Yes.  He is standing at the table diagonally behind you

25  standing up right now in a blue suit, blue shirt, red tie.

Michael Ledford - Direct

1       MR. TORZILLI:  Your Honor, may the record reflect

2  identification of Defendant Mulrenin?

3       THE COURT:  It shall.

4  BY MR. TORZILLI:

5  Q.  Do you see Brian Roberts in the courtroom today?

6  A.  Yes, I do.

7  Q.  Can you identify him, please, sir?

8  A.  He is standing up behind you at that same table

9  Mr. Mulrenin was at in a blue suit and a reddish tie, red and

10  blue tie.

11       MR. TORZILLI:  May the record reflect, Your Honor, the

12  identification of Defendant Brian Roberts?

13       THE COURT:  It shall.

14  BY MR. TORZILLI:

15  Q.  You mentioned Koch as one of the competing suppliers in

16  both 2012 and 2013; was that correct?

17  A.  Yes.

18  Q.  Was there someone at Koch that was the primary person that

19  you were dealing with in contract negotiations with that

20  company?

21  A.  Yes.

22  Q.  Who was that person?

23  A.  Bill Kantola.

24  Q.  Do you see Mr. Kantola in the courtroom today?

25  A.  Yes, I do.

Michael Ledford - Direct

1    Q.  Can you identify him, please?

2    A.  He is at the table two tables to my right wearing a gray

3    suit, blue shirt, yellow tie.

4          MR. TORZILLI:  Your Honor, may the record reflect

5    identification of Defendant Kantola?

6          THE COURT:  It shall.

7          MR. TORZILLI:  Thank you, Your Honor.

8    BY MR. TORZILLI:

9    Q.  And you mentioned George's was a competing supplier in both

10   2012 and 2013.  Did I understand you correctly?

11   A.  Yes.

12   Q.  Was there someone at George's who was the primary person

13   for your contract negotiations with that company?

14   A.  I mainly dealt with Ric Blake and Darrell Keck.

15   Q.  And could you spell Mr. Keck's name, if you know?

16   A.  I believe Darrell is D-A-R-R-E-L-L; Keck, K-E-C-K.

17   Q.  Do you see Mr. Blake in the courtroom today?

18   A.  Yes, I do.

19         MR. POLLACK:  Your Honor, we will stipulate that

20   Mr. Ledford can identify Mr. Blake.

21         THE COURT:  Do you accept the stipulation?

22         MR. TORZILLI:  Yes.

23         THE COURT:  All right It shall.

24   BY MR. TORZILLI:

25   Q.  Mr. Ledford, are you familiar with a company called

Michael Ledford - Direct

1   Marshall Durbin?

2   A.   Yes, I am.

3   Q.   What was -- what is or what was Marshall Durbin?

4   A.   Marshall Durbin was a fully integrated poultry processor

5   that was bought by Mar-Jac.

6   Q.   Do you know approximately when Mar-Jac acquired Marshall

7   Durbin?

8   A.   I believe that was around 2012.

9   Q.   Focusing in on 2012 now, did you and your team have a

10  process that you undertook to negotiate with competing chicken

11  suppliers for the following calendar year's contract?

12  A.   Yes, we did.

13  Q.   Could you summarize the process that you and your team

14  undertook?

15  A.   Yes.  Typically we would start with what we called an RFI,

16  which was a request for information.  The purpose of that was

17  to gather information typically around cost savings

18  initiatives, bounce ideas off the suppliers and see if there

19  was anything we needed to go after specifically and target it

20  during that negotiation cycle.  After we sent them the RFI, got

21  the responses back, we would then issue what we called an RFP

22  or request for proposal.  Typically speaking, on average there

23  was two rounds of negotiations, a round one and a round two of

24  those negotiations before we would finalize pricing and award

25  business, sign contracts.

Michael Ledford - Direct

1   Q.  Mr. Ledford, would you turn in the binder in front of you

2   to Tab 24.  And you should find there an exhibit that's been

3   marked as Government Exhibit 1438.

4           Are you there?

5   A.  Yes.

6   Q.  Do you recognize Exhibit 1438?

7   A.  Yes.

8   Q.  What is it?

9   A.  It is an e-mail from myself to the suppliers asking for

10  them to fill out the attached document for the request for

11  information.

12  Q.  And does a request for information have a shorthand that

13  you used?

14  A.  RFI.

15  Q.  There should be a second page and that second page should

16  be marked 1438-1.

17          Do you see it?

18  A.  Yes.

19  Q.  Do you recognize 1438-1?

20  A.  Yes, I do.

21  Q.  What is 1438-1?

22  A.  It is the accompanying document that's referenced in the

23  e-mail before for them to fill out for that RFI.

24  Q.  Was the accompanying document that's been marked as 1438-1,

25  was that sent as part of the e-mail that you transmitted to the

Michael Ledford - Direct

1   chicken suppliers with the RFI?

2   A.  Yes.

3           MR. TORZILLI:  Your Honor, government offers 1438 and

4   1438-1 into evidence.

