IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-CR-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JAYSON JEFFREY PENN,
MIKELL REEVE FRIES,
SCOTT JAMES BRADY,
ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,
WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,
WILLIAM WADE LOVETTE,
GAR BRIAN ROBERTS,
RICKIE PATTERSON BLAKE,

    Defendants

---

REPORTER'S TRANSCRIPT
Trial to Jury, Vol. 1

---

    Proceedings before the HONORABLE PHILIP A. BRIMMER,
Chief Judge, United States District Court for the District of
Colorado, commencing at 8:13 a.m., on the 25th day of October,
2021, in Courtroom A201, United States Courthouse, Denver,
Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Janet M. Coppock, 901 19th Street,
Room A257, Denver, Colorado, 80294, (303) 335-2106

APPEARANCES

1

2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul

3     Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of

4     Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing

5     for Plaintiff.

6          Anna Tryon Pletcher and Michael Tubach of

7     O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

8     San Francisco, CA 94111-3823;

9          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

10    N.W., Washingon, DC 20006, appearing for Defendant Penn.

11         David Beller, Richard Kornfeld and Kelly Page of

12    Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

13    CO 80202, appearing for Defendant Fries.

14         Bryan B. Lavine of Troutman Pepper Hamilton Sanders,

15    LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

16          Laura Kuykendall and Megan Rahman of Troutman Pepper

17    Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,

18    appearing for Defendant Brady.

19         Michael Felberg of Reichman, Jorgensen, Lehman,

20    Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21    10017;

22

23

24

25

APPEARANCES (Continued)

1

2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4    CA 94065; appearing for Defendant Austin.

5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7          Marci Gilligan LaBranche of Stimson, Stancil,

8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9    80218, appearing for Defendant Mulrenin.

10          James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12          Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14          Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16          Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19          John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

```
 1              APPEARANCES (Continued)
 2         Craig Allen Gillen and Anthony Charles Lake of
 3   Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,
 4   Atlanta, GA 30339;
 5         Richard L. Tegtmeier of Sherman & Howard, LLC,
 6   633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing
 7   for Defendant Roberts.
 8         Barry J. Pollack of Robbins, Russell, Englert, Orseck
 9   & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,
10   DC 20006;
11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,
12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing
13   for the Defendant Blake.
14
15                   PROCEEDINGS
16         THE COURT:  Good morning everybody.  The matter before
17   the Court is United States of America versus Jayson Jeffrey
18   Penn and others.  This is Criminal Case 20-CR-152.
19         I'll take entries of appearance, first of all, on
20   behalf of the United States.
21         MR. KOENIG:  Good morning, Your Honor.  Michael Koenig
22   on behalf of the United States.  With me is Heather Call,
23   Carolyn Sweeney, Paul Torzilli and FBI Special Agent LaNard
24   Taylor.
25         THE COURT:  Good morning to you.
```

1          On behalf of Mr. Penn.

2          *MR. TUBACH:*  Good morning, Your Honor.  Michael

3     Tubach.  Mr. Penn is here with me and my colleague, Anna

4     Pletcher, also.

5          *THE COURT:*  Good morning to each of you too.

6          And on behalf of Mr. Fries?

7          *MR. KORNFELD:*  Good morning, Your Honor.  Rick

8     Kornfeld, David Beller.  This is Mr. Fries.  And our colleague,

9     Kelly Page, is in Judge Krieger's courtroom.

10         *THE COURT:*  Right.  I think it was locked, but

11    hopefully the door is open now.

12         *MR. KORNFELD:*  Mr. Keech took care of that, Your

13    Honor.

14         *THE COURT:*  Excellent.  We can count on Mr. Keech for

15    that.  Good morning to each of you.

16         On behalf of Mr. Brady?

17         *MR. LAVINE:*  Good morning, Your Honor.  Brian Lavine

18    and Megan Rahman.  And my client, Scott Brady, is here.  And

19    our colleague, L.A. Kuykendall, is upstairs in the overflow

20    courtroom.

21         *THE COURT:*  Good morning to each of you.

22         On behalf of Mr. Austin.

23         *MR. FELDBERG:*  Good morning, Your Honor.  Michael

24    Feldberg.  Mr. Austin, this is Mr. Austin.  My colleagues are

25    in the overflow courtroom.

1          *THE COURT:*  Okay.  And good morning to each of you.

2                On behalf of Mr. Mulrenin?

3          *MS. PREWITT:*  Good morning, Your Honor.  Elizabeth

4    Prewitt.  I am here with Mr. Mulrenin and also Marci LaBranche.

5    And our colleague, Caroline Rivera, is in the overflow

6    courtroom.

7          *THE COURT:*  Good morning to each of you.

8                On behalf of Mr. Kantola?

9          *MS. HENRY:*  Good morning, Your Honor.  Roxann Henry

10   along with Mr. James Backstrom.  And Mr. Kantola is also here

11   with us.

12         *THE COURT:*  And good morning to each of you.

13               On behalf of Mr. Little?

14         *MR. BYRNE:*  Good morning, Your Honor.  Mark Byrne and

15   Dennis Canty on behalf of Mr. Little, and Mr. Little is present

16   in the courtroom.

17         *THE COURT:*  And good morning to each of you.

18               On behalf of Mr. Lovette?

19         *MR. FAGG:*  Good morning, Your Honor.  John Fagg, and I

20   am here with Dru Nielsen and our colleague Jim McLoughlin.  We

21   are here on behalf of Bill Lovette.

22         *THE COURT:*  Good morning to each of you.

23               And on behalf of Mr. Roberts?

24         *MR. GILLEN:*  Good morning, Your Honor.  Craig Gillen

25   on behalf of Mr. Roberts.  Mr. Roberts is here, as is

 1   Mr. Tegtmeier.  And our colleague, Mr. Lake, is in the overflow

 2   room.

 3           THE COURT:  Good morning to each of you.

 4           And on behalf of Mr. Blake.

 5           MS. JOHNSON:  Good morning, Your Honor.  Wendy Johnson

 6   and Barry Pollack here in the courtroom on behalf of Mr. Blake

 7   who is with us, and our colleague, Chris Plumlee, in the

 8   overflow courtroom.

 9           THE COURT:  Good morning to each of you.

10           First of all, are you good on the tables?  I didn't

11   know what system you were going to have to divvy up table

12   space, but I don't want anyone to think they got bad real

13   estate or something like that, so hopefully you're okay.

14   Obviously, it's tight in here.  I can tell it's real tight

15   right back there.  So perhaps what we could try to do, we might

16   be able to separate this table over a little bit to give you

17   just a tiny bit more room.  Let us know if there are some

18   little adjustments like that that we can make.  It's really

19   tight back there as you know.  Anyway, let us know if we can

20   make some adjustments or something of that nature.

21           For those of you in the front row there, you're -- you

22   obviously will not be able to be sitting there because as you

23   can tell by the numbers.  Of course, one disadvantage of the

24   numbers is that people sit where the numbers are and cover up

25   the numbers, so it's -- it's a little bit tricky.  Believe me,

1    you will see me fumbling around.  Especially with so many

2    people in here, it's a little bit hard to get a view,

3    particularly in the front rows what position people will be in,

4    but we'll get through it.

5            COURT DEPUTY CLERK:  Your Honor, I did provide counsel

6    for each party a copy of the seating arrangement for that very

7    reason.

8            THE COURT:  I don't know what system you may use.  I

9    use Post-it notes and do it like that.  If you want to use a

10   chart that will accommodate a Post-it note that you can then

11   move around, let Mr. Keech know once we take a break.  And

12   maybe Mr. Keech will be able to copy those.  And it might help

13   you better than the smaller chart where you would be scribbling

14   a lot of stuff because, as I mentioned to you, we'll play

15   musical chairs.

