1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 20-CR-00152-PAB
3

UNITED STATES OF AMERICA,
4

      Plaintiff,
5

vs.
6

JAYSON JEFFREY PENN,
7   MIKELL REEVE FRIES,
    SCOTT JAMES BRADY,
8   ROGER BORN AUSTIN,
    TIMOTHY R. MULRENIN,
9   WILLIAM VINCENT KANTOLA,
    JIMMIE LEE LITTLE,
10  WILLIAM WADE LOVETTE,
    GAR BRIAN ROBERTS,
11  RICKIE PATTERSON BLAKE,

12      Defendants

13  _____

                    REPORTER'S TRANSCRIPT
14                  Trial to Jury, Vol. 4

15  _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17  Chief Judge, United States District Court for the District of

18  Colorado, commencing at 8:05 a.m., on the 28th day of October,

19  2021, in Courtroom A201, United States Courthouse, Denver,

20  Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

1                        APPEARANCES

2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul

3  Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of

4  Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing

5  for Plaintiff.

6          Anna Tryon Pletcher and Michael Tubach of

7  O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

8  San Francisco, CA 94111-3823;

9          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

10  N.W., Washingon, DC 20006, appearing for Defendant Penn.

11          David Beller, Richard Kornfeld and Kelly Page of

12  Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

13  CO 80202, appearing for Defendant Fries.

14          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,

15  LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

16           Laura Kuykendall and Megan Rahman of Troutman Pepper

17  Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,

18  appearing for Defendant Brady.

19          Michael Felberg of Reichman, Jorgensen, Lehman,

20  Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21  10017;

22

23

24

25

1                    APPEARANCES (Continued)

2            Laura F. Carwile of Reichman, Jorgensen, Lehman,

3      Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4      CA 94065; appearing for Defendant Austin.

5            Elizabeth B. Prewitt of Latham & Watkins, LLP,

6      555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7            Marci Gilligan LaBranche of Stimson, Stancil,

8      LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9      80218, appearing for Defendant Mulrenin.

10           James A. Backstrom, Counselor at Law, 1515 Market

11     Street, Suite 1200, Philadelphia, PA 19102-1932;

12           Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13     Bethesda, MD 20814, appearing for Defendant Kantola.

14           Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15     Street, Suite 1100, Los Angeles, CA 90017;

16           Dennis J. Canty, Canty Law Corporation,

17     1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18     appearing for Defendant Little.

19           John Anderson Fagg, Jr. and James McLoughlin of

20     Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21     Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

```
 1                    APPEARANCES (Continued)

 2           Craig Allen Gillen and Anthony Charles Lake of

 3   Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

 4   Atlanta, GA 30339;

 5           Richard L. Tegtmeier of Sherman & Howard, LLC,

 6   633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

 7   for Defendant Roberts.

 8           Barry J. Pollack of Robbins, Russell, Englert, Orseck

 9   & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11           Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                        PROCEEDINGS

16           THE COURT:  Thank you.  Please be seated.

17           All right.  We are back on the record and everyone is

18   present except for Mr. Byrne.  I think Mr. Byrne is still out.

19           MR. CANTY:  Yes, Your Honor.

20           THE COURT:  All right.  Let's take up, first of all,

21   the motion filed yesterday.  This is Docket No. 739 regarding

22   Mr. Bryant.  I will ask, because of the nature of the motion, I

23   am going to ask that we not -- we refer to the subject matter

24   of what he would be impeached with in somewhat elliptical

25   terms, if we will, because ultimately what I had decided
```

1    previously is it's a 403 matter.

2              Let's hear what the proposal is on behalf of the

3    defendants.

4              Mr. Feldberg, go ahead.

5              MR. FELDBERG:  Thank you, Your Honor.  There are two

6    parts of our application to the Court.  The first deals with

7    the Court's ruling that there should be no reference to

8    other --

9              COURT DEPUTY CLERK:  Your Honor, I am sorry to

10   interrupt.  He needs to turn on the microphone.

11             MR. FELDBERG:  Is that better?

12             THE COURT:  I think so.  Go ahead.

13             MR. FELDBERG:  The first part of our application deals

14   with Your Honor's earlier ruling that if -- that there should

15   be no reference to other proceedings in this case.  Your Honor

16   ruled --

17             THE COURT:  Let me cut you short on that.  I agree

18   with the defendants.  I think that it would be just extremely

19   prejudicial if it was mentioned that there was a plea

20   agreement.  We can say agreement, but that I think would have a

21   huge impact on the jury, so we have got to eliminate it.

22             MR. FELDBERG:  If I may, Your Honor.  We looked for

23   the language in the Pilgrim's plea agreement that obligated

24   employees to testify truthfully.  There is actually nothing

25   explicit that says that, surprisingly enough, in the agreement.

 1   So we have taken the pieces that sort of talk around that issue

 2   and put them together in a proposed form of impeachment, but

 3   we're not wedded to the particular provisions.  We are happy to

 4   work with the prosecution to come up with some alternative

 5   language just that avoids the use of the phrase "plea

 6   agreement."

 7           THE COURT:  Mr. Koenig?

 8           MR. KOENIG:  Sure.  And I think if we look back at the

 9   transcript, I was very careful in opening to say he had an

10   agreement.  I didn't say that word.

11           One thing we would suggest -- I see the parts that he

12   has excised.  And I think it would be maybe better if we just

13   redacted the page, you know, so it really looks more like an

14   official agreement rather than something that's just typed up

15   in a Word document.

16           THE COURT:  Yeah, why don't you work with Mr. Feldberg

17   on that.  He indicated that he is agreeable to that.  I think

18   we can get around it, but yeah, I do agree that, you know, if

19   the jury were to hear that there is a plea agreement by a

20   company, it would have an undue impact on them.  Great.  I

21   think we're good on that.

22           Second issue, Mr. Feldberg?

23           MR. FELDBERG:  Second issue goes to the cross of

24   Mr. Bryant.  And there are two parts of this issue, Your Honor.

25   The first is can we impeach him on the issue of dishonesty.

1    And the second is can we impeach him on the fact that he has

2    committed crimes for which he has not, at least so far, been

3    prosecuted and for which he is not protected by any immunity.

4         THE COURT:  Well, there is no impeachment of crimes in

5    the air.  There just isn't.  I mean, it's like Jimmy Carter,

6    you know, sinning in your heart.  You can't prosecute -- you

7    can't impeach President Carter for something like that either.

8         MR. FELDBERG:  Let me walk the Court through the

9    issues.  On September 8th Mr. Bryant tells the prosecutors and

10   agents --

11        THE COURT:  We don't have time to go into all that.

12   We honestly don't.  What I was anticipating is that you would

13   have some way of minimizing the undue prejudice which I have

14   already found exists, but still suggest to me a way that you

15   might be able to confront him with a possible dishonesty to the

16   government.  Anything like that?

17        MR. FELDBERG:  Did you tell the government that you

18   had not engaged in any misconduct at work?  In a subsequent

19   interview, did you tell the government that you had engaged in

20   misconduct with multiple people and been repaid through company

21   funds via a bonus?  Did you thereafter tell the government that

22   you had not engaged in this conduct with multiple people, it

23   was only one person, and you had not been repaid with company

24   funds?

25             So it's a series of statements that cannot be squared

1  with each other.  We can simply call it misconduct -- we don't

2  have to go into the details.  We have no interest in going into

3  the details -- and simply say misconduct unrelated to antitrust

4  issues.

5       THE COURT:  Well, first of all, who has labeled it

6  misconduct?

7       MR. FELDBERG:  Well, actually, it was Mr. Bryant's

8  words.  In the first interview where this came up, he said no

9  misconduct.

10      THE COURT:  Well, yeah, but denying that you had any

11  misconduct doesn't mean that you engaged in misconduct.  But

12  where does that characterization come?  I mean, did the company

13  label it misconduct?  Is it a rule?  Where does that come from?

14      MR. FELDBERG:  No, the company has not labeled it

15  misconduct.  Mr. Bryant said no misconduct.  Then he describes

16  the activities, which in fairness we consider misconduct.  We

17  are not wedded to any particular verbal formula.  And on -- in

18  a subsequent interview --

19      THE COURT:  Because isn't the issue is whether he lied

20  to the government?

21      MR. FELDBERG:  That is --

22      THE COURT:  So why do we need to say misconduct?

23      MR. FELDBERG:  I am happy to find another word, Your

24  Honor, that is not misconduct.

25      THE COURT:  For instance, if Mr. Bryant were shown the

1   302 or whatever it is and it had it, you know, the subject

2   matter highlighted on that portion, and then you asked him as

3   to that highlighted portion "Did you lie to the government,"

4   you know, something like that where we don't get into this

5   issue of misconduct, but rather we are boiling it down to

6   whether he lied, would that work?

7            MR. FELDBERG:  We can do that, Your Honor.  The one

8   thing I would like to be able to show him along those lines is

9   the 302 where he says he did not engage in misconduct at work.

10  Those are at least his reported words.

11           THE COURT:  Okay.  So spell it out to me one more time

12  based on what we talked about.  What's your proposal?

13           MR. FELDBERG:  Following Your Honor's direction,

14  September 8th 302 interview, I did not -- he did not engage in

15  misconduct at work.  Show him the September 14th 302 and the

16  portions describing what he did.  On September 8th when you

17  said no misconduct at work, were you being truthful or

18  untruthful?  September 14th, you described misconduct.

19  October 12th, you described the activity differently.  Which

20  one is true?  Something along those lines.

21           THE COURT:  Mr. Koenig?

22           MR. KOENIG:  Your Honor, I think this is just way too

23  thorny.  For one thing, it just invites jurors' imagination

24  into what possibly could he have done.  And, you know, it's

25  calling misconduct at work is just -- you know, this is

1    decidedly not at work.  And the other thing is if he denies

2    lying, how do we rehabilitate him without getting into the

3    subject matter?  I mean, it's just going to be:  Did you lie?

4    No.  Defense counsel says yes, you did.  We say he didn't.  And

5    it just -- I think this just has -- it's just -- it's going

6    down a rabbit hole that the jury just -- it ultimately is not

7    going to be very probative, if at all.

8             MR. FELDBERG:  Well, Your Honor, first of all, the

9    whole question of dishonesty and dishonesty in interviews with

10   government agents is an issue that's fundamental to

11   credibility.  And confronting a witness with that dishonesty is

12   an issue of constitutional dimension.  These issues have

13   nothing to do with antitrust crimes.  We are perfectly happy to

14   make that clear.  And we are happy to use a verbal formula

15   either similar to the one the Court -- exactly the one the

16   Court suggested or some other formula that we can work out with

17   the Court and the prosecution to avoid any reference to the

18   salacious behavior.

19            THE COURT:  There is a 10th Circuit case -- I don't

20   have the citation for it right now, but I will try to get it

21   for you -- but what it says is that if there is a situation

22   where the government's case heavily relies upon one witness,

23   and here I am kind of thinking that Mr. Bryant may qualify,

24   that there is probably a need for greater leeway for the

25   defendant to be able to confront the witness with -- as to

1    dishonesty.  I was not aware of that particular case when I

2    made the ruling previously as to Mr. Bryant.  I think in light

3    of that case, in light of Mr. Bryant's role in this particular

4    case for the government, that I am going to allow him to be

5    confronted.

6          Mr. Koenig is absolutely right, it's very -- it's

7    thorny.  It's really thorny.  And the reason that -- the part

8    that is thorny is that I really don't think that the conduct

9    itself, as I said in my previous order, it's just -- it's not

10   relevant.  And you can't impeach people based on just the fact

11   that once upon a time they didn't tell the truth.  You can't

12   impeach someone -- and I saw a footnote to this effect -- you

13   can't -- I think Mr. Koenig mentioned it.  For instance, the

14   fact that he may have been accused of something once upon a

15   time you can't impeach someone with.  You know, that is not

16   grounds for impeachment.

17         What makes this a different situation is that for some

18   reason the government kept asking him about this particular

19   matter, and he gave responses which the defendants think may --

20   you know, they couldn't both be right.  I am going to allow the

21   defendants to ask him questions about that.

22         *MR. FELDBERG:*  Thank you, Your Honor.

23         *THE COURT:*  But you need to use that -- because it's a

24   403 issue, I don't want it to come out from the defendants.  If

25   Mr. Koenig or the government, whoever is doing Mr. Bryant,

1    wants to bring it out so that, you know, the jury isn't

2    wondering what is this, the government can do that.  It's at

3    the government's option because presumably the government would

4    ask Mr. Bryant about it and see how Mr. Bryant feels.  That, of

5    course, would then open the door to the defendants.

6         But, once again, under 608 you can't get into -- there

7    is not going to be any extrinsic evidence to prove what the

8    conduct is.  You're stuck with the answer, okay?

9              MR. FELDBERG:  Understood, Your Honor.  Thank you.

10             THE COURT:  Mr. Koenig, any clarifications?  Go ahead.

11             MR. KOENIG:  Two things.  First of all, I understand

12   Your Honor's ruling, but I will say just for the record that in

13   general when we do investigations, an exculpatory denial at

14   first is not considered something that we, you know, charge or

15   anything like that.  Second, and more importantly, this is such

16   a thorny issue that I really think we should be able to at

17   least have some sort of preview of how the defendants plan to

18   navigate this in advance.  I understand that that's unusual,

19   but, I mean, this is really -- there is a lot of ground for

20   missteps here.  And I think an agreeable approach would be --

21             THE COURT:  Yeah, I am going to order the defendants

22   to make that be a little bit more specific about how that would

23   be done; for instance, like if he is going to be -- if a piece

24   of paper with a 302 or something like that is going to be used,

25   to show that to the government in advance just so we have --

 1   both sides have some clarification about how it's going to

 2   proceed.

 3        MR. TEGTMEIER:  Your Honor, my apologies.  I was

 4   trying to turn it off.

 5        THE COURT:  Yeah, we need to make sure we do those

 6   things before court.  But the jury is not here, so it's not

 7   quite as serious.

 8        MR. FELDBERG:  Understood, Your Honor.

 9        THE COURT:  Great.  Thank you very much, Mr. Feldberg.

10        Mr. Tubach, do you want to take up the issue as to

11   GX-1030?

12        MR. TUBACH:  Yes, Your Honor.  And just for the

13   record, I don't want to belabor this and I appreciate the Court

14   resolving this issue.  At least for Mr. Penn, we believe that

15   the correct ruling -- that we should be allowed to

16   cross-examine him on the full scope of the misconduct.  We

17   understand the Court's ruling.  I just want the record to be

18   clear that we do believe we should be entitled to

19   cross-examination.

20        THE COURT:  I understand.  Are we going to talk about

21   GX-1030 now?  I really think we are spending lots of paper and

22   lots of brain damage on the issue of authentication.  Let me

23   ask Mr. Koenig or whoever is going to attempt the admission of

24   that particular document, how would we get the document in?

25   How is that -- Mr. Torzilli?

1          MR. TORZILLI:  Sure, Your Honor.  You are asking about

2     how we are going to get it into evidence?

3          THE COURT:  Yes.  Let's assume it's authenticated.

4     How are you going to get it in?  And I haven't even seen it

5     yet.  Does someone have a copy of it?

6          MR. TORZILLI:  I have copies.

7          THE COURT:  Mr. Keech will hand it up.

8          Okay.  Do you want to use the microphone, Mr.

9     Torzilli?

10          MR. TORZILLI:  Sure.  So, Your Honor, your question is

11     assuming the document is authentic, how it will be admitted

12     into evidence?

13          THE COURT:  Right.

14          MR. TORZILLI:  It's being conditionally admitted into

15     evidence as a result of the *James* hearing.

16          THE COURT:  Right.  But the law is real clear on that.

17     Just because I say, yeah, the statement can come in by *James*

18     hearing, it still has to somehow, if it's hearsay, meet -- be

19     admissible.

20          MR. TORZILLI:  Sure.

21          THE COURT:  How would that work?

22          MR. TORZILLI:  We intend to present a case agent and

23     admit the document through a case agent.

24          THE COURT:  And how -- what foundation would the case

25     agent lay for this particular document?

1          MR. TORZILLI:  That he has worked on the

2     investigation.  He's reviewed documents in connection with the

3     investigation and woven the documents and other information

4     including telephone records together, including telephone

5     records at or around the time that this handwritten note was

6     written, August 29, 2014, and be able to say that this is part

7     of the conspiratorial actions that were occurring at that time.

8          THE COURT:  Okay.  Now let's have -- thank you very

9     much, Mr. Torzilli.

10          Let's have Mr. Tubach address that.  You may not have

11     been necessarily anticipating addressing that issue, but would

12     there then be some objection to the admission of 1030 based

13     upon that foundation being laid by a case agent?

14          MR. TUBACH:  Yes, there would, Your Honor, under the

15     best evidence rule.  I think the government is under the

16     obligation to provide an original when there is a question

17     about the authenticity about the document and there is a

18     question.  And the government -- it's not our burden to show

19     that the original had been lost or that it's -- this is the

20     best copy available.  It's the government's burden to show that

21     they can't get the original and they haven't done that.

22          So regardless -- and I do want to address the

23     authentication because I think that is a serious constitutional

24     issue.  But even putting all that aside, they haven't shown

25     that the original is lost.  So why are they introducing --

1          *THE COURT:*  So let's skip best evidence right now too.

2    Would there be an additional ground like it's just hearsay and

3    we don't know whether it's accurate?

4          *MR. TUBACH:*  Well, it's certainly hearsay.  The Court

5    has held provisionally --

6          *THE COURT:*  Yeah, but this isn't a statement written

7    by Mr. Penn.

8          *MR. TUBACH:*  It is not.

9          *THE COURT:*  This is a statement written by Mr. Martin.

10         *MR. TUBACH:*  Yes.

11         *THE COURT:*  Mr. Martin is not going to be testifying,

12   Mr. Torzilli?

13         *MR. TORZILLI:*  He is not testifying in this case.

14         *MR. TUBACH:*  Yeah, so it's absolutely hearsay.

15         *THE COURT:*  How do you get around that, Mr. Torzilli?

16   That's the whole thing.  He's recording -- he's writing down

17   something that Mr. Penn allegedly said, but how would you get

18   around the issue of, you know, how do we know that Mr. Penn

19   said it?

20         *MR. TORZILLI:*  Well, the fact that Mr. Martin wrote it

21   down and that they were co-conspirators and this was in

22   furtherance of the conspiracy.  The content of the handwritten

23   notes, as will be explained by the case agent in his testimony,

24   will explain how this relates to the conspiracy.  And it

25   relates to the conspiracy because on August 29th, 2014, the

1      chicken -- conspiring chicken suppliers were negotiating with

2      KFC, Kentucky Fried Chicken.

3              THE COURT:  All right.  When do you anticipate

4      introducing this document?

5              MR. TORZILLI:  Probably early next week.

6              THE COURT:  Okay.  I am going to reserve ruling on

7      this one, but that gives me a little bit better explanation of

8      at least how it might come in too.  I am going to take that

9      into account generally.  There are some tricky issues regarding

10     authentication as well, but I will take that all into account.

11             Did you have something else, Mr. Torzilli?

12             MR. TORZILLI:  Just on the best evidence rule point, I

13     don't think there is really any, at least in our view, any

14     serious question that this copy is anything other than a fair

15     and accurate representation of the original.

16             THE COURT:  Mr. Tubach, you had mentioned something

17     about whiteout.  Where on the document do you believe that that

18     occurred?  In the .75R?  I don't know.

19             MR. TUBACH:  Yes.  I am sorry, Your Honor.  You can

20     see in several places including in the third line where DEC,

21     underneath the DEC the dots are missing, the dots that run

22     across the page.  There is no indication about why those dots

23     are missing.  That would be because of whiteout.  There is

24     several other instances there where the same thing is occurring

25     where the dots are missing which obviously can't occur by

 1    itself.  There is no indication it's a photocopy problem.  So I

 2    am telling the Court I am very confident that these are

 3    whiteouts.

 4         THE COURT:  Mr. Torzilli, anything about that?

 5         MR. TORZILLI:  Just, yeah, two points.  And I would

 6    ask Your Honor not to lose sight of the fact that the author of

 7    this document, Pete Martin, did in his deposition agree that

 8    this was his handwritten notes.  But second, the content that's

 9    of paramount importance to the government and shows the

10    conspiracy in action starts with the line, the handwritten line

11    about halfway down the page where it says "Talked to Mitch.

12    They are up .19 and holding."  So it's really that down.

13         THE COURT:  So you wouldn't even introduce the top

14    part?

15         MR. TORZILLI:  We would be willing to redact that back

16    with the exception of the date there, 8/29.  In the upper

17    right-hand corner, it says Steve Campisano," who is an RSCS

18    employee at the time, so that is KFC's bargaining cooperative

19    that the defendants were colluding with at that time, we'd want

20    that unredacted and would be willing to redact the rest down to

21    the "Talked to Mitch" part.

22         THE COURT:  Mr. Tubach, I will let you respond to that

23    offer, but let me ask you too, so on the issue -- now we are

24    switching over to authentication and the confrontation clause

25    issue that you mentioned.  But just -- and I understand you

1    made the point that, oh, the jury knows that he admitted that

2    it's his -- that Mr. Martin admitted that it's his handwriting,

3    and they are also going to assume that it's -- that it's true.

4    But just on whether Mr. Martin would testify in person and be

5    able to be confronted as to his handwriting, why do you

6    anticipate that he would have any other answer than the one he

7    gave at his deposition?

8         MR. TUBACH:  Your Honor, I don't have to have any

9    reason to believe he would have a different answer.  I didn't

10   have any right to cross-examine him at all.

11        THE COURT:  I know, but what would he say differently?

12   If all we are talking about is authentication, just yes, that's

13   my handwriting, why do you have a confrontation right on an

14   issue where there is no expectation that he would answer any

15   differently?

16        MR. TUBACH:  Your Honor, the confrontation clause

17   rights don't turn on the expectation of revealing conduct that

18   is different than what the witness would testify about.

19        THE COURT:  But authentication in a lot of instances

20   as you admit doesn't require a live witness.

21        MR. TUBACH:  And the reason for that, Your Honor, is

22   critical, because in those instances when you are talking about

23   business records, the Court has held, and this is the Supreme

24   Court has held, this is *Melendez-Diaz*, the reason why that's

25   not a confrontation clause problem is because those underlying

1   records, they were created for the administration of an

2   entity's affairs and not for the purpose of establishing or

3   proving some fact at trial.  The whole point of the

4   confrontation clause is that it -- is whether it's testimonial.

5           And it seems obvious that a deposition in a case

6   that's been filed where you're trying to prove some fact at

7   trial is testimonial.  And Mr. Penn was not a party to that

8   civil action.  He had no opportunity to cross-examine

9   Mr. Martin about these notes.  And the confrontation clause

10  gives me the guarantee to do that on Mr. Penn's behalf.

11          THE COURT:  All right.  How are we doing, Mr. Keech,

12  on jurors?

13          COURT DEPUTY CLERK:  Last I checked there were 11.  I

14  know I heard at least one set of footsteps.  I will go check

15  right now.

16          THE COURT:  That's all right.  We are done.  We will

17  be in recess until we make sure we have all the jurors.

18          MS. HENRY:  Your Honor, may I just add that on behalf

19  of Defendant Kantola I join in the objections that Mr. Penn

20  made that we would prefer and believe we should be able to do a

21  full impeachment on Mr. Bryant.

22          THE COURT:  Sure.

23          MR. KORNFELD:  And, Your Honor, if you will indulge

24  me.

25          THE COURT:  It will have to be real quick.

1          MR. KORNFELD:  This goes to the all object rule with

2     the Court.  We conferred last night.  Our suggestion is this,

3     that unless somebody opts out, an objection by one is an

4     objection by all.  Two issues with that.  If, for instance, I

5     object under 401 and Mr. Tubach thinks I missed something, he

6     may pop up and say 403 or whatever.

7          And second, the one concern is we don't want to be

8     viewed as a whole.  And I don't know if it's appropriate for

9     the Court to essentially tell the jury what's going on for

10    efficiency's sake, but we do think it's appropriate.  In other

11    words, I don't want them to think that one person is doing

12    their job and nine aren't or et cetera.  So I don't know how

13    you would like to articulate it, but it would be our request

14    that one time you do that so they know what's going on.

15         THE COURT:  Okay.  Response by the government?  Any

16    problem from the government's perspective with adopting that

17    assumption?

18         MR. KOENIG:  I am not sure I quite follow at all.  If

19    you could explain it more.

20         MR. KORNFELD:  Our concern is that we want the jury to

21    know that all 10 of us are representing our clients as

22    independent defendants.  And so if only one person is objecting

23    and nine aren't or nine aren't joining on the record in order

24    to facilitate efficiency, we just want the Court one time to

25    instruct the jury essentially that we, you know, that we have

1    agreed to this procedure to promote efficiency.

2          And the other thing, Your Honor, while Mr. Koenig is

3    thinking about what I said, if something is admitted, we will

4    assume -- we would ask the Court to assume that it is admitted,

5    you know, without objection by anybody unless somebody pops up

6    and says "I object" or "I don't join."  And that would include

7    documents in the defense case.  We can envision a situation

8    where maybe eight of us are fine with the document and two of

9    us don't like it.  Those two people, it's their obvious

10   responsibility to make an objection if there is one; but if

11   there isn't one, the Court can assume that, you know, we're all

12   on the same page.

13         THE COURT:  Well, as to that, I would ask typically,

14   any objection to the admission of exhibit so and so.  And if no

15   one says anything --

16         MR. KORNFELD:  Fair enough.

17         THE COURT:  Mr. Koenig?

18         MR. KOENIG:  So you would instruct the jury, just so I

19   want to make sure I understand it, you would instruct the jury

20   that for efficiency's sake if there is an objection, it's

21   assumed to be on behalf of all defendants unless there is some

22   other --

23         THE COURT:  But that some defendants may add

24   additional grounds.

25         MR. KOENIG:  And are those additional grounds, then,

1    adopted by all the other defendants?

2         THE COURT:  Mr. Kornfeld?

3         MR. KORNFELD:  Yeah.  I think for efficiency's sake, I

4    think yes.  I can't imagine one of us popping up and saying no,

5    I don't like the 403.  I am only riding the 401.  So I think

6    the answer to that question is yes, absent an articulation to

7    the contrary.

8         MR. KOENIG:  Okay.  It's the first time I am hearing

9    it, so I think that's fine.  If Your Honor would allow if

10   somehow we see that there is something we didn't foresee, if we

11   could just re-raise the issue.

12        THE COURT:  Yeah, of course you can do that.  I think

13   it's a reasonable request.  And that way the jury -- to tell

14   you the truth, I think the jury would not be holding it against

15   anyone if they didn't object, but it's an appropriate thing to

16   mention to the jury just so that they know.

17        Mr. Pollack, real quick.

18        MR. POLLACK:  Real briefly, I just want to make sure

19   that the objection for all applies with respect to your rulings

20   on Mr. Bryant even though those arose before we reached this

21   agreement.

22        THE COURT:  Right.  I would assume that too, and once

23   again, unless someone wants to articulate a different position.

24        MR. POLLACK:  Lastly, if I heard the government right,

25   it characterized Mr. Campisano in RSCS as someone who is in

1    collusion with the defendants.  That was not the government's

2    position at the *James* hearing and I just wanted to clarify if

3    that was, in fact, the government's position.

4              *MR. TORZILLI:*  I am here to clarify.  Paul Torzilli

5    for the United States.  If I did create that impression, I want

6    to correct it.  So RSCS was not in collusion with the charged

7    defendants in the conspiracy.

8              *MR. POLLACK:*  Thank you.

9              *THE COURT:*  All right.  Mr. Keech, do we know what our

10   count is?

11             *COURT DEPUTY CLERK:*  I do not.  I would have to go

12   back and check.

13             *THE COURT:*  Let's go check.

14             *MR. TUBACH:*  While we are waiting, Your Honor,

15   presuming the government wouldn't object to the redaction also

16   of Mr. Campisano's name at the top of the document or Mark

17   McEwen.

18             *THE COURT:*  Why don't you talk to the government.

19             *MR. TORZILLI:*  Your Honor, one last thing.

20             *THE COURT:*  Yes.

21             *MR. TORZILLI:*  I believe we have stipulations.  And my

22   request is if Your Honor would --

23             *THE COURT:*  And hold on one second.  And by

24   stipulations, are you talking about stipulations as to some of

25   the documents that would otherwise be the subject of testimony

1    by custodians of record?

2         MR. TORZILLI:  Correct, including witnesses that we're

3    prepared to put on this morning.  So my request would be or an

4    option would be if Your Honor would indulge a 30 to 45-minute

5    recess from now to enable us to streamline our presentation of

6    those custodian witnesses because it wouldn't fully obviate the

7    need to put them on.

8         THE COURT:  Even though Mr. Keech just went back and

9    made sure that all those jurors are ready to go.  Okay.  It

10   nonetheless, it makes sense.  That's the type of thing that's

11   good to know early on before we get the jurors.  So there is a

12   deal, but the deal needs to be memorialized?

13        MR. TORZILLI:  The deal memorializing I think would

14   take a very short amount of time, but we would need a little

15   more time to be able to streamline who we still need to present

16   and for some of the witnesses we still do need to present, just

17   what we can in essence cut from our direct exam and what still

18   we would need to accomplish with the witness.

19        THE COURT:  And how long do you think that will take?

20        MR. TORZILLI:  I would say 30 to 45 minutes.

21        THE COURT:  Okay.  So you would propose, then, that we

22   resume at 9:30?

23        MR. TORZILLI:  Yes.

24        THE COURT:  Okay.  Is that all right with the

25   defendants?  Any objection to doing so?

1          *MR. TUBACH:*  No objection.

2          *THE COURT:*  Okay.  I am going to have Mr. Keech, then,

3    tell the jurors that we'll go ahead and they should plan on

4    resuming, being back in the jury room at 9:30, and that the

5    attorneys are working in a way to streamline the case.  Is that

6    acceptable?

7          *MR. TORZILLI:*  It's acceptable for the government.

8          *THE COURT:*  Then we will -- all right.  Well, now we

9    have got some additional time.  Mr. Keech, you can tell them

10   that.

11         Anything else that we should take up at this time?

12         *MR. TORZILLI:*  Your Honor, one other thing in terms of

13   the witnesses we're going to present today.  So we intend to

14   call Robbie Bryant today.

15         *THE COURT:*  Okay.

16         *MR. TORZILLI:*  It would be I think technically a

17   witness out of order because we have another fact witness that

18   would be ahead of Mr. Bryant that would be Bob Lewis.  So we

19   would be taking Bryant out of order, so we just wanted to

20   inform the Court that.

21         *THE COURT:*  Okay.  Well, then make sure that you have

22   an opportunity to talk to Mr. Feldberg and anyone else on the

23   defense side who are intending on cross-examining Mr. Bryant on

24   that issue that we had talked about, okay?

25         *MR. TORZILLI:*  Sure.

1          *THE COURT:*  Mr. Tubach, did you have an additional

2   matter?

3          *MR. TUBACH:*  No, Your Honor.  I was just saying we

4   could do that during the break.

5          *THE COURT:*  It would seem so.  Okay, great.  We will

6   be in recess, then, until 9:30.  Thank you.

7       (Recess at 8:40 a.m.)

8       (Reconvened at 9:35 a.m.)

9          *THE COURT:*  Mr. Torzilli, go ahead.

10         *MR. TORZILLI:*  If I may, Your Honor, Paul Torzilli for

11   the United States.  I just wanted to inform the Court that

12   although I'd said before the break that there was at least our

13   understanding an agreement in principle on e-mails and

14   attachments and the authenticity thereof, I was informed by the

15   defendants that that's not the case, so we will need to absent

16   a stipulation to the authenticity on the terms that we need,

17   we'll need to present them this morning.  But we do have an

18   agreement on the toll records, so the telephone company

19   witnesses will only need to be essentially put on for one issue

20   and those should be brief, and that will cut back on what we'll

21   need to accomplish with them this morning.

22         *THE COURT:*  Okay.  Ms. Prewitt?

23         *MS. PREWITT:*  Yes, Your Honor.  I just wanted to

24   apprize you about where we are with that so you understand

25   where the impasse is.  The defendants agreed to stipulate to

1    authenticity as to a long list of documents produced directly

2    to the Department of Justice.  The impasse, and it's relating

3    to e-mails, attachments, calendar entries without handwriting

4    on them, Your Honor.  And it's the vast majority, probably --

5    it's the vast majority of the documents at issue in this case.

6         The impasse is that for documents that were produced

7    by civil plaintiffs, because in this matter there was a fair

8    amount of engagement between the DOJ and the civil plaintiffs

9    here, we just don't have that witness before us to feel assured

10   that the authenticity is on all fours.  We are going to be

11   listening to these witnesses and taking onboard what we hear

12   and will certainly reconsider that point, but I just want to

13   let Your Honor know we have been working diligently to try to

14   expedite the process to the extent we can.

15        THE COURT:  Mr. Torzilli?

16        MR. TORZILLI:  Just two things.  One, without the

17   stipulation on these civil documents, we just can't cut the

18   custodians because the custodians are talking about both.  And

19   two, I want to let Your Honor and others know, so I have a

20   stipulation here on our terms that's signature ready and would

21   look forward to the defendants signing it.

22        THE COURT:  Right.  It sounds like the parties are

23   working on things, and I very much appreciate that.  I think

24   that that's great for purposes of us being efficient.  And it

25   sounds like we'll see how it goes with some of these documents

1    that may be authenticated through custodians or through -- not

2    custodians, but through witnesses associated with the civil

3    plaintiffs, so we'll see how that goes.

4            All right.  Mr. Keech, is the jury ready to go?

5            *COURT DEPUTY CLERK:*  Yes, Your Honor.

6            *THE COURT:*  Why don't we bring the jury in.

7            And why don't we get Ms. Sandoval back on the witness

8    stand, please.

9            *MS. ROGOWSKI:*  The government calls Melissa Sandoval

10   to the witness stand.  And, Your Honor, I would like to ask --

11           *THE COURT:*  Hold on one second.  We don't call anyone

12   to the witness stand unless the jury is here.  She is on the

13   witness stand, so we are just getting her.

14           *MS. ROGOWSKI:*  I would just like to mention that due

15   to where we are in the stipulations --

16           *THE COURT:*  Ms. Sandoval, just come right up and have

17   a seat, if you will.  And we stand when the jury comes in,

18   so --

19           *THE WITNESS:*  Absolutely.

20           *THE COURT:*  -- just so you know.

21           Go ahead, Ms. Rogowski.

22           *MS. ROGOWSKI:*  I would just like to mention that based

23   on where we are with stipulations with defendants --

24           (Jury present.)

25           *THE COURT:*  Please be seated.

1        Good morning, ladies and gentlemen.  So you may recall

2   when I had that introductory jury instruction that I mentioned,

3   that we might occasionally have some breaks that you couldn't

4   be present for, but nonetheless be patient with them because

5   they actually could save some time, that's what we did this

6   morning.  The attorneys on both sides are working to try to

7   streamline things when possible, so I appreciate your patience

8   on that.

9        One other thing that I wanted to mention to you,

10  ladies and gentlemen, and that is of course we have 10

11  defendants, each of whom has a right to object to anything that

12  they feel is proper to object to.  However, the defendants have

13  agreed that one objection will serve -- that all of them will

14  join that objection.  So if you hear just one defendant make an

15  objection, that doesn't mean that the other ones aren't

16  objecting.  They are -- they may be just -- they are just

17  joining that objection.

18       Also, even if one defendant makes an objection,

19  another defendant may also object to add an additional grounds

20  for it.  So you may hear that go on too, but that's perfectly

21  acceptable for them to do that, all right?  Just so that you

22  understand that particular point.

23       All right.  So ladies and gentlemen, you will recall

24  that we had Ms. Sandoval on the witness stand.  Are we ready to

25  begin the direct examination?

Melissa Sandoval - Direct

1        *MS. ROGOWSKI:*  Yes, Your Honor.

2        *THE COURT:*  All right.  Go ahead.

3        (**Melissa Sandoval** was previously sworn.)

4                **DIRECT EXAMINATION CONTINUED**

5    *BY MS. ROGOWSKI:*

6    *Q.*  Good morning, Ms. Sandoval.

7    *A.*  Good morning.

8    *Q.*  Ms. Sandoval, in your work at Verizon, are you familiar

9    with the type of account called a post-paid account?

10   *A.*  Yes.

11   *Q.*  Can you please explain what it is?

