IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-CR-00152-PAB

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

JAYSON JEFFREY PENN,
MIKELL REEVE FRIES,
SCOTT JAMES BRADY,
ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,
WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,
WILLIAM WADE LOVETTE,
GAR BRIAN ROBERTS,
RICKIE PATTERSON BLAKE,

     Defendants

_____

REPORTER'S TRANSCRIPT
Trial to Jury, Vol. 18
_____

        Proceedings before the HONORABLE PHILIP A. BRIMMER,

Chief Judge, United States District Court for the District of

Colorado, commencing at 11:42 a.m., on the 19th day of

November, 2021, in Courtroom A201, United States Courthouse,

Denver, Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Janet M. Coppock, 901 19th Street,
Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                              APPEARANCES
 2           Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3   Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
 4   Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
 5   for Plaintiff.
 6           Anna Tryon Pletcher and Michael Tubach of
 7   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 8   San Francisco, CA 94111-3823;
 9           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10   N.W., Washington, DC 20006, appearing for Defendant Penn.
11           David Beller, Richard Kornfeld and Kelly Page of
12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13   CO 80202, appearing for Defendant Fries.
14           Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16            Laura Kuykendall and Megan Rahman of Troutman Pepper
17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18   appearing for Defendant Brady.
19           Michael Felberg of Reichman, Jorgensen, Lehman,
20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21   10017;
22
23
24
25
```

1          APPEARANCES (Continued)

2              Laura F. Carwile of Reichman, Jorgensen, Lehman,

3     Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4     CA 94065; appearing for Defendant Austin.

5              Elizabeth B. Prewitt of Latham & Watkins, LLP,

6     555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7              Marci Gilligan LaBranche of Stimson, Stancil,

8     LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9     80218, appearing for Defendant Mulrenin.

10              James A. Backstrom, Counselor at Law, 1515 Market

11     Street, Suite 1200, Philadelphia, PA 19102-1932;

12              Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13     Bethesda, MD 20814, appearing for Defendant Kantola.

14              Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15     Street, Suite 1100, Los Angeles, CA 90017;

16              Dennis J. Canty, Canty Law Corporation,

17     1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18     appearing for Defendant Little.

19              John Anderson Fagg, Jr. and James McLoughlin of

20     Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21     Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

```
 1              APPEARANCES (Continued)

 2         Craig Allen Gillen and Anthony Charles Lake of

 3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

 4    Atlanta, GA 30339;

 5         Richard L. Tegtmeier of Sherman & Howard, LLC,

 6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

 7    for Defendant Roberts.

 8         Barry J. Pollack of Robbins, Russell, Englert, Orseck

 9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10    DC 20006;

11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12    5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13    for the Defendant Blake.

14

15                   PROCEEDINGS

16         THE COURT:  We are back on the record in 20-CR-152.

17    The jury is not present.  We are meeting on a -- I don't know

18    if you call it a special session, but the expansion of this

19    case to a 33-day trial potentially.  And my rosy prediction

20    about the length of the 10:00 o'clock has obviously been proven

21    false.  But we have just a little bit of time, might as well

22    use it since we are all here.  So where do we want to pick up

23    at this time?

