Exhibit A

**Assistant Attorney General Jonathan Kanter Delivers**

**Keynote at the University of Chicago Stigler Center**

Chicago, IL

Thursday, April 21, 2022

**Antitrust Enforcement: The Road to Recovery**

Unofficial Transcript of Event

**AAG Kanter's Prepared Remarks**

It is wonderful to be back at the Stigler Center. Five years ago, I attended the Center's inaugural antitrust and competition conference. That first conference asked an important question: "Is There a Concentration Problem in America?" In retrospect, that particular conference functioned as a critical inflection point in the conversation regarding corporate concentration and the state of antitrust more broadly — a conversation that we are still having today, but against the backdrop of a dramatically different enforcement and political environment.

I have vivid memories of attending a lunchtime keynote, much like this one, where Judge Richard Posner quipped with a degree of seriousness and a bit of humor: "antitrust is dead, isn't it?" It was a provocative statement, to be sure, but a fair question. Judge Posner was saying the quiet part out loud. Indeed, the purpose of the conference was, in many ways, to assess whether antitrust enforcement still had a pulse and whether it could be nursed back to health.

It turns out that antitrust was not actually dead. If anything, the patient was on the table for open heart surgery.

I am pleased to report that the patient is alive and well, and the prognosis is good. Antitrust enforcement is on the mend, cared for and supported by a broad, bipartisan coalition devoted to its rehabilitation and full recovery.

We are not completely out of the woods yet though. Now we have the distinct challenge — and opportunity— of charting the path forward.

The good news is: that which does not kill us makes us stronger. And I am here to declare that the era of lax enforcement is over, and the new era of vigorous and effective antitrust law enforcement is back But the path will not be easy or linear.

With the remainder of my time today, I would like to outline what I see as ==five pillars of an effective civil antitrust enforcement.== These are not exhaustive and although I am heartened by the productive discussions taking place in Congress to clarify our antitrust laws, Americans cannot afford to wait for new legislation to combat our competition crisis. These five pillars, which are by no means exhaustive, as I noted before, focus on enforcing the laws we already have — as Congress wrote them and as courts have interpreted them for decades.

First, recognize that the purpose of antitrust law is to protect competition.

1    Second, change the language of antitrust so it empowers all Americans to participate.

2    Third, adapt antitrust to address market realities rather than relying on static models and
3    assumptions.

4    Fourth, revive enforcement of Section 2 of the Sherman Act.

5    Fifth, litigate cases to decisions so that the law can develop.

6    Each of these five pillars are worthy of their own discussion or perhaps conference, but I will
7    take my limited time here today just to summarize them a bit and then we can discuss as
8    appropriate.

9    The first pillar is to recognize that the purpose of antitrust law is to protect competition. "The
10   heart of our national economic policy," which is what the Supreme Court said in Standard Oil v.
11   FTC, "long has been faith in the value of competition."

12   Yet somewhere along the way, the antitrust community lost its North Star. Over time, antitrust
13   enforcement turned into a mathematical exercise focused on measuring welfare tradeoffs rather
14   than trusting in the benefits of competition. We took up the impossible challenge of quantifying
15   often unquantifiable welfare effects and speculative efficiencies down to the last decimal point.
16   On the basis of those calculations and projections, the antitrust community took it upon
17   themselves to decide who should win and lose rather than allowing competition and competitive
18   markets to govern that determination.

19   The problem is that standards about measuring welfare tradeoffs turn antitrust into a narrow
20   technical exercise that overlooks the realities of our economy. Antitrust law is about so much
21   more. To paraphrase the Supreme Court in Northern Pacific, antitrust promotes material
22   progress, quality, and innovation, "at the same time" that it supports our democracy and
23   preserves a society of choice and opportunity. Antitrust helps make us both prosperous and free.

24   We usually cannot measure and quantify all of those values. But we can promote them the way
25   Congress intended — by protecting competition and the competitive process.

26   Instead, however, for years scholars and pundits have expended enormous energy debating the
27   meaning of words that do not appear in the statute: the ephemeral "consumer welfare standard."
28   By my back of the envelope calculation, about 831 academic articles have been written invoking
29   the consumer welfare standard, with more than 200 since 2020. It is the academic gift that keeps
30   on giving and given that we're in an academic environment, happy birthday.

31   All of this is fine as an intellectual exercise, but there is just one problem — the phrase
32   "consumer welfare standard" does not appear in any statute, legislative history, or common-law
33   precedents. The vibrant debate around the consumer welfare standard is an attempt to interpret
34   words that are not in the law. Instead, the text of the antitrust laws reflects a value judgment by
35   Congress to protect competition.

36   For generations, Congress has continued to anchor our antitrust laws in a simple but powerful
37   concept: that competition deserves protection. Congress prohibited agreements that restrain

trade, mergers that substantially lessen competition tend to create a monopoly and conduct that monopolizes markets. Where the Sherman Act's prohibition on unreasonable restraints of trade was general, the Supreme Court explained that, based on the common law it invoked, it outlawed restraints that were "unreasonably restrictive of competitive conditions."

The Supreme Court describes antitrust very much the same way. Though there are zero Supreme Court opinions that use the phrase "consumer welfare standard." Instead, the Supreme Court has repeatedly described the purpose of the antitrust laws as protecting competition. For each of the handful of times the Supreme Court has mentioned that antitrust is a prescription for consumer welfare, it has a dozen times reminded us that the mandate of the law is actually competition itself. Even when courts mention the welfare of consumers as a prescription, they do not declare it as the exclusive goal. Indeed, courts have articulated myriad benefits and goals associated with preserving competition and enforcement of the antitrust laws.

Competition itself is the process of rivalry we see it play out in the markets and participate in every single day as buyers, sellers, workers and innovators.

