IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    v.<br><br>JAYSON JEFFREY PENN,<br>MIKELL REEVE FRIES,<br>SCOTT JAMES BRADY,<br>ROGER BORN AUSTIN,<br>WILLIAM WADE LOVETTE,<br><br>    Defendants. | No. 20-cr-00152-PAB |

**DEFENDANTS' MOTION IN LIMINE 6: JOINT MOTION TO EXCLUDE GOVERNMENT EXHIBITS**

The government introduced exhibits GX 433-451, 1056, 3037, and 6198 during the last trial. Its exhibit list for the third trial shows that it plans to do so again. But none of these exhibits are relevant to any matter that the government has put at issue in the trials to date. Instead, their only relevance appears to be the use of out-of-context soundbites (e.g., "A-Hole premium," "not exactly a legal conversation," and small-bird companies thanking Pilgrims "for getting our act together") that appear prejudicial but do not relate to the charged conspiracy. Accordingly, given the experience of the last trials, Defendants move that all of these exhibits be excluded as irrelevant under Federal Rule of Evidence 401 or, in the alternative, as substantially more prejudicial than probative under Federal Rule of Evidence 403.

**ARGUMENT**

To be relevant, evidence must both have a "tendency to make a fact more or less probable than it would be without the evidence" and be "of consequence in determining the action." Fed.

1

R. Evid. 401.  Even relevant evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury.  Fed. R. Evid. 403.  But the evidence from the last two trials shows that the challenged exhibits GX 433-451, 1056, 3037, and 6198 are not, in fact, relevant to any fact of consequence in this action and are highly prejudicial.

I.     **GOLDEN CORRAL DOCUMENTS (GX 433-451)**

The first set of exhibits (GX 433-451) relate to Golden Corral.  These exhibits consist of two text message strings between Pilgrim's employees in October and November, 2014.

In the first text message, on October 17, Tim Stiller texts his supervisor Jayson Penn to update him on the Golden Corral negotiations.  GX 433.  Mr. Stiller informs Mr. Penn that "Scott [Tucker] and Roger [Austin]" are negotiating with Golden Corral on behalf of Pilgrims.  GX 434-436.  Stiller adds that "[w]e know marjec [*sic*] [who is Golden Corral's] biggest supplier is 0.02 higher than us and they are not going to negotiate."  GX 437.  Penn replies, "Good deal.  Last time they did cave a cent or two w KFC."  GX 438.  And Mr. Stiller responds, "They are listening to my direction."  GX 439.

At this point in the conversation, it appears that Mr. Penn and Mr. Stiller misunderstand each other.  Mr. Penn asks "Who is they" and then adds "If they is illegal don't tell me."  GX 440-441.  Mr. Stiller promptly replies, "Was referring to roger listening.  Sorry, thought you were referring to roger caving.  Got you on marjec caving on Kfc.  MJ might cave but I wouldn't think for our volume and their current."  GX 442.  Mr. Penn and Mr. Stiller then speculate about Tyson's prices to Golden Corral.  GX 443-445.  At the end of that conversation, Mr. Stiller adds that Tyson "did not add anything" to the price it charged to Golden Corral "for cost of doing

2

business with GC like us and marjec did," GX 446, to which Mr. Penn replies, "Mar-Jac is a solid competitor," GX 447.

Three weeks later, on November 7, 2014, Mr. Stiller updates Mr. Penn that "GC just called back…came up on price.  Would net somewhere around 1.00 and we went in at 1.04/1.08. Scott going to recap conversation and we can talk monday." GX 448.  That Sunday, November 9, 2014, Mr. Penn communicates with his own supervisor, William Lovette, and Chief Financial Officer Fabio Sandri, "I am a marketing guy at heart. I raised OK Corral 15c per lb to ensure our Brand Promise is personally delivered." GX 449.  Mr. Lovette sends a sarcastic reply denigrating Golden Corral's importance as a customer and saying that he will have to contact his therapist at his emergency weekend number.  GX 450.  Mr. Penn replies, "Keep Calm and Market On…note OK Corral's Key Customer status.  Telly Smith and his crew will pay market price plus the special A-Hole premium." GX 451.

