## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1. **JAYSON JEFFREY PENN,**
2. **MIKELL REEVE FRIES,**
3. **SCOTT JAMES BRADY,**
4. **ROGER BORN AUSTIN,**
5. **WILLIAM WADE LOVETTE,**

     Defendants.

---

**UNITED STATES' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS *IN LIMINE***

---

The government submits its omnibus response to Defendants' Motions *in Limine*

Nos. 1-11, filed May 9, 2022.  (Docket Nos. 1301, 1303-1304, 1308-13, 1315, 1317.)

**1.     The Court Should Deny *Motion in Limine* No. 1 (Docket No. 1301) Because Defendants' Proposed Jury Instruction is Unwarranted.**

The Court should deny Defendants' now-twice renewed motion for a preliminary

jury instruction.  As Defendants recognize in the opening paragraph of their motion, this

is motion for reconsideration, (Docket No. 1301 at 1), and no changed circumstances

justify departure from the Court's prior rulings.

Defendants' first two bites at this apple were denied.  In the first trial, Defendants

requested a lengthy preliminary jury instruction distinguishing lawful and unlawful

conduct.  (Docket No. 592 at 7-9.)  The Court denied Defendants' request, and instead

gave a simple introductory instruction setting forth the three elements of a Sherman Act violation, as requested by the Government and following the Tenth Circuit's pattern instructions.  (Docket No. 603 at 2-3; Docket No. 562 at 7-8; Docket No. 611.)  In the second trial, Defendants moved for reconsideration of the Court's ruling and again proposed a lengthy preliminary jury instruction.  (Docket No. 988.)  The Court, again, denied Defendants' motion, and found that "the substantive preliminary jury instruction it gave at the first trial, which instructed the jury on the elements of the offense, is appropriate and [the Court] will give it at the second trial."  (Docket No. 1023.)[1]

There is no reason to consider this issue a third time.  Defendants claim that a juror's questions about the Sherman Act constitutes changed circumstances to justify a reversal of the Court's prior rulings.  (Docket No. 1301 at 3-4.)  But—as the Court itself recognized—those questions were neither unusual nor alarming, and simply indicated the juror was doing exactly as the Court had expected and instructed.  Indeed, the Court's response emphasizes the danger that could occur if the lengthy preliminary instruction sought by Defendants were given, *i.e.* that a juror could draw conclusions prematurely.  (2/24/22 R. Tr. at 138:12-139:6 ("jurors shouldn't be drawing conclusions, especially with the first witness. . . . [A]t the end of the case after you have heard all the evidence, then I'll instruct the jury.").)  The juror's questions therefore provide no change in circumstances justifying overturning the Court's prior rulings on this issue.

---

[1] The Court's order made minor modifications to the preliminary jury instruction to conform it to Instruction No. 14 of the closing instructions given in the first trial.  The substance of the instruction, a succinct statement of the three elements of a Sherman Act violation, remained the same.

Moreover, such an instruction is unnecessary.  The agreement itself is the crime. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940); *Nash v. United States*, 229 U.S. 373, 378 (1913).  The Government needs to prove only that the conspiracy to eliminate or suppress competition existed, Defendants knowingly joined that conspiracy, and the conspiracy affected interstate or foreign commerce.  *See* 15 U.S.C. § 1; *Socony-Vacuum Oil Co.*, 310 U.S. at 219-20.  The Court's preliminary instruction addresses each of these elements.

Defendants' proposed instruction would likely create more confusion than the well-established instruction given by the Court.  Defendants seek to have the Court instruct the jury that, among other things, "[m]ere exchanges of information, even regarding price, are not necessarily illegal" and that "[t]here may be legitimate reasons that would lead competitors to exchange price information other than fixing prices or rigging bids."  (Docket No. 1301 at 11.)  However, the law is clear that even legitimate business activities, while not unlawful on their face, can facilitate and support a finding of unlawful agreement.[2]  But the appropriate time to give this instruction is, as the Court

---

[2] "Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition."  *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946).  *See also Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ("Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement."); *United States v. Foley*, 598 F.2d 1323, 1331-32 (4th Cir. 1979) (exchange of future commission rates, followed by efforts to hold conspirators to the planned rates, allowed inference of price-fixing conspiracy); *United States v. Consolidated Packaging Corp.*, 575 F.2d 117, 126-28 (7th Cir. 1978) (exchanging price information in advance of bidding and adjusting bids accordingly was sufficient to support price fixing conviction); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999) ("[P]arallel behavior may . . . support the existence of

has now twice done, at the close of evidence and argument.[3]

In sum, Defendants' requested instruction is misleading, incomplete, and prejudicial.  The Court's three-element instruction is accurate and consistent with the Tenth Circuit's pattern instructions.  There is no circumstance warranting reconsideration, and Defendants' motion should be denied.

**2.    The Court Should Deny Motion *in Limine* No. 2 (Docket No. 1308) Because Introduction of New Evidence Is Not Prejudicial.**

Defendants' arguments to exclude the government from admitting additional exhibits or witnesses during retrial are meritless.