5           THE COURT:  Any objection to the admission of

6   Exhibits 1438 and 1438-1?  Both will be admitted.

7           MR. TORZILLI:  Thank you, Your Honor.  And permission

8   to publish 1438.

9           THE COURT:  You may.

10  BY MR. TORZILLI:

11  Q.  Mr. Ledford, I would like to direct your attention in

12  Exhibit 1438 to the very last sentence that starts with the

13  words, "The deadline."  Do you see it?

14  A.  Oh, yes.

15  Q.  Would you please read that into the record.

16  A.  The deadline for returning this information is next Friday,

17  October 10th, 2012 or sooner.

18  Q.  And what were you telling the recipients of this e-mail

19  with that sentence?

20  A.  I was telling them when I wanted this information filled

21  out and returned to us.

22  Q.  And when did you want it filled out and returned to you?

23  A.  October 10th, 2012.

24  Q.  And did the competing chicken suppliers provide the

25  response on or around that time?

Michael Ledford - Direct

1    A.   Yes.

2    Q.   To whom were the responses directed?  Were they directed to

3    you or someone else?

4    A.   Typically speaking, they were directed to Mark Oechsli.

5    Q.   What was Mr. Oechsli's job responsibilities when he

6    received RFI responses?

7    A.   He would collect those and he was the one on our team that

8    managed our internal system for bids called CombineNet.  And he

9    would make sure everything was entered in there properly and

10   everything was synced up, and he would disseminate that

11   information back out to the rest of the poultry team.

12   Q.   Was it part of your job responsibilities to review the

13   information as it came in even if it wasn't sent directly to

14   you by the suppliers?

15   A.   Yes.

16   Q.   Sir, what happened next?  What happened on or around the

17   due date of October 10th?

18   A.   We would get that information and typically we would have

19   internal meetings after we received the RFI information.  And

20   we would develop a strategy for how to proceed forward with our

21   negotiations and what exactly to ask for, if any, of the

22   initiatives in the RFI or any of the questions that we asked if

23   that helped us formulate a better strategy to move forward and

24   develop the RFP.

25   Q.   And then what happened after that?

Michael Ledford - Direct

1   *A.*  After that we would issue an RFP to each of the suppliers.

2   *Q.*  And what does RFP stand for in this context?

3   *A.*  Request for Proposal.

4   *Q.*  And what specifically were you asking the suppliers to do?

5   *A.*  At that point we were asking them to enter in typically

6   volume information and pricing by each item that we purchased.

7   *Q.*  And what did you expect in return from the competing

8   suppliers?

9   *A.*  I expected them to put forth their best effort and complete

10  that task and get us responses by when we asked and meet the

11  deadlines.

12  *Q.*  Sir, if you will turn in the binder in front of you to Tab

13  33, and we should find there a document that's been marked as

14  Government Exhibit 1524.  Do you see it?

15  *A.*  Yes.

16  *Q.*  What is this?

17  *A.*  This is an e-mail from Roger Austin to Mark Oechsli dated

18  October 10, 2012 that looks like he is turning in his model for

19  bone-in chicken.

20  *Q.*  Now, this is on October 10 and the model is coming in.  Was

21  it your expectation that the suppliers would be submitting

22  pricing models on October 10th?

23  *A.*  Yes.

24  *Q.*  And if you can now turn to the next tab which is Tab 34,

25  and we should find there an exhibit marked as 9693.

Michael Ledford - Direct

1    *A.*  Yes.

2    *Q.*  Do you see it?

3    *A.*  Yes.

4    *Q.*  Do you recognize this?

5    *A.*  Yes, I do.

6    *Q.*  What is it?

7    *A.*  This is a -- the first page is a cover sheet for Pilgrim's

8    cost model during that bid cycle.

9    *Q.*  Can you explain what a cost model is, please?

10   *A.*  A cost model is a model we use to determine the pricing for

11   the suppliers, in this case for the chicken-on-the-bone

12   products that started with their cost to hatch a baby chick, to

13   feed that chick, grow it into a broiler chicken and bring that

14   into the plant, process it, run it through KFC's processing

15   requirements.  And then typically speaking there was a margin

16   line in there for them as well to then come to an output of the

17   final cost of the product.

18         *MR. TORZILLI:*  At this time the government offers

19   Exhibits 1524 and 9693 into evidence, including the native file

20   version of 9693.

21         *THE COURT:*  Let's start with 1524 first.

22         Go ahead, Mr. Torzilli.

23         *MR. TORZILLI:*  May I just make one more note for the

24   record?  I will just cross-reference Your Honor to *James* log

25   entry No. 18 where these two documents were logged and were

Michael Ledford - Direct

1   conditionally --

2          THE COURT:  Any objections to 1524?

3          MR. FELDBERG:  None from us, Your Honor.

4          THE COURT:  Exhibit 1524 will be admitted.

5          COURT DEPUTY CLERK:  Your Honor, 1524 is already in.

6          THE COURT:  And any objection to Exhibit 9693

7   including the native version and the printed pages of this

8   particular exhibit?