16           So you will see in the back there up to 32, that's our

17   magic number, so you will be doing your voir dire of the first

18   32.  But then if people are removed for cause or something of

19   that nature, we'll plug in the next person on the list, so

20   we'll actually make people get up and take the seat.  I think

21   that's a better way to do it so you can have your visuals.  And

22   then when we start exercising peremptories, we'll do the same.

23   We will actually have people move into those seats so you can

24   kind of know who's going to be in the jury and who's not.

25           Okay.  So keep in mind -- oh, here is another thing.

1    So we put in some privacy screens over in the law clerk area

2    over there and they work pretty well, but it's so tight over

3    here, you have to make sure that your screens are not visible

4    to the jury.  Now, if it's one of the big screens on the table

5    that won't be displaying -- Mr. Keech, it won't be displaying

6    any unadmitted exhibits, right?

7            *COURT DEPUTY CLERK:*  I don't believe so.  I believe

8    the large monitors are tied into the jury box.

9            *THE COURT:*  Right.  But in any case, we have to make

10   sure that we don't.

11           The jury trial protocols mention that if one of the

12   jurors is unvaccinated or otherwise wishes to socially

13   distance, that person would normally be in the front row.  We

14   just can't do that.  I mean, having a juror right behind you

15   for the people over there is just unworkable, so we are going

16   to have to do it here.  I think that if we have -- let's say we

17   have two jurors who want to be socially distanced, we can shift

18   everyone else over to the right side for me and have two people

19   in seats or we might have to set up a folding chair or

20   something like that, but we just can't have jurors back there.

21           And hopefully we'll get lucky in terms of people who

22   want to be socially distanced.  That would be good too.

23   Because assuming that we can pull that off, we'll then have the

24   attorneys and your, you know, paralegals or whomever be able to

25   occupy the gallery.  And hopefully, who knows, maybe if we get

1    lucky we won't have to use the overflow courtroom because there

2    will be enough seating for spectators too.  We'll play that by

3    ear.

4         Okay.  And then as you will recall from the trial

5    preparation conference, you can exercise a strike on the

6    alternate seats at any point in time.  So the alternate seats

7    are 3 and 11, okay, 3 and 11.  Keep that in mind.

8         So before I start asking my questions of the jurors, I

9    am going to read to them the following instructions:

10   Presumption of innocence, burden of proof, and right not to

11   testify.  So as you may recall from the jury instructions, and

12   this is stipulated Instruction No. 10, that contemplates it

13   being given after the evidence is closed and we know whether

14   anyone has testified or not.  We don't know that right now, so

15   here is a question for you.  We could either phrase the very

16   beginning of that as follows.  It could say:  The defendants

17   may not testify and I remind you that blah, blah, blah.  We

18   could say:  The defendants may choose not to testify and I

19   remind you that you cannot consider blah, blah, blah.  Or we

20   could say:  The defendants may decide not to testify.

21        Anyone have a preference?  Mr. Beller looks like maybe

22   he is the point person.

23        *MR. BELLER:*  Your Honor, unless I get very dirty looks

24   from my colleagues, I believe our recommendation and request is

25   No. 1, please.

1          THE COURT:  Okay.  Just say:  The defendants may not

2     testify.

3          MR. BELLER:  Correct.

4          THE COURT:  Does that sound good to everybody?

5          MS. CALL:  No objection from the government.

6          THE COURT:  Okay.  That's what we'll do.

7          And then both sides submitted some language that we

8     will tell the jury about just to kind of introduce what type of

9     case this is.  I kind of combined both of those.  Let me read

10    that to you now.

11         The Indictment in this case charges each of the

12    defendants with a conspiracy to suppress and eliminate

13    competition by rigging bids and fixing prices in the broiler

14    chicken industry.  A broiler chicken is a chicken produced for

15    human consumption.  The Indictment also charges Mr. Little with

16    obstruction of justice.

17         Each of the defendants denies that he agreed or

18    conspired with anyone to rig bids or to fix prices for broiler

19    chicken parts.  Mr. Little additionally denies that he

20    obstructed justice.

21         Does that work for people?

22         MR. BELLER:  Yes, Your Honor.  Thank you.

23         MS. CALL:  Your Honor, the only suggested revision on

24    behalf of the government would be the word "products" instead

25    of "parts."

1          *THE COURT:*  Yeah, I think products would be fine.

2          *MR. BELLER:*  There is no objection to that.

3          *THE COURT:*  Okay.  So I think that each defendant

4    should now have a transceiver; is that right?  So presumably

5    those were checked out to you.  We're going to be charging

6    those up at lunch.

7          Yes?

8          *MS. HENRY:*  Excuse me, Your Honor, Roxann Henry.  On

9    the jury instruction you were just talking about --

10         *THE COURT:*  On the right not to testify?

11         *MS. HENRY:*  Excuse me?

12         *THE COURT:*  On the right not to testify?

13         *MS. HENRY:*  No, the one about the --

14         *THE COURT:*  The introduction of the case?

15         *MS. HENRY:*  Correct.  We had in our trial brief asked

16   for an additional sentence.

17         *THE COURT:*  Yeah, I am not going to give that.

18         *MS. HENRY:*  We just wanted to make the record that we

19   did, in fact, still want that.

20         *THE COURT:*  Yeah, I am assuming.  We will get totally

21   bogged down if everyone continually makes -- you know, we filed

22   this, but anyway, fine.

23         Go ahead.

24         *MR. POLLACK:*  Barry Pollack.  Just on the defendants

25   testifying, would the Court mind saying some or all of the

1   defendants may not testify, because obviously they may not all

2   make the same decision.  As opposed to defendants may not

3   testify, some or all of the defendants may --

4          THE COURT:  I don't have a problem.  Anyone have a

5   problem with that?  Yeah, I will be happy to do that.

6          MR. POLLACK:  Thank you, Your Honor.

7          THE COURT:  I just have to find it now.  Okay.  All

8   right.  So anyway, back to those transceivers.  So make sure

9   that you have your transceiver back after it's been charged.  I

10  mean, just make sure you've got it.  One thing that is a handy

11  way to make sure that you are not inadvertently broadcasting

12  we'll say -- they don't really broadcast -- but is just unplug

13  the headset from the top of it.  That will turn it off.  And

14  then I think you'll remember to plug it in before you use it

15  because you'll notice if you put your headset on.

16          If we have a juror who wishes to say something to the

17  Court in private, you never know how that goes.  Sometimes you

18  get kind of a run on the bank and everyone wants to and other

19  times not that many do.  But let's assume that one does.

20  Normally, of course, that would be done by a bench conference

21  and the attorneys at the bench conference would be able to kind

22  of see the juror.  I think what I'll do here, I'll have the

23  juror come forward.  Mr. Keech will help the juror with the

24  headset.

25          First, the juror will have a mask on.  The juror will

1    kind of stand up in this area over by the witness stand.

2    Mr. Keech will turn on the white noise machine and then we'll

3    instruct the juror to talk softly.  As you may have figured out

4    from those tests, you can really practically whisper and be

5    well heard.  They're very sensitive and they work great.  So

6    the juror can talk softly and that will prevent the juror from

7    being overheard, but at the same time you'll be able to see the

8    juror and we'll have the juror talk that way.

9            And then, of course, when we're using the

10    transceivers, make sure you identify yourself.  We'll get

11    better once Ms. Coppock learns your names, but particularly for

12    today's purposes before talking mention your name.  We should

13    do that every time so we make a good record about who is

14    speaking.

15            All right.  So the defendants had asked if I would

16    explain to the jurors that for voir dire they are just going to

17    have two people, and I will do that.  I'm not going to read

18    your exact language, but I will explain that for practical

19    purposes it's just not -- that they decided to go with two,

20    okay?  And then in terms of the amount of time to confer before

21    we start exercising peremptories, I will give the defendants --

22    I will give you 25 minutes.  There is not a real good place --

23    I don't have a room.  There is so many of you.

24            But what I would suggest is the following, and that is

25    you go up to one of the other floors.  You know, just pick a

1    floor.  Maybe Mr. Keech can look and see -- if you don't mind,

2    Mr. Keech, if you could take a look at the judges' dockets and

3    see if you can find a floor where there is nothing going on

4    when it gets to that time.  I am not sure what time that will

5    be, but that would be my suggestion is you go up to one of the

6    floors.  Then you'll have more room in one of the hallways

7    there outside of the courtrooms and can be able to confer with

8    each other about that.