12   *A.*  Certainly.  A post-paid account is essentially a consumer

13   account that is billed monthly for services.

14   *Q.*  Are post-paid accounts paid before or after calls are

15   actually made?

16   *A.*  Well, you are billed in advance for access to the service,

17   but the calls that you make typically appear on the following

18   statement, so you are essentially paying ahead to have the

19   service available to you.

20   *Q.*  And in order to set up a post-paid account, is there

21   anything in particular you need to do or provide to Verizon

22   Wireless?

23   *A.*  Yes, there is.

24   *Q.*  Could you please explain?

25   *A.*  Certainly.  In order to set up a post-paid account, you

Melissa Sandoval - Direct

 1   would need a government issued ID, so it could be a driver's

 2   license or a state identification card, and we do ask for the

 3   Social Security number.

 4           MS. ROGOWSKI:  No further questions, Your Honor.

 5           THE COURT:  Thank you.

 6           Cross-examination anyone?

 7           All right.  May Ms. Sandoval be excused?

 8           MS. ROGOWSKI:  Before Ms. Sandoval is excused, just

 9   because we are not quite sure where we are with stipulations,

10   we would like to respectfully request a ruling on the 803(6)

11   foundation of the subscriber information and the toll records.

12   And we would also respectfully request a ruling on the 901

13   authenticity of just the subscriber information.

14           THE COURT:  Well, I can't do that, but what I can do

15   is you can offer into evidence certain exhibits and then we

16   will figure that out.  Is that what you intend to do?

17           MS. ROGOWSKI:  Yes, Your Honor.  We would like to

18   offer into evidence the exhibits that are on what's been marked

19   as Government's Exhibit 9556.

20           THE COURT:  I don't have a copy of that.

21           MS. ROGOWSKI:  May I provide you with a copy?

22           THE COURT:  Mr. Keech can hand it up.

23           MS. ROGOWSKI:  Provide Mr. Keech with a copy?

24           THE COURT:  Okay.  Let me ask whether defendants have

25   a copy of what is marked as Government's Exhibit 9556 which

Melissa Sandoval - Direct

1   contains and which consists of a list of government trial

2   exhibits listing various what I assume to be Verizon records on

3   it.  And the question then becomes whether there is any

4   objection to the admission of the exhibits listed on

5   Exhibit 9556.

6          MS. ROGOWSKI:  Your Honor, I believe the defendants do

7   have an electronic copy.  I am happy to provide a paper copy if

8   anyone needs one, but I will let them speak to whether they

9   have any objections.

10          THE COURT:  Okay.  Any objection?  I don't hear any

11   objection.

12          So ladies and gentlemen, this is a bit lengthy, but I

13   don't want to just be admitting a bunch of exhibits that you

14   don't hear about, so I am going to read to you those exhibits

15   that are admitted.  Exhibit 352, Exhibit 352-1, Exhibit 495,

16   Exhibit 495-1, Exhibit 496, Exhibit 497, Exhibit 497-1,

17   Exhibit 499, Exhibit 499-1 -- actually, why don't we do this.

18   This might actually be a little bit more efficient.

19   Ms. Rogowski, can you display Exhibit 9556 on the document

20   viewer?

21          MS. ROGOWSKI:  Yes, Your Honor.

22          COURT DEPUTY CLERK:  Your Honor, if I could get a copy

23   of that at some point too, please.

24          THE COURT:  Yes.  Exhibit 9556 is not admitted, but it

25   will be made part of the record to indicate that these

Melissa Sandoval - Direct

1    particular exhibits have been admitted.  So why don't we

2    reorient that document.  Is there a way to reorient it and then

3    also turn it around?  If we can't --

4            MS. ROGOWSKI:  No, Your Honor, I don't believe there

5    is a way.

6            THE COURT:  Let's just do it like that, then.  All

7    right.  And Ms. Rogowski, if you can then flip that document

8    over and show it to the jury.

9            All right.  Thank you, Ms. Rogowski.

10           So ladies and gentlemen, each of those exhibits has

11   been admitted, all right?

12           Ms. Sandoval, any request that Ms. Sandoval remain?

13           MR. PLUMLEE:  Your Honor, Chris Plumlee for Mr. Blake.

14   I would just note Ms. Sandoval is under subpoena by the

15   defense.  And we will certainly address with her whether there

16   is a need for her at a later time.

17           THE COURT:  Yes, thank you.  Ms. Sandoval, it sounds

18   like you have another subpoena, so if you can just make sure to

19   be in contact with Mr. Plumlee or whoever.

20           THE WITNESS:  Absolutely.

21           THE COURT:  Thank you.  You are excused.

22           MS. ROGOWSKI:  Just one thing if I may, Your Honor.

23   The copy that I showed to the jury that I showed through the

24   document viewer actually has some checkmarks on it.  If you

25   like, I can provide that copy to Mr. Keech.

Matthew Bunch - Direct

1          THE COURT:  I am sorry, what about the checkmarks?

2          MS. ROGOWSKI:  It had some checkmarks on it as you

3     were reading the numbers.

4          THE COURT:  If you can provide a clean copy to

5     Mr. Keech.

6          COURT DEPUTY CLERK:  I just needed it to keep track of

7     what exhibits have been received.

8          THE COURT:  Yes, but it has been shown to the jury.

9     We will retain a copy of Exhibit 9556.  It hasn't been

10    admitted, but it has been displayed.  It's just a list of the

11    documents that were admitted through Ms. Sandoval.

12    Ms. Sandoval, thank you very much.

13         THE WITNESS:  Thank you.

14         THE COURT:  The United States may call its next

15    witness.

16         MS. BUTTE:  Laura Butte for the United States.  We

17    would like to call Matthew Bunch.

18       (**Matthew Bunch** was sworn.)

19         THE WITNESS:  I do.

20         COURT DEPUTY CLERK:  Please state your name and spell

21    your first and last for the record.

22         THE WITNESS:  It is Matthew Wayne Bunch,

23    M-A-T-T-H-E-W, B-U-N-C-H.

24                         **DIRECT EXAMINATION**

25    BY MS. BUTTE:

Matthew Bunch - Direct

1    *Q.*  Thank you, Mr. Bunch.

2           Could you please let me know the highest level of

3    education you have obtained?

4    *A.*  Master's degree.

5    *Q.*  And where do you work?

6    *A.*  Tyson Foods.

7    *Q.*  How long have you been employed at Tyson Foods?

8    *A.*  For over 24 and a half years.

9    *Q.*  What is your job title?

10   *A.*  Senior director of information security/cyber.

11   *Q.*  Could you describe your responsibilities in that position

12   at Tyson Foods?

13   *A.*  My responsibilities include establishing cyber security

14   risk for the organization, including all operational security

15   controls that we maintain.

16   *Q.*  In your role at Tyson Foods, are you familiar with how

17   Tyson creates, manages, stores and retrieves e-mails and

18   attachments?

19   *A.*  I am.

20   *Q.*  Calendar notations?

21   *A.*  Yes.

22   *Q.*  Are you familiar with the domain name for Tyson?

23   *A.*  I am.

24   *Q.*  What is Tyson's domain name?

25   *A.*  The primary domain name is Tyson.com.

Matthew Bunch - Direct

1    *Q.* Are e-mails with that domain name stored on Tyson's

2    systems?

3    *A.* They are.

4    *Q.* How are they stored?

5    *A.* They are stored in multiple ways.  One, on the device that

6    the e-mails are sent, so such as a tablet, a PC, phone,

7    anything like that.  They are stored on Tyson's servers that

8    store e-mail.  They are also stored in the Microsoft 365

9    environment, so it's stored there as well.

10   *Q.* What is the process for assigning e-mail addresses at

11   Tyson?

12   *A.* We retrieve various details from our human resources system

13   such as first name, nickname or preferred name, as well as last

14   name.  And we've got an automatic system that will create those

15   names to create a unique e-mail for every individual.

16   *Q.* Thank you.  In front of you you have a binder of documents.

17   If you could turn to Government Exhibit 114.

18        Are you familiar with the e-mail addresses at the top

19   of the e-mail chain of this document?

20   *A.* I am.

21        *MR. POLLACK:* Your Honor, if they are going to show a

22   exhibit to the witness, can they put them up on the screen so

23   we can see them?

24        *THE COURT:* That would be great.  I think that would

25   be appropriate so I can see them too.

Matthew Bunch - Direct

1           *MS. BUTTE:*  If I can move over to the document viewer,

2     Your Honor.

3           *THE COURT:*  Yes.

4           *MR. POLLACK:*  To be clear, this would not be for the

5     jury unless something is admitted, obviously.

6           *THE COURT:*  Obviously.

7           Ms. Butte, do you have a copy of that?  Now it's

8     appearing.  Never mind.

9           Ms. Call, that's not that helpful.

10          *MS. CALL:*  I will turn it and we can highlight certain

11    portions of it.

12          *THE COURT:*  Okay.

13    BY MS. BUTTE:

14    *Q.*  Mr. Bunch, are you familiar with the e-mail address that is

15    at the top of the e-mail of Government Exhibit 114?

16    *A.*  I am.

17          *MR. TEGTMEIER:*  Your Honor, I am sorry.  I am having

18    difficulty hearing counsel's questions.

19          *THE COURT:*  Okay.

20    BY MS. BUTTE:

21    *Q.*  Could you tell me the e-mail addresses at the top of the

22    e-mail chain of this e-mail?

23    *A.*  It is Brian.Roberts@tyson.com, Carl.Pepper@tyson.com,

24    Tim.Scheiderer@tyson.com, and Tim.Mulrenin@tyson.com.

25    *Q.*  And these are the e-mail addresses whose e-mails would be

Matthew Bunch - Direct

1    stored on Tyson's servers?

2    *A.*   That is correct.

3    *Q.*   How are e-mails that are sent or received from e-mail

4    addresses stored in Tyson's systems?

5    *A.*   As previously stated, they would originate from a client

6    device such as a computer, laptop, desktop, phone or tablet,

7    and they would be stored there.  They would then be transmitted

8    to Tyson's e-mail servers whether they be stored within Tyson's

9    data center on-prem or in the Microsoft 365 cloud environment.

10   *Q.*   When an e-mail has attachments, how are the attachments

11   stored in Tyson's system?

12   *A.*   They are stored the same way.

13   *Q.*   What is the process for e-mail transmissions when sending

14   an e-mail with a Tyson domain?

15   *A.*   The process is that the e-mail is sent from that

16   originating device through Tyson's e-mail systems whether they

17   be in our data center or through the Microsoft service.  They

18   are then sent and transmitted to the alternate domain, the

19   target domain for that e-mail.  It is stored on those servers

20   and then ultimately to whatever client device would ultimately

21   read those e-mails.

22   *Q.*   What about the process for receiving an e-mail with a Tyson

23   domain?

24   *A.*   It would be the same.

25   *Q.*   What about the process for a calendar invitation sent to

Matthew Bunch - Direct

1    someone with a Tyson domain?

2    A.   It would be the same.

3    Q.   And received by someone with a Tyson domain?

4    A.   The same.

5    Q.   What is the process if an employee with a Tyson domain name

6    sends or receives an e-mail from their Tyson e-mail address

7    with their mobile device?

8    A.   It's the same process.

9         THE COURT:   Ms. Butte, some people may be having some

10   trouble.  So if you can make sure the microphone is a little

11   closer to your mouth, and if you don't mind, if you could slow

12   down just a little bit.  Thank you.

13        MS. BUTTE:   Thank you, Your Honor.

14   BY MS. BUTTE:

15   Q.   Are e-mail messages and calendar invitations sent and

16   received from a Tyson e-mail domain automatically saved?

17   A.   Yes, they are.

18   Q.   Are they saved at the time they are sent by the person with

19   the Tyson e-mail?

20   A.   Yes, they are.

21   Q.   Where are they saved?

22   A.   They are saved both on the client device that sends the

23   e-mail, the tablet, the phone, the laptop computer or desktop,

24   and then they are also saved on the Tyson server storing the

25   e-mails.

Matthew Bunch - Direct

1  Q.  Are e-mails saved at the time they are received?

2  A.  Yes, they are.

3  Q.  And where are they saved?

4  A.  The same devices.

5  Q.  Continuing to review Government Exhibit 114, do you see the

6  date and time fields at the top of the e-mail?

7  A.  I do.

8  Q.  Does Tyson's e-mail system record that information for each

9  e-mail and calendar invitation that passes through its servers?

10  A.  They do.

11  Q.  Are those fields automatically generated?

12  A.  They are.

13  Q.  To the best of your knowledge, is the automatic generation

14  process reliable?

15  A.  To the best of my knowledge, yes.

16  Q.  Is it accurate?

17  A.  To the best of my knowledge, yes.

18  Q.  Are you knowledgeable about the time zone stamp that

19  appears at the top of each e-mail or calendar invitation?

20  A.  I am.

21  Q.  What is the time zone?

22  A.  In this instance, it is UTC, which is a universal time

23  irrespective of individual time zones across the world.

24  Q.  If the To, From or CC field on an e-mail does not list an

25  e-mail address but may list just a name, how is that name

Matthew Bunch - Direct

1    generated?

2    *A.*   That name is automatically generated by the system that

3    corresponds to the name and the e-mail address for that

4    individual.

5    *Q.*   Is that an automatic process?

6    *A.*   That is an automatic process.

7    *Q.*   To the best of your knowledge, is that automatic process

8    reliable?

9    *A.*   To the best of my knowledge, yes.

10   *Q.*   Is that process accurate?

11   *A.*   To the best of my knowledge, yes.

12   *Q.*   Further in your binder I would like you to take a look at

13   Government Exhibit 230, and then once folks have had a chance

14   to look at it, Government Exhibit 232.

15          Did you review each of these documents before today?

16   *A.*   I did.

17   *Q.*   When?

18   *A.*   Last Friday.

19   *Q.*   What are these documents?

20   *A.*   These documents appear to be a -- the sending of a pricing

21   schedule from Tyson to one of our customers.

22   *Q.*   Are you familiar with the process for how these documents

23   are stored and kept at Tyson?

24   *A.*   I am.

25   *Q.*   How are these records stored?

Matthew Bunch - Direct

1  *A.*  They are stored both on the device that originates the

2  e-mail, as well as the e-mail servers that they are sent

3  through.  And then any of these attachments which would have

4  been created, in this case a Microsoft Excel document, would

5  have been stored on that laptop or other client device.  It

6  would have potentially been stored on a file server or a

7  network file server that would store those.  And then it would

8  be ultimately stored as attached to this e-mail within the

9  e-mail system.

10  *Q.*  Is it a regular part of Tyson's business practice to send

11  monthly pricing to its customers?

12  *A.*  It is.

13  *Q.*  Are these documents made during the course of Tyson's

14  regularly conducted business?

15  *A.*  They are.

16       *MR. POLLACK:*  Your Honor, object to the last few

17  questions based on lack of foundation.

18       *THE COURT:*  Sustained.  If you could ask him for his

19  foundation.

20  *BY MS. BUTTE:*

21  *Q.*  So what do these documents look like to you?

22  *A.*  These documents appear --

23       *MR. POLLACK:*  Objection, same objection.  That doesn't

24  lay a foundation.

25       *THE COURT:*  Well -- sustained.  You have to ask the

Matthew Bunch - Direct

1   witness what basis he has to know about this type of document.

2   BY MS. BUTTE:

3   Q.  How are you knowledgeable about these types of documents?

4   A.  I spoke to our sales organization and they confirmed that

5   the documents that are --

6          MR. POLLACK:  Objection, Your Honor, hearsay.

7          THE COURT:  Sustained.

8   BY MS. BUTTE:

9   Q.  How did you become knowledgeable, without discussing what

10  you heard from other people, about these documents?

11  A.  These documents appear based upon the wording in them

12  called pricing --

13         MR. POLLACK:  Objection, Your Honor.  We still have

14  not laid a foundation.

15         THE COURT:  Let's have a side bar.

16     (At the bench:)

17         THE COURT:  Ms. Butte, can you hear me?

18         MS. BUTTE:  I hear you.

19         THE COURT:  Mr. Pollack, can you hear me?  Mr. Pollack

20  is indicating he can.  I can't hear him.

21         MR. POLLACK:  Can you hear me?

22         THE COURT:  Yes.

23         MS. BUTTE:  Can you hear me now, Your Honor?

24         THE COURT:  I can.  So I think you figured it out,

25  Ms. Butte, but there is just one earphone and the other one is

Matthew Bunch - Direct

1    just to keep on your head.

2         Okay.  Ms. Butte, the witness had mentioned that he

3    had talked to people.  What's your understanding of when he had

4    those discussions?

5         MS. BUTTE:  My understanding is as a custodian of

6    records, he had spoken to those people either the last week or

7    the week before to be knowledgeable about these documents.

8         THE COURT:  And what do you anticipate he is going to

9    say in regard to this particular exhibit and the pricing

10   information contained on it?

11        MS. BUTTE:  That it was the regular part of Tyson's

12   business practice to send them pricing to their customers and

13   these are kept in the ordinary course of business.

14        THE COURT:  Okay.  Mr. Pollack?

15        MR. POLLACK:  Your Honor, if the witness has

16   knowledge, personal knowledge, of that and is simply repeating

17   what other people have told him, one, that's hearsay; and two,

18   he cannot say that this is a business record.  He is just

19   simply saying that somebody else thinks it's a business record.

20        THE COURT:  Response, Ms. Butte?

21        MS. BUTTE:  Yes, Your Honor.  This is based on Your

22   Honor's order previously about witnesses being able to testify

23   when it comes to authenticating admissibility of certain

24   records, not necessarily based on their personal knowledge, but

25   becoming knowledgeable about that information and how that

Matthew Bunch - Direct

 1    would be appropriate for a custodian of records.

 2         THE COURT:  Well, what my order said was that a

 3    custodian of records doesn't have to know each document,

 4    doesn't have to be familiar with every document, but that does

 5    not mean that the witness can familiarize himself with a

 6    document that he otherwise is not familiar with simply by

 7    talking to other people about it and learning about that

 8    document through someone else.  That someone else would need to

 9    come in and lay the foundation in terms of a business record

10    for it.

11         So unless this particular witness had some -- you

12    know, it was within the scope of his normal duties to know for

13    a fact that pricing information of this sort was sent, he might

14    be able to authenticate it.  But he couldn't -- this witness

15    just gained that by virtue of talking to people as part of the

16    litigation process.  That would not suggest that -- I don't

17    believe that that's an appropriate authentication as to the

18    regularity of sending business documents to customers, all

19    right?

20         MS. BUTTE:  Your Honor, and just a preview, then we

21    will be calling another Tyson witness to establish the

22    authentication of these documents in addition to other

23    documents.

24         THE COURT:  Understood.  The objection is sustained.

25         (In open court:)

Matthew Bunch - Cross

1          THE COURT:  The objection is sustained.

2          MS. BUTTE:  Your Honor, I have no further questions at

3     this time.

4          THE COURT:  Thank you.  Cross-examination,

5     Mr. Pollack?

6                         **CROSS-EXAMINATION**

7     BY MR. POLLACK:

8     Q.  Very briefly, Mr. Bunch, you were shown a document that was

9     marked as Government's Exhibit 232.  I think at the bottom of

10    that exhibit there was an e-mail from another organization, not

11    from Tyson's; is that correct?

12    A.  Could you be more specific about where in this document you

13    are referring to?

14    Q.  I believe it's at the bottom of the document.  Is it 230?

15    I apologize.

16         MS. CALL:  I believe 114 may be what you are referring

17    to.

18         MR. POLLACK:  Thank you.

19    A.  There is a non-Tyson domain that is mentioned in

20    Exhibit 114.

21    BY MR. POLLACK:

22    Q.  And am I correct that you do not have familiarity with the

23    systems of other organizations --

24    A.  That is correct.

25    Q.  -- besides Tyson?

Matthew Bunch - Cross

1    *A.* That is correct. But I will state that the vast majority

2    of organizations use the same type of e-mail systems and so

3    everything would work exactly the same.

4    *Q.* Well, except it doesn't work exactly the same because you

5    will see that the time that is offered on that e-mail is in

6    Central Daylight Savings Time, whereas the time that's on the

7    Tyson document is a UTC time, correct?

8    *A.* That's correct. Central Daylight Time would be the

9    displayed time for that specific client, but at the end of the

10   day, all e-mails are designated and have time stamps in UTC

11   time.

12   *Q.* On the Tyson's side of the equation.

13   *A.* On the vast majority of systems in the world, yes.

14   *Q.* I understand. On Tyson's and in your experience on the

15   vast majority of systems, correct?

16   *A.* That is correct.

17   *Q.* But you don't know whether this organization, this other

18   organization is in that vast majority or is not in that vast

19   majority.

20   *A.* I have no direct knowledge, correct.

21   *Q.* And just lastly, Mr. Bunch, you referenced the Microsoft

22   365 environment?

23   *A.* That's correct.

24   *Q.* That's not the environment that has been in use throughout

25   your time at Tyson, I take it.

Matthew Bunch - Cross

1    A.   Correct.

2    Q.   There was previously an environment called Microsoft

3    Exchange?

4    A.   That is correct.

5    Q.   And there was a migration at some point from Microsoft

6    Exchange to Office 365?

7    A.   That is correct.

8    Q.   How long did that migration take?  When did that occur?

9    A.   It started approximately 2015 and lasted for well over a

10   year.

11   Q.   And in that migration were any files corrupted?

12   A.   Not to my knowledge.

13   Q.   When you say not to your knowledge --

14   A.   No.

15   Q.   Okay.  How do you know that?

16   A.   We have systems in place.  And the migration utility that

17   is used to move those documents and objects verifies that the

18   objects are intact and/or moved completely without

19   modification.

20   Q.   So at least on the Tyson side of the equation, nothing was

21   lost in the translation in that migration.

22   A.   That is correct.

23            MR. POLLACK:  Thank you, Mr. Bunch.

24            THE COURT:  Thank you, Mr. Pollack.

25            Additional cross?

436

Matthew Bunch - Cross

1               All right.  Redirect?

2               MS. BUTTE:  Nothing, Your Honor.  Thank you.

3               THE COURT:  Is Mr. Bunch excused?

4               MS. BUTTE:  We would like to hold him while we further

5      proceed with the other Tyson witnesses.

6               THE COURT:  Well, for rebuttal.

7               MS. BUTTE:  Yes.

8               THE COURT:  That's a long ways away, but you can talk

9      to Mr. Bunch about that.

10              MS. BUTTE:  Yes.  We will speak to Mr. Bunch.

11              THE COURT:  Thank you very much, Mr. Bunch.  You are

12     excused.

13              MR. POLLACK:  Your Honor, to be clear, he is not

14     released with respect to the defense case at this point.

15              THE COURT:  Oh, he is not.

16              MR. POLLACK:  No, Your Honor.  I thought I made that

17     clear the other day and I apologize if I did not.

18              THE COURT:  Has he been separately subpoenaed?

19              MR. POLLACK:  No, Your Honor.  With respect to the

20     custodians, we would ask that they not be released until we

21     work our way through this process and then we can confer.

22              THE COURT:  Okay.  So Mr. Bunch, you are subject to

23     recall by the defendants.  And they will be in touch with you

24     or working through the government to make sure you know about

25     when that may occur, but you don't have to be waiting around

Carolyn Arens - Direct

1  here all the time.

2          THE WITNESS:  Okay.

3          THE COURT:  Thank you very much, Mr. Bunch.

4          MS. BUTTE:  Your Honor, the government would like to

5  call Carolyn Sue Arens.

6          THE COURT:  You may.

7      (**Carolyn Arens** was sworn.)

8          COURT DEPUTY CLERK:  Please state your name and spell

9  your first and last name for the record.

10          THE WITNESS:  Carolyn Sue Arens, C-A-R-O-L-Y-N,

11  A-R-E-N-S.

12                        **DIRECT EXAMINATION**

13  BY MS. BUTTE:

14  Q.  Thank you, Ms. Arens.

15          Could you let us know your highest educational

16  background level?

17  A.  I have a bachelor's degree in human resource development.

18  Q.  Where do you work?

19  A.  I am employed by Tyson Shared Services which is a

20  subsidiary of Tyson Foods.

21  Q.  How long have you been employed there?

22  A.  Nine years.

23  Q.  What is your job title?

24  A.  Senior paralegal for litigation.

25  Q.  Could you describe your responsibilities in that position

Carolyn Arens - Direct

1    at Tyson?

2    A.  My main responsibility is working with the attorneys to

3    respond to complaints and such, but also one of my main

4    responsibilities is eDiscovery.

5    Q.  In that role at Tyson Foods, are you familiar with how

6    Tyson stores their e-mails and attachments?

7    A.  Yes, I am.

8    Q.  In your role are you familiar with how Tyson retrieves and

9    produces documents in response to subpoenas?

10   A.  Yes.

11   Q.  To document requests from third parties?

12   A.  Yes.

13   Q.  What is that process?

14   A.  That process is that -- our protocol is that when our

15   in-house attorneys tell me of a matter, that they request

16   e-mail searches and structure data searches from me.

17   Q.  Are you familiar with how e-mails, attachments and other

18   documents were retrieved and copied by Tyson Foods so they

19   could be produced to the Department of Justice?

20   A.  Yes.

21   Q.  Could you describe that process?

22   A.  We have two different systems.  One is called Discovery

23   Accelerator, and then from there we went to Microsoft Exchange.

24   And I use both of those systems to pull e-mails for matters.

25   Q.  Is that process reliable?

439

Carolyn Arens - Direct

 1   A.   Yes, it is.

 2   Q.   Is that process accurate?

 3   A.   Yes.

 4   Q.   Are you familiar with how e-mails, attachments and other

 5   documents were retrieved and copied so they could be produced

 6   by Tyson Foods to third parties?

 7   A.   Yes.

 8   Q.   Could you describe that process?

 9   A.   The process is we have a protocol and a process in that

10   once given the names of the custodians and the date range and

11   search terms if required, I go to those two systems and pull

12   the data.

13   Q.   Was that process reliable?

14   A.   Yes.

15   Q.   Was that process accurate?

16   A.   Yes.

17          MS. BUTTE:   Thank you.   Your Honor, I have a binder of

18   documents for the witness.

19          THE COURT:   All right.

20          MS. BUTTE:   And I also have a list of those same

21   documents that are in the binder, if I could hand it to

22   Mr. Keech.   And we have previously sent a native version to

23   defendants, but I have additional copies if anyone would like a

24   paper copy.   The list itself has been marked as Government

25   Exhibit 9549.

Carolyn Arens - Cross

1  *BY MS. BUTTE:*

2  *Q.*  Ms. Arens, do you recognize the documents in this binder?

3  *A.*  I do.

4  *Q.*  Are you able to verify that the originals of these

5  documents were stored on Tyson's document and e-mail systems?

6  *A.*  Yes, they are.  I have authenticated them.

7  *Q.*  How did you do that?

8  *A.*  I went back to our systems and I looked at each individual

9  e-mail and verified that it was an accurate copy as to what is

10  on our system.

11  *Q.*  Is that with respect to all the documents, not just

12  e-mails?

13  *A.*  Yes.

14  *Q.*  To your knowledge, are these exhibits true copies of the

15  e-mails, attachments and other documents that Tyson maintained

16  on its servers?

17  *A.*  Yes.

18      *MS. BUTTE:*  Thank you.  I have no further questions at

19  this time.

20      *THE COURT:*  All right.  Cross-examination of

21  Ms. Arens?  Any?

22      *MS. PREWITT:*  Your Honor, Elizabeth Prewitt on behalf

23  of Mr. Mulrenin.

24      *THE COURT:*  Go ahead.

25                          **CROSS-EXAMINATION**

1    *BY MS. PREWITT:*

2    *Q.*   Good morning, Ms. Arens.

3    *A.*   Good morning.

4    *Q.*   How are you today?

5    *A.*   Very well, thank you.

6    *Q.*   I have a few questions for you regarding some documents.

7         Now, you testified that there was a group of documents

8    that the government has shown you in that binder that you

9    consider to be documents that are authentic, correct?

10   *A.*   Yes.

11   *Q.*   Now, do you remember that on July 24th you executed a

12   certification of authenticity as to a large number of

13   documents?  Do you remember that?

14   *A.*   Yes.

15   *Q.*   Do you need to see that or do you recall that?

16   *A.*   I recall that.

17   *Q.*   Okay.  Now, and that was not the only certification.  You

18   also certified another time on October 8th, 2021.  Do you

19   remember that?

20   *A.*   Yes.

21   *Q.*   And do I need to show that to you or do you remember it?

22   *A.*   I remember it.

23   *Q.*   Okay.  Now, in each of those certificates, you explain that

24   you are qualified to authenticate about 7 million documents.

25   Does that sound about right?  Many millions.

Carolyn Arens - Cross

1    A.   There were 7 million pages of documents that have been

2    produced.  It would take some time for me to authenticate each

3    page, yes.

4    Q.   Understood.  Thank you.

5              Now, I am going to hand you what has been marked as

6    Defense Exhibit H-675, okay?  I will just hand that to you.

7              And we will provide copies to the government as well.

8    Thank you so much.

9              MS. BUTTE:  Your Honor, we object.  This is outside of

10   the scope of Ms. Arens' direct testimony.  This appears to be

11   defendants' exhibit list.

12             THE COURT:  Response, Ms. Prewitt?

13             MS. PREWITT:  I will represent to you that these are

14   all within the certification that she signed as being authentic

15   previously, so in the interest of moving along.

16             THE COURT:  Will the question have to do with

17   authentication issues that this witness may know about?

18             MS. PREWITT:  Exactly, Your Honor.

19             THE COURT:  Yes.  Objection is overruled.

20   BY MS. PREWITT:

21   Q.   Now, Ms. Arens, I will represent to you that this is an

22   excerpt of defendants' exhibit list that's been marked and it's

23   H-675 just for identification purposes for you to take a look

24   at.  Now, you will notice that the documents listed here are

25   all Bates stamped with a TY prefix.

Carolyn Arens - Cross

1  A.  Yes.

2  Q.  And that's the prefix that you affixed to these documents

3  as part of this production process you testified to, correct?

4  A.  I did not personally assign the numbers, but yes.

5  Q.  But you were part of that process and you know that that is

6  the prefix used --

7        MS. BUTTE:  Objection, Your Honor.  This is not the

8  subject of our direct examination.  This is Ms. Prewitt's

9  direct examination and not a proper cross-examination.

10        MS. PREWITT:  Your Honor, I can move through this

11  pretty quickly.

12        THE COURT:  I am going to overrule the objection.

13  Let's see where this is going.

14  BY MS. PREWITT:

15  Q.  Now, this is -- these documents all fall within the range

16  of TY documents that you certified to in July of 2020 and

17  October 2020, correct?

18  A.  Yes.

19  Q.  Now, based on your prior testimony as to the government's

20  exhibit list, you can testify that these Bates stamped

21  documents, the ones with the TY affixed to it, that Bates

22  number, are also authentic Tyson documents, correct?

23  A.  I am sorry, they were also what?

24  Q.  Based on your prior testimony when you were looking at the

25  documents that the government showed you which had the same

Carolyn Arens - Cross

1   prefix and fall under the same certification that you signed --

2   A.   Yes.

3   Q.   -- you can testify that these TY Bates stamped documents

4   are also authentic which you certified to previously, correct?

5   A.   I did not individually go through the defendants' list as I

6   did the government's list, but I believe our processes are

7   sound.  And so based on the knowledge of authenticating the

8   government's list, then I would believe -- it is my belief that

9   all TY documents are authentic.

10  Q.   Thank you.  Now, let's talk about the government's -- there

11  are also documents with a TF prefix, correct?

12  A.   Yes.

13  Q.   You testified that these are documents that Tyson produced

14  in connection with another matter, correct?

15  A.   That's right, a separate matter.

16  Q.   So would the same -- would your testimony be the same with

17  respect to those documents?  To the extent the government

18  provided you a list and asked you to testify that they were

19  authentic and you certified to that, the same would apply to

20  those documents in that Bates number range within the

21  defendants' exhibit list.

22  A.   Yes.

23  Q.   Just for clarity of the record, let me just show you that

24  list.

25          MS. PREWITT:  For the record, this is H-676.

Carolyn Arens - Cross

1   *BY MS. PREWITT:*

2   *Q.*  Those are the TF documents that you have testified were

3   authentic, correct?

4   *A.*  That's correct.

5   *Q.*  And that is your testimony as to these TF documents.

6          *MR. POLLACK:*  Your Honor, I am not sure if she has

7   testified that the TF documents.

8          *THE COURT:*  I am not sure she was asked about the TF

9   documents yet.  I am not sure, but why don't we clarify that.

10          *MS. PREWITT:*  Thank you, Your Honor.

11          *THE COURT:*  Oh, she did testify to the TF documents.

12   Sorry.  Go ahead, Ms. Prewitt.

13   *BY MS. PREWITT:*

14   *Q.*  To the extent you have testified previously that you

15   believe that the TF documents, the ones with the TF prefix were

16   authentic, correct, the ones you were shown by the government,

17   correct?

18   *A.*  Yes.

19   *Q.*  And you certified to as much in the certification, correct?

20   *A.*  In the certification, yes.

21   *Q.*  And these similarly are affixed with a TF label and you

22   also believe fall within that certification.  And it is your

23   testimony that they are also authentic, correct?

24          *MS. BUTTE:*  Objection, Your Honor.  I don't believe

25   the witness has copies of these documents available to her.

Carolyn Arens - Cross

1          *MS. PREWITT:*  I have a binder, Your Honor, if she

2     would like to look through them, but I haven't heard from the

3     witness that she feels she needs to do that.

4          *THE COURT:*  Right, if the witness asks to see them.

5     She has already indicated she is familiar with that series.

6     Objection is overruled.

7          *MS. PREWITT:*  Your Honor, I have no further questions

8     for this witness.

9          Thank you very much, Ms. Arens.

10         *THE COURT:*  Thank you, Ms. Prewitt.

11         Additional cross, Mr. Pollack?

12         *MR. POLLACK:*  Your Honor, can we have a brief side

13    bar?

14         *THE COURT:*  Yes.

15       (At the bench:)

16         *THE COURT:*  Ms. Butte, can you hear me?

17         *MS. BUTTE:*  I can hear you, Your Honor.

18         *THE COURT:*  All right.  Mr. Pollack, can you hear me?

19         *MR. POLLACK:*  I can, Your Honor.

20         *THE COURT:*  All right.  Mr. Pollack, go ahead.

21         *MR. POLLACK:*  So I apologize, Your Honor.  Maybe I am

22    confused or mis-recalling the testimony on direct, but all of

23    the documents on the government's list were from the TY series.

24    I do not recall any testimony on direct that was attempting to

25    authenticate anything from the TF series.

Carolyn Arens - Cross

1          THE COURT:  The witness testified that the TF series

2      were documents that Tyson produced in connection with another

3      matter.  And I can't recall whether there was some additional

4      testimony that that series were authentic, but there may have

5      been.  I am not looking at the transcript.  I am not quite sure

6      about that at the present time.  Ms. Butte, do you recall

7      whether the witness did so testify?

8          MS. BUTTE:  Her binder does include 12 documents that

9      do have the TF prefix that are listed on our list.  And we were

10     carefully trying to gauge her testimony since they were

11     documents produced in the civil litigation that we are trying

12     not to reference.

13         MR. POLLACK:  Your Honor, I am looking at Government

14     Exhibit 9549 which is the list that we were -- I do see there

15     are -- I apologize, Your Honor.  I thought these were all TY

16     documents.  This is the --

17         THE COURT:  Right.  There are some TF documents.

18     There is three listed on the bottom of the first column on the

19     first page and perhaps there are some additional ones.  Yes,

20     there are some additional ones, for instance, on Page 3, first

21     column, middle of the document there is some.

22         MR. POLLACK:  Thank you, Your Honor.

23         THE COURT:  Okay.  Side bar ended, thank you.

24      (In open court:)

25         THE COURT:  All right.  Anyone else,

1    cross-examination?  No?

2              All right.  Then Ms. Arens --

3              MS. BUTTE:  May we have a moment to confer?

4              THE COURT:  Yes, before you do redirect, sure.

5              MS. BUTTE:  Your Honor, we would like permission to

6    recall the witness later this afternoon if we need to.

7              THE COURT:  Normally there is no recalling in the

8    government's case, so you should ask whatever questions you

9    need to ask now.

10             MS. BUTTE:  Given that we were given the defendants'

11   exhibit list and Ms. Arens had not had a chance to look at it,

12   we would just like to have a chance to recall her and be able

13   to take a look at that and see if we have any additional

14   questions for her.