24         Ms. Henry?

25         MS. HENRY:  Your Honor, I need to correct a
```

1   misstatement I made in court yesterday.  I made a reference to

2   Mr. Torzilli that was incorrect.  I went back on November 8th.

3   There was a discussion with regard to the testimony of Telly

4   Smith where it was sought to put a toll record side by side

5   with one of the texts.  There was an objection that it was a

6   mini closing argument.  The Court did sustain that objection.

7   It did not involve Mr. Torzilli, and I apologize for bringing

8   him into it.

9        The issue did come up again in the testimony of

10  Mr. Ledford about displaying two things side by side and the

11  Court did hold that it was argumentative.  Again, it did not

12  relate to Mr. Torzilli, and I wish to apologize to him.

13       Separately, we found an article that was published by

14  the American Bar Association that dealt with the exact same

15  issues that we are grappling with here today and we thought it

16  might be helpful.

17            THE COURT:  Sure.

18            MS. HENRY:  With permission?

19            THE COURT:  Yes.  Mr. Keech can hand that up.

20            MS. HENRY:  Thank you, Your Honor.

21            THE COURT:  Mr. Beller, go ahead.

22            MR. BELLER:  Thank you, Your Honor.  I hope the Court

23  will indulge me and just lay a couple of foundation -- or set

24  the table, so to speak, before we pick up on where we had left

25  off yesterday.  And my hope is that that will assist in

1   streamlining ongoing objections as we move forward.

2        Your Honor, one of the Court's concerns that was

3   raised yesterday is that the Court has ruled on the admission

4   of these particular exhibits under F.R.E. 1006.

5        THE COURT:  That's not totally true.  The defendants

6   keep neglecting to mention 611.  611 is a very important piece

7   of the puzzle because in *Renteria* and *Ray* that was a

8   foundational aspect to it, so those really have to be

9   considered together.

10       Sorry to interrupt.  Go ahead.

11       MR. BELLER:  Not an interruption at all.  I am happy

12  the Court raised that because that is something I also wanted

13  to address.  Your Honor, I would call the Court's attention,

14  however, to the Court's order on defendants' Docket No. 529.

15  The Court's order is at 603.  Your Honor, this is the limine

16  issues and the Court's order on the limine issues.

17       One of the things the defense has raised or have

18  raised was whether or not the Superseding Indictment would be

19  sent back to the jury.  The Court in ultimately finding that it

20  should not go back to the jury indicated there is no reason to

21  provide the Indictment to the jury, but there is a reason not

22  to, namely the danger of unfair prejudice given the

23  argumentative nature of the Indictment.

24       With that as a background, I would note for the Court

25  that the Government's Exhibit 1-1, which is Church's freezing

1    charge, is almost verbatim Paragraph 66 through 70 of the

2    Indictment.   Chart 2-1, which is Church's QA issues, is again

3    almost identical to the Superseding Indictment, Paragraphs 77

4    through 83.   Exhibit 3-1 and 9-1 are almost identical to

5    Paragraphs 84 through 86.   And when I say almost identical, my

6    intention is not to mislead the Court.   There are some slight

7    differences amongst those including the deletion of limited

8    information and inclusion of others.

9         Exhibit 4-1, almost identical at 108 through 112.   5-1

10   is Pollo Tropical, and as the Court knows, that was not in the

11   Superseding Indictment.   7-1, virtually identical to Paragraphs

12   136 through 143.   8-1, Paragraphs 127 and 128.   10-1,

13   Paragraphs 87 through 98.   10-2, Paragraphs 99 through 100.

14   10-3, Paragraphs 101 through 107.

15        Just a handful more, Your Honor.

16        THE COURT:   Sure.

17        MR. BELLER:   14-1, Paragraphs 51 through 53.   14-2,

18   Paragraphs 54 through 57.   14-3, Paragraphs 58 through 63.

19   16-1, Paragraph 64 through 65.   17-1, Paragraph 71 through 76.

20   18-1, Paragraphs 129 through 135.   18-3 is not in the

21   Indictment.   20-1 is identical without exception to Paragraphs

22   117 through 119.

23        So what we do have is at least if, in fact, the

24   Superseding Indictment is argumentative, it is my opinion that

25   the summary charts are equally as argumentative, Your Honor.

1    Coupled with that or overlaid and that is limiting

2    instructions.  And I appreciate that the government spent some

3    time either last evening or this morning trying to embed some

4    of the limiting instructions into the charts themselves.

5          Your Honor, it is my belief twofold.  No. 1, that what

6    the government is doing is requesting an advisory opinion here,

7    which I would urge the Court to not grant an advisory opinion

8    and instead deny the admission of either the originally

9    tendered exhibits or the newly tendered exhibits that include

10   the limiting instruction.  And I would draw the Court's

11   attention to a simple legal principle, and that is even where

12   only portions of an underlying source material constitutes

13   improper hearsay, those defects may be imputed to the summary

14   exhibit as a whole.

15         And for that proposition I would call the Court's

16   attention to *Peat, Inc., v. Vanguard Research, Inc.,* 378 F.3d

17   1154.  Your Honor, that's an Eleventh Circuit case out of 2004.

18   There is also a 10th Circuit case that touches upon this same

19   issue that the Court is likely aware of, and that is *U.S. v.*

20   *Irvin,* 682 F.3d 1254.  That is a 2012 case, Your Honor.

21         Our concern, of course, as the Court is aware, is that

22   the admission of the summary exhibits are more than just

23   restatements that highlight certain information.  These are

24   argumentative and it's allowing the government to make two

25   closing arguments.

1          Now, that goes directly to I think what the Court has

2     raised with me which is Federal Rule of Evidence 611(a).  In

3     611(a), of course, a chart that is a pedagogical chart, which

4     is an educating chart or teaching chart, can be more sided or

5     one-sided in the presentation of relevant evidence.  But in

6     that case there is a concern and we need to have further

7     discussion whether that should ultimately be tendered into

8     evidence as substantive evidence as opposed to having a

9     limiting instruction.  And I think the Court has indicated a

10    willingness for a limiting instruction such that the charts are

11    intended only to aid the jury in its evaluation of evidence,

12    but they are not in and of themselves evidence.

13         THE COURT:  I agree with you, Mr. Beller, and that

14    kind of came up when Mr. Tubach yesterday made that point about

15    how would they come in.  I think -- of course the government

16    has cited to a 10th Circuit pattern instruction, I forget which

17    one it is, maybe it's 4.11 -- but I think that there is

18    authority for the proposition that the summary could not be

19    considered in and of itself as substantive evidence, but only

20    as to the -- but that the cited exhibits are the evidence.  So

21    in effect I think it would be analogous to a demonstrative

22    that's allowed to go back.  Sorry to interrupt once again,

23    Mr. Beller.

24         MR. BELLER:  No, not at all, Your Honor, although I

25    would not agree that it necessarily needs to go back.

1          THE COURT:  Well, that would be a question.  I think

2     some courts have ruled that they can go back, but not that I'm

3     ruling on that issue now, but I think that like in *Renteria* and

4     *Ray*, I think they did go back.  But there still would appear to

5     be the law and the cases cited in the 10th Circuit pattern

6     instruction as well would suggest that a limiting instruction

7     accompanied the exhibits.

8          MR. BELLER:  I agree.  And for purposes of an

9     appellate record that hopefully isn't needed, and that is a

10    clear delineation in terms of what we're arguing as to whether

11    we are talking about 611(a), 1006, or some hybrid of the two.

12    And I certainly understand the Court's analysis and I

13    appreciate the Court directing me toward 611(a) without

14    necessarily indicating that that is exclusive of the Court's

15    order.

16          With that said, under the analysis of either rule,

17    Your Honor, I believe that the hearsay issues and the

18    inadmissibility of some of those hearsay issues ultimately

19    cannot be cured through these summary charts, either through

20    611(a) or 1006, and certainly we can analyze them on a

21    chart-by-chart basis as we are going through them.  The Court

22    has mentioned *Renteria*.  I believe one of my colleagues also

23    wishes to address *Renteria*, but I appreciate the Court letting

24    me at least set the table.

25          THE COURT:  We have got five minutes, so *Renteria* can

1    be encapsulated in five minutes.

2          Ms. Pletcher?

3          *MS. PLETCHER:*  Thank you, Your Honor.  I will do my

4    best to cover *Renteria* in five minutes.

5          The touchstone set out in *Renteria* was that the

6    summary chart needs to aid the jury in ascertaining the truth.

7    And what I would like to do is compare the summary charts that

8    were admitted in *Renteria*.  We dug those up and I can bring

9    them up to the Court and the government and compare those to

10   the summary charts being offered in this case.  It might take

11   more than five minutes, but maybe I can hand them out now and

12   maybe we can continue the discussion.

13         *THE COURT:*  Sure.

14         *MS. PLETCHER:*  Just to set the stage for what I would

15   like to do when we come back and comparing these to the summary

16   charts that are offered in this matter, these charts in

17   *Renteria* had a few unique characteristics that are very

18   different to what we are seeing here.

19         First, there is a separate summary chart offered for

20   each defendant, which is not the case in the summary charts

21   that are at issue here.  Second, these summary charts were

22   based on documents that had been admitted as business records.

23   And third, there were no limiting instructions requested or

24   even offered with respect to the summary charts in *Renteria*.

25         Those are the three main points that I would like to

1   compare to our summary charts.  And when we come back, what I

2   would like to do is pull up some of our summary charts and kind

3   of walk through the comparison, so that's the plan.  Sound

4   good?

5           THE COURT:  Yes.  Two minutes to take on one of those.

6           MS. PLETCHER:  Great.  I would like to start with the

7   summary chart 14-1.

8           THE COURT:  All right.

9           MS. PLETCHER:  And the first entry on summary chart

10  14-1 -- I am sorry, it's 14-3.  It's 14-3.  The first entry on

11  14-3 is an excerpt from an e-mail based on the underlying

12  Exhibit 1544.  And I would like to hand up to the Court 1544.

13          THE COURT:  Sure.

14          MS. PLETCHER:  The excerpt from -- so 1544 is an

15  e-mail and it's a lengthy e-mail.  It's two pages long.  The

16  excerpt that appears in the summary chart is highlighted,

17  should be highlighted in the Court's copy and the defense copy.

18  It's an excerpt from the end of the first paragraph on the

19  first page that says "I will also be having some other

20  discussions today to get the pulse."

21          If we compare that selective choice of one sentence

22  from a very lengthy e-mail and compare that to what we see in

23  *Renteria*, the differences are very clear.  In *Renteria*, again

24  the summary chart was based off of business records that had

25  previously been admitted.  This summary chart, so this e-mail

1    although it's an e-mail is certainly not a business record.

2          The second point is there are clearly some choices

3    made by the government as to the relevance and import of this

4    particular statement that was chosen again from a two-page long

5    e-mail.  In *Renteria* we see it's just very neutral information

6    taken from a business record, and even from a UPS record that

7    just indicates transactional data, transactional information

8    that has very little subjectivity to it.

9          And the very clear contrast for this particular

10   statement, "I will also be having some other discussions today

11   to get the pulse," is of a highly argumentative nature of

12   selecting one single statement from a lengthy e-mail, taking it

13   out of context to make an argumentative point to the jury, very

14   different than what we are seeing with the *Renteria* chart.

15         THE COURT:  Maybe we will break there unless you

16   wanted to follow up more on that particular point.

17         MS. PLETCHER:  That's a good place to stop.

18         THE COURT:  Ms. Call, go ahead.

19         MS. CALL:  Your Honor, just briefly, I am trying to

20   figure out how to most efficiently use the Court's time here.

21   If defendants are going to be raising new law articles and

22   evidence from other cases, and when I say new, I think almost

23   all of this is from 2012 or earlier, it may make sense to do a

24   motion for reconsideration on the paper so the government has

25   an opportunity to respond.

1          THE COURT:  I don't think we would really have that

2     opportunity.  I think that what we need to figure out once we

3     reconvene at 3:00 is whether the table has been set or whether

4     the table cloth has been successfully yanked out and left all

5     the -- everything in place.  What we need to do is use our time

6     efficiently to be able to get through it.  That was the purpose

7     of today.  So what we have to do is figure that out.  And

8     right, we were going through it systematically.

9          I think we need to do that so we can make a record as

10    to each one.  I would suggest that we focus on that first.  And

11    if there is a way to more efficiently do that by incorporating

12    previous objections, whatever, I think that that certainly has

13    to be something that we check off our list today.  And then

14    perhaps if we have time after that to make the more general

15    points that Ms. Pletcher was just making perhaps illustrated by

16    certain exhibits, then that's fine too.  But I do think we need

17    to make the record on each individual summary chart as part of

18    what we do today.  That should be high on the list.

19          MS. CALL:  That sounds reasonable, Your Honor.

20          THE COURT:  Any additional thoughts before we break?

21          All right.  So as I said, I have got a 1:30 hearing.

22    I need to get ready for that now.  I won't predict how long

23    that's going to last, but it may not take quite as long.  And

24    because I am going to essentially pull the plug on that trial,

25    I think I am probably going to be ready by 2:30.  If you wanted

1    to reconvene at 2:30, I think we can do that.  So if that's

2    agreeable with everyone, why don't we plan on 2:30, and I will

3    endeavor to make sure that I am ready to go at that time, okay?

4         All right.  We will be in recess, then, until 2:30.

5    Thank you.

6         (Recess at 12:03 p.m.)

7         (Reconvened at 2:36 p.m.)

8         THE COURT:  Thank you.  Please be seated.  We are back

9    on the record in 20-CR-152.  There has been a change since we

10   were last in court.  And Ms. Call, I will let you provide what

11   information you wish regarding that particular issue.  And let

12   me just say we are disconcerted to see you don't have a mask

13   on.  We are used to seeing people with masks on, but now by VTC

14   you don't have to wear one.

15        Go ahead.

16        MS. CALL:  Yes, Your Honor.  Can you hear me all

17   right?

18        THE COURT:  Yes.

19        MS. CALL:  The government did confer with the parties

20   and sent them updates via e-mail over the lunch hour as well.

21   But just for the record, a member of the government's team did

22   test positive via rapid test result at some point today.  The

23   government counsel found out during the lunch hour and notified

24   the Court and the parties as soon as possible.  The government

25   was directed by our management not to return to court this

1    afternoon, so we are appearing remotely.  And we are not

2    wearing masks, but we are all in offices with closed doors at

3    the moment.

4         THE COURT:  Okay.  And I think we will have to rely

5    probably on the defense to be able to put exhibits up or things

6    of that nature if we need to, but, of course, I think everyone

7    has a copy of the summary exhibits, so we should be able to

8    figure out a way to muddle through on things, okay.

9         Did both sides have an opportunity to discuss what may

10   be the best approach for our time this afternoon?  And if so,

11   what is that proposal?

12        MR. TUBACH:  Yes.  The suggestion was just start with

13   5-1 -- I think that makes sense -- and just march through.

14        THE COURT:  Okay.  Let's do that.

15        So we had some argument on 5-1.  I am not sure we

16   ended.  Anyone have anything else 5-1?

17        Okay.  Mr. Byrne?

18        MR. BYRNE:  I am pretty sure we finished it.  Are you

19   talking about the old 5-1 or the new 5-1?

20        THE COURT:  I have not seen the new ones.

21        MR. BYRNE:  So 1-1 through 5-1, we got new ones this

22   morning.

23        THE COURT:  I didn't get new ones, so I am unaware of

24   those.

25        MR. BYRNE:  I don't know if I have an extra copy.

 1              MR. TUBACH:  I think we have extra copies we can

 2    provide the Court.

 3              MR. BYRNE:  We were sent these new ones under the

 4    theory -- and the government can weigh in on this -- but that

 5    was going to fix the issues that were addressed yesterday.

 6    And, of course, we don't think they do fix it, but that's a

 7    different issue.

 8              Your Honor, I do have a set, if I could give it to the

 9    clerk.

10              THE COURT:  Absolutely.  Mr. Keech will hand them up.

11    Thank you, Mr. Byrne.

12              MR. KOENIG:  Your Honor, this is Mike Koenig.  Could

13    you please ask defense counsel to speak at a microphone because

14    it's really hard to hear.

15              THE COURT:  Yes.  We will do so.

16              MR. KOENIG:  Thank you.

17              THE COURT:  Okay.  My suggestion -- so I will ask

18    Mr. Koenig, Mr. Koenig, were the summary exhibits that were

19    redone overnight limited to those that we discussed yesterday?

20              MR. KOENIG:  Yes.  We didn't want to go through all of

21    them if Your Honor and defendants didn't agree with the

22    approach.  So we thought it made more sense just to do those,

23    and then if that approach is fine, then we can go through the

24    rest or however you would like deal with the rest.

25              THE COURT:  Why don't we do this, then.

1           Well, let me get the defendants' position on whether

2    the redone exhibits, which probably is it true, Ms. Call and

3    Mr. Koenig, that the changes had to do with how various

4    limiting instructions were communicated through the exhibits?

5           *MS. CALL:*  Yes, Your Honor.  I believe there is two

6    primary changes, the first being how the limiting instructions

7    were conveyed which removes the asterisks that had previously

8    appeared and instead for any exhibit, and I perhaps should more

9    properly say for any particular e-mail to which a limiting

10   instruction applied, that has been added in italics in the

11   excerpt portion, but also within brackets to make it clear that

12   it is not an excerpt of the actual document.

13          The second change I will note is that the references

14   to King testimony have been removed as discussed on the record

15   yesterday.

16          *THE COURT:*  I am sorry, what was that last part, the

17   reference to what?

18          *MS. CALL:*  The reference to King testimony was the

19   time zone change.  That has been removed.

20          *THE COURT:*  Why don't we talk about first thing those

21   changes that Ms. Call just discussed to the exhibits that we

22   talked about yesterday.

23          Go ahead, Mr. Kornfeld.

24          *MR. KORNFELD:*  Your Honor, while we appreciate the

25   government's efforts, the problems aren't solved.  For

1    instance, in Government Exhibit 1-1 toward the bottom, the

2    second entry from the bottom, it says, "This statement may only

3    be considered against Defendant Little."  The legal