Focusing on rivalry and competition lets us decide the tough questions in particular cases as markets evolve.

I have seen those that say antitrust does not protect our democracy argue that, even though that was plainly Congress' intent, acknowledging that value in the law would not be administrable in particular cases. I would say the same for assessing the allocative efficiency impacts of particular cases. We spend millions arguing about models of the economy and how conduct will hypothetically shift outcomes to the fourth decimal point up or down. Plaintiffs and defendants offer experts to present quantitative models. More often than not, courts reject both competing models and do not believe either side. The judges are on to something. Law enforcers and courts are not central planners capable of consistently making those kinds of measurements. Calculating welfare effects is difficult in non-dynamic markets and is increasingly impossible in today's multisided, cross-subsidized, and dynamic markets.

We can, however, more easily assess how conduct or mergers impact competition and the competitive process. That is how the antitrust laws simultaneously serve prosperity and freedom and all their many values — by preserving economic liberty and letting competition operate to organize our economy.

That is not to say promoting competition never raises tough questions and never requires debate and expertise. Of course, there will always be hard issues and hard cases. However, focusing on competition, will ensure that we remain faithful to the underlying purpose of the antitrust laws, which is that a competitive economy yields innumerable benefits for a free, open and democratic society.

Congress has chosen the values we are to preserve, and it has squarely settled on upholding a competitive process in free markets. Our job is to ensure a fair game, not to choose who wins.

The good news is that promoting competition can be administrable and effective. That is why it is the first pillar in addressing the competition crisis. We need to enforce the laws as we find them and vigorously protect competition as Congress demanded.

That brings me to my second pillar. For too long we have cloaked the antitrust laws in technocratic language. We must use the language of the people and the markets to empower participation in the Antitrust enterprise.

Our competition crisis affects real people. These people are not numbers in a spreadsheet. They are farmers struggling to find competitive buyers for their livestock. They are travelers who cannot afford a plane ticket home to visit family, or consumers who have little choice in who extracts and exploits their data.

When we issue guidelines and speak only of small but significant non-transitory increases in price, or of how vertical effects derive from the elimination of double marginalization, we exclude these people from the antitrust dialogue. This language boxes the public and the courts out of a critical discourse about how their economy is structured.

The technocratic veil around antitrust has helped mask contortions in the law that undermine its purposes. How else can one rationalize a theory that monopolies and competition can coexist? Or that establishment and maintenance of monopoly power are consistent with antitrust law? Using the language of the law and of real people we can be clear — merger to monopoly always lessens competition.

At the same time, a technocratic approach has made antitrust less accessible, and less democratically accountable. Congress, the courts and the people cannot engage with language that is accessible by a small segment of the population. Shielding the antitrust exercise from the public benefits only those with the money and power to hire experts and purchase access. And it shuts out other forms of expertise and real-world experience.

Finally, our inaccessible antitrust system makes it harder for businesses to understand whether their conduct is lawful. Antitrust is supposed to empower businesses to operate to their fullest potential in an economy free from the threat of monopolists. But businesses cannot act confidently if they do not know the rules or if the rules are so complex that it is impossible to rely on them with any degree of certainty.

Of course, economics remains incredibly important. So do other forms of expertise.

But at the same time, you should not need a graduate degree in economics, no offense to our folks here, to understand the law. The challenge before us is to engage in sound reasoning at the same time that we reengage the public with critical decisions that impact the structure of their economy.

That is why one of my primary goals as Assistant Attorney General is implementing the division's Access to Antitrust Justice initiative — "AT2J." Think R2D2 but for antitrust. That means listening to the public. That also means writing our guidelines in language that reflects how people understand harm to competition. For example, we recently published an updated

FAQ to our leniency program. We have an ongoing review of the merger guidelines and as part of that process we're out there listening to all Americans. Not just folks inside the beltway. Not just folks in academia. We're also listening to farmers, to grocery store owners, listening to doctors, emergency room technicians, nurses, these are the people who understand their markets the best and we need to speak to them and we need to give them the language and the taxonomy to speak back to us.

The third pillar is to focus on the competitive realities of today's markets. The digital revolution has brought about change in our economy rivaling, if not exceeding, that of the Industrial Revolution. We must acknowledge that new market realities demand new approaches to competition enforcement. We need to update our tools to meet the facts, not try to contort the facts to fit out of date tools.

The changes in our economy are not confined to digital markets. The internet revolution, the advent of Big Data, and the new ubiquity of connectivity have transformed our entire economy, from finance to healthcare to energy to retail and so on. Now you order your ticket online in advance, interacting in seconds with a dozen or more interconnected businesses. Across the economy, businesses are harvesting more data, gatekeepers are growing in strength and automated decision-making is changing business paradigms. Just as our economy evolves, so must the tools that we use to understand it. In the absence of evolving our tools, not only will we not be effective, we will be destructive.

That will often mean focusing first on the facts when we examine competitive realities, as opposed to beginning with assumptions embedded in out of date models or cases. We need to start with how competition really works in a market, then extrapolate to whether competition would be harmed or a monopoly created or maintained.

It will also mean reassessing whether precedents are outdated because they reflect embedded assumptions about how markets work that no longer hold true. As Justice Gorsuch recently explained in NCAA v. Alston, analysis of competitive effects follows market realities, and so "[i]f those market realities change, so may the legal analysis." While enforcers and the courts must respect Congress' core command that the antitrust laws should be applied to protect competition, how we do that must evolve as competitive realities themselves involve.

Antitrust enforcers must therefore think critically about where their practices, and the cases, are based on outdated assumptions.