Despite the colorful language, these exhibits have never played a significant role in the government's case.  Indeed, it appears that the government only seeks to introduce them ***because of*** their colorful language, not because they are probative of bid rigging and price fixing related to Golden Corral.  In the first trial, the government called Golden Corral a "victim[]," First Trial Tr. 69:23-25 (Oct. 26, 2021)[1], but presented no evidence that Golden Corral prices were actually fixed.  Its evidence related to Golden Corral in the first trial consisted only of these two text message chains (GX 433-448 and GX 449-451) and the testimony of Golden Corral purchaser

---

[1] All citations to the first trial record are to the official transcript.  Because Defendants do not yet have the official transcript from the second trial, all citations to that record are to the unofficial transcripts.  Given the draft status, Defendants defer to the Court's recollection if it differs from the drafts in any way.

3

Telly Smith. And it only raised these text messages briefly in closing statements, but not before. *See* First Trial Tr. 4817:2-23 (Dec. 8, 2021). In the second trial, the government introduced the same text messages, but called no Golden Corral witnesses. In fact, during the entire second trial, no government attorneys or government witnesses mentioned the phrase "Golden Corral" at all until closing arguments. Even then, the government only raised these text messages to point out Mr. Penn use of the phrase "if they is illegal don't tell me." Second Trial Tr. 222:1-223:2 (Mar. 22, 2022). The government's witness list for the third trial similarly lists no witness related to Golden Corral.

The government acknowledged, as it must, that this text message exchange on its face does not show evidence of price-fixing, given that Mr. Stiller immediately clarified that the "they" in "if they is illegal" referred to his Pilgrim's co-workers Mr. Tucker and Mr. Austin, not a competitor. The government nevertheless invited the jury to speculate that, when Mr. Stiller said he was only referring to his Pilgrim's co-workers, he was lying. *Id.* at 222:21-25 (closing statements) ("Mr. Stiller corrects himself staying oh I was actually referring to Scott and Roger. You can be the judge. Who knows whether he is just correcting himself in writing because this is Tim Stiller the same person who wrote no comp names in e-mail."). As evidenced in these closing arguments, the government's primary reason to admit these text messages is only to create inflammatory soundbites.

These messages are not relevant under Federal Rule of Evidence 401. In the second trial, the government did not claim that the documents established price-fixing, but rather that they were relevant only to show Defendants' "state of mind." *Id.* at 222:20. But it has never explained precisely what state of mind these text messages actually reveal. On their face, they

4

refer at most to a state of mind related to Golden Corral. But since the government put on no evidence of price-fixing as to Golden Corral in the last trial, that state of mind is not at issue and is not relevant.

For example, the sarcastic comments from Mr. Penn and Mr. Lovette about Golden Corral paying a "special A-Hole premium" and not being a key customer is entirely irrelevant to the charged conspiracy. The text from Mr. Penn states that Golden Corral will pay a "market price plus the special A-Hole premium." GX 451. A market price is not a fixed price, and the undisputed evidence is that the "special A-Hole premium" had to do with Golden Corral's breach of a contract in a prior year to buy wings. *See generally* First Trial Tr. 1964:23-1969:21, 1974:8-1980:13 (Nov. 8, 2021). This breach soured the relationship between Pilgrim's Pride and Golden Corral so much that Pilgrim's Pride stopped selling chicken to Golden Corral altogether after 2015. *Id.* at 1965:6-9. Given this undisputed evidence, the sarcastic references to an "A-Hole premium" and Mr. Lovette contacting his therapist on the emergency weekend number have no relevance at all to the charge conspiracy. While it may have been reasonable to admit these exhibits into evidence in the first trial, before the government's evidence was fully known, the experience of two jury trials makes clear that these exhibits, offered without a witness, serve no purpose aside from making Mr. Penn and Mr. Lovette look bad, misleading the jury, and forcing Defendants to present evidence in their case of Golden Corral's prior breach of contract.

Even if these texts had some minimal relevance, they should still be excluded under Rule 403, because any probative value would be substantially outweighed by the danger unfair prejudice, confusing the issues, and misleading the jury.

This danger is not abstract. National press coverage of this case has focused

5

overwhelmingly on the language included in GX 433-451, greatly out of proportion to their minimal role in the government's trial evidence. For instance, the *Wall Street Journal* reported, at the outset of the case:

> In the fall of 2014, the indictment alleged, Mr. Penn texted with a Pilgrim's colleague about ongoing price negotiations with a nationwide fast-food chain. The Pilgrim's employee told Mr. Penn that a competing chicken company's bid was higher than Pilgrim's, and that the competitor wasn't negotiating further. "They are listening to my direction," the Pilgrim's employee told Mr. Penn.
>
> "Who is they?" Mr. Penn texted back. "If they is illegal don't tell me." The Pilgrim's employee clarified that he was referring to Mr. Austin, who also was involved in the negotiations.
>
> As negotiations with the fast-food chain progressed, the complaint said, Mr. Penn told Pilgrim's then-CEO that the chain should "pay market price plus the special A-Hole Premium."