First, precedent forecloses Defendants' argument.  Even after *reversal* of a conviction, "[i]t is undeniable, of course, that . . . the Government is not limited at a new trial to the evidence presented at the first trial, but is free to strengthen its case in any way it can by the introduction of new evidence."  *United States v. Shotwell Mfg. Co.*, 355 U.S. 233, 243 (1957).  Thus, "after a trial ends in a hung jury," it is "so clear" that "[n]othing prevents the government from presenting a stronger case" with "'new' witnesses or evidence."  *United States v. Brantley*, 215 F.3d 1330, 1330 (7th Cir. 2000). "In fact, we would think it odd if the government did *not* try to present a stronger case the second time when the evidence presented at the first trial was not sufficient to win a conviction."  *Id.* (emphasis in original); *accord Landers v. Robinson*, No. 3:18-CV-175,

---

an illegal agreement when augmented by additional evidence from which an understanding among the parties may be inferred.").

[3] The Court appropriately instructs the jury *how* to find a price-fixing agreement, including distinguishing between lawful and unlawful conduct, with the rest of its instructions at the end of the case after the jury has heard all evidence and argument.

2018 WL 5993348, at *2 (S.D. Ohio Nov. 15, 2018) ("Once a mistrial has been declared . . . it would be [] foolish" to omit "new or different evidence" on retrial).

Second, a retrial following a mistrial is both in purpose and effect a new trial. *See United States v. Palmer*, 122 F.3d 215, 221 (5th Cir. 1997); *United States v. Taylor*, 489 F. App'x 34, 38 (6th Cir. 2012) ("A mistrial for manifest necessity is essentially a do-over, allowing the government to reprosecute if it chooses to do so.").  As such, the government is not bound to its previous trial presentation and is free to modify its approach during a subsequent trial in an effort to more effectively present its position. *See United States v. Harvey*, No. 2:16CR109-PPS, 2022 WL 1224313, at *2 (N.D. Ind. Apr. 25, 2022); *United States v. Wall*, 37 F.3d 1443, 1449 (10th Cir. 1994) (a defendant "cannot expect that the government will not learn from the earlier trial.").  Here, the government should be entitled to amend its order of proof to satisfy its burden at trial.[4]

Third, Defendants have not and cannot demonstrate any particularized hardship or unfair surprise from the government's amended exhibit log, (Docket No. 1268, 1322), or the additional witnesses.  In addition to a fresh perspective, the government listened to the Court and considered how to better present the case to the jury.  This reevaluation resulted in the inclusion of 111 new exhibits and new witnesses. (*See* 4/14/2022 Hearing Tr., at 9:9-10:25.)  Defendants are attempting to conflate the marked

---

[4] In preparing to present the third trial in this matter to the jury, the government also intends to streamline its case-in-chief through both the introduction of witness testimony and exhibits, as it represented to the Court in the April 14th, 2022 hearing.  Adding exhibits does not necessarily mean additional trial time and it certainly does not mean additional featured episodes.  Indeed, the government's case will be more streamlined simply by the presentation and focus on a more select group of episodes.

5

exhibits with new evidence.  Evidence available before trial is not "new" evidence.

*United States v. Starr*, 275 F. Appx. 788 (10th Cir. 2008).   Availability of the underlying

documents is the primary consideration in evaluating prejudice to a party's trial

preparation.  *United States v. Lewis*, 594 F.3d 1270, 1281 (10th Cir. 2010).

      Next, it would be manifestly unjust to preclude the government from amending its

witness and exhibit list where, as here, the defense has ready access to the documents

and has suffered no prejudice as a result.  *See United States v. Varner*, 13 F.3d 1503,

1507 (11th Cir. 1994) (an amended exhibit list may establish a critical element of a

party's case); *Sherman v. United States*, 462 F.2d 577, 579 (5th Cir. 1972)

(amendments should be permitted "where no substantial injury will be occasioned to the

opposing party, the refusal to allow the amendment might result in injustice to the

movant, and the inconvenience to the court is slight").  Here, manifest injustice would

occur if the government was not permitted to amend the exhibit list to include additional

documents, the vast majority of which were previously produced and all of which are

available to Defendants in advance of trial, to meet its burden, streamline trial, and

demonstrate the elements of the charged conspiracy at trial.

      Fourth, Defendants' citations—all to *civil* cases relying on *civil* discovery rules—

are inapposite.  Defendants rely chiefly on a private products liability suit, *Cleveland By

and Through Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438 (10th Cir. 1993),

*abrogated on other grounds by US Airways, Inc. v. O'Donnell*, 627 F.3d 1318 (10th Cir.

2010).  (Docket No. 1308 at 2-5.)  There, Piper Aircraft sought "to enlarge trial time" with

"totally new" evidence about *seven years* after the district court's pretrial order.  *Id.* at

1449.  The exclusion of this evidence turned on not only the Federal Rules of *Civil*

Procedure, but also the "extensive additional discovery" that five "totally new expert

witnesses" would demand.  *Id.* at 1149 & n. 24.

The government merely proffers a handful of company invoices and Defendants'

own employment records—and otherwise has long since produced its purportedly "new"

evidence.  Given these facts, the inapplicability of Defendants' other cases is also clear.

*See, e.g.*, *Gagne-Fusco v. Gen. Motors Corp.*, 804 F. Supp. 404, 405 (D.N.H. 1992)

(excluding new expert witness proffered more than a year after close of *civil* discovery);

*Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2016 WL 524904, at *3 (N.D.