9          MR. FELDBERG:  Again, no objection, Your Honor.

10         THE COURT:  Then 9693 both as a native version and as

11  the printed pages will be admitted.

12         MR. TUBACH:  Can we have a brief side bar?

13         THE COURT:  Yes.

14      (At the bench:)

15         THE COURT:  Go ahead, Mr. Tubach.

16         MR. TUBACH:  My only concern Your Honor, Mr. Torzilli

17  is now referencing a *James* log.  I don't think the jury is

18  going to know what that means, but I am concerned that is going

19  to veer off into other topics.  I don't think there is any

20  *James* log and *James* hearing with this witness.

21         THE COURT:  Response, Mr. Torzilli?

22         MR. TORZILLI:  Sure.  I understood that the *James*

23  hearing had meaning and my understanding of the *James*

24  proceeding is that it rendered certain statements including

25  certain documents at least conditionally admissible.  And I

Michael Ledford - Direct

1   think it's appropriate whether it be at side bar if there is an

2   issue, but to bring to Your Honor's attention that there has

3   been a conditional admissibility ruling already.

4            THE COURT:  Why don't we refer to that by shorthand as

5   Docket No. -- is it 599?

6            MR. TORZILLI:  559 is Your Honor's order.

7            THE COURT:  Yeah, 559.  Why don't we do that.

8            Is that acceptable to you, Mr. Tubach?

9            MR. TUBACH:  That's fine.  Thank you, Your Honor.

10           THE COURT:  Let's do that.  Thank you.

11      (In open court:)

12           THE COURT:  Go ahead, Mr. Torzilli.

13           MR. TORZILLI:  Permission to publish the second page

14   of 9693, the printed version.

15           THE COURT:  You may.

16           MR. TORZILLI:  Thank you.

17   BY MR. TORZILLI:

18   Q.  Mr. Ledford, on the screen in front of you is the second

19   page of what's been marked as Government Exhibit 9693.  And can

20   you summarize what this page is, please?

21   A.  It is the cover sheet with the prices for all of their

22   fresh chicken items for Pilgrim's Pride for the 2013 bid.

23   Q.  And you used the term bid.  Could you explain what at least

24   in RSCS terminology what that signifies?

25   A.  A bid would have been synonymous with what they entered in

30

Michael Ledford - Direct

1   for the RFP.

2   Q.  If you could go down to the chart.  And the first entry on

3   the chart says Injected 8-Piece.  Do you see that?

4   A.  Yes.

5   Q.  Can you tell us what that is?

6   A.  So Injected 8-Piece would have been the main product that

7   KFC serves for their eight-piece chicken.  It is injected with

8   a marinate.

9   Q.  And the column next to it says 0.9885.  What does that

10  signify?

11  A.  That would be the price per pound, so 98.85 cents per

12  pound.

13  Q.  And then to the right of that it says (FOB Price From Cost

14  Model).  What does that represent?

15  A.  So that represents the FOB price which would not include

16  any freight to get it.  It's just at their dock door at the

17  chicken processing plant.

18  Q.  Is it then fair to say that at least for the eight-piece

19  product that Pilgrim's bid was 98.85 cents per pound?

20  A.  Yes.

21  Q.  A few entries down -- it's toward the bottom -- there is an

22  entry called Non-Inject Wings - Bulk Packed, with the D cut

23  off.  Do you see that?

24  A.  Yes.

25  Q.  What type of product is that?

Michael Ledford - Direct

1   A.  So these were what we would have called supplemental wings,

2   wings that we needed above and beyond the two wings that would

3   come on every chicken in the eight-piece cut up.  And we bought

4   some level of supplemental wings.  In this case the bulk pack

5   means just what it says.  It's just wings bulk in a 40-pound

6   case, no inner liner, not separated by any inner bagging or

7   anything like that.  It's just 40 pounds of wings in a box.

8   Q.  And the next entry is Non-Inject Wings - Precounted.

9   What's that product?

10  A.  Yes.  That would be a similar product to the product above

11  except for in this case instead of just having a certain

12  poundage in there, these wings would have actually been counted

13  and you would have had a case count for the product that was in

14  that case.  So there was a little bit more labor that was

15  involved.  And that product, so typically speaking it was a

16  little bit more expensive.

17  Q.  Mr. Ledford, can I now ask you to turn to Tab 25 in your

18  binder?  You should find there Government Exhibit 1505.

19  A.  Okay.

20  Q.  Do you see it?

21  A.  Yes.

22  Q.  Do you recognize Government Exhibit 1505?

23  A.  Yes, I do.

24  Q.  What is it?

25  A.  It is an e-mail from Scott Brady to Mark Oechsli dated

Michael Ledford - Direct

1    October 9, 2012 with their chicken-on-the-bone cost model for

2    the 2013 bid.

3    Q.  And if you flip to the next tab, you will see what's been

4    marked as Government Exhibit 9692.  Do you see that?

5    A.  Yes.

6    Q.  And could you take a moment to just flip through the two

7    sheets of paper that comprise that tab?