9         All right.  So on the preliminary instruction, first

10   of all, for the same reasons that I declined at the trial

11   preparation conference to expand further on the elements of the

12   Sherman Act count, I am also declining to modify the

13   preliminary instruction as suggested by the defendants in

14   Docket No. 665 at Page 14.

15        Second, because Count Two against Mr. Little has now

16   been dismissed, I am not going to refer to counts by number and

17   you should not either.  There is just no purpose to it.  The

18   problem is there is a gap.  So if we are mentioning Count One

19   and Count Three, people are going to wonder where Count Two is.

20        Similarly, we are not going to talk about the

21   Superseding Indictment.  We are only going to talk about the

22   Indictment.  Because if you mention a Superseding Indictment,

23   there is always the chance that some juror will wonder what the

24   Indictment was.  So we are just going to talk about the

25   Indictment.  We are just going to talk about the counts.  You

1    know, we will have the Sherman Act count.  We will have the

2    count involving Mr. Little.

3            And Mr. Koenig, on your opening you are still hitting

4    20 minutes?

5            MR. KOENIG:  I think last night it was down to 15 and

6    a half.

7            THE COURT:  Okay.  So Mr. Koenig will have his.  He is

8    maybe going to go 20 minutes.  And then for the defendants

9    we'll go in whatever order you want to do.  Do you want me to

10   give you a heads-up when you have a certain amount of time left

11   or you can keep time at your tables.  I will -- if you're out

12   of time, I'm going to tell you, but I would prefer some

13   universal thing like if I could tell you two minutes left or

14   five minutes left, something of that nature.  Any preference?

15           MR. GILLEN:  I would love a two-minute warning, Your

16   Honor.

17           THE COURT:  Actually, we are not going to get to

18   openings anytime soon.  You can think about it.  Maybe when we

19   start up for lunch, you can let me know.  I would prefer a

20   universal one, although if you really want different ones, I

21   can probably accommodate that, but just think about that.

22           Yes?

23           MR. McLOUGHLIN:  This is Jim McLoughlin for

24   Mr. Lovette.  With respect to the preliminary jury

25   instructions, how does Your Honor want us as a group or as

1    individuals to register an objection with respect to not giving

2    the requested instruction?  We want to make sure that that's on

3    the record.

4              THE COURT:  Why don't you make those now.

5              MR. McLOUGHLIN:  On behalf of Mr. Lovette, we would

6    object to the Court declining to give our preliminary

7    instructions.  The second point is with respect to the issue of

8    the Indictment or the Superseding Indictment, for those who

9    were within the Superseding Indictment but not the Indictment

10   with respect to cross-examination or other issues where the

11   procedures of the investigation come into play and are going to

12   be possibly the subject of direct or cross or the like, we I

13   think as a practical matter are going to be compelled to

14   distinguish between the first Indictment and the Superseding

15   Indictment because of the change of parties.

16             THE COURT:  What do you mean the change of parts?

17             MR. McLOUGHLIN:  To follow the issue of -- we have to

18   talk about both.

19             THE COURT:  Okay.  That's a good point.  So what do

20   you mean the change of parts?

21             MR. McLOUGHLIN:  Parties.

22             THE COURT:  All right.  So you think that there may be

23   some reason that it would be important during the trial to

24   distinguish between the two?

25             MR. McLOUGHLIN:  Yes, Your Honor.

1        THE COURT:  Yeah, and I see a number of other heads

2   nodding.  So that's fine.  So you can refer to -- we'll refer

3   to the Superseding Indictment.  But if there is a reason to ask

4   about the Indictment, Superseding Indictment, that's fine, but

5   we will try to avoid the counts issue, okay?

6        MR. McLOUGHLIN:  Thank you, Your Honor.

7        THE COURT:  Any additional objections regarding the

8   introductory instruction?

9        MR. TUBACH:  Michael Tubach on behalf of Jayson Penn.

10  I just wanted to join in Mr. Lovette's objection.

11       MR. FELDBERG:  Michael Feldberg on behalf of

12  Mr. Austin.  I join as well.

13       MR. BYRNE:  Mark Byrne on behalf of Mr. Little.  We

14  join.

15       MR. KORNFELD:  Rick Kornfeld on behalf of Mr. Fries.

16  We would join.  Thank you.

17       MS. PREWITT:  Liz Prewitt on behalf of Mr. Mulrenin.

18  We would join.

19       MR. LAVINE:  And Bryan Lavine on behalf of Scott

20  Brady.

21       Judge, if I can ask a procedural issue here.

22       THE COURT:  Let's get the objections on the record

23  first and then we will do that.

24       MR. LAVINE:  That's fine.

25       MR. GILLEN:  Craig Gillen on behalf of Mr. Roberts.

1    We join as well.

2         *MS. HENRY:*  Roxann Henry on behalf of Mr. Kantola.  We

3    also join in the objection.

4         *MR. POLLACK:*  Barry Pollack.  And Mr. Blake also

5    joins.

6         *THE COURT:*  Mr. Lavine, go ahead.

7         *MR. LAVINE:*  Yes, your Honor.  Obviously during this

8    trial we are going to have objections of which probably many

9    people are going to want to join in.  Do you want us, everyone

10   to stand up and make the objection for the record or is an

11   objection for all -- for one will be carried for all?  How

12   would you like us to handle this?

13        *THE COURT:*  That's a great question.  I don't have a

14   good sense for it.  If you anticipate that the norm would be

15   everyone joins, then I think that we could do that as long as

16   everyone agrees to that.  If -- and then we need some procedure

17   just in case someone did not want to join, but if that's the

18   exception and therefore there would be fewer records being made

19   in that regard, then that might be the best way to do it.  So

20   I'm not sure what the sense is because I just don't have a good

21   feel for it, but...

22        Mr. Beller?

23        *MR. BELLER:*  Thank you, Your Honor.

24        And Your Honor, I can advise the Court that's

25   something we are happy to discuss and then report back.  The

1    concern that I have on behalf of my client is making sure that

2    the jury understands, of course, that each one of our clients

3    are individuals where evidence is to be analyzed and processed

4    differently as well.  So long as that is being projected to the

5    jury and we're not being viewed as a single whole --

6         THE COURT:  Well, I think the jury is going to hear

7    that time and time again.

8         MR. BELLER:  I think so.

9         THE COURT:  The disadvantage for the defendants, but

10   once again it's totally up to you, is that if the rounds of

11   objections are cumbersome and time consuming, maybe at some

12   point in time the jurors become just so used to it, but it is a

13   potential downside for the defendants too.

14        MR. BELLER:  I agree with that, Your Honor.

15        At the risk of switching gears prematurely, I did want

16   to address the voir dire issues and jury protocols.  Is this an

17   appropriate time to do so?

18        THE COURT:  What unique thing that we haven't talked

19   about already would we need to talk about right now?

20        MR. BELLER:  Judge, I think I am going to be

21   relatively brief and simply inform the Court that during the

22   defense's jury selection, Ms. Nielsen is going to be

23   voir-diring first.  We are going to be internally tracking the

24   amount of time and we are going to try our best to split the 45

25   minutes between Ms. Nielsen and myself.  If the Court will

1    allow us to have our phone simply with the timer --

2                THE COURT:  Oh, that's fine.

3                MR. BELLER:  -- on the lectern.

4                THE COURT:  Yeah, you can do that.

5                MR. BELLER:  Thank you, Your Honor.

6                THE COURT:  Anyone can do that.  If you want to have a

7    phone up there to keep as your timer, that's fine.