15             THE COURT:  Later today?

16             MS. BUTTE:  Yes.

17             THE COURT:  Well, I am not saying that you can, but if

18   you want to keep her around to try, that's fine.

19             MS. BUTTE:  Thank you, Your Honor.

20             Ms. Arens, you are excused subject to recall by the

21   defendants too.  Both sides will be in contact with you to let

22   you know if your testimony at a time other than today is

23   necessary, okay?  Thank you very much.

24             THE WITNESS:  Thank you.

25             THE COURT:  The United States may call its next

Stephen Gresch - Direct

1   witness.

2           *MS. BUTTE:*  Yes.  We would like to call Steven Gresch.

3           Your Honor, may I hand Mr. Keech the documents for

4   Mr. Gresch?

5           *THE COURT:*  You may.

6       (**Stephen Gresch** was sworn.)

7           *THE WITNESS:*  I do.

8           *COURT DEPUTY CLERK:*  Please state your name and spell

9   your first and last name for the record.

10          *THE WITNESS:*  Stephen Gresch.  That's S-T-E-P-H-E-N;

11  Gresch, G-R-E-S-C-H.

12                    **DIRECT EXAMINATION**

13  *BY MS. BUTTE:*

14  *Q.*  Thank you, Mr. Gresch.

15          Where do you work?

16  *A.*  I work at TransPerfect Legal Solutions.

17  *Q.*  How long have you been employed there?

18  *A.*  Approximately, four years.

19  *Q.*  What is your job title?

20  *A.*  I am a manager of forensic technology and consulting.

21  *Q.*  Could you describe your responsibilities in that position

22  at TransPerfect?

23  *A.*  Sure.  So I oversee the day-to-day operations of our lab in

24  Chicago, Illinois.  That includes the consulting on incoming

25  cases and incoming projects, also the collection of data,

Stephen Gresch - Direct

1   evidence handling and delivery of data to clients and to our

2   internal processing departments.

3   Q.  Was TransPerfect ever retained by Tyson Foods or its

4   counsel?

5   A.  It was, yes.

6   Q.  What was TransPerfect retained to do?

7   A.  So TransPerfect went on site to do forensic collections, as

8   well as to process data that was received from Tyson as well as

9   from the forensic collections, and to review and produce

10  documents.

11  Q.  As part of those forensic collections, did TransPerfect

12  process any e-mails?

13  A.  TransPerfect did process e-mails, yes.

14  Q.  How did TransPerfect process the time zones for those

15  documents?

16  A.  So the time zones were processed in UTC, which is

17  coordinated universal time.

18  Q.  You mentioned forensic collections.  Did TransPerfect ever

19  collect data directly from Tyson?

20  A.  We did, yes.

21  Q.  Where was that data collection from?

22  A.  So the data collections occurred at their headquarters, if

23  you are referring to the specific location, or like what types

24  of devices?

25  Q.  What particular devices were collected?

1  *A.*  Sure.  So we collected from laptop data, as well as from

2  mobile devices.

3  *Q.*  With respect to the laptop data, could you generally

4  describe the data collection process for that?

5  *A.*  Sure.  So for laptop data we would create a forensic image.

6  And that's a bit for bit copy, almost like a photograph of the

7  hard drive, and that's an exact copy of all the data, system

8  files, user files that exist on the laptop.

9  *Q.*  Is the process for that data collection reliable?

10  *A.*  It is, yes.

11  *Q.*  Is the process for that data collection accurate?

12  *A.*  It is, yes.

13  *Q.*  You have a binder in front of you.  It contains Government

14  Exhibits 244, 3074, 9211, 9212, and 9214.

15       *MS. BUTTE:*  And, Your Honor, we also have a list of

16  these exhibits that has been marked as Government 9552.  I can

17  hand that to Mr. Gresch for you and I can pass out to counsel

18  if you would like.  We have sent them the native version

19  previously.

20       *THE COURT:*  Mr. Keech can hand that up and can hand me

21  a copy as well.

22  *BY MS. BUTTE:*

23  *Q.*  Are you familiar with the exhibits in your binder and

24  listed on Exhibit 9552?

25  *A.*  So I am familiar with the exhibits listed here.

Stephen Gresch - Direct

1  Exhibit 9552, I am sorry, is it in this binder?  Was I going to

2  receive something?

3  Q.  It is a list of documents which -- I have given out all my

4  copies.

5  A.  Thank you.  And that's the same as here.  Yes, so I am

6  familiar with these documents.

7  Q.  Where do these documents originate from?

8  A.  Sure.  So these are all documents from laptops that were

9  imaged either by The Oliver Group or by TransPerfect Legal

10  Solutions that the evidence was then received by TransPerfect

11  if we did not create the image.

12  Q.  And how did you become familiar with these documents?

13  A.  I was -- so the first time I became familiar with them as

14  relates to this was I received a list of documents that had

15  been produced and was told to look into them.  That was my

16  first introduction into them specifically.

17  Q.  Does that apply to all the documents within your binder?

18  A.  It does, yes.  I will take a quick look at the actual

19  documents, but that is correct from the index.

20  Q.  I will give you a moment to take a look at the binder.

21  A.  Thank you.  So that is correct.

22  Q.  To the best of your knowledge, are the documents in the

23  binder and listed on Exhibit 9552 true copies of the documents

24  originally stored on the laptops that TransPerfect and The

25  Oliver Group collected?

Stephen Gresch - Direct

1   *A.*  They are, yes.

2         MR. POLLACK:  Objection, lack of foundation, in

3   particular with documents that were collected by The Oliver

4   Group.

5         THE COURT:  I don't understand your objection,

6   Mr. Pollack.

7         MR. POLLACK:  As I understand it, Mr. Gresch received

8   documents, some of which he directly acquired from laptops at

9   Tyson.  Others he acquired information from an entity called

10  The Oliver Group.  And I don't know -- we haven't laid a

11  foundation as to which of the documents on this list he got

12  directly and which ones he got from The Oliver Group.

13        THE COURT:  Okay.  So the objection is that the

14  question is vague?

15        MR. POLLACK:  The question is vague.  And to the

16  extent that it's asking about documents obtained The Oliver

17  Group, there is a lack of foundation for him to give an answer,

18  the answer to the question called for.

19        THE COURT:  Okay.  I will sustain both aspects of the

20  objection.

21        If you could lay a foundation.

22  *BY MS. BUTTE:*

23  *Q.*  Do you recall which documents in this list The Oliver Group

24  collected that data for?

25  *A.*  I do, yes.  Would you like me to describe?

1   Q.  Yes, please.

2   A.  So the first document, the e-mail chain between trial

3   Exhibit No. 244 was an e-mail taken from Brandon Campbell's

4   laptop.  That was collected by TransPerfect, I believe.  The

5   second, 3074, was from custodian Richard Collyar's laptop.

6   That I believe -- that was collected by The Oliver Group.  And

7   9211 and 9212 were taken from Carl Pepper's laptop.  That was

8   collected by The Oliver Group.  And 9214 was from Andrew

9   Lubert's laptop and that was collected by TransPerfect Legal

10  Solutions.  And to elaborate a little bit, the forensic images

11  that we received from The Oliver Group were full, true and

12  correct copies of the hard drive data from the laptop that we

13  were able to --

14          MR. POLLACK:  Objection, lack of foundation for this

15  answer which is not -- which I also object as not being

16  responsive to any question.

17          THE COURT:  Okay.  Let's limit the answers to just the

18  documents that are part of Exhibit 9552.

19  A.  Which is the same list that I am reading off of, if I

20  understand that correctly.

21  BY MS. BUTTE:

22  Q.  Yes.  If you could just explain what data that TransPerfect

23  received from The Oliver Group with respect to just the

24  documents that are listed on this list.

25  A.  Sure.  So the original answer -- so the first document was

Stephen Gresch - Direct

1    from The Oliver Group.  Excuse me, yeah, so the first -- okay.

2    So Oliver Group did the laptop for Carl Pepper and for Richard

3    Collyar, so TransPerfect did the laptops for trial Exhibit No.

4    244 and 9214.  And Oliver Group collected the data for 3074,

5    9211 and 9212.

6    Q.  And did TransPerfect process the data that it received from

7    The Oliver Group for those documents listed on this list that

8    The Oliver Group did the forensic image for?

9    A.  TransPerfect did process that data, yes.

10          MS. PREWITT:  Your Honor, we need maybe to have a side

11   bar on this, on the foundation question.

12          THE COURT:  Not right now.

13          Next question.

14   BY MS. BUTTE:

15   Q.  So the best of your knowledge, are the documents listed on

16   this list true copies of the documents that were originally

17   stored on the laptops?

18          MR. POLLACK:  Objection, lack of foundation with

19   respect to 3074, 9211 and 9212.

20          THE COURT:  Response?

21          MS. BUTTE:  Your Honor, we already have a certificate

22   of authenticity.  There was under 902(14) that was I believe

23   ruled authentic already for documents collected by The Oliver

24   Group.

25          THE COURT:  And where is that document?

Stephen Gresch - Direct

1          MS. PREWITT:  Your Honor, if I can be heard.  I

2     believe that that certification is from TransPerfect.  It's not

3     from The Oliver Group.

4          THE COURT:  Well, hold on, Ms. Prewitt.  Let's try to

5     find a copy of it so I can see that first, okay?

6          MS. PREWITT:  Of course, Your Honor.

7          THE COURT:  Ladies and gentlemen, let's go ahead and

8     take our mid-morning break at this time.  And why don't we plan

9     on reconvening at just shortly after 11:00 o'clock, all right?

10    Keep the admonitions in mind, ladies and gentlemen.  The jury

11    excused.  Thank you.

12          (Jury excused.)

13          THE COURT:  Mr. Gresch, you can go ahead and step down

14    at this time.  And if you could return just a little bit after

15    11:00 and be ready to go.  Thank you very much.

16          THE WITNESS:  Thank you.

17          THE COURT:  All right.  Was that certification found?

18          MS. BUTTE:  We will locate that right now during our

19    break, Your Honor.

20          THE COURT:  Okay.  Let's see if that can be found and

21    then we will take this issue up at -- if you can swing it.  If

22    counsel can't get back in time, we will obviously wait, but

23    let's see if we can be back so that at about five minutes of

24    11:00 we can take that up so we can deal with this before the

25    jury comes back in if possible, all right?

Stephen Gresch - Direct

1          The Court will be in recess.  Thank you.

2      (Recess at 10:44 a.m.)

3      (Reconvened at 11:00 a.m.)

4          THE COURT:  All right.  Ms. Butte, did we locate that?

5          MS. BUTTE:  Your Honor, my apologies.  I misspoke on

6   the record.  We have a declaration from The Oliver Group, but

7   we do not have a certification.  And we are not seeking to

8   introduce the declaration.

9          THE COURT:  I am sorry, what was the last part?

10          MS. BUTTE:  We are not seeking to enter the

11   declaration or discuss the declaration.

12          THE COURT:  Okay.  And then you still have some more

13   questions of the witness?

14          MS. BUTTE:  Just a few more questions, Your Honor.  I

15   will not over-promise and under-deliver, so I have a few more

16   questions.

17          THE COURT:  Anything else before we get the jury back

18   in?

19          MS. BUTTE:  That's all, Your Honor.

20          THE COURT:  Mr. McLoughlin?

21          MR. McLOUGHLIN:  Your Honor, my recollection is the

22   government indicated in front of the jury that it had a

23   certification, and so we would like the correction from the

24   government that that statement was inaccurate to be repeated so

25   that the jury has that information.

Stephen Gresch - Direct

1          THE COURT:  I will inquire of Ms. Butte whether she

2    located the certifications, and then she can respond to that.

3          MR. McLOUGHLIN:  Thank you, Your Honor.

4          MS. BUTTE:  Thank you.

5          THE COURT:  Mr. Keech, if the jury is ready, let's

6    bring the jury back in.

7          (Jury present.)

8          THE COURT:  Ms. Butte, did you locate that

9    certification?

10         MS. BUTTE:  Your Honor, I misspoke earlier.  We have a

11   declaration, but not a certification.  And we are not seeking

12   to enter that certification into evidence or discuss that

13   certification.

14         THE COURT:  All right.  Let's get Mr. Gresch back in.

15         Mr. Gresch, if you could resume the witness stand.

16         Go ahead, Ms. Butte.

17   BY MS. BUTTE:

18   Q.  Mr. Gresch, before you left you mentioned a hash value.  So

19   what is a hash value?

20   A.  Sure.  So a hash value is essentially a digital

21   fingerprint, so a series of letters and numbers that is derived

22   by an algorithm.  And if any of the contents of a file change,

23   if you run the algorithm on that file or group of files again,

24   you will get a different value.  We use that to validate the

25   contents of a file to make sure that metadata hasn't changed or

1    the content hasn't changed.

2    Q.  Were you able to perform that hash value analysis on the

3    documents that TransPerfect collected from the laptops you

4    discussed earlier?

5    A.  So the hash value analysis is done on the forensic image of

6    the group of files.  There is also a hash value associated with

7    each individual file and that's done at a later time.

8    Q.  Did you perform either of those hash value analyses?

9    A.  We did.  So when the collection is running, the forensic

10   tool creates the hash value.  And then we run it a second time

11   to validate the content, so we do that as a quality control

12   measure.

13   Q.  Were you able to perform that hash value analysis on the

14   data collected by The Oliver Group?

15   A.  We did.  So they logged the hash value for the collection

16   and then they validated it on their side.  And then we also

17   revalidated it once we received the data.

18        MR. POLLACK:  Objection, Your Honor, as to the

19   testimony about what he was informed The Oliver Group did.

20        THE COURT:  That will be sustained as to testimony

21   regarding The Oliver Group.

22        Ladies and Gentlemen of the Jury, you should ignore

23   that testimony.

24        Go ahead, Ms. Butte.

25   BY MS. BUTTE:

Stephen Gresch - Cross

1   Q.  To the best of your knowledge with respect to the documents

2   where TransPerfect performed the hash value analysis and

3   TransPerfect collected the data, are those true copies of the

4   documents originally stored on the laptops?

5   A.  They are.

6   Q.  And how do you know that?

7   A.  I know that by the process of the forensic imaging and then

8   the validation of the images from the hash values, as well as

9   our best practices for extracting data from those forensic

10  images and delivering them to our processing team.

11  Q.  Turning back to the exhibits in your binder, can you let us

12  know which exhibits that analysis pertained to?

13  A.  Sure.  So that was the laptop data from Brandon Campbell,

14  so 244, and Andy Lubert, 9214.

15      MS. BUTTE:  Thank you.  I have no further questions at

16  this time.

17      THE COURT:  Thank you.

18      Cross-examination?

19      MS. PREWITT:  Yes.  Liz Prewitt for Timothy Mulrenin.

20                  **CROSS-EXAMINATION**

21  BY MS. PREWITT:

22  Q.  Good morning, Mr. Gresch.

23  A.  Good morning.

24  Q.  How are you?

25  A.  I am good.

Stephen Gresch - Cross

1    Q.  I have a few questions for you.  In relation to -- you

2    talked earlier when Ms. Butte was standing here about data

3    collection being accurate.  Do you recall that?

4    A.  I do.

5    Q.  But you in fact cannot testify to the accuracy of the data

6    collection performed by The Oliver Group; isn't that correct?

7    A.  I would say that the data collected by The Oliver Group

8    that was logged in a forensically sound manner when my team

9    validated it --

10       MR. POLLACK:  Your Honor, I am going to object.  He

11   has no personal knowledge and he cannot testify about something

12   he doesn't have personal knowledge of.

13       THE COURT:  Overruled.  He can testify, but that issue

14   can be explored obviously.

15       Go ahead.

16   BY MS. PREWITT:

17   Q.  Did you observe the extraction performed by The Oliver

18   Group?

19   A.  I did not.

20   Q.  Okay.  So you are not aware of specifically their

21   procedures that they use to extract data, do you?

22   A.  So while I did not permanently witness it --

23   Q.  That's my question to you, sir.  You don't work for The

24   Oliver Group.

25   A.  That's correct.

Stephen Gresch - Cross

1   Q.   And you weren't trained by The Oliver Group.

2   A.   That is correct.

3   Q.   And so you don't have any direct knowledge about the

4   procedures that The Oliver Group uses to extract data; isn't

5   that correct?

6   A.   I received their collection notes.

7   Q.   But you were not involved.  You didn't witness it.  And you

8   do not know what was actually done, do you?

9   A.   I know from the notes that they gave me, but I did not

10   personally witness it.

11   Q.   And that would --

12        MS. PREWITT:  Your Honor, under Rule 602, this witness

13   does not have personal knowledge of the extraction, wasn't a

14   witness to it.  He is not qualified to offer that --

15        THE COURT:  Well, this is -- I am not sure what the

16   purpose of this statement is.  Do you have any additional

17   questions?

18        MS. PREWITT:  I just have an objection to this witness

19   being used to lay a foundation given the fact that he does not

20   have personal knowledge with respect to the documents, the

21   exhibits the government is seeking to admit.

22        THE COURT:  The government hasn't moved to admit them

23   yet, so any objection is premature.

24        MS. PREWITT:  Thank you, Your Honor.

25   BY MS. PREWITT:

Stephen Gresch - Cross

1   Q.  Now, with respect to the -- to be clear, we are talking

2   about with respect to the extraction performed by The Oliver

3   Group you already testified that you didn't witness and did not

4   participate in, that's in reference to the laptop, HP laptop

5   Elite 840 G3 associated with Carl Pepper; isn't that correct?

6   A.  I would need the declaration that I wrote to verify the

7   model number you referenced, but the Carl Pepper laptop to the

8   best of my understanding, that's correct.

9   Q.  And if it's reflected, you know, in the certification, that

10  would be accurate, correct?

11  A.  Correct.

12  Q.  Okay.  And the same would apply for the Dell HPS by Ritchey

13  Collyar, also reflected in your certification?

14  A.  Correct.

15  Q.  Also performed by The Oliver Group, the extraction?

16  A.  Correct.

17  Q.  In your other certification you refer to an iPhone 8 Plus

18  owned by Carl Pepper.  And that was also -- the extraction was

19  performed --

20       MS. BUTTE:  Your Honor, objection.  This is improper

21  cross, outside of the scope of Mr. Gresch's testimony.  We did

22  not discuss any mobile device collection.

23       THE COURT:  Response?

24       MS. PREWITT:  Your Honor, it's within the scope of his

25  testimony in the sense that he is here to testify based on

Stephen Gresch - Cross

 1   certifications and with respect to devices where there have

 2   been collections by TransPerfect.

 3           MS. BUTTE:  Your Honor, he was here with respect to

 4   testifying to the five documents that are listed on our exhibit

 5   list.

 6           THE COURT:  Sustained.

 7           MS. PREWITT:  Nothing further for this witness, Your

 8   Honor.

 9           THE COURT:  Thank you.

10           Additional cross-examination?

11           All right.  Redirect?

12           MS. BUTTE:  Your Honor, I have no further questions at

13   this time, but we would like to seek to admit into evidence

14   Government Exhibit 244 and 9214.

15           THE COURT:  Can you hand up hard copies of those to

16   me?  So something just happened that is causing some static.

17   If anyone has hot spots at your table, you have to be really

18   careful of those.  They could be the cause of the background

19   static.

20           MR. KOENIG:  Yesterday we unplugged our microphone, so

21   I don't think --

22           MR. FAGG:  I don't think the defense has a copy of

23   these exhibits.

24           MS. BUTTE:  They were listed on our exhibit list and

25   we provided you copies multiple times.

Stephen Gresch - Cross

1          THE COURT:  Hold on.  Ms. Butte, you have to use that

2     microphone.

3          MS. BUTTE:  All right, Your Honor.

4          THE COURT:  And also all comments need to be made to

5     me.  So Mr. Fagg made a comment to me.  You then need to make a

6     comment back to me.

7          MS. BUTTE:  Yes.

8          THE COURT:  The side conversations make for a bad

9     record, okay?

10         MS. BUTTE:  Yes, Your Honor.

11         THE COURT:  Response?

12         MS. BUTTE:  We did as we previously discussed with

13    defense counsel provide a list of the documents that we planned

14    to use with Mr. Gresch in advance.  And we have provided

15    electronic copies of these documents previously to them.

16         THE COURT:  But I thought that -- weren't you going to

17    have hard copies of the documents for counsel?

18         MS. BUTTE:  We provided them a full set of our hard

19    copy documents.  As per we agreed with them, we didn't have an

20    agreement that we provide copies in advance 10 copies for

21    defendants to try to cut down our paper printing.

22         THE COURT:  Okay.  Is there a hard -- are there hard

23    copies that Mr. Fagg can take a look at right now?

24         So Mr. Pollack, I am not asking for whether there is

25    objections yet.  I am still trying to look at these documents.

Stephen Gresch - Cross

1    Did you have something that needs to be --

2            MR. POLLACK:  If you are not ready for objections, no.

3            THE COURT:  Okay.  First of all, let us take document

4    244.  Any objections to the admission of document 244?

5            Mr. Pollack?

6            MR. POLLACK:  Yes, Your Honor.

7            THE COURT:  What is that objection?

8            MR. POLLACK:  So let me state part of it and there is

9    another part that may be better done by a side bar.  But as an

10   initial matter, whether or not the custodian has established

11   authenticity, the custodian has not established admissibility.

12   There are multiple layers of hearsay in this document and it's

13   inadmissible for that reason.  We can deal with that if we need

14   to by side bar.

15           THE COURT:  Agreed.

16           Response by the government?

17           MS. BUTTE:  Then we will seek to admit it later in

18   time, Your Honor, but we have laid the foundation for

19   authenticity for this document.

20           THE COURT:  I am sorry, for what?

21           MS. BUTTE:  We believe we've laid the foundation for

22   authenticity for this document, so we will seek to admit it

23   later and establish relevance and the other hearsay objections.

24           THE COURT:  So you are not admitting -- moving to

25   admit 244.

Stephen Gresch - Cross

1            *MS. BUTTE:*  Yes.

2            *THE COURT:*  Okay.  Are you moving to admit 9214?

3            *MS. BUTTE:*  We are still moving to admit that.

4            *THE COURT:*  Any objections to 9214?

5            *MR. POLLACK:*  Yes, Your Honor.  We would have the same

6       objections.

7            *THE COURT:*  Okay.  Response by the government?

8            *MS. BUTTE:*  Then we will seek to admit that at a later

9       time when we establish relevance and meet any hearsay

10      objections, but we do believe we have laid the foundation for

11      authenticity for this document.

12           *THE COURT:*  Because there is a difference between

13      authenticity and admissibility, we will take up that issue

14      later as well.

15           All right.  Do you have any additional questions for

16      Mr. Gresch?

17           *MS. BUTTE:*  No further questions, Your Honor.

18           *THE COURT:*  Mr. Gresch, you are, Mr. Gresch, subject

19      to recall by the defendants.  Either the government or defense

20      counsel will get in contact with you in the event that you are

21      needed, but you don't need to wait around the courthouse today

22      unless the government is requesting that you do.  And I know

23      that's not crystal clear, but take your direction from them.

24      But otherwise you are excused.  Thank you.

25           The United States may call its next witness.

Bill Kent - Direct

1        MS. ROGOWSKI:  The government calls Mr. Bill Kent.

2        (**Bill Kent** was sworn.)

3        THE WITNESS:  I do.

4        COURT DEPUTY CLERK:  Please state your name and spell

5     your first and last name for the record.

6        THE WITNESS:  Bill Kent, B-I-L-L, K-E-N-T.

7                           **DIRECT EXAMINATION**

8     BY MS. ROGOWSKI:

9     Q.  All right, Mr. Kent.  Where do you work?

10    A.  I work for Restaurant Supply Chain Solutions.

11    Q.  How long have you worked there?

12    A.  Close to five years.  It will be five years in February.

13    Q.  What is your job title?

14    A.  I am the vice-president of business technology.

15    Q.  And as vice-president of business technology, could you

16    just please briefly describe your responsibility?

17    A.  Absolutely.  I am responsible for all things information

18    technology.  I lead the department and I am responsible for

19    strategy, all of its people, processes, right to policies.  We

20    have a help desk and IT operations group.  We have

21    infrastructure and security, so hardware, software, networks,

22    data centers, things of that nature.  I run that department.

23    Q.  And do your responsibilities also include maintaining

24    RSCS's servers?

25    A.  Yes, they do.

Bill Kent - Direct

1  *Q.*  Could you please briefly describe?

2  *A.*  Sure.  We have servers in the cloud and we have a small

3  on-premise environment.  Those servers are responsible again

4  for all hardware, so the security around those servers.  Some

5  of them run applications.  Others run e-mail and things of that

6  nature.  But overall I have, you know, overreaching

7  responsibility for all of that.

8          *MS. ROGOWSKI:*  I have a binder for the witness.  May I

9  pass it to the witness and Mr. Keech?

10          *THE COURT:*  Mr. Keech can, yes.

11          *MS. ROGOWSKI:*  And also a list of exhibits.

12  *BY MS. ROGOWSKI:*

13  *Q.*  Mr. Kent, we are showing you a list of exhibits marked 9554

14  and a binder of those exhibits.  Do you recognize both of those

15  items?

16  *A.*  I do.

17  *Q.*  How do you recognize them?

18  *A.*  I was provided this information over the weekend, and I was

19  responsible for the data collection for some of those, that

20  information.

21  *Q.*  Okay.  And as a part of your position, Mr. Kent, are you

22  familiar with how RS creates, stores and maintains e-mails and

23  attachments?

24  *A.*  Yes, I am.

25  *Q.*  How are e-mails and attachments stored?

Bill Kent - Direct

1    *A.*  We use a very common platform, Microsoft, in particular the

2  Microsoft 365 on-line Exchange environment.  Those e-mails are

3  stored on our server, what's called a tenant server that we pay

4  licenses for as a service, and those are in the Microsoft

5  cloud.

6    *Q.*  And is that system monitored?

7    *A.*  Absolutely, yes.

8    *Q.*  Is it verified to ensure that it's operating properly?

9    *A.*  Yes.

10    *Q.*  Mr. Kent, I would like to direct your attention to the time

11  period between 2009 and 2019.  I am just going to refer to this

12  as the relevant time period.  Throughout this relevant time

13  period, to the best of your knowledge, was the system that RSCS

14  used to monitor its servers functioning properly or not

15  properly?

16        *MR. POLLACK:*  Objection, lack of foundation.  The

17  witness testified he has only been at the company since

18  February of 2017.  He is being asked about the period back to

19  2009.

20        *THE COURT:*  Sustained.  If you can lay a foundation.

21  *BY MS. ROGOWSKI:*

22    *Q.*  Mr. Kent, are you familiar with how RSCS stored and saved

23  its e-mails and attachments from anytime before your -- could

24  you please explain?

25    *A.*  Yes.  As I was sort of coming onboard, I did a full review

Bill Kent - Direct

1   of the past history, the environment, the architecture.  They

2   certainly made changes.  Technology would progress over the

3   years, but I am familiar with how it was stored prior to my

4   tenure with RSCS.

5   Q.  Can you please explain what you reviewed specifically with

6   respect to servers and how the servers were maintained?

7   A.  Yeah.  At that point in time we did not have much in the

8   "cloud," whether it be Oracle or Microsoft or Amazon.

9           MR. McLOUGHLIN:  Objection, Your Honor.  He is merely

10  repeating hearsay.  This is hearsay upon hearsay.

11          THE COURT:  Overruled.

12          MR. McLOUGHLIN:  The period from 2009 to 2019, the

13  fact he got a briefing again is hearsay and he is merely

14  repeating it.

15          THE COURT:  He can testify about his review of this

16  system integrity.  Overruled.

17  A.  So at that point in time, yes, we did a thorough review of

18  sort of where the company was and had come to, certainly

19  created a new road map of where we were going.  At that point

20  in time servers were maintained within the four walls of our

21  office in Louisville, Kentucky.  We did not have a cloud

22  environment at that point in time.  We did have an Exchange

23  server, if you will, that held all of the e-mails for the

24  company at that time when I was there in 2017, and then we

25  migrated to the on-line environment thereafter.

Bill Kent - Direct

1    *BY MS. ROGOWSKI:*

2    Q.  And at that previous point in time when you had physical

3    servers in your location in Kentucky, were those servers

4    monitored?

5    A.  Yes, they were.

6    Q.  And were they verified to ensure that they were functioning

7    properly?

8         *MR. McLOUGHLIN:*  Objection, Your Honor, to practices

9    from 2017 to 2009 about monitoring and whether they functioned

10   properly.  This is hearsay and speculation based on a review

11   years later.  We haven't established that the information he is

12   being asked about was in that review.

13        *THE COURT:*  Sustained as to the last part and in terms

14   of whether he reviewed information that would indicate the

15   integrity of those particular systems.  Otherwise, the

16   objection is overruled.

17   *BY MS. ROGOWSKI:*

18   Q.  Mr. Kent, when you were performing your review when you

19   came onboard to RSCS, what types of information did you review?

20   A.  Well, I was able to review the actual -- not only the

21   vendors and the partners that we used.  Clearly there were some

22   historical logs and things of that nature, and I had interviews

23   with my staff and others to assess what that current state was.

24   Q.  And were you satisfied based upon this review that the

25   servers were, in fact, monitored during this previous time

Bill Kent - Direct

1   period?

2   A.  Yes, I was.

3          THE COURT:  Overruled.

4   BY MS. ROGOWSKI:

5   Q.  Were you satisfied that based upon your review that these

6   servers were, in fact, functioning properly in this previous

7   time period or improperly?

8          MR. McLOUGHLIN:  Objection.

9          THE COURT:  Overruled.

10  A.  The servers were functioning properly.  In my interviews,

11  one of the interviewees was an IT operations manager who had

12  been with the company now 25 years.  And it was part of his

13  responsibilities to monitor.  But we also had a third-party

14  vendor who was also providing security and monitoring to those

15  servers, so I had interviews with that vendor partner as well.

16  BY MS. ROGOWSKI:

17  Q.  What was the name of that third-party vendor?

18  A.  It was -- Trace3 is the current name.  It was a -- prior to

19  that it was a different name, but Trace3 is their current name.

20  Q.  Mr. Kent, are you familiar with the RSCS domain name?

21  A.  Yes, I am.

22  Q.  What is the domain name?

23  A.  It is -- we actually have the RSCS.com.  We also have a

24  domain name for mail historically called UFPC.com.

25  Q.  Could you please explain to the jury why it's called

Bill Kent - Direct

1  UFPC.com?

2  *A.*  Sure.  Our business was -- prior to 2013 our business was

3  known as Unified Foodservice Purchasing Co-op.  And our current

4  CEO came in around that time and we just -- we had a name

5  change, so we added the RSCS.com domain.  And we made sure --

6  all of the e-mail and all of the other correspondence still

7  flows to the same server, if you will, but we had two different

8  domains.  We continue to have two as well.

9  *Q.*  You anticipated my next question.  So is it -- am I

10  understanding correctly that both of those two domain names are

11  still active?

12  *A.*  Yes, they are.

13  *Q.*  And are e-mails with both of those two domain names stored

14  and saved on RSCS's e-mail server?

15  *A.*  They are, yes.

16  *Q.*  Mr. Kent, are you familiar with the process for assigning

17  e-mail addresses to employees of RSCS?

18  *A.*  Yes, I am.

19  *Q.*  Could you please explain?

20  *A.*  Sure.  The typical process is we are provided from our

21  human resources department a notification, an alert in the form

22  of electronic form that outlines the new employee to onboard.

23  It's at that time we normally establish their e-mail address.

24  That e-mail address is first name.last name@RSCS.com.  There

25  are aliases as well that we can enter and have for nicknames

Bill Kent - Direct

1    and things of that nature because the employees most often want

2    to go by a nickname versus a formal name.  But needless to say,

3    both of those e-mail addresses if there are two or even more

4    would go to the same mailbox.  It would go to the same person,

5    but that's typically the onboarding, done at the onboarding

6    process.

7    Q.  Are you familiar with the e-mail address of RSCS employee

8    Sara Fisher?

9    A.  Yes, I am.

10   Q.  Could you please tell it to the jury?

11   A.  That would be Sara, S -- should I spell it?

12   Q.  Yes, please.

13   A.  Sara.Fisher@RSCS.com.  Now, she is a long-time employee and

14   would likely have had a UFPC.com e-mail address as well.

15   Q.  Are you familiar with the e-mail address of a Mike Ledford?

16   A.  Yes.

17   Q.  Could you please tell it to the jury?

18   A.  It's Mike.Ledford, M-I-K-E, dot, L-E-D-F-O-R-D.

19   Q.  And could you finish the e-mail address, please?

20   A.  @RSCS.com.  Apologies.

21   Q.  Would Mr. Ledford also likely have had a UFPC e-mail

22   address?

23   A.  Yes.  He was a longer term employee.  He also would have

24   had that for a period of time, yes.

25   Q.  What about a Pete Suerken?

Bill Kent - Direct

1   *A.*  I am familiar with Pete.  And his e-mail address is

2   P-E-T-E, dot, S-E-U-R-E-K-E-N.  It's Suerken,

3   S-E-U-R-K-E-N@RSCS.com.  And he would too would have had a

4   UFPC.com.

5   *Q.*  Are you familiar with the e-mail address of Rich Eddington?

6   *A.*  Yes.

7   *Q.*  Could you please tell the jury?

8   *A.*  It's Rich.Eddington, R-I-C-H, dot,

9   E-D-D-I-N-G-T-O-N@RSCS.com.

10  *Q.*  And what about Mary Hester?

11  *A.*  I am familiar with Mary as well.  Mary.Hester, M-A-R-Y,

12  dot, H-E-S-T-E-R@RSCS.com.

13  *Q.*  And what about a Robert Lewis?

14  *A.*  I am familiar with Robert as well, Robert.Lewis,

15  R-O-B-E-R-T, dot, L-E-W-I-S@RSCS.com.

16  *Q.*  All right.  Mr. Kent, have you reviewed the e-mails and the

17  attachments in the binder in front of you and listed in

18  Exhibit 9554 to confirm whether they did, in fact, come from

19  RSCS's system?

20  *A.*  Yes, I did, and I did confirm that.

21  *Q.*  And when did you do this review?

22  *A.*  I did this review -- I received it electronically late last

23  week and reviewed it over the weekend and reviewed it again the

24  last few days.

25  *Q.*  And just to avoid any miscommunication, you said you did,

Bill Kent - Direct

1    in fact, confirm that?

2    A.  Yes, I did.

3    Q.  All right.  Mr. Kent, let's talk a little bit about e-mails

4    some more.  When you look at the header information on the top

5    of an e-mail, what type of information is usually shown?

6    A.  It's normally the To and From or Sender, Receiver, along

7    with the date, along with if there is any particular

8    attachment, that's normally shown within that header

9    information.  It could also be in the body, but that's the

10   typical header information that's shown in the e-mail for RSCS.

11   Q.  Regarding the date and time at the top of the e-mail, do

12   you know how RSCS's systems generate that information?

13   A.  I do.

14   Q.  Could you please explain?

15   A.  Yeah.  The date and time is generated based on the -- if

16   it's a sender from RSCS, it will be based on the date and the

17   time in which they hit the enter key, if you will, that they

18   sent the e-mail.  That's recorded within the Exchange on-line

19   system itself.  It's in the metadata, if you will.  It's based

20   on their location.  That's synced with Microsoft Windows and

21   the time and dates are synced, if you will.  And if you are the

22   receiver, it's at the point in time you receive that message.

23   That would be noted as well.

24   Q.  And how does RSCS store that information?

25   A.  All of the e-mails are stored in the Microsoft 365 Exchange

Bill Kent - Direct

1   on-line environment on our server.

2   Q.  And would that include the date and time?  Is that also

3   stored?

4   A.  Yes, it would.

5   Q.  And does the date and time that's stored reflect the date

6   and time that the e-mail was actually sent?

7   A.  Yes.  It's from -- depending on what I received or is it

8   from the sender or receiver, yes, that date and time matches.

9   Q.  And to the best of your knowledge, is the process of

10  recording and storing that information accurate or not

11  accurate?

12  A.  It's accurate.

13  Q.  Is it reliable?

14  A.  Yes, it is.

15  Q.  Let's go back to the top of the e-mail.  And you mentioned

16  something about the To field and From field.  How is that

17  information generated?