4    implication, of course, is that it is inadmissible against the

5    nine other defendants.

6           Same thing happens, for example, on Exhibit 3-1 where

7    at the top there is the Mulrenin e-mail, and then

8    parenthetically consistent with the Court's limiting

9    instruction it says, "This statement may only be considered

10   against Defendant Mulrenin," and therefore not against the

11   other nine.  And not to reiterate my colleague Mr. Beller's

12   argument yesterday, but it's the same problem, that we're

13   putting in evidence that is inadmissible against in those two

14   examples nine other defendants, and I don't think -- you know,

15   that would not otherwise come in against them normally because

16   it is inadmissible against them.

17          So I am concerned in my case on behalf of Mr. Fries,

18   but I know my colleagues share their concerns on behalf of

19   their clients, that this doesn't cure the prejudice because you

20   are putting in front of the jury and not only putting before

21   the jury, but essentially highlighting, literally highlighting

22   in green and on a, you know, a written government exhibit

23   evidence that is by law inadmissible against again in these two

24   examples nine out of the 10 defendants.  So for those reasons

25   and among all the other reasons we articulated yesterday and I

 1    don't need to repeat, we would continue to object.

 2              THE COURT:  Mr. Byrne, if you can go to a microphone.

 3              MR. BYRNE:  Just to elaborate on that a little bit

 4    more, and this may apply to just Defendant Little, but I see,

 5    for example, on 2-1 it applies probably to Mr. Mulrenin, but it

 6    says on here that, "This can only be considered against

 7    Defendant Little."  And I would like to change that to "as to

 8    Defendant Little."

 9              THE COURT:  I think I rejected that already.

10              MR. BYRNE:  Did someone else raise that?

11              THE COURT:  The issue did come up before, but I think

12    it's appropriate to say against.

13              MR. BYRNE:  Okay.

14              THE COURT:  Mr. Gillen?

15              MR. GILLEN:  Your Honor, I believe this microphone

16    works back here.  I don't know whether the Court --

17              THE COURT:  Can you tap it?  It seems so.  Can you

18    hear Mr. Gillen, Ms. Call?

19              MS. CALL:  Yes, we can hear you.

20              MR. GILLEN:  Your Honor, I don't know whether the

21    Court is asking for comments confined to 5-1 or the changes

22    that have been made by the government on the charts after

23    yesterday's hearing.  If it's the latter, then I would like to

24    state that our objection that we made to 1-1, specifically to

25    the portion there where it says 6/3, Brian Roberts e-mail, "I

1  want to discuss this before we submit.  I want to understand

2  what the storage expectation is."

3          Our objection at the time, and I am not sure whether

4  the Court made an exclusive ruling on this, about making sure

5  that a declarant's statement is complete in its context, but

6  the argument we made yesterday can be found if we can put up

7  Government's Exhibit 114, if that's possible.

8          THE COURT:  Well, what we were doing right now is

9  simply going over comments on changes made to the exhibits that

10  we talked about yesterday overnight.

11          MR. GILLEN:  And I guess my point would be, and

12  perhaps I have jumped the gun on this, our comments are

13  attributable to the lack of changes they made.  But if we are

14  only dealing with the changes that they made, then I can

15  reserve the comments about their failure to include the portion

16  of the statement attributed to Mr. Roberts in 114 to show what

17  he really meant in the context of what was conveyed by him

18  which was taken out of context in 1-1.

19          THE COURT:  Okay.  We will hold that one.

20          MR. GILLEN:  Thank you, Your Honor.

21          THE COURT:  Additional comments.

22          Mr. Fagg, go ahead.

23          MR. FAGG:  Thank you, Your Honor.  Just briefly to

24  respond or to follow up on Mr. Kornfeld's point, I think that

25  the changes that the government have made really highlight the

1   issue that the defendants have been raising because what the

2   government is seeking to do in 1-1 is to admit that exhibit as

3   to all defendants.  And there are at least two limiting

4   instructions in here that prohibit this evidence from being

5   introduced against those other nine defendants.  And so I think

6   this actually crystallizes the concern that we have in that the

7   government is seeking to integrate into a single exhibit

8   different communications, some of which are not admissible

9   against the other defendants.  And I think it highlights the

10  difficulty of a limiting instruction and, frankly, the

11  limitations that a limiting instruction can have in this

12  instance.

13          THE COURT:  Thank you, Mr. Fagg.

14          Anyone else?

15          All right.  Why don't we get the government's

16  response, then, to the objection that those summary exhibits

17  which contain a statement by a defendant that can be considered

18  only as against -- or some statement that can be considered

19  only against that defendant by appearing in a summary is going

20  to by its very nature seem to apply to the rest of the

21  defendants.

22          Ms. Call?

23          MS. CALL:  Yes, Your Honor.  So I haven't heard of any

24  long comment, and the answer may frankly be that there isn't

25  any, but I don't quite see the prejudice when, first off, the

1    jury is presumed to listen to its instructions.  And here,

2    frankly, in the summary now they have even more of a reminder

3    of the instructions than they would have would they just be

4    looking at the exhibit itself back during their deliberations.

5    So I am not quite sure I see the prejudice.

6            But even more broadly as to, you know, what the

7    purpose is and what the Court has found as the usefulness of

8    these summaries, in ECF-181 the Court already did find that

9    these exhibits will assist the jury in ascertaining the truth.

10   Viewing the content and statements of defendants in context is

11   just as important and just as relevant to ascertaining the

12   truth as it were an 801(d)(2)(E) statement, so I don't believe

13   that statements of defendants just because they are admissible

14   for that limited purpose should be taken out of context on that

15   basis.  And I don't necessarily see a prejudice putting them in

16   context with phone calls that defendant was having or

17   communications of their conspirators around the same time

18   period.

19           MR. KORNFELD:  May I briefly respond?

20           THE COURT:  Well, I don't think you need to.

21           I am going to sustain the objection as to any exhibit

22   that contains a statement of a defendant that can only be

23   considered as against that defendant.  I think the nature of

24   the summary exhibit -- we'll call them summaries -- is that

25   they help summarize and put together associations between or

1    among various evidence.  So if a summary contains a statement

2    that can only be considered against one defendant, but yet

3    appears on an exhibit that has statements of other defendants,

4    the necessary implication to the jury I think, the natural one

5    is that in fact this demonstrates a relationship among all

6    those pieces of evidence.

7         I think it would be very difficult and confusing for

8    the jury to be able to isolate out how, for instance, the

9    statement of Mr. Little on Government Exhibit 1-1 could be

10   considered only against him, but at the same time appears to be

11   associated with lots of other evidence.  So I do think that

12   that would result in the rejection of exhibits that have that.

13   Now, so far, at least among the redone exhibits, I see 1-1 and

14   2-1 and 3-1 have those types of problems.  I am not sure about

15   some of the other ones.

16        All right.  Should we then shift our attention?  I

17   think that Mr. Byrne is correct that we finished 5-1.  Should

18   we now take up the next one?

19        *MR. BELLER:*  Your Honor, as to 5-1, if I may be heard.

20        *THE COURT:*  Yes.

21        *MR. BELLER:*  Your Honor, I would note on 5-1 to

22   reinforce the -- what I am going to say somewhat misleading

23   nature, and first I would note that Exhibit 563 is admissible

24   only against Mr. Little, but in that circumstance we have, "I

25   need 2015 pricing for splits and breasts" from Mr. Little to

1    Mr. Stiller.  And the way this then shows is that Mr. Little

2    calls Mr. Cooper.  So it appears as though based on the way

3    these are arranged, that Mr. Cooper is being called for the

4    purpose of obtaining splits and breasts which I believe is

5    unconsciously misleading.

6            I would note that 528, which is the third entry from

7    the bottom, is a two-page e-mail.  That's an important one.

8    And Mr. Brink was subject to many, many questions regarding

9    this particular e-mail because that's the e-mail in which

10   Mr. Brink explains -- or it's this e-mail string in which

11   Mr. Brink explains that he needs the competitors to match

12   prices for purposes of showing compromise.  That is not

13   included, for example, on the entry on the summary chart.

14           Finally, the next one, which is 9/30 at 1:03 p.m., the

15   importance of that particular e-mail is because that is the one

16   in which pricing differed because Mr. Cooper had indicated a

17   willingness to be able to stair-step Claxton's price.

18           So I point all these out only to perfect the record in

19   terms of what I believe to be not an appropriate summary, but

20   rather a Frankenstein, if you will, of the different exhibits

21   that are cut and pieced together for purposes of creating a

22   narrative that I don't believe actually advances a

23   truth-seeking process.  Thank you.

24           *THE COURT:*  Thank you, Mr. Beller.

25           Mr. Byrne?  If you could go to the podium again just

1    so we can make sure the government can hear you well.

2           *MR. BYRNE:*  So just in line with your ruling a couple

3    minutes ago, the same line that Mr. Beller was just talking

4    about, on 5-1 says, "This statement may only be considered

5    against Defendant Little," so that's the same problem as on the

6    other one.

7           *THE COURT:*  Yes.  As Mr. Beller mentioned, Exhibit 563

8    has that problem.

9           Ms. Call, did you want to address the further -- and

10   maybe we have some more.  Do you have more, Ms. LaBranche, on

11   5-1?

12          *MS. LaBRANCHE:*  This is on 3-1 so I can wait, Your

13   Honor.

14          *THE COURT:*  Why don't we hold off for just a second.

15          Ms. Call, did you want to say anything more as to 5-1?

16          *MS. CALL:*  Very briefly, Your Honor.

17          I heard Mr. Beller's arguments with respect to

18   Exhibit 563 and 500 as summarized on 5-1, although I don't know

19   that I quite heard anything misleading about the portions that

20   are excerpted by the government.  As Your Honor previously

21   found in I believe it was ECF-141, it is entirely proper for a

22   summary or a pedagogical aid under 611 or 1006 to contain

23   evidence favorable to one party.  I don't believe this is

24   misleading in any way.  So I suppose that would just be the

25   response absent having a better understanding of the

1    explanation of how it could be misleading.

2          THE COURT:  Why don't we then move on to the next

3    exhibit.  7-1, I guess?

4          And Ms. LaBranche, we will come back to 3-1.  We are

5    going to loop back around because Mr. Gillen had some

6    additional points on 1-1, but we will come back to 3-1 too.

7          MS. LaBRANCHE:  Thank you, Your Honor.

8          MR. PLUMLEE:  Your Honor, Chris Plumlee for Mr. Blake,

9    if I may address the Court.

10          THE COURT:  You absolutely may.  Go ahead.

11          MS. CALL:  Briefly before Mr. Plumlee speaks, I cannot

12    hear him.

13          MR. PLUMLEE:  Chris Plumlee.  Your Honor, with respect

14    to 7-1, this is -- this particular exhibit contains a number of

15    text messages that are on the -- towards the latter portion of

16    Page 1 and continue throughout the second part of Page 2, and

17    there are approximately eight text messages listed by the

18    government.  In all prior versions of this exhibit, the times

19    of these particular text messages were listed in a different

20    time zone.  And in the most recent version filed with the

21    Court, the government has adjusted the time zone to be UTC

22    time.

23          In supporting the time change, they have cited the

24    testimony of Mr. Gresch and included Mr. Gresch's testimony.

25          THE COURT:  Looks like it got redone.  Mine at least

1    has Eastern time, but...

2             MR. PLUMLEE:  It does say Eastern time, Your Honor.

3             THE COURT:  It used to be UTC.

4             MR. PLUMLEE:  I think it did used to be UTC.  But from

5    what we can tell, it looks like it's been moved up a number of

6    hours, but Mr. Gresch's testimony is listed as the source and

7    the exhibit number on the right side.  And it looks like it was

8    adjusted on the basis of his testimony for UTC.

9             We looked back at Mr. Gresch's testimony.  There is

10   also a declaration that was filed with the Court under

11   Mr. Gresch's name in which he did evaluate an iPhone 8 owned by

12   Carl Pepper which is where these text messages were derived

13   from.  There is nothing in the declaration that cites what the

14   time zone was under which the text messages were derived.

15            Reviewing Mr. Gresch's testimony, he did testify that

16   the e-mails he examined through TransPerfect were adjusted to

17   UTC time.  I would note Ms. Prewitt attempted to examine

18   Mr. Gresch as to the iPhone 8 owned by Carl Pepper.  The

19   government, Ms. Butte specifically, objected that it was

20   improper cross-examination.  The Court sustained the objection

21   and discussed that they did not discuss any mobile device

22   collection during the examination.  We would submit, Your

23   Honor, there has been no testimony as to the basis of time that

24   was the correlation of these particular text messages.

25            I would ask our technology assistant to pull up

1  Government Exhibit 754 and 755.  And as you can see from these

2  two exhibits which are cited, they reflect times of 3:34 on --

3         THE COURT:  Hold on just one second, Mr. Plumlee.

4         Ms. Call, can you see those?

5         MS. CALL:  No.

6         THE COURT:  Do you happen to have the ability to call

7  up exhibits from where you are?

8         MS. CALL:  We should be able to.  I will note that the

9  government laptops aren't amenable as one would hope in pulling

10  up multiple items at once, but I will attempt.  Am I correct it

11  was 744 and 755?

12         MR. PLUMLEE:  754 and 755.

13         And, Your Honor, I would note that the time on these

14  e-mails list 3:44 on each of them.  It's logical to presume

15  that because Mr. Pepper resided in Arkansas, which is in the

16  Central Time Zone, that the most logical inference from that is

17  these were sent at 3:34 Central Time which presumably would

18  correlate to the Eastern Time Zone and could be modified to

19  that time.  So however, what is listed on the government's most

20  current exhibit correlates them to 11:34 a.m. Eastern which

21  would not correlate to such a time change.  That's a four-hour

22  difference by my calculation.

23         So we would submit that this does not support the time

24  zone change that's been applied by the government.  It's

25  misleading in that respect.  And we think that it should, based

 1   on the evidence that's in the record, be at most modified by

 2   one hour in these exhibits.

 3          I would note that there are eight exhibits on these

 4   text messages affected by this testimony:  751, 752, 753, 754,

 5   755, 756, 757, and 758, that we feel would all be affected by

 6   the government's application of Mr. Gresch's testimony which we

 7   feel does not support this modification.

 8          *THE COURT:*  All right.  Thank you.

 9          Ms. Call, did you have a chance to take a look at

10   that?

11          *MS. CALL:*  Yes, Your Honor.  I am still attempting to

12   pull up Mr. Gresch's testimony, but I had reviewed it and I

13   believed it supported that, but we will certainly double-check

14   it.  One thing I will note, I think this goes to the accuracy

15   of the exhibit and not to whether it is misleading, although I

16   understand the point made by counsel.  However, I will need to

17   review Mr. Gresch's testimony in more detail and get certainty

18   on that.

19          And one thing I did want to note for Your Honor

20   regarding your ruling regarding statements admissible under

21   801(d)(2)(A) is that the government would seek to amend the

22   summary exhibits containing statements of that nature to remove

23   them based on that.

24          *THE COURT:*  If we do something like that, it's going

25   to have to be accomplished fast.  If it's just a deletion, I

 1   think we can take it up, but there may be other exhibits that

 2   might change in some fundamental way.  Nothing could be added.

 3   But if something could be deleted and the exhibit otherwise

 4   stay the same, then there is at least that possibility, but I

 5   doubt we would be able to take it up today unless it is simply

 6   the deletion of that particular testimony.

 7           MS. CALL:  Yes, Your Honor.  That would be the

 8   government's intention, simply to remove those entries.

 9           THE COURT:  Okay.  So in making -- in considering

10   those exhibits that have that problem, I believe that the

11   government is proposing, then, that that line, that testimony

12   simply be deleted and the Court then consider the exhibit with

13   that deletion.  But why don't we focus more on Mr. Plumlee's

14   point.

15           And Ms. Call, is what you are asking is that we maybe

16   skip this one for a time while the rest of the team works on it

17   or what?

18           MS. CALL:  Yes.  If we could table this for later in

19   the afternoon and approach it again, it would be helpful.

20           THE COURT:  We will do that.

21           Additional objections on 7-1?

22           Mr. Beller?

23           MR. BELLER:  Thank you, Your Honor.

24           Your Honor, I would note that 7-1 is predicated at

25   least in part on an e-mail, this is Government's Exhibit 710,

1    which is an e-mail from Kent Kronaugue -- excuse me, from Dean

2    Bradley to Kent Kronaugue.  Your Honor, this was admitted

3    because in the Court's determination this particular exhibit

4    had independent legal significance.

5            Your Honor, the concern that I have therefore is if,

6    in fact, it's admitted based on independent legal significance,

7    if it then has testimonial effect.  And if it has testimonial

8    effect, then obviously the defendants have confrontation

9    rights.  So, Your Honor, I submit to the Court my position that

10   it does.  I also believe in a duty of candor I need to advise

11   the Court that I am frantically researching this issue, so I am

12   not coming to the Court with law to be able to argue on that

13   fact, but I raise that issue given the underlying basis by

14   which the Court admitted 710.

15           THE COURT:  All right.  Thank you.

16           Ms. Call?

17           MS. CALL:  May I respond, Your Honor?

18           THE COURT:  Yes, go ahead.

19           MS. CALL:  Yes.  I don't believe that argument could

20   be predicated with legal support.  I understand Mr. Beller is

21   looking for support for it, but the entire point of independent

22   legal significance is an exception to hearsay or at least a

23   non-hearsay purpose.  And there is no way that that rule would

24   exist if you somehow transformed materials of independent legal

25   significance into testimonial documents because every case I

1   have seen in which the rule comes up relates to pieces of

2   evidence and documents, and if they were testimonial, they

3   would never come into evidence.  So it seems a little backwards

4   of an argument that this whole hearsay exception wouldn't exist

5   if such records were testimonial.

6        THE COURT:  Any additional objections?  Ms. Henry, go

7   ahead.

8        MS. HENRY:  Your Honor, I just wanted to make the

9   point that was made with regard to the King testimony that we

10  would view any of these exhibits that refer to this testimony