Take Brooke Group. There, the Supreme Court recognized a safe harbor for above-cost pricing, even where such pricing is exclusionary, based upon what it characterized as "the general implausibility of predatory pricing."

A growing body of evidence suggests that above-cost pricing strategies can in fact be a rational strategy for anticompetitive exclusion, particularly in modern digital markets. We need to think about whether an assumption of general implausibility still holds in modern markets when companies often prioritize long-term growth of share price over short-term profitability. Strategies that may have once seemed implausible or irrational can yield eye-popping wealth for

executives that earn more from their shareholding than from salaries or bonuses. Different considerations drive decisions. That necessitates a change.

Another example is the refusal to deal paradigm set forth in Trinko and Aspen. Modern online platforms are cooperatives. They are fundamentally participatory in a way telephone lines and ski lifts never were. Yet Trinko relies on basic understandings about how networks are built and whose investment incentives are most important. If the nature of the networks changes, other parts of the analysis should probably follow.

That is the third pillar: we need to focus on markets as they exist today. If conduct harms competition, the models and tools need to be adapted, not the other way around.

The fourth pillar of my plan is to vigorously enforce Section 2 of the Sherman Act.

Section 2 prohibits monopolization, but when we met here five years ago it was probably the best illustration of Judge Posner's question. At the time there had been no major section 2 litigations to a decision in nearly twenty years, Section 2 was very near death.

Senator Sherman warned that "if the concentrated powers of [a monopoly] are entrusted to a single man, it is a kingly prerogative, inconsistent with our form of government." Yet we now know many such people who enjoy power over markets. Notwithstanding the original goals of the law, we have seen the emergence of monarchs over new industries in the digital revolution.

Senator Sherman wrote the antitrust laws as a prescription. We must vigorously enforce the Sherman Act to prevent the unlawful acquisition, maintenance and extension of monopoly power.

That means we must assess conduct on its merits, and based on the entire course of conduct involved. We need to use all our tools and understanding to assess how monopolies have arisen and how they are maintained. We must challenge conduct that suppresses or destroys competition.

We also need to take more seriously courses of conduct that maintain monopolies. I gave remarks on this point a couple weeks ago in Brussels. Monopoly maintenance, in the form of moat-building strategies, helps to prevent the erosion of monopoly positions and thereby harms competition. We can no longer view individual acts in a vacuum. Digging a moat in front of your castle cannot be considered a separate exercise than digging a moat in the back of your castle. This is all interrelated and for us to actually understand what is really happening in the market place we have to have the willingness and the ability to connect related acts, and understand how moats protect monopoly power and how competition presents itself in modern markets. Because more often than not, it's not through an exact replica of the castle. It's through insurgents and allowing those insurgents to thrive in a free, durable, and uninhibited way, that is competition in the modern market. That presents itself both in individual acts and can present itself through a course of conduct. So that's the fourth pillar.

The fifth pillar that I will discuss today is to faithfully discharge the division's affirmative "duty" to "prevent and restrain" antitrust violations. Our duty is to litigate, not settle, unless a remedy

1  fully prevents or restrains the violation. It is no secret that many settlements fail to preserve
2  competition. Even divestitures may not fully preserve competition across all its dimensions in
3  dynamic markets. And too often partial divestitures ship assets to buyers like private equity firms
4  who are incapable or uninterested in using them to their full potential.

5  At the Department of Justice, we are law enforcers. It is not our role to micromanage corporate
6  decision making under elaborate consent decrees. It is our job to enforce the law. And when we
7  have evidence that a defendant has violated the law, we will litigate to remedy the entire harm to
8  competition. That will almost always mean seeking an injunction to stop the anticompetitive
9  conduct or block an anticompetitive merger.

10 But my emphasis on litigation is not just about institutional competence. It also supports the goal
11 of ensuring the language of antitrust reflects how people think about competition and in ensuring
12 that the law catches up to market realities. If we do not bring cases, the law will stagnate. Even
13 as our economy undergoes revolutionary change, over-reliance on settlement would leave us
14 governed by yesterday's law. We need to bring cases to enable the courts to wrestle with the
15 realities of today's markets and ensure antitrust law is fit for purpose.

16 That is point five: litigate. Congress designed antitrust law to play out in the courts, before
17 judges and juries in an open forum.

18 I want to end my prepared remarks by reflecting on my duty. I swore an oath to uphold the
19 antitrust laws. Just last week, I appeared before a federal court in Denver where I explained just
20 how seriously I take my obligation to protect the American public. Antitrust is a kitchen table
21 issue. The public depends on us to police the channels of commerce against collusion and
22 monopoly. When we fail, families struggle to afford groceries. They earn lower wages. They lose
23 control of their own private data to dominant platforms. The American Dream slips away.

24 That is why the Department of Justice must zealously protect competition. With a healthy diet,
25 steady exercise and regular checkups, I have a feeling that the patient will continue to lead a long
26 and healthy life. I look forward to the work ahead.

27

28 Thank you.

**Transcript of Moderated Q&A**

▉ = AAG Kanter    ▉ = Moderator (Prof. Tomasso)

**Moderator:** Thank you very much, Jonathan. Although you said there are many other pillars – I'm sure this will go through as the 'five pillars' speech of Jonathan Kanter and there will be many articles that will be written about it trying to dissect what you said. Actually, these five pillars give me the opportunity to start reacting, and in the meantime, you can also start thinking about your own questions. So, the first and second pillars. Second pillar in particular: you want to change the language. You want to broaden the language to make it more inclusive. That probably means trying to tell people why this is relevant, why this is relevant to them, to their own lives and then you're going to bring up examples to make it more tangible, make it less technocratic. But ultimately this will become also an exercise in trying to get some measure about things that affect us. It's a price of what you buy at the supermarket or it's something like that. And I was wondering how this squares with the previous point you made: the impossible task of quantifying effects. So, are you not going to get in the same direction, ultimately trying to measure something else and then you end up in the same [place]… you dig yourself in because there will be the consultants [who] are going to come up with their own measures. So how do you reconcile this attempt to broaden and also have a narrative that can be explained – which is not just your narrative because you're good and everything – but can also be made accountable.