Brent Kendall and Jacob Bunge, *Chicken Industry Executives, Including Pilgrim's Pride CEO, Indicted on Price-Fixing Charges*, WALL ST. J. (Jun. 3, 2020), https://tinyurl.com/2fxshrst. Likewise, *Bloomberg* headlined its own coverage of the indictments with the headline, "*If It's Illegal, 'Don't Tell Me.'*" See Lydia Mulvaney, et al., *If It's Illegal, 'Don't Tell Me': Chicken Probe Ensnares a CEO*," BLOOMBERG (Jun. 4, 2020), https://tinyurl.com/2fxnkjsf.

The "court has not only the discretion but also the duty to exclude evidence of little or no relevance or probative value which might have a prejudicial effect." *Sec. State Bank v. Baty*, 439 F.2d 910, 913 (10th Cir. 1971). The tendency of these statements to grab headlines shows that they have an inflammatory effect, even as they play little part in the case. Distracting or inflammatory evidence with little probative value is exactly the kind of evidence that Rule 403 seeks to exclude. *See, e.g.*, *Brandom v. United States*, 431 F.2d 1391, 1398 (7th Cir. 1970) ("Inflammatory, irrelevant evidence is improper and inadmissible. Under appropriate

circumstances, its admission may constitute reversible error."); *see also Huskey v. Ethicon, Inc.*, 848 F.3d 151, 160-61 (4th Cir. 2017) (upholding exclusion of evidence with "tangential" relevance when its "relative lack of probative value" creates "risks of confusion"); *United States v. McQuarry*, 816 F.3d 1054, 1057-58 (8th Cir. 2016) (upholding exclusion, in a tax fraud case, of a video discussing fractional reserve banking that influenced the defendant's tax positions, but which the court feared would mislead or confuse the jury). Because the negotiations with Golden Corral have nothing to do with the case that the government has chosen to present—which the past two trials make clear—the purpose for showing them can only be to mislead and to inflame the jury.

## II.     COMMENTS ON THE SMALL BIRD INDUSTRY (GX 1056)

The previous trials demonstrate that GX 1056 should be excluded for the same reasons: it is likewise irrelevant to the case and, if admitted, would only mislead the jury. The exhibit reflects an email exchange between Jayson Penn and Jason McGuire of Pilgrim's Pride. The two Pilgrim's employees discuss a chart (not included in the government's exhibit) showing a shift toward higher bird weights in the small bird category. Mr. McGuire explains that Pilgrim's used the chart with customers "to reinforce weight increases in small birds over the next 3-5 years and how they need to position themselves into sustainable bird size ranges so that they can increase supply volume." GX 1056. In a follow-up email, Mr. McGuire adds, "we are going to change the small bird industry this upcoming year no doubt. I told Tommy after the KFC meeting last week that we just need our competition to get out of the way so we can get some things done, be better for us and them in the end." *Id.*

Mr. McGuire's statement shows an ***absence*** of collusion: he explicitly says that the

7

competitors need to "get out of the way," not that Pilgrim's intends to cooperate with them. Thus, the government's interest in this exhibit appears to come only from Mr. Penn's response, where he writes: "In 2013 I had a few owners of small bird companies thank us via me for getting our act together." *Id.* The government asserted that this email was part of "a plan" to "tak[e] prices up across the fast-food industry." Second Trial Tr. 195:24-196:2 (Mar. 22, 2022). Counsel provided no argument other than Mr. Penn's statement in this email chain—and this argument makes no sense given that HEB is a grocery store chain and not a fast-food company.

The government's argument that GX 1056 reflects a plan to collusively raise prices flies in the face of the text of GX 1056 itself. As that exhibit makes clear, Mr. McGuire and Mr. Penn's conversation was about convincing customers to increase the weight of their small birds—or, as Mr. McGuire put it, for customers "to position themselves into sustainable bird size ranges." GX 1056. This meaning is clear from Mr. McGuire's first email in the chain. But it is made even clearer after reviewing the pieces of the chain that the government left out. GX 1056 begins with a message from Mr. Penn, the subject line of which states "This will be in my deck tomorrow. Can you provide the talking points so we are on the same page? Thanks" Attached to Mr. Penn's email is a chart. *Id.* Because that full email was not included in the government's exhibit, the Defendants submitted it as a separate exhibit. *See* E-873, E-874. These defense exhibits include attachment to the original email, which depicts a chart to be used at a meeting with the retail customer HEB, showing weight distribution of Pilgrim's chicken products in the small bird segment. *See* E-874. The chart projects a shift to bigger bird weights over time. *Id*. The government has never claimed that its charged conspiracy involved colluding with competitors to shift customers into buying bigger birds. Likewise, the government's own

8

cooperating witness Robert Bryant agreed on cross examination that chicken suppliers like Pilgrims engaged in "flat out hard nosed competition" in the retail market, including for retail customers like HEB.  *See* Second Trial Tr. 74:9-21 (Mar. 10, 2022).