Cal. Feb. 10, 2016) (excluding new evidence in the parties' fourth patent infringement

trial); *Oriental Fin. Grp., Inc. v. Fed. Ins. Co., Inc.*, 2007 WL 9760439, at *1-2 (D.P.R.

June 19, 2007) (excluding new evidence in partial retrial of insurance claim nearly

seven years after start of lawsuit).

And finally, Defendants' argument that the "continuing jeopardy" theory favors

excluding new evidence should be dismissed.  The Double Jeopardy Clause does not

prevent retrial after a mistrial.  *Yeager v. United States*, 557 U.S. 110, 118 (2009) (*See

also* Opposition to Defendants' Motion to Dismiss Indictment (Docket No. 1328).)

Accordingly, the Court should deny Defendants' joint motion.

### 3.   The Court Should Deny Motion *in Limine* No. 3 (Docket No. 1304) Because the Government's Summary Exhibits are Timely, Relevant, and Admissible.

The Court has already ruled that the government's summary exhibits are

admissible under the two-part test articulated in *United States v. Ray*, 3701 F.3d 1039

(10th Cir. 2004), *vacated on other grounds*, 543 U.S. 1109, because they summarize

7

voluminous material and assist in jury comprehension.  (Docket No. 741, 5-6; 3/3/2022
R. Tr. at 6:8-15.)  The fact that the government has dismissed five of the Defendants
does not change the underlying volume of evidence that the summary exhibits
summarize nor the fact that summary exhibits would assist with juror comprehension of
the charged conspiracy.  There is no need for the Court to revisit its prior rulings that the
government's summary exhibits are admissible.  Defendants' remaining arguments
focus on specific changes to the summary exhibits and are similarly unavailing.[5]

**New Entries Were Timely Disclosed.**  This is a new trial.  It has new deadlines.
The government supplemented its charts on the Court's deadline and Defendants have
been given an opportunity to respond.[6]  Defendants agree that the vast majority of
entries the government has added to the summary exhibits consist of documents and
evidence that were already "admitted or stipulated to in previous trials."  (Docket No.
1304 at 4 & Ex. A.)  The Court permitted the government to supplement its summary
exhibits between the November 2021 and February 2022 trials and it should be
permitted to supplement its summary exhibits for the June 2022 trial as well.  The
pretrial order anticipates as much.

**The Government's Formatting Changes Do Not Make the Charts**
**Argumentative.**  The government's charts are substantially the same as the charts

---

[5] The government addresses the Defendants' specific objections in Attachment A.
[6] The government inadvertently failed to note that it had added Exhibit 10026 to Exhibit
60 or that it had excerpted additional information from Exhibit 9691 on Exhibit 50.  The
Court has never required that the government identify every change it makes to the
summary exhibits to the Defendants, it should not begin to do so now.  Defendants'
arguments to that effect should be denied.

8

used in both prior trials.  The changes to the government's color scheme and addition of company logos do not turn them into argument.

The Court has permitted the government to apply a color scheme to its summary exhibits finding that color coding is an "organizational aid."  (Docket No. 781 at 4.)  The government's color coding continues to satisfy the Court's requirement that it not be either "misleading or argumentative" or "unduly prejudicial or even prejudicial signaling." (*Penn 1* Cert. Tr. at 3839:7-17; 2/24/22 R. Tr. at 225:15-17.)  As it has in both prior trials, the government has applied a consistent color coding to the summary exhibits—every single communication of the same type has been given the same color highlighting.  It has not embellished or highlighted any specific row or type of communication.

The company logos summarize an undisputed and admitted fact: the employer of the named individuals.  The government's use of corporate logos in lieu of the typewritten names of chicken suppliers is neither argumentative nor unfairly prejudicial. The pictures are direct substitutes for words and assist with the jury's ability to understand and remember the employer affiliations of the individuals relevant to the charged conduct.[7]  *United States v. Curtis*, 344 F.3d 1057, 1067 (10th Cir. 2003) ("'As has been stated many times, Rule 403 does not protect a party from all prejudice, only unfair prejudice.'") (quoting *Deters v. Equifax Credit Info. Servs.*, 202 F.3d 1262, 1274 (10th Cir. 2000)).  The government has used the logos consistently for all individuals

---

[7] Defendants are particularly concerned that there are instances where a company logo is used without the name of an individual at the company.  However, prior versions of the summary exhibits sometimes included a company name without corresponding individual.  (*See, e.g.*, Exhibit 4.)  The use of logos achieves the same effect.

who work at chicken suppliers, including individuals who the government has not claimed are coconspirators.  It has not applied any "labels, captions, and highlighting techniques" and has treated the charged Defendants the same way that it treated every other chicken-supplier employee.  *See United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998).  There is no prejudice, much less unfair prejudice, arising from the government's use of colors or company logos as organizational aids.

**The Government Accurately Summarized Excerpts of Verizon Records.**  The government included in its summary exhibits the origination information from the underlying Verizon records where that information can be used to determine the time zone of the call.  Not every summary entry for a phone call includes the origination location because not all underlying records are the same.  There have always been differences in the summary entries for phone records based on the different content from the underlying records.  For example, Verizon and AT&T differently record the length of calls.  (*Compare* Exhibit 52, row 4 ("ET…10:22") *with* row 5 ("Min…1").)  The fact that some records now include the origination location only makes those summaries more accurate and will not cause any juror confusion.