8    A.  Okay.

9    Q.  Have you done that?

10   A.  Yes.

11   Q.  Do you recognize 9692?

12   A.  Yes, I do.

13   Q.  What is it?

14   A.  It is Claxton's model that was referenced in that earlier

15   e-mail.

16          MR. TORZILLI:  Your Honor, at this time the government

17   would move for the entry of Exhibits 1505 and 9692 including

18   the Excel or so-called native version of 9692.

19          THE COURT:  All right.  First of all, any objection to

20   the admission of Exhibit 1505?

21          MR. BELLER:  No objection.

22          THE COURT:  Exhibit 1505 will be admitted.

23          MR. TORZILLI:  Thank you, Your Honor.

24          THE COURT:  And next any objection to the admission of

25   the printed pages, but also the native version of Exhibit 9692?

33

Michael Ledford - Direct

1          MR. BELLER:  No objection.

2          THE COURT:  All right.  And that exhibit including the

3   native version will be admitted as well.

4          MR. TORZILLI:  Thank you, Your Honor.

5          Permission to publish Page 2 of 9692?

6          THE COURT:  You may.

7   BY MR. TORZILLI:

8   Q.  Thank you.

9          Mr. Ledford, on the screen to your left there you

10  should see Page 2 of 9692.  What is this, please?

11  A.  It is a summary page of Claxton's bid for 2013 for all of

12  their fresh chicken or chicken-on-the-bone items.

13  Q.  What's their bid for the eight-piece purple label product?

14  A.   .9620 or 96.20 cents per pound.

15  Q.  What is the purple product or purple label product?

16  A.  The purple label was the chicken for the fried chicken

17  eight-piece.

18  Q.  And did Claxton submit bids here for their bulk packed and

19  precounted wings?

20  A.  Yes, they did.

21  Q.  And what are the bids for those products?

22  A.  The bid for the bulk wings was $1.8120 per pound.  And the

23  bid for the pre-counted was $1.9120 per pound.

24  Q.  And then if you can look at the -- I think it's the fourth,

25  fifth and sixth entries are various forms of dark meat.  Do you

Michael Ledford - Direct

1    see those?

2    A.   Yes.

3    Q.   First, can you just summarize what those three products

4    are?

5    A.   Sort of like supplemental wings, supplemental dark meat was

6    the additional pieces of dark meat, so in this case the drum

7    and the thigh that KFC needed to fill their volume needs that

8    was above and beyond the dark meat pieces that would come in

9    the eight-piece chicken.

10   Q.   And if you look at the pricing formula column for those

11   three products, they each say eight-piece minus .30.  Do you

12   see that?

13   A.   Yes.

14   Q.   Could you explain what that means?

15   A.   Yes.  We tied the dark meat price in relation to the

16   eight-piece price.  So in this case we were referring to that

17   as 30 back of the eight-piece or said another way 30 cents less

18   than the price of the eight-piece chicken.

19   Q.   So for the injected dark meat, the middle one, the injected

20   dark meat code 9249 red --

21   A.   Yes.

22   Q.   -- can you just walk us through the math to get to that

23   .6620 figure that appears?

24   A.   Yes.  You take the eight-piece price on the first line of

25   the .9620 and take 30 cents off of it or subtract 30 cents from

35

Michael Ledford - Direct

1   it to get the .6620.

2   Q.  Thank you.  Can you turn to Tab 27 in your binder and you

3   should find there Government Exhibit 1410, 1410.

4   A.  Okay.

5   Q.  Do you recognize 1410?

6   A.  Yes.

7   Q.  What is this, Mr. Ledford?

8   A.  This is an e-mail from Bruce MacKenzie at Koch Foods to

9   Mark Oechsli that is attaching their fresh cost model for the

10  bid cycle.

11  Q.  What is the date of this communication?

12  A.  It is dated October 10, 2012.

13  Q.  And can you now turn to the next tab, Tab 28?  And you

14  should find there Government Exhibit 9691.

15          Do you see it?

16  A.  Yes.

17  Q.  Do you recognize this?

18  A.  Yes.  This is the cost model that was attached to the

19  document before.

20  Q.  Okay.  And is this a bid that Koch submitted to RSCS around

21  October 10 of 2012?

22  A.  Yes, it is.

23          MR. TORZILLI:  I would offer into evidence Government

24  Exhibit 1410 and 9691, both printed and native versions.

25          MS. HENRY:  No objection.

1          *THE COURT:*  All right.  Any objections to Exhibit

2     1410?

3               1410 will be admitted.

4               And any objection to Exhibit 9691 including the native

5     file version?

6               That exhibit will be admitted as well.

7          *MR. TORZILLI:*  Thank you, Your Honor.

8     *BY MR. TORZILLI:*

9     *Q.*  Mr. Ledford, would you -- well, first let me ask whether

10    when we discussed earlier this afternoon the chicken suppliers

11    that were competing for contracts in 2012, whether the

12    companies that were involved included George's?

13    *A.*  Yes.

14    *Q.*  And did George's submit bids to RSCS in that calendar year?

15    *A.*  Yes, they did.