8                MR. BELLER:  Certainly.  And the Court has ruled on

9    this process and the amount of time, and I am not going to

10   belabor the issue, only to say that it is the request of the

11   defendants that each one of them have equal time to the

12   government to individually address the jury for jury selection.

13   I understand the Court has asked us to divide our 45 minutes or

14   at least has given the entire defense 45 minutes.  We don't

15   need to reargue that.  I simply wanted to note the objection on

16   behalf of all defendants as to that procedure.

17               Your Honor, finally, in the interests of trying to

18   make our selection of our peremptories as efficient as

19   possible, we have designated one individual who are going to be

20   collecting all of the different requests of the defendants and

21   trying to manage those.  And so currently she is -- actually,

22   she is behind me planning on going to the overflow room.  If

23   the Court would simply allow us one chair anywhere in the

24   courtroom for her to be able to listen and be able to collect

25   information from the different defendants for purposes of

1   exercising peremptories, we think we can make that 25 minutes

2   the Court has allotted us very efficient.

3          THE COURT:  Oh, so in other words, have an extra

4   person.  Yeah, you can do that.

5          MR. BELLER:  Thank you, Your Honor.

6          And then, Judge, the last thing I want to simply bring

7   to your attention is it dawns on us that there may be a

8   possibility that the government accepts the panel as seated at

9   some point, in which case I would simply ask for leave of the

10  Court to be able to quickly reconvene and make sure that that

11  doesn't modify any defendant's position regarding the use of

12  additional peremptories.

13         THE COURT:  I will allow time to do that, but -- well,

14  I might give you a few minutes to step outside.

15         MR. BELLER:  Understood.

16         THE COURT:  It would have to be quick, but that -- in

17  the event that that does happen, it will -- it changes things

18  quite a bit, but on the other hand, you'll presumably still

19  have your order.

20         MR. BELLER:  Great.  Thank you, Your Honor.

21         MR. POLLACK:  Your Honor, Barry Pollack on behalf of

22  Mr. Blake.  So I want to just be clear that we understand the

23  Court's ruling and in light of the ruling have designated two

24  lawyers to conduct the voir dire, but obviously all 10

25  defendants in our view have a right to do voir dire and to be

1   active participants in the voir dire.  I am not sure -- for

2   example, if an issue comes up as to whether or not a juror

3   should be struck for cause, if the Court is going to take that

4   up at the time the issue comes up, will there be time for the

5   other defendants to confer with the two to articulate positions

6   or are we essentially in a position we need to deputize two and

7   the other eight have no voice in whether or not somebody is

8   going to be --

9           THE COURT:  That's up to you.  All 10 defendants can

10  use part of the 45 minutes.  And the same -- we're not going to

11  have any meet-and-confers every single time we have an issue

12  that comes up.  So I don't know.  You'll have to figure that

13  out.

14          MR. POLLACK:  Can I make a request, Your Honor?

15          THE COURT:  Sure.

16          MR. POLLACK:  And that is rather than dealing with

17  strikes for cause as they come up, would it be possible to at

18  some point take a break and then come back and deal with all

19  the strikes for cause that may have arisen in that previous

20  segment?

21          THE COURT:  Well, that's essentially like not taking a

22  break.  Are you talking about taking a break, spending the

23  time -- spending a break to figure out the challenges for

24  cause?

25          MR. POLLACK:  Yes.

1          *THE COURT:*  Then you won't get a break.

2          *MR. POLLACK:*  I am sorry, Your Honor.  I guess I am

3     not following you.  I take it the answer is no.

4          *THE COURT:*  No, not necessarily.  But if we hold

5     off -- for instance, here is what happens all the time.  You

6     know, because once we get to the "Anyone have a hardship," it's

7     going to -- we are going to spend over an hour trying to go

8     through it.  But let's say we get someone who says, "Yeah,

9     I've -- I'm going off on this prepaid trip for two weeks.  I

10    leave next week."  It's just absolutely a clear-cut case of

11    hardship.  Typically you would just deal with that right then

12    and there.

13          Now, closer calls, yes, you know, we could go ahead

14    and save some of those people up.  My point is this.  If we

15    then talk about those issues outside of the presence of the

16    jury, then after we finish doing that, then presumably all of

17    you will still need 15 minutes for a break.  So you are turning

18    this huge group of 75 people loose on the world for now half an

19    hour instead of just 15 minutes, so there are disadvantages to

20    having people wondering around and getting them back

21    reassembled.  That's what I mean.

22          *MR. POLLACK:*  And so the conclusion from that is what?

23    That you will deal with any -- that if someone wants to make a

24    motion for cause, they need to make it at the time that the

25    issue arises?

1        THE COURT:  No.  My point is this.  There will be some

2    clear-cut people, and what I want to do is at that point say

3    anyone have a problem with excusing Ms. Rodriguez or whatever.

4        MR. POLLACK:  And I appreciate that, Your Honor.  I

5    guess let's put the clear-cut ones to the side and let's take a

6    juror where there might be some debate either between the

7    government and the defendants or even amongst the defendants

8    about whether or not what that person has raised rises to the

9    level that there should be a strike for cause.

10       THE COURT:  Well, we're not going to do that on a

11   rolling basis because that would deprive, for instance, the

12   defendants the ability to ask questions of that person, the

13   ability to try to rehabilitate someone or see if you can show

14   that the person's biased.  So typically those will come at the

15   end anyway.  And when we do that, I do agree with you, we'll

16   probably have a sufficient number and we will excuse the jury.

17   So I think bottom line is that I don't think we really have an

18   issue.  We will do the clear-cut ones contemporaneously.  We

19   will save the rest up till the end.

20       MR. POLLACK:  Thank you, Your Honor.  I think that

21   does resolve it.  I just didn't want to be in a position where

22   eight of the defendants were essentially going to have no input

23   into whether or not someone was going to be stricken for cause.

24       THE COURT:  You will always have input.  The question

25   is how much huddling up may occur before then.  Let's play that

1    by ear.  We'll save up close cases to the end.

2             *MR. POLLACK:*  And I don't want to belabor the point.

3    As a practical matter, we will not have input unless there is

4    the ability to huddle up.  And there is no way that the other

5    eight defendants can in real-time communicate with the other

6    two.  It's just not practical given the numbers.  I guess maybe

7    it's just a matter of semantics, but I am concerned that unless

8    there is a break where the defendants can talk to their two

9    representatives, there really is no way for the other eight to

10   participate in a meaningful way.

11            *THE COURT:*  Yeah, I understand.  I think the

12   semantics, we don't want to spin our wheels on semantics this

13   morning.

14            *MR. POLLACK:*  I am not trying to, Your Honor.  I

15   understand the record is clear.  I'd appreciate the opportunity

16   to have that discussion.

17            *THE COURT:*  Here is another thing that you guys have

18   got to be very, very careful about, and that is not to talk

19   about the case in the hallways.  You have got to warn your

20   witnesses.  You have got to be super careful, each and every

21   one of you.  Murphy's law is in full effect, I guarantee you.

22   If you're in an elevator, assume that the person that you can't

23   see is a juror who is not supposed to be on the floor but is

24   anyway.  When you're in the security line, you cannot talk

25   about the case.  You just have to be -- and as a matter of

 1    fact, if you're walking across the block to the courthouse

 2    crossing the street, you can't be talking about the case

 3    because people are all in the morning or after lunch heading

 4    into the courthouse again.  So you have to be very, very, very

 5    careful about that.  And let those who aren't present know that

 6    as well.

 7            Of course, warn your witnesses.  I will have the

 8    jurors -- I will tell the jurors make sure to wear your yellow

 9    juror buttons.  But if the weather turns cold -- we'll see --

10    you know, they put on a coat to go out to lunch and, you know,

11    at lunch they have to be extremely careful.  So make sure that

12    you're real careful about that.