18  A.  The person who is composing an e-mail would basically fill

19  out -- they are defaulted to the To field at the center and

20  they would basically address a receiver by typing in their

21  e-mail address.  If it's an internal person, those things can

22  be found by just typing in their name and it resolves, but

23  that's how you basically would create an e-mail.  The sender is

24  defaulted to their e-mail address and the receiver is whatever

25  they type in.

Bill Kent - Direct

1    *Q.* And how is that information, specifically with respect to

2    the To and the From and the CC and those fields, how is that

3    information stored?

4    *A.* That information is stored -- again, it's the same answer.

5    It's on the Exchange server, the exchange server we use.

6    *Q.* Would that be stored as the same information as was in the

7    e-mail when it was either sent or received?

8    *A.* Identically, yes.

9    *Q.* To the best of your knowledge, is that process accurate or

10   not accurate?

11   *A.* It's accurate.

12   *Q.* And is that reliable?

13   *A.* It is reliable.

14   *Q.* So you also mentioned something earlier about being able to

15   see if there is an attachment to an e-mail. And I believe that

16   you mentioned that you could see sometimes in the body of the

17   e-mail. Are there any other ways that you can see if an e-mail

18   has an attachment?

19   *A.* Yes. It would either be in sort of the header and would be

20   outlining a number of field names. It may be in the body. You

21   might see an icon along with the file name. And then of course

22   behind the scenes there is the metadata that sort of provides a

23   digital footprint of things, but it will have an indicator

24   of -- I think it's a yes or no, does it have attachments. It

25   may also list the attachment name within sort of the

Bill Kent - Direct

1   configuration of that metadata that goes along with every

2   e-mail.

3   Q.  And when looking at an e-mail that is saved and stored on

4   RSCS's servers, specifically talking about the text within the

5   body of that e-mail, is the text that's sent or received to an

6   RSCS e-mail address the same as the text that's stored when the

7   e-mail itself is actually stored?

8   A.  Yes, it is.

9   Q.  Mr. Kent, as a part of your work at RSCS, did there come a

10  time when you worked on a project to help RSCS respond to a

11  Grand Jury subpoena?

12  A.  Yes, absolutely.

13  Q.  Could you please briefly describe that process.

14  A.  Specific to this, we were notified by our legal counsel,

15  our legal team, that we needed to place a legal or litigation

16  hold on records.  And I received that request both verbally and

17  via e-mail.  And it outlined specific things that we needed to

18  look for and do.  But we immediately placed the litigation hold

19  using the Microsoft tool.

20        And then we had to scan all of our mailboxes for our

21  entire enterprise and look for certain key words and dates and

22  times, look for certain sender names or e-mail addresses or

23  receiver names and e-mail addresses.  And we did that and

24  provided electronic information back to our legal team.

25  Q.  And once that information was provided to your legal team,

481

Bill Kent - Cross

1    are you aware of whether it was extracted and copied to the

2    Department of Justice?

3    *A.*   I don't have any indication of what happened thereafter,

4    but we provided that information.   It was called PST files, and

5    from there I wasn't privy to.

6    *Q.*   For the process of collecting and copying the information,

7    to the best of your knowledge was the process that you used

8    functioning properly or not properly?

9    *A.*   It functioned properly, yes.

10   *Q.*   Okay, Mr. Kent.   Just two more questions for you.

11        Have you reviewed the e-mails and attachments and

12   other documents that are in the binder in front of you?

13   *A.*   Yes, I did.

14   *Q.*   And that are also listed on Government Exhibit 9554?

15   *A.*   Yes, I did.

16   *Q.*   And have you been able to confirm whether they were, in

17   fact, true copies of the documents on RSCS's servers?

18   *A.*   I did confirm and they are true copies.

19        *MS. ROGOWSKI:*   No further questions.

20        *THE COURT:*   Thank you.

21        Cross-examination, Mr. Pollack?

22                    **CROSS-EXAMINATION**

23   *BY MR. POLLACK:*

24   *Q.*   Hello, Mr. Kent.   Just a couple of questions for you.

25        When you said that you confirmed that the documents

482

Bill Kent - Cross

1    that are listed on 9554 are, I guess, true and correct copies,

2    I take it what you mean by that is you took the electronic copy

3    that the prosecutor gave to you and then you personally went

4    back to the RSCS server and made sure that the metadata and all

5    of the other information matched up with what the government

6    had provided you?

7          MS. ROGOWSKI:  Objection, Your Honor.  I don't believe

8    that's what he said he did.

9          MR. POLLACK:  It was a question, Your Honor.

10         THE COURT:  He can answer the question.  Overruled.

11   A.  Yeah, that was one approach.  I also as part of before the

12   electronic information went out, I confirmed that the

13   information, all of the configuration that we used to pull the

14   information was accurate and it was what we were asked to do.

15   But I did -- and I also basically looked and I did kind of know

16   what I printed and what this information looks like.  The

17   various nuances where we have signature lines and headers and

18   things of that nature, I could see that it matches sort of our

19   template that we use as a company.

20   BY MR. POLLACK:

21   Q.  Okay.  It matches your -- the template that you use as a

22   company, but I guess I am asking something a little bit

23   different.  For each and every one of these items listed, did

24   you yourself go back and compare -- let me start over.

25              What you got from the Department of Justice was an

483

Bill Kent - Cross

1   electronic copy?

2   A.   And I have a hard copy as well.

3   Q.   Okay.  Did you go back to the RSCS server to compare the

4   electronic copy that you got from the Department of Justice for

5   each one of these documents and ensure that it matched what was

6   on the RSCS server?

7   A.   I did not go back and look at it since it was received.  I

8   did go back and look at it two years ago when we pulled the

9   information.

10   Q.   Okay.  These documents have a document ID?

11   A.   Uh-huh.

12   Q.   I take it that's not your document ID.  You did not put

13   that on.

14   A.   Did not, no.

15   Q.   So how do you know that the documents that are listed here,

16   each and every one of them, is one of the documents that you

17   reviewed two years ago?  How do you know that what the

18   Department of Justice gave you is identical to what you

19   reviewed two years ago?

20   A.   Just looking at it based on knowing the mailboxes that we

21   provided, and I am speaking specifically to mail, those were

22   the names of those individuals that we had provided them in

23   discovery.

24   Q.   So it's the same people that these documents pertain to.

25   A.   Correct.

Bill Kent - Cross

1   Q.  But you didn't take this list and go back to the RSCS

2   servers.

3   A.  No, I did not do that this week.

4   Q.  Well, you didn't do it this week.  They didn't give you

5   this exact list two years ago, did they?

6   A.  They did not.

7   Q.  So you didn't do it two years ago either for this exact

8   list.

9   A.  For this exact list, I did not.

10  Q.  And then just one more thing, Mr. Kent.  You said that the

11  time that goes on in the e-mail that is sent from RSCS, it

12  depends on the location of the user; is that correct?

13  A.  That's typical, yes, yes.  It would sync with the time on

14  their computer based on what their location is.

15  Q.  And I just want to clarify that.  If I'm based in the

16  Central Time Zone, for example, but I am traveling for work and

17  I am in the Eastern Time Zone when I send an e-mail, is it

18  going to show the Eastern Time Zone time or is it going to show

19  the Central Time Zone time because that's where the IP address

20  is affiliated?

21  A.  It will show the Eastern Time Zone time.  It will follow --

22  it is set to change the time based upon where it's located.  It

23  will follow it.

24  Q.  So to know what time zone that time is reflecting, you

25  would have to know where the user was physically located at the

Bill Kent - Cross

1  time they sent the e-mail?

2  A.  Not exact physical location, but the time zone, yes, sir.

3  Q.  Which time zone they were physically located.

4       MR. POLLACK:  That's all I have.  Thank you, Mr. Kent.

5  I appreciate it.

6       THE COURT:  Thank you, Mr. Pollack.

7       Ms. Henry?

8                      **CROSS-EXAMINATION**

9  BY MS. HENRY:

10  Q.  Good morning.  I am Roxann Henry.

11      COURT DEPUTY CLERK:  Your Honor, I am sorry, I think

12  the battery is dead.

13      THE COURT:  Let's change the battery, Ms. Henry.  It

14  doesn't seem to be amplifying, so let's check on it.

15      MS. HENRY:  Thank you.

16  BY MS. HENRY:

17  Q.  Sir, you said on direct you were familiar with Robert

18  Lewis.  Didn't Mr. Lewis leave the employ of RSCS years before

19  you joined the company?

20  A.  He did.  He still was sort of connected.  And we have a lot

21  of legendary employees and people who didn't know who they are,

22  and we've met at parties and things of that nature.

23      MS. HENRY:  Thank you.

24      Mr. Fagg, go ahead.

25                      **CROSS-EXAMINATION**

486

Bill Kent - Cross

1    *BY MR. FAGG:*

2    *Q.*  Good morning, sir.

3    *A.*  Good morning.

4    *Q.*  Just a couple of quick questions.

5           When you are talking about the time zones for e-mail

6    and where they -- whether it will be updated, I assume when you

7    were testifying about that and how it would update, that would

8    require the computer or the device to actually recognize that

9    it is in that time zone.

10   *A.*  To be on-line, that's correct, to be connected to some sort

11   of service, an internet service of some sort, yes.

12   *Q.*  On your servers does someone have the ability to send an

13   e-mail through a computer, for example, that would not

14   recognize the time zone where they were?

15   *A.*  No.  You've got to be -- people can send an e-mail multiple

16   ways, right?  So you can be on your client, your e-mail client

17   which is on your laptop.  You can go to a web portal, which is

18   Microsoft on-line.  And in recent years a lot of people are

19   using mobile apps, so that's generally synced to a satellite

20   that has internet connectivity.  But as long as there is

21   internet connectivity, that's the time that is going to be

22   placed in the metadata and on the e-mail.

23   *Q.*  But if you are connected to your portal as you said, it

24   would still recognize you as being the time zone where you are

25   physically located?

Bill Kent - Cross

1    A.   Yes.

2         MR. FAGG:   Thank you.

3         THE COURT:   Mr. Tubach, go ahead.

4                    **CROSS-EXAMINATION**

5    BY MR. TUBACH:

6    Q.   Good morning.  Michael Tubach.  Just a few questions.

7         If you are looking at a hard copy of an e-mail, how do

8    you know whether it came from the sender's account or the

9    receiver's account in determining what the time zone is?

10   A.   Just the hard copy itself?

11   Q.   Yes.

12   A.   Clearly the two -- based on what you look at, it starts

13   with a To -- or rather a From, which is the provider, the

14   person who composed that e-mail.  And that parent e-mail sort

15   of lives -- and there may be multiple attachments, but that's

16   one way of looking at it.  And clearly the header information

17   on the metadata can be reviewed as well and that can be

18   assessed to see that same information.

19   Q.   Let me ask my question a little more directly because you

20   know a lot more about this than I do.

21        Let's say someone is in New York and they send an

22   e-mail to someone in Denver and they are two hours apart.

23   A.   Uh-huh.

24   Q.   So if you are just looking at a hard copy of an e-mail,

25   how do you know whether it came from the sender's account and

Bill Kent - Redirect                                        488

1   it would be on your time or from the recipient's account and

2   would be on Denver time?

3   A.  It's from the sender's account if that's the e-mail you are

4   printing.  If you are printing from the receiver's, that's

5   different.

6   Q.  You would have to know which account it came from, right?

7   Because that same e-mail would reside in two places and would

8   have two different time stamps right?

9   A.  More than likely.  Depends on if the receiver is outside of

10  RSCS, I don't have privy or knowledge as to how that would be,

11  but I know how it would be for us.

12  Q.  Thank you for that.  I was just talking about two people

13  within RSCS.

14  A.  I see.

15  Q.  So you could potentially have the same e-mail with two

16  different time stamps.

17  A.  The metadata would reflect the actual -- whether it came

18  from the receiver or the sender.

19  Q.  You would have to look at the metadata.

20  A.  That's right.

21          *MR. TUBACH:*  Thank you.

22          *THE COURT:*  Thank you.

23          Additional cross-examination?

24          All right.  Redirect?

25                         **REDIRECT EXAMINATION**

489

Bill Kent - Redirect

1    *BY MS. ROGOWSKI:*

2    *Q.* Mr. Kent, earlier you said the e-mail address of a Mr. Pete

3    Suerken.

4    *A.* Yes.

5    *Q.* Are you sure you spelled his name correctly?

6    *A.* I am pretty sure. It's not sure, as in S-U-R-E, but it's

7    S-E-U-R-K-E-N. We kind of pronounce it Suerken.

8    *Q.* Mr. Kent, you said you were the vice-president of business

9    technology; is that correct?

10   *A.* That's correct.

11   *Q.* And in that position you are responsible for all IT

12   infrastructure, that's correct?

13   *A.* Correct.

14   *Q.* You also said you used the Microsoft Exchange cloud system

15   to monitor servers. Do you have a contract with the Microsoft

16   Exchange cloud system?

17   *A.* We do, yes.

18   *Q.* And are you the one who is responsible for that contract?

19   *A.* I am.

20   *Q.* And so you pay them as a part of the contract. Is part of

21   that contract to be accurate and to store information

22   accurately?

23   *A.* Yes, it is.

24        *MR. POLLACK:* Your Honor, I am going to object. One,

25   it's not proper redirect. It's not responsive to anything in

490

Bill Kent - Redirect

1    cross.  Two, I don't think it's relevant.  And three, to the

2    extent that they are trying to make a statement about the

3    accuracy of Microsoft, the witness is not able to do that.

4              THE COURT:  Overruled.

5    BY MS. ROGOWSKI:

6    Q.  So Mr. Kent, you said as part of your position you monitor

7    the contract.  You do pay Microsoft Exchange and part of that

8    is that you expect them to be accurate; is that correct?

9    A.  That is correct.

10   Q.  So in your position if there was a problem with this

11   Microsoft Exchange cloud service that does store and maintain

12   RSCS e-mails and attachments, would you be aware of that?

13   A.  Absolutely.

14   Q.  And to the best of your knowledge, when you pulled and

15   copied the information from RSCS's servers in response to the

16   Grand Jury subpoena, was that information, in fact, pulled and

17   copied correctly?

18   A.  It was, yes.

19              MS. ROGOWSKI:  Your Honor, may I have permission to

20   hand the witness a document?

21              THE COURT:  You may.

22   BY MS. ROGOWSKI:

23   Q.  Mr. Kent, could you please turn to Exhibit 1136?

24   A.  Sure.

25              MR. POLLACK:  Can I ask if we can put this up on the

Bill Kent - Redirect

1    screen?

2          THE COURT:  Let's display that.

3          THE WITNESS:  I have it as well.

4          THE COURT:  That means that someone from the

5    government needs to put that up on the document viewer unless

6    you have a way to -- here you go.  You did.  Go ahead.

7          MS. ROGOWSKI:  No problem.

8    BY MS. ROGOWSKI:

9    Q.  So Mr. Kent, if you could please look at the CC field of

10   this e-mail.

11   A.  Yes.

12   Q.  What's the first name that you see there.

13   A.  That's Pete Suerken's name.

14   Q.  If you take a look at the spelling of the name, does that

15   change any of the answers related to his e-mail address from

16   previously?

17   A.  No.  It's P-E-T-E, dot, S-U-E-R-K-E-N as opposed to

18   Sureken, S-U-R-E, but it's spelled correctly.

19         MS. ROGOWSKI:  No further questions.

20         THE COURT:  Mr. Kent, you are subject to recall by the

21   defendant.  Someone will be in contact with you if they wish

22   for you to come back and testify.  It wouldn't be today.  And

23   subject to whatever the government may have told you about

24   whether you might have to stay here today, you are otherwise

25   excused.  Thank you very much.

Bill Kent - Redirect

1          THE WITNESS:  Thank you.

2          MS. ROGOWSKI:  Your Honor, based on Mr. Kent's

3     testimony, if I may, the government respectfully moves for a

4     ruling on the authenticity of the documents listed in

5     Government's Exhibit 9554.

6          THE COURT:  I am not going to make rulings on

7     authenticity.  I will rule at the time that something is moved

8     into evidence.

9          MS. ROGOWSKI:  Thank you, Your Honor.

10          THE COURT:  The United States may call its next

11     witness.

12          MS. ROGOWSKI:  The United States calls Lumaker Challa.

13          THE COURT:  I am sorry, what was the name again?

14          MS. ROGOWSKI:  Lumaker Challa.

15       (**Robert Hood** was sworn.)

16          THE WITNESS:  I do.

17          COURT DEPUTY CLERK:  Please state your name and spell

18     your first and last name for the record.

19          THE WITNESS:  Robert Hood, R-O-B-E-R-T, H-O-O-D.

20          MS. ROGOWSKI:  Your Honor, I am sorry.  We called

21     Mr. Challa.

22          THE COURT:  Right.  I am not sure.  Mr. Hood, you are

23     a bit of a surprise.  We thought you were Mr. Challa.

24          MS. ROGOWSKI:  We can take Mr. Hood now, Your Honor.

25          THE COURT:  As long as Mr. Hood is comfortable there,

Robert Hood - Direct                                                 493

1    so go ahead.  And if you could state your name and spell your

2    first and last name for the record.

3           THE WITNESS:  It's Robert Hood; R-O-B-E-R-T, H-O-O-D.

4           THE COURT:  And I can't remember now, Mr. Keech, have

5    you sworn him in?

6           COURT DEPUTY CLERK:  Yes, he was sworn in.  When he

7    stated and spelled his name --

8           THE COURT:  That's when we realized, yes, that's

9    correct.  Mr. Hood, we are going to break in just five minutes,

10   but we will get five minutes in.

11          MS. ROGOWSKI:  Your Honor, if we could please pass the

12   binder and the exhibit list over to the witness.

13          THE COURT:  Yes, you may.

14                     **DIRECT EXAMINATION**

15   BY MS. ROGOWSKI:

16   Q.  All right, Mr. Hood.  Could you please state and spell your

17   full name?

18   A.  It's Robert Hood, R-O-B-E-R-T, H-O-O-D.

19   Q.  Do you work for George's?

20   A.  Yes, I do.

21   Q.  How long have you worked there?

22   A.  16 and a half years.

23   Q.  And what is your job title?

24   A.  It's vice-president of IT.

25   Q.  As vice-president of IT, could you please briefly describe

Robert Hood - Direct                                    494

1    your responsibilities?

2    A.   Just oversee technology operations of servers, storage,

3    security, e-mail, network, et cetera.

4    Q.   Mr. Hood, in front of you there is a binder that contains

5    various exhibits and there is a list that's labeled

6    Government's Exhibit 9553.  Do you recognize both of those

7    items?

8    A.   Yes, ma'am, I do.

9    Q.   How do you recognize them?

10   A.   I reviewed these items.  They were given do me by counsel.

11   And I was sent the copies of what we had sent to counsel.  And

12   then through counsel DOJ sent copies of the trial exhibits, and

13   I used this document to cross-reference and from a high level

14   go through and look at each one of these documents.

15   Q.   And just to be clear, when you said the copies of documents

16   that you gave to counsel, were you -- what were you talking

17   about there?

18   A.   So that was from requests that came from counsel to us.  A

19   gentleman named, Keith Pennington, who I supervise goes out and

20   pulls e-mails from our system.  It may be an employee or former

21   employee, date range, key word, all three maybe.  We pull those

22   requests.  We take them, we put them into a PST file, and we

23   upload those to counsel's servers.

24   Q.   And Mr. Hood, you said you were able to page through the

25   documents.  Were you able to compare them to versions of the

Robert Hood - Direct

1   actual documents on George's servers?

2   A.  So I used the version that counsel sent me that they

3   assured me was copies of what we had sent them, and I compared

4   that to what we received from counsel -- through counsel from

5   you.  And again from a high level, I looked at those.  There

6   was 127 documents or 128 documents.  I received those Monday.

7   And I went through them and looked at, you know, basic length.

8   I looked at sender, recipient, subject, header information and

9   looked at those.  If there was an attachment, I looked at the

10  basics of an attachment to say this was 15 pages or this was 13

11  pages, so at that level I did review all of those.

12  Q.  And when you were doing your review, were you able to

13  confirm whether those documents in front of you did, in fact,

14  come from George's servers?

15          MS. JOHNSON:  Your Honor, Wendy Johnson for Mr. Blake.

16  If I understood the witness correctly, he is comparing

17  documents that came from outside counsel or counsel of some

18  sort that were sent to him to documents from the government

19  that were sent to him and did not go back to the server, so I

20  would object to a proper foundation.

21          THE COURT:  Overruled.  He can answer the question and

22  determine whether he has foundation or not.

23          Go ahead.

24  A.  So the question again was can I determine if they came from

25  our servers?

Robert Hood - Direct

1    *BY MS. ROGOWSKI:*

2    *Q.* Yes.

3    *A.* So I was told by counsel that the Bates --

4            *MS. JOHNSON:* Objection, Your Honor, hearsay.

5            *THE COURT:* Sustained. So why don't we -- we are

6    going to go ahead and break for lunch now and then we will

7    resume after that.

8            So ladies and gentlemen, we will go ahead and take our

9    lunch break now. Plan on reconvening at 1:30. Keep the

10   admonitions in mind. Keep those yellow juror buttons visible.

11   Make sure you don't confer or talk amongst yourselves about the

12   case. And the jury is excused for lunch. Thank you.

13           (Jury excused.)

14           Mr. Hood, you can step down. Thank you very much.

15   And then you can come back in at 1:30.

16           Mr. Hood, was that the notebook that you brought in or

17   was that one you were handed?

18           *THE WITNESS:* This is what I brought in.

19           *THE COURT:* Okay. Thank you, Mr. Hood.

20           Anything to take up before we recess? We will be in

21   recess, then, until 1:30. Thank you.

22       (Recess at 12:01 p.m.)

23       (Reconvened at 1:34 p.m.)

24           *THE COURT:* Are we ready for the jury? Okay. Let's

25   bring the jury back.

1          MS. ROGOWSKI:  Briefly one thing.  We just wanted to

2     mention, Your Honor, that in order to avoid mentioning directly

3     the civil litigation, we are going to be asking -- we have

4     asked our witnesses to refer to the civil litigation in this

5     matter as the litigation and we not to refer to the In re:

6     Broiler Chicken case.  And the law firm involved in that case

7     is Lockridge.  We wanted to avoid directly referencing that

8     litigation and that law firm, so we just want to call it the

9     litigation.

10          THE COURT:  Well, the litigation could be

11    misunderstood by the jury to mean this litigation.

12          MS. ROGOWSKI:  We could also say another matter.

13          THE COURT:  I think that that's a good phrase.  That

14    was the phrase used before.  I think that's better and it's so

15    neutral that it's probably the least likely to cause the jury

16    to speculate about things.

17          MS. ROGOWSKI:  We will use another matter.  Thank you.

18          THE COURT:  Mr. Fagg?

19          MR. FAGG:  Your Honor, just for a point of clarity for

20    the record, we would object to any reference to the litigation.

21    We don't have any objection to another matter.

22          MS. CARWILE:  Your Honor, Laura Carwile on behalf of

23    Mr. Austin.  Could we also have the witnesses admonished not to

24    mention their type of employment as a lawyer or paralegal to

25    the jury?

Robert Hood - Direct

1      THE COURT:  I don't know if they can or whether that

2  would affect their qualifications.

3      MS. CALL:  That's precisely what I wanted to raise,

4  Your Honor.  We have witnesses testifying as to where we

5  received documents from, which include a law firm in the civil

6  litigation, and a witness who is employed by that law firm,

7  which I think we can just refer to as a law firm and not by its

8  name or what matter it was in relation to, just by the matter

9  and a law firm.  I know it's vague and kind of makes an unclear

10  record, but I don't know if Your Honor has any suggestions on

11  how to handle that with the witnesses.

12      THE COURT:  I am not sure about that.  That wasn't

13  Ms. Carwile's point.  Her point is whether they could identify

14  themselves as something other than, say, a paralegal.

15      MS. CARWILE:  I am sorry, Your Honor.  I would ask

16  they not refer to themselves as lawyer, paralegal.  And I would

17  also that rather than using law firm, we use the word company.

18  I think that's perfectly reasonable given that it's not

19  relevant that there was a litigation involved.

20      THE COURT:  I don't know.  As long as that doesn't

21  prejudice the government's ability to establish authenticity,

22  that's the issue.  So, you know, if there is going to be an

23  objection from the defendants that they don't know anything and

24  it would make it all relevant.  On the other hand, if the

25  government is able to keep it all that neutral and still convey

Robert Hood - Direct                            499

1    the fact that these are authentic documents, you know, that

2    seems fine to me, but I don't know exactly what type of

3    foundation the government needs to establish or wants to

4    establish.

5              MS. CARWILE:  Can I respond briefly to that, Your

6    Honor?

7              THE COURT:  Why don't we have Ms. call respond.

8              MS. CALL:  I think it will be difficult for the

9    individuals not to reference the law firm generally in

10   establishing --

11             THE COURT:  Why is that?

12             MS. CALL:  Just to establish chain of custody of

13   documents.  This is kind of a middle step, obviously, and I am

14   afraid that the term company might just be too vague,

15   especially when we are referring to --

16             THE COURT:  What about your firm?

17             MS. CALL:  That would be fine.

18             THE COURT:  Okay, firm.  How is that?

19             MS. CARWILE:  I will let other teams speak for

20   themselves, but I think it gets closer to a better compromise,

21   although I think the point remains that if they refer to

22   themselves as lawyer and paralegal, it's pretty obvious what a

23   firm is.  So I just ask -- I don't think that at least for my

24   cross about custody the fact that this is a law firm versus

25   another type of company is relevant.

Robert Hood - Direct

500

1        THE COURT:  Well, I'm not sure it's prejudicial

2    either.  It creates a risk that something else could be said

3    that could add -- cause the jury to put two and two together, I

4    am not sure.  But if the government can attempt to use -- and

5    you would have to mention this to your witnesses before they

6    come onto the stand, but some more neutral term because

7    ultimately I think the fact that they received documents, it

8    probably doesn't matter that they were part of a law firm at

9    all.  And their titles probably, I don't know, but probably

10   don't matter either.  I just -- I am not sure.

11        For instance, if we say some real neutral term, the

12   company or the firm or the partnership, but then they say "I am

13   a paralegal," you know, some of the benefit of the neutral

14   terms as to the place of employment is lost.

15        MS. CALL:  I think we would request to be able to

16   establish their involvement in eDiscovery or receipt of

17   documents and things of that kind at least.

18        THE COURT:  Obviously, the question once again is

19   whether in order to establish that, their title, their job

20   needs to -- and maybe that's true, but I just don't know.

21        MS. CALL:  I think we can certainly try to avoid it,

22   Your Honor.  And I think -- so these witnesses are a little

23   later down in the chain for today, but we did want to raise it

24   early.  So I think what the government would suggest is we'll

25   use the mid-afternoon to be able to instruct those witnesses in

Robert Hood - Direct

1    referring to the company as just the firm and anything else,

2    but I don't know that there was any additional instructions for

3    us.

4            THE COURT:  Okay.  Once again, I do not want to

5    condition the jury to think that every time we say that we're

6    going to come back at 1:30, it's never 1:30.  Did you tell

7    Mr. Keech that we had this issue?

8            MS. CARWILE:  The government --

9            THE COURT:  Yeah, anything else?  We have got to get

10   the jury back in here.

11           MS. CALL:  I think that was just it.  We just wanted

12   to flag it.

13           THE COURT:  Once again, if there is some issue that is

14   going to come up, you need to let Mr. Keech know so we can meet

15   early so we don't continually, you know, send a signal to the

16   jury that we never start on time because we almost never start

17   on time.

18           MS. CALL:  I apologize, Your Honor.

19           THE COURT:  Mr. Keech, let's get the jury.

20           (Jury present.)

21           THE COURT:  Let's get Mr. Hood back in here.  Can

22   someone from the government get Mr. Hood?

23           Mr. Hood, if you could please resume the witness

24   stand.

25           Go ahead.

Robert Hood - Direct

1          MS. ROGOWSKI:  Thank you, Your Honor.

2     BY MS. ROGOWSKI:

3     Q.  Good afternoon, Mr. Hood.  Do you still have the binder and

4     the list of exhibits that's labeled 9553 in front of you?

5     A.  Yes, ma'am, I do.

6     Q.  Mr. Hood, when we broke for lunch, you were -- we were

7     discussing the e-mails and the attachments in that binder and

8     whether or not they came from George's servers.

9          Did you in this matter and related to this matter sign

10    any certificates of authenticity?

11    A.  Yes, I did.

12    Q.  Did you sign multiple certificates of authenticity?

13    A.  Yes, ma'am, I did.

14    Q.  Do you recall if those certificates of authenticity said

15    anything about George's servers?

16    A.  I do not recall.  I would have to look at them again.  They

17    had Bates ranges associated that I worked with Stinson Law Firm

18    on to identify that those were document extracts that we had

19    sent to them and if they had assigned Bates ranges to.

20    Q.  If I shows you those certificates of authenticity, would

21    that perhaps refresh your recollection?

22    A.  Yes, ma'am.

23         MS. ROGOWSKI:  If I could perhaps ask permission to

24    hand them up to the witness through Mr. Keech.

25         THE COURT:  You may.

Robert Hood - Direct

1          MS. ROGOWSKI:  This is Government Exhibit 9531 and

2    9533.

3          THE WITNESS:  Yes, ma'am.

4    BY MS. ROGOWSKI:

5    Q.  Mr. Hood, let's look starting at Government Exhibit 9531.

6          MS. JOHNSON:  Your Honor, we don't have a copy.

7          MS. ROGOWSKI:  We are passing them around.  I can

8    wait.

9    BY MS. ROGOWSKI:

10   Q.  All right, Mr. Hood.  If you could take a look at

11   Government Exhibit 9531.  You mentioned there were a few Bates

12   ranges.  In your certificate, could you look at the line that

13   begins below the Bates ranges?  And could you just read to

14   yourself the sentence that starts with "To the" and just read

15   the rest of that sentence to yourself?

16   A.  Okay.

17   Q.  Does that refresh your recollection, Mr. Hood, on whether

18   or not this certificate has anything to say about George's

19   servers?

20   A.  Yes, ma'am.  I just didn't remember the verbiage.  Thank

21   you for providing it.

22   Q.  I am sorry, I didn't hear your answer.

23   A.  I just didn't remember the verbiage.  Thank you for

24   providing it.

25   Q.  Could you please tell the jury roughly what you said in

Robert Hood - Direct

1    your certificate of authenticity without reading the document

2    about George's servers and these documents?

3           MS. JOHNSON:  Objection, Your Honor.  The document is

4    hearsay.  The witness is here and can testify about the server

5    or his involvement in the documents pulled from the server, but

6    the document is hearsay.  And I believe she asked him to read

7    from it.

8           THE COURT:  She asked him not to do that.  Overruled.

9    A.  So I say here that these Bates ranges were pulled from the

10   George's e-mail servers during the normal course -- e-mails

11   that were stored on the George's e-mail servers during the

12   normal course of business.

13   BY MS. ROGOWSKI:

14   Q.  Thank you, Mr. Hood.  Could you look at what's been marked

15   as Government Exhibit 9553?

16   A.  9553?  Yes, ma'am.

17   Q.  And could you please read the sentence just to yourself

18   that continues after the Bates range?

19   A.  You are talking about Government Exhibit 9533, correct?

20   Q.  Yes.

21   A.  Okay.  Were retrieved --

22   Q.  Sorry, just to yourself.

23   A.  Sorry.  Yes, ma'am.

24   Q.  Does that refresh your recollection, Mr. Hood, on anything

25   about George's servers?

505

Robert Hood - Direct

1   A.   Yes, ma'am.

2   Q.   Can you tell the jury without reading from the document

3   what you certified to with respect to George's servers?

4   A.   That these Bates ranges were pulled from e-mail stored on

5   George's systems during the normal course of business.

6   Q.   Thank you, Mr. Hood.

7           Mr. Hood, as a part of your position at George's, are

8   you familiar with how George's creates, stores and maintains

9   e-mails and attachments?

10  A.   Yes, I am.

11  Q.   And how are they stored?

12  A.   They are stored on our Microsoft exchange servers.

13  Q.   Do you understand, Mr. Hood, that Microsoft has the

14  technical capability to store and maintain e-mails in the cloud

15  from George's?

16  A.   Yes, I do.

17  Q.   And does George's have an agreement with Microsoft to do

18  just that?

19  A.   Yes, we do.

20  Q.   Is this the same process that's used for calendar

21  invitations at George's?

22  A.   Yes, ma'am, it is.

23  Q.   Mr. Hood, I would like to direct your attention to the time

24  period between 2009 to 2019.  So I am going to refer to this as

25  the relevant time period.  During the relevant time period, to

Robert Hood - Direct

1   the best of your knowledge was the system that George's uses to

2   monitor George's servers functioning properly or improperly?

3   A.   Properly.

4   Q.   And to the best of your knowledge, were there any issues

5   with George's servers that would have caused any e-mails or

6   attachments to be altered?

7   A.   No, ma'am.

8   Q.   Mr. Hood, are you familiar with George's domain name?

9   A.   Yes, I am.

10   Q.   What is it?

11   A.   It's GeorgesInc.com.

12   Q.   And are all e-mails with that domain name saved on George's

13   server or the cloud as you mentioned?

14   A.   Yes, ma'am, unless they were deleted.

15   Q.   And unless they were deleted, how are these e-mails or

16   attachments stored on the cloud?

17   A.   When a message is sent or received, it's stored on

18   Microsoft systems.

19   Q.   Is that the same process for calendar invitations?

20   A.   Yes, ma'am, it is.

21   Q.   Mr. Hood, what's the process for assigning e-mail addresses

22   for employees at George's?

23   A.   A new user request form is completed requesting setup of

24   their account and part of that is an e-mail address.  We use

25   first name.last name at georgesinc.com is the standard.  If

Robert Hood - Direct

1   that's taken, then we would append a 2 to it, so first

2   name.last name2@GeorgesInc.com.

3   Q.  Are you familiar with a Ric Blake from George's?

4   A.  Yes, I am.

5   Q.  What is it?

6   A.  It's R-I-C.B-L-A-K-E@GeorgesInc.com.

7   Q.  Continuing on, when you look at an e-mail, is there usually

8   any header information at the top of that e-mail?

9   A.  Yes, ma'am.

10  Q.  Could you please tell the jury what type of header

11  information?

12  A.  So there is a subject.  There is a recipient.  There is a

13  Bates time stamp for received or sent and the sender.

14  Q.  And how are those fields generated?

15  A.  So when you send an e-mail, you have to enter the To

16  information or CC or BCC.  You have to enter the subject and

17  certainly the content.  The sender is automatically populated

18  and the date being sent is automatically populated.

19  Q.  And once that information is either automatically populated

20  or entered and the e-mail isn't actually sent, how is that

21  information stored?

22  A.  It's stored on Microsoft's Exchange servers.

23  Q.  Is the information that's actually stored the same as the

24  information that's entered or automatically populated?

25  A.  Yes, it is.

508

Robert Hood - Direct

1    Q.   And is that the same process for calendar invitations?

2    A.   Yes, ma'am.  You might put a location or something like

3    that, but it's the same process.

4    Q.   Could you explain how that works with location?

5    A.   Just with a calendar event, you might put it's going to be

6    in conference room A or conference room B or this site or that

7    site.

8    Q.   So would the user input that information?

9    A.   Yes, ma'am.

10   Q.   Would that information be automatically saved once the

11   calendar invitation is sent or received?

12   A.   Yes, ma'am.

13   Q.   Regarding both e-mails and calendar invitations, are both

14   types of those documents saved at the time that the e-mail

15   calendar invitation is actually sent or received?

16   A.   Yes, they are.

17   Q.   And to the best of your knowledge, is the process that

18   saves and maintains those accurate?

19   A.   Yes, ma'am.

20   Q.   Is it reliable?

21   A.   To the best of my knowledge.

22   Q.   Mr. Hood, is there any way that you can tell if an e-mail

23   that stays on George's servers has an attachment or not?

24   A.   I don't do this directly, but I supervise people who do.

25   You can go query.

Robert Hood - Direct

1          MS. JOHNSON:  Objection, Your Honor.  The witness said

2     he did not do whatever he is about to testify directly, that he

3     only supervises people that does it, so I would object to the

4     relevance of his testimony about whatever actions are about to

5     be testified about.

6          THE COURT:  Well, we haven't heard enough to know

7     whether he has foundation.  I think that's what you were

8     talking about.  So I will overrule it at this time.  Go ahead.