11  in there as somehow bolstering.  And it's also misleading

12  because it suggests that the testimony had something to do with

13  the text that is quoted and it does not.  So that's going to

14  come up on a number of exhibits, and I think we discussed it

15  yesterday, but it would apply here as well.

16       THE COURT:  Okay.  Ms. Call, did you want to respond

17  to that point at this time or did you want to hold that

18  response until after you had a chance to take a look at

19  Mr. Gresch's testimony?

20       MS. CALL:  I think as a preliminary matter, and this

21  may save time if there are additional objections of this kind,

22  as the government noted, we have amended the first five

23  exhibits based on the issues that came up in court yesterday,

24  but we still do intend to amend the other five.  So we do

25  anticipate we would remove the reference to Gresch testimony

1    regardless of the outcome of the accuracy of the testimony

2    regarding the time zone conversion.  So at least to the

3    objection based on the word testimony appearing, we do plan to

4    remove those for instances where it's based on the time zone

5    conversion.  And I don't believe there are any other references

6    to testimony at this time.

7              THE COURT:  Ms. Pletcher, go ahead.

8              MS. PLETCHER:  Your Honor, I did want to offer a case

9    cite with respect to Mr. Beller's point.  *United States v.*

10   *Cameron*, 699 F.3d 621.  It's a First Circuit case from 2012

11   discussing how a summary chart that's made of exhibits that

12   underlying it are not necessarily testimonial can become

13   testimonial when those statements are excerpted and put into a

14   summary chart, particularly when they are not from records such

15   as a business record, but rather they are statements about

16   something else, like if it's an e-mail or a text.  It's not a

17   business record statement.  So I would direct the Court to that

18   particular case.

19             THE COURT:  All right.  Do you happen to have a copy

20   of that, Ms. Pletcher?

21             MS. PLETCHER:  We will get a copy for the Court.  I

22   don't have one right away.  We will get one.

23             THE COURT:  Okay.

24             Additional objections on 7-1?

25             Mr. Lavine?

1          MR. LAVINE:  Yes, Your Honor.  And I realize, Your

2   Honor, that the government hasn't had time to revise 7-1, so I

3   realize there is some that are going to come out because there

4   are some with limitations.  But I think one of the problems I

5   have with this, Your Honor, is this is about Popeye's 2018

6   contract.  There is no testimony in the record whatsoever as to

7   this event.  This is all just the admission of documents.

8          So when I look at the first entry which they have for

9   8/16, the next entry after that is on 9/5, which is almost, I

10  guess, three weeks, four weeks later.  So I am trying to figure

11  out what is the basis for the determination that these phone

12  calls have anything to do with the above references in light of

13  the time span from 8/16 to 9/5 is No. 1.

14          No. 2, Your Honor, I am not sure, but I don't think

15  that 746-1 has been admitted.  And I could be wrong on that.

16  That is the entry on 9/6, 9:07 a.m., Your Honor.  And I could

17  be mistaken, but I am just not sure on that.  Our records show

18  it has not been.

19          THE COURT:  I don't see that it has been admitted.

20          Ms. Call, what do your records show?  Have we reserved

21  ruling on that?  I don't recall.

22          COURT DEPUTY CLERK:  I am trying to pull it up right

23  now, Your Honor.  What was the number?

24          MR. LAVINE:  746-1.

25          MS. CALL:  I am pulling up our record as well.  I know

1    there are obviously several exhibits that we plan to offer on

2    Monday and that may be what's going on, but I am looking to

3    confirm.

4         THE COURT:  Yeah, we'll check on that.  But obviously

5    if that is not admitted, that is a potential problem.

6         MR. LAVINE:  The other issues, if you look at the

7    timing, Your Honor, some of them have Eastern Standard Time or

8    ET time and then some of them don't have anything.  I think we

9    have to be consistent.  I am just not sure that these times

10   work out.  So I don't think -- if there has been any

11   conversion, to make sure that all the times are consistent.

12        And also, Your Honor, the e-mail on 10:23 p.m. on

13   9/5/17 from Scott Brady, I think just putting in that one line

14   from there I think is misleading.  I think if they are going to

15   put the whole e-mail in, it would be appropriate to put the

16   whole e-mail in.

17        THE COURT:  Which one was that again?

18        MR. LAVINE:  I am sorry, Your Honor.  It would be on

19   the date of 9/5/17 at 10:23 p.m. from Scott Brady to Kent

20   Kronaugue.

21        THE COURT:  Okay.  I see it.

22        MR. LAVINE:  I think the biggest problem I have with

23   this, Your Honor, is the government has turned around and

24   placed these phone calls in response to e-mails.  And as you

25   can see on the first entry, there is about a three-week

1   difference.  And I am not sure how you do that if you have no

2   testimony with it.

3            I understand the government can put in their case the

4   way they want and they can put documents in, but this kind of

5   goes to the whole issue of argument, Your Honor, because there

6   is no testimony to even put this summary together.  And there

7   are no bids, no contracts in the record relative to the 2018

8   contract issue.  Thank you, Your Honor.

9            THE COURT:  Thank you, Mr. Lavine.

10           Additional objections on 7-1?

11           Mr. Fagg, go ahead.

12           MR. FAGG:  Thank you, Your Honor.

13           And it was a little unclear to me where we left off

14   from this morning when Ms. Pletcher was making arguments as

15   relates to the *Renteria* case.  So if Your Honor doesn't want to

16   hear those sort of objections now as it relates to individual

17   exhibits, I am happy to --

18           THE COURT:  No, I think this is the time to make them

19   as to the individual exhibits.  So if you want to bring it up

20   in reference to *Renteria*, go ahead.

21           MR. FAGG:  Thank you, Your Honor.

22           So I think this exhibit as well as the one that

23   Ms. Pletcher had raised this morning as well as a number of

24   others is a very good example on why these types of summary

25   exhibits that the government seeks to admit are far different

1   than what we have in *Renteria* where they are just pure business

2   records.

3           And if you look at the document that Ms. Pletcher

4   handed up this morning and just look at the first page of it,

5   for example, there are two entries of wire transfer business

6   record receipts and then there is an entry about when a package

7   was delivered.  And it applies very specifically to individual

8   defendants.

9           Here we have a series of different types of

10  communications.  You have e-mail.  You have text messages.  You

11  have phone calls that are occurring over a period of almost a

12  month among a number of different individuals.  These are --

13  the government would like the Court to believe and would like

14  the jury to believe that these are all related, but I think

15  this is a very good example of how different what the

16  government is trying to do in this instance as compared to what

17  was done in the *Renteria* case.

18          There it is -- all of the relevant information -- when

19  I say there, in *Renteria*, all of the relevant information is

20  presumably contained within the chart.  As my colleague,

21  Mr. Lavine, just pointed out, at least for one of these e-mails

22  there is only part of the e-mail that is included and it's the

23  part that the government wishes.  So I think it's very

24  different than what we have as the model here from *Renteria*

25  where all of the relevant information is included in the chart

1    as opposed to excerpts.

2            *THE COURT:*  Thank you, Mr. Fagg.

3            Mr. Lavine, go ahead.

4            *MR. LAVINE:*  Your Honor, if I can make one additional

5    comment just for the record.  I realize the government has not

6    gone back and revised 7-1, but I wanted to for the record note

7    that the first entry on this 8/16/2017 e-mail from Kent

8    Kronaugue is not for the truth of the matter asserted.  It is

9    only for the effect on the listener.  And that is not listed.

10   It is not noted as a limitation.  And if you will notice in the

11   box "To," there is nobody there.  So we don't even have it as

12   who is it applying to.

13           *THE COURT:*  Thank you.

14           Anyone else?

15           Ms. Call, response?

16           *MS. CALL:*  Yes, Your Honor.  I think for many of the

17   legal arguments that have been made, and this is not just 7-1,

18   but really many of the ones made today, are all issues that

19   have either previously been briefed or should have been when

20   this was first raised because nothing as to the substance of

21   these charts have changed since the approximate, and I may be

22   miscounting, but nine briefings that there has been on them.

23           For items that I can point to that I am certain were

24   already briefed were, one, an assertion that the documents

25   underlying the charts turn the chart into a testimonial issue.

1   That was briefed and Your Honor did cite a District of Kansas

2   case already for the proposition that the summary charts are

3   not testimonial if the underlying evidence is not.

4       Second, as to some of the hearsay points, and I don't

5   know if counsel has just made these now, but I certainly heard

6   them this morning, what the case law regarding 1006 summaries

7   as well as 611 evidence basically say is the evidence has to be

8   admissible.  It either needs to fall under a hearsay exception

9   or be deemed non-hearsay.  And since all of the documents

10  underlying these charts have already been deemed admissible as

11  either falling under an exception or non-hearsay, I don't

12  believe there is a hearsay issue with respect to the evidence

13  in these charts.

14      With respect to the third argument -- and I am

15  counting just based on the order I wrote down -- I will note

16  that, you know, only parts of e-mails are included.  That has

17  certainly been briefed before that these charts would really

18  not be summaries at all if the e-mails were included in their

19  entirety.

20      Ms. Pletcher this morning just noted, I believe she

21  called it a voluminous e-mail that was several pages and there

22  is no way that that e-mail could be put in a summary.  And I

23  don't believe there is anything misleading and I didn't hear

24  that there was one that there is anything misleading about the

25  portion that was excerpted where Defendant Austin in that

1   e-mail said he would do some scouting or make some calls.  So I

2   don't believe the excerpting in the e-mails in any way makes

3   them misleading, and I believe all of these issues have already

4   previously been ruled on by Your Honor.

5           With respect to 7-1, I will respond to Mr. Lavine's

6   comment regarding the three-week approximate lapse between the

7   first several entries which is very proper on the face of the

8   document.  If you see the portion of Exhibit 744 that is

9   excerpted in the very first line of Exhibit 7-1, it ends with

10  the request from Mr. Kronaugue that bids be sent by

11  September 5th.  September 5th is then the very next date on the

12  chart including calls and e-mails that were sent on that date.

13  So I don't see how there is anything misleading about that time

14  gap between that it is a very relevant date between the

15  documents and the calls excerpted in this summary.

16          One more moment.  I believe there is a couple notes

17  about accuracy that have been raised with respect to time.  Of

18  course, the witness from which those charts will be offered

19  will be available for cross-examination as to accuracy and that

20  is all that the law requires on these.  And I don't believe it

21  would be proper to standardize time zones if there is not

22  evidence on the record as to the time zone of a particular

23  e-mail or phone call.

24          So to the extent there are items not listed in Eastern

25  time -- and there will be testimony, and I am certainly not

1    testifying as to this, but I believe the testimony will be that

2    the time reflected is simply the time reflected on the

3    document, and there may not be evidence otherwise in evidence

4    as to what time zone that document is in.  So I don't believe

5    there is anything improper or misleading about how the times

6    are reflected on these charts.

7        THE COURT:  However, if it mentions, and I know you

8    are going to change this, but if it mentions Gresch testimony,

9    then there has been a conversion, right?

10        MS. CALL:  Yes, Your Honor.

11        THE COURT:  Okay.  One second, Mr. Kornfeld.

12        So what about Mr. Lavine's point about the first entry

13    where it says From Kronaugue?  And Mr. Lavine believes there is

14    a limitation so it only could be considered for the effect on

15    the listener.  Is that, in fact, a quotation from Mr. Kronaugue

16    or is it from somebody else?

17        MS. CALL:  It is from Mr. Kronaugue.  And I believe

18    that may be the limitation and I believe it is simply not in

19    here because we haven't had the opportunity to revise this

20    chart.

21        THE COURT:  But there would be.

22        MS. CALL:  We would.  To the extent that is correct,

23    which I trust Mr. Lavine's representation, we would be adding

24    that limiting instruction there.

25        THE COURT:  And did you want to respond to Mr. Fagg's

1   point about the -- how the entries here differ from *Renteria*?

2           *MS. CALL:* Yes, Your Honor. I think that is just an

3   extremely moot point. I will note *Renteria* has been briefed in

4   the previous briefings and that should have been raised.

5   However, I'll note there were certainly other kind of summaries

6   that the government has cited in its multiple filings on the

7   issue that do summarize other kinds of evidence that aren't

8   just 803(6) or something as simple as that. And there is

9   nothing improper about summarizing items that are admissible as

10  non-hearsay or exceptions to the hearsay rule.

11          I will point Your Honor, and I was trying to pull it

12  up, to the government's first response to the defendants'

13  motion to exclude where we cited the *Yeley-Davis*, and it's

14  Y-E-L-E-Y, D-A-V-I-S, which included summaries that were

15  admitted including photographs of the defendants. So there is

16  certainly different kinds of summaries that summarize different

17  kinds of evidence.

18          One additional case I would point Your Honor to, and I

19  can follow up with the citation because I don't have it handy,

20  and if we were in court, I would have had paper copies of these

21  summaries to pass out, but *United States v. Aiyer*, A-I-Y-E-R

22  which I believe was in the Southern District of New York. I

23  will follow up with a citation. But it had summaries that were

24  extremely similar to the government's summaries in this case in

25  that they were multi-colored charts looking very similar

 1   containing communications between conspirators.

 2        So the charts in this case are of the kind that have

 3   been summarized in other cases, particularly price-fixing and

 4   bid-rigging cases which *Aiyer* is one of.  So just because there

 5   is a distinction from the charts from the particular *Renteria*

 6   case I don't believe leads to a conclusion that the kinds of

 7   records cited in the government's summaries here are improper

 8   because I believe there are a number of cases.  And if this had

 9   been raised in prior briefing, the government certainly would

10   have raised additional references to compare those types of

11   cases.  And I believe we actually did in prior briefing.

12        So I would just say, A, that it's moot.  B, we are

13   happy to respond and provide additional references to

14   additional cases, but I believe it is covered in the prior

15   briefings here.

16        *THE COURT:*  Did you have an opportunity to check on

17   Exhibit 746-1?

18        *MS. CALL:*  Your Honor, could you repeat the number?  I

19   might have heard more numbers than you actually said.

20        *THE COURT:*  No problem.  It was Exhibit 746-1.

21        Mr. Keech?

22        *COURT DEPUTY CLERK:*  Your Honor, I looked at Sabrina's

23   spreadsheet and did a search, and I did not come up with 746-1.

24        *THE COURT:*  We show that is unadmitted.  However, is

25   it something that we talked about yesterday?

1    MS. CALL:  Your Honor, I believe this might have been

2  a document that we talked about either yesterday or one of the

3  days previously that was an e-mail and let me --

4    THE COURT:  I don't see it on my list from yesterday.

5    MR. TUBACH:  I have it on our list, Docket 825 list as

6  746 and not admitted.  I don't have a 746-1.  So to the extent

7  that's helpful.

8    MS. CALL:  I am happy to clarify.  So I believe what

9  happened was this was an e-mail to Carl Pepper at Tyson Foods.

10  He was cc'd on the e-mail.  And at the time of the hearing, the

11  evidence on its face did not show him as -- he was bcc'd, I

12  apologize.  And the document did not show him as a recipient.

13  We had pulled the metadata in the interim showing the receipt

14  of this e-mail by Mr. Pepper and hope to reoffer it on Monday.

15    THE COURT:  Okay.  Well, we'll cross that bridge when

16  we come to it.

17    Anything more on 7-1?

18    MR. KORNFELD:  My comments were a little more general

19  in response to the points that Ms. Call just made, if I may

20  briefly.

21    THE COURT:  Yes.

22    MR. KORNFELD:  Your Honor, the government keeps

23  essentially saying that the train has left the station on this

24  argument, that the Court ruled and that we need to live with

25  it.  And there is a couple problems with that.  No. 1, the

 1    summary exhibits are a moving target and they have changed, and

 2    not inappropriately so, because, No. 2, which is really No. 1,

 3    is when this was initially litigated, the evidence hadn't come

 4    in.

 5          And it is a different world looking at these in light

 6    of the evidence that was and wasn't presented, the witnesses

 7    that were and were not presented, et cetera.  So as the Court

 8    noted yesterday, the Court -- I don't think this is a motion to

 9    reconsider, but even if it is, the Court has the authority, of

10    course, on the Court's own volition to do that.

11          What I think is a bit ironic is essentially, Your

12    Honor, I think we raised this morning, my colleagues raised

13    this morning that the issue that this is akin to -- that these

14    summary exhibits in summary are akin to sending the Indictment,

15    the Superseding Indictment back to the jury which we have

16    litigated and the Court has ruled on as being prejudicial.

17          And I would respectfully submit that what we're doing

18    here in a sense is asking the Court -- the government is asking

19    the Court through these summary exhibits to reconsider that

20    motion.  So I don't think we advance the ball by, you know, by

21    the government continuing to refer us back to the Court's pre,

22    pre, pretrial ruling.  I think these pleadings were filed on

23    October the 7th.  The Court's ruling at 603 was October the 7th

24    and, you know, the world has changed.  Here we are on the extra

25    day of November 19.

1          The other thing I would say just listening to this is

2     the government kind of wants to have it both ways.  The case

3     needs to be complex under *Renteria* in order to get these -- to

4     make the argument to get these exhibits in, but on the other

5     hand, the government takes a narrative view as right out of the

6     box with Mr. Koenig's opening statement, which I understand is

7     not evidence, that the case is not a complex case.

8          And frankly, Your Honor, it's not a complex case.

9     It's a single count.  The government's theory is it's a

10    conspiracy to fix or raise prices.  And that's what they've

11    opened on and that's what they've tried the case on.  So while

12    it's been complex in terms of putting in, you know, evidence

13    and lots of paper and pieces of paper without sponsoring

14    witnesses and all the other things that have happened, the

15    gravamen of the case and, more importantly, the single charge,