**AAG Kanter:** Sure, I mean administrability is going to be a challenge always, but I think what you have to do is you have to start with understanding how markets function, right? And the antitrust courts and institutions often do that by talking to market participants, but it's a narrow range of market participants. It's often the competitors and it's sometimes the customers who serve as a proxy, often, for consumers. But what I've discovered as I go out and talk to people throughout the country [is] that antitrust law and mergers and conduct affects a much broader range of people who have not been invited to the conversation. We've been doing our listening sessions with the FTC on the merger guidelines and we hear heart-wrenching stories from hog farmers, from small grocery store owners. And they're experts. They know how markets function because they actually live in those markets, and we can learn a lot about the market realities by speaking to them more often. But one of the challenges is we don't give them a good opportunity to speak to us. [Because] one, is the language is exclusionary. The taxonomy. We don't give them a way in which they can articulate in their own language what the problem is. And when they do, we don't listen or we haven't. Why? Because it's not how we talk about things in the guidelines, or it's not how antitrust lawyers and economists speak. The problem is not with them, the problem is with us, and we have to fix that. Second, the process is exclusionary. Who are the people that get an audience with the agencies? It's the people that can hire the folks in this audience and others. And you're all great and talented and doing important work. But if the only folks who can get access to the antitrust agencies are those who have millions of dollars to spend on quantitative analysis and lawyers, then of course that's who we're going to hear from. And so what I'm talking about is developing a better way for us to connect with more people, and making sure that we're not giving – even if it's unintentional – access or preferential access to a small segment – self-selected – of wealthy companies to the exclusion of the broader American public who we are charged to protect.

1  **Moderator:** So in that respect- I think it's very interesting. I think Matt Stoller – I don't know if
2  he is still here – said that about twenty years ago – and I don't remember the specific day – there
3  were comments that were sought for some changes in some guidelines. And the DOJ received, I
4  don't know, twenty comments from economists and consultants. And now a similar process has
5  attracted four thousand comments, which means that some of-

7  **AAG Kanter:** I think it's close to five now five now, five thousand-

9  **Moderator:** Okay now it's [up to five] thousand and counting. But in terms of your own
10 resources then, you're going to listen that's great, but you also need that kind of- you need
11 resources yourselves. And so I don't know, do you have the [resources] and also the
12 skills? Who's going to look at that evidence? Who's going to talk- I mean are you going to
13 have experts in every market? Are you going to have more economists, more lawyers or [you]
14 don't think so? What are the people that you need in the agency?

16 **AAG Kanter:** Yeah so, the antitrust agencies have been chronically underfunded in our
17 resources. I think that's something that I've heard across the political and academic [*inaudible*].
18 The Antitrust Division [has] 350 fewer people today than we did in 1979. 1979! And think about
19 how different our economy is today, how much more complicated our cases are, how much more
20 evidence and data we have to ingest. That is not the mark of an agency that has been
21 appropriately funded to do its job. So we are forced to use the minimal resources that we have as
22 effectively as we can. Since arriving at the Antitrust Division, I have always known the level of
23 talent that exists there, but I've been blown away. I've been blown away by the passion [and] the
24 commitment from top to bottom, [in] every corner of the division, but we need more. And I'm
25 pleased that the President's budget for Fiscal Year 23 would give a significant increase, but it's a
26 start – it's not where we finish. We need to get back on the trajectory that we would have had [if]
27 funding [had] stayed constant after 1979. Also, the demands on us are greater than they've ever
28 been, and people want us to do more. And this is a bipartisan issue in Congress [and] in
29 the public. But to do more, we need more. And you asked about what kind of expertise and skills
30 do we need: more lawyers to litigate, more economists, but we also need other kinds of expertise,
31 right? We need data scientists, we need engineers, we need agriculture experts, we
32 need healthcare experts, we need management consultants, who can help us interpret what we're
33 seeing in our documents. We need the kind of expertise that can go toe-to-toe with corporate
34 America, and we don't have that right now. And that's something we're working to build. And
35 it's a very high priority for me personally to make sure that we have that level of expertise so
36 that we can keep pace.

38 **Moderator:** I want to briefly touch upon your fifth pillar: you want to litigate, but then you have
39 to deal with the courts. And recently you lost two cases. One was this chicken price-fixing and
40 the other one was some poaching of workers. And you lost. So I would like you to comment on
41 what you take out of that, and perhaps of what's being called the 'chickenshit problem'. Can you
42 explain to the audience, what's the 'chickenshit problem'?