Thus, nothing in the record suggests that an email chain showing relating to a chart about projected bird-size increases to be shown at a meeting with customer HEB has anything to do with the charged conspiracy.  Instead, it is clear that the government intends to use this exhibit only to mislead the jury.  This intent was made clear in the second trial, when the government mentioned this exhibit during only closing statements, to argue that it reflected "a plan" to take fast food "prices up."  Second Trial Tr. 195:24-196:2 (Mar. 22, 2022).  This makes no sense because HEB is not a fast-food company and the chart relates to bird sizes, not prices.

Misleading the jury is not an appropriate use of evidence.  Fed. R. Evid. 403.  Thus, proffering evidence of acts not at issue in the current case is properly excluded under Rule 403.  *Cf., e.g.*, *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998) ("The danger of . . . 'misleading the jury' arises when circumstantial evidence would tend to sidetrack the jury into consideration of factual disputes only tangentially related to the facts at issue in the current case."); *United States v. Oldbear*, 568 F.3d 814, 821 (10th Cir. 2009) (affirming exclusion of evidence that would have amounted to a "sideshow from which the jury could have gleaned little valuable information" and was not probative of the legal issues in the case).  Accordingly, GX 1056 should be excluded.

### III. "LEGAL CONVERSATION" (GX 3037, 6198)

The Court should likewise exclude GX 3037.  There, Mr. Penn opines in a September

2012 email to Mr. McGuire that an email he received from Brenda Ray[2] is "not exactly a legal conversation." GX 3037. Ms. Ray's email said: "I received a call today from a friendly competitor telling me it's all over the market that Pilgrim's is taking contract pricing up. They thanked us for taking the lead and told me that contrary to what we might hear regarding their company, they are following as are others. Courage… keep it up guys." GX 3037; *see also* GX 6198 (different email thread without Mr. Penn's reply). Mr. Penn's off-hand remark is irrelevant, an improper and inaccurate lay opinion, and unduly prejudicial. Likewise, Ms. Ray's comments, captured in GX 3037 and 6198 refer to unrelated matters that would only mislead the jury. Ms. Ray's previous trial testimony establishes that her communication relates to products and markets that have nothing to do with the government's case. Thus, Ms. Ray's and Mr. Penn's statements do not satisfy Rule 801(d)(2)(E) as they are not in furtherance of the charged conspiracy.

First, the Court should exclude GX 3037 and GX 6198 because neither one has anything to do with the alleged conspiracy. As noted above, evidence is relevant only when it "make[s] a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. The emails do not and could not make the alleged conspiracy any more probable, because, as Ms. Ray explained during trial, "the market" that she referenced in her opening message is completely separate from the charged conspiracy. Ms. Ray testified that her email referred to the "northeast hallal market"—a market where Mr. Penn had no involvement in the "decision to increase [the] contract price." First Trial Tr. 4348:15-4349:2 (Dec. 6, 2021); Second Trial Tr. 157:17-160:11 (Mar. 21, 2022). The government never

---

[2]

mentioned the halal market at any other point in either of the first two trials, or otherwise put halal meat at issue in the case. And for good reason: Ms. Ray testified that the discussion of halal meat referenced in the email had nothing to do with rigging bids or fixing prices. First Trial Tr. 4349:7-12 (Dec. 6, 2021); Second Trial Tr., 160:7-11 (Mar. 21, 2022). An email referring to an entirely distinct market in which Mr. Penn had no involvement could not possibly be relevant to showing whether there was an illegal agreement to rig bids or fix prices to the customers relevant to the government's case. Ms. Ray's uncontradicted testimony was not available at the *James* hearing, when the government offered the emails under Rule 801(d)(2)(E) and the Court ruled the exchanges admissible under that rule. The Court should exclude GX 3037 and GX 6198 based upon the then-unavailable evidence on the bases that it does not satisfy Rule 801(d)(2)(E) and does not meet the relevancy standard of Rule 401.