Based on information provided by Verizon, which has been produced to Defendants in discovery, the origination location in the underlying Verizon records can be used to determine the time zone in which the Verizon account holder placed a call. The government previously used this information to convert the time zones for some outgoing Verizon calls to Eastern time.  The government has now consistently applied that methodology to all entries summarizing an outgoing call by a Verizon account

holder.[8]  The decision to adjust entries, where possible, to Eastern time is not new.  As government witness Rachel Evans testified in both trials, the government used metadata and other information to determine the time zone in which emails and text messages were sent and phone calls were made.  (*Penn 1* Cert. Tr. at 40141:19-4043:24; 2/28/22 R. Tr. at 79:19-80-6; 127:5-130:13.)

**The Government Will Apply Limiting Instructions As Ordered.**  As it has in both prior trials, and as it has committed to doing, (Docket No. 1270), the government will ensure that the final versions of the summary exhibits reflect any limiting instructions given during this trial.  Since disclosing the summary exhibits, the government has sought reconsideration of the Court's rulings as to GX 1700 and 1713 on the basis that the statements in question should be admissible under Federal Rule of Evidence 801(d)(2)(E).  (Docket No. 1305 at 11-14.)  The government will update its summary exhibits based on the Court's ruling on the government's motion.

**GX 54 and 55 Are Relevant.**  GX 54 and 55 are relevant to the existence of the conspiracy, specifically government witness Carl Pepper's participation therein.  The status of the individuals that are party to the summarized communications, whether present or dismissed Defendants, does not change the fact that the exhibits summarize voluminous material.  (Docket No. 741 at 5-6.)  The government should be permitted to introduce these exhibits.

---

[8] The government's decision to adjust these entries to Eastern time makes the summary exhibits *more* accurate, echoing the Court's decision to allow the government to add the call durations to the summary exhibits in the February 2022 trial after the deadline for disclosure of summary exhibits.  (2/28/2022 R. Tr. at 70:3-10.)

**4.     The Court Should Deny Motion *in Limine* No. 4 (Docket No. 1303) Because Bryant's Testimony Proves a Single, Overarching Conspiracy.**

The Court has repeatedly denied Defendants' now-renewed motion to exclude government witness Robert Bryant's testimony about his conversations with two coconspirators, Scott Tucker and Tim Stiller.  Despite the Court's rulings to the contrary, Defendants argue that this testimony addresses a "separate conspiracy" and is thus irrelevant and inadmissible.  (Docket No. 1303.)  Reconsideration should be denied because no changed circumstances justify departure from the Court's prior rulings. (Docket No. 559 at 8; Docket No. 932 at 20.)

The Court has ruled Bryant's testimony admissible on multiple occasions, and after "extensive" (and repeated) argument from the parties.  (Docket No. 932 at 20.) The Court first found Bryant's testimony to be admissible as coconspirator statements during *James* hearings in *Penn I*.  (Docket No. 559 at 13-16, 48; Docket No. 1303 at 2 (conceding same).)  The Court has cautioned that "the *James* hearing has to have some meaning," and that is true here.  (*Penn 1* Cert. Tr. at 2691:11-17.)  Defendants have frequently argued this very point to exclude evidence the Court previously ruled on. (*See, e.g.*, *id.* at 2117:21-25, 2685:18-22.)

The Court has reaffirmed its ruling multiple times, finding that "the testimony of Mr. Bryant is sufficient for a reasonable jury to conclude that the charged conspiracy existed"; and that it is not evidence of "multiple conspiracies."  (Docket No. 932 at 20; *see also, e.g.*, 3/9/22 R. Tr. at 29:17-30:2 (overruling objections to Bryant's testimony as to US Foods).)  Defendants concede this.  (Docket No. 1303 at 2-3.)

Against this well-established precedent, Defendants now claim that Bryant's

testimony in the second trial somehow revealed a separate conspiracy. (Docket No. 1303 at 1.) The opposite is true. The testimony corroborated the charged conspiracy: to "rig[] bids and fix[] prices and other price-related terms for broiler chicken products sold in the United States" between approximately 2012 and 2019. (Docket No. 101 at 1-2.) Bryant testified that, in 2017, he and coconspirators Tucker and Stiller agreed to increase prices for chicken sold to US Foods; as a result, Pilgrim's and Mar-Jac successfully imposed an increase despite US Foods' attempts to drive a wedge between the competitors. (3/9/22 R. Tr. at 31:3-34:16, 38:6-25.)

Defendants' only support for "changed circumstances" is a cherry-picked excerpt from Bryant's cross-examination, during which Bryant concurred that the US Foods price increase "didn't have to do with anyone in this courtroom at all except [him]." (3/10/22 R. Tr. at 5:14-19.)[9] But Bryant was merely agreeing that Tucker and Stiller are not defendants in the captioned case. That is irrelevant; the Court has repeatedly found that Tucker and Stiller are coconspirators in the charged conspiracy. (*See, e.g.*, Docket No. 559 at 8; Docket No. 900 at 37-41.)[10]

Because the Court's initial rulings regarding Bryant's testimony were well-founded, and because Defendants have identified no new circumstances warranting reconsideration, the Court should deny Defendants' motion *in limine* No. 4.