16    *Q.*  Could you please turn to Tab 29 of your binder?  And you

17    should find there Exhibit 1406.

18    *A.*  Okay.

19    *Q.*  Do you recognize 1406?

20    *A.*  Yes, I do.

21    *Q.*  What is 1406?

22    *A.*  This is an e-mail from Darrell Keck at George's to Mark

23    Oechsli attaching their fresh chicken-on-the-bone cost model

24    for that 2012 bid cycle for the 2013 calendar year.

25    *Q.*  What's the date of the communication in 1406?

Michael Ledford - Direct

1    *A.*  October 10th, 2012.

2    *Q.*  And now can you turn to Tab 30 in your binder?  You should

3    find there Government Exhibit 9690.

4    *A.*  Yes.

5    *Q.*  Do you recognize 9690?

6    *A.*  Yes, I do.

7    *Q.*  What is it?

8    *A.*  It is George's cost model for chicken on the bone for the

9    2013 calendar year.

10         *MR. TORZILLI:*  Your Honor, at this time we offer 1406

11   and 9690, printed and native versions.

12         *THE COURT:*  First of all, any objection to Exhibit

13   1406?

14         *MR. POLLACK:*  No, Your Honor.

15         *THE COURT:*  Exhibit 1406 will be admitted.

16         Any objection to 9690, including the native file

17   version?

18         *MR. POLLACK:*  Can we see it, Your Honor?

19         *THE COURT:*  Yes.

20         *MR. POLLACK:*  Is it four pages in total?

21         *MR. TORZILLI:*  It's four printed pages and then the

22   fifth page is just the cover sheet.

23         *THE COURT:*  Mr. Torzilli, you have to address your

24   comments to me.

25         *MR. TORZILLI:*  If I may clarify the printed version --

Michael Ledford - Direct

1          THE COURT:  Mr. Pollack, the exhibit sticker is on a

2    cover sheet that says produced in native, but then there does

3    appear to be four pages after that.

4          MR. POLLACK:  Could I just clarify, is it identical --

5    is it simply the electronic version of 1407?

6          MR. TORZILLI:  The underlying -- may I respond to

7    that, Your Honor?

8          THE COURT:  Sure.

9          MR. TORZILLI:  The underlying native file, so the

10   Excel spreadsheet of both the printed what's been marked as

11   1407 and 9691, it's the same underlying native file.

12         MR. POLLACK:  With that, Your Honor, no objection.

13         THE COURT:  Ms. Henry, did you have anything?

14         MS. HENRY:  I think he said 9691 and I think that's --

15         THE COURT:  Mr. Torzilli is moving 9690 in.

16         MS. HENRY:  Correct.

17         THE COURT:  9690 including the native file version

18   will be admitted.

19         MR. TORZILLI:  Thank you, Your Honor.

20         Permission to publish Page 2.

21         THE COURT:  Of 9690?

22         MR. TORZILLI:  Yes, Your Honor.

23         THE COURT:  You may.

24         MR. TORZILLI:  Thank you.

25   BY MR. TORZILLI:

39

Michael Ledford - Direct

1   Q.  Mr. Ledford, on the screen to your left is Page 2 of what's

2   been admitted into evidence as 9690.

3        What is this?

4   A.  This is the cover sheet for George's for the 2013 calendar

5   year RFP with all of their prices submitted for round one of

6   the fresh chicken-on-the-bone products.

7   Q.  What's George's purple -- bid for their purple label

8   product that appears on this page?

9   A.  .9694 or 96.94 cents per pound.

10       MR. TORZILLI:  Thank you.  You can take that exhibit

11  down.

12  BY MR. TORZILLI:

13  Q.  If you will turn to Tab 31.  You should find what's been

14  marked as 1569.

15  A.  Okay.

16  Q.  Do you recognize 1569?

17  A.  Yes, I do.

18  Q.  What do you recognize it to be?

19  A.  It is an e-mail from Tim Scheiderer at Tyson Foods to Mark

20  Oechsli with their bid sheet for that same 2012 bid for the

21  2013 calendar year.

22  Q.  What was the date of the communication?

23  A.  It is dated 10th of October 2012.

24  Q.  Now will you turn to the next tab, Tab 32?  You should find

25  Exhibit 9696 there.

Michael Ledford - Direct

1          Do you recognize the printouts that appear in 9696?

2    *A.*   Yes.

3    *Q.*   What does it appear to be?

4    *A.*   It is the printout for all of their bids for products for

5    that 2012 RFP.

6    *Q.*   And is this something that Tyson would have provided to you

7    in an Excel type -- or provided to Mr. Oeschli in an Excel type

8    format?

9    *A.*   Yes.   They would have provided this to Mr. Oeschli.

10          *MR. TORZILLI:*   Your Honor, at this time we would offer

11   into evidence 1569 and the printed and native versions of 9696.

12          *THE COURT:*   Any objection, first of all, to

13   Exhibit 1569?

14          *MS. PREWITT:*   Objection, Your Honor.   I would like to

15   be heard if it can be on side bar.

16          *THE COURT:*   Yes.