13            Yes, Mr. Byrne?

14            MR. BYRNE:  On behalf of Mr. Little.  So we filed a

15    request to have Mr. Little appear intermittently at the trial,

16    and then you agreed that we could file a supplemental on that

17    which we did.  I don't remember seeing a ruling on that, so --

18            THE COURT:  It should have been docketed.  We denied

19    that.  I denied that.  I am sorry about that.  Yeah, it should

20    be docketed.  I don't know why it wouldn't be.

21            MR. BYRNE:  It probably was.  There has been a lot of

22    filings, so I apologize.  I just wanted to raise that.

23            THE COURT:  Yeah, absolutely.  Once again, I apologize

24    to Mr. Little.  I just don't see a way around it.  I am very

25    sympathetic to his situation, but I just -- I think that there

1    is a requirement under the rule and that's why I ruled the way

2    that I did.

3           So during voir dire and during openings, that -- I

4    think that that podium can be canted around.  We can revolve

5    that around.  That doesn't mean that you have to stand directly

6    behind it, but you should be within arm's reach of that.  I

7    don't want you taking a tour of the jury room or something like

8    that while you're doing your opening or voir dire.

9           Also, once we get going and the jury is present, if

10   you need to confer with one another, and there will undoubtedly

11   be those occasions, but let's assume that you need to confer

12   with the government over some point, just ask for the

13   opportunity to confer.  I will give it to you as opposed to

14   shouting over, "Hey, has exhibit so and so been admitted," that

15   type of thing, because we want to make a good record.

16          So witnesses, we need to read the witness lists to the

17   jury to see if they know anyone.  Each side, if it wishes, can

18   read the witness list, and I have prepared each side's

19   witnesses in alphabetical order for you to read.  If you do so,

20   you just read the name.  You don't say special agent.  You

21   don't say doctor.  You just read the name.  If someone raises a

22   hand and would say, "Well, I know John Smith," you might need

23   to provide a few details.  This is John Smith.  He lives in so

24   and so state.  But you wouldn't provide a background,

25   background facts on everyone.  You just read the names.  Or if

1    you would wish, I have prepared an alphabetical list of both

2    sides' witnesses and I could read that list to the jury.

3              Any preference?

4              MS. HENRY:  Your Honor, Roxann Henry.  We would prefer

5    you to read it.

6              THE COURT:  Anyone -- do you want me to read it?

7    Okay.  I'll read it.  Now, let me ask you about a few

8    pronunciations.  Is it Anna Bieganowska?

9              MS. SWEENEY:  Bieganowska, Your Honor.

10             THE COURT:  And is it Sara Knust?

11             MR. TORZILLI:  Paul Torzilli for the United States.  I

12   believe it's Sara Knust.

13             THE COURT:  Okay.  And Kent Kronaugue?

14             MR. BELLER:  Your Honor, it's Kronaugue.

15             THE COURT:  Okay.  Eric -- is it Eric Oare?  Okay.

16             Mark Oechsli?

17             MR. FELDBERG:  Oechsli.

18             THE COURT:  Okay.  Meyer Skalak?

19             MS. SWEENEY:  Your Honor, Carolyn Sweeney for the

20   United States.  It's Skalak.

21             THE COURT:  Okay.  Is it Charles Von der Heyde?

22             MR. TUBACH:  Your Honor, I believe it's Von der Heyde.

23             Your Honor, just in case, again Michael Tubach.  I

24   believe it's Waldbusser.

25             THE COURT:  Okay.  I am glad you mentioned that.

1          *MR. TUBACH:*  It may be trending towards Waldbusser,

2     Your Honor, Waldbusser.

3          *THE COURT:*  Trending towards that.  I will go with the

4     trend, Waldbusser.  Yeah, for both, okay.

5          *MR. BELLER:*  One more, Your Honor, and I am sure the

6     Court knows, but our client is Mikell Fries.

7          *THE COURT:*  Yeah, and I hope not to mispronounce

8     Mr. Fries' name.  The visual, I just want to mispronounce it,

9     but I will, of course, try hard not to.

10          Okay.  Any requests for sequestration?

11          *MR. BELLER:*  Yes, Your Honor.

12          *THE COURT:*  Okay.  One does it.  So make sure that

13     your witnesses all know that too.  Very important that the

14     witnesses understand what sequestration means, okay?

15          *MS. CALL:*  Your Honor, Heather Call for the United

16     States.  With one exception being we do have our advisory

17     witness, Special Agent LaNard Taylor, who is on the

18     government's witness list.

19          *THE COURT:*  Sure.  Pursuant to rule each party is

20     entitled to an advisory witness; and as a result, he may be

21     your advisory witness.

22          Yes, Mr. McLoughlin?

23          *MR. McLOUGHLIN:*  Your Honor, to be clear, however,

24     when an agent, Mr. Taylor or anyone else, is testifying, the

25     sequestration order will apply.

1    THE COURT:  Yes, that's right.  So the rule is this,

2  that when an advisory witness is on the stand, during that

3  period of time he cannot be prepped or, you know, communicated

4  with until he has finished testifying.

5    Okay.  I am going to early on in the process ask each

6  of you to introduce yourselves and your clients.  You can stand

7  or you can do what you want, but make sure that you mention the

8  names of those persons who you anticipate doing a direct

9  argument or a cross, even though they may not be present here,

10  so that the jury hears their names as part of that

11  introduction, okay?

12    MR. McLOUGHLIN:  Your Honor, on the question of the

13  advisory party, we would also request that during the time the

14  other two agents who are on the stand who are listed as

15  witnesses, and that would be Mr. Koppenhaver and Ms. Nelson are

16  testifying, that Mr. Taylor as an adviser not be in the

17  courtroom because of the extensive overlap between the

18  testimony of the agents as summary witnesses.  And so we would

19  ask that Special Agent Taylor is fine except when Agent

20  Koppenhaver or Agent Nelson is testifying and vice versa.

21    THE COURT:  That will be denied.  An advisory witness

22  can remain in the courtroom, so that will be denied.

23    What do we think about the length of the trial?  Have

24  people thought about that?  Are we still going to tell the

25  jurors that it's going to end on no later than December 21st,

1    but that their deliberations are not limited?

2    　　　　MS. CALL:  Your Honor, the government's current

3    estimate -- and as we said at the pretrial conference, this may

4    depend on the amount of cross -- would be resting the

5    government's case on November 9th.

6    　　　　THE COURT:  Okay.  What does that mean in terms of the

7    defendants?  Any -- I am not sure that you could figure it out

8    now, but shall we stick with December 21st?

9    　　　　MR. LAVINE:  Your Honor, we haven't really talked

10   about it, but I think the best thing to do is stick with

11   December 21st.  If it's shorter, that would be wonderful.  But

12   at this point unless anyone has an objection, I think the best

13   thing is December 21st.

14   　　　　THE COURT:  Okay.  Any other things that we should

15   bring up before we bring the panel in?

16   　　　　MS. CALL:  Your Honor, brief I believe procedural

17   questions for the United States.  First is if Your Honor has

18   any preference as for the individual questions of the jurors by

19   attorneys?  I think at least on the government's side many of

20   our questions could be reformulated to change the first couple

21   words to "has anyone ever" and address the potential jurors as

22   a group rather than individually one by one, but I wanted to

23   check with Your Honor.

24   　　　　THE COURT:  No, it's totally up to you.  You can ask

25   each juror.  You can ask the group.  But remember, you're only

1    asking the first 32, so, you know, all the people over there,

2    you're not talking to them.  You will be talking to the

3    people -- some of the people over on this side.  It's a little

4    bit -- it will be a little bit confusing to the jurors because

5    you can see that 32nd seat is in the second to the last row

6    there, so that person's in.  The rest of the people in that row

7    are not, but as I said, we'll plug people in and out as we go.