9     A.  I am sorry, go ahead.

10          THE COURT:  Ask a new question, please, Ms. Rogowski.

11     BY MS. ROGOWSKI:

12     Q.  When you are looking at an e-mail, Mr. Hood, is there any

13     way to tell whether or not it has an attachment?

14     A.  Yes.

15     Q.  How can you tell?

16     A.  It shows up in Outlook and shows that there is an

17     attachment.

18     Q.  Where does it show up in Outlook?

19     A.  At the header information, just below the header

20     information on the e-mail.

21     Q.  Is there any way to tell from the metadata?

22     A.  There is.

23     Q.  And how can you tell from the metadata?

24     A.  So this is where I supervise someone that does this, but

25     you can go out and run queries against the servers and it

Robert Hood - Direct

1    returns you back information.  And there would be a flag that

2    showed that there was an attachment or not.

3    Q.  Mr. Hood, when you are looking at an e-mail from George's

4    that's on George's servers, is the text that's contained in the

5    actual body of the e-mail that's stored on the server the same

6    as the text that was in the e-mail when it was either sent or

7    received?

8    A.  Yes, ma'am.

9    Q.  All right.  Mr. Hood, as a part of your work at George's,

10   did there come a time when you worked on a project -- a matter

11   with a firm to help George's produce documents?

12   A.  Yes, ma'am.

13   Q.  Could you please briefly describe the process?

14   A.  So we get requests from counsel to go pull e-mail for

15   certain date ranges or, like I spoke about earlier, date

16   ranges, employees or former employees or key words.  And we

17   gather that information and put it in a PST file and upload it

18   to counsel's servers.

19   Q.  And specific to this matter, Mr. Hood, were the Bates

20   ranges and the certificates that we just looked at a few

21   moments ago the same Bates ranges related to the matters we

22   were just discussing?

23   A.  These specific Bates ranges were part of a pull that we

24   did, yes, ma'am.

25   Q.  As a part of this project, did you say -- and I apologize

Robert Hood - Direct                                             511

1   if you went over this a little bit -- but did you say that you

2   collected and extracted documents from George's servers?

3   A.   Yes.

4   Q.   And did you copy those documents somewhere?

5   A.   I just want to make sure I am clear.  When you say

6   documents, you are talking about e-mails?

7   Q.   E-mails and attachments.

8   A.   Yes, we did.  We copied them to the Stinson share file

9   server is where we sent those to.

10  Q.   What software did you use to copy those documents?

11  A.   Microsoft's eDiscovery tool is what goes out to the server

12  and grabs the e-mails and puts them into a PST.  And then we

13  take -- and you go to a website to upload them to the share

14  file server.

15  Q.   Are you generally familiar with how Microsoft eDiscovery's

16  tool works?

17  A.   I am high-level familiar with that.  Again, I supervise

18  someone who does these actions.

19  Q.   To the best of your knowledge, when you were working on

20  this matter was that Microsoft eDiscovery tool functioning

21  properly or improperly?

22       MS. JOHNSON:  Objection, Your Honor, to foundation.

23       THE COURT:  Sustained.  If you could ask him what the

24  basis of his knowledge is.

25  BY MS. ROGOWSKI:

512

Robert Hood - Direct

1   Q.  So how do you know about how this Microsoft eDiscovery tool

2   works, Mr. Hood?

3   A.  So I have worked in -- at George's for 16 and a half years

4   around our e-mail environment.  While I didn't administer it

5   directly, I have been involved in the administration of that

6   and been involved in, you know, upgrades and those kinds of

7   things.  And so I get requests frequently where we're asked to

8   go to the server and find e-mails, and so I -- that's how I

9   know about that.  I talk with someone that I supervise that

10  does that, but I am aware of the capabilities or at least the

11  primary capabilities of those tools.

12  Q.  Based on your knowledge of the Microsoft eDiscovery tool,

13  would you be able to tell if it was working properly or

14  improperly?

15          MS. JOHNSON:  Same objection, Your Honor, foundation.

16          THE COURT:  Overruled.  He can answer.

17  A.  I -- what I would say is that I am not using it directly,

18  but that the gentleman that does those pulls for me is very

19  versed with that.  And if there were -- if it wasn't opening or

20  working or pulling things correctly, then I would expect that

21  he would voice concern there.  He has used that for a number of

22  years.  So I can't -- I am trying to answer you, you know,

23  exactly here.  I don't use that tool, but he is very versed

24  with it, and I trust his ability to go out and use that tool

25  and to see if there are issues or problems with what it's

Robert Hood - Direct

1   pulling.

2   *BY MS. ROGOWSKI:*

3   Q.  Would you expect, Mr. Hood, that in your position at

4   George's as VP of information technology, you would be made

5   aware if there was some issue with the Microsoft eDiscovery

6   tool during the document pull?

7   A.  Yes, ma'am.

8   Q.  And were you made aware?

9   A.  I was not.

10  Q.  To the best of your knowledge, Mr. Hood, were the documents

11  that were copied and produced related to this matter true

12  copies of documents that were, in fact, pulled from George's

13  server?

14  A.  Yes, ma'am.

15  Q.  And were you able, Mr. Hood, to look through the documents

16  in the binder and compare them to the versions on George's

17  server?

18  A.  I looked through the documents on the binder and I compared

19  them to the Bates ranges that were given to me from counsel.

20  And I worked with them to identify that these Bates ranges were

21  from directly from the e-mail pulls that we had done.

22  Q.  And were you able to, in fact, confirm that they were true

23  copies when you compared them?

24  A.  As I said already, I compared them at a high level, so I

25  looked at each document and looked at subjects, looked at Bates

514

Robert Hood - Cross

1    time stamps, looked at length, looked to see if there was an

2    attachment on both.  If it was a direct, you know, direct

3    PowerPoint or something like that, I looked at the number of

4    pages for each one.  So at a high level I do feel comfortable

5    with that.

6         MS. JOHNSON:  I would object to the foundation.  This

7    witness is testifying at a high level.  He is also testifying

8    that he compared a document from another company to the

9    document that the government gave him and not to the metadata

10   or the PST files from the server.

11        THE COURT:  I am not sure what your point is.  He just

12   finished testifying and he ended his response, so assuming that

13   that's an objection, it's overruled.

14        Go ahead.

15   BY MS. ROGOWSKI:

16   Q.  To the best of your knowledge, Mr. Hood, were the e-mails

17   and attachments in the binder in front of you true copies of

18   the versions of the e-mails and attachments that you did, in

19   fact, have access to?

20   A.  Yes, ma'am, to the best of my knowledge.

21        MS. ROGOWSKI:  No further questions.

22        THE COURT:  Thank you.

23        Cross-examination?  Ms. Johnson.

24        MS. JOHNSON:  Thank you, Your Honor.

25                         **CROSS-EXAMINATION**

Robert Hood - Cross

1    *BY MS. JOHNSON:*

2    *Q.*  Good afternoon, Mr. Hood.

3    *A.*  Good afternoon.

4    *Q.*  In fact, wasn't this production ongoing and had already

5    started before you became vice-president?

6    *A.*  Yes, ma'am.

7    *Q.*  So the documents that would have been in the process of

8    being produced prior to your time as vice-president, you did

9    not have the administrative authority to supervise and be

10   involved in that production; is that true?

11   *A.*  I was not in the senior most IT role at George's at the

12   beginning of the production.

13   *Q.*  So when you just previously testified in your position as

14   vice-president you would have had authority over this from an

15   administrative standpoint, that authority would not have been

16   in place prior to you becoming vice-president, right?

17   *A.*  It's fair to say that I might not have -- yes, ma'am,

18   that's fair.

19   *Q.*  The government showed you two certificates of authenticity.

20   In fact, there were four involved in this matter, were there

21   not?

22   *A.*  I believe there were four total, but one preempted -- there

23   were four total, but one preempted another one, so I think

24   three official.

25   *Q.*  Specific to that, the last one that there was a preemption,

Robert Hood - Cross

1    was it because there were problems with the actual Bates number

2    in one of the certificates that the government has just asked

3    you about?

4    A.   It was because -- and I worked with Stinson Law Firm and

5    Zach Hemenway specifically to talk to this.  It was because

6    there were documents included in that that weren't stored on

7    our servers, and so they refined those Bates ranges to make

8    sure they were just talking about the e-mails.

9    Q.   So those documents that you had previously certified as

10   authentic were not stored on George's servers and certainly you

11   would not be able to authenticate those; is that correct?

12   A.   Yes, ma'am.

13   Q.   Isn't it true that there was a third-party vendor as well

14   as the counsel that you have already spoken about that were

15   involved in the production of these documents?

16   A.   There is -- when you say third-party vendor, you are not

17   talking about another law firm.  You are talking about -- I

18   guess I don't know what the third-party vendor would be.  We

19   take those files and we -- again they ask for, you know,

20   specifics of what they need.  We create the PST file.  We put

21   that PST file on their share file server, and from there we

22   don't have ownership of that.

23   Q.   Well, the government had listed George's vendor as a

24   third-party vendor, and I just thought if you were in the IT

25   department and you were working with this vendor, you would

517

Robert Hood - Cross

1   have knowledge of who that might be.

2   *A.* I believe that that vendor, it works with Stinson.

3   *Q.* So you are not involved or affiliated or know anything

4   about what they might have done with respect to these

5   documents.

6   *A.* That's true.

7   *Q.* Are you aware that some of the date/time stamps had been

8   altered such that that was the reason for a new certification?

9   *A.* I am aware --

10          *MS. ROGOWSKI:* Objection, Your Honor, foundation.

11          *THE COURT:* He was asked if he was aware. He said he

12   was. Overruled.

13   *A.* When you say that the date/time stamps were altered, are

14   you talking about how in these CLAs where they refer to the

15   time zone being applied, is that what you were referring to?

16   *BY MS. JOHNSON:*

17   *Q.* Correct.

18   *A.* So that's where they are changing -- at the header of the

19   e-mail where they are changing it to UTC time.

20   *Q.* Is that done as part of the George's process or some other

21   vendor or law firm that you don't know anything about?

22   *A.* That's done post, post the George's process after we have

23   handed it off to them.

24   *Q.* So these documents, some of which were actually altered

25   after it left your control.

Robert Hood - Cross

1    *A.* The time -- the date/time stamp and the header information

2    reflected UTC time, yes, ma'am.

3    *Q.* Do you remember speaking with me briefly about this --

4    these documents?

5    *A.* Yes, ma'am.

6    *Q.* And do you remember, did you tell us that you did not have

7    firsthand experience how this operated until you became the

8    e-mail administrator?

9    *A.* I am not the e-mail administrator, so I don't remember

10   saying that specifically.  I don't have firsthand knowledge on

11   how Microsoft stores on their systems, you know, how they deal

12   with -- how they deal with UTC time directly on the servers.

13   *Q.* And did you tell us that your knowledge of this subject

14   matter was partly based on just speaking with others in the

15   department?

16   *A.* Yes, ma'am.

17   *Q.* And just so we're clear, when did you become

18   vice-president?

19   *A.* It was late 2017.  Let me -- the title in late 2017 was a

20   director role.  It changed in -- I don't know the specific

21   date, around 2019, I think it was mid 2019, to be a VP role.

22   The responsibilities associated with it were the same.  It's

23   still the senior most position in IT.  So 2017 for a specific

24   director role, and 2019 for a VP role.

25   *Q.* Mr. Hood, what is your understanding of how the George's

Robert Hood - Redirect 519

1  servers affix time stamps?  Say, for instance, a George's

2  employee is on the East Coast.  George's is in Central.  How

3  are the time stamps affixed?

4  *A.*  So my understanding of that is that the Outlook client

5  which runs on the computer looks at the local computer and

6  determines what time zone they are in and uses that time zone

7  as the time that it affixes to the e-mail when you send that.

8  When you're talking about how it persists to the Microsoft

9  Exchange servers, I do not know the specifics of how Microsoft

10  handles that in the background.  I have some ideas around it,

11  but I do not know specifically.

12  *Q.*  Finally, it's my understanding that the George's documents

13  that you were testifying about today have two prefixes, a GEO

14  prefix and a GEO-DOJ prefix.  Are you familiar with both?

15  *A.*  Yes, ma'am.

16  *Q.*  And were there documents with both of those prefixes that

17  had issues with the outside counsel such that you had to

18  recertify those authentications?

19  *A.*  I do not know the answer to that, ma'am.

20        *MS. JOHNSON:*  That's all I have.  Thank you.

21        *THE COURT:*  Thank you.

22        Additional cross-examination?

23        All right.  Redirect?

24                    **REDIRECT EXAMINATION**

25  *BY MS. ROGOWSKI:*

Robert Hood - Redirect

520

1    Q.   Mr. Hood, when did you say you became vice-president?

2    A.   It's around 2019 was when the title was vice-president.  I

3    believe it was mid 2019.

4    Q.   And before that?

5    A.   The director title was -- I believe it was around October

6    of 2017.  I don't have a specific date.

7    Q.   And before that what was your position?

8    A.   I was the manager of IT infrastructure.

9    Q.   Throughout all three of those positions did you have any

10   responsibilities related to the servers of George's?

11   A.   Yes, ma'am.

12   Q.   Could you describe not your current position, not the one

13   immediately prior, but the one before that could you describe

14   what your responsibilities related to George's servers were?

15   A.   So the manager of IT infrastructure role, my

16   responsibilities were making sure that our networks were

17   secure, that our servers were up-to-date and standing up new

18   servers and storage and those kinds of things for projects that

19   we had, as well as making sure our e-mail system worked

20   adequately.  And I supervised -- in that role as well, I

21   supervised a team of folks that were in charge of doing those

22   things.

23   Q.   So would it be fair to say that throughout that entire

24   time, those three positions, you had knowledge of George's

25   e-mail servers and whether or not they were functioning

Robert Hood - Redirect

1    properly?

2    A.   That's a fair statement.

3    Q.   Would it be fair to say that this knowledge was in part the

4    basis of your certificates of authenticity?

5    A.   I guess my answer to that would be that in that role and in

6    the role I'm in now, I worked with the gentleman that I

7    supervise and have trust in his ability to do that job and know

8    that he knows how to pull that information.

9    Q.   And, Mr. Hood, you mentioned a few problems with Bates

10   numbers earlier.  You briefly discussed them.  To the best of

11   your knowledge, were all of the problems with these Bates

12   numbers in fact corrected?

13   A.   Yes, ma'am, to the best of my knowledge.

14   Q.   And finally, Mr. Hood, you mentioned briefly UTC time.

15   Could you just explain a little bit more about what UTC time

16   is?

17   A.   I'll do my best.  So Universal Time Coordinate I believe is

18   what that stands for.  So to deal with people sending e-mails

19   from all sorts of different time zones around the world, there

20   has to be a standard with which you set a date/time stamp and

21   persist that.  I can't really go into more detail than that.  I

22   have not studied it, but that's my basic understanding of it.

23   Q.   Would it be fair to say that when an e-mail is converted to

24   UTC time, it is, in fact, just converted.  It's not altered.

25   The time isn't actually changed.

522

Robert Hood - Redirect

1   A.  The time would be -- UTC time is adjusted on a specific

2   set, so, you know, six hours or seven hours depending on

3   whether Central Time is in daylight savings time or not, so it

4   will adjust up seven hours or it will adjust up six hours.  I

5   am trying to make sure I am telling you accurately.  It may

6   adjust down seven or six hours, I don't remember specifically,

7   but there is a standard with which it changes, yes, ma'am.

8   Q.  So would it be fair to say that converting something into

9   UTC time is really just standardizing that time?

10  A.  I feel like that's a correct statement.

11          MS. ROGOWSKI:  Thank you.  No further questions.

12          THE COURT:  Thank you, Mr. Hood.  So you are subject

13  to recall by the defendants if they choose.  They will

14  presumably coordinate with you if they need to have you come

15  back some other day.  And assuming that the government is

16  releasing you for today's purposes, you are excused.  Thank you

17  very much, Mr. Hood.

18          The United States may call its next witness.

19          MS. ROGOWSKI:  The government calls Lumaker Challa.

20      (**Lumaker Challa** was sworn.)

21          THE WITNESS:  Yes.

22          COURT DEPUTY CLERK:  Please state your name and spell

23  your first and last name for the record.

24          THE WITNESS:  Lumaker Challa, L-U-M-A-K-E-R,

25  C-H-A-L-L-A.

Lumaker Challa - Direct

1         THE COURT:  Mr. Challa, if I could ask if you could

2   try to lean into that microphone as best you can.  You can get

3   quite close to it, actually, just so we are able to hear you.

4         Go ahead.

5         MS. ROGOWSKI:  May we please have permission to hand

6   the binder and the exhibit list to Mr. Challa through

7   Mr. Keech?

8         THE COURT:  Yes.

9         COURT DEPUTY CLERK:  Both of these lists?

10        MS. ROGOWSKI:  One is for you, Mr. Keech.

11                     **DIRECT EXAMINATION**

12  BY MS. ROGOWSKI:

13  Q.  Mr. Challa, could you please describe your highest level of

14  education?

15  A.  I do have a dual master.  One is a master of computer

16  applications.  The second one I recently completed is an MBA

17  from CSU.

18  Q.  Do you work for Pilgrim's Pride?

19  A.  Yes.

20  Q.  And how long have you worked there?

21  A.  I have been with that company for 13 years.

22  Q.  And what is your job title?

23  A.  My title is IT director.

24  Q.  In your position as IT director, could you please briefly

25  describe your responsibilities?

Lumaker Challa - Direct                                               524

1   A.   Sure.  My job mainly is maintaining the administration of

2   the applications, so I have four different teams reporting to

3   me.  One is database administration.  That team takes care of

4   all the databases in the company.  The second team is SAP

5   Basis, so data responsive for all the SAP applications that we

6   have.  The third team is enterprise application team.  So that

7   team supports non-SAP applications, such as e-mail, SharePoint

8   and many other applications.  And the fourth team is the

9   archiving team, so they are responsible for the e-mail

10  archiving and SharePoint and SAP data archiving.

11  Q.   Mr. Challa, in front of you and to the side of you are

12  binders containing exhibits and also an exhibit list that's

13  been marked by the government as Government Exhibit 9551.

14       Are you familiar with those binders -- the documents

15  in those binders and also this exhibit list?

16  A.   Yes.  I was given these binders on Monday.  I did review

17  it.

18  Q.   And you are also familiar with the exhibit list?

19  A.   Yes.

20  Q.   How are you familiar with that?

21  A.   Again, this was given to me to satisfy this documents in

22  the binder, so that's when I saw the exhibit numbers and the

23  documents.

24  Q.   And did you review both the exhibit list and the documents

25  in the binders?

525

Lumaker Challa - Direct

1  A.  Yes.

2  Q.  As part of your position, Mr. Challa, are you familiar with

3  how Pilgrim's creates, maintains and stores e-mails and

4  attachments?

5  A.  Yes, I do.  So we have -- we use Microsoft Exchange as an

6  e-mail system, so every e-mail sending and receiving go through

7  the servers we have in our data center.  And we also have an

8  archiving solution in place.  Every e-mail sent and received

9  goes to that archiving system.

10  Q.  Let's talk about that archival system, Mr. Challa.  Can you

11  please describe how it works?

12  A.  Sure.  So we have a process called Generlink (ph).  Every

13  time an e-mail coming into our Exchange servers, a copy will be

14  sent into the archiving system.  So the archiving system stores

15  those e-mails and the users can go and check those e-mails.

16  Q.  And are the documents from the archival system ever copied

17  to any of Pilgrim's other systems?

18  A.  No.

19  Q.  To the best of your knowledge, Mr. Challa, are the

20  documents that are stored on the archival system in fact true

21  copies of the original e-mails and attachments?

22  A.  Yes, to the best of my knowledge, the product we use is

23  Simpana.  It's a product from CommVault, so the product is

24  supposed to keep an exact copy of the live system.

25  Q.  And is this product, Simpana, that Pilgrim uses, to the

Lumaker Challa - Direct                                        526

1   best of your knowledge, has that been functioning properly or

2   improperly?

3   A.  The system functions properly.  When there is a problem

4   with the system, we do get a notification, right?  So when I

5   say the system, our whole entire that -- all the servers we

6   have with data, we call it our system.  Sometimes we get a

7   server problem, but that's not a data inconsistency.  When

8   there is a data inconsistency, we do get notifications.  I have

9   a team who monitors that and makes sure it is working.

10  Q.  Could you please describe what a data inconsistency is?

11  A.  Let's say there is a time when the data is not storing in

12  the system, that's what we call it.  So you have an e-mail in

13  the live system, but it's not in the archive system, that's

14  what we consider as an inconsistency.

15  Q.  So just to make sure I am understanding correctly, if there

16  is a data inconsistency, documents are not, in fact, copied?

17  A.  Yes.

18  Q.  So there would be nothing that would actually alter the

19  documents.

20  A.  No.  There is no way the documents can alter or the e-mail

21  can alter.  Either it is copied or it is waiting to copy.  It

22  is in the queue.

23  Q.  Thank you.  Taking a step back from the archival system and

24  just talking about Pilgrim's servers generally, are Pilgrim's

25  servers monitors in any way to ensure that they are functioning

Lumaker Challa - Direct

1  properly?

2  *A.*  Yes.  We do have a monitoring system we use to know if a

3  server is up or down or a service, right?  We get an e-mail

4  notification in the system or sometimes if it is critical we

5  get a pager.  We go and see the system, what's wrong with the

6  system, and bring it up.

7  *Q.*  And if the server system goes down, Mr. Challa, is there

8  any sort of backup system?

9  *A.*  No, no.  So the e-mail system, as I mentioned earlier, the

10  e-mail system, if there is a problem, the e-mail is queuing in

11  a file.  It's not going down.  It takes time.  When the system

12  is up and running, it will dump everything back.

13  *Q.*  And what actually happens then when the system is up and

14  running again?

15  *A.*  So the data will start transferring.  It's like it was

16  waiting for some time when the system is down.  When the system

17  is up, the data will be processed and put into the archive

18  system.

19  *Q.*  During that time period when the data is waiting, is the

20  data altered in any way?

21  *A.*  No, no.  It's a system defined in the back end.  We don't

22  have any way to do anything in the back end.

23  *Q.*  Mr. Challa, does Pilgrim's have a domain name?

24  *A.*  It's pilgrims.com.

25  *Q.*  You said it's pilgrims.com?

Lumaker Challa - Direct

1  A.  Uh-huh.

2  Q.  Does it have any other domain names including a domain name

3  related to its parent company?

4  A.  So we may have other domain names for a marketing purpose

5  or having a website, but for the e-mail system we use

6  pilgrims.com.  So I heard of a pilgrimspride.com, but I don't

7  remember seeing it in the part of the e-mail system, but

8  marketing purpose and branding purpose you have multiple

9  domains.

10  Q.  And the Pilgrim's employees have -- I heard you say there

11  was pilgrims.com and also pilgrimspride.com.  Do Pilgrim's

12  employees have access to e-mails on both of those domain names?

13  A.  To my knowledge, it's only pilgrims.com.  I don't remember

14  seeing pilgrimspride.

15  Q.  Are e-mails with the domain name pilgrims.com saved and

16  stored on Pilgrim's e-mail server?

17  A.  That's correct.

18  Q.  How are they stored?

19  A.  So the e-mail, once a user starts sending a draft e-mail,

20  it's on the client system.  It's called Outlook.  Whenever they

21  click on the send button on the e-mail, that e-mail goes to our

22  servers we have in Richardson.  It stores a copy there.  And

23  then the users on the other end, they have to log it into their

24  system.

25  Q.  Is this the same process that happens for calendar invites

Lumaker Challa - Direct

1    or is it a different process?

2    *A.*  It is the same process.  How -- a user sees a different

3    format, but on the back end how we store it is the same format.

4    *Q.*  Can you briefly explain how e-mail addresses are assigned

5    to that domain name when a new Pilgrim's employee comes?

6    *A.*  Sure.  So we automated the process.  When we have a new

7    employee hired, HR will enter the information in SAP.  That

8    information passes to the application.  The system will check

9    if you have the same user name, first name and last name with

10   already an existing e-mail.  If it exists, it asks number to

11   the end and e-mail ID.  If the user with the same first name,

12   last name doesn't exist, it will create the e-mail ID, first

13   lame.last name@pilgrims.com.

14   *Q.*  Are you familiar, Mr. Challa with the e-mail address of a

15   Roger Austin?

16   *A.*  I did see the e-mails.

17   *Q.*  What is his e-mail address?

18   *A.*  Roger.austin@pilgrims.com.

19   *Q.*  Are you familiar with the e-mail address of Jayson Penn?

20   *A.*  I do.

21   *Q.*  What is it?

22   *A.*  Jason.penn@pilgrims.com.

23   *Q.*  What about Jimmie Little?

24   *A.*  Jimmie.little@pilgrims.com.

25   *Q.*  And what about Bill Lovette?

530

Lumaker Challa - Direct

1    A.   Bill.lovette@pilgrims.com.

2    Q.   Are e-mails to and from all of those e-mail addresses saved

3    on Pilgrim's' server systems?

4    A.   Yes.

5    Q.   And are e-mails from all of the pilgrims.com domain names

6    saved and stored on Pilgrim's server system?

7    A.   That's correct.

8    Q.   Mr. Challa, have you taken a look at the binders in front

9    of you and the documents in those binders to confirm whether

10   all of the e-mails in those binders actually did, in fact, come

11   from Pilgrim's servers?

12   A.   Yes.  I did go through the three binders.  So for me when I

13   see an e-mail ID from pilgrims.com, someone from pilgrims.com

14   in the entire e-mail chain, so that means it's coming from the

15   system, so I did review those.  And I see at least one of the

16   pages has someone from pilgrims.com, so that means either the

17   e-mail sent or received is there.

18   Q.   And does that mean that they were, in fact, saved on

19   Pilgrim's servers?

20   A.   So to say it is in the servers, this is a physical

21   verification that I looked at and I said to the best of my

22   knowledge, right?  Given short notice, we did start going

23   through the e-mails in the system with the sheet we had, the

24   From and To.  I think we did a majority of them, but I didn't

25   get a chance to finish everything because it's very short

Lumaker Challa - Direct

1   notice and too many e-mails.

2   Q.  Can you confirm, Mr. Challa, whether all of those e-mails

3   in those binders have a pilgrims.com e-mail address in them?

4   A.  Physically when I see the papers, yes.  But when you say

5   system, again I didn't get a chance to finish everything

6   because -- I think we had 70 to 80 percent.  We finished and

7   we -- whatever we saw we found in the system.

8   Q.  But you were, in fact, able to review all the binders and

9   confirm?

10   A.  Yes.

11   Q.  When you look at an e-mail, Mr. Challa, could you please

12   briefly tell the jury what kind of header information is at the

13   top of that e-mail?

14   A.  Yes.  So in general we see -- we have different attributes

15   in the e-mail.  The first and foremost is the exact e-mail ID,

16   which is first name.last name@pilgrims.com.  There is another

17   name called display name, so sometimes it only shows first

18   name, space, last name like that, so it's also an attribute.

19   So when I was looking at the binder, I did see the display

20   names, as well as sometimes I see additional -- some additional

21   information, so that depends on how you process the data.

22   Q.  So could you just explain a little bit more what happens

23   with the display name?  How is that information generated?

24   A.  So again when you have a contacts cache in the system,

25   every e-mail system has a contacts cache.  If someone's

532

Lumaker Challa - Direct

1    information is there in the contacts cache, then that display

2    name shows up, right?  But if you ever send an e-mail, it's not

3    cached, you don't see it.  You only see first name, last name

4    and the little circle.

5    Q.  Let's talk specifically about the date and the time

6    information on an e-mail.  Do you know how Pilgrim's' system

7    records that information?

8    A.  The information stores in the cental time zone because we

9    have servers in our Central Time Zone, but if the user is in

10   East Coast time zone, they see it in their time zone.

11   Likewise, if I am in the Mountain Time Zone, I see my time

12   zone.  It's based on the client.

13   Q.  Is that date and time information generated automatically

14   or not automatically?

15   A.  It is automatically.  As soon as the e-mail is delivered or

16   received, that's when the time stamp is at.

17   Q.  To the best of your knowledge, is the process that

18   generates that information reliable?

19   A.  Yes, it is.

20   Q.  Is it accurate?

21   A.  Yes.  We trust Microsoft, so that's how it is.

22   Q.  When you look at an e-mail, Mr. Challa, is there any way

23   for you to tell whether or not it has an attachment?

24   A.  Yes, yes.

25   Q.  Could you please explain?

Lumaker Challa - Direct

1   A.  We have a metadata we call attachment.  If it shows yes --

2   if it is an attachment, it would show yes.  If it is not, it

3   will show no.

4   Q.  And is that information, that metadata that says whether or

5   not there is an attachment, is that stored on the Pilgrim's

6   server?

7   A.  Yes.

8   Q.  And to the best of your knowledge, is that information

9   copied accurately when it's stored on the Pilgrim's server?

10  A.  Yes, it is.

11  Q.  When looking at an e-mail that is saved on Pilgrim's

12  server, let's focus on the text in the body of the e-mail.

13  A.  Uh-huh.

14  Q.  Is that text in the body of the e-mail to the best of your

15  knowledge that's stored on the server the same as the text when

16  the e-mail is either sent or received?

17  A.  Yes.  The e-mail will not alter in any shape or form,

18  right?  So when an e-mail is sent, it is sent and the context

19  is still the same in the server.

20  Q.  Mr. Challa, in response to a Grand Jury subpoena in

21  response to a different matter, did Pilgrim's Pride produce

22  documents from its servers?

23  A.  There is access to vendors, so I don't remember at all, but

24  we do give vendors the requirement for e-mail to share, so we

25  give access to investors.  Then they would extract the data

Lumaker Challa - Direct

1   from the archive systems.

2   Q.  What was the name of that vendor?

3   A.  Consilio.

4   Q.  Did you participate in helping to give Consilio access to

5   those documents?

6   A.  Yes, me and my team.

7   Q.  How did you participate?

8   A.  So we had to create an account.  Then we have to give VPN

9   access so that they can get into our network.  Then we have to

10  give access to the specific Simpana and such.

11  Q.  To the best of your knowledge, Mr. Challa, were the

12  documents that you gave access to Consilio to copy and extract,

13  were they in fact true copies of the original e-mails and

14  attachments from Pilgrim's servers?

15  A.  The archive system we gave has a true e-mail, but I do not

16  know the process they do, how they do it, but the system we

17  gave is the true copy.

18  Q.  So if I am understanding correctly, are you saying up until

19  the point where you gave the information to Consilio?

20  A.  Yes.  In my system the data is accurate, but I am not sure

21  after that what the process they did and how they collected the

22  information.

23  Q.  And is the same true for calendar invitations that were

24  stored on Pilgrim's servers?

25  A.  Yes.  So calendar, it's like an e-mail invite sent and

Lumaker Challa - Cross

1   received, so it should be the same.

2        MS. ROGOWSKI:  No further questions.

3        THE COURT:  Thank you.

4        Cross-examination?

5        Mr. Fagg, go ahead.

6                    **CROSS-EXAMINATION**

7   BY MR. FAGG:

8   Q.  Good afternoon, Mr. Challa.

9   A.  Good afternoon.

10  Q.  The documents that you testified about today that are in

11  those two binders, it's your testimony that all of the

12  documents that are in there are either e-mails, e-mails with

13  attachments or calendar entries; is that correct?

14  A.  That's correct.  That's what I saw.

15  Q.  And so for purposes of our discussion today, the questions

16  I want to ask you about are about e-mails, e-mails with

17  attachments and calendars, okay?

18  A.  Uh-huh.

19  Q.  And you testified that you looked at the e-mails, and you

20  believe that they are Pilgrim's documents because they appear

21  to be Pilgrim's documents because of the e-mail address.  But I

22  believe I heard you say that you did not look at the server to

23  confirm that all of those e-mails are, in fact, on the server,

24  correct?

25  A.  We did start the process.  We gathered the information.

Lumaker Challa - Cross

1    But since it's a very short notice, there is a lot of data.  We

2    did as much as we can until this point.  And we did find the

3    majority of it, right?  The rest of them we didn't get a chance

4    to see.

5    Q.  So the answer to my question is yes, you did not look to

6    see that all of them are on the server.

7    A.  Not all, not all.

8    Q.  Sir, do you remember executing certificates of authenticity

9    three different occasions over the last several months?

10   A.  Yes.

11   Q.  And you executed one on September 1st.  Does that sound

12   right?

13   A.  I do not remember the dates exactly, but yes.

14   Q.  And you executed one on July 6th?

15   A.  July 6th I remember, yes.

16   Q.  Okay, great.  And then one earlier this month on

17   October 7th.

18   A.  Yes.

19   Q.  And when you -- before you executed those certificates of

20   authenticity, did you review the documents that were referenced

21   in there?

22   A.  So the documents referenced looks like this, but we did

23   have internal counsel, had a conversation with them.  So they

24   said the date that we have in this we have given to the

25   Consilio.  That's what they extracted.  I didn't see all the

Lumaker Challa - Cross

1    data at the time, but it's based on my internal counsel, the

2    discussion.  That's what I did.

3    Q.  When you signed the certificate of authenticity, though,

4    sir, you were satisfied for yourself that those documents were,

5    in fact, authentic, correct?

6    A.  Because it's from our servers, yes.

7    Q.  And so I would like to talk with you first about the

8    certificate -- well, let me just talk to you more broadly.  In

9    those three different certificates of authenticity, some of

10   them have -- do you know what a Bates number is?

11   A.  Yes, the stamp with the date and -- yes.

12   Q.  So the Bates prefix is the letters that usually come before

13   the numbers.  Yes?

14   A.  I think so, yes.

15   Q.  And so for one of the sets of authenticity that you

16   submitted or that you executed has a Bates prefix that says

17   PILGRIMS-DOJ, correct?

18   A.  Yes.

19   Q.  And then for two others there are authenticities that you

20   signed that the prefix is just PILGRIMS, right?

21   A.  Pilgrim's with some dash 00s, some numbers.

22   Q.  Correct.  I would like to hand you -- excuse me one second.

23         MR. FAGG:  May I have one moment, Your Honor.

24         THE COURT:  Yes.

25   BY MR. FAGG:

Lumaker Challa - Cross

1    *Q.*  Sir, I am handing you a copy that is not yet stamped, Your

2    Honor, but will be stamped with a defense exhibit number.  And

3    on the first page, I will represent to you, sir, what this is

4    is excerpts from defendants' exhibit list in this case that

5    include documents that are -- were produced by Pilgrim's.  On

6    the first page we have included the first page of the exhibit

7    for ease of identification, so those documents were not

8    produced by Pilgrim's.

9            But if you look at the second page, sir, starting at

10   E-256.  Do you see that?

11   *A.*  Uh-huh.

12   *Q.*  So that is a document that is Bates numbered

13   PILGRIMS-DOJ-0000104930.  Do you see that?

14   *A.*  Yes.

15           *MS. ROGOWSKI:*  Your Honor, objection.  These documents

16   are outside the scope of the direct examination, and Mr. Challa

17   has not testified to the Bates numbers on direct.

18           *THE COURT:*  I am sorry, he didn't testify what?

19           *MS. ROGOWSKI:*  To the Bates numbers on the document.

20           *THE COURT:*  Response?

21           *MR. FAGG:*  The documents that he has authenticated he

22   said he reviewed by looking at the documents themselves.  And

23   they bear these two different sets of Bates numbers that we are

24   talking about, and I am just trying to seek some clarity from

25   him on the scope of his prior authentications that he submitted

1    about these same set of documents.

2         THE COURT:  So, Mr. Fagg, the documents that you are

3    asking him about are within the Bates stamp range of what he

4    was asked on direct?

5         MR. FAGG:  They are within the Bates range of the

6    authenticities that he submitted for this case which cover the

7    documents that are -- he was asked about on direct.

8         THE COURT:  But -- I am not sure I understand.

9         Ms. Rogowski, are they within the range of what you

10   asked him about?

11        MS. ROGOWSKI:  No, Your Honor.  I didn't ask

12   Mr. Challa about the Bates ranges and the certificates of

13   authenticity.  And I don't believe that Mr. Fagg has been able

14   to confirm that all of these documents are within the Bates

15   ranges of the documents in the binder because this is --

16   frankly, there is just too many documents to confirm that.