16    now single charge of the case having dismissed the count

17    against Mr. Little is not complicated.

18         So I think as we go through this, we are trying to go

19    through it kind of in good faith because at this point these

20    exhibits are in effect the government's case.  And, you know,

21    the difference of course, and this Court knows better than

22    anybody in this room, the difference between a case in front of

23    a jury, never mind the burden of proof, but the presentation of

24    a case in front of the jury and the presentation of a case in

25    front of a Grand Jury are two different things.

1           And as I look at these different exhibits and listen

2    to this argument, you know, effectively what strikes me having

3    dealt with lots of cases in front of the Grand Jury on both

4    sides of the aisle is this is effectively the Grand Jury

5    presentation.  Where I think that comes back to is the comments

6    this morning of tracking these different summary exhibits along

7    with the relevant paragraphs of the Indictment.

8           So we're not complaining -- you know, I think

9    Ms. Pletcher's point was a fine one.  There is nothing wrong.

10   The government can absolutely take a sentence out of an e-mail

11   and show it to the jury and argue.  Lawyers do that all the

12   time.  Assuming that e-mail is in evidence, nothing wrong with

13   that.  That's a very different process than putting it in a

14   summary exhibit that goes back to the jury whether what rule it

15   comes under.  It doesn't really matter.  That's what we're

16   talking about.

17          And so we're not -- I just want the record to be

18   clear, we are not complaining about for lack of a better phrase

19   cherry-picking or highlighting or selecting bits and pieces

20   with the suggestion that there is anything wrong with doing

21   that.  The government is absolutely welcome to do that in

22   closing and everything else.

23          We are focusing on our concerns about doing that in

24   these exhibits that go back to the jury and have the imprimatur

25   of a non-demonstrative if that's what the Court finds them to

1    be.  So I just think it's important to kind of hit the breaks

2    and reiterate that point for purposes of the record.  As we go

3    through, we don't like this line, we think this is a problem,

4    we're not nitpicking to nitpick.  We are trying to do it within

5    the context of our understanding.

6              And the final thing I will say is, as the Court has

7    pointed out, I think *Renteria* absolutely sets the intellectual

8    framework.  And the key theme there is does it assist the jury

9    in ascertaining the truth?  And I think all of us take great

10   issue with cherry-picking or selecting a line out of a

11   three-page e-mail, whether that under *Renteria* assists the jury

12   in ascertaining the truth in the form of an exhibit that goes

13   back for the jury.

14             So again, for purposes of the record, and I

15   appreciate the Court's indulgence because I know we are trying

16   to go one by one, but I felt it important to respond to the

17   government's broader sort of arguments against what we're doing

18   here.  And just to be crystal clear both for the Court and for

19   purposes of the record of why we think this is important, why

20   we're making these objections and why we think that, you know,

21   what the government is trying to do here only in the form they

22   are trying to do it in, these type of exhibits that go back to

23   the jury is problematic.

24             Thank you, Your Honor.

25             *THE COURT:*  Thank you, Ms. Kornfeld.

1          Ms. Henry?

2          MS. HENRY:  Just to reiterate a few points here, but

3     also to put them in a focus.  These exhibits have changed.  A

4     quick example just looking at one is on Exhibit 2-1.  The one,

5     two, three, four -- fifth text message was added just this

6     week.  It never appeared on any of these summaries before that.

7     I mean, we have stacks of these where we've had to go through

8     them multiple, multiple times to try to figure out what's

9     changed, what hasn't.  Sometimes the changes are smaller.

10    Sometimes they are larger.  It's been a continuing process.

11         Also, and I don't know whether you want to take this

12    up now, when you had said that 2-1 was out, I didn't go through

13    all of the issues on why it's misleading.  I can do that now or

14    we can go through it again later.  But apparently if it's just

15    going to be a matter of they're going to take out a few things

16    and still leave it in, then I need to address those issues as

17    well.

18         THE COURT:  Well, yes.  The suggestion was made that

19    the government would take out the addition -- sorry, take out

20    the e-mail from Mr. Little.

21         MS. HENRY:  So let me just point out on this one, the

22    newly added information does not tie into the other.  And the

23    next one after that says, "Talk to Jimmie Little and he said

24    they were planning on adding to their cost to do this."  I do

25    not know who "they" is, but the implication is that "they"

1    would be the newly added exhibit ahead of that.  And I do not

2    believe that there is any basis whatsoever under 221 to make

3    that connection.  It is an improper connection and so the

4    antecedent of this pronoun is extremely misleading.

5          THE COURT:  All right.  Thank you.

6          MS. HENRY:  Thank you.

7          Mr. Fagg?

8          MR. FAGG:  Thank you, Your Honor.

9          Just one last point and perhaps a point of

10   clarification from the government.  Ms. Call mentioned the

11   *Aiyer* case out of the Southern District of New York, and we

12   represented a client who was tangentially involved in that

13   matter.  And I seem to recall that in that case when the

14   summary exhibits came in, they came in through an expert

15   witness.

16         And if -- my recollection may be incorrect on that,

17   but if I am correct on that, I do think it's a different

18   analysis than what we are talking about here where an expert

19   would get up on the stand and say that -- I think in that case

20   I have analyzed a bunch of trading data or I analyzed bids and

21   offers that were published on screens and I compared that to

22   other communications.  I think that's a different analysis than

23   having these presented through a paralegal.

24         THE COURT:  Okay.  Anything else on 7-1?

25         Let's move to 8-1.

1         I am sorry, Ms. Call.  Anything else you want to bring

2    up?  Because a number of attorneys made some points.  On 7-1,

3    did you want to respond to those?

4         *MS. CALL:*  Yes, Your Honor, and I will be brief for

5    purposes of efficiency.

6         One thing I wanted to point to was the references to

7    the Superseding Indictment not being sent back to the jury.

8    And I do want the record clear on that.  If you were to look at

9    the defendants' filing which is ECF-529 on the third page, the

10   arguments they made stating that a Superseding Indictment was

11   argumentative was based solely on the use of the term "it was

12   further part of the conspiracy that," and then X, Y, Z.  And

13   they believed that that term saying that something was part of

14   the conspiracy was what made the Superseding Indictment

15   argumentative.

16        So it was that argument at ECF-529 that was the basis

17   of the Court's finding in 603, I believe, that it would be

18   argumentative.  So I don't quite see how the Court's ruling

19   there would affect these summary exhibits which do not state

20   that anything is in furtherance of the conspiracy.  They do not

21   have headers attempting to characterize the data in any way.

22   It is simply excerpts from documents that are in evidence.  So

23   I don't agree with the argument by counsel on that point.

24        I hear what Mr. -- counsel for Mr. Fries said on --

25   Mr. Kornfeld, I apologize, said regarding the complexity of the

1   case.  But if you look at the 10th Circuit standard on this

2   which has been adopted from the Fourth Circuit in *United States*

3   *v. Johnson*, when they say complexity of the case there, they

4   include the length of the trial, the amount of documents, the

5   number of witnesses.  And I think under that standard this

6   certainly qualifies as a complex case now that we are in, I

7   believe, the fifth week of trial.  And I believe that has been

8   the basis of the Court's findings on the usefulness of these

9   exhibits in the past.

10          With respect to the cherry-picking argument, I won't

11   go further because I believe this has been fully addressed in

12   the briefings.

13          And then with respect to Ms. Henry's note about -- I

14   believe Exhibit 2-1, I don't see the misleading nature of the

15   term "they" there.  I think anyone reading this statement

16   excerpted in Exhibit 2-1, as well as if they were to look at

17   the underlying Exhibit 221, would likely perceive "they" to

18   refer to Pilgrim's where Defendant Little works.  And Jimmie

19   Little's name does appear on Exhibit 2-1 associating with him

20   with Pilgrim's Pride.  So I don't believe there is a misleading

21   nature to the inclusion of the term "they" as it was used by

22   Carl Pepper in this e-mail.

23          *MR. LAVINE:*  Your Honor, may I respond?

24          *THE COURT:*  Yes.  Go ahead.

25          *MR. LAVINE:*  Your Honor, the government counsel has

1    referenced this case as a complex case and because of the

2    length of the trial.  I would beg to disagree and I would like

3    it make my record on that.

4         This case involves seven fact witnesses.  The reason

5    this case has gone on as long as it has is, No. 1, they had to

6    bring all of the custodians in.  And I am not pointing fingers

7    whether anybody was wrong as far as not stipulating, but the

8    bottom line is the parties couldn't agree to stipulate.  The

9    majority of the time was spent with the custodians.  We had two

10   and a half days where we sent the jury home in order to go

11   through documents to determine admissibility.  And then we

12   turned around and we spent how much time publishing documents

13   to the jury.  In fact, I counted one, Your Honor.  It took us a

14   minute and a half to show a document.

15        The bottom line is this case is not that complex.  It

16   is a seven-witness case so far, seven substantive witnesses.

17   And as far as the documents, yeah, a lot of them are in there,

18   There are phone records.  But if you boil this case down, Your

19   Honor, you are about 100 to 150 documents.  This is not a

20   complex case.  It is a price-fixing case.  And there are seven

21   witnesses and about 100 to 150 documents.

22        And I realize we spent a tremendous amount of time,

23   and I appreciate the Court's indulgence on this, but for the

24   government to say that it is a complex case, when you boil down

25   what the facts are -- and most of the facts we had to put in,

1    the defense, on cross-examination because on their directs they

2    wanted to limit what was actually talked to as far as the jury

3    because they wanted to produce the documents without a witness.

4    So I beg to differ with the government as far as this is a

5    complex case.  It is not.

6            Thank you.

7            THE COURT:  Thank you, Mr. Lavine.

8            Ms. Henry?

9            MS. HENRY:  Your Honor, I want to thoroughly agree

10   with Ms. Call that Exhibit 221 is not misleading about who

11   "they" is.  The concern is that when you excerpt and put these

12   together in this summary, "they" becomes misleading.  There is

13   no question exactly as she said, 221 is not misleading.  This

14   document with the summary where "they" is looking as though it

15   refers to the excerpt previous to it is misleading.

16           THE COURT:  Anything else on 7-1?

17           Okay.  Let's switch over to 8-1.

18           Objections to 8-1?

19           Mr. Fagg, go ahead.

20           MR. FAGG:  Thank you, Your Honor.  Let's shift gears a

21   little bit here.  8-1 is a -- what the government is submitting

22   is a summary exhibit, but it is a summary exhibit of

23   Exhibit 803 which has been admitted and is a one-page e-mail.

24   It is an e-mail that is between --

25           THE COURT:  Is it possible to put that up?  Do you

 1   have that available to you, Ms. Call?

 2          *MS. CALL:*  Yes, Your Honor.

 3          *THE COURT:*  Go ahead, Mr. Fagg.

 4          *MR. FAGG:*  Thank you, Your Honor.

 5          803 has been admitted.  This is simply cumulative.

 6   There is no reason why 803 needs to be presented in a summary

 7   exhibit given that the underlying e-mail is a one-page exhibit.

 8   The entire e-mail is contained within the summary exhibit, and

 9   it would be simply cumulative for the government to put it in a

10   second time.

11          The government cites in the revised version of 8-1 to

12   the Bryant testimony.  Mr. Bryant did not testify about this

13   e-mail.  Mr. Bryant did not testify about Joe Grendys.  And

14   Mr. Bryant did not testify even about Mr. Lovette other than to

15   say he was Jayson Penn's supervisor.  That was it.  And so

16   there is no relevance to Mr. Bryant's testimony.

17          He didn't testify about this pricing -- or this

18   payment term plan that Sysco had been -- it was rolling out.

19   And as Ms. Hoyt testified just the other day, that program

20   didn't have anything to do with chicken.  It was to all their

21   suppliers, their thousands of suppliers.  So that was something

22   that they were doing for all of their suppliers.  They then

23   modified it according to Ms. Hoyt to be 14 days as it relates

24   to chicken suppliers.

25          So there is nothing about Mr. Bryant's testimony that

 1  is relevant to this exhibit.  And so first, we don't think it's

 2  appropriate at all to be a summary exhibit when the entire

 3  exhibit is already in and it's easily digestible to the jury.

 4  This doesn't make it any -- it doesn't require -- this isn't

 5  the type of exhibit that requires assistance for the jury to

 6  understand.  And two, the Bryant testimony is completely

 7  irrelevant.

 8          THE COURT:  Ms. Call, response to Mr. Fagg's points?

 9          MR. FAGG:  Yes, Your Honor.

10          As all are aware, these summaries were previously

11  condensed into one large file and have since been broken out.

12  I think I tend to agree with Mr. Fagg's point regarding 8-1 and

13  we will withdraw this and simply use the underlying exhibit.

14          THE COURT:  Okay.  8-1 will be withdrawn.

15          Let's next take up 9-1.

16          MS. CALL:  Very briefly, maybe for a more clear

17  record, I will say I do not agree with all Mr. Fagg's points,

18  just to be clear.

19          THE COURT:  No, just that first one.

20          MR. FAGG:  Understood.

21          THE COURT:  Objections to 9-1?

22          Mr. Lavine?

23          MR. LAVINE:  Your Honor, as you look at this summary,

24  you start with 5/9 where there is an e-mail from Justin Gay.

25  And almost a month and a half later, Your Honor, they have

1    three phone calls.  And there is nothing in that first e-mail

2    to show any relationship of the phone calls to that e-mail.  So

3    it doesn't make any sense.  It's obviously cherry-picking and

4    it's obviously argumentative.

5              The five --

6              THE COURT:  Refresh my memory, Mr. Lavine.  As I

7    recall, the first e-mail relates to talking about someone new

8    who was coming in at Chick-fil-A; was that it?

9              MR. LAVINE:  I think that's correct.

10             THE COURT:  Mr. Beller?

11             MR. BELLER:  If I may assist Mr. Lavine, it's a

12   discussion about Mr. Ledford having left KFC and joining

13   Chick-fil-A.

14             THE COURT:  Oh, and someone new was coming in to

15   replace Mr. Ledford, right?

16             MR. BELLER:  Yes.  So excuse me for interrupting the

17   Court.  So to Mr. Lavine's point, that is the substance of that

18   particular first e-mail.

19             THE COURT:  Go ahead, Mr. Lavine.

20             MR. LAVINE:  Thank you for the clarification and the

21   help, Mr. Beller.  So Your Honor, I don't quite know why you

22   have three phone calls that have no relationship to that e-mail

23   whatsoever.  And plus the fact the 5/9 e-mail had nothing to do

24   with the change in models, which is what this is all about.

25   And even Mr. Skalak testified that Claxton was on a completely

1    different model than the grain-based model that Chick-fil-A was

2    on.  So the idea of having that first e-mail of 5/9 which talks

3    about Mr. Ledford coming in has no relationship whatsoever to

4    these phone calls.  Then as I said, it has nothing -- no

5    relationship with the rest of it.  It is very misleading, Your

6    Honor.

7              THE COURT:  Thank you, Mr. Lavine.

8              Ms. Henry?

9              MS. HENRY:  Your Honor, I just want to point out that

10   this is again another one of those instances where the

11   juxtaposition of two entries with a pronoun makes the

12   antecedent of the pronoun very misleading.  So again if you

13   look at Exhibit 982, who is the "they"?  "Justin said they."

14   When you juxtapose it here, it sounds like it may be Searcy

15   Wildes or whatever, but that is not the case.  It is misleading

16   because of the juxtaposition of the two pieces of text and the

17   phone call.

18             THE COURT:  Okay.  Mr. Beller?

19             MR. BELLER:  Thank you, Your Honor.

20             Of course, you know, as a bit of an aside, first entry

21   is King testimony, and I trust Ms. Call when she says she's

22   going to be modifying those entries.  Your Honor, I would note

23   what the status of the testimony is at this point and

24   specifically the July 2nd, 2014 call between Scott Brady and

25   Searcy Wildes.  And I don't believe there has been testimony

1    regarding Searcy Wildes.  There has been testimony regarding

2    Perdue and Perdue's involvement in assisting the different

3    suppliers in the conversion of their plants from conventionally

4    raised chicken to no-antibiotic-ever chicken, but the

5    inclusion -- and, of course, that happened some months earlier.

6    And so the inclusion of Searcy Wildes into this particular

7    exchange I believe is ultimately misleading.

8          I would note that this strikes me as similar to taking

9    a magazine and cutting out certain letters in order to put them

10   together and create a narrative or create a system or a story.

11   Here, Your Honor, we have communications between Mikell Fries

12   and Scott Brady, but the testimony of Mr. Skalak specifically

13   was that Claxton Poultry was on the breast market or a

14   market-based model, whereas Pilgrim's was on a cost-plus or

15   grain-based model.

16         There was a question asked of Mr. Skalak whether that

17   would be comparable or whether you can compare those two models

18   for purposes of determining price.  He testified no.  There was

19   specific testimony as that would be comparing apples to

20   oranges.  So taking that testimony, and the only live testimony

21   coming from a witness here completely contradicts the narrative

22   that has been created by taking this -- again at the risk of

23   being dramatic -- frankensteining these particular episodes

24   into a model that frankly fits not just the government's

25   theory, but frankly is completely contradicted by the testimony

1    in which they requested.

2            So as we are talking about the truth-seeking process

3    and intent of a demonstrative, I would simply offer that this

4    is actually antithetical to that and risks confusing the jury,

5    confusing the issues by putting together the evidence in this

6    way that frankly I think is -- well, disconcerting from my

7    perspective.  Thank you.

8            THE COURT:  Thank you, Mr. Beller.

9            Ms. Call, why don't you -- I will give you a chance to

10   respond to the comments so far.

11           MS. CALL:  Thank you, Your Honor.

12           THE COURT:  Maybe you can take that down so I can see

13   Ms. Call.

14           Okay.  Go ahead.

15           MS. CALL:  Thank you.

16           I will first respond I think to Ms. Henry's point

17   regarding the use of a pronoun.  I believe, although please

18   correct me if I am incorrect, she is referring to

19   Exhibit 962 -- sorry, 982 and the use of the term "he."  That

20   is in a text message chain between Defendant Brady and Fries

21   where the initial text message specifically cites to a person