44 **AAG Kanter:** Yes, yeah, so we are- I'm here to declare that we are not part of the chickenshit
45 club, which if folks want to look up the excellent book by Jesse Eisinger, who I believe was
46 here during the first Stigler conference. Let me make a few remarks: Those cases were not

1  examples of the courts' disagreement. In fact, both of those cases – which were extremely
2  important programmatic cases, establishing that harm to workers is an antitrust harm – survived
3  motions to dismiss. They generated courts that say these are legally sound cases. We won
4  those decisions, right? What happened is a jury in one case didn't convict, in the other case
5  convicted only on obstruction of justice, not on the antitrust charges. So we're going to continue
6  to bring the cases. We're not backing down. In fact, I sent out an email to our team telling them
7  they had an assignment, which was to find the medium of their choice – for me it's vinyl – pump
8  up Tom Petty's "I Won't Back Down", turn it up, put it on repeat, dance like nobody's watching,
9  and sing out loud over and over and over again, "we're not backing down". But I also want to
10 make sure I get out ahead of the point. These were- in terms of establishing viable precedent,
11 these cases will most often be cited in our favor going forward because the courts agree that
12 antitrust harms that affect workers, are actionable anti-trust harms. Wage-fixing is no different
13 than price-fixing to consumers. This is a legal principle that we established as a result of these
14 cases, these cases – which started before I got there – in the last administration, were courageous.
15 And the team that brought them forward believed with every fabric of their being that they were
16 good for workers, and they were. And we succeeded in proving that point. Going forward, we're
17 going to continue to work to make sure we can bring these cases to juries and we can hold
18 criminals accountable, but I'm extremely proud of the work that the Antitrust Division has done
19 here.
20
21 Moderator: Okay so you lost but you won. So that's a that's an interesting take, and we will see
22 going forward. I need to ask a few questions about the role of economics – there is a huge
23 debate. There is tension, there's been tension this morning in this conference There is a lively
24 debate, trying how to move whether we were helpful or useless and there are self-reflections, as
25 you know. And I'd like to ask you two related questions: What are the topics that you think
26 economists- well one question in fact, which one[s] are the topics where you think that the work
27 of economists should concentrate on in terms of being helpful to an agency? So I have a couple
28 of things in mind, but I may be wrong. One is conglomerate mergers. We talk a lot about those
29 but we do very little. And economics has been very narrow – dissecting small things, little
30 vertical foreclosure theories – but not understanding the bigger pictures of perhaps a different
31 type of approach to conglomerate mergers through the works of economists. The other one is,
32 reintroducing the forbidden word of structural presumptions that economists in the past helped
33 to basically abandon, but I wonder whether economists could resume some of those. But in
34 general, the question is: can economists be helpful and how?
35
36 AAG Kanter: Expertise is always helpful, right? And I think it's important to take a step back.
37 Economists, just like other forms of experts, help us understand markets, help us understand
38 what we're seeing. But the problem in the United States has been [that] economics has been used
39 to address questions of law, not to address questions of fact, right? And so, when you think about
40 what I was just talking about with [Brooke?] Group or Trinko or Amex, the courts are trying
41 themselves to be economists, and they can't do that. They're trying to take economic principles
42 – static principles – [and] embed them in legal decisions and have that become the law of the
43 land without going through Congress. These are value judgments. Economics, just like other
44 forms of expertise, should help us understand what we're seeing in any case, and help us [to]
45 interpret the facts so that we can enforce the law – not to write the law Itself. If Congress wants
46 to consider economics when writing the law, there's a process for that. That's how a bill

becomes a law. There's a whole song you probably don't know it but I can… I'm sure plenty of people here can sing it for you, Tommaso.

**Moderator:** I know the music.

**AAG Kanter:** Well, you're a bill on Capitol Hill… But I think it's, you know at a minimum, understanding that there's a difference between embedding these principles in law and using them to address questions of fact. Second is, we've lost the independent expert, right? Often, folks will come in and talk to us and they'll say they're 'experts', but they're not experts. They're lawyers with PhDs, right? They come in and they're smart and they can give us evidence, but it's just that. It's advocacy, right? And I think we've lost the purity of the expert. And so we're no longer depending on expertise to help us understand problems – we're trying to figure out which one is telling the truth, because you have two really smart people saying different things, right? It's not about… And it becomes just like a legal debate. And I think that has eroded confidence in the role of experts, and I see that in courts. Increasingly, judges just net them out. They say, "well, you've got a great degree and you've got a great degree, and you're saying 'X' and you're saying 'Y'. I don't know which one to believe, so I'm going to go just focus on the documents and the facts. It doesn't happen in every instance, but it's happening with increasing frequency. And that's because it's no longer an exercise in truth – it's an exercise in who's paid to say one thing and who's paid to say something else.

**Moderator:** Why don't you then try to set… I don't know what's the right term… like a working group, where you invite the academics? There are many which are independent, there are many which are very open and progressive, and they are not involved in any- And many are in in this room in fact. But they need to have access to you to understand your problems and you need to have access to them to understand what is the kind of economics they're doing.

**AAG Kanter:** We do that. That's why we have our own team in-house, and they're excellent, and that's why we need to build out our range of expertise, right? Like think about business school: you have a full range of expertise. You go down the hall and you can see different kinds of experts who can engage with one another in an interdisciplinary way. We want to build more of that culture at the Antitrust-

**Moderator:** Yeah precisely – you can see the talent which is out here, but they're not- as I said, [they are] among the many people which are not invited at the table, is that something-

**AAG Kanter:** Well what we often get are submissions from trade associations, or submissions funded by trade associations who are funded by people with an agenda. That doesn't help us solve problems. And so we need more honest brokers in the process. It's getting better, but you know that, when everyone's coming to you… like I sometimes joke with my friends who are economists – and believe it or not I have friends who are economists, many, and I have deep respect for what they do and they're so important to what we do – but I joke that the economists believe so much in incentives except when it applies to economists.

**Moderator:** We said that this morning actually, in one of the sessions.

11

**AAG Kanter:** - Yeah, [so] I think, again, it's fine – these are intelligent people making intelligent arguments. But it's advocacy. And I think we need to start being honest about the difference between advocacy and expertise. Because there is a difference.

**Moderator:** The DOJ, though, hasn't had a chief economist – or whatever it's called in this country, 'Assistant Attorney General [of whatever]' – for many years now actually, under your predecessor. So are you are you going to have a chief economist or not?