Second, even assuming relevancy to the charged conspiracy and that it is admissible under a hearsay exception, it is the province of the jury to determine guilt, and any witness opinions that undermine that role must be excluded under Rule 701. Where a witness "is no better suited than the jury to make the judgment at issue," "opinions which merely tell the jury what result to reach" are not "helpful" to the jury. *United States v. Brooks*, 736 F.3d 921, 931 n.2 (10th Cir. 2013) (quotation omitted); Fed. R. Evid. 701 (lay witness testimony must be "helpful" to "determine[ation] [of] a fact in issue"); *see United States v. Espino*, 32 F.3d 253, 257 (7th Cir. 1994) ("unfamiliar with the contours of the criminal law," a lay witness "may feel that the legal standard is either higher or lower than it really is.") (quotation omitted). Accordingly, "testimony about a defendant's substantive guilt in a conspiracy should . . . not be permitted as lay opinion under Rule 701." *Brooks*, 736 F.3d at 931 n.2; *see United States v. Moore*, 651 F.3d

11

30, 57 (D.C. Cir. 2011) (lay witness cannot express opinions on defendant's culpability).  As with improper lay witness testimony, the Court should exclude Mr. Penn's email opining on legality; he "is no better suited than the jury to make the judgment at issue." *Brooks*, 736 F.3d at 931 n.2 (quotation omitted).

       Third, the Court should exclude the email because the danger of "unfair prejudice" would "substantially outweigh[]" any "probative value," "confus[e] the issues, and "mislead[] the jury." Fed. R. Evid. 403.  As Ms. Ray's uncontradicted testimony in two trials showed, her communication about the northeast halal market was not, in fact, "illegal."  Thus, the risk of jury confusion by its adoption of the mistaken view that it is "not exactly a legal conversation" is prejudicial in violation of Rule 403, particularly in light of the email's feather-light relevance.  There is a substantial danger that the jury would rely on Mr. Penn's off-hand and irrelevant remark to "declar[e] guilt on a ground different from proof specific to the offense charged"—the quintessential "unfair prejudice" to criminal defendants.  *Old Chief v. United States*, 519 U.S. 172, 180-81 (1997).  If the jury hears Mr. Penn's statement, it "could easily accord too much weight to the pronouncement of a lay witness unfamiliar with the standards erected by the criminal law." *United States v. Ness*, 665 F.2d 248, 250 (8th Cir. 1981).  An email describing irrelevant conduct as "not exactly legal" thus carries a substantial danger of unfair prejudice to Defendants: a jury might rely on Mr. Penn's uninformed and incorrect legal conclusion to declare guilt regardless of the proof offered.  *See Espino*, 32 F.3d at 257 (finding district court "should have . . . excluded" witness's legal conclusion because based on "danger that the jury gave his response undue weight").  That false inference is especially prejudicial and misleading where, as here, the incorrect legal conclusion has nothing to do with the government's case.

## CONCLUSION

For the foregoing reasons, to the Court should exclude GX 433-451, 1056, 3037, and 6198 from the third trial.

Dated: May 9, 2022

Respectfully submitted,

*s/ John A. Fagg, Jr.*
John A. Fagg, Jr.
MOORE & VAN ALLEN PLLC
Attorney for William Wade Lovette
100 North Tryon Street, Suite 4700
Charlotte, NC 28202
(704) 331-3622
johnfagg@mvalaw.com

*s/ Michael F. Tubach*
Michael F. Tubach
O'MELVENY & MYERS LLP
Attorney for Jayson Jeffrey Penn
Two Embarcadero Center, 28th Floor
San Francisco, California 94111-3823
(415) 984-8700
mtubach@omm.com

*s/ Richard K. Kornfeld*
Richard K. Kornfeld
RECHT KORNFELD, P.C.
Attorney for Mikell Reeve Fries
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 573-1900
rick@rklawpc.com

*s/ Michael S. Feldberg*
Michael S. Feldberg
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
Attorney for Roger Born Austin
750 Third Avenue, Suite 2400
New York, NY 10017
(212) 381-1965
mfeldberg@reichmanjorgensen.com

*s/ Bryan Lavine*
Bryan Lavine
TROUTMAN PEPPER HAMILTON
SANDERS LLP
Attorney for Scott James Brady
600 Peachtree St. NE, Suite 3000
Atlanta, GA 30308
(404) 885-3170
Bryan.lavine@troutman.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of this filing to all listed parties.

Dated: May 9, 2022

*s/ Michael F. Tubach*

Michael F. Tubach