---

[9] The only other testimony Defendants cite to support their motion for reconsideration is from Bryant's testimony in the *first* trial. (Docket No. 1303 at 6-7.) Defendants' challenge to this testimony was argued and rejected by the Court before the *second* trial. (Docket No. 1050 at 3.) Defendants lack any basis for reconsideration.
[10] For the same reasons, the Court's prior rulings that Bryant's testimony is relevant to the charged conspiracy and not unduly prejudicial should stand. And the Court has twice ruled the statements in question are admissible coconspirator statements.

***5.*** **The Court Should Deny Motion *in Limine* No. 5 (Docket No. 1315) because Motive Evidence of Compensation or Earnings is Admissible.**

The Court has already twice overruled Defendants' argument, now raised again,

that executive compensation and bonus plans are irrelevant and prejudicial.  No

changed circumstances justify departure from the Court's prior rulings.

In the first *Penn* trial, the Court ruled:

> The Court will exclude references to Mr. Penn's and Mr. Lovette's yearly compensation, wealth, or lifestyle. ***However, evidence of how each would benefit from higher chicken prices is relevant to motive for the alleged price fixing conspiracy and will be admitted.***

(Docket No. 603 at 5 (emphasis added).)  Defendants raised the same issue, again,

before the second trial, and the Court reiterated its prior ruling.  (Docket 1087 at 5 .)

For the second time, Defendants seek to overturn the Court's ruling, arguing that

evidence and testimony related to Pilgrim's executive's compensation and bonus plans

is irrelevant and unfairly prejudicial.  (Docket 1315 at 1-4.)  But the Court has twice ruled

that financial incentives to fix prices is relevant motive evidence.[11]  Courts are broadly in

accord.[12]

---

[11] Counsel for Roger Austin made financial incentives a key theme of his addresses to the jury.  (*See* 2/24/22 R. Tr. at 5:1-7 ("There will be no evidence that Roger Austin had anything to gain from a conspiracy to agree to fix prices or rig bids.  He had no motive. There will be no evidence that he had Pilgrim's stock options or that higher prices would result in a big payday.  Does it make sense to you that someone would risk his reputation, his career, his standing in the community and his liberty if he did not expect some substantial benefit?"); (3/23/22 R. Tr. at 118:18-25) (closing argument).)

[12] *See, e.g., United States v. Bradley*, 644 F.3d 1213, 1272 (11th Cir. 2011) (courts have broad discretion to admit compensation evidence and such evidence properly admitted to show motive because defendant's compensation increased with company profits); *United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (compensation properly admitted to show motive to obstruct investigation); *United States v. Schnabel*, 939 F.2d

Any evidence, testimony or exhibits, that the government introduces at trial will be focused on how the Defendants, or the corporations for which they worked, would benefit from the higher chicken prices that were the object and aim of the charged conspiracy.  The government does not seek to circumvent the Court's ruling that it cannot introduce evidence of personal wealth or fixed annual compensation, (Docket 994 at 5-6), and will not seek to introduce a one-time stock grant without further context about how compensation worked and what the incentives were, (*see* 2/24/22 R. Tr. at 205:25-206:10.)  The government's evidence will be limited to information about the incentive-based compensation structures that rewarded executives like Defendants Lovette and Penn with significant compensation in response to, among other things, increases in the pricing of chicken.

Accordingly, the Defendants' fifth motion *in limine* should be denied.

## 6.      Motions *in Limine* Nos. 6 & 9 (Docket Nos. 1309 & 1310) Should Be Denied Because the Court Has Twice Found the Exhibits Admissible.

Defendants' motions to reconsider the Court's prior rulings regarding the admissibility of various government exhibits rely entirely on rehashed legal arguments

---

197, 202 (4th Cir. 1991) (compensation properly admitted to show motive because of defendant's "substantial monetary stake in company's continued operations"); *United States v. Reyes*, 660 F.3d 454, 464 (9th Cir. 2011) (holding same was properly admitted as motive because defendant made money from fraud); *United States v. Rand*, No. 3:10-CR-182, 2011 WL 4914962, at * 1, 2 (W.D.N.C. Oct. 17, 2011) ("Evidence of compensation may be introduced when it is relevant and admissible to prove motive, especially in conjunction with a limiting instruction."); *United States v. Ferguson*, No. CRIM.3:06CR137CFD, 2007 WL 4240782, at *1 (D. Conn. Nov. 30, 2007).

without any changed circumstances, and should again be denied.[13]  (Docket No. 1309 (moving to exclude GX 433-451, 1056, 3037, and 6198); Docket No. 1310 (moving to exclude GX 3025 and 3038).)  The treatment of these exhibits in past trials, which Defendants' motions neither discuss nor reference, entirely rebuts Defendants' arguments for exclusion.

All but one of the exhibits (GX 3038, which the government has not admitted and does not seek to admit) were admitted in both previous trials.  The exhibits' admission was predicated on their relevance, as well as the Court's weighing of their probative value and prejudice.  Because nothing has changed in regard to these exhibits since the Court's previous findings, Defendants' motions to reconsider should be denied.