17      (At the bench:)

18          *THE COURT:*   Ms. Prewitt, go ahead.

19          *MR. FAGG:*   Your Honor, this is John Fagg.   One point

20   quickly.   At the last side bar Mr. Torzilli inadvertently was

21   speaking quite loudly.   We would just ask that everyone keep

22   their voices down.

23          *THE COURT:*   Yes.   And Mr. Torzilli, if you don't mind

24   moving away from the microphone just in case.   The podium mic

25   is on.

1          Ms. Prewitt, go ahead.

2          *MS. PREWITT:*  Thank you, Your Honor.

3          I would like to raise a 401 and 403 objection too.  I

4     will say that this particular incident, I don't think the

5     government has any factual basis to assume there is involvement

6     of anyone at Tyson Foods in the alleged collusion.  I will say

7     that you will see this is a repeated pattern as we saw with

8     respect to the Golden Corral where questions were raised that

9     created a specter of collusive activity for which the

10    government has zero factual basis.  And, in fact, what we have

11    seen in the texts shown to the jury indicated that no one had

12    Pilgrim prices and, in fact, the competitor thought the prices

13    submitted by Tyson were so low that they were "morons."

14         I believe this is a continual issue we will see with

15    respect to the Sysco Food allegations, the Pollo Tropical

16    allegations.  So Your Honor, this is going to be a continued

17    issue we feel from Defendant Mulrenin, and I think Defendant

18    Roberts will join in the objection.

19         *MR. GILLEN:*  Your Honor this is Craig Gillen.  We join

20    in that objection, Your Honor.  There is a disturbing pattern

21    that Ms. Prewitt has articulated that is of concern to us.  And

22    we would -- the inferences that the government is attempting to

23    draw, particularly with some of the questions we don't think

24    had a factual basis or good faith basis with the last witness,

25    the pattern seems to be continuing.

Michael Ledford - Direct

 1          THE COURT:  Mr. Torzilli, response?

 2          MR. TORZILLI:  Yeah, absolutely, Your Honor.  What

 3     we're asking here is for the admission into evidence of bids

 4     that Tyson submitted.  I don't think we put these bids on our

 5     559 log that went to the 559 ruling and so forth, so I think

 6     the submission of bids at a very minimum is relevant for the

 7     purpose of having the jury see the entire competitive landscape

 8     as it played out in this bid process.

 9          MR. GILLEN:  Your Honor, Craig Gillen here.  This

10     again is a pattern that we've seen where they tried to drag

11     Tyson and Mr. Roberts and Mr. Mulrenin into this sort of

12     inference by association and in our view bad faith questioning

13     and we would object to this.  It wasn't in their *James* log

14     presentation for a reason.  And we would ask -- and I renew the

15     objection of 401 and 403 articulated by Ms. Prewitt.

16          THE COURT:  Okay.

17          MS. PREWITT:  Your Honor, will you permit me to make

18     one more statement?

19          THE COURT:  Yes.

20          MS. PREWITT:  Thank you, Your Honor.  If you look at

21     the indictment, Paragraph 54 to 64, you will see that not only

22     is Tyson not mentioned, they are specifically excluded from the

23     group of alleged co-conspirators in relation to this particular

24     episode.  So I would like to point that out for Your Honor's

25     consideration as well, so that is all quite -- not what we

1    would expect, to be honest.

2         *MR. TORZILLI:*  So Your Honor, if I may.

3         *THE COURT:*  Yes, go ahead.

4         *MR. TORZILLI:*  So Your Honor, I will direct your

5    attention to Government Exhibit 1427 where Defendant Brady says

6    about six weeks from the current period we're talking about, we

7    are talking about October 10, so now in mid November he is

8    talking about Tyson being 31 back on dark meat.  And Mr. Brady

9    and Tyson are competitors at that point in time, so I think at

10   a minimum that's an indication that Tyson is involved in the

11   collusion that occurred in this time frame.

12        *MR. GILLEN:*  Craig Gillen again.  Absolutely no

13   evidence to that assertion.  And again, if you look at the --

14        *THE COURT:*  Mr. Gillen, I can't hear you right now.

15        *MR. GILLEN:*  Looking at that exhibit, I believe it

16   says, Ol Mike is bluffing hard.  So there is nothing that

17   connects Tyson and Roberts and Mulrenin to this.  And of course

18   the indictment, although it doesn't go out with the jury, has

19   put us on notice about what the Grand Jury thought was a

20   violation.  Ms. Prewitt has articulated that we are not within

21   that particular episode found by the Grand Jury, and so this

22   would be prejudicial and also frankly a material variance from

23   the indictment as charged and upon which we were put on notice

24   of the charges against us.  And therefore we would ask that

25   this be excluded and that the government be admonished and

Michael Ledford - Direct

1   directed not to continue to ask questions like they did with

2   the last witness with no factual basis whatsoever, but simply

3   just sort of an inference out there upon which they have no --

4   in our view no good faith to be asking those sorts of questions

5   they did with Mr. Smith.