8          *MR. FELDBERG:*  May I step out for one moment?

9          *THE COURT:*  Yes, you may.

10         *MS. CALL:*  The second question Your Honor, is I

11   appreciate the courtroom may be quite filled sometimes, but a

12   number of the government's witnesses are represented by

13   counsel.  And I wanted to see if Your Honor has any opposition

14   to us saving a seat for that counsel to be able to be in the

15   courtroom when their client is present.

16         *THE COURT:*  That is not a problem.  Usually what we

17   would do is have a witness who is represented by counsel, have

18   counsel sit in one of the front rows there, but not at counsel

19   table.  We want the person to be close enough so that he or she

20   can interpose an objection or do something in the

21   representation of the client, so that's what we'd do.  We

22   wouldn't have a special seat for such person, but we would need

23   to make room for such person in one of the front rows there.

24         *MS. CALL:*  Thank you, Your Honor.

25         *THE COURT:*  Mr. Fagg?

1          MR. FAGG:  On behalf of Mr. Lovette, we would object

2     to the government witness -- a witness that the government is

3     calling, having their counsel sit on the front row by their

4     side just given the proximity of all these tables.  We would

5     ask that they at least be in the second row.

6          THE COURT:  Just so they don't overhear something

7     or --

8          MR. FAGG:  Computer screens or --

9          THE COURT:  Yeah, actually, that's not a bad idea.

10    Why don't we do that.  We'll plan on second row, then.

11         MS. CALL:  Perfectly fine, Your Honor.

12         And then on the topic of objections, the government

13    understands from a number of the briefings filed that certain

14    defendants may file objections based on the time periods of

15    certain communications and the relevance of their client.  I

16    think the government would just suggest perhaps the first time

17    those were lodged we take up a side bar on the microphone so

18    that the objection can be properly addressed.

19         THE COURT:  I don't quite follow you.  Time periods,

20    of course, we are talking about a lot of time periods.  What do

21    you mean?

22         MS. CALL:  Sure.  Just in the briefings, not by the

23    government, but I believe, for example, Defendant Blake has

24    objected to the relevance of evidence predating 2016, and we

25    would just suggest a side bar to address those kinds of

1    objections.

2         *THE COURT:*  We might need to.  We'll see.

3         *MS. CALL:*  That is it.  The last question being for

4    turning the lectern, do you have a preference for when we do

5    that, whether it be before the jurors come in?

6         *THE COURT:*  Once I go into recess why don't we try to

7    do that.  I think that it should be mobile enough that we can

8    turn that, but yes, that's no problem there.

9         *MS. CALL:*  Thank you, Your Honor.

10        *THE COURT:*  Anything else?  Okay.  We will be in

11   recess, then.  Mr. Keech will pass out the list.  If you

12   want -- oh, he has made those copies, so if you want a bigger

13   seating chart that will accommodate Post-its, you can get that

14   from him.  And once the jury has been brought in and everyone

15   is seated, then we'll get going with jury selection, okay?

16        *COURT DEPUTY CLERK:*  Your Honor, Ms. Buchanan checked

17   and the seventh floor and the tenth floor look like the most

18   available floors.

19        *THE COURT:*  Yeah, so seventh and tenth.  It should be

20   pretty quiet in those hallways if that's where you want to

21   convene to talk, okay?

22        All right.  The Court will be in recess.  Thank you.

23        (Recess at 9:05 a.m.)

24        (Reconvened at 9:25 a.m.)

25        *THE COURT:*  Welcome everyone to the United States

1   District Court for the District of Colorado.  My name is Philip

2   Brimmer and I am the judge who is presiding over this trial.

3   Let me just thank each of you for responding to your summons

4   and being present today.  Jury service is one of the most

5   important civic obligations of a citizen in the United States

6   and it guarantees that the parties to a dispute have members of

7   the community come in and decide the matter.

8           And just to let you know what trust the system reposes

9   in jurors, perhaps some of you have heard of the litigation

10  that was going out in California, *Apple v. Samsung*, so a big

11  civil case.  That's different than this case, but a civil case.

12  Patents on the iPhone were at issue.  And that case was worth

13  hundreds of millions of dollars and yet people that were drawn,

14  just like you from the community, were the ones who were

15  deciding that issue. despite the fact that they weren't

16  software engineers and may not have had any background in it

17  particularly, but through the trial process the jurors were

18  then -- decided that whole case.

19          To give you another illustration of just how important

20  jury service is, think about the following, and that is that

21  every single person in this courtroom today is just one traffic

22  accident away from either being a plaintiff in a case or a

23  defendant in a case.  And certainly if this was your trial as

24  either a plaintiff or a defendant, you would want the persons

25  who came for jury selection to take the case seriously, to

1    answer the questions truthfully, and to otherwise make sure

2    that the trial would be fair to both sides.

3           The Court is convened today in the following matter:

4    United States of America versus Jayson Jeffrey Penn, Mikell

5    Reeve Fries, Scott James Brady, Roger Born Austin, Timothy R.

6    Mulrenin, William Vincent Kantola, Jimmie Lee Little, William

7    Wade Lovette, Gary Brian Roberts and Rickie Patterson Blake.

8    This is Criminal Action 20-CR-152.  So it is a criminal case,

9    ladies and gentlemen.  That differs from a civil case, like I

10   mentioned that *Apple v. Samsung* case.  In that case the burden

11   of proof was by a preponderance of the evidence.  The burden of

12   proof in a criminal case is beyond a reasonable doubt.

13          The Indictment in the case charges each of the

14   defendants with a conspiracy to suppress and eliminate

15   competition by rigging bids and fixing prices in the broiler

16   chicken industry.  The Indictment also charges Mr. Little with

17   obstruction of justice.

18          Each of the defendants denies that he agreed or

19   conspired with anyone to rig bids or to fix prices for broiler

20   chicken products.  Mr. Little additionally denies that he

21   obstructed justice.

22          Ladies and gentlemen, keep in mind that these are only

23   charges.  Each of the defendants are presumed innocent unless

24   proven guilty.  Let me now read to you, ladies and gentlemen, a

25   couple of instructions that contain some of the basic

1  principles of criminal law.

2       First of all, the government has the burden of proving

3  each defendant guilty beyond a reasonable doubt.  The law does

4  not require a defendant to prove his innocence or produce any

5  evidence at all.  The government has the burden of proving the

6  defendant guilty beyond a reasonable doubt, and if it fails to

7  do so, you must find the defendant not guilty.  Proof beyond a

8  reasonable doubt is proof that leaves you firmly convinced of

9  the defendant's guilt.

10       There are few things in this world that we know with

11  absolute certainty.  And in criminal cases the law does not

12  require proof that overcomes every possible doubt.  It is only

13  required that the government's proof exclude any reasonable

14  doubt concerning the defendant's guilt.  A reasonable doubt is

15  a doubt based on reason and common sense after careful and

16  impartial consideration of all of the evidence in the case.

17       If, based on your consideration of the evidence, you

18  are firmly convinced that the defendant is guilty of the crime

19  charged, you must find him guilty.  If, on the other hand, you

20  think there is a real possibility that he is not guilty, you

21  must give him the benefit of the doubt and find him not guilty.

22       One other instruction, ladies and gentlemen.  Some or

23  all of the defendants may not testify.  And I remind you that

24  you cannot consider each defendant's decision not to testify as

25  evidence of guilt.  You must understand that the Constitution

1    of the United States grants a defendant the right to remain

2    silent.  That means the right not to testify.  That is a

3    constitutional right in this country.  It is very carefully

4    guarded.  And you must not presume or infer guilt from the fact

5    that a defendant does not take the witness stand and testify or

6    call any witnesses.

7            All right.  Ladies and gentlemen, during the jury

8    instruction process, we are going to be selecting 14 people for

9    the jury, 12 regular jurors, two alternate jurors.  Before we

10   begin, let me introduce the people in the courtroom who are

11   assisting me from my staff and also I will have the parties

12   introduce themselves to you as well.