17        THE COURT:  Maybe I am not quite following you,

18   Mr. Fagg.

19        MR. FAGG:  Sure, Your Honor.  We received from this

20   witness three different certificates of authenticity over the

21   course of --

22        THE COURT:  Which weren't asked about on direct.

23        MR. FAGG:  I understand.  What I am trying to do is

24   understand the process that he went through for purposes of his

25   preparation today, which was reviewing documents on their face,

Lumaker Challa - Cross

1  and what he did when he signed these certificates of

2  authenticity, because I believe that the process that he went

3  through was the same.

4       THE COURT:  It's beyond the scope if you are asking

5  him about anything that was not within the Bates stamp ranges

6  that he was asked on direct.

7       MR. FAGG:  Okay.  Fair enough.

8       THE COURT:  Go ahead.

9  BY MR. FAGG:

10 Q.  Mr. Challa, you were asked earlier by the prosecutor about

11 the documents in your binder.  And you testified that Pilgrim's

12 produced documents in response to some documents directly to

13 the government, correct?

14 A.  If I understand correctly, you are asking we give the

15 documents to the government?  I am not sure.

16 Q.  Okay.  So you don't know whether or not the documents in

17 there that you looked at were actually documents that were

18 provided to the government; is that correct?

19 A.  Again, we gave access to Consilio.  They processed it.

20 Beyond that, I don't know.  Sorry.

21 Q.  And so you don't know what Consilio did with the documents

22 that they obtained, correct?

23 A.  That's correct.

24 Q.  And you have not taken any work to try and verify what

25 happened after Consilio obtained the documents, correct?

Lumaker Challa - Cross

1    *A.*  That's not correct.  As I mentioned, I got the information

2    on Friday, so we started looking into the system.  And I got a

3    physical copy on Monday.  Since I don't have enough time, I

4    looked at each page with an e-mail ID associated with

5    Pilgrim's.  That's how I did it.

6    *Q.*  But you haven't completed that process.

7    *A.*  On the physical, yes; but on the system verification, that

8    process is -- still take some time because there is a lot of

9    e-mail.

10   *Q.*  As we sit here today, it's not complete, correct?

11   *A.*  No.

12   *Q.*  When I was referring earlier to Bates numbers about -- on

13   documents, just to make sure that we are talking on the same

14   page, Bates numbers are a stamp that can be applied to the

15   document so that they can later be identified.  Do you

16   understand that?

17   *A.*  I just saw the stamp on it, but I don't know all the

18   details.  Again, I did not get into the detail.  All I looked

19   at is whether we have an e-mail ID on a paper or not.

20          *MR. FAGG:*  No further questions.

21          *THE COURT:*  Thank you.

22          Additional cross?

23          Go ahead, Mr. Canty.

24                         **CROSS-EXAMINATION**

25   *BY MR. CANTY:*

542

Lumaker Challa - Cross

1    Q.   Mr. Challa --

2    A.   Yes.

3    Q.   -- good afternoon.

4    A.   Good afternoon.

5    Q.   I am Dennis Canty.  A couple questions.

6            You said you gave access to Consilio to the Simpana

7    archival system that the Pilgrim's servers are copied to,

8    right?

9    A.   Yes.

10   Q.   When did you do that?

11   A.   I don't remember exactly.  I think it's almost two years.

12   Q.   Did -- is that an ongoing access or were there periods of

13   time when access was granted and then withdrawn?

14   A.   It's a good question.  It's ongoing access.  However, we do

15   have a system where it will stop access in a certain -- two

16   months or three months on the VPN side.  Again, they have to

17   resubmit and send information, then we reactivate that account.

18   It's a security purpose.

19   Q.   With respect to the documents that have been identified on

20   Exhibit 9551, do you have information as to whether these

21   documents were the documents that were taken by Consilio from

22   the Simpana archival system?

23   A.   So if I see the document, I can tell, but I don't remember

24   on top of -- with a specific number.  So if there is an e-mail

25   ID, we can verify; but without that I cannot say exactly the

Lumaker Challa - Cross

1   number.  I don't remember all the numbers.

2   Q.  So you can go backward, right?  You can look at a number

3   and go see whether that document is on the server, right?

4   A.  Yes, we can, because we have a number, exhibit number, and

5   From, To, some type of date, we can go and search.

6   Q.  Do you have any knowledge in the other direction as in

7   whether the document that came off of the Simpana server was

8   actually pulled by Consilio or somebody else?

9   A.  We gave only access to Consilio, so they are the only one

10  that have access.  They are the only one that can take it.  If

11  somebody else, I don't have a clue.  There is no way without

12  access people can take e-mail from the system.

13  Q.  So do you know for sure that the only person that could

14  have created the documents that are identified by Bates number

15  here is Consilio?

16  A.  Yes.  But at the same time end users have access to

17  Simpana.  If I am a user in Pilgrim's, I have access to my own

18  e-mail, right?  So I can take it, I can download, so...

19  But end users do not have access to others' e-mail, but we have

20  access to our own e-mail.

21  Q.  Do you have any knowledge as to the collection process that

22  went into specifically creating the documents that you see here

23  on Government Exhibit 9551?

24  A.  I do not, sir.  I don't have an answer for that.

25  Q.  And to your knowledge, were there other people at Pilgrim's

Lumaker Challa - Redirect                                                544

1    that may have been involved with Consilio in selecting the

2    documents that appear on Government Exhibit 9551?

3    A.  I do not know if somebody else have access to Consilio.  I

4    do not.  I do not have an answer for that.

5            MR. CANTY:  Thanks.

6            THE COURT:  Thank you, Mr. Canty.

7            Additional cross?

8            Redirect?

9                        **REDIRECT EXAMINATION**

10   BY MS. ROGOWSKI:

11   Q.  Mr. Challa, would it be fair to say that only Pilgrim's

12   employees are the ones who would have access to a pilgrims.com

13   e-mail address?

14   A.  Pilgrim's users have their own access to their own e-mail.

15   Legal and my team have access to do a compliance search, so

16   when I say compliance search, we can search for other e-mails.

17   But we don't do such simply without any reason.  If we have

18   someone in legal or someone ask, then we will do it.

19   Q.  Let me rephrase the question.  That isn't what I meant to

20   ask.

21           If someone who doesn't work at Pilgrim's were trying

22   to get a pilgrims.com e-mail address, would they be able to?

23   A.  No.

24   Q.  You reviewed the binders in front of you in preparation for

25   today, correct?

Lumaker Challa - Redirect

1    *A.*   Yes.

2    *Q.*   What did you look for when you were looking through those

3    binders?

4    *A.*   So I was looking at the e-mail IDs, so that is the e-mail.

5    There are two pages, three pages.  I was looking do we have

6    anyone -- a listed e-mail ID associated with the pilgrims.com.

7    That's how I looked at it.

8    *Q.*   To the best of your knowledge, Mr. Challa, were the e-mails

9    in those binders associated with the pilgrims.com e-mail

10   address?

11   *A.*   That's correct.  That's what I noticed.

12   *Q.*   Could you please take a look at Exhibit 9254 in those

13   binders?  I believe it may be in the third one.

14          *COURT DEPUTY CLERK:*  What's the exhibit number?

15          *MS. ROGOWSKI:*  9254.  And I am happy to look for it if

16   that would be helpful.  If we could switch to my colleague's

17   screen on Trial Director.

18          *COURT DEPUTY CLERK:*  Just one moment.

19          *THE COURT:*  That's Mr. Keech's job, so he is tied up

20   for the moment.

21   *A.*   9254?

22   *BY MS. ROGOWSKI:*

23   *Q.*   Yeah.  Do you see the e-mail in the top from a

24   Mr. Walbusser?

25   *A.*   Yes.

Lumaker Challa - Redirect

546

1    *Q.*  After reviewing this e-mail, Mr. Challa, could you please

2    tell me if there is -- without saying the actual domain name,

3    another domain name associated with Pilgrim's Pride employees

4    but with its parent company?

5    *A.*  Yeah.  So let me a little bit explain how the system works.

6    So there is no separate e-mail systems for the different

7    business entities that we have.  JBSSA.com is the primary

8    domain for all e-mails, but based on the business unit

9    employee, if someone is from pilgrims.com, they will see that

10   as a primary.  So the JBSSA goes in the back end.

11   *Q.*  If you could, Mr. Challa, just don't say the domain name

12   itself.  Thank you.

13   *A.*  Sorry.  The primary domain becomes pilgrims.com, and then

14   the e-mail sent and received will be that e-mail ID.  But if

15   someone transferred from a different business unit, they may

16   have a primary e-mail with us before.  It may be there for some

17   time until they notify IT saying we have to change it to

18   pilgrims.com.

19   *Q.*  To the best of your knowledge, Mr. Challa --

20        *MR. FAGG:*  Your Honor, I object.  This redirect is

21   outside the scope of cross.

22        *THE COURT:*  It does seem to be outside of the direct,

23   so I will sustain that objection.

24        *MS. ROGOWSKI:*  My final question, I believe, is inside

25   the scope of the cross.

Sean King - Direct

1          THE COURT:  Go ahead.

2     BY MS. ROGOWSKI:

3     Q.  To the best of your knowledge, Mr. Challa, are the

4     documents that you provided to Consilio in fact true copies of

5     e-mails and attachments from Pilgrim's server?

6     A.  Whatever we gave access, yes.

7          MR. FAGG:  Your Honor, also outside of the scope.

8          THE COURT:  Overruled.

9     A.  So whatever the system we gave access to Consilio, which is

10    Pilgrim's.

11         MS. ROGOWSKI:  No further questions.

12         THE COURT:  Thank you, Mr. Challa.  Some of the

13    defendants may want you to -- may want to recall you, so they

14    will let you know that, but otherwise you are excused for

15    today.  Thank you very much.

16         THE WITNESS:  Thank you very much.  I appreciate it.

17         THE COURT:  The United States may call its next

18    witness.

19         MS. ROGOWSKI:  The government calls Sean King.

20      (**Sean King** was sworn.)

21         THE WITNESS:  I do.

22         COURT DEPUTY CLERK:  Please state your name and spell

23    your first and last names for the record.

24         THE WITNESS:  Sean King, S-E-A-N, K-I-N-G.

25                      **DIRECT EXAMINATION**

Sean King - Direct                                548

1    *BY MS. ROGOWSKI:*

2    Q.  Good afternoon, Mr. King.

3    A.  Good afternoon.

4    Q.  Could you please describe your highest level of education?

5    A.  Bachelor of arts degree.

6    Q.  Mr. King, where do you work?

7    A.  At Consilio.

8    Q.  How long have you worked at Consilio?

9    A.  Specifically with them for the last several months, but

10   they've been acquired, so I have been with their previous

11   companies for seven years.

12   Q.  And what is your job title at Consilio, Mr. King?

13   A.  Vice-president of eDiscovery operations.

14   Q.  Could you please briefly describe your responsibilities as

15   vice-president of eDiscovery operation?

16   A.  Yeah.  Simply put, I oversee a team of people that deal

17   with what we call data processing, document hosting and

18   document production services related to electronic data.

19   Q.  And during your employment at Consilio and also your prior

20   employment with companies that were later bought by Consilio,

21   was Consilio ever retained by Pilgrim's Pride?

22   A.  Yes.

23   Q.  What services did Consilio perform on behalf of Pilgrim's

24   Pride?

25   A.  Consilio has performed services such as data forensics,

Sean King - Direct

1    which is data collection services, data processing of

2    electronic data, document hosting, so hosting documents in an

3    on-line hosting repository for document review, and document

4    production services.

5    Q.  Were you involved in the document production portion of

6    those services?

7    A.  Yes.

8    Q.  How were you involved?

9    A.  I oversaw a team of people that would execute on any of the

10   requests to produce documents at the direction of the client.

11   Q.  For this project could you generally describe how Consilio

12   produced these documents, how the execution occurred?

13   A.  So we use an on-line hosting tool called Relativity that

14   basically documents are prepared and made ready for a review by

15   counsel and the client.  Documents are identified in that tool

16   as being responsive according to whatever criteria the

17   reviewers are using to identify responsiveness.

18        Those documents are then identified to us through a

19   request for production.  We then take those documents and will

20   basically image them.  We will Bates stamp them so that every

21   page has a unique identifier and then deliver them according to

22   whatever specification is required.

23   Q.  When you were processing these documents or overseeing

24   others processing these documents, are you aware of the

25   software that was used to perform that service?

Sean King - Direct

1    A.   Yes.

2    Q.   What was it called?

3    A.   The processing portion used a tool called Nuix.

4    Q.   And are you generally familiar with how Nuix works?

5    A.   Yes.

6    Q.   How are you generally familiar with it?

7    A.   I've both used it, but I more specifically, I oversee a

8    team of people that engage it to perform data processing

9    services.

10   Q.   And at all times relevant to this Pilgrim's Pride project,

11   was this Nuix software to the best of your knowledge

12   functioning properly or improperly?

13   A.   Properly.

14   Q.   And was this data from this project that was processed

15   through Nuix eventually sent to the Department of Justice?

16   A.   Yes.

17   Q.   Mr. King, you mentioned earlier something called a Bates

18   stamp.  Could you please describe what a Bates stamp is?

19   A.   A Bates stamp is a unique identifier applied during

20   production that for the most part is applied to a page level.

21   So if you have a pile of documents, let's say a box of paper

22   that needed to be Bates stamped, every page would have its own

23   unique identifier.  If pretty much goes sequentially from the

24   beginning of your production all the way until you are

25   completely finished over time.

Sean King - Direct

1   Q.  And are you familiar with the Bates stamps that were used

2   in this Pilgrim's Pride matter?

3   A.  Yes.

4   Q.  Could you please tell the jury?

5   A.  The two main ones used were PILGRIMS, so pages were

6   endorsed with a prefix of what's called PILGRIMS and then I

7   believe it was an eight digit number after that, again

8   sequentially going up.  And then the other prefix used was

9   PILGRIMS-DOJ.  Again, I believe it was eight digits

10  sequentially going up.

11  Q.  When processing the documents with these Bates stamps, is

12  there a way that Consilio linked the attachments to the

13  e-mails?

14  A.  Yeah.  So during processing and then as well we do this

15  during production, we have what's called family relationship

16  fields.  So part of the production is to include a series of

17  fields that will tell a person receiving it what documents are

18  related to each other.  Documents that are part of the same

19  family, for example an e-mail and its attachments, they are

20  produced individually, but there is a family relationship field

21  that will tell the user that these two or three documents are

22  actually related to each other.  They have a consistent schema.

23  Q.  And the family relationship field, was that based on

24  information that you got from Pilgrim's or how did you create

25  that field?

552

Sean King - Direct

1    *A.*   That's part of the data processing aspect.  So Nuix as a

2    processing tool will take the electronic data we receive, for

3    example an e-mail, and it will take an e-mail with its

4    attachments, it will break them out into individual documents

5    as a normal course of business.  But at the same time it will

6    also identify that these documents are related to each other

7    and have a family relationship field populated to advise

8    accordingly.

9    *Q.*   And are those fields populated automatically?

10   *A.*   Yes.

11   *Q.*   To the best of your knowledge, were those fields -- was the

12   relationship between the documents in the Pilgrim's Pride

13   server transferred to the family metadata field when the

14   documents were processed by Consilio using Nuix?

15           *MR. CANTY:*  Objection, foundation.

16           *THE COURT:*  Overruled.

17   *BY MS. ROGOWSKI:*

18   *Q.*   When processing the documents with this Pilgrim's and

19   PILGRIMS-DOJ Bates stamp, Mr. King, how did Consilio process

20   the information in the header of the e-mail, so the To and the

21   From and the date and time field?

22           *MR. CANTY:*  Objection, foundation.

23           *THE COURT:*  Sustained.  If you could lay foundation.

24   *BY MS. ROGOWSKI:*

25   *Q.*   When processing the documents with the Pilgrim's and the

553

Sean King - Direct

1    PILGRIMS-DOJ Bates stamps, Mr. King, did Consilio process any

2    of the header information of the e-mail?

3           *MR. CANTY:*  Objection, Your Honor.  We have not

4    established he knows about the process for both groups of Bates

5    stamps.

6           *THE COURT:*  Overruled.  He can answer.

7    *A.*  Can you repeat the question again, please?

8    *BY MS. ROGOWSKI:*

9    *Q.*  When processing documents with the Bates stamps Pilgrim's

10   and PILGRIMS-DOJ, did Consilio process the header information

11   in those e-mails?

12   *A.*  Yes.

13   *Q.*  And what header information?

14   *A.*  Well, there is a myriad of fields that come out.  It's all

15   part of the standard process that Nuix follows, but fields such

16   as To, From, CC, the date the e-mail is sent, subjects, any of

17   the metadata for the actual attachments files, they are all

18   extracted out during processing and populated into a series of

19   fields that a user can see during review and later production.

20   *Q.*  And is the information generated in the header fields

21   copied directly from the documents that you received from

22   Pilgrim's?

23   *A.*  Yes.

24   *Q.*  Are you familiar with how Consilio processed the time zones

25   with these productions?

554

Sean King - Direct

1   *A.*   Yes.

2   *Q.*   Could you please tell the jury how that occurred?

3   *A.*   So the time zone is a setting that we apply at the

4   beginning of data processing.  Typically we apply a single time

5   zone to a project as a whole, so something like this Pilgrim's

6   matter would be considered a project.  And so we identify that

7   the UTC, which is basically the equivalent of what we call

8   Greenwich Mean Time, was the time zone to be applied to these

9   documents.  It's sort of standard operating procedure to use

10  UTC, but it also is part of a conversation had with the client

11  as to what time zone they want to use for the documents during

12  processing.

13  *Q.*   And for this client, Pilgrim's Pride, was UTC in fact used?

14  *A.*   Yes.

15  *Q.*   To the best of your knowledge, Mr. King, is it fair to say

16  that the documents with the Bates stamp PILGRIMS and

17  PILGRIMS-DOJ that were processed by Consilio, in fact, true

18  copies of the original documents were made available to

19  Consilio by Pilgrim's?

20          *MR. CANTY:*  Objection, foundation.

21          *THE COURT:*  Sustained.  If you could lay foundation.

22          *MS. ROGOWSKI:*  Your Honor, I believe he did testify

23  earlier about the PILGRIMS and PILGRIMS-DOJ Bates stamps.

24          *THE COURT:*  He did, but I don't think he testified

25  about the question that you just asked him.

555

Sean King - Direct

1   *BY MS. ROGOWSKI:*

2   Q.  Mr. King, during this project did you receive access to

3   documents from Pilgrim's Pride?

4   A.  Yes.

5   Q.  And did you copy and -- extract and copy those documents as

6   part of your work with Consilio and as part of this Pilgrim's

7   Pride project?

8         *MR. CANTY:*  Objection.  Vague as to time.

9         *THE COURT:*  Overruled.

10  A.  Okay.  Ask that again, please.

11  *BY MS. ROGOWSKI:*

12  Q.  Did you extract and copy documents provided to you by

13  Pilgrim's Pride as a part of this Pilgrim's Pride project

14  through Consilio using the Nuix system?

15  A.  Yes.

16  Q.  And to the best of your knowledge, was this Nuix system

17  that you used during the extraction and copying, was it, in

18  fact, working properly or not properly?

19  A.  Properly.

20  Q.  And were the documents that you did, in fact, copy copied

21  accurately from Pilgrim's system, to the best of your

22  knowledge?

23  A.  To the best of my knowledge, yes.

24  Q.  Do you have any reason to believe they were altered from

25  the time that you received access to them from Pilgrim's Pride

556

Sean King - Cross

1    to the time that Consilio finished copying and extracting them?

2    A.  I have no reason to believe anything has been altered, no.

3          *MS. ROGOWSKI:*  No further questions.

4          *THE COURT:*  Thank you.

5          Cross-examination?

6          Mr. Canty?

**CROSS-EXAMINATION**

8    *BY MR. CANTY:*

9    *Q.*  Good afternoon, Mr. King.

10   *A.*  Good afternoon.

11   *Q.*  We just heard some extensive testimony about Nuix'

12   capabilities and how you took data from Pilgrim's Pride that

13   Pilgrim's Pride allowed you to access and processed it, right,

14   through the tool Nuix?

15   *A.*  Correct, yes.

16   *Q.*  And did you oversee the production of data that bears a

17   Bates number PILGRIMS-DOJ prefix?

18   *A.*  Yes, I did.

19   *Q.*  Did you do the same for the prefix PILGRIMS?

20   *A.*  Not directly, no.

21   *Q.*  And, in fact, was that production not complete and made

22   before you took over duties here?

23   *A.*  Correct.

24   *Q.*  So you have no personal knowledge whatsoever about what

25   happened in that production; is that correct?

557

Sean King - Redirect

1    A.  I have spoken to the individuals that may have been

2    involved with that in the past that I now work with.

3    Q.  So the answer to my question when I asked you about your

4    personal knowledge is you have none, right?

5    A.  If you are defining personal as direct, then no.

6    Q.  Okay.  So you have no direct knowledge whatsoever that any

7    document that bears the prefix PILGRIMS is authentic, right?

8    A.  Again, I think I have answered that.  I have spoken to the

9    individuals that I now work with that have dealt with the

10   PILGRIMS documents, but I don't have the personal -- if you are

11   using personal as direct, then no.

12           MR. CANTY:  That's all I have.

13           THE COURT:  Thank you.

14           Additional cross-examination?

15           Redirect?

16                    **REDIRECT EXAMINATION**

17   BY MS. ROGOWSKI:

18   Q.  Mr. King, are you familiar with the procedures that were

19   used to copy the PILGRIMS- Bates stamped documents by Consilio?

20   A.  Yes.

21   Q.  Could you please explain what procedures were used?

22   A.  So Consilio --

23           MR. CANTY:  Objection, foundation.

24           THE COURT:  Sustained.  If you could lay a foundation

25   how he knows.

Sean King - Redirect

1   *BY MS. ROGOWSKI:*

2   *Q.*  How are you familiar?

3   *A.*  I've -- I work with individuals that have been involved

4   with the processing and production of the PILGRIMS prefix, as

5   the nature of my position is vice-president of eDiscovery

6   operations.  So through my conversations with them --

7              *MR. CANTY:*  Objection, Your Honor, hearsay.

8              *THE COURT:*  Overruled.

9   *A.*  So through my conversations with them, I understand what

10  the process is that Consilio has followed for both processing

11  and document production.

12  *BY MS. ROGOWSKI:*

13  *Q.*  And what processes do you now understand that Consilio

14  followed for this PILGRIMS- Bates stamped document production

15  set?

16             *MR. CANTY:*  Objection, Your Honor.  Calls for hearsay.

17             *THE COURT:*  Overruled.

18  *A.*  So the processing work followed was almost a mirror to what

19  was performed for the PILGRIMS-DOJ work that I talked about

20  earlier, so they leveraged Nuix as a data processing tool for

21  both data extraction of e-mail header and metadata.  Data was

22  loaded to a Relativity hosting platform.  Documents were

23  identified for relevancy, responsiveness, and produced through

24  Relativity to any of the parties that were subject to receiving

25  those productions.  Again, that was all the same exact process

Sean King - Redirect

1   that was followed for the PILGRIMS-DOJ prefix documents.

2   BY MS. ROGOWSKI:

3   Q.  To the best of your knowledge, Mr. King, were the documents

4   that were copied with this PILGRIMS- Bates stamp in fact true

5   copies of the documents that Consilio received access to by

6   Pilgrim's?

7         MR. CANTY:  Objection, foundation.

8         THE COURT:  Overruled.

9   A.  They are true and accurate copies, yes.

10         MS. ROGOWSKI:  No further questions.

11         THE COURT:  All right.  Mr. King, some of the

12   defendants may wish to recall you at a later time, so they will

13   be in contact with you if that's true.  Otherwise, you are

14   excused for today.  Thank you very much.

15         THE WITNESS:  Thank you.

16         THE COURT:  The United States may call its next

17   witness.

18         MS. ROGOWSKI:  The government calls Ted Sangalis.

19      (**Theodore Sangalis** was sworn.)

20         THE WITNESS:  I do.

21         COURT DEPUTY CLERK:  Please state your name and spell

22   your first and last name for the record.

23         THE WITNESS:  Theodore Sangalis, T-H-E-O-D-O-R-E,

24   S-A-N-G-A-L-I-S.

25         THE COURT:  Go ahead.

Theodore Sangalis - Direct

1    MS. ROGOWSKI:  Thank you.  Your Honor, may I have

2  permission for my colleague to walk over a copy of the exhibit

3  list and the binder to Mr. Sangalis?

4    THE COURT:  Yes.

5    MS. ROGOWSKI:  Thank you.

6    And thank you, Mr. Keech.

7                    **DIRECT EXAMINATION**

8  BY MS. ROGOWSKI:

9  Q.  Mr. Sangalis, do you work for Pilgrim's Pride?

10  A.  I do.

11  Q.  How long have you worked there?

12  A.  Since April 2020.

13  Q.  Could you please briefly describe your job responsibilities

14  there?

15  A.  Yeah.  So I am in-house counsel, so I handle whatever sort

16  of legal needs the company has from contracts of all kinds to

17  litigation, M and A, corporate governance, all that.

18  Q.  In front of you, Mr. Sangalis, you have a list of exhibits

19  that's been labeled Government Exhibit 9557 and you also have a

20  binder of exhibits.  Inside that binder, if you open it up,

21  there should be a separate folder.  So you have a binder and

22  you have a folder.

23  A.  Uh-huh.

24  Q.  Do you recognize the list of exhibits, the binder and the

25  exhibits in that folder?

Theodore Sangalis - Direct                                    561

1    A.   I do, yes.

2    Q.   How do you recognize them?

3    A.   Because I was given these last week.

4    Q.   And can you please describe for the jury what's in that

5    folder?

6    A.   The folder has the native documents, which I don't have in

7    the folder but it says it was produced, and then a signed list

8    of antitrust training from 2019.

9    Q.   And could you please identify for the jury the exhibit

10   number for that native document?

11   A.   Sorry.  So there is three native documents.  There is

12   Exhibit 1053, Exhibit 7046 and Exhibit 9264.

13   Q.   And as part of your review for today, Mr. Sangalis, were

14   you able to receive electronic copies of those documents?

15   A.   I was, yes.

16   Q.   And were there any pricing spreadsheets in there?

17   A.   There was.

18   Q.   Was there a period pricing chart?

19   A.   There was, yes.

20           MR. FAGG:  Objection, Your Honor, leading.

21           THE COURT:  Sustained.  Is there another?

22           MS. ROGOWSKI:  There is one more, Your Honor.

23           THE COURT:  Can it be referred to by another term

24   since it has not been introduced?

25           MS. ROGOWSKI:  It has not been introduced, Your Honor.

Theodore Sangalis - Direct

562

 1            THE COURT:  Does it have an exhibit number?

 2            MS. ROGOWSKI:  It does, but Your Honor, I am not sure

    from my list which one is actually which.

 3

 4            THE COURT:  Do you need to look at the documents?

 5            MS. ROGOWSKI:  If I could have a moment, please, Your

 6    Honor.

 7            THE COURT:  Sure.

 8    BY MS. ROGOWSKI:

 9    Q.  Mr. Sangalis, do you recall what the fourth document was in

10    that folder when we provided it electronically to you?

11    A.  Yeah, there was also a contact spreadsheet, contact list.

12    Q.  Thank you.

13            Mr. Sangalis, when we provided the electronic copies

14    of those documents, were you able to compare them to any

15    documents on -- that you had access to through Pilgrim's?

16    A.  Yes.  So I was given access to a home drive for Roger

17    Austin, so I was able to pull the three spreadsheets from that

18    home drive and compare them to the documents that I got from

19    the government.

20    Q.  And what was the result of your comparison?

21    A.  They were the same.

22    Q.  And what about the sign-in sheet that you have in front of

23    you?

24    A.  The sign-in sheet I was able to pull from our compliance

25    shared files and compare it to the government and it was also

Theodore Sangalis - Direct

1    the same.

2    *Q.*  Let's take a look at the exhibit binder in front of you,

3    Mr. Sangalis.  Did you review the documents in those binders

4    before today?

5    *A.*  I did.

6    *Q.*  Could you briefly describe the contents of the documents,

7    the categories of documents that are in there?

8    *A.*  Yeah.  So there were kind of three categories.  There was

9    what I would call sort of a corporate governance category that

10   had board meeting minutes and 8-Ks with the SEC.  There were a

11   series of contracts and bids and offers and then there were

12   expense reports.

13   *Q.*  And are you familiar with these categories of documents

14   based on your position at Pilgrim's Pride?

15   *A.*  I am, yeah.

16   *Q.*  How are you familiar with them?

17   *A.*  So corporate governance, I usually attend the board

18   meetings and take those minutes.  And I review 8-Ks usually or

19   have outside counsel review them before they are filed.  On the

20   contracts I am either involved from the get-go in negotiating

21   the contracts or if a dispute arises, I will be brought in and

22   I will look at the -- whatever is sort of governing that

23   relationship.  And for expense reports it's the same across the

24   company, and I have filed my own expense reports for the

25   company -- with the company.

564

Theodore Sangalis - Direct

1    *Q.* And are you familiar, Mr. Sangalis, with bids and offers

2    that are e-mailed from Pilgrim's Pride employees of the

3    company?

4    *A.* I am, yes.

5    *Q.* Could you just explain how you are familiar with those?

6    *A.* So there have been some disputes that have arisen, so I

7    have had occasion to review some of the e-mails where the --

8    that govern the sales of our products to our customers. But

9    like I said, I also review contracts up front before they are

10    signed and help negotiate them and make sure that the terms

11    comply with our risk tolerances.

12    *Q.* Could you briefly describe how sales contracts are made at

13    Pilgrim's?

14    *A.* So it can be varied on the sales side because usually the

15    customer dictates that process.

16        *MR. FAGG:* Objection, Your Honor, foundation.

17        *THE COURT:* Overruled.

18    *A.* So the process can be varied depending on the customer. So

19    sometimes the customer will sign the contract and say this is

20    what we want signed, in which case you will negotiate that and

21    then come to sort of a full contract. Sometimes they send a

22    spreadsheet that says give us your pricing and fill this out.

23    Sometimes it just asks what kind of pricing can you have for

24    these types of products. And it can be as formal, as informal

25    as the customer wants, but at the end of the day, there is some

Theodore Sangalis - Direct                                     565

1   sort of e-mail confirmation of the agreement.

2   BY MS. ROGOWSKI:

3   Q.  And when you say it could be formal or informal, does

4   that -- can I take that to mean, Mr. Sangalis, that what you're

5   talking about now encompasses formal contracts and also e-mails

6   with bids?

7   A.  Yeah.  Those are in the binder.

8            MR. FAGG:  As to the time frame, Mr. Sangalis is going

9   from the last two years.

10            THE COURT:  Right.  He testified to that.  If that's

11   an objection, it's overruled.

12   BY MS. ROGOWSKI:

13   Q.  Mr. Sangalis, can you please describe how 8-Ks are usually

14   made?

15   A.  So an 8-K is required by the SEC for publicly-traded

16   companies when a material event occurs with the company between

17   the quarterly reports.  And so if the 8-K needs to be filed,

18   some form of either in-house legal, outside counsel and then

19   the accounting department will come together and, A, determine

20   if an 8-K needs to be filed; B, work on the language; and then

21   C, ultimately file it with the SEC.

22   Q.  Can you please explain how Pilgrim's board meeting minutes

23   are created?

24   A.  So board meeting minutes and in-house counsel will be in

25   the board meeting and will take notes.  Those minutes after the

Theodore Sangalis - Direct

566

1  meeting is over will be reviewed for any errors and then

2  submitted to the board for approval of those minutes, and then

3  they are signed after the board approves the minutes.

4  Q.  You mentioned earlier you created expense reports before.

5  Are you familiar with how generally expense reports are created

6  at Pilgrim's?

7  A.  Yes.

8  Q.  Could you please explain the process?

9  A.  So we have an app where you can sort of enter a trip or an

10  event that incurred those expenses.  And then you can -- well,

11  it's an app or a program, I suppose, where you can submit

12  receipts and basically supporting documentation to justify all

13  those expenses.  And then that is approved by your manager and

14  then ultimately given to accounting.  And it goes into SAP,

15  which is our payroll system, and that's how you get reimbursed

16  for those expenses.

17  Q.  And are you familiar with how all of these different types

18  of documents are stored at Pilgrim's?

19  A.  Yes.

20  Q.  Could you please briefly describe the process for sales

21  contracts?

22      THE COURT:  Why don't we take our mid-afternoon break

23  before we launch into that subject, all right?

24      Ladies and gentlemen, we will go ahead and take the

25  mid-afternoon break.  Why don't we plan on reconvening 25

Theodore Sangalis - Direct

1    minutes to 4:00.  Keep the admonitions in mind.  The jury

2    excused.  Thank you.

3              (Jury excused.)

4              Mr. Sangalis, you are excused until after the break.

5    Thank you very much.

6              Anything to take up briefly before we recess?

7              We will be in recess.  Thank you.

8         (Recess at 3:16 p.m.)

9         (Reconvened at 3:37 p.m.)

10        THE COURT:  Let's get the jury back in.  Once I say

11   let's get the jury, we should also automatically get the

12   witness, assuming that someone is resuming their testimony.

13             Mr. Sangalis, if you don't mind resuming the witness

14   stand, that would be great.

15             (Jury present.)

16        THE COURT:  Go ahead.

17   BY MS. ROGOWSKI:

18   Q.  All right.  Mr. Sangalis, if you could briefly describe the

19   process that Pilgrim's engages in to store sales contracts.

20   A.  So it's mostly by e-mail.  So we have a backup system to

21   our e-mail that automatically stores a copy of every e-mail

22   that goes in or out of the company.  And because most of the

23   contracts are communicated by e-mail, that's how we go look for

24   contracts when we need to refer to them.

25   Q.  Would that include what you were talking about earlier,

Theodore Sangalis - Direct

568

1    contracts that were not formalized, but just an e-mail, and

2    also formalized contracts?

3    A.  Yeah, any kind of agreement whether it's a formal contract

4    that's signed or just an e-mail agreement.

5    Q.  Could you please describe how Pilgrim's 8-Ks are stored?

6    A.  So Pilgrim's 8-Ks are filed publicly with the SEC so the

7    SEC has it on their website, which is called EDGAR.  And then

8    Pilgrim's also takes -- anytime there is something posted on

9    EDGAR for Pilgrim's, then pulls it and puts it on our website

10   which is also publicly available.

11   Q.  What about Pilgrim's board meeting minutes, how are they

12   stored?

13   A.  So board meeting minutes, there is a shared file that the

14   legal department has access to, and they are stored by year and

15   date of the meeting.  So those minutes are available to the

16   legal department.

17   Q.  And what about expense reports, are you familiar with how

18   those are stored; and if so, can you explain?

19   A.  Yes.  Those are stored in SAP.  So the accounting team has

20   access to those expense reports, both the line items of the

21   expense as well as the supporting documentation.

22   Q.  Mr. Sangalis, we have discussed sales contracts, both

23   formal and informal.  We've discussed 8-Ks.  We've discussed

24   board meeting minutes and expense reports.  Are all of these

25   records made during the course of regularly conducted business?

Theodore Sangalis - Direct

569

1   A.  They are.

2   Q.  And does this include both executed contracts and

3   unexecuted contracts?

4   A.  Yes.

5   Q.  Are these documents kept in the course of regularly

6   conducted business?

7   A.  Yes.

8   Q.  And that includes all the categories of documents we just

9   discussed?

10  A.  Yes.

11  Q.  And is making all of these records a regular practice of

12  Pilgrim's?

13  A.  Yes.

14  Q.  Specifically with respect to expense reports, are these

15  expense reports made by people who have personal knowledge of

16  the information contained therein?

17  A.  So the person submitting the receipts would have the

18  personal knowledge, and then the manager would review that.

19  And the accounting team would rely on the receipts that were

20  submitted by the individual.

21  Q.  And when you say receipts, do you mean receipts that the

22  person is seeking reimbursement for?

23  A.  Correct.

24  Q.  So Mr. Sangalis, you mentioned that you started at

25  Pilgrim's somewhat recently.  Based on your position, do you

Theodore Sangalis - Direct

1    ever review these categories of documents that were created,

2    stored and maintained before you actually started?

3    A.  So the documents that I have seen from before starting at

4    Pilgrim's have arisen for me through various disputes outside

5    of this that have given me occasion to review various e-mails

6    and sales contracts, as well as some of the expense reports

7    working with the accounting team to pull those.