22   named Justin, but the next text message saying "Did he elude to

23   going up" which clearly refers to the text message before it.

24           In the underlying exhibit, text messages appear in

25   that very same order with that very same juxtaposition of text

1    messages between the one at 11:55 a.m. and the one at noon, so

2    I don't believe it's misleading in any way, either the

3    underlying exhibit or the summary.

4          Regarding Exhibit 920 at the top, these are all -- the

5    e-mails here clearly all have to do with Chick-fil-A and they

6    are in the same year, the same approximate negotiation period.

7    The first e-mail in 920 discusses Mr. Ledford moving, but also

8    specifically discusses the approach towards cost and price that

9    Mr. Ledford had.  So I think it's entirely relevant to put it

10   here in a summary along with other discussions about

11   negotiations with Chick-fil-A that year.

12         One thing I will note about the text messages, I

13   frankly think that the color coding that appears in these

14   exhibits makes more clear and easier for the jury to understand

15   and less misleading any possible issues of juxtaposition of

16   different kinds of records because you do see, and as the

17   testimony will explain with respect to the color coding, that

18   these two messages, A, specifically said they were text

19   messages, but you see them next to each other and you see the

20   same participants.  And the jury would be able to identify the

21   similarity or relation between these exhibits.

22         And then to respond to Mr. Beller's point about the

23   differing price models with respect to Chick-fil-A, the

24   documents here just discuss going up on price.  And it is

25   certainly apples to apples when talking about a price increase.

1    Whether it's a cost-based model or a different one, I believe

2    anyone would understand, and for a price-fixing agreement to be

3    able to effectuate going up on price regardless of the type of

4    model.

5         THE COURT:  Additional objections or responses on 9-1?

6         MR. BELLER:  Your Honor, the only thing that I would

7    add is that the -- as to Chick-fil-A the jury has been provided

8    absolutely no evidence that prices went up or went down or what

9    the different offers and submissions were.  So to the extent

10   these are being offered for the purpose of showing that prices

11   went up, I still believe that it's misleading because it

12   assumes a fact that frankly is not before the jury.

13        THE COURT:  Mr. Fagg?

14        MR. FAGG:  Thank you, Your Honor.

15        Just briefly to respond to Ms. Call's point, and again

16   she has a job to do, right, just like we all do, but she is

17   articulating that this top e-mail about Mr. Ledford's move to

18   Chick-fil-A is somehow or another relevant because it is about

19   Chick-fil-A and it's in the same year and the subsequent text

20   messages and phone calls are about Chick-fil-A.  But that top

21   e-mail is not about what the government contends the rest of

22   these e-mails are about.  It just isn't.

23        So that again highlights the point I think that we

24   have made with respect to a number of these exhibits which is

25   they are argument.  And it's the government's contention that

1   these are related, but there isn't anything in that top e-mail

2   that is about this issue -- these issues that are later

3   discussed in those e-mails and those text messages.

4          THE COURT:  Anything else, Ms. Call?

5          Sorry, Ms. LaBranche?

6          MS. LaBRANCHE:  Very, very briefly, Your Honor.

7   Something that just struck me when Ms. Call was making her

8   argument is the language she used to describe how the color

9   coding would help in that it would help tie certain things

10   together, which I think just goes further to the point that

11   this is argument that's being presented, not summary.

12          THE COURT:  All right.  Let's switch our gears then

13   over to the next exhibit which is 10-1.

14          MR. TEGTMEIER:  Richard Tegtmeier for Mr. Roberts.

15          THE COURT:  Which exhibit did you want to talk about?

16          MR. TEGTMEIER:  10-1.

17          THE COURT:  Go ahead.

18          MR. TEGTMEIER:  Thank you.  This is one of the most

19   intriguing of exhibits, Your Honor, because of a number of

20   reasons.  And we start out with the green at the top referring

21   to the date of 8/7/2014.  And what's included here are the

22   initial letters that went out from Robert Lewis with RSCS to

23   Pilgrim's, and then a second letter went out half an hour later

24   to Scott Brady and Mr. Fries at Claxton, which as you recall

25   came about a week after they had a meeting with all of the

1    suppliers on August 1st saying that they would be sending out

2    the specs that they want to bid on.  And these are two examples

3    of that.  Noticeably missing is Tyson which also received a

4    letter on that same day, August 7, 2014.  These are in green.

5           And the next entry is four days later on August 11th

6    where a phone call from Brian Roberts at Tyson is reflected.

7    And it says "Phone Call," and it's in coral or pink or orange

8    and pink, I am not sure what the color is, to Scott Brady of

9    Claxton.

10           Following that in green again is Brian Roberts and

11   there is a Tyson bid submission.  This is when Tyson sent their

12   bid in to RSCS, Mr. Eddington.  That was their first bid.  It

13   came in about a week ahead of all the other bids because, as

14   the Court recalls, this letter from Lewis to all of the

15   suppliers, Pilgrim's, Claxton, Tyson and so on was requesting

16   those bids be submitted or at least their proposals be

17   submitted by the 18th of August.  So again in green, and I

18   suggest, Your Honor, that this color is not an innocent thing.

19           We know that colors are designed and our human nature

20   puts colors together.  I mean, we would expect that green would

21   reflect similar statements or ideas.  Coral would reflect

22   similar statements and ideas.  Blue would do the same.  And

23   throughout this document particularly what we have are a series

24   of different colors, different calls, different documents woven

25   together to argue a particular result that these calls reflect

 1   guilty collusion or guilty conversations among these several

 2   people and companies.

 3            They are misleading in a number of ways.

 4            If we could pull up the 1231 exhibit, Your Honor, and

 5   go to the 8:56 Eastern Time phone call.  It's probably

 6   reflected at 12:56 on this document.  But the phone call just

 7   says "Phone Call."

 8            *THE COURT:*  I am sorry, Mr. Tegtmeier.  Which exhibit

 9   number?

10            *MR. TEGTMEIER:*  It's 1231.

11            On the exhibit itself, Your Honor, it just says "Phone

12   Call."  And the inference is that Jayson Penn contacted Brian

13   Roberts and they talked.  Now, we know that Brian Roberts' call

14   was made on a cellphone.  This is Mobility is this exhibit at

15   the very top.  And if we go down to the call that was made at

16   12:56 right above where your pointer is right there and

17   highlight that for us all to see -- go to the next one up,

18   please.  We see that this call was may at 12:56 which

19   translates to 8:56 a.m. on their chart which is correct, but

20   Your Honor, look at the time.

21            In the fifth column over, it's clear that this call

22   lasted zero time, but it's put in this chart by the government

23   to suggest that there was a call between Co-conspirators Penn

24   and Roberts.

25            The next call that's in this exhibit is reflected to

1    be at 11:18 a.m.  And it's reflected to be a conversation -- it

2    says Phone Call.  The inference is that they talked -- from

3    Scott Brady to Brian Roberts at 11:18 a.m. Eastern time.  So if

4    we go on this same exhibit down to 16 -- 15:18, we will see,

5    and it's kind of hard to see, Your Honor, on this chart, it

6    probably should have been highlighted, but if we go to

7    15:18 and we look at this call, you have it there.  Sometimes

8    in this particular printout calls are reflected twice.  And in

9    the fifth column over, we see the cellphone call lasted 6

10   seconds.  Obviously, what the inference is of a phone call did

11   not occur.  It's misleading.

12           At 11:34, some eight minutes later, another call is

13   reflected.  And now we are in blue again which is interesting

14   because the phone calls don't seem to have any rhyme or reason

15   in terms of color, but the blue outlines a Tim Mulrenin call to

16   his co-worker, Brian Roberts.  Interesting in that both of

17   these individuals, they don't work at a corporate headquarters.

18   Mr. Roberts works out of his Atlanta home.  Mr. Mulrenin works

19   out of Delaware.  So you will see calls and e-mails between

20   them on their correspondence all the time.  And again, this

21   call is reflected as a phone call, Your Honor.

22           But when we go down to 11:34, which would be 15:34, we

23   see that this entry says 0 seconds.  And at the next entry down

24   it says 24 seconds.  Again, this is a cellphone call.  It's

25   reflected to be a conversation that's intended to tell the jury

1    that this is a conversation that occurred between these two

2    individuals at that time and it's obviously misleading.  These

3    cellphones as we know take time.  If you've got a voice

4    message, it takes time to relay the voice message.  If you are

5    going to leave a message, it takes time to leave a message.

6           And perhaps there was a message in 24 seconds.  We

7    know that on our own personal calls from common knowledge of

8    all of us that many times a one-minute call is a no-connect

9    call and perhaps a message was left or perhaps not.

10          The next two entries do have phone calls.  And as we

11   go down through this, there is another Brian Roberts call

12   reflected at 3:50 p.m. to Jayson Penn.  These are handpicked

13   from all the calls, the dozens of calls that Brian Roberts made

14   and received that day.  He literally in this exhibit, which is

15   contained in the mass exhibit entry of phone records, made

16   hundreds of calls sometimes per day.

17          But the 3:50 p.m. call to Jayson Penn which is

18   reflected in the third to the last line from the bottom of this

19   exhibit, Your Honor, again it looks like they had a

20   conversation by this chart.  But when we go down and we take a

21   look at the truth of the phone records, it looks quite

22   different.

23          At 3:52, which is what, 15:52, 19:52, we would have to

24   go to the next page of Exhibit 1231.  Go up to 19:52 and this

25   is at -- that's the wrong time, I think, but that's correct.

1    This is -- the one right above that is what I am looking at.  I

2    want to go to 3:50.  I apologize.  And then go up one more just

3    to make sure.  This is not the correct call.  It's the next one

4    up.  I am sorry, Your Honor, that's not it either.  It's at

5    3:50.  That is to Jayson Penn's number according to the

6    government's chart and that phone call was 38 seconds.

7         Again, the inference is they had these conversations

8    and that they occurred at a certain time.  So, Your Honor,

9    again the inference is there was a conversation, but there

10   wasn't.  If it was, it was 38 seconds, and we know that's

11   probably not what happened.  They did not talk.

12        Later on there was a call, 3:52, and that's reflected

13   finally down here.  After we have gone through all these

14   gyrations and allegations by the government of phone calls

15   among co-conspirators is a phone call that actually apparently

16   occurred on this record.

17        And, Your Honor, the other types of phone calls that

18   are indicated on this record that either -- I don't know if

19   they occurred or they didn't occur, but we are dealing with

20   cellphones.  For instance, when you go to 4:28 on the same day,

21   which would have been as I understand it, what, 16:20, 20:48,

22   there is a phone call alleged to be between Carl Pepper and

23   Scott Brady.  That call looks like it's a regular call just

24   like all the rest of them, but it's a minute 25 seconds.  Can

25   you find that?  And there are others.  Anyway, I made the

1   point, Your Honor.

2          The reason that this is misleading is for a number of

3   reasons.  First of all, we are either consciously or

4   subconsciously drawn to the color coordination that is here.

5   We have got the order of calls and they are plugged into the

6   exhibits, the bids, the proposals that Austin from Pilgrim's

7   and Brady and Fries from Claxton submitted, although I am not

8   sure that that's accurate.  It is then immediately attempted to

9   be related to a phone call between Brian Roberts and Scott

10  Brady.  There is nothing in the phone records that would

11  indicate that that phone call was in any way related to the

12  proposal that was submitted four days earlier.

13         Furthermore, what's not reflected is that Tyson as

14  well submitted a proposal on the same day, 8/7/2014, that

15  Claxton and Pilgrim's and the other suppliers submitted.  They

16  also submitted -- they all got the same letter.  I am sorry,

17  they all got the same letter asking them to submit their

18  proposals.

19         And so to reflect that call immediately afterwards is

20  meant to suggest that of all the calls that were made, and this

21  exhibit contains dozens and dozens of them, suddenly this one

22  call has significance and only because the way they put it

23  right after the proposal request by the RSCS representative,

24  Robert Lewis.  Putting Brian Roberts' call to Rich Eddington

25  right after that is an attempt to relate these calls, the one

1    to Claxton, to Brady and the rest of them, the Jayson Penn call

2    four days later back to the bid, back to the request for

3    proposals.

4         The other calls, Your Honor, occurred four days later.

5    The first segment is divided off for some reason after there

6    are seven calls made.  Again, the colors don't go every other

7    color or every other call.  They are intended to show that the

8    pattern of conduct by the participants in these calls is a type

9    of agreement among them to conspire.  And so when the

10   government says it's not argumentative, clearly, Your Honor, a

11   jury is going to sit here and look at this document and are

12   going to draw conclusions from it that are not based on facts,

13   but rather on the presentation itself, not only of facts that

14   are truthful, but of facts that are misrepresented and

15   misleading.

16        Let me give you another example.  There was a call

17   second from the bottom on the first page between Mr. Penn and

18   Mr. Roberts.  This call lasted, according to the record that we

19   had and we brought up, 15 minutes and 44 seconds, about 16

20   minutes.  That call from Carl Pepper to Jimmie Little is right

21   next to it, and because it was 16 minutes later, there is some

22   inference that that call from the Tyson salesperson, Carl

23   Pepper, to Jimmie Little was somehow representative -- somehow

24   related to the call with Jayson Penn.

25        But, Your Honor, there is no phone call between Brian

1    Roberts and Carl Pepper or Tim Mulrenin.  There is no text.

2    There is no e-mails.  There is no -- any communication between

3    these three individuals, Brian Roberts who is in Atlanta, Tim

4    Mulrenin who lived in Delaware, and Carl Pepper who lived in

5    Arkansas at the time.  So there is no relationship between

6    these calls.  But the way they are presented in this exhibit

7    makes it look as if all of them back to back to back to back to

8    back over this period of time from the 15th of August until the

9    date of the submission of the proposal by Claxton, by

10   Pilgrim's, they are all related and tied into Tyson somehow.

11         And we go all the way through on the 18th towards the

12   end of that second page to try to bring in Pilgrim's and to try

13   to bring in George's and to try to bring in Tyson again through

14   Carl Pepper into this allegation of conspiracy.

15         Now, interestingly enough, Tyson had already submitted

16   their bid, their proposal.  Tyson's proposal went in on the

17   11th, almost at least a week ahead of the other proposals.

18   There is nothing in this record, nothing in the supporting

19   documents that indicates that Tyson was involved in any kind of

20   conversations with these other men having to do with that bid

21   that is reflected in the first two Robert Lewis e-mails.  It's

22   an attempt to tie them all together.

23         And then we get more green.  And I know the government

24   might say, well, those are e-mails that we're reflecting in

25   green.  Well, maybe they are, but the color does suggest that

1    the different types of colors go together and that conspirators

2    were making phone calls with each other because they are

3    related in some way.  So these exhibits, none of them should

4    have colors coordinated like this in a conspiracy case.  They

5    should be free of any kind of inference from the various kinds

6    of colors that are used here, Your Honor.

7         And then finally and to that point, you look at the

8    fourth page.  And the fourth page, it's a mixture of different

9    e-mails and allegations of phone calls, first of all, to an 877

10   number, but again those are in blue.  And they relate in an

11   observer's mind, in a jury's mind, back to the other blue

12   calls.  And the other blue calls, here are Pilgrim's which are

13   on the last page, but when you go back you see Claxton and you

14   see other calls that are related, not just to Pilgrim's, Your

15   Honor, but to Tyson in the very top row of the second page and

16   to Brian Roberts in that first page, Brian Roberts in that

17   first page, Mulrenin in that first page.  Clearly this is an

18   improper way to weave their theory and to weave their story to

19   the jury through this exhibit.

20        It is not just a straightforward summary of facts.

21   It's not just a straightforward description of what happened.

22   It's an attempt to weave a story into the minds of the jury.

23   It's argumentative and it's certainly intended for the purpose

24   that I just suggested.

25             THE COURT:  Why don't we take that down and I will let

1     Ms. Call respond.

2            Ms. Call, I know that you could not see the things

3     that were being displayed, but essentially Mr. Tegtmeier was

4     going through I think it was Exhibit 1231 and identifying the

5     various calls I think that you heard him refer to.

6            *MS. CALL:*  Yes, Your Honor.  I note I actually was

7     able to see it.  It was about 2 inches by 2 inches, but I did

8     get some of it.  And I did try to pull up my own copy and

9     follow along, so I think I did see most of it.

10            So first off, I will try to correct these throughout,

11     but there was a couple of factual inaccuracies that I will try

12     to correct, the first being, I am sure Mr. Tegtmeier misspoke,

13     I believe he said KFC met with all of its suppliers on

14     August 1st.  Mr. Lewis did testify to these meetings occurring

15     in early August.  However, there were separate meetings with

16     each supplier.  So I did just want to correct that, that it was

17     not a meeting together with the various suppliers.

18            But just to follow up on other times, and I hope I

19     address them all, but please let me know if I do not, regarding

20     the color coding and the organizational scheme of the

21     documents, first off, this has already been sufficiently

22     briefed.  I believe the government first described the

23     color-coding scheme in these exhibits in I want to say ECF-722

24     and later in exhibit filing 774 briefed the case law behind

25     color coding as an organizational aid.

1           In Your Honor's ruling on the motion to exclude newly

2   identified summary exhibits, Your Honor did find the color

3   coding in these documents as a useful organizational aid.  And

4   if I can note, I actually -- somehow I am not going to find it

5   on my desk at this moment, but I actually do have the summary

6   charts from *United States v. Aiyer* handy.  And I will just hold

7   them up on my screen.  I realize that may not be the best

8   record, but they do appear very similar and contain nearly

9   identical color coding to what's used by the government in this

10   case.  So I think there is -- and I will note these entries in

11   the middle are mostly chats.  And we can provide these if that