**AAG Kanter:** Yes. The answer is yes. I won't tell you who it is, but hopefully it'll be soon. And listen, we're working as quickly as we can under our constraints to get people on-board, but I feel very good about the direction we're going.

**Moderator:** Okay so, we will also make you accountable very soon for that. Couple of more questions I have: one is about revolving doors. I can just bring my own experience. The last time I was [in] my official capacity in the U.S. was at the ABA meeting in Spring 2019. And [there] was a senior official of DOJ – who's not currently a colleague any longer – that in a chat, [was asking me], "so what are you going to do next?" And I said, "I'm going to go back to my academic job" because I was coming up to the end of the job. Then I asked – politely – "and what about you?" And he – very American, very bluntly – said "You know, I'm [just] here- I'm waiting for the right offer from a big law firm." And I was a bit shocked. And when he looked at my shock, and said – he wanted to justify himself, you know – "I got two kids in college." And I didn't find that was a good enough reason. So it's a problem, revolving doors, isn't it? And it's part of all [of] the culture change, and also the people that you work with. How do you motivate people? Obviously, you cannot command salaries from the private sector, but how do we react to that?

**AAG Kanter:** You motivate people by empowering them. And so a few thoughts here: First is, we need to develop – and I see this happening on a daily basis and I find it extraordinarily encouraging – a new crop of mission-driven thinkers, advocates who care about outcomes and are not thinking about [the] revolving door. Second is, not just talking the talk but walking the walk. My front office is still coming together, but let's look who's in there right now: Our Principal Deputy Doha Mekki, who's just absolutely wonderful, was promoted from staff. Hetal Doshi, who's out there, one of our deputies and chief litigators, came from a U.S. Attorney's Office. Carol Sipperly, another one of our deputies and one of our head litigators, [was] with the Antitrust Division [and] a career prosecutor [for the] Southern District of New York [and] also Main Justice. Eric Posner's there from this fine institution. We're bringing in different voices. Different voices mean different perspectives. And different perspectives are the way you deal with addressing these kind of revolving door issues. It can't be the case that the only people who are qualified to work in the antitrust institutions are law firm partners – I think we all agree about that. But I think it's important to make sure that we are welcoming that diversity of viewpoints and experiences when we build our teams.

**Moderator:** And the last question I have, and then I'll open to the floor, is – I bring a European perspective. And when it comes to one of the big topics of this conference, it relates to big digital platforms. And Europe was at the forefront of this fight using antitrust [enforcement]. But also, Europe realized how difficult it is to find remedies, to enforce remedies. And there has been a

realization that antitrust [enforcement] failed in the European domain when it comes to antitrust enforcement against digital platforms, to the extent that- As Europeans, we are more inclined to go towards regulation. And we have developed now a regulatory approach. Something similar is happening here with some bills which have been discussed. And I want to know your perspective. So first, the European approach of recognizing how difficult antitrust [enforcement] is, and is that leading also the U.S. towards more regulation in that specific domain?

**AAG Kanter:** We'll see. I remember my first time at the conference, in the initial conference, I was on a panel. It was alongside many other brilliant people, including Dennis and Austin and Kevin and others. And I remember saying – and I'll pat myself on the back a little bit not to gloat too much – that if we don't- Well, my view at the time that I expressed was, competition is [preferable] to regulation. I'd rather regulate competition than regulate companies. And it is a much better solution. But if we don't get our act together in terms of antitrust enforcement and promoting a healthy competitive economy, then we're going to be looking down the barrel of regulation. So I think we have a choice. I think some regulation is inevitable given the realities of today's world. But there's still hope for competition, and I think that is- The foundation of our democratic society is a competitive market that allows for opportunity and upward mobility. I believe that wholeheartedly, in every fabric of my being, and I think that's what we have to promote.

**Moderator:** Well just to be a bit more precise, the European approach is not about regulation in the canonical sense of regulating prices. It's a regulation which is trying to give competition a chance – through interconnection, through data portability, so that…

**AAG Kanter:** Yes, well I think that's what's happening you know in Congress. So we came out with a full-throated support for some of the bills in Congress. And the idea there is- Congress has the ability, and it's the role of Congress, to clarify what the law means and it's no- Antitrust law has become murky – there are questions about its reach. And so I view clarifications by Congress of what the antitrust law means not as regulation but as law enforcement, and giving courts more guidance as to how they should enforce the law. So it's a very similar point of view in that sense.

13

| | |
|---|---|
| 1 | **Transcript of Audience Q&A** |
| 2 | 🟦 = **Audience Members**   🟨 = **AAG Kanter**   🟩 = **Moderator (Prof. Tomasso)** |

3  **Moderator:** So great. We have some good time for questions. Maybe, I'm sure there will be
4  many, so I'm going to perhaps collect two or three at the time and then this gives also Jonathan
5  some time to think about the question and I'll start with Steve. If there's anyone else, also raise
6  your hand. Steve and then Christina.

7  **Steve:** Thank you, thank you Mr. Kanter. I'm curious about the statement of broadening the
8  audience or I should say the participants into the discussion. And it was very broad so I'd like to
9  use an anecdote just to understand what you mean by a more holistic and broader approach, if I
10 may. So, imagine Amazon, Walmart.com investing heavily in the economies of scale of
11 distribution, of logistics and through that managing to reach many rural small communities with
12 a variety of goods that they never had. And as a consequence, small stores that were located in
13 those rural communities go out of business because they can't compete with the prices or the
14 variety. So now you have a contingency of people who are clearly losers and many small people
15 who are buying more stuff - which we could argue whether they need to - but at cheaper prices
16 with more variety. If not for economic models, I'm curious, how will you manage those trade-
17 offs? Who will come to the table? In what ways will different participants get different weights?
18 And I think that is something that's important to address in order to promote what is good about
19 competition and other parts that may not work that well.