In addition, in a separate ruling on the Government's *James* log, the Court found that all but two of the exhibits (GX 450 and 3038, which were not offered as coconspirator statements) were admissible coconspirator statements. (Docket No. 559; Docket No. 1050.)  The Court found that each exhibit was made by a coconspirator in furtherance of the conspiracy, making the fact of the conspiracy's existence more probable—the very definition of relevance.[14]  As Defendants repeatedly asserted, the Court's rulings at the *James* hearing mean something—and they should here as well.[15]

---

[13] Defendants do not style their motions *in limine* as motions for reconsideration. However, as the Court has considered and rejected Defendants' arguments regarding these same exhibits, both are motions for reconsideration, even if not styled as such.
[14] Defendants' hollow objections are highlighted by the fact that they marked some of the so-called irrelevant and unfairly prejudicial government exhibits as their own exhibits: *see* E-427 (GX 433), E-428 (GX 448) & (GX 1056).  (Docket No 1274.)
[15] (*See, e.g.*, *Penn 1* Cert. Tr. at 2117:21-25, 3038:20-22 ("the *James* hearing is supposed to mean something"); *id.* at 2358:18-19("the *James* hearing has to mean something"), *id.* at 2658:18-20, 2687:14-15 (same).)

Because Defendants have not even attempted to provide changed circumstances, the Court should uphold its previous rulings and deny Defendants' motions for reconsideration.

**7.     Defendants Motion *in Limine* No. 7 (Docket No. 1317) Should be Denied Because the Evidence is Relevant and Admissible.**

Defendants move to exclude certain PowerPoint presentations on the government's most recent exhibit list from evidence.  The exhibits in question are slide deck presentations obtained by grand jury subpoena issued to Pilgrim's Pride.  The government is prepared to lay a proper foundation and authenticate any exhibits it introduces at trial, through substantive and custodial witnesses as necessary.  This is a new trial, with new deadlines, and the government is entitled to add new documents and witnesses to its presentation.  It did so in accordance with the deadlines set by the Court.  There is no basis for exclusion of these exhibits.

Curiously ignoring e-mails that include the disputed slides as attachments, Defendants describe the exhibits as "undated" and "unattributed" (Docket No. 1317 at 1). But the necessary context for these slides can be found by looking at the sequential government exhibits.  For example, GX 10071, PILGRIMS-DOJ-000103979, is an e-mail from January 7, 2019 where Jayson Penn sends an e-mail to himself (jayson.penn@gmail.com) that contains the subject line "J Penn 2019 US KO Final.pptx" and an attachment with the identical title.  This e-mail makes perfectly clear the date, author, and nature of its accompanying attachment, GX 10072, PILGRIMS-DOJ-0001039794).

The substance of the slides includes information admissible, among other

reasons, because they are Defendant Penn's own statements.  As outlined above, the corresponding e-mails contain sufficient indicia to authenticate these PowerPoints as documents that Jayson Penn authored and edited.

And these PowerPoints are relevant to the Government's case.  GX 10072, and other versions of the slide deck, summarize the financial status of Pilgrim's Pride over the years, beginning with its 2008 bankruptcy, and its 2009 reorganization (p. 7), and continuing through a period of 2013-2015—during the conspiracy—where the company was "Flying High" in terms of its earnings per pound of chicken (p. 10).  The company posted a "RECORD YEAR PERFORMANCE" in 2015 (p. 11) before a down year in 2016 (p. 13).  Jayson Penn's own statements, through his PowerPoints, are relevant evidence of the company's performance and earnings per pound of chicken during the years of the conspiracy. [16]  The slides are also relevant to Defendants' Lovette and Penn's motive.  Defendants Lovette and Penn were hired to lead a company that had failed financially and had the undergo bankruptcy.  Their motivation to fix prices and rig bids was to turn the company around and make it profitable, ensuring the company's success.[17]

_____

[16] GX 10074 (PILGRIMS-DOJ-0001106233) is an e-mail that Tim Stiller sent to Jayson Penn with no subject and an attachment named "Trainees.pdf".  The body reads, "Have to update a few still.  Thoughts?"  The attachment is GX 10075, which contains many of the same slides as other versions of the slide deck that Defendant Penn authored and sent to himself with a file name that included his own name.

[17] This Court has admitted similar evidence regarding business success and Defendant Penn's enthusiasm for profits.  (*See, e.g.* GX 940, 10/29/2014 Text Message from Jayson Penn to Jason McGuire ("Yup. I called you out in our board meeting today for leading the industry to higher '15 prices if FFS and $75M higher YoY pricing. Now that is impressive."), 2/28/22 R. Tr. at 64:15-22) (admitting GX 940).)

Defendants' arguments to exclude portions of these exhibits under Federal Rule of Evidence 403 are baseless and should be denied.  Some of the slides reflect Defendants Lovette and Penn's drive to make Pilgrim's Pride profitable despite its financial failure and subsequent bankruptcy in 2008.  These facts are not controversial. Indeed, they were the foundation of some defense themes in the previous trials:

> So when Bill Lovette became the CEO of Pilgrim's Pride in 2011, he asked Mr. Penn to join him.  At the time Pilgrim's had just emerged from bankruptcy and was struggling.  Pilgrim's was literally the laughingstock of the industry.  Turning around the company was not going to be easy but it was the perfect challenge for Mr. Penn.

(*Opening Statement of Mr. Tubach,* 2/23/22 R. Tr. at 174:16-24).