6           THE COURT:  I am going to overrule the objections.  I

7   think that the point that Mr. Torzilli made is that the jury

8   would at least be entitled to see the overview of different

9   people who were competing in this particular bidding year.

10  However, I will take a look overnight at the indictment and

11  also the exhibits and documents that have been referred to so

12  that in the event that there is a pattern, I will at least be a

13  little better informed.  It's difficult for me not having those

14  materials at the ready to fully put the argument in context,

15  but I do believe that Mr. Torzilli has a proper basis to ask

16  about these two exhibits of the witness.

17          MR. POLLACK:  Your Honor, Mr. Pollack on behalf of

18  Mr. Blake.  I would just ask you do the same review with

19  respect to the Golden Corral allegations, and you will note

20  that there is no allegation in the indictment that George's

21  even bid on Golden Corral.

22          THE COURT:  Right.  I will do that too.  Thank you.

23      (In open court:)

24          THE COURT:  The objection is overruled.  Go ahead.

25          MR. TORZILLI:  Thank you, Your Honor.  The United

45
Michael Ledford - Direct

1   States offers to the extent it's not already in evidence 1569

2   and 9692, both printed and native versions.

3           THE COURT:  You mean 9696?

4           MR. TORZILLI:  I am sorry, Your Honor.  It's late in

5   the day.  9696.

6           THE COURT:  I don't think that we got to it, but any

7   objection to the admission -- I think there was.  Ms. Prewitt

8   made the objection.  Any other objections to 1569?  So 1569

9   will be admitted.

10          MR. TORZILLI:  Thank you, Your Honor.

11          THE COURT:  And any -- same objection, Ms. Prewitt, to

12  9696?

13          MS. PREWITT:  Yes, Your Honor.

14          THE COURT:  Any additional objections?  That objection

15  will be overruled and Exhibit 9696 including -- Mr. Torzilli,

16  you moved the native version as well?

17          MR. TORZILLI:  Yes, sir.

18          THE COURT:  -- including the native version will be

19  admitted.

20          MR. TORZILLI:  Thank you, Your Honor.

21  BY MR. TORZILLI:

22  Q.  Mr. Ledford, the submissions that we just looked at over

23  the course of the past few minutes, is it fair to say that

24  those were the first round submissions that the competing

25  suppliers provided to RSCS?

1   *A.*  Yes, that's correct.

2   *Q.*  And can you describe what happened next in the process that

3   you had in place for the negotiations at this time?

4   *A.*  Yes.  Typically speaking we would gather the submissions

5   that we got.  We would meet internally for a game plan,

6   strategize next steps.  Then we would typically have feedback

7   discussions or meetings with the suppliers on their round one

8   submissions before we would issue a round two of the bid.

9         *MR. TORZILLI:*  Your Honor, the microphone appears to

10   be not working.

11        *THE COURT:*  The battery appears to be out.  And

12   because it's two minutes until 5:00, we will consider that to

13   be a convenient opportunity to go ahead and excuse you for the

14   day.  Keep the admonitions in mind, if you would.  Don't try to

15   look up anything no matter what.  Don't try to look up any

16   information about the case.  All your information has to come

17   from the trial.  And I hope you have a good evening.

18         And at one of the side bars we talked about and we

19   talked about it a little bit during the break, so tomorrow we

20   are going to -- just the attorneys and me are going to meet and

21   we are going to work through some more of those exhibits, so

22   tomorrow I will have you return at 10:00 a.m., okay?

23   10:00 a.m. tomorrow.  And then we won't be having a mid-morning

24   break, but we'll just go straight through until noon, all

25   right?  So if you will return and be ready to go at 10:00 a.m.,

1    we will be working hard up until that point, okay?

2              Thank you very much, ladies and gentlemen.  You are

3    excused.

4              (Jury excused.)

5              Please be seated.

6              Mr. Ledford, you are excused.  Can you come back

7    tomorrow at 10:00?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  Great.  Thank you very much.

10             All right.  So we will meet tomorrow at 8:00 and then

11   we will work through as many as we can.

12             Mr. Feldberg, did you have something?

13             MR. FELDBERG:  Just a question, Your Honor.  Does the

14   Court require the defendants to be present from the 8:00 to

15   10:00 session?

16             THE COURT:  They do not need to be present just as we

17   did on Friday afternoon.  They can if they wish.  If they

18   choose not to, they do not need to be present.

19             Mr. Koenig?

20             MR. KOENIG:  Two things.  I know I agreed to 5:30 to

21   the list, but can we have until 6:00?  Because by the time we

22   walk back to our offices --

23             THE COURT:  6:00 o'clock is fine.

24             MR. KOENIG:  One other issue we noticed a few times

25   and haven't said anything is during cross there will be an

1   exhibit up, and I think Mr. Tubach did this a couple times,

2   they will blank out part of the exhibit and say, well, if you

3   take out this part of the exhibit, you know, here is what it

4   looks like and what do you see?  And I do think that's a bit

5   argumentative, so we would ask the Court to direct them not to

6   do that.