13           First of all, Mr. Keech, Mr. Rob Keech is right there.

14   He is our courtroom deputy.  He will be assisting us this week.

15   Sabrina Grimm is going to be handling things next week and

16   thereafter.

17           Right in front of me is Ms. Janet Coppock.  She is the

18   court reporter and she is transcribing everything that's being

19   said.  So while we are doing jury selection if I can't hear

20   you, I may ask you to repeat yourself.  And we have a

21   microphone back there.  You will see it.  That can be taken off

22   the stand.  We will be passing that around as well to make sure

23   that we can hear everyone during the course of jury selection.

24           Ms. Virginia Butler right there, she is my law clerk.

25   She will be assisting me in the case.

1          And now I am going to have the parties introduce

2    themselves.  First of all, the United States.

3          MR. KOENIG:  Thank you, Your Honor.  My name is

4    Michael Koenig.  I am a lawyer for the United States

5    Government.  And with me today at the counsel table is Heather

6    Call, Carolyn Sweeney, Paul Torzilli.  Two other attorneys you

7    may see in the course are Jill Rogowski and Laura Butte.  Also

8    with us at counsel table is Special Agent LaNard Taylor from

9    the Federal Bureau of Investigation.

10          THE COURT:  Thank you.

11          And now if counsel for Mr. Penn would please introduce

12    themselves.

13          MR. TUBACH:  Good morning, ladies and gentlemen.  My

14    name is Michael Tubach.  I represent Jayson Penn who is

15    standing next to me.  And also representing Mr. Penn is Anna

16    Pletcher who is currently residing in the overflow room given

17    the lack of space now.

18          THE COURT:  Just by way of explanation, ladies and

19    gentlemen, because of the pandemic, because everyone, we have

20    to have people out in the gallery, not all of each side's

21    attorneys are able to fit into the room.  So there is some

22    attorneys who we have a so-called overflow courtroom and they

23    are watching upstairs.  But once we finish with jury selection,

24    we hope that they'll be able to fit back down in here.

25          All right.  And if counsel for Mr. Fries would

1  introduce themselves.

2           MR. KORNFELD:  Good morning everyone.  My name is Rick

3  Kornfeld.  I represent Mr. Fries.  My colleague David Beller

4  and also our colleague Kelly Page who presently is upstairs.

5           THE COURT:  Thank you.

6           And counsel on behalf of Mr. Brady?

7           MR. LAVINE:  Good morning everyone.  My name is Bryan

8  Lavine.  And I am with my colleague Megan Rahman and my client

9  Mr. Scott Brady.  And upstairs in the overflow room is L.A.

10 Kuykendall who is also assisting on this matter.

11          THE COURT:  Thank you.

12          And on behalf of Mr. Austin.

13          MR. FELDBERG:  Good morning, ladies and gentlemen.  I

14 am Michael Feldberg.  This is Roger Austin, my client.  My

15 colleagues Laura Carwile and Julie Withers are upstairs and

16 will be hopefully with us in the courtroom.

17          THE COURT:  Thank you.

18          On behalf of Mr. Mulrenin.

19          MS. PREWITT:  Good morning.  My name is Elizabeth

20 Prewitt and I represent Mr. Mulrenin here.  With me is also my

21 co-counsel Marci LaBranche.  And also Caroline Rivera is also

22 with our team and is in the overflow courtroom.

23          THE COURT:  Thank you.

24          On behalf of Mr. Little -- I am sorry, Mr. Kantola.  I

25 got ahead of myself.

 1          *MS. HENRY:*  Good morning.  My name is Roxann Henry and

 2     I am here with Mr. James Backstrom, and we are both here

 3     representing Mr. Bill Kantola.  Thank you.

 4          *THE COURT:*  All right.  Thank you.

 5          And now on behalf of Mr. Little.

 6          *MR. BYRNE:*  Good morning, Your Honor.  My name is Mark

 7     Byrne.  I am here with Dennis Canty and we are both

 8     representing Mr. Little.

 9          *THE COURT:*  Thank you.

10          And on behalf of Mr. Lovette.

11          *MR. FAGG:*  Good morning everyone.  My name is John

12     Fagg and I am here with Dru Nielsen.  We represent Bill

13     Lovette.  Also upstairs are our colleagues Jim McLoughlin and

14     Frank Shaw.

15          *THE COURT:*  And on behalf of Mr. Roberts.

16          *MR. GILLEN:*  Good morning everyone.  My name is Craig

17     Gillen.  I represent Mr. Roberts along with Richard Tegtmeier.

18     We will be representing Mr. Roberts, as well as Anthony Lake

19     who is in the other room.  Thank you very much.

20          *THE COURT:*  And on behalf of Mr. Blake.

21          *MS. JOHNSON:*  Good morning, everyone.  My name is

22     Wendy Johnson.  My co-counsel is Barry Pollack and we represent

23     Rick Blake.  We also have Chris Plumlee who is upstairs in the

24     overflow courtroom.  Thank you.

25          *THE COURT:*  All right.  Thank you.

1          Ladies and gentlemen, this trial, I think you may know

2   this from the summons, but this trial is set for 32 days.   And

3   there is not going to be any trial this Friday, but pretty much

4   after that for the next several weeks we are going to have

5   trial five days a week or at least four days a week.   There

6   will be some exceptions later on.   And the last day of the

7   trial is scheduled for December 21st, so that's a Tuesday, on a

8   Tuesday.   The trial will end on that date, if not earlier.

9   There is a chance it could end earlier, but you should think it

10  could possibly go to December 21st.

11         Keep in mind, ladies and gentlemen, however, that the

12  length of time for deliberations is not limited.   So if the

13  jury were to need more time to reach a verdict, the jury could,

14  of course, have as much time as they need to reach a verdict.

15  You probably would be wondering about Thanksgiving.

16  Thanksgiving, of course, we are not going to have trial, and we

17  are not going to have trial the day after Thanksgiving either.

18         The hours of trial, generally as follows:   Usually

19  during a typical trial day we will start at 8:30.   There will

20  be a mid-morning break at 10:15, and then we will break at noon

21  for -- until 1:30 for lunch.   When we reconvene in the

22  afternoon, there will be another break at 3:15, and then we

23  will break usually every day pretty much right at 5:00 o'clock.

24  It would take someone like a witness who is trying to catch a

25  flight and we are almost done with that witness to really go

1   much past 5:00 o'clock.  Obviously, now at this time of year it

2   gets dark earlier, and so we'll end pretty much at 5:00 every

3   day.

4              So what we're going to do with the jury selection is

5   we are going to continue on and we'll probably take a break at

6   about 10:45 this morning, okay?  We'll take a 15-minute break.

7   Ladies and gentlemen, you may have been instructed about this

8   already, but if you would use -- you can use the bathrooms on

9   the second floor or on the first floor.  Don't go higher up in

10  the building to look for bathrooms because I am going to have

11  the attorneys use bathrooms on the fourth floor and up.

12             There is so many of us that I just don't want people

13  to inadvertently be bumping into the attorneys or the clients

14  or anything of that nature, okay?  And the reason for that is

15  because although all of the attorneys and their staff are

16  friendly people, we don't want to create an appearance of

17  impropriety by having the jurors ask questions of the attorneys

18  during breaks or anything like that.  So the attorneys are

19  instructed that they are not going to be talking to you and you

20  should avoid contact with them.

21             Of course, initially it's a little bit difficult to

22  know exactly who everyone is because you are seeing them for

23  the first time.  That's why for today's purposes I would like

24  for you to on breaks if you could stay on the first and second

25  floors.  The attorneys will be using bathrooms on floors on the

1    fourth floor and on up.