8    Q.  And based on your review of those documents because of

9    disputes, are you familiar with how those documents from before

10   you started are actually created, stored and maintained?

11   A.  Yes.

12   Q.  And are you familiar with whether those were actually

13   created as a regular business practice of Pilgrim's?

14   A.  Yes.

15         MS. ROGOWSKI:  No further questions.

16         THE COURT:  Thank you.

17         Cross-examination?

18         MR. FAGG:  No, Your Honor.

19         THE COURT:  Okay.  Then thank you very much,

20   Mr. Sangalis.  You are excused.

21         You may be subject to recall by some of the

22   defendants, but someone will be in touch with you to let you

23   know about that testimony if that occurs, okay?

24         THE WITNESS:  Okay.

25         THE COURT:  Thank you very much.

Theodore Sangalis - Direct

1        The United States may call its next witness.

2        MS. ROGOWSKI:  Your Honor, before we call the next

3   witness, at this point based on Mr. Sangalis' testimony, I

4   would like to move to admit the documents in Mr. Sangalis'

5   binder, not the documents in the folder because the documents

6   in the folder were just for the purposes of authentication, but

7   I would like to move to admit the documents in his binder under

8   803(6).

9        THE COURT:  Okay.  And which documents are those?

10       MS. ROGOWSKI:  So I have a copy of the binder if you

11  would like me to hand it up to you through Mr. Keech.

12       THE COURT:  Yes.

13       MS. ROGOWSKI:  And I can tell Your Honor which of

14  those documents are contracts, which are e-mails with bids,

15  expense reports, board minute meetings and 8-Ks, if that would

16  be helpful.

17       THE COURT:  I don't.  I think we may need to go one by

18  one on them.  So why don't you move to admit the first one,

19  whichever one you choose.

20       MS. ROGOWSKI:  I would like to move to admit trial

21  Exhibit No. 572 which is a contract.

22       MS. HENRY:  Can we pull those up on the screen as she

23  moves them?

24       THE COURT:  Any objection to the admission of

25  Exhibit 572?

Theodore Sangalis - Direct                                                                572

1              MR. TUBACH:  No, Your Honor.

2              THE COURT:  Yeah, I am going to interpret silence

3      as -- give everyone a fair chance to object, but otherwise.

4      Okay.  Exhibit No. 572 will be admitted.

5              MS. ROGOWSKI:  The next document, Your Honor, is

6      Exhibit 3028.  It's also a contract.

7              THE COURT:  Hold on one second.  Let me annotate my

8      chart.

9              MS. ROGOWSKI:  Of course, Your Honor.

10             THE COURT:  I am sorry, Ms. Rogowski, which exhibit?

11             MS. ROGOWSKI:  It's No. 3028.  It should be the second

12     blue piece of paper in your binder.

13             THE COURT:  Any objection to the admission of

14     Exhibit 3028?

15             Exhibit 3028 will be admitted.

16             Next one?

17             MS. ROGOWSKI:  Exhibits No. 1104 and 1105.  It's an

18     e-mail attaching a bid, Your Honor.

19             THE COURT:  And Exhibit 1105 is an attachment?

20             MS. ROGOWSKI:  Yes, Your Honor.

21             THE COURT:  Okay.  Any objection to Exhibits 1104 and

22     1105?

23             Both of those exhibits will be admitted.

24             MS. ROGOWSKI:  Exhibit 1226, Your Honor.  It's also a

25     contract.

Theodore Sangalis - Direct

573

 1          *THE COURT:*  Any objection to the admission of

 2   Exhibit 1226?

 3              Exhibit 1226 will be admitted.

 4              Next one?

 5          *MS. ROGOWSKI:*  Exhibits No. 1529 and 1530.  Again,

 6   it's an e-mail with a bid, and 1530 is the attachment.

 7          *THE COURT:*  Any objection to the admission of

 8   Exhibit 1529 and 1530?

 9              Both of those exhibits will be admitted.

10              Go ahead.

11          *MS. ROGOWSKI:*  Exhibit No. 1531 and 1532, Your Honor,

12   an e-mail with a bid again, and 1532 is the attachment.

13          *THE COURT:*  Any objection to the admission of Exhibits

14   1531 and 1532?

15              Those exhibits will be admitted.

16          *MS. ROGOWSKI:*  Next, Your Honor, would be 1524 and

17   1525, an e-mail with a bid, and also 1525 is the attachment.

18          *THE COURT:*  Any objection to the admission of

19   Exhibits 1524 and 1525?

20              Both of those exhibits will be admitted.

21          *MS. ROGOWSKI:*  And next, Your Honor, we have Exhibits

22   No. 1583 and 1584, an e-mail with a bid, and 84 is the

23   attachment.

24          *THE COURT:*  Any objection to the admission of Exhibits

25   1583 and 1584?

574

Theodore Sangalis - Direct

1          Both of those will be admitted.

2          MS. ROGOWSKI:  Next, Your Honor, we have Exhibits

3    No. 1825 and 1826, an e-mail with a bid, and again 26 is the

4    attachment.

5          THE COURT:  Any objection to the admission of

6    Exhibits 1825 and 1826?

7          Both of those exhibits will be admitted.

8          MS. ROGOWSKI:  Next, Your Honor, we have Exhibits 9504

9    and 9505.  They are actually not -- both -- one is not an

10   attachment of another.  They are both receipts from expense

11   reports.

12         THE COURT:  Any objection to the admission of

13   Exhibits 9504 and 9505?  Sorry.  Yeah, 9504 and 9505.  Both --

14         MR. KORNFELD:  I am sorry, Your Honor, just to make a

15   relevance objection.  I am not quite sure what those receipts

16   pertain to.

17         THE COURT:  Relevance?

18         MS. ROGOWSKI:  Your Honor, those are Mr. Roger

19   Austin's receipts from a trip that we believe he took to

20   visit -- if we may, Your Honor, I think this may be appropriate

21   for a side bar.

22     (At the bench:)

23         THE COURT:  Okay.  Mr. Kornfeld, go ahead.

24         MR. KORNFELD:  I made a relevance objection.  I am not

25   sure what a couple of sundry receipts pertain to even though

Theodore Sangalis - Direct                                          575

 1   they are not from my client, so my objection is just a simple

 2   relevance objection.

 3            THE COURT:  Ms. Rogowski?

 4            MS. ROGOWSKI:  Your Honor, would you like me to

 5   proffer to you how we think we will be able to make -- show

 6   these documents are relevant or would you prefer that we offer

 7   the documents under 803(6) but condition that they are subject

 8   to relevance when we intend to introduce them.

 9            THE COURT:  Well, you're trying to introduce them now,

10   so the objection is relevance.  So you should now explain to me

11   why you think that they are relevant to some issue in this

12   case.

13            MS. ROGOWSKI:  Your Honor, the travel receipts show

14   that Mr. Roger Austin was at a meeting with KFC in a key time

15   period in 2014.

16            THE COURT:  Okay.  Mr. Kornfeld, anything else on

17   this?

18            MR. KORNFELD:  No, Your Honor.

19            THE COURT:  Okay.  Yeah --

20            MS. JOHNSON:  Your Honor, Wendy Johnson for Ric Blake.

21   To the extent these documents, any of them that are being

22   introduced and admitted, precede October 24th, 2016, which is

23   the date that the Court ruled in the *James* hearing that

24   Mr. Blake entered the conspiracy, we would object to their

25   admissibility against Mr. Blake.

Theodore Sangalis - Direct

1          THE COURT:  First of all, let me rule on the relevancy

2     objection.  That is overruled.

3          Next, in terms of Ms. Johnson's objection, the fact

4     that these may predate -- I didn't look at them, but the fact

5     that they may does not matter.  If they are intended to prove

6     that he attended a meeting with KFC and have some -- because of

7     the location perhaps of the restaurant or the date may have a

8     tendency to prove that, that he was at least in that area, they

9     would be relevant and would not be excluded.  So that objection

10    is overruled.

11         MS. JOHNSON:  Thank you, Your Honor.  In any case we

12    will be making the same objection for documents that predate

13    10/24/16.  And based on the Court's ruling we would ask for a

14    limiting instruction as to Mr. Blake.

15         THE COURT:  It would be premature to give any type of

16    limiting instruction.  This is -- the fact that the Court made

17    a ruling on *James*, which was focused on co-conspirator hearsay,

18    has no effect whatsoever on the government's ability to prove

19    through other means whether or not your client was part of the

20    conspiracy at an earlier date.

21         MS. JOHNSON:  Thank you.

22         THE COURT:  Thank you.

23     (In open court:)

24         THE COURT:  The objection will be overruled.

25         Go ahead.

Theodore Sangalis - Direct                    577

1          MS. ROGOWSKI:  The next document, Your Honor --

2          THE COURT:  Wait a minute.  So there was an objection.

   I overruled it.  And so Exhibit Nos. 9504 and 9505 will be

4  admitted.

5          MS. ROGOWSKI:  The next document, Your Honor, is 9166.

6  It is a Pilgrim's Pride board meeting minutes document.

7          THE COURT:  Any objection to the admission of

8  Exhibit 9166?

9          Exhibit 9166 will be admitted.

10         MS. ROGOWSKI:  And the final document, Your Honor,

11 that the government is seeking to admit under 803(6) from this

12 list is document No. 9168.  It is a Pilgrim's Pride 8-K.

13         THE COURT:  Any objection to the admission of Exhibit

14 9168?

15         That exhibit will be admitted as well.

16         Do you have another witness?

17         MS. ROGOWSKI:  Yes, Your Honor, if I may transition to

18 one of my colleagues.

19         MR. KOENIG:  Thank you, Your Honor.  The government

20 calls Stewart Ward.

21     (**Stewart Ward** was sworn.)

22         THE WITNESS:  I do.

23         COURT DEPUTY CLERK:  Please state your name and spell

24 your first and last names for the record.

25         THE WITNESS:  Stewart Ward; S-T-E-W-A-R-T, Ward,

578

Stewart Ward - Direct

1    W-A-R-D.

2        *MR. KOENIG:*  May I pass to Mr. Keech the binder and

3    two documents?

4        *THE COURT:*  You may.

5                    **DIRECT EXAMINATION**

6    *BY MR. KOENIG:*

7    *Q.*  Good afternoon, Mr. Ward.

8    *A.*  Good afternoon.

9    *Q.*  Where do you work?

10   *A.*  I work for Koch Foods.

11   *Q.*  And what do you do at Koch Foods?

12   *A.*  I am the vice-president of information systems.

13   *Q.*  How long have you been there?

14   *A.*  17 years, 18 years, something like that.  I lost count.

15   *Q.*  Where did you go to college?

16   *A.*  Mesa State College which is now Colorado Mesa University

17   over in Grand Junction.

18   *Q.*  What was your major?

19   *A.*  Bachelor's in business administration with an emphasis in

20   computer information systems.

21   *Q.*  And so what did you do after you graduated college?

22   *A.*  I moved to Phoenix and went to work for a company called

23   Aspen Systems.  We developed software for the food industry, at

24   which point I was introduced to Koch Foods and started doing

25   their implementations.  Over the course of years, they

Stewart Ward - Direct

1    eventually invited me to come to work for them.  And I have

2    built basically all the systems that are within Koch Foods.

3    Q.  Okay.  So what year did you get hired do you think?

4    A.  1999.

5    Q.  So I am no mathematician, but you said you have been there

6    17 years.

7    A.  I had a two-year interlude where I went back to Aspen

8    Systems and helped them roll out their newest software package.

9    Q.  And what years was that?

10   A.  2003 to 2005.

11   Q.  So then in 2005 you went back to Koch Foods?

12   A.  I did.

13   Q.  What was your role when you went back to Koch Foods?

14   A.  It was the same as it was before.  I was the director of

15   IS.

16   Q.  And director of IS means what?

17   A.  Basically what it is now, vice-president of information

18   systems.  But as the company grew, the title grew too.

19   Q.  Okay.  And are you familiar with the e-mail servers at Koch

20   Foods and the storage systems?

21   A.  I am.

22   Q.  And how did you become familiar with those?

23   A.  Initially I built the first systems and put them into

24   place.  And then as the company evolved and we began to

25   transition the systems, I directed the people who put in the

Stewart Ward - Direct

1   system we currently have, which is Microsoft Exchange.

2   Q.   I am sorry, I couldn't hear that.

3   A.   The most recent system is Microsoft Exchange.

4   Q.   And what was your involvement in that?

5   A.   I directed the process of getting that installed and set

6   up.

7   Q.   Okay.  Could you just explain for the jury the process --

8   well, Microsoft Exchange, when did that go into effect?

9   A.   We started putting it in around 2008, 2009 time frame, but

10  it was a slow transition from the old system to the new system.

11  So we were fully implemented on it somewhere around 2012, 2013.

12  Q.   And during that four or five-year transition, was there any

13  significant loss of data?

14  A.   No.

15  Q.   Has there ever been a significant loss of data from the

16  Koch e-mail servers?

17  A.   In 2019 we suffered a ransomware attack and we lost about a

18  month's worth of data from the end of October through the first

19  of December, but that's the extent of the data loss we had.

20  Q.   And any data corruption issues?

21  A.   No.

22  Q.   How do you know that?

23  A.   Basically validation by users, by knowing the systems are

24  on-line, by running health checks on those systems continually.

25  If we were to find any kind of corruption or anything that may

Stewart Ward - Direct

```
 1   have happened, then we would restore if necessary, but we
 2   haven't had to.
 3   Q.  Is it fair to say that the e-mail systems at Koch Foods are
 4   reliable?
 5   A.  Yes.
 6   Q.  And they maintain data accurately?
 7   A.  Yes.
 8   Q.  Can you explain the process for when e-mails are sent
 9   either internally within Koch or externally to and from Koch,
10   how that flow works?
11   A.  Microsoft Exchange manages all the flow of e-mail whether
12   it comes from outside or it's internal.  And it has two paths.
13   It will go to the end user's mailbox where they will see it in
14   Outlook and that kind of thing, and the other path is to go to
15   our vault server where a copy of the e-mail is recorded for
16   archival purposes and to be produced, if necessary, in other
17   kinds of matters.
18   Q.  And why is it called the vault?
19   A.  Because it truly is that.  It does -- there is no
20   modification to the e-mails when it goes in there.  There is no
21   structuring system or anything like that that a user might go
22   and assign inside of their Outlook.  It is strictly the e-mail
23   being recorded into the vault.
24   Q.  Does that include attachments to e-mails as well?
25   A.  It does.
```

Stewart Ward - Direct

1    Q.  So is it fair to say that every e-mail that comes in and

2    out of Koch or gets sent internally at Koch, there is a copy of

3    it in the vault.

4    A.  That is correct.

5    Q.  Have you ever had any breaches of the vault?

6    A.  No.

7    Q.  Any corruption?

8    A.  No.

9    Q.  Any hacking?

10   A.  Aside from the ransomware attack that we had that we

11   restored from, no.

12   Q.  Was that to the vault as well?

13   A.  It was to the vault as well, but it was fully restored.

14   Q.  How long has the vault been in place?

15   A.  Let's see.  I was gone -- it went in in 2004.  While I was

16   gone -- while I was at Aspen Systems it was installed into Koch

17   Foods, so it had been in there somewhere around 2004 and was

18   vaulting the old e-mail system as well.

19   Q.  So that's like the one thing at Koch you didn't design.

20   A.  Yeah, to a degree, but it's gone through evolution, so I

21   have even changed the design of that.

22   Q.  All right.  So can I ask you, do you have any knowledge of

23   the way e-mail addresses are assigned at Koch Foods?

24   A.  Yeah.  So initially when I first built the systems, we did

25   what was called a three-by-three.  It was the first three

583

Stewart Ward - Direct

 1   letters --

 2   Q.  I am sorry, a what?

 3   A.  A three-by-three.  So it was the first three letters of the

 4   first name, first three letters of the last name was the user

 5   ID for the e-mail @kochfoods.com.  As we evolved the systems

 6   and made them more sophisticated, we changed that naming

 7   structure to be the first name.last name.

 8   Q.  And why did you make that change?

 9   A.  Mainly because people are more used to dealing with it, and

10   it seems to be kind of best practice as you move forward.

11   Q.  Does that mean some people have two e-mail addresses?

12   A.  No.  They all only have one.  Well, yes, they have two

13   e-mail addresses.  You can send an e-mail to either one of

14   those.  But they only have one e-mail box, so everything will

15   get routed into the same e-mail box.  So, for instance, I still

16   have my stewar@kochfoods.com and I have a

17   stewart.ward@kochfoods.com.  I get all that e-mail in my one

18   Outlook box from both of those addresses, so its alias.

19   Q.  So say you send an e-mail, how does it show up?  How does

20   the return address show up at the other end?

21   A.  It could be either way.  So no, if I send an e-mail today,

22   it will be stewart.ward@kochfoods.com as a return address.

23   Q.  When was the transition to the new e-mail address?

24   A.  I can't give you a specific date because again we did that

25   over a period of time, but it was in that 2013, '14 time frame.

Stewart Ward - Direct

1   *Q.*  So anything before the transition would show up the

2   three-by-three?

3   *A.*  Would be the three-by-three, correct.

4   *Q.*  Gotcha.  And in the e-mails you often see a date/time

5   stamp.

6   *A.*  Uh-huh.

7   *Q.*  How is that stored physically?  Is it stored in a certain

8   time zone?

9   *A.*  The older e-mails were Central Time Zone because those --

10  it was a Central Time Zone server.  Over time they've gone to

11  UTC, so that's just how they got recorded into Exchange.

12  *Q.*  Does that necessarily mean it shows up when -- you know,

13  say I send you an e-mail on your screen, does it pop up in UTC?

14  *A.*  No.  It will show as my time zone.  It will show wherever

15  I'm at.  So I am here right now, so I would see an e-mail

16  received as Mountain Standard Time.

17  *Q.*  And if an e-mail were printed off, let's say, would it be

18  printed off in mountain standard time?

19  *A.*  If I printed it in Mountain Standard Time, yes, it would

20  be.

21  *Q.*  Would it have a little thing that says MDT?

22  *A.*  Not usually.  It usually just has the time on it.

23  *Q.*  Let's talk about attachments for a second.

24          So e-mails have attachments, right?

25  *A.*  Uh-huh.

Stewart Ward - Direct

1   Q.  How can you tell if an e-mail has an attachment?

2   A.  You can see it in the e-mail usually below the subject line

3   in -- at least in Outlook that's where it will show is under

4   the subject line.

5   Q.  And how does the storage work?  How does an e-mail know

6   what its attachment is and vice versa?

7   A.  It's built into the metadata that's behind that e-mail,

8   tells it where it's at.  In many cases it might even be

9   embedded into that specific e-mail.

10  Q.  And in the vault you said e-mail and attachments are there?

11  A.  Correct.

12  Q.  And are they still connected to each other there?

13  A.  Yes.

14  Q.  Does the vault maintain the attachments as, you know,

15  accurately and reliably?

16  A.  Yes.

17  Q.  Did there come a time -- well, let's back up before we do

18  that.

19        Are you familiar with someone named Bill Kantola?

20  A.  I am.

21  Q.  Would you know him if you saw him?

22  A.  I would.

23  Q.  Do you see him in this courtroom?

24  A.  I am sure he is around somewhere.  There he is.

25        MR. KOENIG:  Can the Court please let the record

                                      586
                          Stewart Ward - Direct

 1    identify --

 2              THE COURT:  Why don't we have him describe an article

 3    of clothing or something so I know.

 4    BY MR. KOENIG:

 5    Q.  What color tie is he wearing?

 6    A.  I can't tell.  He is sitting behind this big bookshelf.  It

 7    looks like kind of an orangish tie, rust colored.  I'm color

 8    blind, so...

 9              MR. KOENIG:  Can the record reflect that the witness

10    identified Mr. Kantola?

11              THE COURT:  It shall.

12    BY MR. KOENIG:

13    Q.  So under the new e-mail system, what would Mr. Kantola's --

14    what is Mr. Kantola's address?

15    A.  He would be bill.kantola.

16    Q.  At?

17    A.  @kochfoods.com.

18    Q.  And under the old convention?

19    A.  He would be bilkan@kochfoods.com.

20    Q.  Thank you.

21              Are you familiar with the name Joe Grendys?

22    A.  I am.

23    Q.  Who is he?

24    A.  He is the CEO of Koch Foods.

25    Q.  How about Bruce MacKenzie?

Stewart Ward - Direct

1   A.   I am familiar with him.

2   Q.   Who is he?

3   A.   He is a salesperson -- or was a salesperson.  He no longer

4   works for Koch Foods.

5   Q.   When did he leave Koch Foods?

6   A.   A couple years ago, I think.

7   Q.   How about Mark Kaminsky?

8   A.   Yes.

9   Q.   Who is he?

10   A.   He is my boss.  He is the chief operating officer.

11   Q.   Is he the one who hired you away from your other job?

12   A.   He is.

13   Q.   All right.  Now, did there come a time when you were asked

14   to extract e-mails for production in a matter?

15   A.   Yes.

16   Q.   And approximately when was that?

17   A.   It started in 2016 and has continually progressed from

18   there.

19   Q.   And how were you involved?  Let's start at the beginning.

20   How were you involved?

21   A.   So initially I did the first extractions.  I went into the

22   vault.  I keyed in custodians that were requested and various

23   keywords and extracted those e-mails and produced them.

24   Q.   To whom?

25   A.   To various people who had asked for them.

Stewart Ward - Direct

1  *Q.* If I had asked you for them, would you have produced them

2  to me?

3  *A.* Yeah, most likely.

4  *Q.* But in seriousness, was it a request that you had to like

5  send them to a vendor or something?

6  *A.* Well, initially they were from -- for other matters that we

7  were asked to get involved with.

8  *Q.* And the e-mails and attachments that you extracted, did you

9  have an understanding of whether the extraction was a true and

10  accurate copy of what was in the vault? First of all, did they

11  come from the vault?

12  *A.* They came from the vault.

13  *Q.* Not from the end user system?

14  *A.* None of the extractions I did came from the end user

15  system. They all came from the vault.

16  *Q.* And were the extractions true copies of what was in the

17  vault?

18  *A.* Yes.

19  *Q.* And how do you know that?

20  *A.* You could just do a basic review of the documents as they

21  are being extracted.

22  *Q.* What kind of volume are you talking about in sort of that

23  first wave?

24  *A.* Initially I was pulling in the hundreds of thousands of

25  e-mails. As time went on, it went into the millions.

589

Stewart Ward - Direct

1   Q.  But you didn't check every last document.

2   A.  No.

3   Q.  So was there some sort of --

4   A.  A sampling.  You just do a sampling test on them, check

5   them to see it's coming through, make sure you are not getting

6   errors when you are pulling them out.

7   Q.  After you produced those to the person who had requested

8   them, did you ever hear back that there was a problem with any

9   of them?

10  A.  No.

11  Q.  No corruption issues?

12  A.  No.  They kind of go into a black hole at that point.

13  Q.  Okay.  And did you apply Bates stamps to those numbers --

14  or documents?  I am sorry.

15  A.  I didn't.

16  Q.  Do you have an understanding of who did?

17  A.  It would either be other firms or it would be potentially

18  third-party vendors.

19  Q.  Okay.  Are you familiar with the actual Bates stamps

20  themselves, what code they used?

21  A.  I mean, I generally know just through other discussions

22  I've had in other matters, I have seen the Bates numbers come

23  back.  So I am familiar with the Bates numbers and I recognize

24  them when I see them.

25  Q.  Okay.  Is K-O-C-H dash one of them?

Stewart Ward - Direct

1   A.   K-O-C-H underscore.

2   Q.   I am sorry, underscore.

3   A.   Yes, that is one of them.

4   Q.   K-O-C-H-F-O-O-D-S is another one?

5   A.   Yes.

6   Q.   You said at first you were doing the extraction.  Did at

7   some point that change?

8   A.   Yeah.  The volume just got to a point where I couldn't keep

9   up with it, so we brought in a third party to help.  I directed

10  them how to do it, trained them on how to pull it.  They were

11  let in the door essentially, if you will, to do those

12  extractions through the vault system as I had done the

13  extractions.

14  Q.   And did you have -- where were they located when they were

15  doing it, at least at first anyway?

16  A.   In the very beginning, they actually came to my office in

17  Peoria, Arizona.  As time went on, I would let them in through

18  a machine that sets on my desk right behind me.

19  Q.   So they would come physically sit at your desk and do it?

20  A.   No.  When they came in physically, I have a conference

21  room.  And I would set them up in a conference room and give

22  them access in so they could do it.  And they did the

23  extractions there.  As time went on, they would just come in

24  through remote connection into a machine that I have setting on

25  my desk.

591

Stewart Ward - Direct

1    Q.   And then that -- and you trained them how to do it.

2    A.   Correct.

3    Q.   Did you ever hear that there were problems with the

4    documents that were extracted by the third-party vendor?

5    A.   Every once in a while they would come back and say, hey,

6    this isn't exporting the way I expected it to.  And so I would

7    go in and look at it and say -- most of the time what would

8    happen is the volume was so big, they were trying to dump it

9    off onto a drive that didn't have enough space.  And they would

10   get errors and saying, hey, we can't get this stuff extracted,

11   so I would have to go help them clean it up.

12   Q.   Anytime you weren't able to solve the problem?

13   A.   No.  We solved the problems.

14   Q.   And did you -- did there come a time when you produced

15   documents pursuant to a Grand Jury subpoena in this matter?

16   A.   I didn't, no.

17   Q.   Okay.  Did the vendor?

18   A.   They may have.  They were doing extractions for a number of

19   different matters, so I don't know specifically which ones they

20   were working on.

21   Q.   From your perspective it doesn't matter if it's a Grand

22   Jury subpoena or just whatever.  It's -- an extraction is an

23   extraction.

24   A.   Correct.

25   Q.   And at the time were you aware of a Grand Jury subpoena?

Stewart Ward - Direct

1    *A.*  I was aware of one, yes.

2    *Q.*  And at the time the extractions were being done for that,

3    was the vendor still operating under the process you had

4    trained them in?

5    *A.*  Yes.

6    *Q.*  And is it your belief, then, that whatever they extracted

7    under your supervision was a fair and accurate copy of what was

8    in the vault?

9    *A.*  Yes.

10        *MR. POLLACK:*  Objection, Your Honor, lack of

11   foundation, lack of personal knowledge.

12        *THE COURT:*  Overruled.

13   *BY MR. KOENIG:*

14   *Q.*  All right.  I put in front of you a binder.  And actually,

15   there is two sheets there that I think they are actually in the

16   binder themselves, so you can set those aside.

17   *A.*  Okay.

18   *Q.*  If you could open that.

19   *A.*  Yup.

20   *Q.*  Do you see what's been marked as Government Exhibit 9501?

21   *A.*  I do.

22        *MR. POLLACK:*  Your Honor, can we display these

23   documents?

24        *THE COURT:*  Is that possible, Mr. Koenig?

25        *MR. KOENIG:*  Yeah, we are working on it.  Sorry, I got

Stewart Ward - Direct                                                   593

1    a step ahead of myself.

2              It looks like the margins somehow changed, the width

3    of the table.

4              *MR. TUBACH:*  I believe this is a different document

5    than the paper one we were just handed.

6              *MR. KOENIG:*  Let's put it on the viewer.  Sorry.

7              *THE COURT:*  And this bears an exhibit number,

8    Mr. Koenig?

9              *MR. KOENIG:*  Yes, 9501.

10             *THE COURT:*  Okay.  Go ahead.

11             Let's hold on for one second and make sure

12   Ms. Johnson -- okay.  Go ahead.

13             *MR. KOENIG:*  Thank you.

14   *BY MR. KOENIG:*

15   *Q.*  Aside from the last row that says 9595, do you see the list

16   of trial exhibit numbers and the Bates numbers?

17   *A.*  I do.

18   *Q.*  And have you reviewed all of those documents aside from the

19   last one?

20   *A.*  I have.

21   *Q.*  And are they the documents that are contained in the binder

22   except for the last one, of course.

23   *A.*  Yes, they are.

24   *Q.*  Okay.  And you've seen all those documents before?

25   *A.*  I have.

Stewart Ward - Direct                                594

1    Q.  And when was that?

2    A.  I was first presented these earlier in the week.

3    Q.  All right.  And did you have an opportunity to compare

4    those documents that you just reviewed just now to documents

5    that are on Koch servers?

6    A.  I did.

7    Q.  And how did you do that?

8    A.  I went in and did a search in the vault for each and every

9    one of these documents.

10   Q.  And what did you discover?

11   A.  That each and every one of the e-mails was in the vault

12   server and this is a representation of what was on the vault

13   server.

14   Q.  So this is a -- each and every one of these documents is

15   true and accurate of what's on the vault server?

16   A.  Correct.

17   Q.  Let's turn to -- my apologies -- the last page, 9595.

18   A.  Is that the same as this 9595 that you just gave me?

19   Q.  Yes.

20   A.  Okay.

21   Q.  If you would just take a minute to look at that too.

22   A.  Okay.

23   Q.  Have you seen this list of documents before?

24   A.  I believe so, yes.

25   Q.  And when was that?

Stewart Ward - Direct

1   A.  Last week I believe I got a copy of this list.

2   Q.  Okay.  And did you do anything to verify that all of the

3   documents listed in 9595 are Koch documents?

4   A.  I did.

5   Q.  A couple things I would like to do.  If you could, let's go

6   back to 9501.  Do you see the document 1025 and 1026?

7   A.  I do.

8   Q.  If you could turn to those.

9   A.  In the binder?

10  Q.  Yes, please.

11          THE COURT:  Do you need to confer with Mr. Pollack?

12          MR. KOENIG:  Please.

13          THE COURT:  Yes, go ahead.

14  BY MR. KOENIG:

15  Q.  All right.  We are at 1025, I believe.

16  A.  Yes.

17  Q.  And does 1025 have an attachment?

18  A.  It does.

19  Q.  And is that attachment in 1026?

20  A.  I can't tell based on this information.

21  Q.  Okay.  What would you have to do to be able to tell?

22  A.  I would have to be able to see the metadata for the e-mail

23  so that I could be able to determine and be able to see an

24  actual file name on this.  The one with the 1026, there is not

25  an actual file name associated with this that would identify

Stewart Ward - Direct

1    that it's 3753001.PDF.

2    Q.  Is 1026, however, a document from the vault?

3    A.  It could be.  I was not able to verify the PDFs when I went

4    through this.

5    Q.  Okay.  So when you said before that you verified what was

6    in the vault, it was the e-mails, not necessarily the

7    attachments.

8    A.  Correct, because the vault server does not have a PDF

9    reader nor does it have an Excel Microsoft Office installation

10   on the server, so I can't open the --

11   Q.  Were you able to see when you looked at the e-mails whether

12   they did, in fact, have attachments?

13   A.  I did, yes.  I was able to see that they had attachments

14   and that they were valid attachments.  And I clicked on the

15   links to make sure that they would try to open.  And then it

16   just wants to know what kind of software to read that

17   attachment.

18   Q.  Okay.

19   A.  Just for the record, though, this 9501 that you gave me,

20   1025 and 1026 had different Bates numbers than they do on the

21   documents in the binder.

22   Q.  Oh, yeah.  Can you just for the record read in what the

23   Bates number in 1026 is?

24   A.  KOCHFOODS-0000227522.

25   Q.  And 1025, can you read that Bates number in, please?

Stewart Ward - Cross

1    A.   KOCHFOODS-0000227521.

2    Q.   And so in spite of the error in the table, the documents

3    are still the ones that you verified are accurate?

4    A.   They are.

5    Q.   And that's true for all of them regardless of the Bates

6    number that might have been --

7    A.   Yes, because I researched them outside of Bates numbers.  I

8    researched them Bates on the data and the e-mails.

9            MR. KOENIG:  Can I confer a minute?

10           THE COURT:  You may.

11           MR. KOENIG:  No further questions, thank you.

12           THE COURT:  Cross-examination.

13           Mr. Pollack?

14           THE WITNESS:  Shall I leave these binders here?

15           THE COURT:  You are not quite done, Mr. Ward.  A few

16   additional questions.

17           THE WITNESS:  I am ready to go, but...

18                            **CROSS-EXAMINATION**

19   BY MR. POLLACK:

20   Q.   I just wasn't able to hear.  With the numbers that were in

21   Exhibit 9595, was your answer that you did go back to the

22   servers at Koch and confirm that each and every one of these

23   documents was on the server at Koch or was your answer that you

24   did not do that?

25   A.   I did not do that.

598

Stewart Ward - Cross

1    Q.   Did not.

2    A.   Correct.

3    Q.   And with respect to the documents that are on 9501, if I

4    understand it, you were able to go back and see the e-mails on

5    the Koch server.

6    A.   Correct.

7    Q.   And if it was an e-mail, you compared it to the hard copy

8    document that you were provided and it had the same

9    information, correct?

10   A.   Yes.

11   Q.   But if it was an attachment to an e-mail, you could see on

12   the server that that e-mail had an attachment, but you couldn't

13   actually see the attachment.

14   A.   Correct.

15   Q.   So you couldn't compare the attachment on the server with

16   the attachment in 9501.

17   A.   Yes, that's correct.

18        MR. POLLACK:   I appreciate it.

19        Anyone else, cross-examination?

20        Redirect?

21        MR. KOENIG:   I have nothing further.  Thank you.

22        THE COURT:   Now, Mr. Ward --

23        THE WITNESS:   Thank you.

24        THE COURT:   Now, Mr. Ward.  Mr. Ward, it could be that

25   one or more of the defendants would want to recall you later in

Gregory Finch - Direct                                               599

 1   the trial, but if so, presumably someone will get in touch with

 2   you about that, but you are excused for today.  Thank you very

 3   much.

 4            *THE WITNESS:*  Thank you.  I appreciate it.

 5            *THE COURT:*  The United States may call its next

 6   witness.

 7            *MS. SWEENEY:*  The government calls Greg Finch.

 8         (**Gregory Finch** was sworn.)

 9            *THE WITNESS:*  I do.

10            *COURT DEPUTY CLERK:*  Please state your name and spell

11   your first and last names for the record.

12            *THE WITNESS:*  Gregory Scott Finch; G-R-E-G-O-R-Y,

13   S-C-O-T-T, F-I-N-C-H.

14                          **DIRECT EXAMINATION**

15   *BY MS. SWEENEY:*

16   *Q.*  Good afternoon, Mr. Finch.

17   *A.*  Good afternoon.

18   *Q.*  Who is your employer?

19   *A.*  Norman W. Fries, Inc., d/b/a Claxton Poultry Farms.

20   *Q.*  Can you describe what you mean when you say d/b/a Claxton

21   Poultry Farms?

22   *A.*  Sure.  It's an abbreviation for doing business as.

23   *Q.*  Does your employer have a website?

24   *A.*  We do.

25   *Q.*  What's the domain of that website?

Gregory Finch - Direct

1    A.   www.claxtonpoultry.com.

2    Q.   And do you have a work e-mail address?

3    A.   Do I?

4    Q.   Yes.

5    A.   Yes, ma'am.

6    Q.   What's the domain name of your work e-mail address?

7    A.   Claxtonpoultry.com.

8    Q.   Is that the same for everybody who works at

9    claxtonpoultry.com?

10   A.   Yes.

11   Q.   What's your position?

12   A.   Chief financial officer.

13   Q.   How long have you been in that position?

14   A.   Since April of 2011.

15   Q.   I would like to direct your attention to the

16   responsibilities you have with regard to responding to legal

17   process.  Could you describe those to the jury, please?

18   A.   Responding to legal process?

19   Q.   Your responsibilities with regard to responding to legal

20   process.

21   A.   Sure.  That would fall under my purview.

22   Q.   So what does that include?

23   A.   Depends on what the legal matter is.  They are various and

24   sundry, testimony under oath, depositions, responding to

25   discovery, just depends on what the situation may be.

601

Gregory Finch - Direct

1   Q.   Does it involve the collection of documents?

2   A.   Yes.

3   Q.   Turning back to e-mail servers -- or to e-mails, are e-mail

4   addresses assigned to employees of Claxton Poultry Farms?

5   A.   Yes.

6   Q.   Do you know how?

7   A.   Yes.

8   Q.   How are e-mail addresses assigned?

9   A.   Well, depending on the employee and what their job function

10  will be, we have two types of e-mail accounts under Microsoft

11  365.  So we have a lower level account that cost us $5 a month.

12  That account will come with e-mail electronic calendar and then

13  a virtual version of Excel, Word and the other applications.