12   would be helpful, but they are almost identical in format to

13   the government's summary exhibits in this case.

14           And just to note in addition as to I believe

15   Mr. Tegtmeier's arguments that the color coding could be

16   misleading, there will be testimony by the witness who we will

17   offer these exhibits through regarding the color coding and

18   what means what.  So I don't believe it will mislead the jury

19   because they will hear from a witness regarding how the color

20   coding assists as an organizational aid and identifies certain

21   kinds of communication like e-mails versus phone calls.

22           I guess I will turn just to some of the statements

23   regarding the alleged phone calls.  I don't believe the use of

24   the term phone call is misleading at all.  A phone call is a

25   phone call regardless of whether it's picked up, missed or left

1   a voicemail.  And I believe we were careful to use that term so

2   that it would not be misleading.

3         For example, it does not say the word communication or

4   imply that two people actually spoke.  With respect to some of

5   the calls Mr. Tegtmeier did point out, for example, the first

6   call that would be 12:56 in the Exhibit 1231 which reflected

7   8:56 Eastern on Exhibit 10-1, and I apologize, I am not able to

8   pull it up, but there is an indication on that record that a

9   voicemail was left.  It's not simply a 0 second call.  The call

10  was forwarded to voicemail.  There is indications on the record

11  of that.  It indicates the VM feature, so voicemail is

12  activated, and then shows a call forward to the voicemail

13  number for the individual that was called in that record.

14        I will note just for the -- so the jury will

15  understand that the keys to reading AT&T records are in

16  evidence already, so it's at 852 and 862, such that if they

17  want a better understanding of these records while they

18  deliberate, they surely can.  But I don't think the indication

19  of these phone calls is misleading.

20        And I do believe it's entirely relevant the timing of

21  defendants and their conspirators' calls to each other whether

22  or not they are picked up or not, so I don't believe a length

23  of time is necessary for these charts.  And certainly the

24  preparer of the chart can be cross-examined and defense counsel

25  may want to do so regarding the length of the various calls.

1          Regarding August 11, 2014 on Exhibit 10-1, I think it

2    is entirely relevant and not misleading in any way that

3    Defendant Roberts spoke to his competitor, Scott Brady, within

4    two hours of submitting his bid to KFC -- or to RSCS for the

5    KFC contract.  So I don't quite see how it's misleading to

6    identify that call in this summary.

7          Regardless, I think with respect to the arguments with

8    respect to phone calls, I think some of this may be moot or

9    maybe just been argued other ways for defendants because I do

10   understand that they believe phone call summaries are

11   appropriate.  And I believed that Defendant Austin's counsel

12   has previously tried to offer a summary exhibit excerpting

13   certain phone calls.  I am just noting that for the record.  I

14   don't know that it really affects the argument because the

15   government's point is that this is entirely proper.

16         But I don't believe the phone calls on these dates is

17   misleading.  It is entirely relevant, this volume of calls, and

18   the participants occurring just the two business days preceding

19   the deadline of bids that was articulated by RSCS, and that

20   appears in the second line of Exhibit 10-1.

21         With respect to Tyson, I know Mr. Tegtmeier referenced

22   the August 11 bid submission, but I will note this was a

23   continuing negotiation process.  Numerous witnesses from RSCS

24   have testified about the three-round bidding process and how

25   negotiations were continuous during this.  And, in fact, I

1    believe already in evidence, although not reflected on this

2    chart, on the evening of August 14, Rich Eddington from Tyson

3    e-mailed Defendant Mulrenin asking for a call for the following

4    day, August 15, to discuss Tyson's bid that had been submitted.

5    And it's that next day, August 15, that Defendant Brian Roberts

6    had a phone call with Defendant Penn.

7           So I believe it's entirely relevant and not misleading

8    in any way that Tyson participated here given that they

9    submitted a bid.  They were in contact with their competitors

10   around their competitors' submissions of bid and Tyson received

11   feedback from the customer.  So I think it just goes back to

12   the point that a summary chart like this can present evidence

13   favorable to one side.  I don't know that the -- you know, like

14   showing of a phone call is necessarily favorable in itself, but

15   I did want to make that point.

16          If I missed anything, feel free to let me know.  I am

17   happy to argue more, but I believe I touched on Mr. Tegtmeier's

18   points.

19          But I will go back very, very briefly to the last

20   exhibits we noted because I did receive a reminder wanting to

21   note regarding Mr. Searcy Wildes from Perdue, I believe

22   Mr. Beller had said there was no indication that Mr. Wildes was

23   in any way involved with Chick-fil-A.  But Exhibit 920, which I

24   believe has been entered into evidence now, does contain

25   Mr. Wildes receiving an e-mail from Chick-fil-A, so there is in

1    evidence his participation with respect to that customer.  And

2    regarding a lack of testimony, Mr. Wildes is unfortunately

3    deceased, so he would not be able to provide testimony.

4            *THE COURT:*  Ms. Carwile?

5            *MS. CARWILE:*  Yes, Your Honor, thank you.

6            Very briefly, on behalf of Mr. Austin, I would like to

7    correct Ms. Call's statement.  There was one attempt to show

8    Mr. Bryant a set of phone calls between Mr. Austin and

9    Mr. Pepper.  The government objected to that chart being shown

10   to him and it was taken down.  It was not offered or entered

11   into evidence.  So for whatever it's worth, Mr. Austin does not

12   believe and I assume my colleagues agree that the attempt to

13   show Mr. Bryant one chart waives our argument that these

14   summary charts are misleading or improper.  Thank you.

15           *THE COURT:*  Yes.  Go ahead, Ms. Pletcher.

16           *MS. PLETCHER:*  Thank you, Your Honor.

17           Very briefly, two points with respect to Exhibit 10-1.

18   One is Pages 3 and 4 have multiple references to the King

19   testimony.  And for reasons previously discussed -- I won't go

20   through it again -- but we object to that.

21           The second point is that the first entry dated

22   8/7/2014, 4:17 p.m. on this particular chart is another great

23   example of the contrast with *Renteria*.  This one is an even

24   more egregious example of how the charts in this case differ

25   from *Renteria* because the excerpted language is not even just a

1    full sentence.  It's two phrases excerpted --

2         THE COURT:  Which one are you talking about again?  I

3    am sorry.

4         MS. PLETCHER:  Yes.  Your Honor, we are talking about

5    the very first entry in Exhibit 10-1.  It's an e-mail from

6    Mr. Lewis to Mr. Austin, and the underlying exhibit is 1139.

7         THE COURT:  Go ahead.

8         MS. PLETCHER:  So Exhibit 1139, if we can pull that

9    up, you can see very clearly how the two phrases that the

10   government excerpted are actually from different sentences,

11   different portions of this e-mail.  And excerpting them and

12   putting them together with an ellipses into the summary chart

13   really distorts the meaning of the entire document.  That's

14   just an example of how it differs again from *Renteria* where

15   they are just simple excerpts of transactional data from a

16   business record.

17        THE COURT:  Ms. Pletcher, can we highlight those

18   portions?

19        MS. PLETCHER:  Your Honor, we can do that.

20        So the portions excerpted from into the record -- the

21   portions excerpted into the summary chart are the phrase, "we

22   requested that you provide the following."  And that is from a

23   sentence that says, "During our discussions, we requested that

24   you provide the following."  And this is Mr. Lewis who is

25   writing to Mr. Austin with a summary recap of the meeting that

1    they had on August 1st.

2            And then a few bullet points down, one of the items

3    that Mr. Lewis requests is a "realistic cost model."  And just

4    that points "realistic cost model" was excerpted and put into

5    this summary chart.  But there is actually quite a bit more

6    that Mr. Lewis describes.  And beyond the realistic cost model,

7    he is asking for several other things.

8            And this e-mail suggests that they are engaged in a

9    negotiation that Mr. Lewis hopes will be productive and there

10   is a, "give and take" that Mr. Lewis asks for.  And that

11   message which is the heart of this e-mail is really lost when

12   these two phrases are excerpted and put together with an

13   ellipses suggesting that somehow there was a problem or

14   providing something realistic.  It just distorts the meaning of

15   this e-mail.

16           *THE COURT:*  Thank you.

17           Mr. Byrne?

18           *MR. BYRNE:*  Yes, Your Honor.

19           Just really quickly with respect to Mr. Little, we

20   know already from the testimony that Mr. Little didn't have

21   anything to do with the Kentucky Fried Chicken account, and yet

22   we have phone calls here starting on 8/15 at 4:08 with Carl

23   Pepper.  And then on Page 2 of this exhibit there are other

24   phone calls with Mr. Kantola, Mr. Austin.  But there is

25   absolutely nothing connecting him to this.  There is no mention

1   of him in e-mails or anything.  So I would suggest that this is

2   improper argument because there is no connection between

3   Mr. Little and this at all except the inference that the

4   government is trying to draw.

5            THE COURT:  There is one.  There is a call to

6   Mr. Little at the bottom of Page 1.

7            MR. BYRNE:  And then there are several on Page 2.  But

8   none of the e-mails refer to him.  And it just so happens he is

9   talking to those people during this time period.  So obviously

10  that's the inference the government wants to draw that he is

11  involved in this somehow with no other evidence, so it's very

12  argumentative.

13           THE COURT:  Okay.  Ms. Call, did you want to respond

14  to those last couple of arguments?

15           MS. CALL:  Yes, Your Honor.

16           First off, with respect to arguments this is

17  misleading, I will note that this particular exhibit I believe

18  has been one that defense counsel have had since October 6 of

19  this year and had multiple opportunities to raise these

20  arguments, so it does seem a bit late given that they are doing

21  it now on the eve of them being offered, but I understand their

22  arguments about why they believe that is proper.

23           With respect to that initial Docket 1139, I believe

24  Mr. Lewis was actually cross-examined on either this e-mail or

25  one of the identical or similar ones sent to other suppliers,

1    so I don't believe there is a risk of the jury being misled in

2    any way by the excerpted.  Nevertheless, I also think it's

3    factually not misleading given that in part in this e-mail what

4    Mr. Lewis asks for is a cost model by August 19.  And the fact

5    that that was what he asked for and what was understood by the

6    defendants is supported by the fact that most of them did then

7    indeed submit their cost models on August 19th.  So I don't

8    think the excerpting misleads at least that request.

9            Perhaps Ms. Pletcher was saying there are other items

10   in that e-mail that she or other defendants would prefer to

11   highlight, which they are certainly free to do on

12   cross-examination and free to do in argument if they wish.

13           With respect to Mr. Little's inclusion on here, Robbie

14   Bryant has already testified in this trial that as a part of

15   the conspiracy, at least at Pilgrim's, that individuals at

16   Pilgrim's would be requested to reach out to competitors even

17   if they weren't involved on that particular count -- or

18   account, sorry.  And Mr. Bryant specifically testified about

19   why he asked Scott Tucker, who was another Koch employee, to

20   reach out to Mar-Jac, competitor, regarding US Foods.  I

21   believe specifically noting his testimony that Mr. Tucker

22   wasn't involved in the US Foods account, but that Mr. Tucker

23   had contacts at Mar-Jac and that's why he trusted him to take

24   that conspiratorial step.

25           So I believe Mr. Little's inclusion is proper based on

1    the fact that Defendant Little did have contacts at

2    competitors, and along those same lines he could have reached

3    out to others in furtherance of the conspiracy with respect to

4    the KFC negotiations even if he wasn't specifically assigned to

5    that account.

6            I think I hit everything that I wanted to hit on this

7    one, so thank you, Your Honor.

8            THE COURT:  Mr. Tegtmeier?

9            MR. TEGTMEIER:  Your Honor, I would like to respond to

10   the allegation that we should have done this sooner and we

11   should have brought up these objections sooner.

12           THE COURT:  Let's not get into that.  Obviously, we

13   are spending so much time on this because I am not foreclosing

14   you from doing so, so I don't think we need to respond to that.

15           MR. TEGTMEIER:  Thank you.

16           THE COURT:  Anyone else on 10-1?

17           All right.  Let's turn over to the next one which is

18   10-2.

19           Ms. Henry?

20           MS. HENRY:  Your Honor, on 10-2 there is a phone call

21   about three quarters, maybe two-thirds of the way down, Scott

22   Brady with Bill Kantola it says.  We entered into a stipulation

23   this week with the government which made it clear that the

24   number which is reflected on Exhibit 1239 that Scott Brady's

25   phone number calls to is actually a Koch office number.

1              The government has cited I guess under the exhibit

2    numbers they put 7040 and 9010.  9010 is an exhibit that was

3    discussed yesterday.  The government offered it not for the

4    truth of the matter asserted, and Your Honor actually repeated

5    that as we went through that exhibit.  So to the extent they

6    are now using it as a reference for truth of the matter

7    asserted, that is clearly inappropriate and misleading.

8              7040 is consistent actually with the stipulation that

9    was entered into.  It also refers to the number as an office

10   number, so it is definitely misleading to say that the phone

11   call took place between Scott Brady and Bill Kantola.  And to

12   be clear and maybe save us a smidgen of time, that same issue

13   comes up on Exhibit 10-3.

14             THE COURT:  Thank you.

15             Ms. Carwile?

16             MS. CARWILE:  Thank you.  Very briefly, one of the

17   exhibits underlying this chart, 953, has a limiting instruction

18   that isn't noted on this chart, so we would ask that to the

19   extent those are being added, that it be added to that exhibit.

20             THE COURT:  All right.  Was it not for the truth, but

21   rather effect on the listener?

22             MS. CARWILE:  Yes.  I just checked the transcript and

23   I believe the part of the e-mail from Mr. Slider was being

24   offered for the effect.

25             THE COURT:  Thanks for pointing that out, Ms. Carwile.

1            Additional objections?

2            Okay.  Response, Ms. Call?

3            *MS. CALL:*  Yes, Your Honor.

4            *THE COURT:*  Go ahead.

5            *MS. CALL:*  First to briefly follow up on my citation

6   to Mr. Bryant's testimony, I did have the opportunity to look

7   back at that and I believe he actually did specify that

8   Defendant Little had contacts at Tyson Foods, I believe some of

9   the calls with Defendant Little to be used on 10-1.  I just

10  wanted to note that for the record.

11            With respect to the calls between Scott Brady and Bill

12  Kantola, what Ms. Henry was referencing is that Exhibit 9010,

13  which is Scott Brady's contact list, identifies the number

14  ending in 8818 as one associated with Bill Kantola.  And when

15  Your Honor admitted it for that non-hearsay purpose, it's for

16  the fact that Scott Brady believed that he was contacting Bill

17  Kantola when he called that number, and that is the very

18  directionality, I believe, of this call here.

19            But I will add that Exhibit 7040 which Ms. Henry

20  referred to is an e-mail from Defendant Kantola where he lists

21  that number as his own office number in his e-mail signature

22  for Koch.  So I think it's entirely relevant and I don't really

23  believe it's an argument that Scott Brady believed he was

24  calling Kantola because it's the number in his phone for

25  Kantola, but it's also the number that Kantola represented to

1    his customers, to everyone he conducted business with was

2    associated with him.

3            And employees at that time and I think Kantola at the

4    company had every interest in the accuracy of what they put in

5    their e-mail signatures.  They broadcasted out to their

6    business contacts that this is how you can contact me, so I

7    believe that is a reliable means of establishing that

8    association of that number with Defendant Kantola specifically.

9            And then I think that is everything I wanted to

10   address, and once again thank Ms. Carwile for pointing out 953.

11           *MS. HENRY:*  First, I note there was no reference to

12   the stipulation that made it clear that it is a Koch office

13   number.  With regard to the E-signature, it is a -- we are not

14   contesting that it's not a number where you might be able to

15   reach him or you might be able to leave a message to get him,

16   but to say that it is a phone call with him is misleading.

17   There is no issue about that.  And I don't believe that

18   Ms. Call, anything that she has said contradicts that point.

19           With regard to 9010, it was explicitly admitted not

20   for the truth of the matter asserted and not for the truth of

21   the material that was specifically in there.

22           *THE COURT:*  All right.  Mr. Fagg?

23           *MR. FAGG:*  Thank you, Your Honor.

24           With respect to the reference to the phone call or the

25   inclusion, rather, of the phone call between Mr. Lovette and

1    Mr. Austin which is referenced at 1:58 p.m., we would object to

2    that inclusion based on the again comparison with the *Renteria*

3    case, as well as the finding from *U.S. v. Miller* which was

4    cited in the Court's order at ECF-741.  That summary should not

5    include any -- I am not going to go through the whole list, but

6    they should not include any interpretive or inferential

7    statements drawn from the underlying evidence.

8         The inclusion of Mr. Lovette's phone call here with a

9    colleague at the same company we think is misleading to the

10   jury and would object to its inclusion and think that it should

11   be excluded from this exhibit.

12        *THE COURT:*  All right.  Go ahead, Mr. Lavine.

13        *MR. LAVINE:*  I just have a brief comment to make here.

14   On this exhibit, Your Honor, most if not all the documents were

15   not introduced by any witness.  And so clearly this goes to the

16   point that we have been trying to make as far as being

17   argumentative.  This is the government's characterization of

18   this matter and so in a sense this is their argument to the

19   jury as to what should happen because there is no testimony

20   about this.  Thank you, Your Honor.

21        *THE COURT:*  Thank you.

22        Additional objections on 10-1?

23        *MR. TUBACH:*  Just briefly, we will join in Mr. Fagg's

24   objections relating to the relevance of the phone calls with

25   Mr. Penn.  It's the same issues that relates to -- I said 10-3.

1      I meant 10-2.

2            THE COURT:  Now we are on 10-3.  I am sorry, Ms. Call.

3      I didn't allow you to respond.  Let's go back to 10-2.

4            Anything that you would like to add to the points that

5      Mr. Fagg and Mr. Lavine and potentially Mr. Tubach mentioned?

6            MS. CALL:  I think the only thing I'll note is that

7      the participants in nearly every entry on this list are charged

8      in either this case or others, so they are obviously not