20 **AAG Kanter:** No, it's a fair question. I appreciate it. I'm sorry I know you want to collect
21 questions but it's easier in real time. I'm not saying that we… first of all, I've not said–I just
22 want to be very clear–that we should not have any input from economists or people who
23 understand or have models. What I'm saying is: we can't make our decisions just based on our
24 assumptions and we have to broaden the dialogue so that there are more participants. And so
25 when trying to understand the answer to your question, I'm not going to speak to any specific
26 example or any specific industry. What I'll say is we need a mechanism to make sure we're
27 having a conversation with everybody–right–and then we need to figure out and do the hard
28 work to figure out how we measure the different points of input against the backdrop of what
29 we're required to do by law. But we won't figure out a way to do that unless we try. And I think
30 what we've evolved into as a practice is–not in a necessarily always a destructive way–well,
31 even sometimes unintentionally excluding voices from the conversation. And so because we
32 haven't, we– it's– we have lights that are shining. You know there's a famous anecdote about
33 you know someone's looking for keys and under the lights, in the dark and they're like, you
34 know, oh let me help you, where'd you drop your keys? Over there. And they're like, well why
35 are you looking over here and not over there? Because this is where the light is shining. And I
36 think we just need a little bit more light so that we can understand a broader range of input. We
37 can figure out a way to understand that systematically. But if we only have conversations with
38 ourselves, we only have conversations with an insular community, we're going to miss things
39 and we're not going to find our keys.

40 **Moderator:** There was Christina, then one and two.

1  Christina: Well I thought Steve's question actually, I was going to ask you something else, but I
2  want to pursue that a little bit because what he's pointing to is this trade-off–right–which is there
3  in so many cases, so there is a benefit possibly, who knows, of the conduct, which we call
4  efficiency and there is a harm. And then the traditional path is being, oh let's try and balance
5  them out. And what Steve is suggesting is what can we–can we do it in a–don't you need a
6  model to do this? Isn't the posture now one in which we think, look, let's be serious. The harm
7  can be measured and visible. The efficiency, the benefit is more difficult and more long-term and
8  more uncertain and therefore I do not have to give them equal weight. So, in some sense I focus
9  on the short-term harm because that's what I can see. Isn't it where we are?

10 AAG Kanter: Well this is what I was trying to address in my remarks, which is–you know–we're
11 going to run ourselves around in circles trying to–you know–quantify all the different–you
12 know–balancing. Isn't it better to say, well, competition should figure that out. And so, the
13 question is: is there conduct that's harming competition, so that rivalry can't figure out the
14 answer? And so–you know–the north star should be competition, should be–is the conduct
15 harming the competitive process? Is the merger substantially lessening competition? And there
16 will be debates on how you measure competition. No doubt. It's far from perfect, but ultimately
17 that's what we should be focusing on, rather than trying just to figure out effects.

18 Moderator: One, two, Dina. Sorry, there's lots of questions. Maybe short questions so we can
19 take many more.

20 Question: Sure, hi. Can you speak to your cooperation, your particular group's cooperation with
21 the SEC and the CFTC when a case like a wage-fixing case or a price-fixing case ends up also
22 having 17a or 10b5 implications in terms of securities fraud or disclosure fraud?

23 AAG Kanter: So, our mandate is to enforce the antitrust laws. There are others at the Department
24 of Justice and the SEC that address other areas. Certainly, there can be cross-over, but as I sort of
25 sit–you know, in the context of this conversation–I'm thinking about –you know–has someone
26 violated the antitrust law? And if someone has violated the antitrust law, I need to hold them
27 accountable, and if there are areas, other areas of law that have been violated, it's our obligation
28 to make sure that we're referring those to the proper authorities.

29 Moderator: I also have a question from Twitter, which is: how do you measure successful
30 antitrust enforcement?

31 AAG Kanter: So, Twitter–is that Elon asking the question?

32 Moderator: Somebody on the Twitter just asked: how do you measure successful antitrust
33 enforcement?

34 AAG Kanter: Whether your markets are competitive.

35 Moderator: Question there, there was a question there, and then Dina.

36 Alan: So, Alan [unintelligible last name], you know–

37 AAG Kanter: –I know–

15

1  Alan: –I remember you, I know, I remember you saying if we're going to have Section 2 on the
2  books, we ought to enforce it. Otherwise we shouldn't have it at all. So, congratulations on your
3  new role. It's wonderful. But I wanted to follow up also on the broader conversation issue, but
4  from another perspective, which is being a staff-type person. The antitrust staff has got very
5  good bullshit detectors and they are used to being fed a lot of bullshit and they need to figure out
6  what's true and what's not. I worry that your listening sessions of people who are not prepped by
7  lawyers who can tell them what an antitrust story looks like, or sounds like, or will be receptive
8  are going to run into problems. I mean, I've seen too many instances where lawyers, and frankly
9  economists, will just tune out once they get a particular answer to a question, so this is more of
10 an internal issue.

11 AAG Kanter: Sure, no, it's an important question–right–because that's on us and this part of that
12 AT2J initiative I was mentioning. It's not just broadening the conversation, but making sure that
13 we are listening and we're–you know–one, giving people the opportunity to speak in their own
14 words, using their own taxonomy, and not tune them out because they're not speaking–you
15 know–in antitrust language. And I don't think our staff would or could do that, but I think there
16 are things we can do to help–you know–enhance the ability for that conversation to take place.
17 And some of that–you know– requires changing how we speak about things generally, whether
18 it's in the guidelines, or in our public conversations, to make sure that we–you know–we're not–
19 you know–using words that themselves are exclusionary or impenetrable because we do need to
20 hear from people who are directly affected, or else we're not going to be successful. But that is
21 part of the effort that we're trying to work on.