Defendants also argue that Defendant Penn's own words would prejudice them if introduced at trial.  Defendants focus on Penn's choice in a PowerPoint to superimpose his mentor Defendant Lovette's face onto an image from the movie Godfather and to cast the company's drive to make profits in those cinematic terms.  (GX 10072 at 9, 1.) On one slide, Lovette's face is placed over a character (Don Corleone) depicted by actor Marlon Brando.  (*Id.* at 9.)  The header is "THE TURN AROUND," referring to the company's emergence from dire financial straits and bankruptcy.  (*Id.*)  Penn adds the text to Lovette's character saying, "Don't worry.  A year from now, this company's gonna perform like never before."  (*Id.*)  Defendant Penn's decision to cast Defendant Lovette as the Godfather, and the specific words he used in doing so, are relevant to demonstrate the commitment that Lovette and Penn had to increasing profits and raising prices and to their state of mind.  Moreover, the Court has already recognized the probative value of certain terms that include the word "mafia" in the context of the

government's burden to prove the charged conspiracy.  (Docket No. 604 at 3.)

Nor is the PowerPoint unfairly prejudicial.  Rule 403 sets out a balancing test that weighs the probative value of evidence against unfair prejudice, wasted time, and needles cumulative evidence. The Rule "allows the exclusion of relevant evidence only if its "probative value is *substantially outweighed* by the danger of unfair prejudice." *United States v. Rodriguez*, 192 F.3d 946, 951 (10th Cir. 1999) (emphasis in original).[18]

Defendant Penn's statements in his PowerPoints illustrate the company's financial situation during the years of the conspiracy.  The slides also demonstrate the leadership styles of Defendants Lovette and Penn and the commitment that Defendants Lovette and Penn had to making Pilgrim's Pride profitable.  Just as the Court previously determined that certain terms including the word "mafia" were not unfairly prejudicial to outweigh their probative value, any prejudice that might result from presenting the jury with Defendant Penn's own words does not outweigh the probative value.

**8.     Defendants' Motion *in Limine* No. 8 (Docket No. 1317) Is Moot.**

The government has no current intention to introduce GX 10058 through 10064 in its case-in-chief and Defendants' eighth motion *in limine* is thus moot.[19]

---

[18] "[T]he unfair prejudice aspect of Rule 403 "cannot be equated with testimony which is simply unfavorable to a party."  *United States v. Flanagan*, 34 F.3d 949, 953 (10th Cir. 1994).  Rather, "[e]vidence is unfairly prejudicial if it 'makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.'"  *United States v. Roberts*, 88 F.3d 872, 880 (10th Cir. 1996).
[19] The exhibits are January 21, 2017 texts between Defendant Penn and Tim Stiller. Defendants do not appear to dispute that these texts are authentic.  (Docket 1317 at 8.)

9.    **Defendant's Motion *in Limine* No. 10 (Docket No. 1312) Should Be Denied Because Portions of Lovette's Employment Contract Are Admissible.**

Defendants' motion to exclude Defendant Lovette's employment contract should be denied because the government seeks to admit only limited portions of that agreement (or the terms themselves) consistent with the Court's prior rulings regarding the admissibility of motive evidence.  The Court previously ruled that information demonstrating how Defendant Lovette's overall compensation would increase based on the performance of the company is relevant to his motive to participate in a price-fixing conspiracy.  (2/9/22 R. Tr. at 206:8-10 ("the issue is the incentive that [Lovette] may have to price-fix because that would help increase his compensation."); *see also supra* Opp'n to Defs.' Mot. *In Limine* No. 5.)

The government seeks to admit the portions of Defendant Lovette's employment agreement that show the term of the agreement (2011 to 2013) and Defendant Lovette's bonus structure for that term, which are consistent with the Court's ruling regarding motive evidence.[20]  The redacted version of Exhibit 10045 (Attachment B) directly connects Defendant Lovette's compensation with Pilgrim's financial performance, specifically its earnings before interest, taxes, depreciation, and amortization (EBITDA).  Other witnesses will testify that EBITDA is a proxy for profitability and that the price increases negotiated as part of the charged conspiracy affected Pilgrim's profitability.

---

[20] A redacted version of GX 10045 is attached hereto as Attachment B.  The government would be amenable to the Court reading the relevant portions of GX 10045 into the record rather than using a redacted exhibit.  The government proposes using GX 10045 in lieu of GX 9168 as GX 10045 is in a larger font and easier to read.  The content is the same.

The EBITDA and bonus table in GX 10045 relates to the Company's performance in 2011 and a bonus to be paid in 2012.  The Court has already found that Defendant Lovette joined the conspiracy as of August 2011.  (Docket No. 559 at 11.)  Information connecting Pilgrim's profitability with Defendant Lovette's overall compensation, even without the exact figures, is relevant to his motive to join, and continue participating in, the price-fixing conspiracy.  The employment agreement also shows that his financial motive continued for the remainder of the contract term.  (Exhibit 10045 ¶ 2(b) (stating that Defendant Lovette's bonus for 2012 and 2013 "will be set by the Board so as to align [his] bonus opportunity with the Company's annual budget for that year and shall be based on such objective and subjective performance facts as the Board shall determine after consultation with [him]").)[21]

The redacted version of Exhibit 10045 aligns Defendant Lovette's financial incentives with Pilgrim's profitability, is highly probative of his motive to join and participate in the charged price-fixing conspiracy, and is consistent with the Court's prior rulings.  It should be admitted and Defendants' motion *in limine* should be denied.