7           THE COURT:  Yeah, I don't think the exhibits should be

8   manipulated to that extent.  I don't think that's appropriate,

9   so I would hope that we don't do that in the future.  I didn't

10  notice that, but assuming it happened.

11          MR. TUBACH:  I certainly didn't mean to manipulate any

12  document.  The witness had the full document for every

13  cross-examination that I conducted.  I don't believe there was

14  any manipulation.

15          THE COURT:  Once again, just as there have been

16  objections to the government displaying two things side by side

17  is argumentative, so too with documents.  Even if the witness

18  has an exhibit, if an exhibit is blanked out or something like

19  that, that's argumentative as well.

20          MR. KOENIG:  And one more thing.  Can I pass to

21  Ms. Sweeney for one final issue?

22          THE COURT:  Yes.

23          MS. SWEENEY:  Yes, Your Honor.  We received a request

24  at the lunch break, we have a witness who may testify as early

25  as tomorrow.  It was requested to testify by video

1   teleconference for two reasons.  We understand this request is

2   late under the district's jury protocols, but I think they are

3   good reasons.  The first is that there are --

4          THE COURT:  Who is the witness?

5          MS. SWEENEY:  Mr. Skalak.  There are some health

6   concerns that were confirmed to the government after trial

7   started.  And the anxiety I should say increased with the

8   potential COVID exposure of the jury over the weekend, so we

9   just wanted to make this request to Your Honor.  He would be

10  testifying after Mr. Ledford.

11         THE COURT:  This is the witness that was discussed on

12  Friday; is that correct?

13         MS. SWEENEY:  I don't believe so.

14         THE COURT:  Okay.  So go over those again.

15         MS. SWEENEY:  Sure.  There were -- and I don't want to

16  get into too much detail for obvious reasons -- but some health

17  concerns that were confirmed around the start of trial and the

18  government learned about them a little bit after the start of

19  trial and then the potential of COVID exposure in the jury this

20  morning.

21         THE COURT:  Let me make the following record, and that

22  is as to the juror who was in seat number 11 previously, she

23  had a rapid test performed this afternoon.  It came back

24  negative.  But not knowing what the health concerns are, and I

25  am not sure if defense counsel do either, I think that that

1    information would need to be shared before they could make an

2    intelligent -- to take a position based on, you know, some

3    reason.  So too me.  I just don't know with that little

4    information.

5            MS. SWEENEY:  Sure.  I will confer with counsel.  And

6    if they are amenable, we can file something under seal tonight.

7    We don't obviously want to reveal health conditions.

8            THE COURT:  I understand completely.  The information

9    could be submitted to the Court under seal or under some type

10   of limitation as long as it is also provided to defense counsel

11   that way.

12           MS. SWEENEY:  Yes, Your Honor.  And I will confer with

13   his counsel to confirm that that is all right.  So if you don't

14   see anything from us, that's why.

15           THE COURT:  Thank you.

16           Mr. Beller?

17           MR. BELLER:  Your Honor, we will certainly read any

18   information we are provided with a very open mind.  I would

19   note for the Court that I believe that these health issues were

20   disclosed to the government on October the 6th.  It is

21   contained in his interview on October the 6th, which to my

22   knowledge is the very first time the government ever contacted

23   and/or met with Mr. Skalak despite the indictment being almost

24   at that point a year and a half old.

25           The government did disclose to us that they would

1    contact -- or rather put on either Mr. Skalak or Mr. Rothmeier.

2    We are now in what is starting as our third week of trial with

3    Mr. Skalak, according to the government, being put on the stand

4    tomorrow.  And so certainly we have prepared as though

5    Mr. Skalak and not Mr. Rothmeier is, in fact, going to be

6    testifying.  This is a choice that the government did make.

7           Understanding he may have health issues that the

8    government apparently did not either appreciate or know despite

9    their disclosure and its inclusion in a report on October the

10   6th, our clients obviously have certain confrontation rights.

11   We would strenuously object to this change of course at this

12   point.  With all of that said and with that, I guess, blatant

13   statement of lack of humanity, we are certainly willing to

14   listen to anything the government may have to say.

15          *THE COURT:*  Okay.  Anything else before we recess?

16          All right.  We will in recess, then, until 8:00 a.m.

17   tomorrow.  Thank you.

18      (Recess at 5:07 p.m.)

19

20

21

22

23

24

25

```
 1                              INDEX
 2  WITNESSES
 3      Michael Ledford
 4          Direct Examination By Mr. Torzilli              5
 5                            EXHIBITS
 6  Exhibit        Offered   Received  Refused  Reserved  Withdrawn
 7  1406                       37
 8  1410                       36
 9  1438                       24
10  1438-1                     24
11  1505                       32
12  1524                       28
13  1569                       45
14  9690                       38
15  9691                       36
16  9692                       33
17  9693                       28
18  9696                       45
19                      REPORTER'S CERTIFICATE
20      I certify that the foregoing is a correct transcript from
21  the record of proceedings in the above-entitled matter.  Dated
22  at Denver, Colorado, this 30th day of November, 2021.
23
24                              S/Janet M. Coppock
25
```