2         Let me talk to you now a bit, ladies and gentlemen, I

3    alluded to the fact that because of the pandemic we have got

4    you all spread out in the gallery and you're seated every other

5    chair in the juror box.  Obviously, we are doing that to make

6    sure that as jurors and for all the attorneys and parties, that

7    everyone stays safe.  There may be a lot of people amongst you

8    who are fully vaccinated.  And as you know from reading the

9    newspapers, even people who are fully vaccinated have been

10   getting break-through cases of the Delta variant.  And there

11   may be some people who aren't vaccinated.

12        Wearing masks has been shown to be highly effective in

13   preventing the spread of COVID-19 because, of course, there

14   could be people, even fully vaccinated people, who may be

15   asymptomatic, not showing any signs of having COVID, but

16   nonetheless be contagious.  So by the wearing of masks we are

17   making sure that we are as safe as possible.  The masks not

18   only protect others just in case you happen to be unbeknownst

19   to yourself contagious, but also they provide protection to you

20   as well, the wearer of the mask.

21        So we have people who are in the seating arrangement

22   that we have now, you're spread out by 3 feet.  In the event

23   that after we select the jury the jurors who are fully

24   vaccinated feel comfortable sitting closer to one another, then

25   they can.  If certain jurors want to be more socially

1    distanced, we'll figure that out.  Anyone who is on the jury

2    who is not fully vaccinated are required to be socially

3    distanced, so we'll figure out an arrangement so that those

4    people are socially distanced.

5           Let me talk to you a little bit, ladies and gentlemen,

6    about some other safety issues.  First of all, the courtroom,

7    this courtroom and all the courtrooms in this building have a

8    somewhat unusual ventilation system.  It is a low volume

9    ventilation system and the air comes out of vents in the floor.

10   We have done smoke tests to determine the air flow pattern, and

11   the good news is that the air in this courtroom rises up,

12   straight up, very slowly.  So that's good because we don't have

13   cross drafts in this particular courthouse.

14          Next door in the Rogers courthouse, that has a

15   different type of ventilation system.  And when you do the

16   smoke tests in that, in those courtrooms, it's just completely

17   different and a lot of the air just travels laterally across

18   the floor.  So here it's good.  But as I said, it's a low

19   volume system.  That's nice because it keeps people from

20   feeling drafts.  It makes for good comfort, but the air rises

21   up very slowly.  And because of that, if we had, for instance,

22   a witness who -- or people on the witness stand talking all day

23   long during the trial, there is always a chance that it would

24   create so much exhalation that it may overcome the ability of

25   the air system to get that up out of people's breathing space,

1    so that's why it's important that we all wear our masks.

2            We also have hand sanitizer in various locations.  So

3    if you need some of that, Mr. Keech, we have more, and if you

4    want to use some of that or have it available.  We also have

5    masks.  Mr. Keech has ordered a number of those blue surgical

6    masks that a number of you are wearing.  Those blue surgical

7    masks are really good.  They may look thin.  They are just a

8    one-time use type thing, but they work by electrostatic means.

9    That attracts the particles to them and that's why they are

10   actually highly effective.

11           So if you are wearing a mask, even your favorite mask,

12   but because you are wearing it for a long time in here, you may

13   want to try something different, something that you may think

14   might be cooler or more comfortable, don't hesitate to ask

15   Mr. Keech if you want to try out one of those blue masks.

16           All right.  Ladies and gentlemen, during the jury

17   selection process, and for those of you who are actually

18   selected for the jury, this will apply throughout the entire

19   trial until you are released from jury duty, and that is I am

20   ordering you not to look up any information about this trial in

21   any way.  Don't look up the attorneys' names, the defendants'

22   names, you know, anything you can possibly think of about the

23   trial.

24           All of your evidence has to come from the trial

25   itself.  That makes the trial process fair because, of course,

1    on the internet there is all sorts of stuff and a lot of

2    misinformation, and that is not a process that's guaranteed for

3    you to get information that's accurate.  Rather, the trial is.

4    So you can't look up any information.  You can't have other

5    people look up any information either.

6            Moreover, during the course of the trial and during

7    jury selection, you can't blog or communicate with the outside

8    world about anything other than the following:  That you're a

9    prospective juror in federal court, that it's a criminal trial,

10   and that it may last as long as December 21st.  That's it.

11   Once you're released from jury duty, then you can talk to

12   people as much as you want.  If you are an actual juror, you

13   can write a book about your experiences on the case or you can

14   never mention it to a single solitary soul after you're done.

15   But it's very, very important that you not talk to anyone or

16   look up information or ask anyone else to look up information.

17           Let me give you an illustration.  I am not sure how

18   long ago, but let's say it was about 10 years ago or maybe even

19   longer there was a case in this courthouse involving a charge

20   under the Lacey Act.  The Lacey Act prohibits the importation

21   of wild animal parts.  And that particular case involved the

22   poaching of a leopard alleged to have been shot in Namibia

23   where the hunter had a license to hunt the leopard in South

24   Africa.  The border between the countries was a dry river bed.

25           The judge dutifully told the jury that they could not

1    look up any information.  Nevertheless, one of the jurors took

2    it upon herself to download satellite photos of that particular

3    river bed to inform herself of where the border was and then

4    brought them into the jury room during deliberations.  The

5    other jurors, of course, let the judge know about that fact,

6    and then the judge had to declare a mistrial.

7        The judge was then -- began considering whether the

8    juror would have to pay for the cost of the retrial.  Most of

9    the witnesses, of course, came from Africa and had to travel to

10   the United States from Africa.  That illustrates, while an

11   extreme case, just how serious it is, that admonition.

12       Another thing, ladies and gentlemen, and that is it is

13   not -- while it's not common, it happens that we hear through

14   the grapevine that -- because people will call the courthouse

15   and say, hey, I overheard this person talking at this party

16   about some case that's going on in U.S. District Court, some

17   case involving blah, blah, blah.  Well, it doesn't take very

18   long to figure out who was at that party and who the person

19   was.  So take it real seriously.  Once again, once you are done

20   with the case, you can talk about the case or you can forget

21   about the case.  Totally up to you.

22       The process, ladies and gentlemen, of selecting a jury

23   is to determine whether the prospective members of the jury can

24   be fair and impartial in determining the facts of the case and

25   whether they are committed to following the law as opposed to

1   following their own personal feelings about things or not

2   following the law and just following their own personal

3   beliefs.  To accomplish that, I am going to ask the prospective

4   jurors a series of questions.  I am also going to give counsel

5   for the United States and for the defendants the opportunity to

6   ask questions as well.

7           The questions are not intended to embarrass you in any

8   way.  If, however, a question would cause you to answer and

9   make you embarrassed in a way that you think is -- you just

10   don't want other people in the -- all the other prospective

11   jurors to hear that, let me know, and we will use a system that

12   we call a transceiver system.  That is essentially a device.

13   It's like a headset that the juror would wear.  I am going to

14   have the juror come up and stand up here and then the juror

15   would wear that particular headset and the juror can then talk

16   very softly.  Actually, it picks up a very -- almost a whisper.

17   And that will be heard by counsel and by me, but will not be

18   broadcast otherwise in the courtroom.

19           All right.  Like any witness in a case because the

20   jurors are required to answer the questions that are asked by

21   either me or by the attorneys truthfully and completely, I am

22   going to have each of the prospective jurors please stand and

23   take an oath that Mr. Keech will give to them.  So if you could

24   each stand, raise your right hand, and then if you agree,

25   please say "I do."  Everyone stand.

1          (Prospective jurors were sworn.)

2          *PROSPECTIVE JURORS:*  I do.

3          (Jury selection was sealed.)

4      (Recess at 5:07 p.m.)

5                       REPORTER'S CERTIFICATE

6      I certify that the foregoing is a correct transcript from

7   the record of proceedings in the above-entitled matter.  Dated

8   at Denver, Colorado, this 18th day of January, 2022.

9

10                          S/Janet M. Coppock

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25