14  Then we got a next level up that's a $12 a month application

15  that comes with fully licensed applications as well as e-mail

16  and electronic calendars.

17  Q.   So for both of the types of accounts that you described, is

18  the employee assigned an e-mail address?

19  A.   They are.

20  Q.   And what's the domain name of the e-mail address assigned

21  to that employee?

22  A.   Claxtonpoultry.com.

23  Q.   Is there a naming convention for assigning e-mail addresses

24  to employees?

25  A.   Yes.

Gregory Finch - Direct

1   Q.   What is that naming convention?

2   A.   First name_last name@claxtonpoultry.com.

3   Q.   Mr. Finch, are you familiar with how Claxton stores its

4   e-mails?

5   A.   I am.

6   Q.   Can you describe how Claxton Poultry Farms stores its

7   e-mails?

8   A.   In the cloud.

9   Q.   And how -- what is the name of the server, the process

10  through which Claxton Poultry Farms stores its e-mails?

11  A.   It's Microsoft Office 365, so Microsoft controls the cloud.

12  And the e-mails and attachments and calendar entries and so

13  forth are saved in Microsoft cloud.

14  Q.   So just to confirm, you said e-mails are saved in the

15  cloud?

16  A.   Yes.

17  Q.   And e-mails with attachments?

18  A.   Yes.

19  Q.   And you said calendar invitations?

20  A.   Yes.

21  Q.   And the e-mails and e-mails with attachments and calendar

22  invitations you were describing, are they saved in the cloud

23  outgoing versions or in-coming versions or both?

24  A.   Both.

25  Q.   Has Claxton Poultry Farms always saved its e-mails and

Gregory Finch - Direct

1   e-mails with attachments and calendar invitations in the cloud?

2   *A.*   No.

3   *Q.*   What -- where else do they save their e-mails?

4   *A.*   We had an on-site Microsoft Exchange server until October

5   2015.  And at that time we were responsible for maintaining

6   that server, and the e-mails and calendar invites and so forth

7   were stored on that server on premises.

8   *Q.*   And so that included all of -- everything you described

9   before.  The e-mails, e-mails with attachments and calendar

10  invitations were stored on the server prior to October of 2015?

11  *A.*   Yes.

12  *Q.*   Did that include both incoming and outgoing?

13  *A.*   Yes.

14  *Q.*   Was there a transition from the server to the Microsoft

15  cloud?

16  *A.*   Yes.

17  *Q.*   Was any data lost in that transition?

18  *A.*   Quite possibly.

19  *Q.*   Are you aware of any data being lost in that transition?

20  *A.*   Yes.

21  *Q.*   Are you aware of any e-mail data being lost in that

22  transition?

23  *A.*   Yes.

24  *Q.*   What e-mail data was lost in that transition?

25  *A.*   I can't quantify it.  We had a server crash.  And so we did

Gregory Finch - Direct

1   our best to recover all the data we could recover from that

2   server and migrated over to the cloud, but unfortunately some

3   of the data that was on the server was corrupted and we were

4   not able to recover those and put those in the cloud.

5   Q.  When you talk about the e-mail information that's stored in

6   the server and in the cloud, what parts of the e-mail are saved

7   in the server and in the cloud?  Would that be the header

8   information?

9   A.  Yes.

10  Q.  Would it also include the body of the e-mail itself?

11  A.  Yes.

12  Q.  And have you ever -- aside from the crash that you

13  described, we will start with the server, have you ever known

14  of -- is that server reliable?  Was it reliable?

15  A.  Yes.

16  Q.  Was it maintained?

17  A.  Yes.

18  Q.  Turning now to the Microsoft cloud, has the Microsoft cloud

19  saving system been reliable?

20  A.  Yes.

21  Q.  Is the Microsoft cloud maintained?

22  A.  Yes.

23  Q.  Who maintains the Microsoft cloud?

24  A.  Microsoft.

25  Q.  Who maintained the e-mail server from October 15 and prior?

Gregory Finch - Direct

1    *A.*  Claxton Poultry employees.

2    *Q.*  I would like to now talk about a few Claxton Poultry

3    employees.  Are you familiar with someone by the name of Mikell

4    Fries?

5    *A.*  Yes.

6    *Q.*  Is Mikell Fries a Claxton Poultry employee?

7    *A.*  Yes.

8    *Q.*  And does he have an e-mail address?

9    *A.*  Yes.

10   *Q.*  And could you tell the jury what that e-mail address is?

11   *A.*  Sure.  It's mikell_fries@claxtonpoultry.com.

12   *Q.*  Are you familiar with someone by the name of Scott Brady?

13   *A.*  Yes.

14   *Q.*  Is Scott Brady an employee of Claxton?

15   *A.*  Yes.

16   *Q.*  Does Scott Brady have an e-mail address?

17   *A.*  Yes.

18   *Q.*  Can you share Scott Brady's e-mail address with the jury?

19   *A.*  Sure.  It's scott_brady@claxtonpoultry.com.

20   *Q.*  Focusing on e-mails themselves and the header information

21   we were talking about just a little bit ago, the date on an

22   e-mail, how is that assigned?

23   *A.*  By the Microsoft server.

24   *Q.*  So is that created by a computer?

25   *A.*  It's created by the software.

606

Gregory Finch - Direct

1   Q.  Is that date reliable?

2   A.  To my knowledge, yes.

3   Q.  Have you ever known the date assigned to be wrong?

4   A.  Not to my knowledge.

5   Q.  How about the time?

6   A.  It's assigned the same way.  The software assigns it.

7   Q.  Have you ever known the time to be unreliable?

8   A.  No.

9   Q.  Are there times on Claxton Poultry e-mails where the e-mail

10  address, the full e-mail address is not listed?

11  A.  Yes.

12  Q.  Can you describe what is listed instead of the full e-mail

13  address?

14  A.  It's hard to fully describe, but basically what happens if

15  there is a software differential between the computer and maybe

16  the cloud where it's on, say, version 10.1 on one and 10.0 on

17  the other, then sometimes that full e-mail address like

18  greg_finch won't show in the header.  It will say Greg Finch.

19  Then there will be a parenthetical that identifies the location

20  as Claxton Poultry and who the sender is as Greg Finch.

21  Q.  You said it would be your name followed by a lot of

22  characters.  How are those characters created?

23  A.  The server creates those.

24  Q.  I would like to direct your attention to Tab 1 in the

25  binder in front of you which is Government Exhibit 500 which we

607

Gregory Finch - Direct

 1    will put up on the screen.

 2    A.   I don't have a binder.

 3    Q.   I apologize.  When you've identified it, if you can look up

 4    at me and we will direct you to the From line on the very top.

 5         Is this an example of the computer-generated name that

 6    you were just describing?

 7    A.   Yes.

 8    Q.   And is the computer-generated name that you were

 9    describing, have you ever known that to be unreliable?

10    A.   No.

11    Q.   I would now like to direct your attention to the list that

12    I hope is in front of you, and it's marked as Government's

13    Exhibit 9594.  Do you have that in front of you?

14    A.   Yes.

15    Q.   Have you seen this document before?

16    A.   Yes.

17    Q.   When did you see it?

18    A.   Tuesday evening about 7:15.

19    Q.   And what is it?

20    A.   It is a list of documents, Claxton documents, that the

21    government wishes to enter here, I guess.

22    Q.   You also have a binder in front of you; is that right?

23    A.   Yes.

24    Q.   You now have a binder in front of you?

25    A.   Yes, ma'am.

608

Gregory Finch - Direct

1    Q.  Have you seen that binder before?

2    A.  Not this exact one, but a replica.

3    Q.  How do you know that it was a replica?

4    A.  Well, this one looks like it has all the documents in it

5    and the one Tuesday night did not.

6    Q.  And the binder in front of you, what's in that binder?

7    A.  A bunch of tabs and papers.

8    Q.  What's behind the tabs, the documents that are marked as

9    government exhibits?

10   A.  Would you like me to look through all the tabs?

11   Q.  You can take your time and look through the tabs.

12   A.  It appears to be e-mails, contracts, addendums to

13   contracts, calendar notes, Word documents, Excel documents and

14   a few legal documents.

15   Q.  I apologize, I didn't mean to cut you off.

16   A.  A few legal documents as well.

17   Q.  Have you seen these documents before?

18   A.  Yes.

19   Q.  When have you seen them before?

20   A.  Tuesday night.

21   Q.  Did there come a time when Claxton Poultry produced

22   documents to the Department of Justice in response to a Grand

23   Jury subpoena?

24   A.  Yes.

25   Q.  And did Claxton Poultry produce those documents with the

609
Gregory Finch - Direct

1   prefix CLA underscore?

2   A.   Yes.

3   Q.   Now, with regard to the specific documents on government

4   Exhibit 9594 in front of you, and I believe it's a two-sided

5   document, for the CLA underscore documents, did you have any

6   role in gathering those documents?

7   A.   Yes.

8   Q.   What was your role?

9   A.   I oversaw the collection of those documents.

10  Q.   And where were the documents collected from, specifically

11  the CLA underscore documents on Government Exhibit 9594?

12  A.   They were collected by a third-party vendor from the

13  Microsoft cloud, our servers, from laptops and desktop work

14  stations and from cellular phones.

15  Q.   And so the documents here on Government's Exhibit 9594,

16  were these documents collected from all of those sources or

17  just from some of those sources?

18  A.   All of those sources.

19  Q.   So starting with the Microsoft cloud, what -- where on the

20  Microsoft cloud?  Was it the e-mail server or was it other

21  types of documents -- or a different server.  I apologize.

22  A.   The cloud is going to have the e-mails and the calendar

23  invites and the attachments that go with the e-mails.

24  Q.   The documents that were retrieved from the server, can you

25  specify what server you are talking about?

610

Gregory Finch - Direct

1   A.  From our file server, which would be like Excel documents,

2   Word documents, those kind of things.  And then a copy of the

3   crashed -- the backup that we had of the crashed server was

4   also on that server.

5   Q.  The file server that you were talking about, is that the

6   same as the e-mail server we were discussing earlier?

7   A.  No, ma'am.

8   Q.  So where -- who maintains the file server?

9   A.  Claxton Poultry employees.

10  Q.  And where is the file server located?

11  A.  It's on premises in Claxton, Georgia.

12  Q.  Is the file server -- data from the file server, is it

13  reliable?

14  A.  Yes.

15  Q.  Has it been maintained?

16  A.  Yes.

17  Q.  So were these documents with the Bates numbers CLA

18  underscore, were they produced to the Department of Justice?

19  A.  Yes.

20  Q.  Can you describe generally the process of how they got from

21  the different locations you mentioned of the servers and the

22  laptops to the Department of Justice?

23  A.  The third-party data collection and housing service

24  collected the data using whatever methods they use to do that.

25  Then they housed that data.  And once they had the data

Gregory Finch - Direct                                              611

1   downloaded, they ran it against the terms that had been agreed

2   to by the Department of Justice and counsel.  And then those --

3   once those were culled, they were Bates stamped with CLA

4   underscore number, and then they were produced through counsel

5   to the government.

6   Q.  Was this third-party vendor that you described, were they

7   hired by Claxton Poultry?

8   A.  Yes.

9   Q.  Did you receive reports as to how this process was going

10  throughout the process?

11  A.  Yes.

12  Q.  Did you receive any reports that there were any errors in

13  the collection of the documents?

14  A.  None that I remember.

15  Q.  Any errors in the stamping of the documents?

16  A.  None that I remember.

17  Q.  Any errors that you were told of in the production of the

18  documents?

19  A.  None that I remember.

20  Q.  If there had been errors, would you have been advised of

21  errors?

22  A.  Yes.

23  Q.  The documents in the binder in front of you, beginning with

24  the CLA underscore Bates stamp, have you confirmed that these

25  documents are true and accurate copies of those on the

Gregory Finch - Direct

1    server -- or those -- from where they were pulled?

2    A.   Yes.

3    Q.   And how did you do that?

4    A.   Myself and my legal team in conjunction with the

5    third-party vendor went to those source records and then

6    compared them to these records to make sure they were an

7    accurate copy.

8    Q.   And if we could just confirm, the source records, if you

9    could just describe what the source records are.

10   A.   That was the data warehousing company, the data collection

11   company, once they marked those Bates numbers, they maintained

12   those in their system.  So we went back to that system Tuesday

13   night and Wednesday morning and confirmed that the copies that

14   are in this binder are authentic and have not been in any way

15   modified from what was originally produced.

16   Q.   And you compared it to the government's exhibits with the

17   government exhibit numbers?

18   A.   Yes.

19   Q.   Now I would like to focus your attention to the entries on

20   Exhibit 9594 that begin with the Bates number C-L-A-X-T-O-N

21   underscore.  Were these documents that were gathered in another

22   matter?

23   A.   Yes.

24   Q.   Did you -- were you involved in gathering these documents?

25   A.   Yes.

Gregory Finch - Direct                                    613

1   Q.  Approximately if you could give us a year when in time the

2   collection of these documents started.

3   A.  Approximately, 2017.

4   Q.  Discussing specifically the Claxton underscore documents on

5   this list again on the front page and the back page, where were

6   they gathered from?

7   A.  The same locations as the CLA documents.

8   Q.  And if you could describe the process of gathering the

9   documents through the time when they received the Claxton

10  underscore stamp.

11  A.  It was the exact same as the process for the CLA.

12  Q.  The process you described before?

13  A.  Yes, ma'am.  The only difference is with that matter

14  Claxton underscore was the naming convention for the Bates

15  numbers instead of CLA, but the collection methods and process

16  were identical.

17  Q.  And was the same third-party vendor used?

18  A.  Yes.

19  Q.  Did you receive -- do you recall any reports in the error

20  in the collection of the Claxton underscore documents?

21  A.  No.

22  Q.  Do you recall any reports of error in the processing or

23  stamping of the Claxton underscore documents?

24  A.  None.

25  Q.  Would you have been informed of any errors in the

Gregory Finch - Direct

1    collection or processing and stamping of those documents?

2    A.   Yes.

3    Q.   And the documents in the binder in front of you that bear

4    the Bates stamp that begins with Claxton underscore, have you

5    been able to verify if those are true and correct copies?

6    A.   Yes.

7    Q.   And how have you done that?

8    A.   The same process that I just described Tuesday night and

9    Wednesday morning we did on the Claxton underscore documents

10   that we did on the CLA underscore documents.

11   Q.   Now, in the documents in front of you, are any of them

12   e-mails with attachments?

13   A.   Some of them.

14   Q.   And how do you know that?

15   A.   Some of them have the attachment as an exhibit number.

16   Q.   Is there any other way that you know that there is an

17   e-mail with an attachment?

18   A.   In the body of the e-mail, it may tell you that attached is

19   something or like that, you know, possible.

20   Q.   In the verification process that you described that you did

21   where you compared an e-mail with the government's exhibit

22   number with the prior list of e-mails, were you able to confirm

23   that there were attachments --

24   A.   Yes.

25   Q.   -- in certain e-mails?

Gregory Finch - Direct

1    A.   Yes.

2    Q.   I would like you to turn to Tabs 2 and 3 which is

3    Government's Exhibits 503 and 579 which we will put on the

4    screen.

5             Starting with Exhibit 579, which is behind Tab 3, is

6    there -- is it apparent on the face of this document that there

7    is an attachment to this document?

8    A.   On the face of the last document -- of the last e-mail on

9    this document, no.  The first e-mail on the document seems to

10   say -- seems to say that there was an attachment when that was

11   originally sent.

12   Q.   And when you verified, was there, in fact, an attachment to

13   this document?

14   A.   Yes.

15   Q.   And what was that attachment?

16   A.   The Exhibit 503 that's in front of me on the screen.

17   Q.   Okay.  Now I would like to turn your attention to Tabs 4

18   and 5 which are Government Exhibits 702 and 703.  And starting

19   with Government's Exhibit 702, you can just look up at me when

20   you are ready.

21   A.   Okay.

22   Q.   Is it clear on the face of this e-mail that there is an

23   attachment to this e-mail?

24   A.   Yes.

25   Q.   And is there, in fact, an attachment to this e-mail based

Gregory Finch - Direct

1    on your verification?

2    *A.*   Yes.   There are multiple attachments to this e-mail.

3    *Q.*   And is the document behind Tab 5, Government Exhibit 703,

4    is that one of the attachments to this e-mail?

5    *A.*   Yes.

6    *Q.*   Now I would like to direct your attention to Tabs 12 and

7    13.  And I apologize, but it's Government Exhibit 1500 and

8    1501.

9            Starting with Government's Exhibit 1500, is it

10   apparent on the face of this e-mail if there is an attachment

11   to this e-mail?

12   *A.*   No.

13   *Q.*   In your checking, your confirmation, is there actually an

14   attachment to this e-mail?

15   *A.*   Yes.

16   *Q.*   And what is the attachment to Government Exhibit 1500?

17   *A.*   It's Government Exhibit 1501.

18   *Q.*   Now I would like to direct your attention to Tabs 16 and 17

19   which is Government Exhibit 1506 and 1507.  We will start with

20   Government Exhibit 1507.  You can look up when you are ready.

21           Starting with Government's Exhibit 1507, is it

22   apparent on the face of this e-mail if there is an attachment?

23   *A.*   No.

24   *Q.*   In your checking did you learn if there actually was an

25   attachment to this e-mail?

Gregory Finch - Direct

1   A.  No.

2   Q.  You learned that there was not an attachment to this

3   e-mail?

4   A.  To the best of my recollection.

5   Q.  All right.  And that's I think because I directed you to

6   the wrong exhibit.  So if I could actually direct you to 1505

7   and 1506.

8          So if we can look at 1505, is it apparent from the

9   face of this e-mail if there is an attachment?

10  A.  No.

11  Q.  In your confirmation was there actually an attachment to

12  this e-mail?

13  A.  Yes.

14  Q.  And where was the attachment to this e-mail?

15  A.  It's Government Exhibit 1506.

16  Q.  Thank you.  I would now like to direct your attention to

17  Tabs 18 and 24.  That's Government exhibits 1508 and 3001.

18  We'll start with Exhibit 3001.

19          Is it clear from the face of this document, 3001, that

20  there is an attachment to this e-mail?

21  A.  No.

22  Q.  And in your confirmation and checking --

23          MR. POLLACK:  The documents you are discussing are not

24  on the screen.

25          THE COURT:  It should be now, Mr. Pollack.

Gregory Finch - Direct

1   *BY MS. SWEENEY:*

2   *Q.*   In your checking, did you learn if there was an attachment

3   to Government Exhibit 3001?

4   *A.*   Yes.

5   *Q.*   And what is that attachment?

6   *A.*   It's Government Exhibit 1508.

7   *Q.*   And finally, I would like to turn your attention to Tabs 7

8   and 8.   And we'll start with Tab 8 and Tab 8 is Government

9   Exhibit 900-1.   Tab 7 is Government Exhibit 900.

10  *A.*   We are starting with 900-1?

11  *Q.*   Yes.   Is it apparent from the face of this e-mail,

12  Government Exhibit 900-1, that there is an attachment to this

13  e-mail?

14  *A.*   No.

15  *Q.*   In your checking did you learn if there was an attachment

16  to this e-mail?

17  *A.*   Yes.

18  *Q.*   And what was that attachment?

19  *A.*   Government Exhibit 900.

20  *Q.*   I would actually like to stay on Government's Exhibit 900.

21  Have you seen this document before?

22  *A.*   Yes.

23  *Q.*   Generally what is it?

24  *A.*   This generally is the assistant secretary's contemporaneous

25  notes that she takes during our board meetings.

Gregory Finch - Direct

1   Q.  Are you personally familiar with how this document was

2   created?

3   A.  Yes.

4   Q.  Have you seen this document before?

5   A.  Yes.

6   Q.  And when did you first see this document?

7   A.  Sometime on or around the time it was created.

8   Q.  And when was it created?

9   A.  I don't know the exact date.  I can't tell from this

10  document.  The document itself is dated August 28th, but I am

11  not sure exactly when.  What was the other exhibit number?  I

12  may be able to help here.

13  Q.  901, it's in Tab 8.

14  A.  Sometime around November of '14.

15  Q.  Why do you say sometime around November of '14?

16  A.  Well, the e-mail that Susan sent to me with this document

17  was sent on 11/9 of 2014.

18  Q.  Are documents like this usually prepared in the course of

19  business, regular conducted business?

20  A.  The assistant secretary of the corporation would normally

21  do this as part of her job function.

22  Q.  And is this an example of what you just described?

23  A.  Yes.

24  Q.  Are you familiar with when documents like this are

25  prepared?

620
Gregory Finch - Direct

1    A.   Generally.

2    Q.   When are documents like this generally prepared?

3    A.   Generally a document like this is prepared at the time of

4    the board meeting, at least in written form.  The typewritten

5    form doesn't always get done right then, but sometime between

6    the time of the board meeting, in this case August 28th of

7    2014, and the next board meeting which is typically in October,

8    these would have been created from a transcribed copy into a

9    digital copy.

10   Q.   Are you personally familiar with how these notes are kept

11   or maintained?

12   A.   Yes.

13   Q.   How are you familiar with how these notes are kept or

14   maintained?

15   A.   Because I am responsible for what goes on our file server

16   and these get stored on our file server.

17   Q.   And are documents like this kept and maintained in the

18   regular course of business?

19   A.   Yes.

20   Q.   Is this a true and accurate copy?  You already said this

21   was a true and accurate copy of the version that you reviewed

22   earlier?

23   A.   Yes.

24        MS. SWEENEY:  The government at this point moves to

25   admit Government's Exhibit 900 into evidence.

Gregory Finch - Direct

1           THE COURT:  Any objection to the admission of

2    Exhibit 900?

3           MR. POLLACK:  Yes, Your Honor.  First of all, with

4    respect to authenticity, as I understand the testimony, the

5    witness is able to say that the document is the same as the

6    document that the third-party vendor collected, but he is not

7    able to say whether it is identical to what resided at Claxton.

8    He is just simply relying on the fact that hopefully the

9    third-party vendor did its job correctly.

10           Secondly, it's not clear that this is, in fact, an

11    attachment to this e-mail because the Bates numbers are not

12    sequential.  They skip one.  And then lastly, it doesn't meet

13    the business records exception.  The Court has already ruled

14    that board minutes don't meet the business record exception as

15    a general rule.  And here in particular it's not recorded

16    contemporaneously or near contemporaneously.  They are trying

17    to introduce a document that was created in November that's

18    reflecting events from August.

19           THE COURT:  Response?

20           MS. SWEENEY:  Your Honor, with regard to the

21    authenticity argument, the witness has testified that he

22    oversaw the process of extraction and of stamping and that he

23    would have received reports of errors, but he received none.

24    So when he confirmed that the document with the government

25    sticker was the same as the document preserved by the vendor,

Gregory Finch - Direct

1    he has established that full chain.

2          With regard to the business records, he testified

3    about his personal knowledge of the creation and the fact that

4    these notes were kept and maintained, and it was part of his

5    job function as his testimony came.

6          THE COURT:  The objections will be overruled.

7          In addition to what Ms. Sweeney noted about the

8    testimony of Mr. Finch in regard to the third-party vendor and

9    how he oversaw that and didn't receive any notifications of

10   errors, he testified that the assistant secretary kept

11   contemporaneous notes during the board meeting.  And then later

12   from what he described as a transcribed copy, the board minutes

13   were then formalized at a later time, namely before the next

14   board meeting, and that Mr. Finch was responsible for the

15   process of those being stored thereafter.

16         He also testified that the board meeting minutes are

17   kept in the regular course of business.  I find that those

18   board meeting minutes are -- have indicia of reliability to

19   them because that is the nature of board meeting minutes, and

20   as a result, I will admit Exhibit 900.

21         At this time we are past 5:00 o'clock and we'll go

22   ahead and recess for the day.

23         Mr. Finch --

24         MR. LAVINE:  Your Honor, may I be heard?  I apologize,

25   Your Honor, but Mr. Finch comes from Claxton, Georgia.

Gregory Finch - Direct

623

1        THE COURT:  That's what I was worried about.

2        MR. LAVINE:  We are talking about bringing him back

3   for, what, five, eight minutes on Monday.

4        THE COURT:  Well, normally we just are not going to do

5   that because when we do that, this will then happen all the

6   time.

7        Ladies and gentlemen, do you have -- can you do

8   another eight minutes to get him done?  Okay.  We will do it

9   here, but normally we will not.  But yeah, I appreciate that,

10  especially since we are not going to have court tomorrow.  So

11  let's try to expedite this and wrap Mr. Finch up so he can go

12  home and not have to come back on Monday.

13  BY MS. SWEENEY:

14  Q.  Mr. Finch, I would like to direct your attention to Tab 36

15  which is government Exhibit 9143.

16        Mr. Finch, do you recognize this document?

17  A.  I do.

18  Q.  Very generally what is it?

19  A.  It's a press release.

20  Q.  Do you have personal knowledge of how this document or

21  documents like this are prepared?

22  A.  This particular document, yes.

23  Q.  How about documents like this?

24  A.  Sometimes -- we don't do press releases very often in a

25  privately held company, but when press releases are done, at

Gregory Finch - Direct                                                624

1   times I am involved with that, but not always.

2   Q.  I would like to direct your attention to Tab 18, which is

3   Government Exhibit 1508.

4          Mr. Finch, do you recognize this document?

5   A.  I do.

6   Q.  Generally what is it?

7   A.  This appears to be the pricing model as approved for

8   calendar year 2013 for -- let's see -- KFC.

9   Q.  When you say as approved, why do you say that?

10  A.  Because the document's executed.

11  Q.  By executed, what are you referring to?

12  A.  A signature by Mr. Brady and a signature by what looks like

13  Mike Ledford.

14  Q.  Are you familiar with these types of documents?

15  A.  Yes.

16  Q.  How are you familiar with these types of documents?

17  A.  Because I'm involved with the costing and pricing of our

18  products to KFC.

19  Q.  And are these types of documents prepared in the regular

20  course of business?

21  A.  Yes.

22  Q.  And are they created at or near the time of the information

23  contained in the document?

24  A.  Yes.

25  Q.  Are you familiar with how these types of documents are kept

Gregory Finch - Direct                    625

1    and maintained?

2    *A.*   Yes.

3    *Q.*   And are they kept and maintained in the regular course of

4    business?

5    *A.*   Yes.

6    *Q.*   For what purpose?

7    *A.*   We keep contract information on file.

8    *Q.*   And why do you keep contract information on file?

9    *A.*   Well, we may have to refer back to it at some point in time

10   and we need to keep that record on file.

11        *MS. SWEENEY:*   The government now moves into evidence

12   Government's Exhibit 1508.

13        *THE COURT:*   Any objection to the admission of 1508?

14        *MR. KORNFELD:*   Your Honor, I don't object to it.   I

15   think the foundation has been laid.   However, I think it's

16   incomplete.   I believe there was an e-mail that it was attached

17   to which is Government's 3001 and I would ask that the complete

18   document be introduced, but we don't have an objection to this.

19   It's just incomplete.

20        *THE COURT:*   I am going to admit Exhibit 1508 at this

21   time and then we can deal with the e-mail to which it may have

22   been attached at some point in time at another time.   Anything

23   else?

24        *MS. SWEENEY:*   At this point the government has no

25   further questions.

Gregory Finch - Cross

1          THE COURT:  Thank you.

2          Cross-examination of Mr. Finch?

3          MR. KORNFELD:  Just very briefly, Your Honor.

4                       **CROSS-EXAMINATION**

5    BY MR. KORNFELD:

6    Q.  Mr. Finch, just a couple questions so we can get you home

7    and the jury home.

8          You talked about e-mails in general and testified

9    about the time zones.  Am I correct in understanding that the

10   time zones of Claxton e-mails will always be expressed in

11   Eastern Standard Time regardless of where the sender is?

12   A.  Well, typically those are from where the sender is, so --

13   and it depends on what device the sender is using.  So if the

14   sender is using a cellphone that has the setting to where the

15   time and date automatically update when they go to a new time

16   zone, then the date stamp and time stamp on that e-mail on that

17   device is going to be wherever they are.  So if I sent one

18   today, for instance, it's going to be approximately 5:10 or

19   whatever time it is Mountain Time, okay?

20         On our server it's going to say Eastern Time because

21   that's the way the Microsoft cloud works.  So most laptops are

22   set to where they stay with wherever they are from, right?  So

23   if the laptop is in Eastern Time, they are not set like phones

24   to automatically update typically as a general rule.  The

25   default setting from the software that operates that laptop,

Gregory Finch - Cross

1   you know, says don't change the time and date and zone when you

2   move around.

3   Q.  Got it.  And the same is true on the recipient side.  It

4   depends on where they are and what their setting is.

5   A.  Correct.

6   Q.  But at the server at Claxton it would be expressed as

7   Eastern Standard Time.

8   A.  Correct.

9   Q.  You talked about using a third-party vendor for the

10  production of documents both to the Department of Justice via

11  Grand Jury subpoena and also production in other matters.  Was

12  that third-party vendor Consilio?

13  A.  Yes.

14  Q.  And essentially you described the process, but basically

15  once you engaged Consilio, Consilio kind of took care of the

16  process, right, and ultimately produced the documents?

17  A.  Correct.

18  Q.  And finally, to the last document that got in, the binder

19  in front of you, you have reviewed all those documents,

20  correct?

21  A.  Correct.

22  Q.  There is approximately 35 to 40 exhibits give or take?

23  A.  Fair.

24  Q.  And it's true, is it not, that there are several examples

25  where there are e-mails that reflect or suggest there is an

1    attachment, but the attachment is missing, right?

2    *A.*  Yes.

3    *Q.*  And there is at least one by my count where there is an

4    attachment without the parent e-mail.  Is that consistent with

5    your review of the documents?

6    *A.*  Yes.  I found one that had -- I believe it was one that did

7    not have the parent.  I found several that had multiple

8    attachments.  Where there was only one attachment in this

9    document, I found others where there was an attachment and it's

10   not in the binder.

11   *Q.*  And to your knowledge, did you through corporate counsel

12   make that information available to the government?

13   *A.*  Yes.

14           *MR. KORNFELD:*  Thank you, sir.

15           *THE COURT:*  Additional cross-examination of Mr. Finch?

16           Redirect?  None?

17           *MS. SWEENEY:*  None, Your Honor.

18           *THE COURT:*  Hang on for just a second.  I am going to

19   dismiss the jury, but it looks like you might make your flight.

20           Ladies and Gentlemen of the Jury, I am going to excuse

21   you.  As was just mentioned, we are not going to have court

22   tomorrow, okay?  I am going to give you right now the schedule

23   for November because when you come back on Monday, it's

24   November 1st.

25           The week of November 1st will be a full week, okay,

1    all the way Monday through Friday.  The next week November 8th,

2    the Thursday the 11th is Veteran's Day.  That's a federal

3    holiday.  We won't have court then.  We will have court the

4    next day, Friday, November 12, all right?  Next week,

5    November 15, we will have trial Monday through Thursday, won't

6    have trial on the 19th.  The next week November 22nd, that's

7    the week of Thanksgiving.  As I mentioned to you, we will have

8    trial 22nd through the 24th, not Thanksgiving, not the Friday

9    after Thanksgiving.  The next week, the week of November 29,

10   that's going to be a strange week, one trial day, Monday the

11   29th.

12            December, I will talk to you about that later, but

13   basically we have two pretty full weeks.  I might as well tell

14   you now.  December 6, the week of December 6, we won't have

15   trial on that Friday the 10th.  The week of December 13th, we

16   will have a full week of trial, five days.  And then Tuesday

17   the 21st of the next week is the scheduled last day, okay?

18            Keep all those admonitions in mind, ladies and

19   gentlemen, over the course of the weekend.  Don't be tempted to

20   tell your people at home anything more than I told you at the

21   beginning.  Don't look stuff up.  If you want to go to work

22   tomorrow or work over the weekend or do whatever you want, of

23   course, that's totally up to you, all right?  Have a good next

24   three days.  See on you on Monday.  The jury is excused.

25            (Jury excused.)

630

1          THE COURT:  Please be seated except for Mr. Finch.

2          Mr. Finch, you are excused.  Thanks very much.

3          We only have about 10 minutes before we need to

4    recess.  Anything before we do?

5          MR. McLOUGHLIN:  Your Honor, there is one matter we

6    need to give you notice of.  There is one matter, Your Honor,

7    we want to give you notice of.  It took us a few days because

8    of the amount of work we all have to do, but it appears that on

9    October 21st and October 26 the government produced text

10   messages between Agents Koppenhaver and Taylor.

11         THE COURT:  Who?

12         MR. McLOUGHLIN:  Special Agent Taylor and Agent

13   Koppenhaver.  These text messages date for a fairly lengthy

14   period in and around the Indictment, thereafter and relate to

15   the investigation.  I think it is fair to say that a

16   significant number of these are inappropriate and raise issues

17   with respect to their conduct and the conduct of the

18   investigation.

19         We are not asking Your Honor for any relief right now.

20   We have written to the government today to ask for additional

21   information.  It appears from the tone of the messages that it

22   suggests that there may be others that have not yet been

23   produced, but we are waiting until we get additional

24   information from the government.  We think they are clearly

25   *Brady*.  We think they should have been produced before the

631

1   *James* hearing because they would go to Special Agent Taylor's

2   credibility and the issues he testified to at the *James*

3   hearing.

4        So we have asked the government for an immediate

5   response and information.  We may be back to the Court as early

6   as Monday with a request for relief depending on what

7   information the government provides, but we want it on the

8   Court's radar because at this point it's difficult to assess

9   the significance of the issue, but we do believe it is

10  potentially significant.

11       *THE COURT:*  Okay.

12       *MR. McLOUGHLIN:*  Thank you, Your Honor.

13       *THE COURT:*  Thank you, Mr. McLoughlin.

14       Anything else really quick?

15       All right.  Hope you all have a good weekend.  The

16  Court will be in recess.

17            (Recess at 5:16 p.m.)

18

19

20

21

22

23

24

25

1                          INDEX

2    WITNESSES

3       Melissa Sandoval

4            Direct Examination Continued By Ms. Rogowski      417

5       Matthew Bunch

6            Direct Examination By Ms. Butte                   421

7            Cross-examination By Mr. Pollack                  433

8       Carolyn Arens

9            Direct Examination By Ms. Butte                   437

10           Cross-examination By Ms. Prewitt                  441

11      Stephen Gresch

12           Direct Examination By Ms. Butte                   449

13           Cross-examination By Ms. Prewitt                  460

14      Bill Kent

15           Direct Examination By Ms. Rogowski                468

16           Cross-examination By Mr. Pollack                  481

17           Cross-examination By Ms. Henry                    485

18           Cross-examination By Mr. Fagg                     486

19           Cross-examination By Mr. Tubach                   487

20           Redirect Examination By Ms. Rogowski              489

21      Robert Hood

22           Direct Examination By Ms. Rogowski                493

23           Cross-examination By Ms. Johnson                  515

24           Redirect Examination By Ms. Rogowski              519

25

1                        INDEX (Continued)

2      Lumaker Challa

3          Direct Examination By Ms. Rogowski          523

4          Cross-examination By Mr. Fagg               535

5          Cross-examination By Mr. Canty              541

6          Redirect Examination By Ms. Rogowski        544

7      Sean King

8          Direct Examination By Ms. Rogowski          548

9          Cross-examination By Mr. Canty              556

10         Redirect Examination By Ms. Rogowski        557

11     Theodore Sangalis

12         Direct Examination By Ms. Rogowski          560

13     Stewart Ward

14         Direct Examination By Mr. Koenig            578

15         Cross-examination By Mr. Pollack            597

16     Gregory Finch

17         Direct Examination By Ms. Sweeney           599

18         Cross-examination By Mr. Kornfeld           626

19

20

21

22

23

24

25

1                              INDEX (Continued)

2                                 EXHIBITS

3    Exhibit       Offered   Received   Refused   Reserved   Withdrawn

4    572                      572

5    900                      622

6    1104                     572

7    1105                     572

8    1226                     573

9    1508                     625

10   1524                     573

11   1525                     573

12   1529                     573

13   1530                     573

14   1531                     573

15   1583                     574

16   1584                     574

17   1825                     574

18   1826                     574

19   3028                     572

20   9166                     577

21   9168                     577

22   9504                     577

23   9505                     577

24   15322                    573

25

1                        REPORTER'S CERTIFICATE

2        I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above-entitled matter.   Dated

4   at Denver, Colorado, this 18th day of January, 2022.

5

6                                S/Janet M. Coppock

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25