9      available to testify with respect to these communications.  And

10     RSCS is perhaps the one or two exception.  There have been

11     several witnesses from RSCS, although that's only for the facts

12     of the phone call.

13            With respect to the Lovette/Austin call, I think it's

14     entirely relevant and not misleading that there was a call from

15     the customer to Austin.  Austin thereafter called his

16     supervisor, Penn, who -- and this obviously is not contained in

17     the chart, but Defendant Penn and Lovette were in communication

18     within 10 minutes of the call.  And I won't -- anyways, within

19     10 minutes of that call, Defendant Lovette called Austin and

20     spoke for actually quite some time.  So I think it's relevant

21     that that chain of calls, that they are near in time.  And as

22     participants, while they are at one company, they are all

23     charged as conspirators in this case.

24            We can move on to 10-3.

25            THE COURT:  Let's quickly talk about 10-3.

1        Mr. Beller?

2        MR. BELLER:  Thank you, Your Honor.  You said quickly

3    and I will.

4        Your Honor, I would note that the final entry on 10-3

5    is subject to a limiting instruction.

6        THE COURT:  That's on Page 2?

7        MR. BELLER:  This is on Page 2, Your Honor.  Thank

8    you.  This is Exhibit 955.

9        THE COURT:  Right.

10       MR. BELLER:  I would also note on this particular

11   exhibit that the preceding entries are from 8/29 through 9/3.

12   None of them include either Mr. Stiller nor Mr. Justice.  And

13   so we suddenly have this series of telephone calls and a single

14   text message followed by the last entry, Exhibit 955, from

15   Mr. Stiller to Mr. Justice.  And I believe that it requires the

16   jury or asks the jury to make a logical leap that isn't simply

17   fleshed out in the evidence and I believe that that's

18   misleading.

19       THE COURT:  Ms. Pletcher, go ahead.

20       MS. PLETCHER:  Thank you, Your Honor.

21       Quickly, the first entry on this exhibit, 10-3, is a

22   phone call from Mar-Jac.  We don't know who or what number to

23   Mr. Jayson Penn.  And this is a good example of the misleading

24   connection between a phone call and an e-mail.  There is no

25   connection that we understand in evidence anywhere of

1   connecting a phone call from Mar-Jac, again no individual

2   specified, to Mr. Penn related to this e-mail between Mr. Lewis

3   and a number of individuals that's listed right below.

4        And this is that, you know, Frankenstein, I think one

5   of my colleagues called it, nature of these exhibits that pulls

6   together phone calls and tries to make an inference that

7   they're related to e-mails that are next to them.  So we object

8   to that and frankly to the relevance of this phone call between

9   Jayson Penn and somebody unnamed at Mar-Jac on this exhibit.

10  Thank you.

11       THE COURT:  All right.  Thank you.

12       MS. HENRY:  Very briefly, Your Honor.  It's the third

13  phone call on 10/3 which has the same issues as I addressed

14  earlier.  And I have to point out that it is just striking that

15  Ms. Call's response on this is, in fact, argument.  It is not a

16  summary of what is in the evidence.  It is pure argument.

17  Thank you.

18       THE COURT:  Thank you, Ms. Henry.

19       Additional objections on 10-3?

20       Okay.  Unfortunately we are not going to get through

21  all of them, and that then begs the question of what to do on

22  Monday.  We have some testimony that we need to finish up, but

23  then we run into -- once that's finished up, we run into the

24  problem of Ms. Evans, who is the sponsor for the summary

25  exhibits.  Of course, the government may be admitting some

1    non-summary chart exhibits.

2         Ms. Call, what's your suggestion on how we approach

3    Monday in light of not having gotten through everything today?

4         MS. CALL:  Your Honor, I know I usually do try to have

5    a useful suggestion as to timing.  I don't know that I have a

6    particular one.  I suppose one option could be to have the jury

7    arrive later that day to the extent counsel has additional

8    objections they want to raise to the remaining summaries.  That

9    may be the best, but I would be open to other suggestions as

10   well.

11        MR. BELLER:  Your Honor, if I may inquire of Ms. Call

12   and her team whether -- I don't know what their internal

13   protocols are and whether they are going to even be permitted

14   to be in court on Monday.

15        THE COURT:  Ms. Call, we know that a member of the

16   team had a positive rapid test.  And I am presuming that the

17   rest of the team could have rapid tests between now and Monday.

18   I mean, I don't want to probe into your health stuff, but

19   anything you can help us with in terms of Mr. Beller's

20   concerns?

21        MS. CALL:  Yes, Your Honor.  Thank you for raising

22   that, Mr. Beller, because it's a good point.  I had somehow

23   forgotten.  We are obviously all remote right now.

24        I believe every person who would sit at government's

25   table will be getting tested in the interim.  I don't have the

1  specifics as to whether each is a rapid versus a PCR, but we

2  will hopefully have results by Monday.

3          As far as our own internal protocols, I think we are

4  all still following up and ensuring we have an accurate

5  understanding of those, so I don't want to misstate it, so I

6  don't know that I have an answer on that at the moment.  I

7  think what I'd hope for is to the extent our internal protocols

8  do allow us to come in on Monday provided we have had negative

9  test results, we would want a member of the government team who

10 has received a result at that point to be at the table.  And if

11 there is any issue with any particular person, we will confer

12 with defense counsel and see if there is any change that needs

13 to be made, but I think at this point we are hoping that it

14 becomes -- in the next day or so as we receive test results.

15         THE COURT:  In terms of the PCR results, typically

16 what would happen in Colorado is if you got a PCR test tonight,

17 you might get the results Sunday evening.  But if you were to

18 get a test tomorrow, I doubt that you would know the results of

19 that.  Rapid tests, of course, would be different.

20         MS. CALL:  Yes, Your Honor.  I will note at least for

21 myself I will be heading out to an appointment once we get out

22 of this hearing.  And it is our understanding that at least

23 each counsel at the government's table will have results by

24 Sunday, but I know it's not always predictable.

25         MR. KOENIG:  This is Michael Koenig.  May I interject?

1    I had to step out to go get the PCR test.  And the best they

2    could tell me was two to three days.  They couldn't narrow it

3    down any more than that.  So it sounds like Your Honor is

4    right.  We might get the results Sunday.  There is no

5    guarantee.

6          The other thing is we are having trouble locating the

7    rapid tests.  They seem to be sold out just about everywhere,

8    so we are still looking into that.  And also just on a related

9    note, we are coordinating with the marshals with respect to the

10   courtroom and making sure, you know, that there is -- I think

11   there is some sanitation steps that need to take place; is that

12   right?

13         THE COURT:  I am not sure.  Sanitation issues was a

14   big deal way back when.  I once upon a time, this is over a

15   year ago, I searched world literature to find any evidence

16   whatsoever of anyone contracting COVID-19 from a surface and

17   found one issue that people suspected in a hospital in South

18   Africa, one involving an elevator button in China, and both of

19   the studies were problematic.  There has been nothing better

20   since then, so I appreciate that, Mr. Koenig, because the

21   marshals may be following some older stuff.

22         MR. KOENIG:  We are told they are getting guidance

23   from their upper levels as well, but in the meantime we will

24   avoid elevator buttons.

25         THE COURT:  I don't think you need to avoid elevator

1    buttons.  Yeah, but I do know that the DOJ could have some

2    protocols of its own that may be strict, so that obviously is a

3    problem.  And I would -- you know, because we can conduct

4    business like we just did this afternoon with you being remote,

5    even if the DOJ protocols trip you up, it would be better to

6    try to get ahold of the jurors right away because it's already

7    Friday after 5:00 to see if we could reach them and forestall

8    their arrival in the event that there could be a problem.

9          Mr. Gillen?

10          *MR. GILLEN:*  Your Honor, may the defense confer very

11   briefly out in the hallway about the scheduling issues and the

12   impact it would have on defense witnesses?  And we are in

13   uncharted territory as to whether we would be going forward in

14   any event with the DOJ issues.  If we could have maybe 60

15   seconds if the Court would given us some time.

16          *THE COURT:*  I can give you more than 60 seconds.

17          *MR. GILLEN:*  Okay, good.

18          *THE COURT:*  But not too much more.  I'll stay on the

19   bench, but we will take a quick recess so you can confer on

20   that issue.  Ms. Call or Mr. Koenig, if you want to check on

21   anything you haven't already checked on, go ahead, but defense

22   counsel is going to step out for just a minute to do that now.

23          (Brief recess.)

24          *MR. TUBACH:*  Your Honor, I think we have been trying

25   to confer.  It probably took longer than 60 seconds, but with

1    10 teams we got remarkably little accomplished.

2         *MR. GILLEN:*  I think we got something accomplished,

3    Your Honor.  This is what the defense would suggest.  We've got

4    issues concerning the summary exhibits and then who knows

5    what's going to happen with DOJ.  We come in, we finish with

6    the exhibits in the morning.  We have testimony on Monday

7    afternoon.  Perhaps that might extend the government's case

8    into Tuesday morning.  Then for witnessing purposes we would

9    then be prepared to start the defense case on Tuesday

10   afternoon.  And maybe that works out, but that's for planning

11   purposes that we could live with that.

12        The other thing that we would really request the Court

13   to do is we've got people coming in from out of town.  We

14   thought we would be able to get them up on Monday and Tuesday.

15   They want to spend Thanksgiving with their family.  And we

16   would ask the Court to stop taking testimony at noon on

17   Wednesday so that people could make flight arrangements to get

18   home and spend Thanksgiving with their family.

19        *THE COURT:*  The witnesses or just generally?

20        *MR. GILLEN:*  Excuse me?

21        *THE COURT:*  Generally, or are you talking in

22   particular about the witnesses?

23        *MR. GILLEN:*  Witnesses and generally because other

24   folks would like to get back.  So if we stopped at noon on

25   Wednesday, we could then assure witnesses that they would be

1    able to make arrangements to get back to spend Thanksgiving

2    with their family and that way we would be able to be prepared

3    to then go forward.  We'd then come back and hopefully finish

4    up.  I believe we are scheduled to come back on Monday.

5              THE COURT:  Yeah.  I don't know what all of your

6    schedules are, but I am worried about you too just because I

7    know that there is some weather that may be affecting the East

8    Coast and a jet stream issue.  Maybe you have your flights

9    already, but anyway that's reasonable to take Thanksgiving into

10   account.

11             Ms. Call, your reaction to Mr. Gillen's proposal?

12             MS. CALL:  A couple -- and before we do part today, I

13   would like 30 seconds to respond to 10-3 because I don't

14   believe I was heard on that.  But for Mr. Gillen's proposal, I

15   think first off, I did hear the mention of witnesses flying in.

16   And I will note that the government still does not know the

17   identity of any witnesses planned for next week.  I know that

18   Mr. Beller did note that the agreement regarding documents for

19   direct examination is two days' notice to the government, but I

20   do believe it's harming our ability to prepare for

21   cross-examination not knowing who of dozens of witnesses may be

22   coming up in a couple of days.  So I will note that and just

23   repeat the request for clarification on the defendants' witness

24   list for our preparation of our cross-examination.

25             With respect, though, to the timing on Thanksgiving,

 1    just to make sure I understood it correctly, was it a request

 2    for early release?  I may have just misheard a little bit.  I

 3    don't think the government has travel plans that are affected

 4    next week, so I don't have a strong thought as to the timing

 5    for Wednesday.

 6         THE COURT:  Mr. Gillen, the proposal is to end at

 7    noon?

 8         MR. GILLEN:  Accurate, Your Honor, on Wednesday.

 9         THE COURT:  Yeah, I do -- I am worried about the

10    frustration of the jury because they are being subject to such

11    a hodgepodge.  On the other hand, I guess the issue is whether

12    the defendants knowing, or at least having a much better idea

13    than I do how much time is going to be needed to finish the

14    case, because it's got to finish on time.  If I have got

15    assurances about that, then I certainly would want to make sure

16    that people can make Thanksgiving wherever they may live.

17         MR. GILLEN:  Your Honor, I can give you as most

18    definitive an assurance as I possibly can without knowing the

19    universe of what others may do, but I think that we -- that

20    there is a virtual certainty that we will finish before the

21    Court's deadline of the 21st of December.

22         THE COURT:  Yeah, I think that the defense case --

23    this is just my prediction -- will go more smoothly because for

24    one thing there aren't as many separate people objecting.  And

25    for that reason I think just naturally it would tend to go more

1    quickly.  So yes, with that representation we will end

2    Wednesday at noon.  And I think that will give the witnesses

3    some assurance that they will hopefully be able to get flight

4    arrangements to give them a better chance of going home.

5              MR. GILLEN:  Thank you, Your Honor.  And the defense

6    case will be prepared to start in the afternoon of Tuesday.

7              THE COURT:  I think that's realistic too.

8              MR. GILLEN:  Thank you, Your Honor.

9              THE COURT:  Okay.  So Ms. Call, what we are going to

10   try to do, and if this is acceptable to the government, is we

11   will plan on Monday morning do what we have been doing.  That

12   will at least give us a working plan in the event that the

13   government is tripped up by some of the internal DOJ

14   regulations or testing or whatnot.  But we should -- so we will

15   plan on getting through the summary exhibits and me ruling on

16   them and hopefully we will get all that done.  Then we will

17   have the jury come back at 1:30 on Monday to resume with

18   testimony.

19             Will that work with your witnesses, Ms. Call?

20             MS. CALL:  Yes, Your Honor, I believe so.

21             THE COURT:  And then we will proceed as Mr. Gillen

22   outlined, all right?

23             Anything else that -- and you wanted to make,

24   Ms. Call, a brief record on 10-3 while you thought of it, and I

25   will allow you to do that real quickly now.

1          MS. CALL:  Thank you, Your Honor.  Yes, I did want to

2    articulate the good faith basis for the inclusion of the call

3    with Defendant Penn that counsel raised.  That is the first

4    line item on 10-3.  As I believe folks in the room are aware,

5    Government Exhibit 1030, which has not been admitted into

6    evidence yet, is handwritten notes from a Mar-Jac employee,

7    Pete Martin, identifying a call with Jayson Penn and the

8    document is dated this very day.

9          As of the date of this call, the Court has already

10   found three Mar-Jac employees by a preponderance of the

11   evidence to be conspirators.  I think all that taken

12   together -- and Mar-Jac did submit some similarly high bids to

13   the competitors for the RSCS negotiation.  So notwithstanding

14   1030 not being in evidence, the government does have a very

15   good faith basis for including that call between Defendant Penn

16   and a number associated with Mar-Jac in this exhibit.  So I did

17   want to ensure sure that is articulated.

18         THE COURT:  Okay.  Ms. Pletcher, I know you are

19   chomping at the bit to respond to that one, but I think we are

20   going to hold that.  I will remember where we were.  Anything

21   else, Ms. Pletcher?

22         MS. PLETCHER:  Yes, Your Honor.  I believe I owe the

23   Court a copy of *U.S. v. Cameron* which I will hand up to the

24   Court.

25         THE COURT:  Great.

1          Mr. Fagg?

2          *MR. FAGG:*  With respect to Government Exhibit 9057,

3   the government -- the Court had asked for briefing by today.

4          *THE COURT:*  Which one was that?

5          *MR. FAGG:*  That is the USAPEEC e-mail about the trade

6   organization.

7          *THE COURT:*  And the government responded.

8          *MR. FAGG:*  The government did and we are filing

9   something momentarily.

10          *THE COURT:*  No problem.  I will look for that.

11          Anything else?

12          *MS. JOHNSON:*  Your Honor, for Mr. Blake.  There was a

13   filing this morning by the government regarding two exhibits

14   the Court had a lengthy discussion on, and we are responding to

15   that with your permission, probably later this evening.  Thank

16   you.

17          *THE COURT:*  Okay.  I will look for that as well.

18          Then we will be in recess until -- one thing before I

19   say that so people don't pop up with something.

20          So Ms. Call, if there are some developments, you know,

21   in terms of the testing or whatnot that are material to our

22   schedule on Monday, please file something, and we'll look for

23   that over the weekend.

24          *MS. CALL:*  Yes, Your Honor, we will.  And I do just

25   want to repeat the request because obviously the witness list

1    deadline was quite long ago and the list filed by the

2    defendants was just simply not realistic.  And at least the

3    government would like to have a sequence of witnesses of who

4    the defendants plan to call.  I realize there is planning

5    involved, but they have been planning for this trial for quite

6    some time.  And I believe it does prejudice the government and

7    hamper us in our ability to cross-examine because we can't

8    prepare for 80 individuals at once.

9         THE COURT:  Right.  I think the agreement was that the

10   witness order -- the witnesses would be at least whatever the

11   rule is, but obviously it's important that the government get

12   that information so that we can make assure that things go

13   smoothly.

14        MR. GILLEN:  The 48-hour rule will be adhered to, Your

15   Honor.

16        THE COURT:  Okay.

17        MS. CALL:  The agreement, Your Honor, was regarding

18   documents for direct examination.  It did not relate to witness

19   order, but we believe that to be covered by the Court's rule

20   regarding the witness list and the sequence.  And the

21   government throughout their case provided updates.  To any

22   extent that the government's sequence of witnesses changed, I

23   believe we would be entitled to the same professional courtesy

24   at least.

25        THE COURT:  Yeah, I would hope that the defendants

1    don't just exchange exhibits, but also give the witnesses

2    because the witness list is so huge that it wouldn't give the

3    government any ability to plan.

4         MR. GILLEN:  On the 48-hour rule there will be the

5    witness and the documents that will be admitted through that

6    witness, so that will give them 48 hours to get prepared.  I am

7    sure that will be sufficient.

8         THE COURT:  All right.  The Court will be in recess.

9    Thank you.

10        (Recess at 5:16 p.m.)

11                     REPORTER'S CERTIFICATE

12        I certify that the foregoing is a correct transcript from

13   the record of proceedings in the above-entitled matter.  Dated

14   at Denver, Colorado, this 1st day of February, 2022.

15

16                              S/Janet M. Coppock

17

18

19

20

21

22

23

24

25