22 Moderator: The next question is from Dina and then we can have two more and then I think we
23 have to go.

24 Question: So, I hear you saying that we have constrained resources in terms of enforcement and
25 we want to talk to lots and lots more people. At the same time I think of–sort of–from a big
26 picture perspective, firms have gone from talking to lots and lots of people to just, like, rogue,
27 big data analysis. Do you think that antitrust enforcement in the future might mandate
28 corporations to turn over data in a very privacy-safe way, as they're expert at? And then–you
29 know–enforcement sort of migrating to just data analysis?

30 AAG Kanter: Yeah, I think it's–you know–we need to remember that data is designed to reflect
31 what human beings think. And to do that we have to have an opportunity to connect directly with
32 humans. But–you know–data is a big part of what we do and I think in order to adequately
33 understand, ingest, and use data to help assess market realities, we have to have the level of
34 expertise and tools available internally and I think that's something that we're trying to build. So
35 yeah, I think–you know–as information becomes more readily available and more sophisticated–
36 you know–we'll use that information in a sophisticated way. It's not just about listening sessions.
37 But what I do want to make sure that we do in the process is, we don't get so focused on
38 spreadsheets or whatever the–you know–the analytical tools we're using–that we forget that
39 they're people. Those numbers reflect people and we need to make sure we have the ability to
40 understand the views of those people or understand when the numbers on the page–you know–
41 may not necessarily reflect the actual views of humans. And I think that's a tough thing and it's

1  going to be harder as the volume of information gets greater and the more companies rely on
2  data, and AI, and other tools, machine learning. To understand realities, we're going to have to
3  dig in to that too. My view is, we should use all the tools in the toolkit, but that means all of
4  them.

5  Moderator: I will take the last two questions together, so there is a chance you can address both
6  and them, I'm sorry, I wil need to go to a close.

7  Question: General Kanter, very interesting, you talked about making guidelines more
8  understandable to a wider variety of people, and isn't a possible implication that you want much
9  more simple merger guidelines? Think of the 1968 guidelines, which had strong presumptions
10 about–based on concentration–so is, are you suggesting going to a much simpler time in terms of
11 big merger guidelines, for example?

12 Moderator: And the last question is there. [Whisper] Is your question quick?

13 Question: Hi yeah, sort of along those lines, you mentioned that those two cases in which juries
14 did not fully prosecute or value, I guess, these sort of anti-trust concerns. So why do you think it
15 is that the American public and juries are not as concerned with competition, given all the
16 benefits that you mentioned?

17 Moderator: And super quick one.

18 Question: In 2010, the Antitrust Division was ranked 22nd out of 400 as a place to work in
19 government, and in 2020, it dropped to less than, like 404th out of 420. So, morale has
20 plummeted. You know, if you can't get more funding, and you can't get more staff–you know–
21 how are you improving the morale at the Antitrust Division?

22 AAG Kanter: Great questions, so let me try to hit all of them. To your question, Alden, I think
23 it's premature to say what we're going to do with the merger guidelines. I mean, the whole
24 purpose of having a public comment period and doing listening sessions is to actually get the
25 information and listen. And so we're working through it and we're doing it in a very honest,
26 determined way. I think what I'm trying to say is that when we ultimately write something, we
27 need to do it in a way that creates a process and uses a language that allows–you know–all
28 stakeholders to participate, not just a limited few. Second question is–I think people do get it.
29 Right? You know, just because a jury or two decided not to convict on a specific case doesn't
30 mean that the public isn't demanding more. We're hearing from the public on a regular basis.
31 They want more enforcement. They want help. They want mobility. They want competition for
32 wages. And so that's why we have to make sure we strengthen our resolve. And we are bringing
33 the cases that we believe are righteous, that are–we can prosecute under the law, and that will
34 make a difference. They're hard, but–you know–if it's worthwhile, sometimes it's difficult and
35 we're going to stick with it. In terms of morale, I will say this. I've spent now five months at the
36 Division and it's been an extraordinary opportunity to get know some of the most talented,
37 amazing people that I've ever met, who are totally overworked. But what we're doing is we're
38 empowering our people to make decisions. We're empowering our people to do the work that
39 they're so capable of doing. We're fighting on the frontlines for more resources every day.

1  We're fighting to give people more tools, better technology, the opportunity to do their jobs. And
2  we're trying to recognize them and make sure that they are–that we have transparency in how
3  we're, how we're conducting ourselves, and that we have deference in the appropriate places,
4  and that we are conducting ourselves with a deep culture of respect, which is how we all want to
5  be treated. So it's tough when you're under-resourced and it's tough when you're having the
6  entire world asking you to address the difficult problems. And you're trying to do that work
7  quickly, effectively, and without enough support, so, you know, we're a team and we're acting
8  like a team and I can't speak to scores or surveys, but what I can speak to is–you know–the
9  tremendous hard work and determination and grit and care and passion that I see on a daily basis.
10 And that inspires me to want to work harder.

11 **Question**: So, you think it can go up in the next–

12 **AAG Kanter:** I care about how our people feel. I care about how–whether they have the tools
13 they need to do the work they need to do. I care about making sure that we can fulfill our
14 obligations to the American public. The scores will come. What we need to do is not focus on
15 scores. We need to focus on the humanity around what we're trying to do. We need to focus on
16 respect. We need to focus on empowerment. We need to focus on representing our client
17 zealously and we need to focus on giving people the resources they need. Surveys will come,
18 but–you know–if you try to manage to a survey, you'll fail. We're not managing to a survey,
19 we're managing to the needs of our people and we're managing to the needs of our client.