---

[21] The Court has never ruled on this particular portion of Defendant Lovette's employment agreement.  The parties discussed its admissibility during the November 2021 trial, but the government withdrew the exhibit before the Court made a ruling. (*Penn 1* Cert. Tr. 1500:2-14.)  The government sought to admit a different portion of Exhibit 10045 (using Exhibit 9168) during the February 2022 trial, specifically the portion discussing a one-time stock grant to Defendant Lovette.  The Court found that portion of the employment agreement inadmissible as the government was unable, at that time, to show that Defendant Lovette continued to own the stock.  (2/9/22 R. Tr. at 206:1-4.) The government is not seeking to admit that particular portion during this trial and does not seek to relitigate the Court's ruling on this issue.

10.     **Defendant Lovette's Motion *in Limine* No. 11 (Docket No. 1313) Should be Denied Because Sysco Credit Terms are Relevant and Admissible.**

The Court has already twice denied Defendant Lovette's now-renewed motion to exclude GX 803, and no circumstances warrant reconsideration of these prior rulings. GX 803 is an email thread between Lovette and Joe Grendys of Koch Foods on Sysco's credit terms.  (*See* Docket No. 1313 at 1; Docket No. 559 (admitting entry 224 after *James* hearing); Docket No. 1069 at 6-7 (denying prior motion to exclude Sysco evidence, Docket No. 990).)  It shows an agreement between competitors to oppose Sysco's proposed terms—and establishes Lovette's relationship with Koch, a competing chicken supplier.  (*See* Docket No. 1018.) The Court ruled that GX 803 is not only a coconspirator statement (Docket No. 559 at 39), but also "relevant to charged conduct and not unfairly prejudicial" because it "shows executives at competing chicken suppliers communicated regarding their approaches to a customer's payment terms." (Docket No. 1069 at 7.)

Defendant alleges the testimony of government witness Robert Bryant and Pilgrim's employee Brenda Ray are changed circumstances warranting reconsideration. (Docket No. 1313 at 5.)  Not so.

Defendant relies on a misconstrued fragment of Bryant's testimony during which Bryant said the sales channel for quick-service restaurants (QSRs) was "different than the other segments."  (Docket No. 1313 at 4.)  However, the transcript reveals Bryant's statements were actually about the retail sales channel, including Wal-Mart, *not* the broadline sales channel containing Sysco.  Bryant testified that supermarkets, like Wal-Mart, made up the retail channel, while distributors like "Sysco [and] US Food Service"

made up the broadline channel. (3/8/22 R. Tr. at 150:4-7, 157:2-5.)[22]  Defendants' cited

testimony was in response to a question about "Wal-Mart business," and Bryant's

answer clearly pertained to the *retail* sales channel generally and *Wal-Mart* specifically.

(*Id.* at 170:4-10.)

In addition, it is clear from Bryant's testimony, and consistent with the Court's

prior rulings, that the broadline sales channel *was* implicated in the charged conspiracy.

As detailed above in the government's opposition to Defendants' Motion *in Limine* No. 4

(Docket No. 1303), Bryant testified that Pilgrim's and Mar-Jac successfully conspired to

impose a price increase on US Food.  (*See, e.g.*, 3/9/22 R. Tr. at 31:3-34:16, 38:6-25.)

This testimony shows that Bryant did not believe that the price fixing agreement was

limited to the QSR channel.  (*Id.*)

Brenda Ray's trial testimony is equally unavailing and does not support the Court

reconsidering its prior rulings.  Ray testified that, to her knowledge, Defendant Lovette

was not involved in the Sysco negotiation at issue.  (3/21/22 R. Tr. at 151:25-152:2.)

But Ray also conceded that Sysco was Pilgrim's "second or third largest" customer in

the broadline channel, and Sysco's credit terms were a "big[] deal" and affected "a lot of

money."  (*Id.* at 178:23-179:20.)  Thus, Defendant Lovette—a detail-oriented CEO

supervising all three sales channels (GX 9994)—very well may have played a role in the

Sysco negotiation.  And, regardless of what Ray believed, Lovette *was* in fact involved

in the Sysco negotiation—just as GX 803 indicates.

---

[22] Pilgrim's retail channel supplies grocery stores, supermarkets, and retail delis.  By contrast, its broadline channel supplies broadline food distributors, which are companies that distribute a broad variety of food.  (*See* 3/8/22 R. Tr. at 150:4-7, 157:2-5.)

GX 803 shows that Lovette and Grendys agreed to resist Sysco's request for better credit terms with chicken suppliers like Pilgrim's.  This was price fixing.  As the Supreme Court has held, "credit terms must be characterized as an inseparable part of the price. . . . and thus fall[] squarely within the traditional per se rule against price fixing."  *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648 (1980) (footnotes omitted).  Defendant Lovette's motion for reconsideration should be denied.

Dated: May 12, 2022                    Respectfully submitted,


/s/ Matthew Chou
KEVIN B. HART
LESLIE A. WULFF
PAUL J. TORZILLI
DANIEL A. LOVELAND, JR.
MATTHEW CHOU
AIDAN D. MCCARTHY
KAITLYN E. BARRY
Antitrust Division
U.S. Department of Justice
450 Fifth Street, N.W.
Washington, D.C. 20530
Tel: (202) 549-6183
Email: matthew.chou@usdoj.gov
*Attorneys for the United States*