1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 20-CR-00152-PAB
3   In Re: Penn II
UNITED STATES OF AMERICA,
4
        Plaintiff,
5
vs.
6
JAYSON JEFFREY PENN,
7   MIKELL REEVE FRIES,
SCOTT JAMES BRADY,
8   ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,
9   WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,
10  WILLIAM WADE LOVETTE,
GARY BRIAN ROBERTS,
11  RICKIE PATTERSON BLAKE,

12      Defendants

13  _____

                    REPORTER'S TRANSCRIPT
14                  Trial to Jury, Vol. 10

15  _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17  Chief Judge, United States District Court for the District of

18  Colorado, commencing at 8:21 a.m., on the 9th day of March,

19  2022, in Courtroom A201, United States Courthouse, Denver,

20  Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

APPEARANCES

Michael Koenig, Carolyn Sweeney, Heather Call and Paul Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing for Plaintiff.

Anna Tryon Pletcher and Michael Tubach of O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor, San Francisco, CA 94111-3823;

Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street N.W., Washington, DC 20006, appearing for Defendant Penn.

David Beller, Richard Kornfeld and Kelly Page of Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver, CO 80202, appearing for Defendant Fries.

Bryan B. Lavine of Troutman Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

Laura Kuykendall and Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219, appearing for Defendant Brady.

Michael Felberg of Reichman, Jorgensen, Lehman, Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY 10017;

1          APPEARANCES (Continued)

2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4    CA 94065; appearing for Defendant Austin.

5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7          Marci Gilligan LaBranche of Stimson, Stancil,

8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9    80218, appearing for Defendant Mulrenin.

10          James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12          Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14          Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16          Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19          John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

|     |     |
| --- | --- |
| 1   | APPEARANCES (Continued) |
| 2   | Craig Allen Gillen and Anthony Charles Lake of |
| 3   | Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920, |
| 4   | Atlanta, GA 30339; |
| 5   | Richard L. Tegtmeier of Sherman & Howard, LLC, |
| 6   | 633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing |
| 7   | for Defendant Roberts. |
| 8   | Barry J. Pollack of Robbins, Russell, Englert, Orseck |
| 9   | & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington, |
| 10  | DC 20006; |
| 11  | Wendy Johnson and Christopher Plumlee of  RMP, LLP, |
| 12  | 5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing |
| 13  | for the Defendant Blake. |
| 14  |     |
| 15  | PROCEEDINGS |
| 16  | THE COURT:  We are back on the record in 20-CR-152.  I |
| 17  | understand that there is an issue that Mr. Koenig wants to |
| 18  | bring up.  Go ahead. |
| 19  | MR. KOENIG:  Sure, Your Honor.  It was our |
| 20  | understanding that the Court ordered a few days ago for the |
| 21  | defendants to provide at least the first day's worth of |
| 22  | witnesses last night.  And we got a list of 39 witnesses for |
| 23  | the first day, and it's just really hampering our ability to |
| 24  | prepare.  And so I would ask for as soon as humanly possible to |
| 25  | get the -- at least the first day's witness list. |

1          *THE COURT:* Response?  Ms. Prewitt.

2          *MS. PREWITT:* Thank you, Your Honor.

3          As we have been advising the Court, we have been

4   working diligently to reduce the list.  The list you see, it

5   really represents a slashing of the prior list.  So among 10

6   defendants, it's about a third of the length of the prior list

7   unless I am wrong about that.

8          The issue is not being able to provide a list; it's

9   just who is going up first because that requires a lot of

10  discussions amongst counsel.  So what we are going to be doing

11  is talking throughout the day, and we will meet again tonight

12  to try to see if we can come up with that list.  We just don't

13  want to provide a list that's not meaningful.

14         What I would propose is that -- Your Honor, that we

15  provide a list in terms of the order of witnesses that we

16  expect, we reasonably expect now will take place through the

17  entire trial and provide that by noon on Friday.

18         *THE COURT:* Well, Mr. Koenig and the government needs

19  to know who the first day's witnesses are.  I mean, this is

20  critical.  This is -- the list that was just filed today, you

21  know, it's progress, but not having any dates on it whatsoever.

22  Think about it, if the government gave this to the defendants,

23  you would all be screaming about how utterly unhelpful it was.

24  And this is utterly unhelpful.  I mean, you know, it's really

25  almost nothing.

1          So, yeah, the government has got to get something

2    meaningful for the first day and then -- as soon as possible.

3    Didn't I say by the end of the day today you had to have the

4    list?

5          MS. PREWITT:  We will provide that by the end of the

6    day today.  We might need some flexibility because we are --

7    given the fact the case has accelerated, we are trying to move

8    things around and seeing who can be placed where.

9          THE COURT:  I don't know if things are too

10   accelerated, but, yeah, the government needs to get something

11   quick.

12         Anything else, Mr. Koenig?

13         MR. KOENIG:  I guess, you know, they've had several

14   days to get us a list by the end of the day.  I don't know what

15   flexibility means, but it's just -- it's making it really,

16   really difficult.  So -- and plus we don't even have the order.

17   This is alphabetical by first name.  It's just -- I really

18   don't know what we can do to prepare.  So anyway, that's all I

19   have to say.

20         THE COURT:  All right.  Any count on our jurors?

21         We will be in recess, then, until 8:30.  Thank you.

22      (Recess at 8:25 a.m. until 8:42 a.m.)

23         THE COURT:  Why don't we bring Mr. Bryant back and

24   bring in the jury.

25         (Jury present.)

Robert Bryant - Direct

1          *THE COURT:*  Good morning, Ladies and Gentlemen.  More

2     snow.  We will keep a weather eye out, so to speak, later in

3     the day.  If the conditions are bad, we might recess a little

4     bit early just to get you on the road, and I have to be out

5     right at 5:00.  Maybe Captain Montoya has a special access to

6     really good info.  But anyway, we will do that, so don't fret

7     about that possibility.  We'll play it by ear and see how it's

8     all working out.

9          We will then continue with the direct exam of

10     Mr. Bryant.

11          Ms. Call, go ahead.

12        (**Robert Bryant** was previously sworn.)

                    **DIRECT EXAMINATION CONTINUED**

13

14    *BY MS. CALL:*

15    *Q.*  Good morning, Mr. Bryant.  I believe where we left off

16    yesterday you had been testifying about negotiations with KFC

17    in 2017; is that correct?

18    *A.*  That's correct.

19    *Q.*  I believe we just had been looking at Government Exhibit

20    1882, which is Tab 5 in your binder.

21          *MS. CALL:*  Ms. Pearce, if you could pull that up.

22          May we publish to the jury, Your Honor?

23          *THE COURT:*  You may.  We may be having a technological

24    moment.

25    *BY MS. CALL:*

Robert Bryant - Direct

1    Q.  For now I can ask you questions about the document,

2    Mr. Bryant, and for future documents if this continues, we can

3    use the document viewer.

4         All right.  So, Mr. Bryant, could you remind the jury

5    what you asked Mr. Austin to do in Government's Exhibit 1882?

6    A.  I would like to know where we need to be No. 2 in price if

7    you can find out.

8    Q.  And where were you in the bidding process at the time you

9    asked for that?

10   A.  Technically, it had not really begun.  There was a request

11   from KFC for a meeting.  I don't remember even getting the

12   official RFP from KFC at that time.  This was part of our prep

13   before our prebid meeting with KFC.

14   Q.  Now, did there come a time -- you said Defendant Austin, he

15   didn't respond to this e-mail?

16   A.  Not that I recall, no.

17   Q.  Did there come a time when another person from Pilgrim's

18   made that same request in relation to this bid?

19   A.  They did, yes.

20   Q.  What happened?

21   A.  It was after we had our meeting with KFC on January 27th.

22   I believe the bid was due the -- by Friday the following week.

23   My boss, Tim Stiller, called to talk about the progress of the

24   bid.

25        MR. LAVINE:  Objection, Your Honor, hearsay.

Robert Bryant - Direct

1          *THE COURT:*  Overruled.

2     *A.*  While we were discussing the bid, he asked if I had pricing

3     information from Roger yet, and I told him I had not received

4     any pricing information from Roger.  He got upset, and he told

5     me that I didn't know shit, and he would call and find out for

6     himself or get it himself.  And then he hung up the phone on

7     me.

8     *BY MS. CALL:*

9     *Q.*  All right.  Who did you say this conversation was with?

10    *A.*  That was between myself and Tim Stiller.

11    *Q.*  Now, did you receive another call after your conversation

12    with Mr. Stiller?

13    *A.*  No.

14    *Q.*  Did Defendant Austin reach out to you at any time

15    thereafter?

16    *A.*  I don't recall Roger reaching out to me.  I remember

17    calling Roger after the phone call with Tim Stiller.  I relayed

18    the conversation that I and Tim Stiller had, and Roger Austin

19    told me that he had a similar conversation and he would make

20    some calls and see what he could find out.

21    *Q.*  And did Defendant Austin call you back after that?

22    *A.*  He did.

23    *Q.*  When?

24    *A.*  It was relatively quickly.  I believe that -- our call may

25    have happened that afternoon, and then I believe he called me,

Robert Bryant - Direct

1    returned my call the following morning, so I would say

2    within -- less than 24 hours later.

3    *Q.* All right. Now, that following morning what did

4    Defendant Austin tell you?

5    *A.* The following morning when Roger called me, you know, after

6    a brief hello, he was like, Are you ready? I got it. And at

7    that point, he gave me pricing information from several

8    competitors.

9    *Q.* What do you mean when you say "pricing information"?

10   *A.* Bid information for the upcoming KFC bid.

11   *Q.* And what did you do when Defendant Austin told you this bid

12   information?

13   *A.* I wrote it down in my personal notes, because after the

14   conversation with Tim Stiller, you know, he was quite upset

15   with me. I wanted to be able to relay that information back to

16   him exactly as Roger gave it to me, Roger Austin.

17   *Q.* Now, did you have a reaction as to the speed with which

18   Defendant Austin got this information?

19   *A.* I did.

20   *Q.* What was your reaction?

21   *A.* I was surprised, and I even remember making a comment about

22   how quickly he was able to get this information.

23   *Q.* And did Defendant Austin respond?

24   *A.* He did.

25   *Q.* What did he say?

Robert Bryant - Direct

1    *A.*  He -- he said that it wasn't that big of a deal.  He had

2    pricing information going back to the '90s.

3    *Q.*  All right.  Now, I would like to show you Government's

4    Exhibit 1919, and that's in Tab 6 of your binder.

5             *MS. CALL:*  Ms. Pearce, if you could please pull that

6    up for the parties and the witness and the Court at this

7    moment.

8    *BY MS. CALL:*

9    *Q.*  Mr. Bryant, do you recognize Exhibit 1919?

10   *A.*  I do.

11   *Q.*  What is it?

12   *A.*  They are my handwritten notes.  The page in front of me is

13   from the KFC meeting on January 27 of 2017.

14   *Q.*  And if you turn to the second page, do you recognize that

15   page?

16            *MS. CALL:*  Ms. Pearce, could you turn to the second

17   page?  Thank you.

18   *A.*  I do.

19   *BY MS. CALL:*

20   *Q.*  And what do you recognize that to be?

21   *A.*  More of my personal notes.

22            *MS. CALL:*  Government moves to admit Government's

23   Exhibit 1919.

24            *THE COURT:*  Any objection to the admission of

25   Exhibit 1919?

2137

Robert Bryant - Direct

1          Exhibit 1919 will be admitted.

2              *MS. CALL:*  Permission to publish?

3              *THE COURT:*  You may.

4              *MS. CALL:*  Ms. Pearce, could you start with page 1?

5    Thank you.

6    *BY MS. CALL:*

7    *Q.*  All right.  Mr. Bryant, what does Exhibit 1919 say in that

8    top row?

9    *A.*  KFC meeting 1/27/17.

10   *Q.*  Is it correct you said you believe this page to be notes

11   from that KFC meeting?

12   *A.*  That's what I recall, yes.

13   *Q.*  Now, if you could look down to the bottom of the first

14   page, I think it's the third line from the end beginning with

15   the letter P, what does that say?

16   *A.*  Price next week.

17   *Q.*  And what did you understand that to refer to?

18   *A.*  What I understand that, my notes to be there is that KFC

19   wanted our bid back the following week.

20   *Q.*  And which round of bidding is this?

21   *A.*  The first round.

22   *Q.*  All right.

23              *MS. CALL:*  Now, could we please go to the second page?

24              Ms. Pearce, if you could please zoom on into the chart

25   at the bottom of the page.

Robert Bryant - Direct

1    *BY MS. CALL:*

2    *Q.*  Mr. Bryant, what is this?

3    *A.*  That is the bid information that I received from

4    Roger Austin.

5    *Q.*  So starting at the top, the number 1.0234, what do you

6    recall that to be?

7    *A.*  I believe that was Pilgrim's current price at the time.

8    *Q.*  And the numbers directly under that and the names to the

9    right starting with Koch and ending in George's, could you

10   explain what that information is?

11   *A.*  That was the bid information for the KFC bid in 2017.

12   *Q.*  And what bid -- what product is that bid information for?

13   *A.*  That is for KFC eight-piece.

14   *Q.*  Now, you described yesterday that typically I believe the

15   same group of suppliers would bid from year to year for KFC; is

16   that correct?

17   *A.*  That is correct.

18   *Q.*  Was it your understanding at this time that these

19   competitors would be submitting competing bids to KFC?

20   *A.*  That's correct.

21   *Q.*  Now, could we move on to those bottom numbers starting with

22   I think it says 49.58?

23   *A.*  I know my writing is terrible, but I believe that's 49.38.

24   *Q.*  Thank you, Mr. Bryant.

25          What is depicted in that portion of the document?

Robert Bryant - Direct

1  *A.*  That is the dark-meat pricing to KFC, and the 49.38 would

2  be the case weight.  And then the negative 28 would be 28 cents

3  subtracted from, for instance, George's eight-piece price, so

4  the dark-meat price was relative to the eight-piece price.

5  *Q.*  All right.  And how do you know the minus 28, minus 30,

6  minus 29, what makes you believe those to be dark-meat prices?

7  *A.*  That's the way that we formulated the dark-meat price to

8  KFC.  For instance, if we sold KFC eight-piece for $1 a pound

9  and then the dark-meat price was .30 back, it would be a dollar

10 minus the 30, so it would be 70 cents.  So there wasn't

11 technically a dark-meat price.  It was based off the

12 eight-piece price.

13 *Q.*  So if you could perhaps just explain a very tiny bit of

14 that math using the numbers here.  So I see Mar-Jac, Tyson, and

15 Claxton here all listed as .30 back; is that correct?

16 *A.*  That's correct.

17 *Q.*  And George's, they are listed at .28 back?

18 *A.*  That's correct.

19 *Q.*  So if the eight-piece price were all the same, would

20 George's price be higher or lower than, let's say, Claxton?

21 *A.*  The George's price would be higher for their dark meat

22 because you were subtracting less from their eight-piece price

23 if they were all equal.

24 *Q.*  Using the actual eight-piece prices you have here, was the

25 George's price lower or higher than Claxton for dark meat?  And

Robert Bryant - Direct

1    you can take a moment.

2    A.   I would have to -- it looks like Claxton would have been --

3    would have been higher.  They were 99.  They would have been

4    2 cents higher.

5    Q.   Is that because the difference between George's and

6    Claxton's eight-piece price was greater than the difference

7    between the dark-meat prices?

8    A.   That's correct, yeah.

9    Q.   And you mentioned case weight.  What's a case weight?

10   A.   So the KFC's pricing really was a per-case price.  You

11   negotiated a cent per pound, but there was also a -- what we

12   called a fixed case weight billing.  So their price was a

13   per-case price.  So if you sold it on a contracted price at a

14   dollar per pound and then, for instance, the agreed-upon fixed

15   billing weight regardless of the amount of pounds inside the

16   case was 50 pounds, then each case would be $50 per case.

17   Q.   Okay.  So KFC pays per product by what?

18   A.   Per case.

19   Q.   And then there is two components into that case price?

20   A.   That's correct, the price per pound and the max billable

21   per case.

22   Q.   All right.  So on Exhibit 1919 here, is it correct there

23   are three kinds of prices?

24   A.   Technically, yes.

25   Q.   And this information, did you receive this before or after

2141

Robert Bryant - Direct

1  the first round bid was due for KFC?

2  *A.*  Before.

3  *Q.*  Now, did you have an expectation as to how Pilgrim's

4  competitors would bid?

5  *A.*  Yes.

6  *Q.*  And what was the basis of that?

7  *A.*  Prior experience, you know, from 2014 and through this bid

8  on 2017 that the information would be.

9          *MR. LAVINE:*  Objection, foundation.

10          *THE COURT:*  Hold on one second, Mr. Bryant.

11          *MR. LAVINE:*  Objection, foundation as to what other

12  suppliers did.

13          *THE COURT:*  Overruled.

14  *BY MS. CALL:*

15  *Q.*  Please continue in providing the basis of your

16  understanding, Mr. Bryant.

17  *A.*  Like I said, prior experience, you know, from 2014 through

18  2017; reassurances from my manager, Tim Stiller; and the mutual

19  trust between myself and Roger Austin.

20  *Q.*  When you said "reassurances from Tim Stiller," what do you

21  mean?

22  *A.*  He, for example, would tell me to use Roger --

23          *MR. TUBACH:*  Objection, Your Honor.  Can we have a

24  side bar?

25      (At the bench:)

Robert Bryant - Direct

1          THE COURT:  Mr. Tubach, go ahead.

2          MR. TUBACH:  Your Honor, I believe the government is

3    trying to elicit statements from what they believe to be a

4    co-conspirator under 801(d)(2)(E).  I don't believe these

5    statements have been provided to us or they were not part of

6    the James log, so we object to it on hearsay grounds.

7          THE COURT:  All right.  Response, Ms. Call?

8          MS. CALL:  Yes, Your Honor.  I am frankly not certain

9    what reassurances he was referring to.  There are conversations

10   with Mr. Stiller that are on the James log, and I presumed

11   based on what he told us he would be referring to something

12   from that.

13          I will note as an overall matter counsel is objecting

14   to things that were on the James log, so it is a little hard

15   keeping up flow of this testimony when they are objecting to

16   things that we have pretrial rulings on.  I think Mr. Lavine

17   did it just a couple minutes ago, so I know that's beside the

18   point here.  But Mr. Tubach, I frankly don't know whether or

19   not the statement he is referring to is on the James log, but I

20   am not asking about a specific conversation.  He used the term

21   "reassurances."

22          THE COURT:  Well, once again, if the statement was not

23   disclosed and it's not on the James log, then there is a

24   problem.  So you may, Ms. Call, need to use leading questions

25   or even interrupt him to steer him back on track so that we

Robert Bryant - Direct

1    don't have an issue with disclosure.

2         *MS. CALL:*  Yes, Your Honor.  I just will note, of

3    course, when it comes to discovery, the government has given

4    the defendants notice of the information it has and used that

5    as the basis for a *James* log.

6         A witness is obviously a live thing.  And when a

7    witness is testifying to the basis of understandings he had,

8    there may be information of the source of his many years of a

9    salesman at Pilgrim's Pride that has not been specifically

10   inquired into in the past.  So it is a difficult rule to follow

11   with a live witness to require that every possible statement

12   from a colleague of Mr. Bryant's or from a conspirator of

13   Mr. Bryant's be disclosed on the *James* log, so I do think that

14   is a difficult standard.

15        I will not try to elicit further co-conspirator

16   statements if that is the Court's ruling that we cannot elicit,

17   you know, things that were not included on the *James* log

18   because the government did not know them in discovery, but if

19   that's the Court's ruling, I will not continue with this line

20   of questioning.

21        *THE COURT:*  The problem, again, is if the Court were

22   to adopt a different standard for live witnesses, then who

23   knows what the witness would say.  And if you don't know what

24   the witness is going to say, then we, you know, potentially run

25   into a free-for-all.  So that's why the direct needs to be

Robert Bryant - Direct

1    structured in such a way that minimizes the risk of any type of

2    statement coming out that, you know, may be material but not on

3    the *James* log.

4              All right.  Anyway, that objection will be sustained.

5              (In open court:)

6    BY MS. CALL:

7    Q.  Mr. Bryant, without going into the specific statements of

8    Mr. Stiller's you were referring to, what are the bases of your

9    understanding as to how your competitors would bid in 2017?

10   A.  Reassurances from co-workers to trust Roger Austin and his

11   due diligence and that -- and to let Roger use his network or

12   contacts to -- I am trying to find the right word -- basically

13   to trust Roger and let him use his network of contacts to -- to

14   give me guidance on what to do on price.

15   Q.  Now, Mr. Bryant, you used the word "due diligence."  What

16   do you mean when you use the word "due diligence"?

17   A.  It was a term that was used from time to time about

18   letting -- letting Roger Austin or -- or someone else on his

19   team do due diligence meant to make phone calls to various

20   competitors and get -- get information.

21   Q.  All right.  Now, you testified that you did have an

22   expectation as to how your competitors would bid.  Did you

23   expect them to submit the precise numbers that were here on

24   Exhibit 1919?

25   A.  Not precise, but I expected that it would be very close.

Robert Bryant - Direct

1   They may massage their number a little bit before turning their

2   bid in, but the numbers that I wrote down I felt would be a

3   very close representation of what they would submit.

4   Q.  So they would be kind of somewhere in a range around the

5   numbers you got?

6           MS. HENRY:  Objection, leading.

7           THE COURT:  Sustained.

8   BY MS. CALL:

9   Q.  All right.  We can put Exhibit 1919 down for now.

10          Mr. Bryant, could you describe how you then used these

11  numbers in Exhibit 1919?

12  A.  Yes.  I used these numbers to formulate a bid that would

13  have put Pilgrim's second in price, developed a cost model that

14  KFC required for us to be turned in, and I -- what I recall is

15  the cost model said we should have went up 2 or 3 cents per

16  pound.  I don't remember the precise number.  However, I

17  adjusted the cost model to be where Pilgrim's would be No. 2 in

18  this -- that -- what's called that ranking order from highest

19  to lowest in price.

20  Q.  All right.  And do you have an understanding as to how

21  Defendant Austin used these numbers in Exhibit 1919?

22  A.  I do.

23  Q.  What's the basis of that understanding?

24  A.  During the formulation of our bid in 2017, we had a

25  conference call between myself, Tim Stiller and Roger Austin

Robert Bryant - Direct

1   before final submission of the bid.  During that phone call,

2   and I am not a hundred percent certain, but I do believe it was

3   Roger Austin, I was presenting the bid submission where

4   Pilgrim's was No. 2 in price.

5           MR. TUBACH:  Objection, Your Honor.  I believe we are

6   going to get into hearsay again.

7           THE COURT:  Well, we'll see.  Go ahead.  You can

8   answer.

9   A.  During the course of that phone call, and like I said, I do

10  believe it was Roger Austin said, I believe we need to be more

11  middle of the pack.

12          MR. TUBACH:  Objection.

13          THE COURT:  Let's have a side bar.

14     (At the bench:)

15          THE COURT:  So, Mr. Tubach, the basis of the hearsay

16  objection is that it is not on the *James* log or previously

17  undisclosed?  I am not sure.

18          MR. TUBACH:  Exactly.  It's not on the *James* log

19  previously, and it's the basis for -- on the basis of

20  801(d)(2)(E), we object to it.

21          MR. FELDBERG:  Your Honor, if we may, as far as we can

22  tell, this purported conversation has not been disclosed.

23          THE COURT:  Mr. Fagg?

24          MR. FAGG:  Your Honor, the other thing is this witness

25  is speculating.  He said twice that he believes that the

Robert Bryant - Direct

1    discussion was with Mr. Austin.

2              THE COURT:  Okay.  Ms. Call, response?

3              MS. CALL:  Yes, Your Honor.  First off, to respond to

4    Mr. Fagg, you know, as courts have voiced, including in

5    *United States v. Tipton* which we discussed during the testimony

6    of Ms. Becker, no witness ever has a hundred percent certainty,

7    and Mr. Bryant just said, I don't know that I am a hundred

8    percent certain.

9              But regardless, this was on the government's *James*

10   log, entry 74-S.  Mr. Bryant said that Pilgrim's developed a

11   model to put them second in price.  However, before they

12   submitted the bid, either Tim Stiller or Roger Austin said they

13   felt like Pilgrim's needed to be more in the middle of the

14   pack, so they submitted their price third in line.  That is

15   exactly the conversation Mr. Bryant is testifying to right now

16   and that he testified to in the prior trial.  So I don't

17   believe there is a disclosure issue, and the defendants didn't

18   object when this happened in the prior trial as well.

19             MR. FELDBERG:  It's a different conversation, Your

20   Honor.  The witness started to testify there was a conference

21   call.  The prior disclosure and the prior testimony was either

22   Mr. Austin or Mr. Stiller.  They are different.

23             THE COURT:  I am sorry, Mr. Feldberg.  When you say

24   they are "different," what do you mean?

25             MR. FELDBERG:  What he is talking about or starting to

Robert Bryant - Direct

1    talk about now is a conference call, which is different than a

2    statement by one of Stiller or Austin, he couldn't remember

3    which.  He has now changed that or trying to change that to a

4    conference call.  And the two bits of testimony are different.

5         THE COURT:  Okay.  Mr. Tubach, anything more from you?

6         MR. TUBACH:  No, Your Honor.  Thank you.

7         THE COURT:  Mr. Fagg, anything more from you?

8         MR. FAGG:  No, Your Honor.  And I wasn't commenting on

9    Mr. Bryant's "I am not a hundred percent certain."  It was his

10   later testimony where he said "I believe," and I believe that

11   falls into a line of speculation that is beyond the holding

12   Ms. Call referenced.

13        THE COURT:  Ms. Call, in terms of Mr. Feldberg's

14   point, do you believe that this is the conversation that you

15   anticipate Mr. Bryant is now going to talk about, someone

16   saying that Pilgrim's needs to be more in the middle of the

17   pack?

18        MS. CALL:  Yes, Your Honor.  I believe there is only

19   one conversation he has ever discussed where the Pilgrim's bid

20   was moved from No. 2 to No. 3, and it is this discussion he is

21   talking about.  I don't know and I am trying to see if he

22   specifically used the term "conference call" in his previous

23   testimony, but it is the precise same discussion that was

24   disclosed and was testified about previously.

25        THE COURT:  Okay.  Mr. Fagg's objection in terms of

Robert Bryant - Direct

1    some uncertainty is overruled.  He seems to have sufficient

2    recollection.

3           Mr. Feldberg's objection regarding it being different

4    conversations is overruled.  It's not 100 percent clear, but

5    there doesn't seem to be any reasonable basis to believe that

6    he is now going to describe a different one.

7           And Mr. Tubach's objection is overruled too since it

8    appears as if this is a conversation that was disclosed on the

9    *James* log.

10          Thank you.

11          (In open court:)

12   *BY MS. CALL:*

13   *Q.*  Mr. Bryant, I believe you were describing a conference call

14   with Tim Stiller and Roger Austin.  Can you describe what was

15   said on that call?

16   *A.*  Yes.  Once again, during the course of that phone call, I

17   presented the model that placed Pilgrim's price No. 2 in price

18   in order of the list from my handwritten notes.  And while on

19   that phone call, and I do believe it was Mr. Austin, I am not a

20   hundred percent sure if it was Mr. Austin or Tim Stiller, but I

21   do believe it was Mr. Austin that said that he believed that we

22   needed to be more middle of the pack.  And based off that

23   conversation, I adjusted the model and ranked Pilgrim's third

24   in price according to that -- the order on my handwritten

25   notes.  And it's my understanding that was what was ultimately

Robert Bryant - Direct

1    submitted to KFC.

2    Q.  Now, based on your prebid meeting with KFC, did you have an

3    understanding as to how much KFC wanted Pilgrim's to reduce its

4    price?

5    A.  No, I don't recall an exact number.  You know, after the

6    first round bid submission we did get some indication, but I

7    don't recall an indication of exactly how much of a price

8    concession KFC expected.

9    Q.  Okay.  But what direction did they want Pilgrim's price to

10   move in?

11   A.  They wanted our price to go down.

12   Q.  And what was your purpose, Mr. Bryant, in asking

13   Defendant Austin to get competitors' bid information?

14   A.  To limit the amount of price decrease.

15   Q.  Now, did you have an expectation, yes or no, as to whether

16   Defendant Austin would share Pilgrim's bid pricing with

17   competitors?

18   A.  Yes.

19   Q.  What was the basis of that understanding?

20   A.  The experience in 2014 and after that that information was

21   shared between the various competitors.

22   Q.  And what was your understanding in 2017?

23            MR. FELDBERG:  Objection, Your Honor.  This is an

24   issue we addressed in the trial brief.

25            THE COURT:  Sustained.

Robert Bryant - Direct

1    *BY MS. CALL:*

2    Q.  All right.  Now, after that first round did your

3    negotiations with RSCS continue?

4    A.  They did.

5    Q.  Who was involved in those discussions on the Pilgrim's

6    side?

7    A.  Myself, Roger Austin, and Tim Stiller.

8    Q.  And what do you recall about the discussions you had?

9    A.  I recall Tim Stiller being very upset with the amount of

10   price concession that KFC had requested.  What I recall is KFC

11   gave feedback that they thought our first round bid was

12   received well.  However, they wanted -- I don't recall exactly,

13   but I think it was around 7 cents of total price concession.

14   And Mr. Stiller was very upset with that request.

15          And then our conversation that he told -- he had told

16   me that he had asked Roger to tell the competition that we were

17   going to hold and that we needed to find a new

18   hundred-million-pound customer, which meant that he wanted to

19   have an option to completely replace KFC.

20   Q.  Now, what does the phrase "hundred-million-pound customer"

21   mean?

22   A.  That was a reference to the volume that we sold KFC and

23   that the conversation was that before we gave the price

24   concession, that we would not do business with KFC.

25   Q.  And what did you understand Mr. Stiller to mean when he

Robert Bryant - Direct

 1  told you that he had directed Roger Austin to tell the

 2  competition we were going to hold?

 3          *MS. PAGE:*  Objection, calls for speculation.

 4          *THE COURT:*  Overruled.

 5  A.  That he wanted Roger to tell our competition that we were

 6  not going to concede any more on price and that if -- we would

 7  rather walk away from the business than concede on price.

 8  *BY MS. CALL:*

 9  Q.  Following these negotiations in 2017, did you actually

10  enter into a contract with KFC?

11  A.  We did.

12  Q.  And what was the time period of that contract?

13  A.  It began in -- officially in January of 2018.  However,

14  there was some -- those pricing concessions that we implemented

15  in the summer of 2017.

16  Q.  And how long did the contract run for?

17  A.  It was three years.

18  Q.  So when would that have ended?

19  A.  2021, the beginning of 2021.

20  Q.  All right.  And did Pilgrim's actually sell chicken to KFC

21  under that contract?

22  A.  We did.

23  Q.  All right.  Now, we have been talking about, I believe, the

24  first bid.  How long did the negotiations last in 2017 for this

25  contract?

2153

Robert Bryant - Direct

1  A.  I don't recall exactly how long, but they drug out for a

2  little while.

3  Q.  Were there multiple rounds of bidding?

4  A.  There was a lot of conversations around this bid, yes.

5  Q.  Now, the interactions with competitors that you described

6  today, during what time frame were those?

7  A.  The first round.

8  Q.  Are you aware of contacts with competitors throughout the

9  remainder of the negotiations?

10 A.  I'm not.

11 Q.  Is there a reason why?

12 A.  There was some outside interest in the communication

13 between the competitors, so it's my understanding that it

14 stopped.

15 Q.  Now, you mentioned yesterday in your testimony that you

16 have an agreement not to be prosecuted with the government; is

17 that correct?

18 A.  That's correct.

19 Q.  And did there come a time that one of your colleagues

20 referenced that agreement in a conversation with you?

21 A.  Yes.

22 Q.  And did he tell you something about owning a contract?

23 A.  Yes.

24 Q.  What contract did he refer to?

25 A.  The 2017 KFC contract.

Robert Bryant - Direct

1          MR. TUBACH:  Object.  Can we have a side bar, please?

2          THE COURT:  Yes.

3       (At the bench:)

4          THE COURT:  Mr. Tubach, go ahead.

5          MR. TUBACH:  Your Honor, I could be mistaken, but I

6   thought this was the subject of a hearing in the prior trial

7   where the witness is now going to get into sort of

8   obstruction-type testimony that Mr. Stiller supposedly told

9   Mr. Bryant that he should own the contract because it would

10  be -- he had immunity and, therefore, could do it.  And I could

11  be wrong, but I thought the Court disallowed that testimony in

12  the last trial, but I can be corrected if I am wrong.

13         THE COURT:  I can't recall.  Ms. Call, do you?

14         MS. CALL:  Yes, Your Honor.  I reviewed the

15  transcript.  There was briefing and a hearing on this precise

16  issue, and this line of questioning was allowed in the prior

17  trial.  And it is contained on Pages 859 to 860 on the official

18  trial transcript.  That's the actual testimony, I should note,

19  not the hearing.

20         MR. TUBACH:  Okay.  I will take Ms. Call's

21  representation.

22         THE COURT:  Thank you.

23         (In open court:)

24  BY MS. CALL:

25  Q.  Mr. Bryant, I believe you said the conversation about

Robert Bryant - Direct

1    owning a contract, it related to a particular one?

2    A.  That's correct.

3    Q.  Which contract was that?

4    A.  The 2017 KFC contract negotiations.

5    Q.  So these ones we have just been talking about?

6    A.  That's correct.

7    Q.  What did you believe Mr. Stiller meant when he told you you

8    owned the contract?

9          MR. TUBACH:  Objection, calls for speculation.

10         THE COURT:  I will sustain it.  If you can lay some

11   foundation.

12   BY MS. CALL:

13   Q.  Could you describe the context of your conversation with

14   Mr. Stiller about this?

15   A.  Yes.  The agreement, the immunity and cooperation agreement

16   had been implemented six months or more before this

17   conversation, so --

18   Q.  Mr. Bryant, let me perhaps ask you some specific questions.

19   A.  Okay.

20   Q.  All right.  So the agreement was already in place under

21   which you had immunity?

22   A.  That's correct.

23   Q.  And based on your conversation with Mr. Stiller, were you

24   aware whether he had an understanding of that agreement?

25   A.  Yes, he did.

Robert Bryant - Direct

1    *Q.*  So what did you understand him -- and was that agreement in

2    any way a subject of your conversation with him that we are

3    describing?

4    *A.*  It was.

5    *Q.*  All right.  And was it in that discussion that he mentioned

6    you owning this contract?

7    *A.*  That is correct.

8    *Q.*  Let's move on.

9          Now, I would like -- before I move on, just briefly

10   about 2017, I asked if Pilgrim's sold chicken under the

11   contract.  Did Pilgrim's sell chicken during the entirety of

12   that contract that was negotiated in 2017 to KFC?

13   *A.*  We did.

14   *Q.*  All right.  Now, let's move on to a little bit later in

15   2017.  Did there come a time when you negotiated a price change

16   for a customer called US Foods?

17         *MS. PAGE:*  Your Honor, I am going to object to 402,

18   403, and 404(b).  May we have a side bar?

19         *THE COURT:*  Yes.

20      (At the bench:)

21         *THE COURT:*  Ms. Page, go ahead.

22         *MS. PAGE:*  Your Honor, the testimony that the

23   government is about to elicit is that Robbie Bryant on his own

24   volition in the 2017 negotiations with US Foods for boneless

25   breast asked Scott Tucker, a Pilgrim's employee, to reach out

Robert Bryant - Direct

1    to an unknown supplier at Mar-Jac Foods, and using that pricing

2    information both Mar-Jac and Mr. Bryant agreed to increase

3    their price for US Foods boneless breast.

4         Now, this is problematic for a couple reasons:  One,

5    it's not in the Indictment or the Superseding Indictment, and

6    it was not on the government's 404(b) notice.

7         This fact pattern is significantly different than what

8    the Court has already looked at in relation to objections about

9    2015 Popeye's and 2015 Pollo Tropical.  In those circumstances

10   with Pollo Tropical and Popeye's, the purpose of the conspiracy

11   was the exact same purpose of the conspiracy in the Indictment,

12   which was to seek a substantial price increase.  The testimony

13   of Mr. Bryant today has been that the purpose of the overall

14   conspiracy here in this courtroom involving these 10 men in

15   2017 was to decrease or limit an increase in pricing.  With

16   US Foods, it was an agreement with an unknown supplier to

17   increase the price.

18        And so I would argue that this is an impermissible,

19   constructive amendment to the Indictment.  It is completely

20   irrelevant to the conspiracy that's in front of the Court.

21   It's unfairly prejudicial particularly to Mikell Fries and

22   Scott Brady of Claxton because Claxton doesn't sell boneless

23   breast to US Foods, and it wasn't listed on the 404(b) log.

24        So I make these arguments to protect Mr. Fries' rights

25   under the constitutional right to confrontation, due process,

Robert Bryant - Direct

 1   and is unfair and prejudicial.

 2          THE COURT:  Ms. Call, response?

 3          MS. CALL:  This sounds like something that would have

 4   been entirely appropriate in perhaps a pretrial brief and was

 5   perhaps written in advance but not raised until just now, but

 6   it was briefed already in the government's *James* log, entry

 7   60-S and 75-S, both related to the substance of Mr. Bryant's

 8   testimony.  And the Court did rule that this conduct was in

 9   furtherance of this very same conspiracy.

10          As far as Mr. Bryant's testimony over the last two

11   days, he testified at the very beginning of his testimony that

12   there were two purposes to the communications with the

13   competitors:  One, to increase price; and, two, limiting a

14   decrease in price, and it depended upon the market conditions

15   at the time of which was ever sought in a particular

16   communication.

17          So it is entirely consistent with Mr. Bryant's

18   testimony about the understanding of the scope of this

19   conspiracy.  It has been -- favorably been ruled on on the

20   *James* log, and it was already the subject of Mr. Bryant's

21   testimony in the prior trial.  This was around transcript

22   page 866 -- or 860 to 866 of the official transcript.

23          THE COURT:  Ms. Page, anything more?

24          MS. PAGE:  Your Honor, the issue about it being raised

25   earlier I think is unfair given the testimony that we are

Robert Bryant - Direct

1   hearing today.  I think it changes the way that the Court

2   should view this evidence because I think Mr. Bryant was

3   incredibly clear that the purpose of the conspiracy in 2017 was

4   to limit a price decrease.  So it becomes irrelevant and

5   unfairly prejudicial at this time.

6        THE COURT:  Objection is going to be overruled.  This

7   was on the *James* log.  Mr. Bryant on November 1st of last year

8   testified about the US Foods issue, I am not sure in precisely

9   what detail, in the last trial.

10        Moreover, the fact that this may be talking about or

11   Mr. Bryant may have just recently been talking about a price

12   decrease but perhaps with US Foods it's an increase, I am not

13   sure, but even if it's true, that doesn't mean it's outside the

14   scope of the conspiracy.  The Court has already found that the

15   conspiracy can involve prices going -- either being limited or

16   going up.  So as a result, the Court will overrule each of the

17   objections.

18        Thank you.

19        MR. LAVINE:  Your Honor, I -- just for the record, I

20   join in Ms. Page's objection to this matter.  Thank you.

21        THE COURT:  Right.  And objections are across the

22   board, so you don't have to, but, all right.  Thank you.

23        (In open court:)

24   BY MS. CALL:

25   Q.  Mr. Bryant, I believe you were just getting into a time

Robert Bryant - Direct

1   when you were negotiating with US Foods.  Why were you

2   negotiating with US Foods in 2017?

3   A.  We believed that our boneless breast was -- needed a price

4   increase.

5   Q.  And what was your position at this time in 2017?

6   A.  I was director of sales.

7   Q.  And at the beginning of your testimony yesterday, you

8   described certain channels of sales at Pilgrim's.  What channel

9   is US Foods in?

10  A.  The broad line.

11  Q.  And who supervised that group?

12  A.  In 2017, I believe Brenda Ray was still with us then.

13  Q.  Now, you said you were trying to increase the price on

14  boneless breasts?

15  A.  That's correct.

16  Q.  And did you have discussions with anyone at Pilgrim's

17  regarding that price increase?

18  A.  I did.

19  Q.  Can you describe the subject of those discussions?

20  A.  Yes.  So myself and Tim Stiller had a conversation about

21  the need to increase pricing on our boneless breast to

22  US Foods.  We were concerned that raising price to US Foods

23  would potentially lead to a loss of business.  So we recalled

24  that -- or I believe it was I that recalled that Scott Tucker

25  had a prior working relationship with a person at Mar-Jac, so

Robert Bryant - Direct

1   Tim Stiller asked if I could get Scott Tucker to reach out to

2   his contact at Mar-Jac and see if they would be willing to

3   increase prices with us.

4   Q.  All right.  A couple names we haven't talked about, if at

5   all, for a while.  What is Mar-Jac?

6   A.  Mar-Jac is another competitor, another poultry producer.

7   Q.  Was Mar-Jac a competitor of Pilgrim's for the US Foods

8   business?

9   A.  Yes.  They were, more or less, our direct competitor in the

10  areas that we serviced.

11  Q.  All right.  Now, you mentioned Scott Tucker.  Did

12  Scott Tucker work in the broad line sales?

13  A.  No.

14  Q.  Which group did he work in?

15  A.  He worked in the QSR, in Roger Austin's group.

16  Q.  Now, talking about US Foods, who was the account owner for

17  US Foods?

18  A.  At that time it was -- I just went blank -- Eric Oare.

19  Q.  Did Eric Oare work in the broad line group?

20  A.  He did.

21  Q.  When you and Mr. Stiller were discussing reaching out to a

22  competitor, why didn't you go to Eric Oare?

23  A.  We didn't believe Eric Oare would -- although he worked

24  over there, we didn't believe he would make that type of phone

25  call.

Robert Bryant - Direct

1    *Q.*  All right.  And then why did you choose Scott Tucker?

2    *A.*  Well, at least Tim Stiller at least had reasonable belief

3    that Mr. Tucker would be comfortable making that phone call.

4    *Q.*  And what's the basis of that belief?

5    *A.*  Mr. Stiller instructed me to ask Scott Tucker to call --

6         *MS. LaBRANCHE:*  Objection, non-responsive, move to

7    strike.

8         *THE COURT:*  Overruled.

9    *A.*  Mr. Stiller instructed me to ask Scott Tucker to do this.

10   Up until this point, I don't recall asking Mr. Tucker to do

11   something like this.  And when Tim Stiller directed me to do

12   that, it gave me the confidence that Mr. Stiller had a belief

13   that Scott Tucker would be able to do this.

14   *BY MS. CALL:*

15   *Q.*  And who is Scott Tucker's supervisor at the time?

16   *A.*  Roger Austin.

17   *Q.*  Now, did you ultimately reach out to Mr. Tucker?

18   *A.*  I did.

19   *Q.*  And what did you tell him?

20   *A.*  I explained, you know, our need for a price increase to

21   US Foods and our concern that if we just went to a price

22   increase with them, that there was a potential to lose

23   business.  So I asked Mr. Tucker if he would reach out to his

24   contact at Mar-Jac and see if they would be willing to increase

25   prices along with us.

Robert Bryant - Direct

1   Q.  Do you know whether Mr. Tucker actually did reach out to

2   Mar-Jac?

3   A.  He did.

4   Q.  And how do you know that?

5   A.  He gave me regular updates on his progress.

6   Q.  What did he tell you?

7   A.  After he reached out to his contact at Mar-Jac, he followed

8   up with me and said that they were willing to increase prices

9   with us.  They said that they would submit something similar to

10  our price increase.  However, they wanted to wait a few weeks

11  to submit because they didn't want an appearance that we were

12  going after those price increases together.

13  Q.  Now, first you said they would go in similar.  Why not the

14  same?

15  A.  It would be very obvious if our prices were exactly the

16  same to the customer, for the same reason, for the timing, that

17  they wanted there to be a gap in the submission because this

18  was not during the normal bid.  This was outside the normal

19  bid.  So we were asking for a price increase inside of the

20  contract.

21  Q.  Now, did Pilgrim's actually submit this price increase to

22  Mar-Jac?

23  A.  You mean to US Foods?

24  Q.  Thank you, US Foods.

25  A.  We did.

Robert Bryant - Direct

1   Q.  Do you have an understanding as to whether Mar-Jac did as

2   well?

3   A.  Yes.

4   Q.  What's the basis of that understanding?

5   A.  The same conversations with Mr. Tucker where he gave

6   regular feedback.

7   Q.  Now, what is your understanding as to whether Mar-Jac also

8   proposed a price increase to US Foods?

9   A.  They did.

10  Q.  Now, did you later get feedback from US Foods on this price

11  increase?

12  A.  We did.

13  Q.  Can I direct your attention -- and just for the witness,

14  the Court, and the parties -- to Exhibit 9140?

15        Do you recognize this, Mr. Bryant?

16  A.  I do.

17  Q.  What is it?

18  A.  It's an e-mail from myself to Tim Stiller on April 18th,

19  2017.

20  Q.  What customer or customers does this e-mail relate to?

21  A.  It actually relates to Sysco and US Foods.

22  Q.  Could you explain?

23  A.  The original e-mail was an RFP, request for pricing, from

24  Sysco.  But in my response to Mr. Stiller, I confirmed his

25  question about the Sysco price RFP, but I also added

Robert Bryant - Direct

1   information about our current negotiations with US Foods.

2   Q.  And how do you know that it related to US Foods?

3   A.  I wrote it.

4           MS. CALL:  Government moves to admit Exhibit 9140.

5           THE COURT:  Any objection to the admission of

6   Exhibit 9140?

7           9140 will be admitted.

8           MS. CALL:  Permission to publish?

9           THE COURT:  You may.

10          MS. CALL:  Ms. Pearce, if you could please highlight

11  the top e-mail in the chain.

12  BY MS. CALL:

13  Q.  Who is this e-mail from and to?

14  A.  It is from myself to Tim Stiller.

15  Q.  What time was this e-mail sent?

16  A.  April 18, 2017, at 1:15 p.m.

17  Q.  All right.  And what did you say in the e-mail to

18  Mr. Stiller?

19  A.  Yes, and Janine, which is answering his question to me,

20  discussing with Brenda, and then the second part, And I've got

21  feedback from Mar-Jac, is myself relaying to Tim Stiller that I

22  had feedback from Mar-Jac about our price increases to

23  US Foods.

24  Q.  What feedback did you get?

25  A.  Basically that US Foods -- the feedback that US Foods gave

2166

Robert Bryant - Direct

1   us was that no one else is seeking a price increase.

2           *MR. TUBACH:*  Objection, Your Honor.  This is

3   non-responsive.  The question is what the feedback was from

4   Mar-Jac.

5           *THE COURT:*  Sustained.  If you can reask the question.

6   *BY MS. CALL:*

7   *Q.*  Did you get feedback from US Foods before this time?

8   *A.*  I did.

9   *Q.*  And what was their feedback?

10  *A.*  Their feedback was that no one -- none of their other

11  suppliers were seeking price increases on their boneless breast

12  and that they didn't understand why we were seeking those price

13  increases, so if we needed that, that our business could be in

14  jeopardy.

15  *Q.*  Now, did you also receive feedback from Mar-Jac?

16  *A.*  I did.

17  *Q.*  And did you write another e-mail to Mr. Stiller around this

18  time?

19  *A.*  Yes.  I believe it was immediately after.

20          *MS. CALL:*  Can we now pull up Exhibit 9139?

21  *BY MS. CALL:*

22  *Q.*  And, Mr. Bryant, if you would like the hard copy, that is

23  Tab 9 of your binder.

24          What is this, Mr. Bryant?

25  *A.*  It's an e-mail from myself to Tim Stiller on April 18th,

Robert Bryant - Direct

1   2017.

2   Q.  What time?

3   A.  1:15 p.m.

4   Q.  So the same minute as the last e-mail?

5   A.  Yes, just a few seconds later.

6   Q.  And what customer does this relate to, your e-mail here?

7   A.  US Foods.

8           MS. CALL:  Government moves to admit 9139.

9           THE COURT:  Any objection to the admission of

10  Exhibit 9139?

11          9139 will be admitted.

12          MS. CALL:  Permission to publish?

13          THE COURT:  You may.

14  BY MS. CALL:

15  Q.  Now, Mr. Bryant, what did you tell Mr. Stiller in this

16  e-mail?

17  A.  They told Mar-Jac the same thing on boneless.

18  Q.  So what was the feedback you got from Mar-Jac?

19  A.  It was a similar feedback that they had given us that no

20  one was requesting a price increase on boneless, and if they

21  proceeded with the price increase, then there was the potential

22  that they could lose business.

23  Q.  All right.  I know I said from Mar-Jac, but who did you

24  actually get that feedback from?

25  A.  Scott Tucker.

Robert Bryant - Direct

1    *Q.*  And did you know whether -- or did you have an

2    understanding based on your conversations with Mar-Jac as to

3    whether what US Foods was telling you was true?

4    *A.*  I understood that not to be true.

5    *Q.*  Why?

6    *A.*  Because of the feedback we received and the feedback that

7    Mar-Jac received, and we knew that we were both seeking price

8    increases.

9    *Q.*  Now, did the information you got from Mar-Jac influence

10   whether Pilgrim's would hold on its proposed price increase

11   with US Foods?

12   *A.*  It did.

13   *Q.*  How?

14   *A.*  We knew our competitor was seeking a similar price

15   increase.  They were the other player in the market that we

16   were, so we knew that US Foods couldn't go secure the volume at

17   a cheaper price at our competitor.

18   *Q.*  And did you wind up getting the approximate price increase

19   that you sought?

20   *A.*  We did.

21   *Q.*  All right.  Now, before I move on --

22              And, Ms. Pearce, you don't need to pull it up.

23              But, Mr. Bryant, what time did you say this e-mail was

24   in Exhibit 9139?

25   *A.*  It was 1:15 p.m.

Robert Bryant - Direct

1    Q.  Do you recall whether Mr. Stiller responded to this e-mail?

2    A.  I do.

3    Q.  Did he respond over an e-mail?

4    A.  No.

5    Q.  How did he respond?

6    A.  Via text.

7            MS. CALL:  Can we pull up Exhibit 3039 for the

8    witness, the parties, and the Court?

9    BY MS. CALL:

10   Q.  What is this?

11   A.  It's a text message from Tim Stiller to myself.

12   Q.  And what time is on this text message?

13   A.  1:20 p.m. on April 18th, 2017.

14   Q.  Is this that same day, Mr. Bryant?

15   A.  It is, approximately five minutes later.

16           MS. CALL:  Government moves to admit 3039.

17           THE COURT:  Any objection to the admission of 3039?

18           That exhibit will be admitted.

19           MS. CALL:  Permission to publish?

20           THE COURT:  You may.

21   BY MS. CALL:

22   Q.  All right.  Mr. Bryant, you said this was five minutes

23   after those e-mails you had sent?

24   A.  That's correct.

25   Q.  And what did Mr. Stiller say to you?

Robert Bryant - Direct

 1   *A.*  No comp names in e-mail.

 2   *Q.*  What did you understand this to mean?

 3   *A.*  No competitor names in e-mail.  Mr. Stiller was scolding me

 4   for sending him the two e-mails that referenced Mar-Jac.

 5   *Q.*  So you had put a competitor name in an e-mail?

 6   *A.*  That's correct.

 7   *Q.*  Now, do you have an understanding as to why he texted you

 8   this response?

 9   *A.*  I do.

10        *MR. TUBACH:*  Objection.  Can we have a side bar,

11   please?

12        *THE COURT:*  Yes.

13     (At the bench:)

14        *THE COURT:*  Mr. Tubach, go ahead.

15        *MR. TUBACH:*  Your Honor, this is starting to stray

16   into dangerous territory about why it is that something would

17   have been sent in a text or an e-mail if the answer is going to

18   be anything like there was potential litigation or litigation.

19   I didn't want it to be discoverable in litigation.  I don't see

20   how it doesn't go in that direction.

21        *THE COURT:*  Ms. Call, what answer do you expect

22   Mr. Bryant to give?

23        *MS. CALL:*  Yes, Your Honor.  Mr. Bryant has been

24   instructed to be very mindful of that.  I expect his answer

25   would be he got a follow-up call from Mr. Stiller at the same

Robert Bryant - Direct

1   time suggesting that he be more strategic in his

2   communications.

3        THE COURT:  Okay.  Mr. Tubach, anything else from you?

4        MR. TUBACH:  If that's all he is going to say, that's

5   fine.  I am just worried he is going to say more.  But if he

6   has been properly instructed, that's fine.

7        THE COURT:  Thank you.

8        (In open court:)

9        MS. CALL:  Ms. Pearce, could you please pull back up

10  Exhibit 3039?

11  BY MS. CALL:

12  Q.  Mr. Bryant, did you receive a follow-up call from

13  Mr. Stiller following this e-mail?

14  A.  I did, a text message.

15  Q.  Sorry, following this text message, thank you.  What did

16  Mr. Stiller tell you?

17  A.  He scolded me for sending him the two e-mails with

18  competitors' name in them, and he instructed me to be more

19  strategic when I shared that type of information in the future,

20  that I didn't need to be putting things in writing any longer.

21  Q.  Now, Mr. Stiller, had he been a part of your earlier

22  communications about directing Scott Tucker to reach out to

23  Mar-Jac?

24  A.  Yes.

25  Q.  And Mr. Stiller, had he been involved earlier that year

Robert Bryant - Direct

1   with the 2017 KFC negotiations?

2   *A.*  Yes.

3   *Q.*  Do you recall Mr. Stiller ever telling his subordinates to

4   stop contacting competitors?

5   *A.*  No.  I recall that conversation where he instructed me to

6   be more strategic.

7   *Q.*  All right.  Mr. Bryant, so you testified at the very

8   beginning of our time yesterday about Walmart business.  And I

9   believe, and correct me if I'm wrong, but I believe you said

10  you did not want Pilgrim's bids shared with competitors?

11  *A.*  That's correct.

12  *Q.*  And could you remind the jury of why you didn't want

13  Pilgrim's bids shared?

14          *MS. LaBRANCHE:*  Objection.

15          *MR. LAVINE:*  Objection, Your Honor, asked and

16  answered.

17          *THE COURT:*  Sustained.

18  *BY MS. CALL:*

19  *Q.*  All right.  Now, I want to walk through some of the rest of

20  your testimony, but ask you some more questions.  So in 2014

21  after Jason McGuire told Defendant Austin to put this out to

22  the industry, did you have any concern that Pilgrim's would be

23  undercut by its competitors?

24          *MS. PAGE:*  Objection, asked and answered.

25          *THE COURT:*  Overruled.

Robert Bryant - Direct

1    A.   Yes.

2    BY MS. CALL:

3    Q.   And did that concern change?

4    A.   It did.

5    Q.   Now, later in 2014 when you heard Roger Austin tell his

6    competitors Defendant Kantola and Defendant Brady that the

7    price is the price, did you have a concern then that

8    Defendant Kantola and Defendant Brady would undercut Pilgrim's?

9    A.   No.

10   Q.   Now, on to 2017 when Defendant Austin shared with you his

11   competitors' bids.  Did you believe it to be a two-way street?

12   A.   Yes.

13   Q.   And at that time did you have a concern that Pilgrim's

14   would be undercut by its competitors?

15   A.   No.

16   Q.   And then later in 2017 when Scott Tucker reached out to

17   Mar-Jac, were you concerned about that Mar-Jac would undercut

18   Pilgrim's?

19   A.   No.

20   Q.   Why were you not concerned?

21   A.   It was in our mutual best interest not to do that.  It

22   would make it more profitable for both of us, and then past

23   experience and the trust that, you know, Tim Stiller and --

24   that we had, and that mutual cooperation experience that I had

25   seen through the years.

1    *Q.* You said "it was in our mutual benefit."  Who did you mean

2    by "our"?

3    *A.* The competitors that were involved.

4           *MS. CALL:*  Moment to confer, Your Honor?

5           *THE COURT:*  You may.

6    *BY MS. CALL:*

7    *Q.* All right, Mr. Bryant.  We are almost done.

8           One just logistical question.  When you started out

9    working at Pilgrim's, you worked in Mayfield, Kentucky?

10   *A.* That's correct.

11   *Q.* Is there a time that you moved locations of where you

12   worked?

13   *A.* Yes.

14   *Q.* When was that?

15   *A.* I relocated to Colorado in 2019.

16   *Q.* What was in Colorado?

17   *A.* Pilgrim's corporate office.

18   *Q.* Is that the headquarters?

19   *A.* Correct.

20   *Q.* Did any of the individuals who participated in this conduct

21   you've described with you work in Colorado?

22   *A.* Tim Stiller and Jason McGuire.

23   *Q.* All right.  Now, I am sorry, what city in Colorado is the

24   corporate headquarters?

25   *A.* Greeley.

Robert Bryant - Direct

1    *Q.*  Do you know where Defendant Penn worked?

2    *A.*  Yes.

3    *Q.*  Where was that?

4    *A.*  He officed out of the corporate office in Greeley.

5    *Q.*  Do you know where Defendant Lovette worked?

6    *A.*  Same location.  He officed out of the corporate office in

7    Greeley.

8    *Q.*  All right.  Now, I want to briefly talk about 2014 one more

9    time, Mr. Bryant.  Yesterday you testified that there was a

10   strategy of securing a price increase from KFC first.  Do you

11   recall that?

12   *A.*  Yes.

13   *Q.*  And what customers were you going to later seek price

14   increases from?

15          *MR. LAVINE:*  Objection, Your Honor, asked and

16   answered.

17          *MR. TUBACH:*  Objection to "you," vague and ambiguous.

18          *THE COURT:*  Overruled.

19   *A.*  The strategy was to get KFC done first and then go after

20   the rest of the QSR business, like Popeye's, Church's,

21   Bojangles, the rest of that book of business.

22   *BY MS. CALL:*

23   *Q.*  What was the approximate magnitude of the price increases

24   Pilgrim's sought from those other QSR customers?

25   *A.*  They were similar to the KFC, so in that 15- to 20-cent

Robert Bryant - Direct

1    price range.

2    Q.   Did Pilgrim's actually go on to negotiate those price

3    increases with other QSR customers?

4    A.   That's correct.

5    Q.   All right.  Now, for KFC in 2014, do you recall whether

6    Pilgrim's gained or lost volume?

7    A.   No.

8         MS. CALL:  May we pull up Government Exhibit 979 for

9    the witness, the Court, and the parties.

10   BY MS. CALL:

11   Q.   Mr. Bryant, this looks like a PowerPoint.  What kind of

12   presentation is Exhibit 979?

13   A.   This looks like, and I may have seen this before, a

14   PowerPoint presentation that we would have used in our monthly

15   sales meetings to report our progress on price increases.

16   Q.   Were those monthly sales meetings a regular part of

17   Pilgrim's business?

18   A.   They were held monthly.

19   Q.   And were these kinds of presentations relied on in the

20   regular course of Pilgrim's business?

21   A.   Yes.

22        MS. CALL:  Government moves to admit Exhibit 979.

23        THE COURT:  Any objection to Exhibit 979?

24        Mr. Feldberg?

25        MR. FELDBERG:  Can we just get a date on this, please,

Robert Bryant - Direct

1   Your Honor?

2        MR. TUBACH:  I also object on grounds he's not laid a

3   proper foundation.  He doesn't say he recognizes the document.

4   He says it would have been the type of document.

5        THE COURT:  If you could lay more foundation,

6   Ms. Call.  I will sustain Mr. Tubach's objection.

7   BY MS. CALL:

8   Q.  Yes, Mr. Bryant.  On the first page of Exhibit 979, is

9   there a grayed-out portion and a non-grayed-out portion?

10  A.  There is.

11  Q.  Does that indicate to you the time period of this

12  presentation?

13  A.  Yes.

14  Q.  And what does it tell you?

15  A.  It tells me that it was in -- I believe this was in the

16  fall of 2014.  We were still in progress negotiating price

17  increases amongst various customers.  A good bit of those

18  negotiations had been completed and were successful.  So it

19  would have been, like I said, the fall, after August, September

20  of -- my best guess would be of that time frame.

21  Q.  Thank you.

22        MS. CALL:  Government now offers Exhibit 979.

23        THE COURT:  Any objection to the admission of

24  Exhibit 979?

25        MR. TUBACH:  Same objection as previously, Your Honor.

Robert Bryant - Direct

1          THE COURT:  All right.  Objections will be overruled.

2   Exhibit 979 will be admitted.

3          MS. CALL:  Permission to publish?

4          THE COURT:  You may.

5          MS. CALL:  If you could go to the second page.

6   BY MS. CALL:

7   Q.  Mr. Bryant, could you describe what this slide portrays?

8   A.  Yes.  This is a snapshot of our progress at Pilgrim's

9   getting price increases from our customers, the amount of price

10  increases that we've got, the weekly impact or weekly revenue

11  gained by those price increases, the amount of business lost

12  and the amount of business gained.

13  Q.  All right.  Now, you said first the price increases already

14  obtained and the weekly impact.  Where on this slide is that

15  information?

16  A.  It's on the left-hand side or the what has been attained.

17  Q.  So there is a column beginning with "Price Per Pound."

18  What does that column provide?

19  A.  The cents per pound of the price increase.

20  Q.  Just the increase?

21  A.  Correct.

22  Q.  Now, you said this also portrayed business gained and lost.

23  Where is that on this?

24  A.  That's on the right-hand side.

25  Q.  Is there a line for KFC?

Robert Bryant - Direct

1   A.  There is.

2   Q.  All right.  And does that line tell you whether Pilgrim's

3   actually got a price increase for KFC?

4   A.  On the left-hand side, it does.  On the right-hand side, it

5   appears to have their old price per pound.

6   Q.  So on the left-hand side, how much of a price increase did

7   Pilgrim's actually get?

8   A.  18 cents per pound.

9   Q.  And now looking at the right-hand side, how much business

10  was lost?

11  A.  900,000 pounds per week.

12  Q.  Now, the volume that was lost for KFC, can you tell from

13  this record whether that, I guess, those chickens actually got

14  sold anywhere?

15  A.  What I see on this lost business was 2.2 million pounds per

16  week at a value of $2 million per week.  Gained business was

17  2.2 million pounds per week at a value or revenue of

18  $2.3 million per week.

19  Q.  To break that down a little bit, so were the birds that KFC

20  lost for KFC ultimately sold at a higher or a lower price?

21  A.  It was sold at a higher price.

22  Q.  How much weekly?

23  A.  $243,000 a week, so roughly $12 million a year.

24  Q.  So is it a correct reading that Pilgrim's lost volume for

25  KFC and made an additional $12 million?

Robert Bryant - Direct

1    *A.* Yes.

2              *MS. CALL:* No further questions.

3              *THE COURT:* All right. Cross-examination?

4    Mr. Feldberg?

5              *MR. FELDBERG:* Could we have a side bar before cross?

6              *THE COURT:* Yes.

7         (At the bench:)

8              *THE COURT:* Go ahead, Mr. Feldberg.

9              *MR. FELDBERG:* Your Honor, Mr. Bryant's testimony

10   yesterday that he only lied to the prosecutors and agents once

11   and then went in shortly thereafter to try to correct the

12   record directly contradicts his testimony at the prior trial

13   where he testified that he lied multiple times on multiple

14   occasions.

15             And to address that on cross, we are going to have to

16   go into the -- a little more detail on the lies to lay the

17   groundwork for the cross. We don't propose to go into any of

18   the salacious details, but we are going to have to indicate

19   that the sequence, on September 8th, he said he was not

20   involved in any complaints or misconduct at work; on

21   September 14th, he said he gave detailed statements about

22   misconduct with a substantial number of people and how he was

23   repaid, how he paid for it and how he was repaid. So the

24   September 14th interview made the September 8th interview a

25   lie. And then on October 12th, he changed the story again and

Robert Bryant - Direct

1   said it was really only one co-worker, and he was repaid in a

2   different way making the September 14th interview a lie.

3          He also never said before yesterday or in any of his

4   25 or so interviews that he volunteered to correct the record

5   and he never did correct the record.  So we are going to have

6   to go into a little more detail on the sequence of his

7   untruthfulness than we did the last time just to demonstrate

8   that what he testified to yesterday was false.

9          THE COURT:  All right.  Ms. Call?

10         MS. CALL:  Yes, Your Honor.  First off, I don't see

11  how this couldn't have been raised before the jury came in this

12  morning, but regardless of that fact, I don't believe his

13  testimony is at all inconsistent.  Mr. Bryant's testimony in

14  the last trial, and that's on page 958 of the official

15  transcript, is Mr. Feldberg elicited that he lied multiple

16  times.  It was not multiple occasions.  That I believe is

17  something that one of the defendants said in their openings in

18  this trial and nothing that Mr. Bryant ever said.  Mr. Bryant's

19  testimony yesterday was that --

20         MR. TUBACH:  I apologize.

21         MS. CALL:  I will wait one moment.

22         THE COURT:  Can you hear me now, Mr. Feldberg?

23         MR. FELDBERG:  Yes, Your Honor.

24         THE COURT:  Do you need for Ms. Call to repeat a

25  certain portion of what she just said?

1           MR. FELDBERG:  The last five seconds.

2           THE COURT:  Okay.  Go ahead, Ms. Call.

3           MS. CALL:  I will try.

4           So Mr. Bryant at the last trial testified that he lied

5      multiple times in response to Mr. Feldberg's question.  It was

6      only in defense openings of this trial that a statement was

7      made that Mr. Bryant ever lied on multiple occasions, which I

8      do not believe is consistent with the interview reports that

9      show after the September 8th meeting Mr. Bryant multiple times

10     describing the conduct in a truthful manner to the government.

11          It was in Mr. Bryant's testimony yesterday that he

12     said it was on one occasion, meaning one meeting, that

13     September 8th meeting, that he was untruthful to the

14     government, so there is nothing inconsistent about his

15     testimony that requires any further going into the substance of

16     these matters.

17          THE COURT:  Mr. Feldberg?

18          MR. FELDBERG:  Thank you, Your Honor.

19          What he testified to at the first trial, lied on

20     multiple times, that's correct, about multiple issues in your

21     interviews with the prosecutors, correct?  That's correct.

22     None of them having anything to do with antitrust?  That's

23     correct.

24          And in addition, the fact is that his September 8th

25     interview constituted a lie because he contradicted it on

Robert Bryant - Direct

1    September 14th.  And his September 14th --

2          THE COURT:  Let me ask you about September 14th again.

3    The mere correction can't be a lie if it was the truth, but

4    what you are saying is that on September 14th, instead of

5    correcting himself, he then told falsehoods about that

6    activity?

7          MR. FELDBERG:  Actually, not quite, Your Honor.

8    September 8th he says no misconduct.  September 14th he

9    describes misconduct with multiple people and essentially a

10   false bonus scheme.  And then on October 12th, he changes the

11   misconduct story to one person and a different repayment

12   procedure.

13         So at a minimum, September 8th is false, and one -- at

14   least one of September 14th and October 12th is false, maybe

15   both, but at least one of them because they contradict each

16   other.  So there is at least two and perhaps three occasions

17   when he lied to DOJ and the agents, which contradicts his false

18   testimony from yesterday.

19         THE COURT:  Ms. Call?

20         MS. CALL:  Yes, Your Honor.  I am just going to have

21   to say that's not a correct -- I will say maybe perhaps

22   Mr. Feldberg's misunderstanding of the facts.  And we have

23   briefed this on numerous times and gone through it in numerous

24   hearings, and the government simply sought clarification.  And

25   I know the Court did inquire why did the government seek

Robert Bryant - Direct

1    clarification, but we did, and we simply got clarification to

2    disclose all the information.  And there is nothing showing any

3    untruthfulness in the interviews after September 8th.

4         MR. TUBACH:  This is Michael Tubach.  I believe this

5    may benefit from some additional discussion because the -- his

6    statements on September 14th and October 12th are radically

7    different.  September 14 he says he engaged in this misconduct

8    for a five-year period involving multiple people with 1- to

9    $2,000 in cash he kept available for that type, then he floated

10   the cost to them in their bonuses and was repaid in cash.  When

11   he was interviewed October 12th, he says there was one

12   individual, and it had nothing to do with bonuses.  It was just

13   flatly inconsistent.

14        Just to correct what Ms. Call said, when he testified

15   at the last trial in this court, he testified that he lied,

16   quote, on multiple occasions about multiple issues.  It's

17   flatly inconsistent what he said now.  We can obviously cross

18   him on that, but I think Mr. Feldberg's point is we can't

19   properly impeach him with the many times he has lied unless we

20   can get into some detail about it.

21        THE COURT:  Well, was the term "misconduct" used in

22   the last trial, or what was the -- to what extent was the

23   subject matter of the lies described?

24        MR. FELDBERG:  I believe we did use the term

25   "misconduct" or a synonym for misconduct.

Robert Bryant - Direct

1          THE COURT:  Is that your recollection, Ms. Call?

2          MS. CALL:  No, I don't recall any reference to the

3     conduct other than saying it had nothing to do with antitrust

4     issues.  And I believe that was your Court's direction.

5          MR. TUBACH:  We have the transcript and can pull it

6     up.  He said it had nothing to do with this trial; it had

7     nothing to do with these defendants.

8          THE COURT:  Here is the deal.  Although there could be

9     some disagreement about whether there were subsequent

10    misrepresentations, and I think that Mr. Feldberg can ask him

11    that, the bottom line issue is whether there is a need to go

12    into any more detail, and I don't see any need to go into any

13    more detail.

14          And for that reason, if there is some -- something

15    like misconduct or the subject matter of the false statements,

16    you know, that's fine, but I haven't heard any reason to go

17    into any more detail.  And I will not allow that, because, once

18    again, there is -- as I ruled previously, this is unrelated

19    conduct, and there is a substantial risk of the probative value

20    of the impeachment as to the false statements being overcome by

21    prejudice to the government because this is not conduct that is

22    directly related to this trial at all.

23          MR. FELDBERG:  Understood, Your Honor.  But if I may

24    just make a further point, may we point out the fact that he

25    gave interviews on September 8th, September 14, October 12th,

Robert Bryant - Cross

1    and the stories differed?

2            THE COURT:  I think that that's legitimate --

3    legitimate questioning.

4            MR. FELDBERG:  Thank you, Your Honor.

5            THE COURT:  Thank you.

6            (In open court:)

7            THE COURT:  Cross-examination?  Ms. Page.

8                         **CROSS-EXAMINATION**

9    BY MS. PAGE:

10   Q.  Good morning, Mr. Bryant.  My name is Kelly Page, and I

11   represent Mikell Fries.

12           You have given us a lot to unpack over the last two

13   days, but I want to start by discussing your immunity

14   agreement.  One of the provisions of that immunity agreement is

15   that you will respond fully and truthfully to all inquiries of

16   the United States; is that right?

17   A.  I believe so.

18   Q.  To put it simply, Mr. Bryant, you have to tell the truth to

19   the Federal Government when they ask you questions.

20   A.  That's correct.

21   Q.  And it's the prosecutors sitting at this table who define

22   what the truth is.

23   A.  That's not the way I understand it, no.

24   Q.  Well, let me ask it this way.  It's the prosecutors sitting

25   at this table who you have an immunity agreement with; is that

Robert Bryant - Cross

1    right?

2    A.   It's the U.S. Government.

3    Q.   The U.S. Government, even better.   It is the prosecutors

4    sitting at this table who decide whether you are fully and

5    truthfully responding to all inquiries.

6    A.   I don't know how that process works.

7    Q.   You don't know how your immunity agreement works?

8    A.   I know the immunity agreement, and I know that I am

9    supposed to tell the truth to the best of my ability and

10   cooperate with the government.

11   Q.   Well, we will get to the point about whether you are

12   telling the truth, but what I am asking is, if at any point the

13   United States Government believes you are not telling the

14   truth, they can revoke this immunity agreement.

15   A.   I don't know that.

16   Q.   You don't know how they can go about revoking your immunity

17   agreement?

18   A.   The only way is -- that I understand is if I do not

19   cooperate and if I am not truthful.

20   Q.   Okay.   Now, if you do not cooperate and they don't think

21   you are being truthful, they can revoke your immunity

22   agreement, and they can charge you with a federal felony

23   offense.

24   A.   Possibly, yes.

25   Q.   Possibly.   You know, Mr. Bryant, that they can if they

Robert Bryant - Cross

1   choose not to believe you charge you with any federal felony

2   offense that they have knowledge of?

3   A.  Possibly, yes.

4   Q.  Possibly.  And after they charge you, they can use

5   everything you've told them in your 25 interviews as well as on

6   the stand today against you.

7   A.  That's my understanding, yes.

8   Q.  Okay.  And, again, when we are talking about the truth,

9   your agreement is with the United States Government, including

10  the prosecutors and the agents sitting at this table.

11  A.  I believe so, yes.

12  Q.  It's the United States Government who decides if your

13  testimony today is truthful.

14  A.  I -- I don't really follow this honestly, line of

15  questioning really.  Like I said, I am here to give the truth

16  to the best of my recollection irregardless of the Department

17  of Justice determination after this proceeding.

18  Q.  All right.  Well, you know that the Department of Justice

19  has the power to determine whether you sit at that witness

20  stand or whether you sit out here with one of these 10 men.

21  A.  Well, I assume that would be a different type.

22  Q.  I hope so.

23       Let's talk about a different provision of your

24  immunity agreement, and that immunity agreement requires your

25  continuing cooperation, which you have brought up a few times

Robert Bryant - Cross

1    now, right?

2    A.   Okay.  That's correct, yes.

3    Q.   Continuing cooperation means you have to sit down for

4    interviews with the prosecutors and agents when they ask.

5    A.   That's correct.

6    Q.   And if the prosecutors want to interview you for multiple

7    days in a row, you have to agree?

8    A.   That's -- they would work with me on scheduling conflicts,

9    but, yes.

10   Q.   Well, you have been interviewed multiple days in a row in

11   this case, Mr. Bryant?

12   A.   Yes.

13   Q.   You have actually been interviewed multiple days in a row

14   just as recently as February.

15   A.   Possibly.  I don't recall.

16   Q.   You were interviewed on February 26th, right?

17   A.   I don't recall the date.

18   Q.   You don't recall the dates of your interviews that you just

19   had two weeks ago, Mr. Bryant?

20   A.   No, I really do not.

21   Q.   And you are here testifying about events that happened

22   10 years ago?

23   A.   Yeah, and those events that happened 10 years ago, you

24   know, there are certain things that happen in your life --

25   Q.   Mr. Bryant, I am going to stop you there.  Let me ask you a

Robert Bryant - Cross

1    follow-up question.

2    A.   Can I not finish my answer?

3    Q.   No.   I am going to ask a better question.

4         You were interviewed just three days ago on March 6.

5    Do you remember that one?

6    A.   Yes.

7    Q.   You were interviewed just three days ago.   And at this

8    point the jury had already been impaneled, right?

9    A.   I'm not sure when the jury was impaneled.

10   Q.   Again, you have no idea when this trial started.

11   A.   I knew it started around the last week of February, but I

12   have not been keeping up, no.

13   Q.   Okay.   Well, you knew the opening statements had already

14   been heard.

15   A.   No, I don't know that.   I don't remember.   Possibly,

16   possibly during one of those interviews, yes.   I know, you

17   know, we did meet this week, so, yes, the trial would have been

18   started by then.

19   Q.   You have been meeting with the government while the trial

20   is already underway.   That's the bottom line here, Mr. Bryant.

21   A.   That's correct.

22   Q.   Let's talk about what else continuing cooperation means.

23   It means you have to meet with the prosecutors for as long as

24   they want to meet with you.

25   A.   Once again, you know, scheduling conflict, but, yes, we

Robert Bryant - Cross

1  meet whenever we schedule times that we can work out, yes.

2  Q.  If they want to meet with you for hours on end, you have to

3  agree to meet with them for hours on end.

4  A.  We met for several hours on several occasions.

5  Q.  Exactly.  You have met with the Federal Government for

6  three hours at a time; isn't that right?

7  A.  Normally we do block off three- to four-hour time slots.

8  Q.  And you met with the prosecutors for four hours at a time

9  even?

10 A.  Yeah, that's what I said.  Normally we block three- to

11 four-hour time slots.  Sometimes they last the entire time.

12 Sometimes they are over in an hour.

13 Q.  All right.  And continuing cooperation means if the

14 government wants to meet with you in person in the middle of a

15 pandemic, you have to meet with them in person.

16 A.  That's correct.

17 Q.  And, Mr. Bryant, you currently live in Kentucky; is that

18 right?

19 A.  That's correct.

20 Q.  So if the prosecutors want to meet with you in Washington,

21 DC, you have to fly to Washington, DC?

22 A.  That would be correct.

23 Q.  And if the prosecutors want to meet with you here in

24 Denver, you have to fly to Denver.

25 A.  That would be correct.

Robert Bryant - Cross

1   Q.  And there is not a provision in this immunity agreement

2   that says they can only meet with you a certain number of

3   times, right?

4   A.  That's correct.

5   Q.  So there is no provision that says we can only meet with

6   Mr. Bryant for five times?

7   A.  That's my understanding, yes.

8   Q.  There is no provision that says we can only meet with

9   Mr. Bryant for 10 times?

10  A.  That's correct.

11  Q.  They can interview you as many times as they want to

12  interview you.

13  A.  That's correct.

14  Q.  And you cannot say no; otherwise, you would be in violation

15  of your immunity agreement.

16  A.  Once again, if there is scheduling conflicts.

17  Q.  That's not the question, Mr. Bryant.  If you refuse an

18  interview with the United States Government, they can revoke

19  your immunity agreement because you are no longer cooperating.

20  A.  I am not refusing any --

21  Q.  I am not saying you did.  We're talking in theory.

22  A.  Once again, if there is scheduling conflicts, then we look

23  at our schedules and schedule the meeting accordingly.

24  Q.  Fair enough, Mr. Bryant.  But as you sit here today, I

25  believe your testimony yesterday was you met with the Federal

Robert Bryant - Cross

1    Government about 25 times?

2    A.  Yes.

3    Q.  So let's talk a little bit more in depth about these

4    interviews and the timing of these interviews.  Your first

5    interview with the Department of Justice was June 22nd of 2021;

6    is that right?

7    A.  I don't recall the day.  Like I testified yesterday, I

8    believe it was the very end of May or June, whenever we --

9    Q.  Somewhere in the summer of 2021, fair?

10   A.  Correct, correct.

11   Q.  At the time of this first interview, you had already had

12   your immunity agreement with the United States.

13   A.  That's correct, approximately, yeah.  It had been in place

14   for approximately a year, I believe, at that time.

15   Q.  Right.  Because at the time of this first interview, you

16   knew about the Indictment.

17   A.  That's correct.

18   Q.  And you knew that Pilgrim's Pride employees had been

19   charged with serious crimes.

20   A.  That's correct.

21   Q.  And this was big news at Pilgrim's Pride.

22   A.  That's correct.

23   Q.  This was big news in the entire industry, right?

24   A.  Still is.

25   Q.  Still is.  This is big news in the industry amongst your

Robert Bryant - Cross

1   customers, right?

2   A.   Correct.

3   Q.   Big news in the industry amongst your franchisees?

4   A.   Correct.

5   Q.   Big news in the industry amongst your distributors?

6   A.   Correct.

7   Q.   And by the time of your first interview in June of 2021,

8   you had not been previously interviewed.

9   A.   That is correct.

10  Q.   You were not interviewed until a year after the Indictment.

11  A.   Almost a year after, yes.

12  Q.   Now, your first interview with the government was a virtual

13  interview.

14  A.   That's correct.

15  Q.   Your second interview with the government was a virtual

16  interview.

17  A.   I believe so.  I don't remember how many virtuals we --

18  interviews we had before an in-person one, that's correct.

19  Q.   But that sounds about right.  The first two are these

20  virtual interviews.  And I know we are saying virtual

21  interviews, and we all have been in a pandemic for a while at

22  this point.  When I say "virtual," I mean on Microsoft Teams or

23  Zoom --

24  A.   I don't remember the platform, but we had several

25  interviews before we met in person.

Robert Bryant - Cross

1    Q.  So the nice thing about this is you didn't have to travel

2    to Washington, DC?

3    A.  I haven't traveled to Washington, DC.

4    Q.  You didn't have to travel to Denver?

5    A.  That's correct.

6    Q.  And you are not physically in the room with FBI agents.

7    A.  That's correct.

8    Q.  You are not in the room with federal prosecutors.

9    A.  That's correct.

10   Q.  And you were staring at a screen, but you were staring at a

11   screen with a bunch of unfamiliar faces?

12   A.  Well, to be more precise, there was only one person on the

13   screen at a time, so there was a lot of blocks with names there

14   or numbers, but there was only one person from the government

15   with video on.

16   Q.  So what I am saying, Mr. Bryant, just because this is

17   virtual, it didn't mean you took it any less seriously.

18   A.  That's -- it was -- yeah, it was very taxing.

19   Q.  Right.  Taxing, I think that's a great word.

20          For your third interview with the government, that's

21   when they finally wanted to meet you in person.

22   A.  Like I said, I don't remember how many virtual.  I don't

23   remember which interviews was the in-person meeting.

24   Q.  Does September 8th sound about right for the first time you

25   met the government in person?

2196

Robert Bryant - Cross

1    A.   I don't recall.

2    Q.   Fall of 2021 sound about right that you first met the

3    Federal Government in person?

4    A.   I would have thought it was sooner, but --

5    Q.   Fair enough.

6              Now, you were interviewed in person just weeks before

7    a major hearing in this case; isn't that right, Mr. Bryant?

8    A.   I am not aware of a major hearing.

9    Q.   Your immunity agreement, Mr. Bryant, one of those

10   provisions requires you to testify at all judicial proceedings

11   that the Federal Government requires; is that right?

12   A.   I believe so, yes.

13   Q.   So you knew that it was possible that you would end up on

14   the stand today.

15   A.   Yes.

16   Q.   And you knew it was possible that you would be

17   cross-examined.

18   A.   That's correct.

19   Q.   You knew that the Federal Government was in these

20   interviews not just wanting to know information, but they were

21   also wanting to know what you might say on the stand if you

22   ended up in a courtroom; is that fair?

23   A.   There was very little cross-examination.  You know, there

24   was some, but it was more for my benefit to prepare me.

25   Obviously, this is your profession; it's not mine.  So this is

Robert Bryant - Cross

 1  very unfamiliar to me, so it was just in an effort to try to

 2  prepare me for the scrutiny.

 3  Q.  Let's stick with that.  It is your testimony you have been

 4  prepared on numerous occasions by the Federal Government to be

 5  cross-examined today?

 6  A.  I don't recall how many times we prepared for

 7  cross-examination, you know, with the Department of Justice.

 8  Q.  Not only have you been prepared many times for

 9  cross-examination, you have been prepared many times for that

10  direct examination that just went on for hours.

11  A.  That's correct.

12  Q.  So let's talk a little bit about what these in-person

13  interviews look like as you are getting prepared for testimony.

14  These in-person interviews are in Denver for the most part.

15  A.  I believe they all may have been in Denver.

16  Q.  All may have been in Denver.  They were at the Department

17  of Justice's office.

18  A.  I -- yes, I think the U.S. Attorney's Office once, and then

19  the antitrust division has a temporary office here that --

20  where most of those interviews were conducted.

21  Q.  Fair enough.  It's at a Federal Government office building?

22  A.  Correct.

23  Q.  And you had never been to the offices of the Department of

24  Justice prior to your interviews with the government?

25  A.  Not that I can recall, no.

Robert Bryant - Cross

1   *Q.*  And when you go into these offices, and correct me if I'm

2   wrong, you actually have to go through security to get in

3   there?

4   *A.*  Yes, I believe so, yes.

5   *Q.*  And you have to check in at a reception desk.

6   *A.*  I know when I went to the U.S. Attorney's Office, yes, I

7   did have to check in, their temporary office.  You had to show

8   ID and screening, but I don't remember signing an actual book.

9   *Q.*  Right.  You actually have to get escorted back to the

10  conference room where you are going to be meeting with the

11  government?

12         *MS. CALL:*  Your Honor, I will object to questions

13  about the levels of security at the Department of Justice

14  facilities.  It seems irrelevant.

15         *THE COURT:*  What's the relevance?

16         *MS. PAGE:*  Your Honor, that was my last question.  It

17  was simply foundational.  I will move on.

18         *THE COURT:*  Go ahead.  Overruled.

19  *BY MS. PAGE:*

20  *Q.*  The reason I am focusing on this first in-person interview,

21  Mr. Bryant, because you testified that you took these first two

22  interviews that were virtual very seriously, but when you were

23  in person at the Department of Justice office, it felt more

24  serious at this point.

25  *A.*  They all felt serious.

Robert Bryant - Cross

1    Q.  Right.  But at this point at this in-person interview, you

2    were finally in the room with these real FBI agents, right?

3    A.  I wouldn't use the word "finally."

4    Q.  Not like you were looking forward to it, I know,

5    Mr. Bryant.

6    A.  That's correct.

7    Q.  But you weren't just staring at a screen, one person's face

8    anymore, right?

9    A.  There was a lot of people in the room.

10   Q.  There were a lot of people there.  And you sat across from

11   all of these people in that room, and you looked them directly

12   in the eyes as you answered their questions that day at that

13   in-person interview?

14   A.  That's correct.

15   Q.  And you knew -- well, let me ask this.  This was

16   nerve-racking.

17   A.  It was -- like I said, it was the first time doing that

18   with the government, yes.

19   Q.  I believe you used the words "it was really taxing."  Is

20   that fair?

21   A.  Yes, yes.

22   Q.  I apologize, Mr. Bryant.  You have to say yes, or maybe I

23   just didn't hear you over the mask.

24          In talking about this interview, I want to give the

25   jury a better sense for who is actually present while you are

Robert Bryant - Cross

1   being interviewed and prepared for testimony.  When you were

2   escorted into the conference room at the Department of

3   Justice's office, you already testified that there is a lot of

4   people waiting there for you, right?

5   A.   That's correct, yeah.

6   Q.   There are at least two federal agents.

7   A.   There were -- I don't recall who all was there.  I just

8   remember there was approximately 15 to 20 people in the room.

9   Q.   Approximately 15 to 20 people in the room during your

10  interview.

11  A.   That's what I recall, yes.

12  Q.   And these were all government prosecutors, agents, or

13  staff.

14  A.   Yes.  I don't recall their titles, but, yeah, there were

15  people from the Department of Justice.

16  Q.   Many of those people from the Department of Justice are

17  sitting over here at this table today?

18  A.   Some of them, yes.

19  Q.   You recognize some of the faces over here?

20  A.   Yes, I remember a few of them.

21  Q.   And, you know, after you were escorted into the room and

22  you introduced yourself, again, you set down at the table

23  across from many of the people who sit here today, fair?

24  A.   Yes.

25  Q.   Just like when you walked through the courtroom yesterday

Robert Bryant - Cross

1    and this morning, you took a seat at the witness stand and set

2    across from these very same people, fair?

3    A.   That's correct.

4    Q.   And to be clear, Mr. Bryant, I am focusing on these first

5    few interviews with the Department of Justice, but having 15 to

6    20 individuals sitting in on these interviews is not uncommon

7    for you.

8    A.   In the first few you mean?

9    Q.   Yes, absolutely.

10   A.   Yeah.  I don't recall how many people, but I would -- on

11   the virtual, I would probably say 10 to 15.  There may have

12   been 20.  I don't recall exactly, but there was several people

13   on those virtual interviews as well.

14   Q.   To your knowledge, none of those interviews were recorded?

15   A.   I don't know.

16   Q.   So going back to just the interview process in general,

17   before the government asked you any questions, they explained

18   the interview process to you.

19   A.   What do you mean by that?

20   Q.   Well, they told you that you were free to consult with your

21   attorney at any time, right?

22   A.   I don't recall that exact statement.

23   Q.   Well, they told you that you were free to take breaks at

24   any point.

25   A.   Yes.

2202

Robert Bryant - Cross

1  *Q.* You already said that they were very cognizant of your

2  scheduling conflicts, so they certainly were going to let you

3  leave the room if you needed to leave when you were in these

4  interviews.

5  *A.* Yeah, we took a couple breaks similar to the mid-afternoon

6  or mid-morning break.

7  *Q.* Right.

8      *MS. PAGE:* Which I realize is coming up, Your Honor.

9  I have a few more questions, and then I will be at a good

10  stopping point, if that's okay.

11      *THE COURT:* Do you have a few more?

12      *MS. PAGE:* I have a few more questions.

13      *THE COURT:* Yeah, I lost track of the time, so, yes, a

14  few more questions, and then we will break.

15      *MS. PAGE:* Perfect.

16  *BY MS. PAGE:*

17  *Q.* Just to finish up this line of questioning, Mr. Bryant,

18  when the Federal Government is explaining the interview process

19  to you, most importantly, they told you that it was a crime to

20  lie to federal agents.

21  *A.* I believe so, yes.

22  *Q.* Right. And not just any crime, it was a federal felony

23  offense to lie to FBI agents.

24  *A.* I don't remember going into that much detail. I do

25  remember that it is a crime to lie to a federal agent.

Robert Bryant - Cross

1   Q.  And they told you this previously before on your first and

2   second interviews?

3   A.  I am sure they did.

4   Q.  And after you were told for a third time it was a crime to

5   lie to federal agents, you promised to tell them the truth;

6   isn't that right?

7           MS. CALL:  That misstates testimony.

8           THE COURT:  Overruled.

9   A.  I don't recall there being a promise explicitly as you are

10  saying.  I just remember that there is -- that it could be an

11  offense if you lied.

12  BY MS. PAGE:

13  Q.  And, Mr. Bryant, you certainly after you learned that

14  wanted to tell the truth or the Federal Government believed you

15  would tell them the truth.

16  A.  I did my best.

17  Q.  You did your best.

18          MS. PAGE:  Your Honor, if we could break here, I think

19  this would be a good time.

20          THE COURT:  Ladies and Gentlemen, because we went a

21  little bit later, why don't we plan on reconvening 20 minutes

22  of 11:00.  The jury is excused.  Thank you.

23          (Jury excused.)

24          THE COURT:  We will be in recess.  Thank you.

25          (Recess at 10:25 a.m. until 10:43 a.m.)

Robert Bryant - Cross

1          MR. KOENIG:  One housekeeping issue.  Our last

2    witness, Joe Brink, he has -- basically has to be off the stand

3    by the end of the day tomorrow because of some medical thing,

4    and so I don't know how long cross is going to go, but I just

5    wanted to alert the Court and ask if things are not looking

6    like he will be done by the end of the day Thursday, if we

7    might be able to call him out of order or put him on while

8    Mr. Bryant is still testifying.

9          THE COURT:  We might have to accommodate that.  And

10   what's your time estimate?

11         MR. KOENIG:  For direct?

12         THE COURT:  For the whole thing.  Is the time estimate

13   that you have on your list the one that was true for the last

14   time?

15         MR. KOENIG:  Yeah, I think that is accurate, yeah.

16         THE COURT:  Yes.  So we will take that into account,

17   and hopefully we will be able to accommodate that.

18         All right.  Let's get Mr. Bryant, and let's bring the

19   jury back in.

20         (Jury present.)

21         THE COURT:  Ms. Page, go ahead.

22         MS. PAGE:  Thank you, Your Honor.

23   BY MS. PAGE:

24   Q.  Mr. Bryant, let's reorient ourselves now we are back from

25   the break.  Before the break, we were talking about your

Robert Bryant - Cross

1   interviews with the Federal Government, right?

2   A.   Correct.

3   Q.   And we were talking about how during your interviews with

4   the Federal Government you were advised that it was a crime to

5   lie to federal agents.

6   A.   Correct.

7   Q.   And we were talking about how you were asked questions for

8   hours by the Federal Government in some of these interviews?

9   A.   Correct.

10   Q.   And how you were able to sit across the table from the

11   Federal Government as they asked you questions, right?

12   A.   That's correct.

13   Q.   So, Mr. Bryant, you took an oath this morning, correct?

14   A.   That's correct -- well, yesterday, but I understand I am

15   still under oath.

16   Q.   You are still under oath as we sit here today.  And

17   yesterday and this morning you walked in through that courtroom

18   door, and you took a seat at the witness stand; is that right?

19   A.   That's correct.

20   Q.   And Ms. Grimm had you raise your right hand and asked if

21   you promised to tell the truth.

22   A.   That's correct.

23   Q.   And you said "I do."

24   A.   Correct.

25   Q.   And after you swore that oath, you took your seat up at the

Robert Bryant - Cross

1   witness stand yesterday and today.

2   A.   Correct.

3   Q.   And you spent the next several hours answering Ms. Call's

4   questions.

5   A.   Who?

6   Q.   Ms. Call's questions.

7   A.   Oh, I am sorry, yes.

8   Q.   Sitting right over here.  You spent the next several hours

9   answering Ms. Call's questions as you looked her directly in

10  the eyes; is that right?

11  A.   That's correct.

12  Q.   But more importantly, you have been looking this jury in

13  the eyes for the last several hours as you answered questions?

14  A.   That's correct.

15  Q.   And just as on September 8th, you looked at those

16  prosecutors and agents in the eyes as you answered their

17  questions.

18  A.   That's correct.

19  Q.   But, Mr. Bryant, on September 8th as you sat across from

20  federal prosecutors and agents, you looked them in the eyes as

21  you answered their questions.  You lied to them.

22  A.   I made a misstep, and I corrected the record.

23  Q.   Mr. Bryant, that's not the question.  You lied to them.

24  Yes or no?

25  A.   I have already said yes.  Like I said, I made a misstep.

Robert Bryant - Cross

1    *Q.* Mr. Bryant, it's a yes-or-no question at this point.  You

2    lied to a room full of federal prosecutors.  Yes or no?

3    *A.* I did.  And I corrected --

4    *Q.* And you lied to a room full of federal agents.  Yes or no?

5    *A.* Once again, I made a misstep.  I regret that it happened.

6    After it happened --

7    *Q.* Mr. Bryant, that's not my question.  You lied to a room

8    full of federal agents?

9    *A.* Once again, yes.

10   *Q.* The answer is yes or no.

11           *MS. CALL:* Object to the testimony, "A room full of

12   federal agents."

13           *MS. PAGE:* A room with federal agents, Your Honor.

14           *THE COURT:* Objection is overruled.  Go ahead.

15   *BY MS. PAGE:*

16   *Q.* You lied while your lawyer was sitting right next to you in

17   that room.  Yes or no?

18   *A.* That's correct.

19   *Q.* It is your testimony yesterday on direct examination that

20   you lied on a single occasion to prosecutors, Mr. Bryant.

21   *A.* That's -- I believe I said -- I recall the single occasion,

22   yes.

23   *Q.* You recall the single occasion.

24           And, Mr. Bryant, you testified at a previous hearing

25   in this case on November 2nd; isn't that right?

Robert Bryant - Cross

1    A.  I did.

2    Q.  This major hearing that you forgot about a few minutes ago.

3    A.  No, I didn't realize that's what you were talking about

4    when you asked me about a major hearing.  I understand what you

5    meant now.

6    Q.  All right.  And you testified in this same courtroom on

7    November 2nd.

8    A.  That's true.

9    Q.  And from your testimony or from the time of your testimony

10   on November 2nd to today, you have had an opportunity to meet

11   with the Federal Government.

12   A.  That's correct.

13   Q.  You have met with them an additional six times since your

14   testimony on November 2nd, correct?

15   A.  I don't recall the exact number, but that sounds

16   approximate, yes.

17   Q.  And when you testified in this same courtroom, you also

18   took the same oath that you took this morning, correct?

19   A.  That's correct, yes.

20   Q.  Judge Brimmer was also present when you took that oath.

21   A.  I believe so, yes.

22   Q.  The same people sitting at this table were also present

23   when you took that oath.

24   A.  I believe so, yes.

25   Q.  And all of the defense attorneys and clients sitting out

Robert Bryant - Cross

1    here were present when you took that oath.

2    A.  I believe so, yes.

3    Q.  And the most important person in the courtroom is this

4    wonderful woman sitting in front of Ms. Pletcher, Ms. Coppock.

5    She was also present when you took that oath.

6    A.  That's correct, yes.

7    Q.  And you know it's Ms. Coppock's job to take down everything

8    you say.

9    A.  That is correct, yes.

10   Q.  And everything I say.

11   A.  That's correct.

12   Q.  I could start singing show tunes, and she would have to

13   take it all down?

14   A.  Yeah.

15   Q.  And the best part about Ms. Coppock is she actually puts

16   together a transcript of what we all said in this courtroom,

17   correct?

18   A.  That's my understanding, yes.

19   Q.  And that transcript gets provided to federal prosecutors

20   and defense counsel.

21   A.  That's correct, yes.

22   Q.  And, Mr. Bryant, we are in luck.  I have that transcript

23   with me today, because when you were asked on November 2nd how

24   many times you lied to federal prosecutors, your response was

25   "I lied multiple times;" is that correct?

Robert Bryant - Cross

1    A.   What I recall is --

2    Q.   No, Mr. Bryant.  I am just asking if that was your

3    testimony.  When you were asked if you lied multiple times,

4    your response was, "That's correct"?

5    A.   That's correct.

6    Q.   And when you were asked if you lied multiple times about

7    multiple issues in your interviews, your answer was also,

8    "That's correct"?

9    A.   That's correct.

10   Q.   Mr. Bryant, these multiple lies about multiple issues were

11   incredibly important to you; is that fair to say?

12   A.   That's correct.

13   Q.   They were incredibly important to you because you lied when

14   you knew it was a felony offense to lie to a federal agent.

15   A.   That thought was not going through my mind at the time, no.

16   Q.   Well, you knew it was important to you because you lied

17   while you were cooperating with the Federal Government.

18   A.   That's correct.

19   Q.   You lied when there was an agreement where you said you

20   would be truthful.

21   A.   That's correct.

22   Q.   And not only did these lies happen while you were

23   cooperating with the Federal Government, these lies were

24   completely unrelated to this case.

25   A.   That's correct.

2211

Robert Bryant - Cross

1   *Q.*  And by "unrelated to this case," I mean the allegations

2   that bring us all in this courtroom today.

3   *A.*  That's correct.

4   *Q.*  These lies were not just you denying your involvement in

5   the allegations in this case, correct?

6   *A.*  That's correct.

7   *Q.*  They were not related to an illegal agreement of any sort.

8   *A.*  That's correct.

9   *Q.*  They were not related to antitrust laws.

10  *A.*  Not that I'm aware of, no.

11  *Q.*  They were not related to any of the 10 men you see sitting

12  in this courtroom?

13  *A.*  That's correct.

14  *Q.*  Mr. Bryant, when the prosecutors found out that you lied to

15  them, they could have charged you right then and there.

16  *A.*  I assume, yes.

17  *Q.*  You know they could have charged you.

18  *A.*  It was their discretion.

19  *Q.*  They could have put you in handcuffs, fair?

20  *A.*  I am assuming.  I have never been through that process, so

21  I don't know that process.

22  *Q.*  Well, if you are charged with a felony offense, you might

23  end up in handcuffs, correct?

24  *A.*  Yes.

25  *Q.*  If you are charged with a felony offense, you could end up

2212
Robert Bryant - Cross

1  in jail, fair?

2  A.  Fair.

3  Q.  If you are charged with a felony offense, you could be

4  brought into a courtroom just like the one we are sitting in

5  here today?

6  A.  Correct.

7  Q.  And they could have prosecuted you for a felony for lying

8  to them, right?

9  A.  That's my understanding, yes.

10  Q.  But they could have also prosecuted you for the same

11  conduct that you were testifying about here today.

12  A.  Possibly, had it been discovered prior to the agreement.

13  Q.  Making you a two-time felon for the rest of your life?

14  A.  Potentially, yes.

15  Q.  And you were terrified they were going to charge you.

16  A.  Actually, I was not.

17  Q.  Mr. Bryant, let's stop there.  You are telling me you

18  weren't terrified to become a two-time felon?

19  A.  You know, there was a document collection several years

20  ago.

21  Q.  Mr. Bryant, I am going to stop you there.  Let me ask this

22  question.  You had a lot to lose if you were charged with a

23  felony.

24  A.  Made my peace with that a long time ago.

25  Q.  Well, you had a good job at Pilgrim's Pride at the time you

Robert Bryant - Cross

1   lied to the Federal Government, right?

2   A.   That's true.

3   Q.   You were pursuing an MBA online at Colorado State

4   University at the time you lied to the government?

5   A.   Yes, I believe so.  I was trying to put the time line

6   together.

7   Q.   You were recently married around the time of your first

8   interview, right?

9   A.   That's correct.

10  Q.   You have three kids?

11  A.   That's correct.

12  Q.   You have a house?

13  A.   That's correct.

14  Q.   And all of that could have changed in an instant if you

15  were charged with a federal felony offense and put in jail.

16  A.   Possibly.

17  Q.   And the last thing you wanted was to be sitting where these

18  men sit here today, fair?

19  A.   Once again, many years ago I knew that was a possibility,

20  and I knew that, for instance, if that handwritten note was

21  discovered --

22  Q.   Well, Mr. Bryant, let me ask you, you would much prefer

23  your seat up here in the witness stand today.  Yes or no?

24  A.   Yes.

25  Q.   Thank you.

Robert Bryant - Cross

1             With that background, I want to talk to you about

2  Claxton Poultry.  You have never spoken with Mr. Fries about

3  Claxton's prices.

4  A.  Not that I can recall, no.

5  Q.  Well, you would recall if you spoke to Mr. Fries about

6  Claxton's pricing given it's what you are here to testify about

7  today.

8  A.  I don't remember having any conversations about pricing

9  with Mr. Fries.

10  Q.  You had never talked to him about how Claxton goes about

11  determining its prices?

12  A.  Not that I can recall, no.

13  Q.  You don't -- you never spoke to Mr. Fries about what data

14  points Claxton considers in determining its bids?

15  A.  Not that I can remember.

16  Q.  Again, Mr. Bryant, you are saying "not that I can

17  remember," but you have been interviewed 25 times by the

18  Federal Government, correct?

19  A.  That's correct.

20  Q.  Fair to say you would have told them if you remembered a

21  conversation with Mr. Fries about competitor pricing?

22  A.  Had I remembered, yes.

23  Q.  You have never talked to Mr. Fries about Claxton's volume

24  of business.

25  A.  Not that I can remember, no.

Robert Bryant - Cross

1  Q.  You have never spoken to Mr. Fries about other suppliers'

2  pricing at all.

3  A.  Not that I can remember.

4  Q.  And you have never given Mr. Fries Pilgrim's pricing.

5  A.  No.

6  Q.  You have never talked to Mr. Fries about Pilgrim's business

7  strategy?

8  A.  No, not that I can remember.

9  Q.  You have never called him, and he has never called you.

10  A.  Not that I can recall, no.

11  Q.  You have never e-mailed him, and he has never e-mailed you?

12  A.  Not that I can remember, no.

13  Q.  And you have never exchanged text messages.

14  A.  Not that I can recall, no.

15  Q.  Mr. Bryant, again, you have been interviewed 25 times, and

16  you were shown a lot of documents in the course of that

17  interview, correct?

18  A.  Correct.

19  Q.  You have never been shown an e-mail between you and

20  Mr. Fries; is that right?

21  A.  That's correct.

22  Q.  You have never been shown a phone call between you and

23  Mr. Fries?

24  A.  That's correct.

25  Q.  You have never been shown an e-mail -- or, rather, a text

Robert Bryant - Cross

1    message between you and Mr. Fries?

2    A.  That's correct.  The reason why I said I don't recall --

3    Q.  Mr. Bryant, that's all I needed.  I want to move on and

4    talk to you about Scott Brady.

5         You met Mr. Brady while he was still an employee at

6    Pilgrim's?

7    A.  That's correct.

8    Q.  And you met him at the Pilgrim's Mayfield plant?

9    A.  I have, yes.

10   Q.  And that was prior to August of 2012?

11   A.  Yes.  I don't recall the exact date.  It was before he left

12   Pilgrim's and went to Claxton.

13   Q.  About 10 years ago, fair to say?

14   A.  A long time ago.

15   Q.  And you kind of thought about my next question, but you

16   know it had to be 10 years ago because Mr. Brady actually moved

17   to Claxton Poultry in August of 2012.

18   A.  That's correct.

19   Q.  And when you met Mr. Brady when you worked for Pilgrim's,

20   he never shared supplier pricing information with you.

21   A.  Not that I can remember.

22   Q.  And again, Mr. Bryant, if you remembered, you would have

23   told the Federal Government about that in your 25 interviews.

24   A.  Yes.

25   Q.  And you would have testified about it yesterday.

Robert Bryant - Cross

 1   A.  More than likely, yes.

 2   Q.  You also -- well, when Mr. Brady left Pilgrim's and went to

 3   Claxton, you never received Claxton's pricing information from

 4   Mr. Brady.

 5   A.  Not directly, no.

 6   Q.  And you never gave Pilgrim's pricing information to

 7   Mr. Brady.

 8   A.  Not directly, no.

 9   Q.  And, in fact, when he left Pilgrim's and went to Claxton,

10   you didn't have any further contact with him except for maybe a

11   customer trip?

12   A.  Yeah, it was social contact, but I don't recall us talking

13   business.

14   Q.  You are not even certain he was on that trip.

15   A.  I believe he was on one or two, yes, but anyway, it's

16   irrelevant regardless.  I don't recall us talking any business.

17   Q.  You didn't have any substantive conversations with

18   Mr. Brady after he left Pilgrim's?

19   A.  Not that I can remember.

20   Q.  No phone calls?

21   A.  None that I can recall, no.

22   Q.  No text messages?

23   A.  I don't recall Scott Brady and I exchanging text messages.

24   Q.  No e-mails.

25   A.  There could have been some e-mails, but none that I recall.

Robert Bryant - Cross

1   Q.  Let's go back to the 25 interviews that you have had with

2   the Federal Government, Mr. Bryant.  At no point has

3   prosecutors shown you a phone call between you and Mr. Brady.

4   A.  That's correct.

5   Q.  And at no point has the prosecution shown you an e-mail

6   between you and Mr. Brady.

7   A.  Not directly, no.

8   Q.  And at no point has the prosecution shown you text messages

9   between you and Mr. Brady.

10  A.  That's correct.

11  Q.  So despite the fact that you haven't talked to Mr. Brady in

12  about 10 years, you testified on your direct examination that

13  you overheard a phone call between Mr. Austin and who you

14  believed to be Mr. Brady.

15  A.  That's correct.

16  Q.  And you walked in during the middle of this conversation?

17  A.  Yeah, I don't recall the --

18  Q.  Just yes or no, you walked in on the middle of the

19  conversation?

20  A.  Once again, I don't recall exactly at what stage that phone

21  call was in.

22  Q.  Mr. Bryant, let me ask it this way.  You didn't hear this

23  whole conversation?

24  A.  Not that I remember, no.

25  Q.  This conversation was already underway by the time you

Robert Bryant - Cross

1    walked into Mr. Austin's --

2    A.  I don't remember if it was already underway.  Like I

3    testified yesterday, what I remember is the part --

4    Q.  Mr. Bryant, I am asking simply yes-or-no questions, so

5    listen to the question that I am asking.  Are we good to go

6    now?

7            MS. CALL:  Objection.  It's clearly not a simple

8    yes-or-no answer.  The witness should be allowed to answer.

9            THE COURT:  Overruled.  She has indicated she is going

10   to ask yes-or-no questions.

11   BY MS. PAGE:

12   Q.  When you walked in on this call that you testified on

13   direct about yesterday, Mr. Austin didn't put the caller on

14   speakerphone.

15   A.  Correct.

16   Q.  Mr. Austin didn't invite you into the conversation.

17   A.  That's correct.

18   Q.  You don't know what the person on the other line said.

19   A.  That's correct.

20   Q.  You don't know who initiated this phone call?

21   A.  That's correct.

22   Q.  Meaning you don't know if Mr. Austin made the call or vice

23   versa.

24   A.  That's correct.

25   Q.  And you didn't hear the entirety of the conversation.

Robert Bryant - Cross

1    A.   That's correct.

2    Q.   And just to remind the jury since your testimony was all

3    the way yesterday, you overheard this call sometime during the

4    2014 negotiations?

5    A.   That's correct.

6    Q.   And it was after Pilgrim's already submitted their first

7    round bid during these 2014 negotiations that you heard this

8    phone call?

9    A.   I believe so, yes.

10   Q.   And the call happened when you were in Louisville for a

11   meeting with KFC.

12   A.   That's correct.

13   Q.   You can't remember if this call happened before or after

14   that meeting with KFC.

15   A.   That's correct.

16   Q.   And at the time you heard this call, you had been pacing

17   around in and out of Roger Austin's office?

18   A.   That's correct.

19   Q.   At no point did Mr. Austin try to prevent you from walking

20   in and out of his office during the day?

21   A.   That's correct.

22   Q.   He didn't lock the door during the day?

23   A.   That's correct.

24   Q.   He didn't ask you to leave while he spoke to the other

25   person on the other line?

Robert Bryant - Cross

1   A.   That's correct.

2   Q.   He wasn't trying to conceal that he was on the phone with

3   anyone.

4   A.   Correct.

5   Q.   Instead, he was pretty loud when he was speaking on the

6   phone.

7   A.   Yes.

8   Q.   And not only was he pretty loud, but to use your words,

9   after he hung up he announced that he is on the phone with

10  Mr. Brady.

11  A.   Yes.

12  Q.   Which meaning, he is announcing that he is on the phone

13  with another supplier.

14  A.   Correct.

15  Q.   The only thing you remember from this supposed phone call

16  is Mr. Austin saying, "I told him the price is the price.  I

17  just need to know how many loads you need."

18  A.   That's correct.

19  Q.   You did not hear Mr. Austin convey a price to the person on

20  the other line.

21  A.   Not that I can remember, no.

22  Q.   Not a Pilgrim's price or any supplier's price, right?

23  A.   That's correct.

24  Q.   Not future prices or current prices.

25  A.   That's correct.

2222

Robert Bryant - Cross

1   *Q.*  You did not hear the person's response to Mr. Austin's

2   statement.

3   *A.*  That's correct.

4   *Q.*  You did not hear Mr. Austin try and get the person on the

5   other line to agree to anything.

6   *A.*  That's correct.  I don't recall that.

7   *Q.*  You heard one comment and one comment alone.

8   *A.*  No, I heard more than one comment.  I only recall the one

9   comment.

10  *Q.*  Now, again, this call happened when you were in the middle

11  of your negotiations with some of your biggest customers?

12  *A.*  That's correct.

13  *Q.*  You just traveled to Louisville for the meeting -- or

14  Louisville.  I feel you dying from that Colorado pronunciation.

15  Let me try again.  Louisville for the meeting with KFC?

16  *A.*  Yeah, Louisville.

17  *Q.*  Louisville.  I am going to have to practice that.

18          You had a ton of things to get ready for in these

19  negotiations with KFC.

20  *A.*  For this one, I don't recall all the prep.

21  *Q.*  Well, to put it simply, negotiation time is a busy time.

22  *A.*  That's true.

23  *Q.*  And you certainly couldn't just sit in Mr. Austin's office

24  all day listening to his phone calls.

25  *A.*  I don't recall doing that, no.

Robert Bryant - Cross

1   Q.  Now, even though it's not your job to sit in Mr. Austin's

2   office all day, it was your testimony yesterday that you walked

3   in on Mr. Austin saying the exact same phrase twice in one day.

4   A.  That's correct.

5   Q.  And that phrase you testified was, "I told them the price

6   is the price.  I just need to know how many loads you need."

7   A.  That's correct.

8   Q.  And you heard this being conveyed to who you believe to be

9   Bill Kantola?

10  A.  Well, I mean, that's who Roger conveyed to me he was

11  speaking with was --

12  Q.  Right.  He was still pretty loud on this call, right?

13  A.  -- Scott Brady and Bill Kantola.

14  Q.  Right.  He announced that he is on the phone with

15  Bill Kantola?

16  A.  When he hung up the phone, he said that was Kantola or that

17  was Brady.  It wasn't that he announced.  He just --

18  Q.  Well, I am using your words, Mr. Bryant.

19  A.  He said who he had been talking to, yes.

20  Q.  And that means he was announcing that he was on the phone

21  with another supplier.

22  A.  Yes.

23  Q.  And in the second call, you still don't hear Mr. Austin

24  convey a price.

25  A.  Not that I remember, no.

Robert Bryant - Cross

 1    *Q.*  Not a future price or a current price?

 2    *A.*  That's correct.

 3    *Q.*  Not a Pilgrim's price or any supplier's price?

 4    *A.*  Not that I remember.

 5    *Q.*  And you have no idea what the caller on the other line

 6    said.

 7    *A.*  That's correct.

 8    *Q.*  So to switch gears just a little bit, I want to move on

 9    from 2014, 2015, and go to 2017 and your testimony about

10    US Foods.  You testified you went about getting pricing

11    information from another supplier during those negotiations; is

12    that right?

13    *A.*  I don't recall receiving their pricing information.  It was

14    if they would be willing to increase prices with us.

15    *Q.*  You are absolutely right.  You asked Scott Tucker to go to

16    a contact at Mar-Jac to discuss a price increase.

17    *A.*  Correct.

18    *Q.*  You did not ask Scott Tucker to contact Claxton for

19    US Foods?

20    *A.*  Correct.

21    *Q.*  Because you know that Claxton is a large Chick-fil-A

22    supplier; is that right, Mr. Bryant?

23    *A.*  I do.

24    *Q.*  And Chick-fil-A buys a lot of boneless breast chicken.

25    *A.*  Correct.

Robert Bryant - Cross

1   Q.  And you know that Claxton doesn't sell its boneless breast

2   chicken to US Foods.

3   A.  I don't know that they don't.  I just knew that Mar-Jac was

4   our biggest competitor.

5   Q.  Well, it certainly wouldn't surprise you that Claxton

6   doesn't sell boneless breast to US Foods?

7   A.  No, it doesn't surprise me.

8   Q.  Mr. Bryant, your testimony on direct today and yesterday on

9   direct examination was that you're aware of competitors' prices

10  and their volumes.

11  A.  Yes.

12  Q.  So I want to talk about 2015.  You're aware that Claxton

13  submitted three different rounds of bids to KFC in 2015.

14  A.  In 2015?

15  Q.  Yes.

16  A.  No, I'm not.

17  Q.  It's your testimony that you're not aware how many rounds

18  of bids Claxton submitted during those negotiations that you

19  spoke about for hours about yesterday?

20       MS. CALL:  Objection to scope.  I believe Ms. Page

21  means 2014.

22       MS. PAGE:  2014, excuse me, Ms. Call.

23  BY MS. PAGE:

24  Q.  You have no idea how many rounds of bids Claxton submitted

25  in the negotiations in the fall of 2014.

Robert Bryant - Cross

1   A.   That's correct.

2   Q.   But you must surely be aware, then, Mr. Bryant, that

3   Claxton reduced its price and undercut Pilgrim's by 4 cents

4   from the initial bid to the final contract.

5   A.   I am not.  I am not aware of that.

6   Q.   You are not aware that Claxton undercut Pilgrim's by

7   2 cents and took volume away from Pilgrim's in that

8   negotiation?

9   A.   I am not aware, no.

10  Q.   Mr. Bryant, sticking with this, you never spoke to

11  Mr. Fries about Claxton's bid and contracts during that

12  negotiation; is that right?

13  A.   That's correct.

14  Q.   Sticking with 2014, 2015, you never spoke to Mr. Brady

15  about Claxton's bids or contract?

16  A.   That's correct.

17  Q.   You never spoke to Mr. Fries about Claxton's prices, right?

18  A.   No.

19  Q.   He never gave you Claxton's prices?

20  A.   Not directly, no.

21  Q.   And you never gave him Pilgrim's' prices?

22  A.   That is correct.

23  Q.   And the same goes for Mr. Brady.  Mr. Brady never gave you

24  Claxton's prices in 2014.

25  A.   That's correct.

2227

Robert Bryant - Cross

1    Q.  And you never gave Mr. Brady Pilgrim's prices?

2    A.  That's correct.

3    Q.  And, Mr. Bryant, the only thing Claxton Poultry got from

4    Pilgrim's in 2014 is Pilgrim's volume that they lost in that

5    contract negotiation.

6    A.  I am not aware of that.

7    Q.  Well, Mr. Bryant, you just spent a whole lot of time

8    talking about how none of these competitors undercut each other

9    in the course of those 2014 negotiations; is that right?

10   A.  That's correct.

11   Q.  You haven't looked at a single bid of Claxton's, correct?

12   A.  Say it again?

13   Q.  You haven't looked at a single bid of Claxton's?

14   A.  No, I have not.

15   Q.  You haven't looked at a single contract of Claxton's?

16   A.  That's correct.

17   Q.  You're asking this jury to take your word that the purpose

18   of your actions in 2014 were to not undercut each other.

19   A.  No, I'm not.

20   Q.  You are not providing any documentation today about

21   Claxton's bids and contracts in the course of that

22   negotiations.

23   A.  To answer your question, just giving the jury the facts

24   that I can recall, and they make their own determination on

25   whether or not they want to use those facts.

Robert Bryant - Cross

1   Q.  Absolutely, Mr. Bryant.  You are giving your testimony and

2   your testimony alone, and you are asking them to believe that

3   you are telling the truth despite the fact that you have

4   already lied to the Federal Government.

5   A.  Is that a question?

6   Q.  Yes, it is a question.

7   A.  Once again --

8   Q.  Mr. Bryant, it's a yes or no.

9   A.  I am giving my best recollection.

10  Q.  You are giving your best just like you did when you lied to

11  the Federal Government.

12  A.  Is that a question?

13  Q.  It is.

14  A.  Can you ask it again?

15  Q.  You are giving your best today just like you were giving

16  your best on September 8th when you looked all these

17  prosecutors and agents in the eyes and lied to them.

18  A.  No, better than that.

19          MS. PAGE:  One moment.

20          THE COURT:  Yes.

21          MS. PAGE:  No further questions, Your Honor.

22          THE COURT:  Thank you.

23          Thank you.

24          Mr. Feldberg.

25                          **CROSS-EXAMINATION**

Robert Bryant - Cross

1    *BY MR. FELDBERG:*

2    *Q.*  Mr. Bryant, I am Michael Feldberg.  I am Roger Austin's

3    lawyer.

4            You told Ms. Page a few minutes ago that all of your

5    25 or so interviews with the prosecutors and agents felt

6    serious, correct?

7    *A.*  That's correct.

8    *Q.*  And yet as you testified under oath at a prior hearing, you

9    lied to them multiple times about multiple issues, correct?

10   *A.*  Once again, I admitted it.  I regret it.  And I corrected

11   the record.

12   *Q.*  Well, we'll come to that.  But before we do, you testified

13   under oath at a prior hearing that you lied to the agents and

14   prosecutors multiple times about multiple issues, correct?

15   *A.*  That's correct.

16   *Q.*  And those issues were unrelated to any antitrust issues,

17   correct?

18   *A.*  That's correct.

19   *Q.*  And those issues were unrelated to any of the 10 men who

20   are on trial here, correct?

21   *A.*  That's correct.

22   *Q.*  And you know that lying to the agents and prosecutors was a

23   crime, correct?  They told you that.

24   *A.*  That's correct.

25   *Q.*  And you know that they can prosecute you at their

Robert Bryant - Cross

1   discretion for the crime of lying to them.

2   A.   That's correct.

3   Q.   And they haven't prosecuted you yet, have they?

4   A.   That's correct.

5   Q.   But they could, and you know they could, correct?

6   A.   That's correct.

7   Q.   And you've been -- it's totally up to the Department of

8   Justice, correct?

9   A.   That's my understanding, yes.

10  Q.   And you've been interviewed about 25 times by the

11  prosecutors and agents?

12  A.   Yeah, approximately, yes.

13  Q.   So you know what they want you to say at this trial, don't

14  you?

15  A.   They just want me to tell the truth.

16  Q.   You know what their version of the truth is, don't you?

17  A.   I think that the truth only has one version.

18  Q.   Their version from your perspective, correct?

19  A.   I am giving my best recollection of the events in answering

20  the questions to the best of my memory.

21  Q.   And you know that if the prosecutors are not happy with

22  your testimony, they have the sole discretion to charge you

23  with a felony.

24  A.   I don't believe that would be accurate.

25  Q.   What's not accurate about it, Mr. Bryant?

2231

Robert Bryant - Cross

1   A.  Well, you said if the prosecutors aren't happy with my

2   testimony.  That's not my understanding.  My understanding is

3   that I cooperate and I tell the truth to the best of my

4   recollection.

5   Q.  You know, do you not, Mr. Bryant, that the decision whether

6   or not to prosecute for the felony of lying to the Federal

7   Government is totally within the Department of Justice's

8   discretion, correct?

9   A.  That's my understanding, yes.

10  Q.  And you, as you told Ms. Page, would much rather sit in a

11  witness chair than out here in a defendant's chair with these

12  10 men, correct?

13  A.  That's correct.

14  Q.  So you have every incentive to say what the Department of

15  Justice wants you to say, correct?

16  A.  No.

17  Q.  Your testimony is you don't have every incentive to say

18  what they want you to say?

19  A.  You know, it's to tell the truth to the best of my memory.

20  It's not to say what they want me to say.  It's to give the

21  testimony to the best of my recollection.  It's not to say

22  something they want me to say.

23  Q.  It's up to them whether you get charged with a felony or

24  not, correct?

25  A.  That's correct.

Robert Bryant - Cross

1   Q.  And since we've just established that in your prior

2   testimony you testified that you lied multiple times about

3   multiple issues, your testimony yesterday that you lied once

4   was also false, correct?

5   A.  I didn't say that.  I said I recalled one time in

6   particular.

7   Q.  Oh, you recalled lying one time; is that right?

8   A.  That's what I said, yes.

9   Q.  Oh, so you lied multiple times on multiple occasions, but

10  yesterday when you were here after 25 preparatory interviews,

11  you could only recall one, correct?

12  A.  I believe the way I said it is I recall one instance in

13  particular, so it wasn't -- not the way you are trying to

14  characterize it.

15  Q.  The jury's recollection of your testimony yesterday will

16  control.

17          MS. CALL:  Objection to statements that aren't

18  questions.

19          THE COURT:  Yeah, attorneys should not be making

20  statements.

21          Go ahead, Mr. Feldberg.

22          MR. FELDBERG:  I stand corrected, Your Honor.

23  BY MR. FELDBERG:

24  Q.  And you testified yesterday that you volunteered to correct

25  the record with the Department of Justice and the agents,

Robert Bryant - Cross

1    correct?

2    A.   That's correct.

3    Q.   Isn't it a fact, Mr. Bryant, that yesterday was the first

4    time you ever said that?

5    A.   No.

6    Q.   Sir, in your 25 or so interviews with the Department of

7    Justice and the FBI and other agents, you never ever said that

8    you volunteered to correct the record, correct?

9    A.   I don't know if I made that statement in there.  I just

10   know that I was the one that initiated the follow-up meeting.

11   Q.   Well, let's talk about the follow-up meetings.  As you

12   testified under Ms. Page's examination, on September 8th, you

13   gave an interview that was false, correct?

14   A.   Like I said, I don't recall the date.

15   Q.   And then on September 14th, you gave -- well, you may not

16   recall the exact date, but you gave an interview in which you

17   made false statements, correct?

18   A.   Like I said, I don't recall the dates, but --

19   Q.   But you recall the falsehoods.

20   A.   I have already conceded that -- that, yes.

21   Q.   And then on September 14th, you gave another interview in

22   which you described certain misconduct, correct?

23   A.   Correct.

24   Q.   And then on October 12th, you gave yet another interview in

25   which you described misconduct completely differently than you

Robert Bryant - Cross

1    had on September 14th, correct?

2    *A.*  Not that I recall.

3    *Q.*  You don't recall that?

4    *A.*  I don't know.

5    *Q.*  You don't recall that the misconduct you described on

6    September 14th involved multiple people, none of whom are here

7    in this courtroom, and that on October 12th you described it

8    differently and said it only involved one person also not

9    involved in this -- not here in this courtroom?

10   *A.*  No, I don't.

11   *Q.*  You don't recall that.

12   *A.*  No.

13   *Q.*  Sir, isn't it a fact that the testimony you gave yesterday

14   that you volunteered to correct the record was something you

15   just made up yesterday?

16   *A.*  No.

17   *Q.*  But you don't recall whether or not you ever said it before

18   yesterday, correct?

19   *A.*  Once again, I asked for the follow-up meeting because I

20   felt like I needed to correct the record.

21   *Q.*  You have never said that before yesterday, correct?

22   *A.*  I don't know if I used those exact words.  I am doing my

23   best to explain what happened, you know, the events.

24   *Q.*  Mr. Bryant, I am going to ask another question.  You don't

25   know.

Robert Bryant - Cross

1           Let's talk about 2017.  You testified that Mr. Austin

2    told you about what you described as competitors' future bids

3    and that you wrote them down in your notebook, correct?

4    A.   That's correct.

5    Q.   What Mr. Austin told you were current prices, not future

6    bids, correct?

7    A.   That's not the way I understood it, no.

8           MR. FELDBERG:  Well, let's call up Exhibit 1919, and

9    would it be possible to put Exhibit 19 side by side with

10   Exhibit I-054 which is in evidence.

11          THE COURT:  Let me just check I-054.  And I-054 has

12   been admitted.  Let's see if we can get Ms. Call a copy.  And

13   those can be displayed.

14          MR. FELDBERG:  May we publish?

15          THE COURT:  Yes.

16          MR. FELDBERG:  Thank you, Your Honor.

17   BY MR. FELDBERG:

18   Q.   Now, Mr. Bryant, on the left-hand side of the screen --

19          MR. FELDBERG:  And may I just approach the screen,

20   Your Honor?  My eyes are getting old.

21          THE COURT:  Yes, you may.

22   BY MR. FELDBERG:

23   Q.   On the left-hand side of the screen is page 2 -- let's go

24   to page 2.  That's page 2 of your handwritten notes, correct?

25   A.   That's correct, yes.

2236

Robert Bryant - Cross

1          MR. FELDBERG:  And for the record, that's

2    Exhibit 1919.

3    BY MR. FELDBERG:

4    Q.  On the right-hand side of the screen is Exhibit I-054,

5    which is the Period 2 pricing for various competitors in

6    February of 2017, correct?

7          MS. CALL:  Objection, foundation for this witness.

8    There is nothing showing he has ever seen this document before.

9    A.  I have never seen this document before.

10   BY MR. FELDBERG:

11   Q.  I will represent to you that Exhibit I-054 in evidence is

12   the Period 2 pricing for the various suppliers in

13   February 2017, their current pricing.  You know what period

14   pricing is, do you not, Mr. Bryant?

15   A.  I do.

16   Q.  What is period pricing?

17   A.  The margin over feed contracts that grain -- there is

18   inputs that could change based off the customer's position and

19   things of that nature, so those -- that pricing would adjust.

20   Q.  Okay.  Now, looking at your notes on the left, on the

21   bottom half of the page, the top number there is 1.0234,

22   correct?

23   A.  That's correct.

24   Q.  And that was Pilgrim's current price for Period 2 pricing

25   in February of 2017, correct?

2237

Robert Bryant - Cross

1   *A.* I don't recall that. I do -- I do believe that was our

2   current price, and that's why I wrote it at the top, to compare

3   it to where the other competitors were at.

4   *Q.* All right. Now, the next line in your notes is for Koch.

5   And that says 1.0125, correct?

6   *A.* That's correct.

7   *Q.* And let's look at I-054. What is listed for Koch?

8        *MS. CALL:* Objection to foundation on this line of

9   questioning. It's entirely argumentative, showing two

10  documents side by side, including one the witness has never

11  seen.

12       *THE COURT:* Response, Mr. Feldberg, on lack of

13  foundation on I-054?

14       *MR. FELDBERG:* Your Honor, it's in evidence, and this

15  is how we show that, in fact, the prices that --

16       *MS. CALL:* Argument entirely.

17       *THE COURT:* Hold on.

18       *MR. FELDBERG:* It's impeaching Mr. Bryant who

19  testified that he thought for some reason these were future

20  prices when, in fact, they were current prices.

21       *THE COURT:* Sustained as to the display of I-054. He

22  is not familiar with the document.

23       *MR. FELDBERG:* Your Honor, may I establish that the

24  prices were current prices? That's the whole point, to impeach

25  him on his testimony that --

Robert Bryant - Cross

1      THE COURT:  Sure, but you are asking him to compare

2  something that's a document that he is not familiar with as if

3  he knows it to be true.

4      MR. FELDBERG:  But it's in evidence, Your Honor, and I

5  am just asking him to compare a document that is in evidence

6  with his handwritten notes.

7      THE COURT:  He can compare numbers, but there can't be

8  any assumption or you can't phrase questions to ask him that he

9  assumes or that it is true or any of that.  He can compare

10  numbers, that's true, but he can't be asked questions that

11  represent that the -- that I-054 is -- it is what it is because

12  he doesn't know that.

13      MR. FELDBERG:  Fine.  I understand, Your Honor.  May I

14  proceed?

15      THE COURT:  Yes.

16  BY MR. FELDBERG:

17  Q.  All right.  Your note for Koch is 1.0125, correct?

18  A.  That's correct.

19  Q.  And on I-054, the number for Koch is 1.0123, correct?

20  A.  Correct.

21  Q.  It's two numbers off in the fourth decimal point to the

22  right, correct?

23  A.  That's correct.

24  Q.  Your number for Claxton is .9943; is that right?

25  A.  That's correct.

Robert Bryant - Cross

1    *Q.* What's the number for Claxton on I-054?

2    *A.* .9943.

3    *Q.* Your number for Mar-Jac is 98.35, correct?

4    *A.* Correct.

5    *Q.* What's the number for Mar-Jac on I-054?

6    *A.* .9835.

7    *Q.* Your number for Tyson is 97.83, correct?

8    *A.* Correct.

9    *Q.* What's the number for Tyson on I-054?

10   *A.* .9783.

11   *Q.* Your number for George's is 96.52, correct?

12   *A.* Correct.

13   *Q.* What's the number for George's on I-054?

14   *A.* .9652.

15        *MR. FELDBERG:* We can take these documents down.

16   BY MR. FELDBERG:

17   *Q.* And, Mr. Bryant, you were interviewed by prosecutors and

18   agents on February 27th of this year, correct?

19   *A.* Correct, I am assuming. I don't recall the exact dates.

20   *Q.* And that was, what, about 10 days ago?

21   *A.* Approximately, yeah.

22   *Q.* And isn't it a fact, sir, that on February 27th, 2022, you

23   told the prosecutors and agents that your 2017 handwritten

24   notes were current prices and not bids?

25   *A.* I don't recall making that statement.

Robert Bryant - Cross

1            *MR. FELDBERG:*  Could we call up, please, not for the

2     jury, Defense Exhibit I-799?

3     *BY MR. FELDBERG:*

4     *Q.*  Mr. Bryant, do you see Exhibit I-799?

5     *A.*  I do.

6     *Q.*  And I invite your attention --

7            *MR. FELDBERG:*  And could we enlarge the paragraph just

8     under bullet point No. 5 that begins "Subject."

9            *MS. CALL:*  May the government inquire as to a copy of

10    this exhibit?

11           *MR. FELDBERG:*  It's one of your agent's notes.

12           *THE COURT:*  Hold on.  Let's get Ms. Call a copy.

13           *MR. FELDBERG:*  You can have mine.

14    *BY MR. FELDBERG:*

15    *Q.*  Mr. Bryant, do you see the paragraph that begins "Subject

16    2017"?

17    *A.*  I do.

18    *Q.*  Does that refresh your recollection --

19    *A.*  No.

20    *Q.*  Could I finish the question, please?

21           Does that refresh your recollection that your 2017

22    handwritten notes were current prices and not bids and that you

23    told the agents and prosecutors that as recently as

24    February 27th of this year?

25    *A.*  No.  And I believe this to be incorrect, a representation

Robert Bryant - Cross

1   of my statements.

2   Q.  You think the agents and prosecutors got it wrong?

3   A.  Apparently.

4   Q.  Okay.  That's fine.

5   A.  Can I finish?

6   Q.  No.  You've answered my question.  You think the agents and

7   prosecutors got it wrong?

8   A.  I don't recall making that statement.  I just -- what I

9   recall is the way I recall us using the information is that it

10   was bids and, like I testified earlier, that we formulated our

11   bid to be third in that ranking.

12   Q.  You don't recall making that statement on February 27.

13   Does that mean maybe you did and maybe you didn't?

14   A.  Once again, the way I remember the prices were that they

15   were -- they are intended prices, and we used the information

16   as if they were their intended price for the 2017 bid.

17   Q.  Mr. Bryant, my question was different.  Please listen.  My

18   question was, since you don't recall one way or the other

19   whether you told the agents on February 27th of this year that

20   your handwritten notes were current prices and not bids, maybe

21   you did and maybe you didn't; is that right?

22   A.  I don't recall making that statement.

23   Q.  If you don't recall making that statement, is it your

24   testimony that the agents and prosecutors got it wrong?

25   A.  Once again, this isn't my notes.

Robert Bryant - Cross

1   Q.   I understand that.

2          So is it your testimony that the agents and

3   prosecutors misunderstood, got what you said wrong; or is it

4   your testimony you don't recall one way or the other what you

5   said?

6          MS. CALL:   Objection to description of the evidence

7   about prosecutors writing reports that aren't written to them,

8   that -- attorneys describing facts that are not facts.

9          THE COURT:   If you could rephrase on that,

10  Mr. Feldberg.

11         MR. FELDBERG:   I will do my best, Your Honor.

12  BY MR. FELDBERG:

13  Q.   The way I understand correctly, Mr. Bryant, that you don't

14  recall whether or not you said on February 27th to the agents

15  and prosecutors that your notes were current prices and not

16  bids.

17  A.   No, I don't recall that.

18  Q.   And is it, I don't recall one way or the other; or, I don't

19  recall saying that?

20  A.   I don't recall saying that.

21  Q.   And given that you don't recall saying that, is it your

22  testimony that the agents and prosecutors got it wrong when

23  they wrote this memo?

24         MS. CALL:   Objection, misstates any testimony or

25  evidence, once again.

Robert Bryant - Cross

1          THE COURT:  Overruled.  He can answer.

2     A.  And, again, please.

3     BY MR. FELDBERG:

4     Q.  Is it your testimony that the agents and prosecutors when

5     they wrote up this memo of your interview on February 27 got it

6     wrong?

7     A.  I don't know where they got this from.  I don't.

8     Q.  So you don't know one way or the other whether they got

9     your statement wrong.

10    A.  Once again, this isn't -- this isn't my words, and from

11    what I see here, it's not a quote, so I don't know.

12    Q.  Well, it's not within quotation marks.  It's a pretty clear

13    statement, isn't it, Mr. Bryant?

14    A.  Well, it's not, obviously, because we are debating it.

15    Q.  No, what we are debating, Mr. Bryant, is whether or not you

16    told the prosecutors and agents 10 days ago that your

17    handwritten notes were current prices and not bids.

18    A.  I don't recall making that statement.

19    Q.  Okay.  Let's take a look at the actual bids and see how

20    they line up with your handwritten notes.

21          MR. FELDBERG:  Could we call up, please, not for the

22    jury, Defense Exhibits A-112 and A-113?  Your Honor, I am

23    conferring with counsel for just a moment.

24          THE COURT:  Yes, that's fine.

25          MR. FELDBERG:  Your Honor, we offer A-112 and A-113

Robert Bryant - Cross

1   into evidence, independent legal significance.  They are bids

2   like multiple other bids that have come in.

3          THE COURT:  Any objection to the admission of A-112

4   and A-113?

5          MS. CALL:  Objection as to relevance.  This does seem

6   from months before the subject of this witness' testimony,

7   scope.

8          MR. FELDBERG:  If you look at the bottom half of the

9   first page of 112, it's February 7.

10         MS. CALL:  I am going to object to foundation.  It's

11   just unclear what this is.

12         MR. FELDBERG:  Your Honor, this is Case's first round

13   bid, and it, I think for context, makes it quite clear what it

14   is.

15         THE COURT:  Is what's being displayed right now A-112?

16         MR. FELDBERG:  Yes, Your Honor.

17         THE COURT:  Ms. Call, what's the objection?

18         MS. CALL:  I will object to scope and relevance to

19   this witness's testimony given that Case's numbers were not on

20   Mr. Bryant's handwritten notes.

21         THE COURT:  As least at to A-112, which is the only

22   one I have seen, objections are overruled.  It does appear to

23   be a bid submission.  It has independent legal significance,

24   and I will admit A-112.

25         MR. FELDBERG:  Could we call up, please, not for the

Robert Bryant - Cross

1    jury, A-113.

2           THE COURT:  Ms. Call, when you are ready, any

3    objection to A-113?

4           MS. CALL:  Just to the first page, Your Honor.  I am

5    not sure if that is part of the actual document.

6           THE COURT:  Can we display the first page of A-113 so

7    I can see?

8           MS. CALL:  I believe the native is being displayed.

9    The sticker version seems to have a first page that is not a

10   part of the actual document.

11          MR. FELDBERG:  We are happy to omit the first page,

12   Your Honor.

13          THE COURT:  So based on the omission of the first page

14   of A-113 in the PDF version, any objection to A-113?

15          MS. CALL:  No objection, just assuming that the

16   highlighting is in the original and not in the actual document.

17          MR. FELDBERG:  I believe it is.

18          THE COURT:  It seems to be consistent with other Excel

19   spreadsheets, that there may be some yellow highlighting, so

20   other than that first page of the PDF version, A-113 will be

21   admitted.

22          MR. FELDBERG:  Okay.  Could we please call up -- I

23   think it's the second page of A-113, which is now in evidence,

24   that shows the -- begins -- that's the page.  Can we display

25   this to the jury, please?

Robert Bryant - Cross

1          THE COURT:  You may.

2     BY MR. FELDBERG:

3     Q.  Mr. Bryant, do you see what Case Farms' first round bid for

4     the period 2018 to 2020 is?

5          MS. CALL:  Objection, once again, to Mr. Feldberg

6     describing documents the witness has never seen, and objection

7     as to foundation and relevance for his testimony given that

8     Case, I don't believe, was ever mentioned.

9          THE COURT:  Response, Mr. Feldberg?

10         MR. FELDBERG:  Your Honor, it's correct that Case is

11    not on Mr. Bryant's handwritten notes, but we'll come to others

12    which are.  And the purpose is to impeach by showing that the

13    numbers he wrote in his notes have no relation to the first

14    round bids.

15         THE COURT:  Well, once again, it's the same that we

16    talked about in relation to I-054.  The questions can compare

17    numbers, but the questions asked of the witness cannot assume

18    the truth of either A-112 or A-113.

19         MR. FELDBERG:  Okay.  We will move on to others.

20         Let's -- may we call up C-464, not for the jury.

21         Your Honor, I believe 464 is in evidence.

22         THE COURT:  Let me just double-check.  That sounds

23    right.  C-464?

24         MR. FELDBERG:  Yes.

25         THE COURT:  I don't show that as being in.

Robert Bryant - Cross

1          MR. FELDBERG:  Does Your Honor show C-465 in evidence?

2          THE COURT:  Yes, I do.

3          MR. FELDBERG:  Let's call up C-465.  And, Your Honor,

4     may we offer 464, which is essentially the cover e-mail that

5     transmits 465?

6          THE COURT:  Any objection to the admission of C-464?

7          MS. CALL:  Yes, hearsay, but also the government would

8     request a copy.

9          MR. FELDBERG:  It's on the stip list, Your Honor.

10          THE COURT:  Let Ms. Call just double-check that fact.

11          MS. CALL:  No objection on hearsay grounds, but I

12     would request a copy.

13          THE COURT:  Ms. Call, do you need to wait to get a

14     copy of the 464?

15          MS. CALL:  Not 464.  465 would be helpful.

16          THE COURT:  But no objection to the admission of --

17          MS. CALL:  No objection.

18          THE COURT:  Okay.  Anyone else?

19          C-464 is admitted.

20          MR. FELDBERG:  May we display C-464 to the jury, Your

21     Honor?

22          THE COURT:  You may.

23     BY MR. FELDBERG:

24     Q.  Mr. Bryant, do you see Exhibit C-464 from Mr. Kantola to

25     Sara Fisher at RSCS?

Robert Bryant - Cross

1    A.   Yes.

2    Q.   Dated January 30th?

3    A.   Yes.

4         MR. FELDBERG:  Could we display 465 to the jury and in

5    particular the third page?

6         THE COURT:  You may.

7         MR. FELDBERG:  Could we enlarge the line at the bottom

8    that says "Total FOB WOG plant cost"?

9    BY MR. FELDBERG:

10   Q.   Mr. Bryant, do you see Koch's first round total FOB WOG

11   plant cost bid?

12   A.   I see this, yes.  I don't know if it's their first round or

13   not.  I haven't seen this document before.

14   Q.   And it's .9935, correct?

15   A.   Yes.

16   Q.   That's not 1.0125, is it?

17   A.   No, it's not.

18   Q.   Let's go to the next exhibit.

19        MR. FELDBERG:  Could we call up, please, Government

20   Exhibit 26?  And this one, Your Honor, I believe is already in

21   evidence.  May we display it to the jury, Your Honor?

22        THE COURT:  Yes, that is in evidence, and you may

23   display it to the jury.

24        MR. FELDBERG:  Thank you.  I have lost the ability to

25   control my notes, Your Honor.

Robert Bryant - Cross

1          *THE COURT:*  We should have a bigger podium.

2          *MR. FELDBERG:*  Well, we are going to make do with what

3   we have.

4   *BY MR. FELDBERG:*

5   *Q.*  Mr. Bryant, I am representing to you that Exhibit 1826

6   is --

7          *MS. CALL:*  Objection, once again, to a representation

8   of what exhibits are.

9          *MR. FELDBERG:*  May we display 1825, Your Honor?  I

10  believe it's in evidence.

11         *THE COURT:*  Yes, that is in evidence, and you may

12  display it.

13         *MR. FELDBERG:*  Thank you.

14  *BY MR. FELDBERG:*

15  *Q.*  Do you see Exhibit 1825, Mr. Bryant?

16  *A.*  Yes.

17  *Q.*  And this is an e-mail from Mr. Austin to Sara Fisher and

18  Rich Eddington at RSCS dated February 3rd, 2017, correct?

19  *A.*  Correct.

20  *Q.*  And it attaches Pilgrim's first round bid, correct?

21  *A.*  I assume so.

22  *Q.*  That's what it says, isn't it?

23  *A.*  Yes, I just -- normally there is that attachment line or

24  something.  I just didn't see it, yeah.

25  *Q.*  Let's look at the attachment, Exhibit 1826.

2250

Robert Bryant - Cross

1           MR. FELDBERG:  And may we display that to the jury,

2   Your Honor?

3           THE COURT:  You may.

4   BY MR. FELDBERG:

5   Q.  And this is Pilgrim's first round bid submitted on

6   February 3rd, 2017, correct?

7           MS. CALL:  Objection, once again, Your Honor, to the

8   description of evidence to the witness.

9           THE COURT:  Unless he has foundation for the exhibit.

10  He can be asked to compare prices -- or compare numbers, but he

11  shouldn't be asked to assume what it is.

12          MR. FELDBERG:  Well, he was at Pilgrim's at the time,

13  Your Honor.

14          THE COURT:  You can ask him foundational questions.

15          MR. FELDBERG:  Fair enough.

16  BY MR. FELDBERG:

17  Q.  Mr. Bryant, are you familiar with Pilgrim's actual first

18  round bid on February 3rd, 2017?

19  A.  I helped prepare it, yes, but I don't recall our exact

20  number, no.

21  Q.  But is this the bid?

22  A.  It looks similar.  I just don't recall what first round

23  bid.

24  Q.  And what's the number on the first round bid?

25  A.  On here, it's .9849.

2251

Robert Bryant - Cross

1    *Q.* That's not 1.0234, is it?

2    *A.* No.  As I testified earlier, we used those notes to put

3    ourselves third in line and against those notes.  I don't think

4    I said that 1.02 is what we turned in.

5    *Q.* Okay.  Let's go to Exhibit F-852.

6             *MR. FELDBERG:* Could we call this up, please, not for

7    the jury?

8             Your Honor, I believe F-852 and 853 are in evidence,

9    and I am handing copies to Ms. Call.

10            *THE COURT:* Yes, both are and may be displayed.

11            *MR. FELDBERG:* May we display F-852 to the jury,

12   please?

13            *THE COURT:* Yes.

14   *BY MR. FELDBERG:*

15   *Q.* Mr. Bryant, Exhibit F-852 is an e-mail from Scott Brady on

16   February 3rd, 2017, to Sara Fisher and Rich Eddington at RSCS

17   with Claxton's first round bid, correct?

18   *A.* Once again, I don't know that it's Claxton's first round

19   bid.

20   *Q.* Well, first round bids were due on February 3rd, 2017,

21   correct?

22   *A.* It was the first week of February, yes.

23   *Q.* And F-852 in evidence from Mr. Brady at Claxton to

24   Ms. Fisher and Mr. Eddington at RSCS conveys a bid, correct?

25   *A.* It appears to, yes.

2252

Robert Bryant - Cross

1          *MR. FELDBERG:*  And let's call up F-853 in evidence.

2   And could we look at the second page, please?

3   *BY MR. FELDBERG:*

4   Q.  This is -- it says:  UFPC feed flow through pricing for

5   Period 1, 2018, Claxton Poultry, effective January 1st to

6   January 28th.

7          And what's the price?

8   A.  The first one is .9939.

9   Q.  And that's not .9943, is it?

10  A.  That's correct.

11  Q.  Let's move on.  You testified, Mr. Bryant, that you

12  overheard Mr. Austin speaking on the telephone on the same day

13  back in 2014, correct?

14  A.  That's correct.

15  Q.  And this happened in Louisville, Kentucky, correct?

16  A.  That's what I recall, yes.

17  Q.  In Mr. Austin's office?

18  A.  That's what I remember, yes.

19  Q.  Mr. Austin worked in Louisville at the time, correct?

20  A.  That's correct.  We had an office there.

21  Q.  And you had a meeting with RSCS on the day that you say you

22  overheard those phone calls, correct?

23  A.  I believe it was.  I don't remember when I arrived in

24  Louisville typically.  Depending on schedule, I could have

25  arrived a day earlier, and, you know, I don't recall when I

2253
Robert Bryant - Cross

 1  actually arrived and if I --

 2  Q.  I am not asking you when you arrived, sir.  I am asking you

 3  whether the phone calls you say you overheard were on the same

 4  day as a meeting between Pilgrim's and RSCS.

 5  A.  I don't -- I don't remember if they were -- it was the same

 6  day or if I arrived the day before, but it was during that time

 7  period.

 8  Q.  Well, you say you heard Mr. Austin say, "I told them the

 9  price is the price.  The only question is how many loads,"

10  correct?

11  A.  Correct.

12  Q.  Would it stand to reason, sir, that if, in fact, Mr. Austin

13  actually said that, it would be after the meeting with RSCS?

14  A.  Not necessarily.  Whenever you have these type of meetings

15  with the customers, it would not -- you generally didn't want

16  to walk in and surprise them with something like that.  So it

17  would be very common for Mr. Austin to have already had

18  conversations with the customer to prepare them for our

19  position going in there.  And typically you didn't like to

20  blindside your customers, so there should have been some

21  discussions or --

22  Q.  Mr. Bryant, let me stop you there.  Are you aware of any

23  conversation that Mr. Bryant had -- I am sorry, Mr. Austin had

24  with RSCS prior to the August 22nd meeting -- and it was on

25  August 22nd, correct?

Robert Bryant - Cross

1  A.  I don't recall any discussions with Roger about any

2  conversation he had.

3  Q.  What you say you overheard is Mr. Austin saying, "I told

4  them," past tense, "the price is the price.  The only question

5  is how many loads," correct?

6  A.  That's correct.  That's what I remember, yeah, past tense.

7  Q.  And that meeting with RSCS was on August 22nd of 2014,

8  correct?

9  A.  That's correct, yes.

10  Q.  Now, your testimony is, if I understand it, that on two

11  separate occasions you walked into Mr. Austin's office almost

12  eight years ago and overheard him say the exact same words.

13  A.  Similar, yes.

14  Q.  Two separate occasions, same words.

15  A.  Yeah.  It wasn't like two separate occasions.  It was all

16  one occasion, and it was a relatively short period of time what

17  I recall.  And I was -- there was a space in front of his desk,

18  and I was kind of pacing in front of that desk.  I may have

19  walked out into the hall some.  But it wasn't that it was like

20  I walked in at the exact right time to hear that one phrase.  I

21  mean, he had conversations, and I may have wanted to speak to

22  him, and I was waiting for him to get done.

23  Q.  Right.  But your testimony is it's two separate phone

24  calls, so they weren't at the same time, correct?

25  A.  That's correct.

Robert Bryant - Cross

1   Q.  And you walked in two separate times.

2   A.  I don't know if it was two separate times, but like I said,

3   I was in and out.  I may have been in there two or three times.

4   I don't recall that, that level of detail.

5   Q.  Your testimony is that in those two separate conversations

6   you overheard Mr. Austin say the same words.

7   A.  I remember him saying the same words, yes.

8   Q.  And this was nearly eight years ago, correct?

9   A.  That's correct.

10  Q.  You don't have any notes of this incident?

11  A.  No, I don't.

12  Q.  You didn't write any memos about it, did you?

13  A.  No.

14  Q.  You didn't tell anybody about it until this case arose,

15  correct?

16  A.  Not that I remember, no.

17  Q.  You didn't report it to the legal department at Pilgrim's?

18  A.  No.

19  Q.  You didn't report it to the compliance department at

20  Pilgrim's?

21  A.  I don't know if there was a compliance department in 2014.

22  Q.  Well, if there was, you didn't report it to them, did you?

23  A.  No.

24  Q.  You didn't report it to the HR department at Pilgrim's?

25  A.  No.

Robert Bryant - Cross

1    Q.  Pilgrim's had an ethics hotline, didn't it, at the time?

2    A.  They had -- yeah, they had something, yes.

3    Q.  Did you report it to the ethics hotline?

4    A.  No.

5    Q.  Did you call the FBI?

6    A.  No.

7    Q.  You never mentioned those calls you say you overheard until

8    you began interviewing with the prosecutors and agents in

9    connection with your immunity agreement seven-and-a-half years

10   later, correct?

11   A.  That's correct.

12   Q.  And now seven-and-a-half years, almost eight years later,

13   you say you remember Mr. Austin saying the same thing twice.

14   A.  That's correct.

15   Q.  Even if we accept what you say you overheard, Mr. Austin

16   did not convey a price to whoever he was speaking with on the

17   phone, correct?

18   A.  I don't remember a price, no.  Like I testified, all I

19   really remember is -- are those comments.  I don't recall

20   pricing.

21   Q.  And you don't recall hearing Mr. Austin asking whoever was

22   on the other end of the calls for a price, do you?

23   A.  No, I don't.

24   Q.  And Mr. Austin, according to your testimony, didn't ask

25   either caller on the other side of the phone to agree to

Robert Bryant - Cross

1   anything, correct?

2   A.   I don't remember that, no.

3   Q.   And these two calls which you say you overheard in which

4   you say Mr. Austin said, "I told them the price is the price,

5   and the only question is how many loads you want," and didn't

6   ask anybody to agree to anything, this is the basis for your

7   claim that Mr. Austin was somehow involved in a conspiracy in

8   2014, correct?

9   A.   Part of it, yes.

10  Q.   Well, that's basically it, correct?

11  A.   Part of it -- I mean, the e-mail confirmation from

12  Mr. McGuire and Mr. Austin where they were confirming that

13  competitors were increasing prices along with Pilgrim's, and,

14  yes.

15  Q.   In terms of conversations with Mr. Austin -- the e-mails

16  are the e-mails and we'll deal with that, but in terms of

17  conversations with Mr. Austin, the only conversations that you

18  have identified that you said -- conversations with Mr. Austin

19  that you say are the basis for your allegation that Mr. Austin

20  was part of some conspiracy in 2014 are the two calls you have

21  just described.

22  A.   That's correct.

23          MR. FELDBERG:   Your Honor, it's three minutes to

24  12:00, and I am about to move to another topic.  I don't know

25  whether you want me to start.

2258
Robert Bryant - Cross

1           THE COURT:  No, I think now is a good time to break.

2           Ladies and Gentlemen, we will break for lunch.  Plan

3    on reconvening at 1:30.  Keep the admonitions in mind, yellow

4    juror buttons visible, and we'll -- we are excused for the

5    lunch recess.

6           (Jury excused.)

7           THE COURT:  You are excused, Mr. Bryant, and everyone

8    else can be seated.  Thank you.

9           Anything to discuss?

10          We will be in recess until 1:30.  Thank you.

11       (Recess at 12:00 o'clock until 1:30 p.m.)

12          THE COURT:  Why don't we go ahead and get Mr. Bryant

13   and get the jury.

14          MR. FELDBERG:  May I come up to the podium, Your

15   Honor?

16          THE COURT:  Yes, of course.

17          (Jury present.)

18          THE COURT:  Mr. Feldberg, go ahead.

19          MR. FELDBERG:  Thank you, Your Honor.

20   BY MR. FELDBERG:

21   Q.  Good afternoon, Mr. Bryant.  Yesterday in direct

22   examination by Ms. Call, you told the jury that Mr. Austin told

23   you that he and Carl Pepper shared information.  Do you recall

24   that?

25   A.  That's correct.

2259

Robert Bryant - Cross

1  *Q.*  And did he tell you that that -- they shared information

2  including in the summer of 2014?

3  *A.*  I don't recall that.

4  *Q.*  Do you recall -- do you have any notes or memos of what you

5  say Mr. Austin told you about his conversations with

6  Carl Pepper?

7  *A.*  No.

8  *Q.*  Until you began speaking with the prosecution in the hopes

9  of obtaining immunity, did you tell anyone, anyone, about these

10  purported phone conversations between Mr. Austin and

11  Mr. Pepper?

12  *A.*  About Mr. Pepper, possibly.

13  *Q.*  Possibly?

14  *A.*  Possibly.

15  *Q.*  Do you have a recollection one way or the other?

16  *A.*  Not certain, but --

17  *Q.*  Okay, thank you.

18          Now, you also testified yesterday under Ms. Call's

19  direct examination that you heard Jason McGuire direct

20  Mr. Austin to put something out to the industry.  Do you recall

21  that testimony?

22  *A.*  Yes.

23  *Q.*  Now, you testified about that at a prior hearing, correct?

24  *A.*  That's correct.

25  *Q.*  And at that prior hearing, you testified that that happened

Robert Bryant - Cross

1   at a meeting at SMS, correct?

2   A.   I don't recall.

3   Q.   Would you like to see the transcript of that hearing?

4   A.   Can I finish?

5   Q.   Do you recall one way or the other, sir?

6   A.   I recall that it was either Church's or Popeye's.  I don't

7   recall which.

8   Q.   The question, Mr. Bryant, is what your testimony under oath

9   at a prior hearing was.  Do you recall that you testified that

10  Mr. McGuire made that statement at a meeting at SMS, the co-op

11  for Popeye's?

12  A.   Once again, I don't recall which.

13  Q.   And do you recall that you were then shown at the prior

14  hearing a calendar invite which showed that Mr. Austin was not

15  at the meeting at SMS?

16  A.   I recall seeing the calendar invite, but I don't recall

17  conceding that he was not at the meeting.

18  Q.   You recall that Mr. Austin was not shown on the calendar

19  invite, correct?

20  A.   That's correct, yes.

21       MR. FELDBERG:  Could we call up, not for the jury,

22  please, Exhibit E-174.

23  BY MR. FELDBERG:

24  Q.   That's the calendar invite, correct?

25  A.   I believe it is, yes.

Robert Bryant - Cross

1   Q.  And that was sent to you, correct?

2   A.  Yes.

3   Q.  And that's the calendar invite for the meeting in July of

4   2014 at SMS, correct?

5   A.  That's correct, yes.

6   Q.  And Mr. Austin is not on that calendar invite, correct?

7   A.  That's correct, yes.

8        MR. FELDBERG:  Your Honor, consistent with the prior

9   hearing, we would offer this, the top half of this page down to

10  where it begins "note."

11       THE COURT:  Where it begins what?

12       MR. FELDBERG:  The word "note," about halfway down the

13  page.  I have a redacted copy if Your Honor would like to see

14  it.

15       THE COURT:  Is what's being displayed right now the

16  same as your redacted copy?

17       MR. FELDBERG:  Yes.

18       THE COURT:  So you are offering E-174.  Any objection

19  to that?

20       MS. CALL:  No, Your Honor, but I would ask that the

21  redactions be in a consistent color so it's not confusing.  It

22  looks like they are just whiting out part of the document.

23       MR. FELDBERG:  Your Honor, that's above my capability.

24       THE COURT:  Oh, I see.  So it's just being displayed

25  in redacted form, but what's being displayed right now,

Robert Bryant - Cross

 1  Ms. Call, you have no objection to; is that correct?

 2          MS. CALL:  Correct.

 3          THE COURT:  Yeah, then as redacted, E-174 is admitted.

 4          MR. FELDBERG:  Thank you.  May we display it to the

 5  jury, Your Honor?

 6          THE COURT:  Yes.

 7  BY MR. FELDBERG:

 8  Q.  Mr. Bryant, just so the jury understands, this is the

 9  calendar invite for that meeting at SMS in July of 2014,

10  correct?

11  A.  That's correct.

12  Q.  And Mr. Austin is not on it.

13  A.  That's correct.

14          MR. FELDBERG:  Let's call up, not for the jury,

15  please, Exhibit H-911.

16  BY MR. FELDBERG:

17  Q.  Mr. Bryant, do you recognize H-911?

18  A.  I don't remember this, but I see that I'm on it, yes.

19  Q.  This is an e-mail sent to you by Larry Higdem at Pilgrim's

20  sent to Mr. McGuire, Mr. Gay, and you on July 21st, 2014?

21  A.  That's correct, yes.

22  Q.  And is it fair to say that the subject matter of this

23  e-mail is essentially preparation for the SMS meeting?

24  A.  Yes.  Well, it appears like we're planning to get together

25  before the meeting, yes.

Robert Bryant - Cross

1   Q.   And Mr. Austin is not on that e-mail either, correct?

2   A.   That's correct.

3        MR. FELDBERG:   We offer H-911, Your Honor.

4        THE COURT:   Any objection to the admission of H-911?

5        MS. CALL:   Hearsay.

6        THE COURT:   Response?

7        MR. FELDBERG:   Effect on the listener, Your Honor.

8        THE COURT:   The objection will be sustained.  You can

9   lay foundation as to effect if you would like.

10  BY MR. FELDBERG:

11  Q.   Did you rely on this e-mail to help you prepare for the

12  meeting at SMS, Mr. Bryant?

13  A.   It looks like we were using it to schedule time.

14       MR. FELDBERG:   We offer it, Your Honor.

15       THE COURT:   Any objection to H-911?

16       MS. CALL:   Same objection, hearsay.

17       THE COURT:   I will admit H-911, but, Ladies and

18  Gentlemen, the statements of a Mr. Higdem and also Mr. Gay are

19  admitted not for the truth of the matters asserted, but rather

20  only for the effect that they would have on Mr. Bryant, all

21  right?

22  BY MR. FELDBERG:

23  Q.   And, Mr. Bryant, at the last hearing, the prior hearing

24  when you were also testifying under oath, you acknowledged that

25  you weren't sure that Mr. Austin was at the SMS meeting,

Robert Bryant - Cross

1   correct?

2   A.  I don't recall which meeting he was at.  I just recall that

3   conversation.

4   Q.  Mr. Bryant, the question is, you admitted at the prior

5   hearing when you were under oath that you weren't sure that

6   Mr. Austin was even at the SMS hearing; is that correct?

7   A.  That's correct.

8   Q.  So yesterday you testified that the meeting that you say

9   Mr. McGuire gave this direction to Mr. Austin happened at

10  Church's.  Do you recall that?

11  A.  I believe I said I wasn't sure if it was at Church's or

12  Popeye's.

13  Q.  Well, we established it wasn't at Popeye's.  And yesterday

14  you said it was at Church's, correct?

15  A.  No.  Once again, I believe I said that I wasn't sure which

16  meeting it was at.

17  Q.  Now we've seen it wasn't at Popeye's because Mr. Austin

18  wasn't at the Popeye's meeting.  Now let's talk about Church's.

19  Before yesterday, did you ever tell anybody that this meeting

20  was at Church's?

21  A.  I believe I did, yes.

22  Q.  Who did you tell?

23  A.  The Department of Justice.

24  Q.  And when did you tell them that?

25  A.  Maybe in one of our first meetings, I am not sure.

Robert Bryant - Cross

1    *Q.*  One of your first meetings, back in 2021?

2    *A.*  I believe so, yes.

3    *Q.*  Well, we'll take a look.

4         But have you seen any documents or calendar invites or

5    e-mails referring to a meeting between Pilgrim's and Church's

6    in July of 2014?

7    *A.*  No.

8    *Q.*  Either have we, and we've looked.  There was a meeting

9    between Pilgrim's and Church's in August of 2014, correct?

10        *MS. CALL:*  Your Honor, objection to counsel continuing

11   to object -- state facts of his own investigation that just

12   aren't in evidence.

13        *THE COURT:*  The last question was fine.  The

14   statements before that, though, should be avoided.

15   *BY MR. FELDBERG:*

16   *Q.*  There was a meeting, Mr. Bryant, between Pilgrim's and

17   Church's in August of 2014, correct?

18   *A.*  I don't recall.

19   *Q.*  And you know that, do you not, because you were sent an

20   e-mail about preparation for that initial meeting with Church's

21   which -- scheduled to take place in August of 2014, correct?

22   *A.*  Like I said, I don't remember that.

23        *MR. FELDBERG:*  Could we call up, not for the jury,

24   please, Exhibit J-018.

25   *BY MR. FELDBERG:*

Robert Bryant - Cross

1   Q.  Now, do you see Exhibit J-018, Mr. Bryant?

2   A.  I do.

3   Q.  Does this refresh your recollection that you were included

4   in a discussion in August of 2014 for a preplanning call for

5   Church's?

6   A.  That's what it says, but I don't know what we were

7   preplanning about.

8   Q.  But you received this e-mail.

9   A.  Yes, I received this e-mail.

10  Q.  And you relied on it in the ordinary course of your

11  business and your work, correct?

12  A.  Yes.  I just don't have any recollection about the purpose

13  of this meeting.

14  Q.  Fair enough.

15          MR. FELDBERG:  We offer J-018, Your Honor.

16          THE COURT:  Any objection to the admission of J-018?

17          MS. CALL:  No objection.

18          THE COURT:  J-018 will be admitted.

19          MR. FELDBERG:  And could we call up, please, not for

20  the jury -- may we publish J-018, Your Honor?

21          THE COURT:  Yes.

22          MR. FELDBERG:  And may we call up, not for the jury,

23  Defense Exhibit J-019?

24  BY MR. FELDBERG:

25  Q.  You see J-019, Mr. Bryant?

Robert Bryant - Cross

1   A.  I do.

2   Q.  Does that help you remember that the initial meeting with

3   Church's in 2014 was on August 22nd, 2014?

4   A.  No, it does not.  This looks like a top-to-top meeting that

5   happened periodically.  I wasn't included in this, but I see

6   that Bill Lovette, Jayson Penn, and Jason McGuire were on

7   there, which would have been typical of that type of meeting.

8   Q.  And Jason McGuire was on there, correct?

9   A.  Correct.

10  Q.  And that meeting was scheduled for August 22nd, 2014,

11  correct?

12  A.  Yes.

13  Q.  And you weren't at the meeting on August 22nd, 2014, were

14  you?

15  A.  No.  It looks like this was in our Greeley corporate

16  office.

17  Q.  And Mr. Austin was not at the meeting with Church's on

18  August 22nd, 2014, correct?

19  A.  That's correct.

20  Q.  Because both you and Mr. Austin were meeting with RSCS in

21  Kentucky on August 22nd, 2014, correct?

22  A.  I do believe that's correct, yes.

23  Q.  You testified yesterday under Ms. Call's examination that

24  the suppliers did not undercut each other, correct?

25  A.  That's correct.

Robert Bryant - Cross

1    Q.  You testified that they didn't take volume from each other,

2    correct?

3    A.  That's correct.

4    Q.  But you testified at a prior hearing also under oath that

5    Pilgrim's lost KFC volume, correct?

6    A.  I believe if you're referring to 2014, I believe I said I

7    didn't remember losing that volume.  I thought it was due to

8    store closings.

9    Q.  Well, let's -- the contracts between Pilgrim's and RSCS

10   contain volume information, do they not?

11   A.  They do.

12   Q.  And you are familiar with those contracts.

13   A.  I believe they do, yes.

14   Q.  And as national sales representative, you are familiar with

15   the contracts between Pilgrim's and KFC, correct?

16   A.  Somewhat, yes.

17   Q.  I said KFC; it's really RSCS.  But RSCS and KFC are

18   essentially synonymous for this purpose?

19   A.  Yes.  We use those terms interchangeably.

20   Q.  So let's take a look at Exhibit 1729.

21        MR. FELDBERG:  Which, Your Honor, I believe is in

22   evidence.

23        THE COURT:  It is.

24   BY MR. FELDBERG:

25   Q.  Mr. Bryant, Exhibit 1729 is the contract between Pilgrim's

Robert Bryant - Cross

1    and RSCS for the period -- for 2014, correct?

2          THE COURT:  Would you like that displayed to the jury,

3    Mr. Feldberg?

4          MR. FELDBERG:  I would, Your Honor, thank you.

5          THE COURT:  All right.  We can display that.

6    A.  Yes, it looks like it is.

7    BY MR. FELDBERG:

8    Q.  And if we scroll ahead to the page that's headed Exhibit 6,

9    and it ends in the Bates No. 1565 -- could we do that -- that

10   shows the estimated volume per week for the 2014 year of sales

11   from Pilgrim's to KFC, correct?

12   A.  That's correct.

13   Q.  And that number is 2,670,435 pounds, right?

14   A.  2.6 million.

15   Q.  Close enough?

16   A.  2006 is -- 2.6 million.

17   Q.  Okay.  Let's look at the contract for 2015.

18         MR. FELDBERG:  Could we call up, please, Exhibit 1126,

19   which I also believe is in evidence, Your Honor.

20         THE COURT:  Yes, it has been admitted.

21         MR. FELDBERG:  May we publish it?

22         THE COURT:  You may.

23   BY MR. FELDBERG:

24   Q.  Now, Mr. Bryant, this is the contract between Pilgrim's and

25   RSCS for the years 2015 through 2017, correct?

Robert Bryant - Cross

1    A.   Correct.

2    Q.   And as you told us yesterday, it was a three-year contract,

3    correct?

4    A.   That's correct.

5    Q.   And can we scroll ahead to Exhibit 2?  Do you see that?

6    A.   Yes.

7    Q.   And what is the weekly volume commitment?

8    A.   2.6 million -- I am sorry, 2.1 million.  Sorry.

9    Q.   It's more than 500,000 pounds a week less than the prior

10   year's contract, correct?

11   A.   That's correct.

12   Q.   And that volume went to other companies, correct?

13   A.   My assumption, or their demand fell that much, I am not

14   sure.

15   Q.   Well, it was a three-year contract, but there was

16   adjustments made periodically within the three years, correct?

17   A.   What do you mean by "adjustments"?

18   Q.   Changes in price and volume, correct?

19   A.   I don't know that the volume changed.  I know KFC's volume

20   decreased over that time due to the store closures I mentioned.

21   And, yes, the pricing would have changed based off the corn,

22   soy, and other -- the feed impacts.

23   Q.   When you say "due to store closures," you also include

24   sales by other suppliers which took volume away from Pilgrim's,

25   correct?

2271

Robert Bryant - Cross

1   A.  During that -- the contract term, I am not aware of losing

2   business inside that contract term.  I don't recall that

3   happening.

4   Q.  You don't recall it one way or the other?

5   A.  No.

6   Q.  Okay.

7        MR. FELDBERG:  Let's call up Exhibit E-014, not for

8   the jury at this time.

9   BY MR. FELDBERG:

10  Q.  Do you see Exhibit E-014, sir?

11  A.  It looks like the one we were just looking at.  Is it

12  different?

13  Q.  Well, this was signed in September of 2016, correct?

14  A.  Yes, I see the difference in the signature now.

15  Q.  So is this one of these mid three-year contract

16  adjustments?

17  A.  I don't -- I don't have a memory of this one.

18  Q.  Well, you were familiar -- by 2016, sir, you were -- I

19  think your position was head of pricing for national sales?

20  A.  I was promoted, I believe it was, in 2016, but it could

21  have possibly been after this.  I don't recall the exact date.

22  Q.  But you were certainly familiar, generally speaking, with

23  the contracts between Pilgrim's and RSCS.

24  A.  Yes.

25        MR. FELDBERG:  Your Honor, we are going to offer

2272
Robert Bryant - Cross

1    E-014.  It's not yet in evidence, I don't think, but it's on

2    the stipulation list.

3            THE COURT:  Any objection to the admission of E-014?

4            MS. CALL:  A moment to confirm, Your Honor.

5            THE COURT:  Sure.

6            MS. CALL:  No objection.

7            THE COURT:  That exhibit will be admitted.

8            MR. FELDBERG:  May we publish, Your Honor?

9            THE COURT:  You may.

10           MR. FELDBERG:  Thank you.

11           And could we turn, please, to Exhibit 2 of E-014?

12   BY MR. FELDBERG:

13   Q.  And do you see the volume listed there, sir?

14   A.  I do.

15   Q.  And that's 1.675 pounds per week.

16   A.  1.675 million.

17   Q.  Million, thank you.  50 truckloads?

18   A.  Roughly, yes.

19   Q.  Down from 2.1 million in the contract before, correct?

20   A.  That's correct.

21   Q.  That was 63 truckloads per week?

22   A.  Correct.

23   Q.  And down from 2.6 million in the 2014 contract, correct?

24   A.  That's correct.

25           MR. FELDBERG:  And let's turn to F-796, which, Your

Robert Bryant - Cross

1    Honor, I believe is in evidence.

2              THE COURT:  It is, and you may publish it if you would

3    like.

4              MR. FELDBERG:  Thank you, Your Honor.

5    BY MR. FELDBERG:

6    Q.   The first page, Mr. Bryant, of F-796 is a contract between

7    Pilgrim's and RSCS for the period May 21, 2017 through

8    December 31, 2017, correct?

9    A.   That's correct.

10   Q.   Another adjustment in the middle of the year -- in the

11   middle of that three-year contract, correct?

12   A.   That's correct.

13   Q.   And this was signed in September of 2017, correct?

14   A.   That's correct.

15   Q.   And if you turn to Exhibit 7, if we could do that, it's on

16   page 17, that gives a volume of 1.675 million pounds per week,

17   50 truckloads, correct?

18   A.   That's correct.

19   Q.   And that's the same as the prior contract we looked at

20   which was also signed in September of 2017, correct?

21   A.   '16.

22   Q.   '16.  So the volume stayed the same from September '16 to

23   September '17.  But let's turn to page 18.

24              This is the contract for the period January 1, 2018

25   through the end of 2020, correct?

Robert Bryant - Cross

1    A.   That's correct.

2    Q.   And the volume there is 1.34 million pounds per week,

3    correct?

4    A.   That's correct.

5    Q.   40 truckloads, correct?

6    A.   Correct.

7    Q.   So from 2014 to 2018, the weekly volume went from

8    2.6 million pounds a week to 1.3 million pounds per week?

9    A.   That's correct.

10   Q.   Pilgrim's lost half of its volume for KFC.

11   A.   That's correct.

12   Q.   And by the way, while we are looking at this exhibit,

13   F-796, could we turn to page 5?  And page 5 shows, does it not,

14   the FOB cost for the proposed 2018 contract?  Correct?

15   A.   Is this for 2018, because in 2017, I remember we offered

16   some pricing concession.

17   Q.   This is for the 2018 contract, sir, and the FOB cost is

18   .9621, correct?

19   A.   That's correct.

20   Q.   And do you recall from Government Exhibit 1826 that

21   Pilgrim's first round bid was .9849?

22   A.   I believe that's correct, yes.

23   Q.   So between the first round bid in February of 2017 and the

24   actual contract price, Pilgrim's reduced its price by about

25   2-1/2 cents per pound.

Robert Bryant - Cross

1   *A.*  That's correct, yeah, about 6 cents in total.

2          *MR. FELDBERG:*  Could we call up, please, not for the

3   jury at this time, Exhibit I-979.

4          And, Your Honor, if I recall correctly, Your Honor has

5   permitted this to be displayed to the jury as a summary

6   exhibit.

7          *THE COURT:*  Let me check.

8          *MR. FELDBERG:*  It's been admitted as a summary

9   exhibit.  I stand corrected.

10         *THE COURT:*  Yes.  It has been admitted.

11         *MR. FELDBERG:*  May we publish it, Your Honor?

12         *THE COURT:*  You may.

13  *BY MR. FELDBERG:*

14  *Q.*  Mr. Bryant, I am showing you Exhibit I-979, which has been

15  admitted into evidence.  Are you aware of the information

16  that's on this chart about volume?

17  *A.*  No.

18  *Q.*  In any of your 25 or so interviews with the prosecutors and

19  the agents in which you said the purpose of what you say was

20  collusive behavior and for the companies not to undercut each

21  other, did anybody on the prosecution side give you this

22  information about volume changes?

23  *A.*  Not that I remember, no.

24         *MR. FELDBERG:*  A moment, Your Honor?

25         *THE COURT:*  Yes.

Robert Bryant - Cross

1          MR. FELDBERG:  Thank you, Mr. Bryant.  I have nothing

2     further.

3          THE COURT:  Thank you, Mr. Feldberg.

4          Mr. Tubach.

5                        **CROSS-EXAMINATION**

6     BY MR. TUBACH:

7     Q.  Good afternoon, Mr. Bryant.  My name is Michael Tubach.  I

8     represent Jayson Penn.  I have some questions for you.

9          Let me start with some easy ones here.  You have no

10    personal knowledge of Jayson Penn agreeing with any competitors

11    to fix prices; is that correct?

12    A.  That's correct.

13    Q.  You have no personal knowledge of Jayson Penn agreeing with

14    any competitor to rig bids; is that correct?

15    A.  That's correct.

16    Q.  You have no personal knowledge of Jayson Penn telling

17    anyone to fix prices or rig bids; is that correct?

18    A.  That's correct.

19    Q.  And you have no personal knowledge of Jayson Penn knowing

20    of anyone rigging bids or fixing prices; is that correct?

21         MS. CALL:  Objection to this line of questioning based

22    on prior ruling.

23         THE COURT:  Overruled.

24    A.  That's correct.

25    BY MR. TUBACH:

Robert Bryant - Cross

1   Q.  Thank you.

2          Now, yesterday you testified about this organizational

3   chart that the government put together.  I believe it's

4   Exhibit 994 -- 9994; is that correct?

5   A.  Yes.

6   Q.  And you testified that that org chart was current as of the

7   beginning of 2014; is that correct?

8   A.  Yes.

9   Q.  I want to show you what we've marked as J-30 for

10  identification.

11         MR. TUBACH:  Could we put up Government Exhibit 9994,

12  please?

13  BY MR. TUBACH:

14  Q.  And 9994 shows that John Curran is the head of retail sales

15  as of the beginning of 2014, correct?

16  A.  That's correct.

17  Q.  And you looked over this chart to make sure it was

18  accurate, right?

19  A.  John Curran was over all of retail.

20  Q.  That wasn't my question, sir.  I asked you whether you

21  looked over this chart to make sure it was accurate.

22  A.  Yes.

23  Q.  Okay.

24         MR. TUBACH:  Might we approach, Your Honor, with

25  Exhibit J-30, please?

Robert Bryant - Cross

1          THE COURT:  You may.

2     BY MR. TUBACH:

3     Q.  Mr. Bryant, why don't you take a look at what is in front

4     of you marked as Government Exhibit J-30.  Tell me when you are

5     done looking at it.

6     A.  Okay.

7     Q.  Do you recognize the document, sir?

8     A.  I do.

9     Q.  What is it?

10    A.  I mean, I am familiar with them, yes.

11    Q.  What is Exhibit J-30, sir?

12    A.  It's the announcement of leadership changes at Pilgrim's.

13    Q.  Okay.  And you received this -- it was sent to all

14    Pilgrim's employees, correct?

15    A.  Normally, yes, I should have been on the distribution.

16    Q.  And you would have gotten this sort of distribution?

17    A.  I should have, yes.

18    Q.  And these are the types of announcements that would be made

19    regularly within Pilgrim's to announce leadership change within

20    the organization?

21    A.  That's correct, yeah.

22         MR. TUBACH:  Your Honor, I would move Exhibit J-30

23    into evidence.

24         THE COURT:  Any objection to the admission of J-030?

25         MS. CALL:  One moment, Your Honor.  I am just trying

2279

Robert Bryant - Cross

1    to read the Bates number.  I am trying to figure out what it

2    is.

3              THE COURT:  Go ahead.

4              MS. CALL:  If I may inquire as to the authenticity,

5    Your Honor.  I don't know if it's just missing from this

6    document, but I am wondering where this came from.

7              MR. TUBACH:  I believe the witness testified it would

8    have been something that would have been sent out in the

9    ordinary course.  I am quite sure there is a document that is

10   easily retrievable from Pilgrim's.

11             MS. CALL:  I believe he said "would have had."  I have

12   never seen this.  I don't know if it was produced by the

13   government in discovery, and I don't know if it was produced --

14             THE COURT:  So what's the objection?

15             MS. CALL:  Authenticity.

16             THE COURT:  Objection will be overruled.  J-030 will

17   be admitted.

18             MR. TUBACH:  Thank you.  May we publish this to the

19   jury, please?

20             THE COURT:  You may.

21   BY MR. TUBACH:

22   Q.  Looking just at the top half just to orient the jury, what

23   the document is is basically a company-wide e-mail sent out

24   announcing some leadership changes, correct?

25   A.  Correct.

Robert Bryant - Cross

1    Q.  Good.

2          Now if we could scroll down to the fourth paragraph.

3    We would also like to?  That says:  We would also like to

4    congratulate John Curran on his promotion to head of retail

5    sales for Pilgrim's where he will have responsibility for

6    retail products across both fresh and prepared foods.  In his

7    new role, John will report to Jayson Penn.

8          Do you see that?

9    A.  I do.

10   Q.  What's the date of this announcement?

11   A.  It was March 2nd of 2015.

12   Q.  So as of the beginning of 2014, John Curran was not the

13   head of retail sales in FFS, was he?

14   A.  In Pilgrim's, a lot of times you do the position before you

15   actually get the promotion, so there may have been some other

16   direct reports to Jayson as part of retail, but John would have

17   been the one that we looked at at retail.

18   Q.  Sir, my question is a very simple one.  Chart 9994 says

19   John Curran is the head of retail channel for fresh food as of

20   January 2014.  That's wrong, isn't it?

21   A.  I mean, according to this, yes.

22          MR. TUBACH:  Now, 9994, if we could put that back up,

23   please.

24   BY MR. TUBACH:

25   Q.  9994 is really a tiny slice of Pilgrim's, isn't it?

Robert Bryant - Cross

1    A.   A very tiny slice.

2    Q.   Because it has only some of the sales employees for one

3    business unit, right, fresh food service?

4    A.   That's correct.  Basically, all it is --

5    Q.   That was my only question, Mr. Bryant.  It's just a very

6    small subset of sales employees for just the fresh food service

7    business unit, correct?

8    A.   That's correct.

9    Q.   Now, fresh food service also has a whole operations side;

10   is that right?

11   A.   That's correct.

12   Q.   That's not on here anywhere, right?

13   A.   That's correct.

14   Q.   And fresh food service is only one of six business units

15   within Pilgrim's; is that correct?

16   A.   Yeah, that's correct.  I generally say it's five, but I

17   usually forget about protein conversion.  But, yes, there are

18   several other business units.

19   Q.   Let's go through them.  There is fresh food service, right?

20   A.   Fresh food service, prepared foods, big bird, small bird

21   debone, case ready, and then protein conversion.

22   Q.   Right.  And commercial was actually divided, big bird was

23   divided between east and west, correct?

24   A.   Yes, but it was still one business unit, or one head is the

25   way I recall it, yes.

Robert Bryant - Cross

1    *Q.* None of that is represented on this chart, right?

2    *A.* That's correct.

3    *Q.* And so would you agree with me that Mr. Penn rather than

4    having four direct reports as reflected on 9994 had more like

5    22 direct reports?

6    *A.* Yes. And I believe I did say that yesterday, that Mr. Penn

7    had a lot of direct reports that aren't on here.

8         *MR. TUBACH:* Thank you. We can take that down.

9    *BY MR. TUBACH:*

10   *Q.* Now, all of your working for Pilgrim's, you never reported

11   directly to Jayson Penn, did you?

12   *A.* No.

13   *Q.* There was always at least one layer between you and

14   Mr. Penn, correct?

15   *A.* That's correct.

16   *Q.* You also talked, it was yesterday, about these sales

17   meetings, perhaps it was this morning, these sales meetings

18   that you attended monthly within Pilgrim's, correct?

19   *A.* That's correct.

20   *Q.* Now, you attended those meetings often or sometimes?

21   *A.* At the beginning, you know, after the promotion in 2010, I

22   did not. I believe I started attending those meetings in 2015.

23   I may have attended some in 2014. I was at the -- the

24   corporate office periodically.

25   *Q.* But you did not attend those meetings regularly until 2015

2283

Robert Bryant - Cross

1   is what you are saying?

2   A.   That's correct.  I don't recall exact date.  I just

3   remember when Tim Stiller was promoted, that shortly after that

4   he asked me to start attending those meetings.

5   Q.   Understood.  I am not interested in the long history.  Just

6   2015 is when you first started attending --

7   A.   The fall of 2014 or sometime in 2015.

8   Q.   To be clear, these sales meetings were not one-on-one

9   meetings between you and anybody, right?

10  A.   That is correct.

11  Q.   There was -- it was a big room?

12  A.   There was probably 20 to 30 people in the room, and each

13  business unit took a turn.

14  Q.   And so 20 or 30 people in a large room and different

15  business units, sales folks took turns reporting on what was

16  happening within their business unit, correct?

17  A.   That's correct.

18  Q.   So this wasn't a sort of one-on-one meeting you had with

19  Mr. Penn ever, correct?

20  A.   That's correct.  I hope -- I wasn't trying to convey that.

21  Q.   That's fine, thank you.

22       Now, you mentioned this meeting in -- I want to change

23  subjects again.  You mentioned this meeting in -- might have

24  been July of 2014, first it was Popeye's, maybe it was

25  Church's, maybe it was something else, but let me be very clear

Robert Bryant - Cross

1    about that.  That meeting, whatever it was, had nothing to do

2    with Jayson Penn, right?

3    A.  That's correct.

4    Q.  He wasn't at that meeting?

5    A.  No.

6    Q.  He wasn't dialed into the conference call in some way?

7    A.  No.

8    Q.  You also testified about US Foods, and we will call it a

9    side hustle you had about trying to get the boneless price up

10   to Mar-Jac with US Foods, correct?

11   A.  That's correct.

12   Q.  And, again, Mr. Penn had nothing to do with that, right?

13   A.  That's correct.

14   Q.  You testified earlier today that you did not even tell

15   Eric Oare about that; is that right?

16   A.  That's correct.

17   Q.  You certainly didn't tell Brenda Ray about it either,

18   right?

19   A.  That's correct.

20   Q.  And you didn't tell Jayson Penn.

21   A.  That's correct.

22   Q.  Now, let's take a look at Government Exhibit 9140, if we

23   could.  You were shown that exhibit earlier today, correct?

24   A.  That's correct.

25        MR. TUBACH:  If we could blow up that top part.

Robert Bryant - Cross

1    *BY MR. TUBACH:*

2    *Q.*  Exhibit 9140, the title of the document --

3         *MR. TUBACH:*  Could we publish this to the jury, Your

4    Honor?  I believe this is in evidence.

5         *THE COURT:*  Let me just check.

6         You may.

7         *MR. TUBACH:*  Thank you.

8    *BY MR. TUBACH:*

9    *Q.*  Exhibit 9140 is an e-mail exchange between you and

10   Tim Stiller, correct?

11   *A.*  That's correct.

12   *Q.*  And even though the e-mail itself is talking about Sysco,

13   it was your testimony today that, in fact, this reference to

14   feedback from Mar-Jac related to US Foods; is that right?

15   *A.*  That's correct.

16   *Q.*  There is nothing on this document that says anything like

17   that, right?

18   *A.*  That's correct.

19   *Q.*  And your testimony in a prior proceeding was that this

20   exhibit was when you first got feedback from Scott Tucker about

21   his conversation with Mar-Jac and trying to get the prices up,

22   right?

23   *A.*  I don't recall.

24   *Q.*  Were you asked the following question and gave the

25   following answer on November 2, 2021:

Robert Bryant - Cross

1          Question -- this is, for the record, page 1062 to 1063

2     of the transcript.

3          When you testified earlier about what that feedback

4     meant on Government Exhibit 9140, what you said was the

5     feedback that I got from Scott Tucker from Mar-Jac is that they

6     agreed to raise prices similar to ours.  However, they wanted

7     to wait a couple weeks to submit those price increases so there

8     would be the appearance that we were not working together,

9     right?

10         Answer:  That sounds accurate.

11         Question:  That's the feedback you are talking about

12    on Exhibit 9140?

13         Answer:  Yeah.

14    A.  Okay.

15    Q.  So that's your testimony in November, correct?

16    A.  Okay.

17    Q.  So that's the first time that Scott Tucker is reporting

18    back to you about the supposed conversation with Mar-Jac,

19    right?

20    A.  Scott Tucker --

21    Q.  It was a very simple yes-or-no question.  Was that your

22    testimony in November of 2021 that that's what Scott Tucker was

23    reporting back to you?

24    A.  I believe it was.

25    Q.  The whole idea, then, was for Mar-Jac supposedly to wait

Robert Bryant - Cross

1   two weeks to increase its pricing so it would not look like

2   they were similar, correct?

3   A.   That was the plan.

4   Q.   Good.

5   A.   Two or three weeks, I don't recall the exact time frame,

6   but, yes, they wanted to wait a few weeks.

7   Q.   Two weeks is what you said in November.

8   A.   Okay.

9   Q.   Let's look at 9139.

10        MR. TUBACH:   And I believe that's in evidence also,

11  Your Honor.

12            THE COURT:   It is.

13        MR. TUBACH:   Publish that to the jury, please?

14            THE COURT:   It may be.

15  BY MR. TUBACH:

16  Q.   Now, this e-mail, 9139, is exactly 29 seconds after the

17  e-mail you sent at 9140; is that right?

18  A.   That's correct.

19  Q.   And Exhibit 9139, you are already reporting back to

20  Tim Stiller that Mar-Jac has already gotten feedback on the

21  boneless, right?

22  A.   That's correct.

23  Q.   Because the "they" in 9130 in that top sentence refers to

24  US Foods, correct?

25  A.   That's correct.

Robert Bryant - Cross

1    Q.  You are not saying that those two weeks went by in 29

2    seconds, did you?

3    A.  No, I'm not.

4    Q.  Okay.  Let's move on to the 2015 contract for KFC.

5           Is your testimony that the three-year contract that

6    was signed in 2014 for the 2015, '16, and '17, that you

7    thought -- you didn't know whose idea that was?  Right?

8    A.  I don't understand the question.

9    Q.  Do you recall whose idea it was to have a three-year

10   contract?

11   A.  I'm not sure.  I thought it was Pilgrim's idea.  I don't

12   know if KFC or RSCS wanted that as well.  I don't recall

13   exactly.  I thought at the time it was our, when I say "our,"

14   Pilgrim's position that they wanted a longer-term deal.

15   Q.  And you do know based on having worked there at Pilgrim's

16   for a while, you knew that this was the first time that KFC

17   contract ever had been for three years, right?

18   A.  That's what I remember, yes.

19   Q.  They were all annual contracts before then.

20   A.  They were, yes.

21   Q.  Okay.  Now, take a look at Exhibit 1919, which I believe is

22   the first -- I would like to look at the first page.  These are

23   these two pages of notes that you took.

24   A.  That's correct.

25           MR. TUBACH:  I would like to publish this to the jury

Robert Bryant - Cross

1  if I can.

2         *THE COURT:*  You can.

3  *BY MR. TUBACH:*

4  Q.  Now, this --

5         *MR. TUBACH:*  If we could blow up the first third of

6  that to make it a little easier to read.  Thank you.

7  *BY MR. TUBACH:*

8  Q.  These are your handwritten notes, right?

9  A.  That's correct.

10  Q.  And you took these notes on January 27, 2017, at the

11  meeting with KFC, right?

12  A.  That's correct.

13  Q.  And it says four lines down there, two- to three-year

14  contract, right?

15  A.  That's correct.

16  Q.  And that's what they were telling you, right?

17  A.  In this meeting.  What I recall is we had a conversation

18  about what their idea was -- what their position was on

19  contract length, and, yes, this is what they said they were

20  still looking for, a two- to three-year deal.

21  Q.  And that's because they wanted a two- to three-year deal in

22  the prior time too, right?

23  A.  I don't know.

24  Q.  Well, do you know that the supply was super tight in 2014?

25  A.  Yes.

Robert Bryant - Cross

1          MR. TUBACH:  We can take this down, thank you.

2     BY MR. TUBACH:

3     Q.  And that's why KFC was desperate to lock up supply for the

4     following three years, weren't they?

5     A.  I don't know.  I don't know that.

6     Q.  You weren't in the loop on that?

7     A.  No.

8     Q.  Okay.  Did you know that RSCS asked its suppliers prior to

9     even the bid submissions what profit margin they needed and how

10    that compared to big-bird profitability?

11    A.  No.

12    Q.  You weren't told that either?

13    A.  No.

14    Q.  Did you know that RSCS hired a consultant named McKinsey to

15    help them evaluate the small-bird business?

16    A.  No.

17    Q.  Did you know that Pilgrim's put together a contingent of

18    people to go down to Louisville in June of 2014 to make a big

19    presentation about the small-bird business at McKinsey's and

20    RSCS's request?

21    A.  No.

22    Q.  Let me show you what's been marked as D-445 for

23    identification.

24         MR. TUBACH:  I believe I have multiple copies, Your

25    Honor, but right now I only have one.  This is D-445.  Counsel

Robert Bryant - Cross

1    has seen this previously.  We will try and locate another copy.

2          If I may approach the witness, Your Honor, through

3    Ms. Grimm?

4          *THE COURT:*  Yeah, Ms. Grimm will hand it up -- or to

5    him, rather.

6    *BY MR. TUBACH:*

7    *Q.*  Mr. Bryant, why don't you take a look at Exhibit D-445.  Do

8    you recognize this document, sir?

9    *A.*  No.

10   *Q.*  You have never seen this before, have you?

11   *A.*  Not that I can recall, no.

12   *Q.*  It's a June 2014 presentation to KFC about 120 or so odd

13   pages?

14   *A.*  I don't remember seeing this.

15   *Q.*  You weren't invited to this meeting in June of 2014, right?

16   *A.*  Not that I remember, no.

17   *Q.*  Thank you.  You can put that aside.

18          Now, you also testified that it was Pilgrim's that

19   wanted to get the KFC deal done first so they could then use

20   that to try to leverage other negotiations.  Did you remember

21   that testimony?

22   *A.*  Yes.

23   *Q.*  Do you have any idea about whose idea it was to negotiate

24   when the negotiations took place?

25   *A.*  No.  That, what's called strategy, I learned of that

Robert Bryant - Cross

1    through Jason McGuire.

2    Q.  Well, that wasn't my question, though.  Who decided when

3    the bid submissions would be due?

4    A.  The bid submission, that would have been KFC would have set

5    that time.

6    Q.  That wasn't Pilgrim's, right?

7    A.  That's correct.

8    Q.  And, in fact, the negotiations in 2014 were a lot earlier

9    in the year than they had been in prior years.  Do you know

10   that?

11   A.  I don't recall that.

12   Q.  So you don't know that either.  You have no idea whether it

13   was KFC's idea because they are so desperate to get supply to

14   try to do those negotiations earlier to lock up the supply and

15   beat out their competitors like Popeye's and others.

16   A.  I don't know that.

17   Q.  And you have no evidence at all that this idea of locking

18   up supply -- finishing up the contract with KFC first had

19   anything to do with any other suppliers, correct?

20   A.  That's correct.

21   Q.  Now, you testified about a couple meetings at KFC in 2014.

22   The first was on August 1st, 2014.  Do you recall that?

23   A.  I do.

24   Q.  That was a meeting that you attended along with some other

25   folks at KFC, correct -- sorry, other folks from Pilgrim's,

Robert Bryant - Cross

1   correct?

2   A.  Pilgrim's and KFC, yes.

3   Q.  And you -- Mr. Penn was not at that meeting, right?

4   A.  I don't recall him attending, no.

5   Q.  He didn't attend the pre-meeting?

6   A.  Not that I recall.

7   Q.  Didn't attend the meeting with KFC itself?

8   A.  Not that I recall, no.

9   Q.  Didn't attend any post-meeting if there was one, right?

10  A.  That's correct.

11  Q.  Now, in that August 1st meeting, you showed a presentation

12  to KFC to try to explain the small-bird market, right?

13  A.  That's correct.

14  Q.  Why don't we take a look at Government's Exhibit 1055.

15          MR. TUBACH:  I believe it's in evidence, Your Honor,

16  and I would ask to publish it to the jury.

17          THE COURT:  You may.

18  BY MR. TUBACH:

19  Q.  Again, just to orient us here, Exhibit 1055 that's on the

20  screen is the presentation that you and the folks listed on

21  page 2, if we can scroll to page 2, made to RSCS during that

22  August 1, 2014 meeting, correct?

23  A.  Correct.

24  Q.  And you said that you were responsible -- let me start

25  over.  You said there were only two points that Pilgrim's

2294

Robert Bryant - Cross

1    wanted to get across in that meeting, right?

2    A.  That's correct.

3    Q.  The first was that supply of small birds was tight, right?

4    A.  Correct.

5    Q.  And that's absolutely true, wasn't it?

6    A.  That's correct.

7    Q.  100 percent accurate, right?

8    A.  That's correct.

9    Q.  The second point you want to get across is that big birds

10   were more profitable than small birds, right?

11   A.  That's correct.

12   Q.  And that was 100 percent true too, wasn't it?

13   A.  That was my understanding, yes.

14   Q.  Not your understanding.  You were in the business.  You

15   knew it was more profitable.

16   A.  I wasn't in that business unit, so in the big-bird business

17   unit, what I mean, so just going off -- excuse me -- AgriStat

18   data, so I don't know if those business units would have

19   changed is what I mean by that.  But at the time we did the

20   presentation, yes, I believed that information to be accurate.

21   Q.  And you have no reason to believe even now it's inaccurate,

22   right?  Big birds were more profitable than small birds in

23   2014, correct?

24   A.  Yes, in 2014.

25   Q.  Now, you testified also that you were responsible for

Robert Bryant - Cross

1    preparing or talking about the third page of this presentation,

2    correct?

3    A.  The one with the bar charts, that's correct.

4    Q.  The one that's in front of you right now, correct?

5    A.  Yeah.

6    Q.  I believe you described it as a little messy or busy,

7    right?

8    A.  Yes, because it had a transition in there, so when you look

9    at it like this, you can't see that transition.

10   Q.  Well, Mr. Bryant, we are in luck.  We have that transition

11   for you.

12        MR. TUBACH:  If we could pull that up, please,

13   Mr. Brian.

14   BY MR. TUBACH:

15   Q.  Now, before we do the transition, what this chart was

16   supposed to demonstrate was that the bell curve of chicken was

17   shifting to the right, right?

18   A.  Yeah.  It was two things, yes.  It was shifting to the

19   right because the industry in total was adjusting to the demand

20   in the deli, and by doing so, that there was actually a

21   contraction in the size of the birds that KFC was buying.

22   Q.  Right.

23   A.  And there was actually fewer birds in that category.

24   Q.  Because when you shift that bell curve to the right, what

25   you are doing is you are increasing the higher weight birds and

2296
Robert Bryant - Cross

1  reducing the lower weight birds, right?

2  A.  80 percent of your birds fall within a half pound range

3  north or south of your midpoint.

4  Q.  So now let's do that transition so we can see that.

5       MS. CALL:  Just for the record, is there an exhibit

6  number for this?

7       MR. TUBACH:  I guess we can mark it separately, Your

8  Honor.

9       THE COURT:  It needs to be, because 1055 is just a PDF

10  version.  So if this is the actual PowerPoint, we should

11  separately mark it.

12       MR. TUBACH:  I apologize.  That's exactly right.  Why

13  don't we mark this as 1055-1, or we can mark it as a completely

14  new one.

15       THE COURT:  Any problem with that, Ms. Call?

16       MS. CALL:  Yes, Your Honor.  It doesn't even have the

17  same information as 1055, so I don't know that it's the same

18  thing.

19       THE COURT:  Do you want to use a J number for it or

20  something?

21       MR. TUBACH:  It's already marked as J-27.  I didn't

22  realize that.

23       THE COURT:  Any objection?  Ms. Call, do you need

24  to -- let me just ask you, first of all, any objection to the

25  admission of J-27?

Robert Bryant - Cross

1          MS. CALL:  I would like an opportunity to review a

2     copy.

3          THE COURT:  Let us just have displayed for Ms. Call's

4     purposes how the transitions proceed, if you don't mind.

5          MS. CALL:  Is it one slide?

6          MR. TUBACH:  We just did the transition.  We will do

7     it again.  It goes fast.

8          MS. CALL:  If I may inquire, is this a one-page

9     document with the transition, or is there more behind it?

10          MR. TUBACH:  It's just a PowerPoint that has two

11     slides to it, and there is a transition to it.

12          MS. CALL:  Authenticity.  There is no customer name in

13     here.  I don't know what this is presented for.

14          THE COURT:  I can't remember if Mr. Bryant has

15     identified it, but if you can ask that question.

16     BY MR. TUBACH:

17     Q.  Mr. Bryant, you recognize this transition set of slides I

18     just showed you, right?

19     A.  Yeah.  It looks similar to the one that we prepared.  The

20     only thing I see missing is we did highlight the drop in the

21     sizes that -- the percentage of availability drop in the sizes

22     that KFC purchased.

23     Q.  And that's because -- this is a slide presentation that you

24     created?

25     A.  I think this was -- we probably added that in the actual

Robert Bryant - Cross

1    PowerPoint.  I don't recall, but, yes, this is basically the

2    information we were presenting.

3    Q.  And you created this, right?

4    A.  With some help.  I am not that creative.

5    Q.  And the whole point of this, again, was to show that --

6    this whole thing was to show that the size of the birds was

7    increasing, right?

8    A.  It was to illustrate three points:  First of all, that the

9    bell curve was shifting to the right, which meant that there

10   was fewer birds available in that size; and that there were

11   overall in numbers fewer birds in the category; and that --

12   specifically that the sizes that KFC purchased in shown a

13   substantial drop.

14   Q.  Thank you.

15          MR. TUBACH:  I move the admission of J-27.

16          THE COURT:  Any objection to the admission of J-027?

17          MS. CALL:  I would request voir dire, Your Honor.  I

18   can't tell if this is a demonstrative that defense counsel have

19   created or if this is actually a document that comes from any

20   source.

21          MR. TUBACH:  Your Honor, the witness testified that he

22   helped create it.

23          THE COURT:  Yeah.

24          MR. TUBACH:  I will represent to the Court we

25   certainly didn't create this.

Robert Bryant - Cross

1      THE COURT:  The witness has identified it already.

2  Any other objections?

3      MS. CALL:  No, Your Honor.

4      THE COURT:  All right.  J-027 will be admitted, and

5  it's a PowerPoint.

6      MR. TUBACH:  Thank you, Your Honor.  If we could

7  display that to the jury, please.

8      THE COURT:  You may.

9      MR. TUBACH:  Mr. Brian, if you could show them this

10 transition that occurs between slide 1 and slide 2.  And maybe

11 do that one more time just so they can see it.  Thank you very

12 much.

13 BY MR. TUBACH:

14 Q.  Mr. Bryant, you testified in response to questions from

15 Mr. Feldberg that -- remember, you went through all those

16 questions about how the volume kept dropping --

17 A.  That's correct.

18 Q.  -- to KFC from Pilgrim's?

19 A.  That's correct, yes.

20 Q.  From 2014 to 2015, the volume dropped just for chicken on

21 the bone over 20 percent, right?

22 A.  How much?  I am sorry.

23 Q.  Over 20 percent, right?

24 A.  I didn't do the math.

25 Q.  Well, 2.6 million down to about 2.1 million, I believe it

Robert Bryant - Cross

1   was 20.97 percent.  We can go back and do the math if you would

2   like.

3   A.  It would be a little over 20, yeah.

4   Q.  Now, you're not suggesting that KFC closed 20 percent of

5   its stores in one year, are you?

6   A.  No.

7   Q.  Okay.  So some of that business went to other suppliers,

8   right?

9   A.  That would be correct.

10   Q.  Okay.  And we were only talking about the chicken on the

11   bone, the eight-piece chicken on the bone when Mr. Feldberg

12   went through those questions about 2.6 million to 2.1 to 1.6,

13   right?

14   A.  That's correct, yes.

15   Q.  And Pilgrim's lost other business, for example, the dark

16   meat, that volume went down also, didn't it?

17   A.  Generally, they were tied to each other, yes.

18   Q.  And, in fact, KFC wasn't the only customer that Pilgrim's

19   lost business to, are they?

20   A.  I am sure we lost -- I know we lost to others based off

21   that chart.  The one that came to mind in 2014 was the Walmart

22   loss.  I did remember that particular loss.

23   Q.  That was a huge loss of business, wasn't it?

24   A.  It was.

25   Q.  850,000 pounds of chicken a week, wasn't it?

Robert Bryant - Cross

1    A.  I believe that's correct.

2    Q.  Okay.  And they also -- Pilgrim's also took a lot of

3    business away from other suppliers, didn't they?

4    A.  That's correct, yes.

5    Q.  And, in fact, they took business away from Tyson to

6    King Soopers, didn't they?

7    A.  We gained a significant amount of Kroger business over the

8    year, yes, over the years, through the years, yes.  I don't

9    recall if -- exactly in 2014 if we picked up King Soopers

10   business, but we gained quite a bit of that Kroger volume from

11   Tyson.

12   Q.  And King Soopers and Kroger are related items?

13   A.  They call them banners, so Kroger owns several different

14   banners.

15   Q.  To be clear, Pilgrim's took business away from Tyson for

16   the customer King Soopers, right?

17   A.  I don't know -- I don't remember that independently.

18   Q.  Do you remember testifying in the prior proceeding, this is

19   page 1077, lines 15 to 17, Question:  Pilgrim's took a lot of

20   business away from other suppliers in relation to King Soopers,

21   right?

22          Answer:  That's correct.

23          Question:  Who did they take that business away from?

24          Answer:  I believe it was Tyson.

25          That was your testimony just four months ago, right?

Robert Bryant - Cross

1  A.  Yes.

2  Q.  And is that correct or not?

3  A.  Can I finish?

4  Q.  I am just asking you if your testimony was correct.

5  A.  When you asked the question just a minute ago, you put a

6  time frame on it, which was 2014.  I do know that we did gain

7  the King Soopers business.  I just didn't recall if that was in

8  2014.

9  Q.  You don't know when it was, but you know that Pilgrim's

10  took business away from Tyson for the King Soopers --

11  A.  Yes, when you put the time frame on there, that's why I

12  was --

13  Q.  Thank you.

14       What about Bob Evans?  Do you remember Pilgrim's

15  taking away 200,000 pounds a week from another supplier to

16  Bob Evans, the customer?

17  A.  No, I don't.  I don't -- I believe we did, but I just don't

18  recall it.

19  Q.  Now, there was a particular strategy that Pilgrim's used to

20  try to take business away from other suppliers when they

21  weren't doing a very good job with their customer, right?

22  A.  There was, yes.

23  Q.  Yeah.  And, in fact, well, what would happen often or at

24  times, a supplier would be unable to fulfill the commitments it

25  had made to one of -- to a customer, right?

Robert Bryant - Cross

1   A.   That's correct.

2   Q.   And so that supplier might come to Pilgrim's and say, Hey,

3   can you cover for me because I can't fulfill my commitment to

4   this customer, right?

5   A.   That's correct.

6   Q.   And Pilgrim's sometimes refused to cover those shorts,

7   right?

8   A.   That's correct.

9   Q.   We heard about covering shorts, right?  When someone is

10  short a load, a truck runs it, maybe you will cover for

11  someone, right?

12  A.   I don't know if we discussed that today.

13  Q.   You are familiar with that, right?

14  A.   Yes, I am very familiar with that.

15  Q.   This is a different issue.  This is a more systemic problem

16  where another supplier has -- cannot fulfill its commitment to

17  a customer, right?

18  A.   That's correct.

19  Q.   And, in fact, that happened while you were at Pilgrim's,

20  right?

21  A.   That's correct.

22  Q.   And Pilgrim's answer to that situation was to say, No,

23  we're not going to cover your shorts, right?

24  A.   Yeah.  We didn't want to be, what I would say, a

25  fair-weather friend.  We'll supply you, but we want to be your

Robert Bryant - Cross

1    permanent supplier.

2    *Q.*  And we want to be your permanent supplier so we are not

3    going to cover, we are not going to be the Band-Aid for another

4    supplier's problem, but we'll take all of the business, right?

5    *A.*  That's correct.

6    *Q.*  Now, Pilgrim's actually had a name for that, didn't they?

7    *A.*  We did.

8    *Q.*  And what was that name, sir?

9    *A.*  Otis.

10   *Q.*  Otis.  What does that mean?

11   *A.*  It was a reference to the town drunk in the Andy Griffith

12   show.

13   *Q.*  And the reason why it was called Otis is because the idea

14   was, if you just kept feeding the drunk beer, he wouldn't ever

15   have to change his ways, right?

16   *A.*  That's correct.

17   *Q.*  So instead what you say is, No juice for you, Otis; you can

18   come to us, and we'll give you all of your needs, right?

19   *A.*  That's correct.

20   *Q.*  You, customer, come to us, right?

21   *A.*  That's correct.  It was -- Otis was technically the

22   customer.

23   *Q.*  And you did that specifically with Tyson, didn't we --

24   didn't Pilgrim's?

25   *A.*  I wouldn't say it was limited to Tyson, but, yes.

2305

Robert Bryant - Cross

1    *Q.* I didn't say it was only Tyson, but we also did it with

2    Tyson, right?

3    *A.* Yes, Tyson was probably the primary target.

4    *Q.* The primary target.  So in that situation, Tyson is the

5    town drunk, right?

6    *A.* Not my interpretation.  I would say that the customer would

7    have been, because the customer was the one coming and asking,

8    so in order to get them to change the business, we wouldn't

9    give them any product.

10   *Q.* Because we are trying to get all of the customer's

11   business, right?

12   *A.* That's correct, split it or a division, or there was some

13   ask to switch volume.

14   *Q.* And this occurred multiple times, right?

15   *A.* That's correct.

16   *Q.* It occurred with Fresh Market?  Do you recall that?

17   *A.* Yes.  I don't recall if they were short.  I don't recall

18   the scenario.

19   *Q.* I can show you the text if you would like to see it.

20   *A.* I am not going to dispute you.  I am just saying that it

21   happened across multiple customers.

22   *Q.* And Fresh Market was one of them?

23   *A.* Possibly.

24   *Q.* And took the business away from Tyson, right?

25   *A.* I remember taking business from Tyson for Fresh Market.

Robert Bryant - Cross

1    *Q.*   H-E-B was another one?

2    *A.*   I don't know that Tyson was a supplier there, but we did

3    take quite a bit of business from others at H-E-B.

4    *Q.*   And H-E-B, in case folks are not familiar, is a supermarket

5    in Texas, right?

6    *A.*   Yes, and I believe they are the largest supermarket chain

7    in Texas.

8    *Q.*   And that was just -- that practice, that Otis principle

9    being sort of hard-nosed about it, telling the customer you're

10   going to feel pain until you come to us, that's just flat out

11   hard-nosed competition, isn't it?

12   *A.*   I would agree, yes.

13   *Q.*   Now, switching topics, there was a time -- your expense

14   reports at some point were going to Mr. Stiller; is that

15   correct?

16   *A.*   From 20 -- whenever he became my boss, yes, he approved my

17   expense reports.

18   *Q.*   At some point, Mr. Stiller got promoted, and your expense

19   reports started going directly to Mr. Penn, didn't they?

20   *A.*   That's correct.

21   *Q.*   And you were warned to be careful about your expense

22   reports because they were going directly to Mr. Penn, weren't

23   you?

24   *A.*   That's correct.

25   *Q.*   And who warned you?

Robert Bryant - Cross

 1   *A.*   Tim Stiller.

 2   *Q.*   And do you recall what your response was when you were

 3   warned?

 4   *A.*   I do.

 5   *Q.*   What was that?

 6   *A.*   I am behaving, LOL.  It was a joke.

 7   *Q.*   But that wasn't your entire response, was it?

 8   *A.*   There may have been more on there.  I think I said, Did the

 9   last two go to Mr. Penn?

10   *Q.*   In other words, I am behaving, LOL, but you also asked,

11   Hey, did the last two reports go to Jayson Penn?

12   *A.*   Yeah, and what I can recall from back then is I had some

13   customer dinners that were quite expensive, and Mr. Penn was

14   known to ask a lot of questions.

15   *Q.*   One last topic here, Mr. Bryant.  We established now

16   through some extensive cross-examination that you lied to the

17   agents in your interviews, correct?

18   *A.*   That's correct.

19   *Q.*   And in this prior proceeding on November 2 of last year,

20   just four months ago, you testified in this court before this

21   judge that you lied on multiple occasions about multiple

22   issues; is that correct?

23   *A.*   That's correct.

24   *Q.*   Now, yesterday you testified that you lied in only one

25   meeting; is that right?

2308

Robert Bryant - Cross

1   *A.*   That's -- that's not correct.  I believe what I said is I

2   recall one instance in particular.

3   *Q.*   You recall one instance in particular.  Your exact quote

4   was "I recall one" in response to questions from Ms. Call,

5   right?

6   *A.*   I think I -- like I said, I said I recalled.

7   *Q.*   That was your testimony, "I recall one" --

8   *A.*   Yes.

9   *Q.*   -- right?

10          Now, did you forget from the four months ago when you

11  knew there were multiple lies and multiple meetings about

12  multiple issues, now you are only recalling one?  Is that what

13  you are telling us?

14  *A.*   No, that's not what I am saying.

15  *Q.*   Okay.  Now, you knew those questions were coming, didn't

16  you?

17  *A.*   What?

18  *Q.*   Those questions about your lies to the agent, you knew

19  those questions would be coming today, didn't you?

20  *A.*   From you, yes.

21  *Q.*   Not from me, from just whoever wanted to ask you questions,

22  right?

23  *A.*   Yes.

24  *Q.*   In fact, the government asked you about them on direct

25  examination, didn't they?

Robert Bryant - Cross

1   A.  They did, yes.

2   Q.  And you already testified about it back in November, hadn't

3   you?

4   A.  I have, yes.

5   Q.  And you met with the government six times after that last

6   proceeding before you testified here today; is that right?

7   A.  I am not sure on the exact number, but, yes.

8   Q.  Does that sound about right?

9   A.  Possibly, yes.

10  Q.  Okay.  And you went over this specific issue with them,

11  didn't you?

12  A.  I believe so, yes.

13  Q.  You rehearsed your testimony with them?

14  A.  We practiced direct, yes.

15  Q.  And you also practiced cross-examination, didn't you?

16  A.  Yes.

17  Q.  And now four months after you remembered multiple meetings

18  where there were multiple lies about multiple issues on

19  multiple occasions, now your testimony is I only recall one; is

20  that right?

21       MS. CALL:  Objection, misstates testimony.  I cannot

22  recall multi --

23       THE COURT:  Overruled --

24       MR. TUBACH:  I am happy to provide the transcript and

25  read it.

Robert Bryant - Cross

1          THE COURT:  The objection has been overruled.

2     BY MR. TUBACH:

3     Q.  Correct?

4     A.  Can you repeat?

5     Q.  And now your testimony is even though you -- four months

6     ago you testified under oath there was multiple occasions,

7     multiple issues, multiple times in which you lied, your

8     testimony yesterday was I only recall one; is that right?

9     A.  I don't believe I said "I only."  I have said I recalled

10    the one, and I am not disputing my prior testimony.

11    Q.  Mr. Bryant, you can't even tell the truth about your lies,

12    can you?

13    A.  Is that a question?

14    Q.  It is.

15    A.  I think I've admitted to the lie.

16    Q.  Which version of the truth is anyone in this room supposed

17    to believe of you, Mr. Bryant?

18    A.  I think there is only one version of the truth.

19          MS. CALL:  Object to 403 and cumulative grounds.

20          THE COURT:  Overruled.

21          MR. TUBACH:  No further questions.  Thank you, Your

22    Honor.

23          THE COURT:  Thank you, Mr. Tubach.

24          Mr. Pollack.

25                         **CROSS-EXAMINATION**

Robert Bryant - Cross

1   *BY MR. POLLACK:*

2   *Q.*  Good afternoon, Mr. Bryant.

3   *A.*  Good afternoon.

4   *Q.*  Mr. Bryant, my name is Barry Pollack, and I represent

5   Ric Blake.

6           Am I correct, Mr. Bryant, you don't really know

7   Mr. Blake?

8   *A.*  No.

9   *Q.*  Not somebody that you had business dealings with?

10  *A.*  No.  I don't know if we've even ever met.

11  *Q.*  Don't know if you have ever even met him?

12  *A.*  Yeah, even in a casual or social event, I don't recall him

13  being there.  He may have, but I don't recall it.

14  *Q.*  I want to follow up on something that Mr. Tubach asked you

15  about briefly, and that is the topic of what have been referred

16  to as covers and shorts.  And you said you are familiar with

17  that?

18  *A.*  That's correct, yes.

19  *Q.*  And the basic idea is that if one supplier of a particular

20  customer is short in their ability to fulfill their commitment

21  for a particular day or a particular week, that another

22  supplier might cover for them, meaning that the one supplier

23  will sell to the other supplier so they can make good on their

24  obligation.

25  *A.*  Yes.  That generally only happened in the QSR group.

Robert Bryant - Cross

1   *Q.*  Correct.  And the QSR group, we are talking about sales to

2   places like KFC, Popeye's, correct?

3   *A.*  Yeah, generally was just the KFC side of the business, yes.

4   *Q.*  Okay.  And so in most instances, you and the other

5   suppliers are competitors with each other.  But on occasion you

6   have a different relationship.  You are selling to them.  They

7   become a customer to you on that occasion.

8   *A.*  That would be correct.

9   *Q.*  And there are times when Pilgrim's is selling to another

10  supplier it's conveying the price that Pilgrim's charges its

11  customer, for example, KFC.

12  *A.*  It would be the per-case price, yes.

13  *Q.*  Well, are there times when Pilgrim's tells the other

14  supplier what it charges its customer to the thousandths of a

15  cent?

16  *A.*  I don't remember that myself.  What I recall is it was X

17  amount of cases at whatever price per case.

18  *Q.*  Mr. Bryant, do you recall giving this testimony at a prior

19  proceeding under oath?

20          Question:  There are times -- and I am sorry, this is

21  transcript cite 1099.

22          There are times that when Pilgrim's is buying from

23  another supplier, that other supplier is conveying to Pilgrim's

24  exactly to the thousandth of a cent what their price is to KFC

25  for, for example, eight-piece chicken on the bone.

Robert Bryant - Cross

1           Answer:  That's correct.

2   *A.*  There could have been times, yes.  I -- like I said, I just

3   don't recall it.  It was more common to get a per-case price.

4   *Q.*  And when Pilgrim's purchased from another supplier in

5   situations where Pilgrim's was the one short, Pilgrim's might

6   learn from that other supplier what that supplier's contracted

7   price was with the customer, correct?

8   *A.*  Not entirely correct.  Like I said, it would be a per-case

9   price.  You need to have both sides of that equation, the

10  per-pound price plus the max billable.

11  *Q.*  Do you recall being asked under oath at a prior proceeding,

12  and this is transcript 1144, saying:  When we purchased from --

13  directly from we'll use Claxton, for instance -- my

14  understanding is Pilgrim's would pay Claxton's contracted

15  price.

16           Do you recall saying that?

17  *A.*  Yes.  When I meant by that "contracted price" would be the

18  per-case price.  They could have shared their price per pound.

19  I have seen it come across different ways.

20  *Q.*  I would like to show you, Mr. Bryant, a redacted version of

21  F-065.  And if you can start at the second and third pages, can

22  you tell me, Mr. Bryant, what are the second and third pages

23  just generally?

24  *A.*  They look like Pilgrim's invoices.

25  *Q.*  And you are familiar with the format of Pilgrim's invoices?

1   *A.*  Yes.

2   *Q.*  And who on this occasion are the Pilgrim's invoices going

3   to?

4   *A.*  George's.

5   *Q.*  So would this be an instance where George's is buying from

6   Pilgrim's?

7   *A.*  Yes.

8   *Q.*  And then if you can go to page 1, do you see that there is

9   an e-mail chain about these invoices, and you're copied on that

10  e-mail chain?

11  *A.*  Yes.

12      *MR. POLLACK:*  Your Honor, I would move to introduce

13  the redacted version of F-065.

14      *THE COURT:*  Any objection to the admission of F-065 as

15  redacted?

16      *MS. CALL:*  No, Your Honor.

17      *THE COURT:*  F-065 as redacted will be admitted.

18      *MR. POLLACK:*  And if I can go to the third page.

19  *BY MR. POLLACK:*

20  *Q.*  And, Mr. Bryant, this is the invoice, an invoice from

21  Pilgrim's to George's, correct?

22  *A.*  That's correct.

23  *Q.*  And in this instance, George's is buying 640 cases of KFC

24  eight-piece product?

25  *A.*  That's correct.

Robert Bryant - Cross

1   Q.  And it gives the total weight, correct?

2   A.  That's correct.

3   Q.  And then it gives a price, correct?

4   A.  Yes, the price per case.

5   Q.  Price per case.  And this is what you were saying before,

6   if all you knew was the price per case, you wouldn't

7   necessarily know that four-decimal-place price per pound,

8   correct?

9   A.  That's correct.

10  Q.  Let's look at the e-mail that appears on page 1 at the

11  bottom.

12          MR. POLLACK:  If you can blow that up.

13          I am sorry, Your Honor, I realize we did not publish

14  this to the jury.  If we can publish it to the jury.

15          THE COURT:  Yes.

16  BY MR. POLLACK:

17  Q.  And there is an e-mail there from Justin Gay to

18  Rhonda Warble.  Do you know who Ms. Warble is?

19  A.  I do not.

20  Q.  You are not familiar with Ms. Warble at George's?

21  A.  I am not.

22  Q.  Let's go back -- I am sorry, Mr. Gay is saying, Rhonda,

23  please send us the purchase order -- purchase order number.

24          Do you see that?

25  A.  I do.

Robert Bryant - Cross

1   Q.  And that would be standard if you were selling to another

2   supplier, they would send you a purchase order, and then you

3   would send them an invoice, right?

4   A.  Well, a PO would come from any customer, not just

5   necessarily a supplier.

6   Q.  But in this case, it was another supplier.

7   A.  Like I said, I don't know who Rhonda Warble is.

8   Q.  Well, the attached invoice is an invoice to George's,

9   right?

10  A.  An invoice wouldn't have been attached to an e-mail.  The

11  invoice would have been generated after the product had

12  shipped.  I am not sure how you are tying the two together.

13  Q.  I see.

14          So in the initial -- let me see if I got the sequence

15  right.  Initially, the customer would provide --

16  A.  I would say that if she did send us a PO number, if that's

17  available, then we could tie this back to the invoice.

18  Q.  Okay.  And it is -- you know who Justin Gay is.

19  A.  Yes.

20  Q.  He is a Pilgrim's employee.

21  A.  That's correct.

22  Q.  And so the customer has to get the information from the

23  Pilgrim's employee to put into the purchase order, correct?

24  A.  That's correct.  They have to know the quantity and the

25  price, yes.

Robert Bryant - Cross

1    *Q.* And here what the Pilgrim's employee is indicating to

2    Ms. Warble is, Send us the purchase order for 640 cases of KFC

3    Purple, correct?

4    *A.* That's correct.

5    *Q.* Let's go to page 3, the invoice.  They are buying 640

6    cases?

7    *A.* That was -- a normal shipment of KFC was 640.

8    *Q.* And Pilgrim's is telling the customer the price per pound,

9    .9689, correct?

10   *A.* Correct.

11   *Q.* And that is at 50.5 -- 50.5 pounds per case.  That's the

12   case weight?

13   *A.* That's correct.

14   *Q.* And so that .9689 would be Pilgrim's current price, what

15   its current contracted price is with its customer, in this case

16   KFC?

17   *A.* That's correct.

18   *Q.* And Pilgrim's is communicating that to Ms. Warble.

19   *A.* That's correct.

20   *Q.* And when we say "current contracted price" -- you've talked

21   a little bit about period prices, correct?

22   *A.* That's correct.

23   *Q.* And after a contract is set, the price varies within the

24   contract term period by period or can vary if there are

25   fluctuations in the grain cost, correct?

2318
Robert Bryant - Cross

1   A.  Correct.

2   Q.  But the price is already set by contract, correct?

3   A.  The base, yes.

4   Q.  There is not a new RFP period, right?

5   A.  That's correct.

6   Q.  And so the period price is just another way of saying the

7   current contract price, correct?

8   A.  Correct.

9        MR. POLLACK:  And if I can show I-975 just to the

10  witness at this point.

11  BY MR. POLLACK:

12  Q.  And, Mr. Bryant, that is a calendar for the year 2019?

13  A.  '13.

14  Q.  I am sorry, 2013.

15        And let's just go back real quick to F-065 because I

16  don't think I asked you this.  What was the date of this

17  transaction to sale of the 640 cases at .9689 a case?

18        MR. POLLACK:  Brian, you can go back to that first

19  page.

20  BY MR. POLLACK:

21  Q.  You can see the date of the e-mail if that's easier.

22  A.  October 3rd of 2013.

23  Q.  Now let's go back to I-975, which is the calendar for 2013,

24  Mr. Bryant?

25  A.  Yes, it is, sorry.  I didn't know that was a question.

2319

Robert Bryant - Cross

1   Q.   And for KFC, periods were four weeks?

2   A.   Believe it or not, I am not familiar with their periods.

3   Q.   Okay.  This calendar has been blocked off into four-week

4   periods?

5   A.   Yes.

6        MR. POLLACK:  Permission to publish I-975 as a

7   demonstrative only.

8        THE COURT:  Any objection to the display of I-975 for

9   demonstrative purposes?

10       MS. CALL:  Just on foundation grounds, I am not sure

11  how it would help this witness because he is not aware of

12  Period 1.

13       THE COURT:  Mr. Pollack?

14       MR. POLLACK:  Your Honor, I am just going to ask him

15  what period October 3rd would have been in.

16       THE COURT:  I am going to sustain the objection.  If

17  he doesn't know the periods, then the question wouldn't have

18  any foundation.

19       MR. POLLACK:  In that case, Your Honor, let me do

20  this.  Let me show 6088, which is already in evidence.

21       THE COURT:  Yes, you may show that.

22  BY MR. POLLACK:

23  Q.  Mr. Bryant, this is an e-mail from Ric Blake to

24  Darrell Keck.  Do you see that?

25  A.  I do.

Robert Bryant - Cross

1   *Q.* Do you know who Mr. Keck was?

2   *A.* I do not.

3        *MR. POLLACK:* And attached to this e-mail was a

4   spreadsheet that is also in evidence, Your Honor, 6089.  And if

5   I can show 6089.

6        *THE COURT:* You may.

7   *BY MR. POLLACK:*

8   *Q.* And there are tabs at the bottom.  Could we go to the tab

9   for KFC 2013?  And do you see a first column GEO?

10  *A.* I do.

11  *Q.* Is there a supplier that begins with GEO?

12  *A.* George's.

13  *Q.* And if we look at Period 10 for KFC 2013, what is the price

14  in the George's column?

15  *A.* .9714.

16  *Q.* Did Pilgrim's charge George's for KFC chicken the same

17  amount that it was charging KFC?

18  *A.* I don't know which column.

19  *Q.* Let's move on, then, and I want to ask you about 2014.  In

20  2014, you were negotiating or Pilgrim's was negotiating for

21  what became the 2015 to 2017 contract?

22  *A.* That's correct.

23  *Q.* And you had indicated earlier that supply was tight,

24  correct?

25  *A.* That's correct.

Robert Bryant - Cross

1   Q.  And that there was high demand for the small bird, correct?

2   A.  I don't know if demand went up or it's because supply went

3   down, but that supply/demand was in effect.

4   Q.  And this was not a secret in the poultry industry, was it?

5   A.  Not that I'm aware of, no.

6   Q.  Okay.  There was enough publicly available data that pretty

7   much everyone in the broiler chicken industry should have known

8   that there were going to be price increases between 2014 and

9   2015.

10  A.  Should have, yes.

11       MR. POLLACK:  Your Honor, if I might just grab

12  something from my table here.

13       THE COURT:  Of course.

14       MR. POLLACK:  If I can go to 1729, which is, I

15  believe, already in evidence.

16       THE COURT:  Yes, it is, and you may display that.

17       MR. POLLACK:  And if we can go to where it says page 2

18  at the bottom with the No. 1559.  You might need to show the

19  top to Mr. Bryant.

20  BY MR. POLLACK:

21  Q.  Mr. Bryant, is this the contract that was in place for the

22  year 2014 for Pilgrim's?

23  A.  I believe so, yes.

24  Q.  And what was the eight-piece COB price for Pilgrim's for

25  the 2014 contract year?

Robert Bryant - Cross

1    A.   It looks like .9250.

2    Q.   And what was the margin or profit for Pilgrim's under the

3    2014 contract year?

4    A.   .1175, 1175 cents.

5    Q.   We can -- if we can go to 1126, also in evidence.   And,

6    Mr. Bryant, is this the Pilgrim's 2015 contract?

7    A.   Yes.

8    Q.   What was the 2015 contract price for Pilgrim's for the

9    eight-piece chicken on the bone?

10   A.   $1.0856.

11   Q.   What was the margin under the 2015 contract?

12   A.   .2175.

13   Q.   And if we can go back now to 1729, the 2014 contract, the

14   page that ends in 1565, what was the volume under the 2014

15   contract for Pilgrim's?   I think it's the next page.

16   A.   I was going to say this is the -- 2.6 million on the

17   eight-piece.

18   Q.   To be precise, 2,670,435?

19   A.   Correct.

20   Q.   If we could go back to 1126, the 2015 Pilgrim's contract,

21   on page 3 that ends in 1580, what is the volume under the 2015

22   contract?

23   A.   2.1.

24   Q.   And to be precise, 2,110,500?

25   A.   Correct.

Robert Bryant - Cross

1            MR. POLLACK:  Your Honor, I would like to publish to

2    the jury as a demonstrative only the first line of J-008.

3            THE COURT:  If we could -- this is a new one; is that

4    correct?  I assume so.

5            MR. POLLACK:  It has not been used previously, that's

6    correct.

7            THE COURT:  I see it now.  Any objection to the

8    displaying of the first line of J-008?

9            MR. POLLACK:  And, Brian, I would be looking for the

10   entire first line.  No, that's not the right document.  Hold on

11   one moment, Your Honor.

12           THE COURT:  Sure.

13           MR. POLLACK:  Maybe we can go to the document viewer,

14   then.

15           THE COURT:  Do you need someone to --

16           MS. JOHNSON:  Your Honor, I believe it now can be

17   digitally displayed.

18           THE COURT:  Okay.  Let's try it.

19           MR. POLLACK:  Okay.  We are looking to just display

20   that first line.

21           THE COURT:  Okay.  And, Ms. Call, any objection to the

22   display of the first line of J-008 for demonstrative purposes

23   only?

24           MS. CALL:  Just if the witness is able to confirm the

25   math that's in here, because I don't believe there is

Robert Bryant - Cross

1    foundation laid.

2         THE COURT:  I think, I am not sure, but -- I am not

3    sure if he was asked about the contract.  Yeah, I think he was

4    asked about --

5         MR. POLLACK:  I asked about every line, Your Honor,

6    except Ms. Call is right, I did not ask him to verify the

7    2,670,435 minus 2,110,500 is a decrease of 559,635, but I can

8    certainly supply him with a calculator.

9         THE COURT:  Actually, I have got a calculator, so we

10   have one available now.  Just in case Mr. Bryant wanted to use

11   it, he could.

12        You can pose that question to him, Mr. Pollack.

13        MR. POLLACK:  May we publish this to the jury, or do I

14   need to do that first?

15        THE COURT:  Let me ask Ms. Call, any objection --

16   other than that math, Ms. Call, any objection to displaying the

17   first line?

18        MS. CALL:  No, Your Honor.  And I will withdraw the

19   objection.  I do have a calculator.

20        THE COURT:  Then, yes, Mr. Pollack, you may display

21   the first line for demonstrative purposes only.

22        MR. POLLACK:  Thank you, Your Honor.

23   BY MR. POLLACK:

24   Q.  So, Mr. Bryant, this shows that Pilgrim's lost

25   559,935 pounds.  Is that a week?

Robert Bryant - Cross

1   A.   That's correct.

2   Q.   Between what they had under the 2014 contract and what they

3   had under the 2015 to 2017 contract; is that correct?

4   A.   That's correct.

5        MR. POLLACK:   This may be easier if I hand up, Your

6   Honor.  I would like to hand to the witness Exhibit 1728 and

7   1119, both of which I believe are in evidence.

8        THE COURT:   You may.

9   BY MR. POLLACK:

10  Q.   So let's start with 1728.

11       MR. POLLACK:   And can we display this to the jury?

12       THE COURT:   Let me just check on 1728.  Yes, it is in,

13  and you may display both of them.

14  BY MR. POLLACK:

15  Q.   And what is the date on Exhibit 1, Mr. Bryant?

16  A.   December 2nd, 2013.

17  Q.   And you know at the end of 2013 suppliers signed their

18  contracts for the 2014 year?

19  A.   Sometime in that fall, yeah, before the beginning of the

20  year.

21  Q.   And this one is signed by Claxton on December 17th, 2013?

22  A.   It appears so, yes.

23  Q.   And signed by Unified Foodservice Purchasing Co-op

24  December 23rd, 2013?

25  A.   Yes.

Robert Bryant - Cross

1  *Q.* And Unified Foodservice Purchasing Co-op or UFPC, that's

2  the same company as RSCS, the buying arm for KFC?

3  *A.* Yes.  They changed their name, I don't remember why, but,

4  yes, they did.

5  *Q.* Okay.  But we are talking about a KFC contract here,

6  correct?

7  *A.* Correct.

8  *Q.* And in 2014, what was Claxton's price per pound for KFC

9  eight-piece COB?  Should be on the page that ends in 0345,

10  page 2, total FOB plant cost.

11  *A.* 9275.

12  *Q.* What was Claxton's margin under the 2014 contract?

13  *A.* .0673.

14  *Q.* Now let's go to 1119.

15       *MR. POLLACK:* And, Your Honor, may we display 1119?

16       *THE COURT:* You may.

17  *BY MR. POLLACK:*

18  *Q.* What was Claxton's total FOB plant cost for the chicken on

19  the bone under the 2015 contract?

20  *A.* 1.0669.

21  *Q.* And what was the margin?  You may need to add two figures

22  together here to get that.

23  *A.* It looks like 1940.

24  *Q.* And under the 2014 contract, 1728, if we can go back to

25  that on page 8, what was the volume for Claxton in 2014?

Robert Bryant - Cross

1   A.  459,040.

2   Q.  If you can go back to the 2015 contract, 1119, what was the

3   volume for Claxton under the 2015 contract?

4   A.  536 -- 536,000.

5        MR. POLLACK:  And if I could now go back to the

6   demonstrative, J-008, and publish for the jury the second line.

7        THE COURT:  Any objection?

8        MS. CALL:  No, Your Honor.

9        THE COURT:  You may do so.  And then after that,

10  Mr. Pollack, we will take a break, if that works for you.

11       MR. POLLACK:  That's fine, Your Honor.  Thank you.

12  BY MR. POLLACK:

13  Q.  So in 2015, Claxton gained almost 77,000 pounds per week

14  over the 2014 contract; is that correct?

15  A.  That's correct.

16       MR. POLLACK:  Your Honor, we can go ahead and take the

17  break now.

18       THE COURT:  Okay.  Ladies and Gentlemen, we will go

19  ahead and take our mid-afternoon break.  We will reconvene at

20  3:30.  The jury is excused.

21       (Jury excused.)

22       THE COURT:  We will be in recess.  Thank you.

23    (Recess at 3:15 p.m. until 3:35 p.m.)

24       MS. CALL:  Very briefly, I don't know how many

25  cross-exams are left and how many times we are going into the

Robert Bryant - Cross

1    untruthfulness, but I do think many have gone very close to the

2    line on mentioning the prior trial and talking about the judge,

3    the court reporter, Ms. Grimm all being the same.  And I think

4    that does need to stop.  Nobody here wants another mistrial.

5            THE COURT:  Well, Mr. Bryant has not lapsed into

6    anything, and that's good.  The page transcripts are a little

7    dangerous.  When they hear about a prior proceeding with a

8    thousand pages, they may be thinking like, Whoa.

9            But anyway, I am not going to forbid anyone to do that

10   because Mr. Bryant hasn't said anything.

11           MR. POLLACK:  I have no need to give the page

12   references.  I was really doing that for government counsel's

13   benefit so they could find the quote, but if you would prefer

14   me not to.

15           THE COURT:  It doesn't matter.  It's out there

16   already, and hopefully the numbers don't mean anything.

17           MS. CALL:  I actually did find it helpful, so if that

18   does continue, I would like the page numbers.

19           THE COURT:  Yeah, there are page numbers, but

20   Mr. Bryant hasn't made a lapse, so that's good.

21           MR. KOENIG:  Maybe if the Court could inquire, please,

22   about how much cross is left because we are dealing with a

23   situation with Mr. Brink having to go.  I just want to know

24   if --

25           THE COURT:  Well, we shall see.  I am going to cut the

Robert Bryant - Cross

1   jury loose at 4:30.  The weather is not terrible out there, but

2   it is -- might snow.  There is going to be a rush of traffic,

3   so as I told them, I am going to let them go at 4:30.

4          MR. KOENIG:  Would it be possible to inquire if we

5   have like an hour of cross left, if that's going to take us to

6   the end of the day?

7          THE COURT:  Any estimates?

8          MR. POLLACK:  I am not sure, Your Honor, who is after

9   me, but I think I would probably take the better part of an

10  hour.

11         MR. KOENIG:  Fair enough.

12         MR. POLLACK:  I don't think we will get done with

13  Mr. Bryant today.

14         THE COURT:  No, I don't think there was that

15  suggestion.  I think Mr. Koenig was trying to estimate because

16  he is trying to fit Mr. Brink in, but we will try to

17  accommodate him tomorrow.  But looks like this will take the

18  rest of the day with cross-examination at a minimum, maybe just

19  with Mr. Pollack.

20         Let's bring Mr. Bryant back in.  Let's bring the jury

21  back in.

22         MR. McLOUGHLIN:  Can we assume the next witness will

23  be Mr. Brink?

24         THE COURT:  That, I don't know.  You will have to ask

25  the government that.

Robert Bryant - Cross

1          *MR. KOENIG:*  I think we can confer.

2          *THE COURT:*  Yes, that's fine.

3          Ladies and Gentlemen, you looked out the window on the

4   break.  I am going to let you go at 4:30 today just so you get

5   a head start.  The roads don't look too bad, but there might be

6   a lot of traffic where people are being extra cautious.  I

7   don't think it's as intense Mr. Whiteside's way as it is down

8   in Denver, but I think, nonetheless, it would be a good idea,

9   so we will let you go at 4:30.

10         Ms. Moore?

11         *JUROR:*  If there is a snow day tomorrow, how do we

12  know that?

13         *THE COURT:*  You will be called by Ms. Grimm.  By

14  definition, we are very stingy about snow days, just so you

15  know, just generally, so likelihood small.  But if there were

16  to be one, like a late start or something, we would let you

17  know.

18         *JUROR:*  Thank you.

19         *THE COURT:*  Mr. Pollack, go ahead.

20  BY MR. POLLACK:

21  Q.  Mr. Bryant, before the break we were comparing 2014

22  contracts with the 2015 contracts.  And I am going to return to

23  that, but I wanted to pause because I realize I made a mistake

24  earlier.  I wanted to go back to it.

25         *MR. POLLACK:*  If we can go ahead and put up that F-065

Robert Bryant - Cross

1  again.  This was the sale from Pilgrim's to George's.

2  BY MR. POLLACK:

3  Q.  And, again, that e-mail you were conveying to Ms. Warble --

4  not you, Pilgrim's was conveying to Ms. Warble that the price

5  was .9689, correct?

6  A.  That's correct.

7  Q.  So that's Pilgrim's price, Pilgrim's selling to George's,

8  not the other way around.

9  A.  That's correct.

10      MR. POLLACK:  So if we can then go back to 6089 to the

11  2013 KFC tab, and if I can publish that for the jury, the

12  native.

13      THE COURT:  Yes, you may.

14  BY MR. POLLACK:

15  Q.  So it's actually the Pilgrim's column that we should be

16  looking at, not the George's column.  Can you tell me what it

17  says under P-10 for Pilgrim's?

18  A.  .9689.

19  Q.  And that is precisely the four digits, the price that had

20  been communicated to Ms. Warble, correct?

21  A.  That's correct.

22  Q.  And so Pilgrim's gave the precise period price to George's

23  because George's was buying chicken from them?

24  A.  That's correct.

25  Q.  That period price being the current contract price.

Robert Bryant - Cross

1    A.   Yes.

2    Q.   And also gave them the case weight of 50.50.

3    A.   Correct.

4    Q.   Now, if we can go back, then, to the contracts and to make

5    this a little easier, Mr. Bryant, over the break I placed some

6    folders in front of you.  If you could go to the folder that

7    says Tyson.  And if you can get the 2014 Tyson contract.

8            MR. POLLACK:  That would be 9871, and, Your Honor, I

9    believe that's in evidence.

10           THE COURT:  Yes, it is.

11           MR. POLLACK:  And if we can publish that at page 2.

12           THE COURT:  Yes.

13   BY MR. POLLACK:

14   Q.   And, Mr. Bryant, what was the 2014 contract for eight-piece

15   COB for Tyson?

16   A.   .9299.

17   Q.   And what was the 2014 margin?

18   A.   .075.

19   Q.   And let's go to the Tyson 2015 contract, which should be

20   right behind it, 1127.

21           MR. POLLACK:  That also, Your Honor, should be in

22   evidence.

23           THE COURT:  You may display it.

24   BY MR. POLLACK:

25   Q.   And what was the contract price for Tyson in 2015 under the

Robert Bryant - Cross

1   2015 contract?

2   A.   1.0762.

3   Q.   And what was the margin?

4   A.   .1931.

5   Q.   Okay.  And then let's go back to the 2014 contract,

6   Mr. Bryant.  What was Tyson's volume in 2014?

7   A.   577,575.

8   Q.   And what was its volume in -- under the 2015 contract?

9   A.   837,500.

10           MR. POLLACK:  So if you could go ahead, Brian, if you

11   could put up J-008 again and display the first three lines.

12           THE COURT:  Any objections, Ms. Call, to displaying

13   now the third line?

14           MS. CALL:  No, Your Honor.

15           THE COURT:  It may be.

16   BY MR. POLLACK:

17   Q.   And so, Mr. Bryant, Tyson gained 259,925 pounds per week

18   between the 2014 contract and the 2015 to 2017 contract; is

19   that correct?

20   A.   That's correct.

21   Q.   And then if you can go to the next folder, should be

22   Koch Foods.  1122 would be the 2014 contract.

23           MR. POLLACK:  Again, I believe it's in evidence.

24           THE COURT:  It is.

25           MR. POLLACK:  If you could publish 1122.

Robert Bryant - Cross

1   *BY MR. POLLACK:*

2   *Q.*  What was the 2014 eight-piece chicken-on-the-bone price for

3   Koch Foods?

4   *A.*  .9219.

5   *Q.*  What was the 2014 margin?

6   *A.*  9 cents.

7   *Q.*  If you could go to the 2015 Koch Foods contract, that's

8   1123.

9         *MR. POLLACK:*  And I believe that's also in evidence.

10        *THE COURT:*  It is.

11  *BY MR. POLLACK:*

12  *Q.*  What was the 2015 Koch Foods contract price?

13  *A.*  1.0369.

14  *Q.*  And what was the margin?

15  *A.*  22 cents.

16  *Q.*  And going back to 2014, what was Koch's volume under the

17  2014 contract?

18  *A.*  679,500.

19  *Q.*  What was their volume under the 2015 contract?

20  *A.*  1.139 million.

21  *Q.*  And then if you could go back to J-008, now let's show the

22  first four lines.  And so Koch Foods increased their volume

23  459,500 pounds per week between the 2014 contract and the 2015

24  to '17 contract, correct?

25  *A.*  That's correct.

Robert Bryant - Cross

1    Q.  And then the next one is Mar-Jac.  And if you look at the

2    2014 contract, that would be Exhibit 1124.

3           MR. POLLACK:  It should also be in evidence.

4           THE COURT:  It is.

5    BY MR. POLLACK:

6    Q.  What was the eight-piece COB price under the 2014 contract

7    for Mar-Jac?

8    A.  .9254.

9    Q.  And what was the margin?

10   A.  Looks like 9 cents.

11   Q.  And under the Mar-Jac 2015 contract, that would be 1125 --

12          MR. POLLACK:  It should also be in evidence.

13          THE COURT:  It is.

14   BY MR. POLLACK:

15   Q.  -- what was the eight-piece COB price, Mr. Bryant?

16   A.  1.0775.

17   Q.  And the margin?

18   A.  23 cents.

19          MR. POLLACK:  And let's go back to J-008 and display

20   the first five lines.

21          JUROR:  We can't see it.

22          THE COURT:  It may take just a moment to come up.

23   BY MR. POLLACK:

24   Q.  I did not do volume for Mar-Jac.  Mr. Bryant, do you recall

25   that Mar-Jac and an entity called Marshall Durbin, another

Robert Bryant - Cross

1     supplier, the two combined?

2           *MS. LaBRANCHE:*  It sounds like some of the jurors are

3     indicating they can't see, and they wanted to see.

4           *MR. POLLACK:*  Is it not on the jurors' monitor?

5           *THE COURT:*  Oh, it should be displayed.

6           *MR. POLLACK:*  Thank you.

7     BY MR. POLLACK:

8     Q.  And so you see I did not do volume for Mar-Jac.  And,

9     Mr. Bryant, you were starting to say Mar-Jac combined with

10    another supplier called Marshall Durbin, correct?

11    A.  Correct.

12    Q.  So the combined volume of the two, you couldn't compare

13    that just to the Mar-Jac volume because you would be comparing

14    apples and oranges, right?

15    A.  I guess you could have done both years.

16    Q.  I am sorry?

17    A.  You could have done both years for both -- combine both

18    companies over both years.

19    Q.  Okay.  But it certainly wouldn't be fair to do the combined

20    entity versus just Mar-Jac.

21    A.  Agreed.

22    Q.  So let's do Case Farms.

23          *MS. CALL:*  Briefly, Your Honor, would it be possible

24    for the government to receive a copy of this exhibit?  The one

25    on the screen doesn't match the one the government was handed.

2337

Robert Bryant - Cross

1           *THE COURT:*  You are talking about J-008?

2           *MS. CALL:*  Yeah.

3           *MR. POLLACK:*  The only difference is I had the volumes

4   in the version that I gave to Ms. Call from Marshall Durbin.

5   We have whited them out here because I realized it would not be

6   an apples-to-apples comparison.

7           *THE COURT:*  Go ahead, Mr. Pollack.

8   *BY MR. POLLACK:*

9   *Q.*  If we can go to Case Farms, then, their 2014 contract would

10  be F-743.

11          *MR. POLLACK:*  And I believe that's in evidence.

12          *THE COURT:*  It is.

13  *BY MR. POLLACK:*

14  *Q.*  Mr. Bryant, what was the 2014 eight-piece COB price for

15  Case Farms?

16  *A.*  .9202.

17  *Q.*  And the margin?

18  *A.*  Looks like 11 cents.

19  *Q.*  Then if you can go to the Case Farms 2015 to 2017 contract,

20  that would be F-744.

21          *MR. POLLACK:*  It should also be in evidence.

22          *THE COURT:*  It is.

23  *BY MR. POLLACK:*

24  *Q.*  And what was the eight-piece 2015 contract price for

25  Case Farms?

Robert Bryant - Cross

1    A.   1.0310.

2         THE COURT:  Is -- F-744, do you show that?  That has

3    not been admitted.

4         MR. POLLACK:  In that case, I move the admission.  It

5    is subject to the agreement.

6         THE COURT:  Any objection to the admission of F-744?

7         MS. CALL:  One moment, Your Honor.

8         THE COURT:  Sure.

9         MS. CALL:  No objection.

10        THE COURT:  F-744 will be admitted.

11        MR. POLLACK:  Thank you, Your Honor.

12   BY MR. POLLACK:

13   Q.   Let's then go to 2014 for Case Farms.  What was the volume?

14   A.   339,750.

15   Q.   Under the 2015 Case Farms contract, what was the volume?

16   A.   268,000.

17        MR. POLLACK:  So then if we can go back and publish

18   for the jury J-008 and show what would be the top six lines.

19        THE COURT:  Any objection to that, Ms. Call?

20        MS. CALL:  No, Your Honor.

21        THE COURT:  You may.

22   BY MR. POLLACK:

23   Q.   So Case Farms lost volume.  They lost about 72,000 pounds

24   per week, correct?

25   A.   That's correct.

Robert Bryant - Cross

1    Q.  And then finally let's go to George's.

2           MR. POLLACK:  1120 should be in evidence, and that

3    would be the George's 2014 contract.

4           THE COURT:  It is.

5    BY MR. POLLACK:

6    Q.  Mr. Bryant, what was George's 2014 eight-piece COB price?

7    A.  .9215.

8    Q.  And what was the margin?

9    A.  .0967.

10   Q.  Okay.  And then let's go to George's 2015 contract, which

11   is 1121.

12          MR. POLLACK:  Which should also be in evidence.

13          THE COURT:  It is.

14          MR. POLLACK:  Thank you, Your Honor.

15   BY MR. POLLACK:

16   Q.  What was the contract price under the 2015 to 2017 price --

17   2015 to 2017 contract, what was the COB price for George's?

18   A.  1.0307.

19   Q.  And the margin?

20   A.  A little over 18 cents, maybe right at 18.  I would have to

21   do the math.

22   Q.  17.98?

23   A.  Yeah.

24   Q.  And under the 2014 contract, what was the volume?

25   A.  1,080,405.

Robert Bryant - Cross

1  *Q.*  Under the 2015 George's contract, what was the volume?

2  *A.*  1,105,500.

3      *MR. POLLACK:*  So now can we display for the jury in

4  its entirety J-008?

5      *THE COURT:*  Any objection to that, Ms. Call?

6      *MS. CALL:*  No, Your Honor.

7      *THE COURT:*  You may.

8  *BY MR. POLLACK:*

9  *Q.*  So, Mr. Bryant, first of all, would you agree with me that

10 the volumes did not stay constant between the competitors

11 between the 2014 contract and the 2015 contract?

12 *A.*  That's correct.

13 *Q.*  Some competitors lost volume; other competitors gained

14 volume.

15 *A.*  That's correct.

16 *Q.*  Competitors who gained volume gained it from the

17 competitors who lost volume.

18 *A.*  I don't know if the totals would match, but, yes.  Some

19 lost; some gained.

20 *Q.*  And --

21 *A.*  What I mean is it looks like there was more volume awarded

22 than what was taken.

23 *Q.*  But you don't have any doubt that volume shifted between

24 suppliers.

25 *A.*  That's correct.  You know what I was seeing here was 560

Robert Bryant - Cross

1   lost and 71, 70, like 625, and then the 459,259 would be more

2   than that loss.

3   Q.  Okay.  My question is, you don't have any doubt that volume

4   shifted between suppliers?

5   A.  No.

6          THE COURT:  Mr. Pollack, one housekeeping matter.  I

7   incorrectly told you that F-743 was in.  It's not in.  Do you

8   wish to move the admission?

9          MR. POLLACK:  I would, Your Honor.

10         THE COURT:  Any objection?

11         MS. CALL:  No, Your Honor.

12         THE COURT:  F-743 will be admitted as well.  Go ahead.

13  BY MR. POLLACK:

14  Q.  And, Mr. Bryant, let's talk about the 2015 contract prices.

15  They were not all identical, were they?

16  A.  No.

17  Q.  And, in fact, there is a significant range from the lowest

18  to the highest.  Would you agree with that?

19  A.  Yes.

20  Q.  Who is the lowest?

21  A.  It looks like George's.

22  Q.  In fact, George's is about 5-1/2 cents lower than

23  Pilgrim's; is that correct?

24  A.  That's correct.

25  Q.  And you said George's has the lowest contract price in

Robert Bryant - Cross

1   2015.  Who has the lowest margin in 2015?

2   A.  Looks like George's.

3        MR. POLLACK:  Your Honor, I would move the admission

4   of J-008 as a summary exhibit.

5        THE COURT:  Any objection to the admission of J-008 as

6   a summary exhibit?

7        MS. CALL:  No, Your Honor.

8        THE COURT:  J-008 will be admitted.

9        MR. POLLACK:  Thank you, Your Honor.

10  BY MR. POLLACK:

11  Q.  Mr. Bryant, did you know what George's bids were in

12  response to the RFP for the 2015 contract?

13  A.  No.

14        MR. POLLACK:  I would like to -- we can go ahead and

15  take that down.  And if we can publish 1008, which I believe is

16  in evidence, Your Honor.

17  BY MR. POLLACK:

18  Q.  What is the date of this document?

19  A.  August 12, 2014.

20  Q.  Was that around the time the first round bids were due for

21  KFC's RFP for the 2015 contract?

22  A.  It was probably a week or so before.

23        THE COURT:  Mr. Pollack, it is in evidence.

24        MR. POLLACK:  Thank you, Your Honor.  Can I go ahead

25  and publish that, then?

Robert Bryant - Cross

1          *THE COURT:*  You may.

2     *BY MR. POLLACK:*

3     *Q.*  So you said that August 12, 2014 was probably a week before

4     the first round bids?

5     *A.*  Approximately, yeah.

6          *MR. POLLACK:*  Brian, can you go to the page that ends

7     in 6620?

8     *BY MR. POLLACK:*

9     *Q.*  So this would be about the date that the first round bids

10    were due?

11    *A.*  I don't remember the date it was due.

12    *Q.*  You don't remember?

13    *A.*  No.  I just remember we were getting feedback, you know,

14    around the 22nd of August from that bid submission.

15    *Q.*  So by the 22nd, you had submitted your first round bid?

16    *A.*  That's correct, and received some feedback, yes.

17    *Q.*  And this is dated on the 19th.

18    *A.*  Correct, yes.

19         *MR. POLLACK:*  If we can go to the page that ends in

20    6628, and you might have to blow up that middle section.

21    *BY MR. POLLACK:*

22    *Q.*  So, first of all, it's entitled Realistic Cost Model,

23    correct, Option 1?

24    *A.*  Yes.

25    *Q.*  If we can go to the middle section under Proposed for

Robert Bryant - Cross

1    Purple Label, what is the total FOB cost in that column?

2    A.   1.0913.

3    Q.   $1.09.13?

4    A.   Correct.

5    Q.   If we can go back to J-008.  And tell me again, what was

6    George's final negotiated contract price for 2015?

7    A.   1.0307.

8    Q.   So if on August 19 they were at 1.0913, how much did they

9    come down in the negotiations.

10   A.   About 6 cents.

11   Q.   They did not hold with their early bid; they negotiated and

12   went down another 6 cents?

13        MS. CALL:  Objection on foundation.

14   A.   That would be my assumption.

15        THE COURT:  Hold on one second, Mr. Bryant.

16   Overruled.  He can answer if he knows.

17   A.   I don't know, but that would be my assumption.

18   BY MR. POLLACK:

19   Q.   That would be your assumption based on what we've just

20   looked at?

21   A.   Correct.

22   Q.   Now, I want to talk to you for a minute about your notes

23   that were at Exhibit 1919.

24        MR. POLLACK:  You can go ahead and put those up.  I

25   guess it's page 2.  And if we can look at the bottom, there we

Robert Bryant - Cross

1    go.

2    BY MR. POLLACK:

3    Q.  And the 1.0234, your understanding was that that was

4    Pilgrim's current contract price, correct?

5    A.  That's correct.

6    Q.  Or period price?

7    A.  It was a current price, and what I remember is that was

8    just so we would have a relation to the others.

9    Q.  I understand.  But my question is, you understood that to

10   be the current contract price or the period price, and we use

11   those two interchangeably, right?

12          MS. CALL:  Objection, misstates testimony.

13          THE COURT:  Overruled.  He can answer.

14          MR. POLLACK:  I apologize, Your Honor, apparently this

15   is not up on the jury's screen.

16          THE COURT:  Oh, it may be published.

17   BY MR. POLLACK:

18   Q.  And you believed that these other figures for the other

19   suppliers were not current period prices but what they were

20   intending to bid?

21   A.  That's correct.

22   Q.  But the 1.0234 was Pilgrim's current price?

23   A.  That's correct.

24   Q.  Now, I think you placed these notes as being early

25   February 2017?

Robert Bryant - Cross

1    A.  That's correct.

2    Q.  Do you know if George's had even submitted a bid as of

3    early February 2017?

4    A.  At the time these were made, no, I do not.

5         MR. POLLACK:  And let's go to I-054, which is in

6    evidence.  And if we can enlarge that.

7    BY MR. POLLACK:

8    Q.  And this is entitled Period 2, 2017?

9    A.  That's correct.

10   Q.  February is the second month of the year?

11   A.  That would be correct.

12   Q.  And what does it say for Pilgrim's?

13   A.  1.0234.

14   Q.  And so that 1.0234 matches exactly what you thought to be a

15   period price, correct?

16   A.  Or current price, yeah.

17        MR. POLLACK:  And if we can put that side by side with

18   page 2 of 1919 -- I am sorry, this, again, is not published for

19   the jury, Your Honor, if we could.

20        THE COURT:  You could display both I-054 and also

21   1919.

22   BY MR. POLLACK:

23   Q.  And you went through this with Mr. Feldberg.  The other

24   suppliers, what you have written down for them in their notes

25   matches identically to what is in I-054 with the exception of

1    one, I think, was off by two 10,000ths of a cent; is that

2    correct?

3    A.   I believe that's correct.

4    Q.   And so I-514, which is called Period 2, 2017, contains what

5    you believe to be Pilgrim's period price and contains the exact

6    same figures for all of the other competitors.

7    A.   That's correct.

8    Q.   You have had, ballpark, 25 interviews with the government?

9    A.   Yeah, somewhere around there.

10   Q.   In any of those 25 interviews, Mr. Bryant, did the

11   government show you the current prices, the current contract

12   prices, the Period 2 prices in 2017, and ask you to compare

13   them to your notes to see if the information you had gotten

14   from Mr. Austin, in fact, were current contract prices?

15   A.   I don't remember that.

16        MR. POLLACK:   Now, let's see if we can blow up 1919.

17   You can go ahead and get rid of I-054.  If you can make that

18   bottom part a little bit larger.

19   BY MR. POLLACK:

20   Q.   It also says George's minus 28, correct?

21   A.   That's correct.

22   Q.   And you said that would be a dark-meat price, correct?

23   A.   Correct.

24   Q.   28 cents back or lower than whatever the eight-piece price

25   was, correct?

Robert Bryant - Cross

1    A.   That's correct.

2              MR. POLLACK:   And if we can go to F-764, which is in

3    evidence.

4              THE COURT:   It is.

5    BY MR. POLLACK:

6    Q.   And you might have to turn the page.   Actually, let's start

7    here.

8              What's the date of this?

9    A.   December 22nd, 2016.

10   Q.   And this is a contract between George's and Restaurant --

11             MR. POLLACK:   Again, I am sorry, Your Honor.   It's --

12   can we display it to the jury?

13             THE COURT:   You may.

14   BY MR. POLLACK:

15   Q.   This is between George's and what we've been calling RSCS?

16   A.   That's correct.

17   Q.   And this is the end of '16, and this would be for the

18   period January 1st, 2017 to December 31st, 2017, correct?

19   A.   That's correct.

20   Q.   And so if we can turn -- what was -- under that 2017

21   contract, what was George's price for dark meat?

22             MR. POLLACK:   We might have to turn the page again.

23   One more.   Keep going.   Keep going.   You don't have it?   Let me

24   do it this way.   You don't have the page that ends in 675?

25   There we go.

Robert Bryant - Cross

1   *BY MR. POLLACK:*

2   *Q.*   Mr. Bryant, under George's 2017 contract, what was their

3   price for dark meat?

4   *A.*   Minus 28 cents a pound.

5   *Q.*   So that minus 28 that was in your notes is the current

6   George's price for dark meat .28 back.

7   *A.*   That's correct.

8   *Q.*   Not a future price.

9   *A.*   I don't know that.  I mean --

10  *Q.*   You don't know that because you don't even know if George's

11  had made a bid at that point?

12  *A.*   The way it was presented to me is that was the bid price.

13  *Q.*   But what we know for sure is it was the current contract

14  price, correct?

15  *A.*   That's correct.

16  *Q.*   Now, period prices are different than bids, correct?

17  *A.*   Correct.

18  *Q.*   A bid is a proposal for a future contract; whereas, period

19  prices is set under a current contract, correct?

20  *A.*   That's correct.

21  *Q.*   And you have no idea how Mr. Blake used period prices?

22  *A.*   No.

23  *Q.*   Now, 2014, everybody negotiated for a contract with KFC

24  that covered 2015 to 2017, right?

25  *A.*   Yeah, through the end of 2017.

Robert Bryant - Cross

1    Q.   To the end of 2017.

2    A.   Correct.

3    Q.   But by 2017, market conditions were different than they had

4    been back in late 2014 when the 2015 contract was negotiated;

5    is that fair?

6    A.   That's correct.

7    Q.   And RSCS began the process of negotiating the 2018 contract

8    earlier than they typically do.

9    A.   That's correct.

10   Q.   And I guess I should have asked you this.  When I asked you

11   you have no idea how Mr. Blake used period prices --

12           MR. POLLACK:  Can we go ahead and put up 6088 again,

13   the e-mail that is the cover to the period prices that we were

14   looking at?  And you can display that for the jury.

15           May I display that to the jury, Your Honor?

16           THE COURT:  You may.

17   BY MR. POLLACK:

18   Q.   What is the date here?

19   A.   It looks -- that's weird.

20   Q.   August 15, 2016?

21   A.   August 15, 2016.  I am not used to seeing the year first

22   like that.

23   Q.   There was no RFP going on in August of '16, was there?

24   A.   No, not that I can recall, no.

25           MR. POLLACK:  You can go ahead and take that down.

Robert Bryant - Cross

1    *BY MR. POLLACK:*

2    *Q.*  So by 2017, market conditions had changed, and RSCS starts

3    negotiating again, correct?

4    *A.*  That's correct.

5         *MR. POLLACK:*  If we can look at F-765, which should be

6    in evidence, and permission to publish that to the jury.

7         *THE COURT:*  You may.

8    *BY MR. POLLACK:*

9    *Q.*  Whose contract is this?  Look at the bottom of the page.

10   *A.*  George's.

11   *Q.*  George's with RSCS or KFC?

12   *A.*  Correct.

13   *Q.*  And it's a Mr. Brian Coan who signs on behalf of George's?

14   *A.*  It appears to be.

15   *Q.*  Do you know Mr. Coan?

16   *A.*  I don't.

17   *Q.*  And the contract that was in place you said went through

18   the end of 2017, correct?

19   *A.*  The original, yes.

20   *Q.*  The 2015 contract.

21   *A.*  Correct.

22   *Q.*  But market conditions had changed, and RSCS asked suppliers

23   to decrease their prices and to start that price decrease early

24   before the expiration of the 2015 contract.

25   *A.*  That's correct.  It was -- what I remember, it was -- we

Robert Bryant - Cross

1    agreed on a price decrease for the 2018 contract.  They asked

2    us to start that decrease, I believe it was around a penny and

3    a half, in the summer of 2017.  However, they delayed that

4    penny and a half that they got early to take effect in, I

5    believe, 2019 or maybe it was later in 2018.  They just wanted

6    some of that decrease to hit in 2017, and then they delayed

7    getting the entire decrease.

8    Q.  And what you just described was what happened with

9    Pilgrim's, right?

10   A.  Yes, that's my -- yes.

11   Q.  But this is George's contract.  The applicable period here

12   is May 21st, 2017 to December 31st, 2017, correct?

13   A.  That's correct.

14        MR. POLLACK:  And if you can go to the next page,

15   page 2.

16   BY MR. POLLACK:

17   Q.  What price did George's agree to starting May 21st, 2017?

18   A.  .9537.

19   Q.  9537.  And so even though there was already a contract in

20   place at $1.03, which is what we saw before, they agreed to

21   accept .9537 starting in May for the remainder of 2017.

22   A.  That appears correct.

23        MR. POLLACK:  And if we can look at page 4 and then 5,

24   so let's start with page 4.

25   BY MR. POLLACK:

Robert Bryant - Cross

1    *Q.*  What period is covered under page 4?

2    *A.*  Looks like calendar year 2018.

3    *Q.*  Okay.  And what price was George's charging for eight-piece

4    COB for calendar year 2018 on the next page?

5    *A.*  .9455.

6    *Q.*  So they decreased the price again between the remainder of

7    2017 and 2018, correct?

8    *A.*  Yeah.  I don't know if it was actual price decrease or that

9    was the grain input.

10   *Q.*  What you know is the bottom line number for 2018 is lower

11   than the bottom line number for 2017.

12        *MS. CALL:*  I am going to object to foundation just on

13   this continuing line of questions.  We have had three RSCS

14   witnesses.  I don't understand Mr. Bryant's relevance to any of

15   this.

16        *THE COURT:*  Once again, he can be asked to compare

17   numbers, but the question can't assume the truth of something

18   that he has no foundation for.

19   *BY MR. POLLACK:*

20   *Q.*  Is the 2018 FOB price of .9455 lower than the 2017 price of

21   .9537?

22   *A.*  Yes.

23        *MR. POLLACK:*  And if you go to page 7.

24   *BY MR. POLLACK:*

25   *Q.*  What period does page 7 cover?

Robert Bryant - Cross

1    *A.*  Calendar year -- well, it looks like calendar years 2019

2    and 2020.

3    *Q.*  Okay.  So for a two-year period.

4         *MR. POLLACK:*  And if you go to page 8.

5    *BY MR. POLLACK:*

6    *Q.*  What is the price for the two-year period?

7    *A.*  .9412.

8    *Q.*  And so the .9412 for 2018 and -- I am sorry, 2019 and 2020

9    is lower again than the price for 2018, which was .9455?

10   *A.*  It appears so, but, like I said, without going through

11   those numbers, I don't know.

12   *Q.*  If it was all negotiated at the same time, you will assume

13   that the grain model was kept constant?

14   *A.*  That would be my assumption, yes.

15   *Q.*  So, therefore, we are comparing apples to apples, and we

16   are seeing a decrease every year.

17   *A.*  If that happened.  I don't know then.

18        *MR. POLLACK:*  I apologize, Your Honor.  I need just a

19   minute here.

20        *THE COURT:*  No problem.

21        *MR. POLLACK:*  If I can have just a minute, Your Honor.

22   Let me see if I can hand Mr. Bryant something that might make

23   this go a little quicker.

24        *THE COURT:*  Sure.

25   *BY MR. POLLACK:*

Robert Bryant - Cross

1   *Q.* Mr. Bryant, I would like to go through a similar exercise

2   that we went through.  Can you look for Case Farms, their 2017

3   contract price for eight-piece COB?

4          *MR. POLLACK:* Your Honor, for the record, we are

5   looking at F-747, which I believe is in evidence.

6          *THE COURT:* Let me just check real quick.  It sounds

7   familiar.

8          *MR. POLLACK:* They all sort of blur together at this

9   point, Your Honor.

10          *THE COURT:* It is in.

11          *MR. POLLACK:* Thank you.

12   *BY MR. POLLACK:*

13   *Q.* What was the Case Farms --

14          *THE COURT:* Do you want that displayed, Mr. Pollack?

15          *MR. POLLACK:* Sure.  Thank you, Your Honor.

16   *BY MR. POLLACK:*

17   *Q.* What was the Case Farms eight-piece COB price for that

18   latter part of 2017?

19   *A.* .9757.

20          *MR. POLLACK:* Your Honor, what I would like to do is

21   show J-012, which is a demonstrative only at this point, and

22   just show the first line, if I may.

23          *THE COURT:* Any objection, Ms. Call, to the display of

24   the first line of J-012?

25          *MS. CALL:* No, Your Honor.

Robert Bryant - Cross

1          THE COURT:  You may do so, Mr. Pollack.

2    BY MR. POLLACK:

3    Q.  And then let's move on to Claxton, and Claxton should be

4    75 -- F-756, which should be in evidence.

5    A.  It is.

6    Q.  What was Claxton's eight-piece COB price for that latter

7    part of 2017?

8    A.  .9809.

9          MR. POLLACK:  Okay.  If we can go back to J-012, and

10   if we can publish the first two lines for the jury.

11         THE COURT:  Any objection to that, Ms. Call?

12         MS. CALL:  No, Your Honor.

13         THE COURT:  You may.

14   BY MR. POLLACK:

15   Q.  And then next if we can do Koch Foods.  And Koch Foods is

16   F-774.

17         Mr. Bryant, what was the price for the latter part of

18   2017 for Koch Foods?

19   A.  .9988.

20   Q.  Okay.

21         MR. FELDBERG:  If we can go back to the J-012 and

22   publish for the jury the first three lines.

23         MS. CALL:  May I inquire?  There is an April date on

24   here.  Is that the date on the contract?

25   BY MR. POLLACK:

Robert Bryant - Cross

1   Q.  If you can verify that, Mr. Bryant.  The date in

2   parenthesis for each of these is the date the supplier has

3   agreed to offer this price, the starting date.

4   A.  That's correct.

5   Q.  And in each instance through the end of 2017.

6   A.  That's correct.

7   Q.  Okay.

8        MS. CALL:  No objection.

9        THE COURT:  All right.  That may be displayed.

10  BY MR. POLLACK:

11  Q.  Let's go on, then, to Mar-Jac, and that's F-783.  And what

12  was Mar-Jac's eight-piece COB contract price for the remainder

13  of 2017?

14  A.  .9650.

15       MR. POLLACK:  If we can publish for the jury J-012,

16  the first four lines.

17       THE COURT:  Any objection to that, Ms. Call?

18       MS. CALL:  No, Your Honor.

19       THE COURT:  That may be displayed.

20  BY MR. POLLACK:

21  Q.  And Pilgrim's also agreed to a price concession for the

22  latter part of 2017?

23  A.  That's correct.

24  Q.  And that's F-796.  What was Pilgrim's price for the

25  remainder of 2017?

Robert Bryant - Cross

1    A.   .9998.

2           MR. POLLACK:  And if we could go to J-012 and show the

3    first five lines to the jury, please.

4           THE COURT:  Any objection to that, Ms. Call?

5           MS. CALL:  No, Your Honor.  That may be displayed.

6           MR. POLLACK:  Brian, you don't have to flip back and

7    forth.  You can keep that up.  But let's go on then to Tyson.

8    BY MR. POLLACK:

9    Q.   Now, Tyson, does Tyson agree to a price reduction for 2017?

10   A.   I don't know.

11   Q.   Well, in the Tyson contract, do they offer a 2017 price; or

12   do they just offer 2018 through 2020?

13   A.   What I have in front of me is January 1st, 2015 through

14   December 31st, 2017.

15   Q.   Okay.  Do you have --

16   A.   What number should I be looking for, exhibit number?

17   Q.   Do you have G-474?

18   A.   No.  I have 1127.

19   Q.   Look behind it and see if you see G-474.  If not, I will

20   hand one up to you.

21   A.   There is three copies of 1127 here.

22          MR. POLLACK:  May I, Your Honor?

23          THE COURT:  Yes, you may.

24   A.   Okay.

25   BY MR. POLLACK:

2359

Robert Bryant - Cross

1  *Q.* Did Tyson's offer a reduced price for the remainder of

2  2017?

3  *A.* I don't know if it was a price reduction.  There is a

4  period on this contract from January 1st, 2018 to

5  December 31st, 2020.

6  *Q.* Precisely.  January 1st, 2018, so unlike all the other

7  contracts that you have looked at so far, there is not a new

8  price for the latter part of 2017, correct?

9  *A.* Well, I don't know if they agreed to one or not.

10 *Q.* It's not there?

11 *A.* I haven't been shown one.

12 *Q.* Okay, fair enough.  You were shown the existing contract

13 that covered the 2017 year, the 2015 contract?

14 *A.* Yes.

15 *Q.* What was Tyson's price under the 2015 contract?

16 *A.* 1.0762.

17     *MR. POLLACK:* Can we show J-012, the top six lines?

18     *THE COURT:* Any objection to that, Ms. Call?

19     *MS. CALL:* Yes, Your Honor.  This witness can give no

20 foundation for what's described as the 2017 mid-year price for

21 Tyson.  He doesn't know whether there are any other agreements.

22 He knows what's in front of him.  The government has, frankly,

23 never seen this before and can't confirm it either, but I think

24 there is just no foundation for showing that.

25     *THE COURT:* Response, Mr. Pollack?

Robert Bryant - Cross

1    MR. POLLACK:  Your Honor, he has a document that is

2  already in evidence, which is the contract that was negotiated

3  in 2017, and it does not -- unlike the other contracts, it

4  starts January 1st, 2018 rather than starting at some point in

5  2017.  He also has what is already in evidence the 2015 to 2017

6  contract, and that's the price under the 2015 to 2017 contract,

7  so that's the price that would have been in effect for Tyson's

8  in 2017.

9    THE COURT:  Anything else on that, Ms. Call?

10    MS. CALL:  No, Your Honor -- well, yes.  I think there

11  is another witness who clearly could have provided testimony to

12  this, and the government is willing to stipulate to summaries

13  like this, but we just need advance notice, so I think it's

14  just no foundation at this time for the admissibility of this

15  or for the jury to be able to see it.

16    THE COURT:  I will overrule the objection.  The jury

17  has heard the testimony and the limitations as to Mr. Bryant's

18  knowledge, and he has basically taken that number from a

19  particular exhibit.  So you may display the sixth line at this

20  time, Mr. Pollack.

21    MR. POLLACK:  Thank you, Your Honor.

22  BY MR. POLLACK:

23  Q.  And now, Mr. Bryant, let's go to OK Foods.  And am I

24  correct OK Foods didn't have a contract in 2015?  They were a

25  new entrant in 2017, correct?

1    *A.*  That's my understanding.  I don't know when they got their

2    first KFC loads.

3    *Q.*  Okay.  What is the OK Foods contract?  Give me the exhibit

4    number because I have given you my copy.

5    *A.*  For OK Foods, it says C-938.

6         *MR. POLLACK:*  Your Honor, I am not sure that C-938 is

7    in.  If it's not, I will offer it.

8         *THE COURT:*  Let me check.

9    *A.*  And there is three copies here.

10         *MR. POLLACK:*  I will take one back from him, then.

11         *THE COURT:*  It has not been admitted yet.

12         *MR. POLLACK:*  In that case, I would offer it.  It's

13    subject to the stipulation.

14         *THE COURT:*  Hold on.  I was looking at the wrong one.

15    Yes, it has not been.  Any objection to the admission of C-938?

16         *MS. CALL:*  I don't believe it is subject to

17    stipulation, so the government would request a copy to see what

18    it is.

19         *THE COURT:*  Mr. Pollack, just for a heads-up, we are

20    right at 4:30 now.

21         *MR. POLLACK:*  I've got one more.  I can either do that

22    now, or we can do that when we come back tomorrow.

23         *THE COURT:*  Why don't we do it when we come back

24    tomorrow.  Sometimes it doesn't quite work out.  It might take

25    a little longer.  But let's first get an answer from Ms. Call.

2362

1          MS. CALL:  No objection subject to the representation

2     that lines of text that appear to be cut off is the original

3     document versus any unknown redactions.

4          MR. POLLACK:  Your Honor, we have not redacted this

5     document.  This is the way it was produced by the government.

6          MS. CALL:  Then no objection.

7          THE COURT:  Then C-938 will be admitted.

8          Ladies and Gentlemen, I will go ahead and excuse you

9     for the evening.  Subject to that phone call, which I told

10    Ms. Moore, I wouldn't get your hopes up, but we will reconvene

11    tomorrow at 8:30.  If you are driving, drive carefully.  The

12    jury is excused.  Thank you.

13          (Jury excused.)

14          THE COURT:  Mr. Bryant, you are excused for the day.

15    Thank you.  Everybody else may be seated.

16          Anything to take up at this time?  Ms. Call?

17          MS. CALL:  Respectfully, I don't want to bring up

18    summaries again, but I think we were handed four today without

19    having seen them before.  And I understand that some

20    verification was done through the witness, but I think it could

21    be a better use of everyone's time if perhaps they were

22    provided to the government in advance.  We can check them for

23    accuracy.  We may be able to stipulate to their admissibility

24    and save a lot of time for all the parties.

25          And the government, frankly, just requests that

1   regardless so we are just not sitting here doing math rather

2   than listening to the testimony to confirm accuracy of these

3   exhibits.  So I would request the defendants be ordered to

4   provide summary exhibits to the government.

5       We did ask for that several days ago.  The defendants

6   represented they had no idea what summaries they may be

7   introducing yet when, in fact, they were planning on using

8   several with the government's own witnesses.  So we think it's

9   quite a double standard the government has been put through

10  with its summaries versus these now being sprung on the

11  government while they are being admitted.  So I would request

12  that.

13      As well as, if possible, and I know it may not be

14  technically within the grounds of reciprocal discovery, but we

15  were handed or shown without being handed several documents

16  that I don't believe we have seen before or received or

17  reviewed, and it's impossible to be able to make calls on the

18  spot when, for example, for a PowerPoint there is no Bates

19  number, no exhibit number.  We haven't been given it.  I don't

20  believe it was prepared by this witness, and it's just a very

21  difficult position the government is being put in.

22      THE COURT:  Anyone want to respond?

23      Mr. Pollack?

24      MR. POLLACK:  Your Honor, with respect to the

25  demonstratives that I used with Mr. Bryant, I guess the point

1    is mooted at this point.  But in any event, I think Ms. Call is

2    conflating two different things.  One is summaries we are going

3    to put in during our case in chief, which we will disclose in

4    advance, versus giving a road map for our cross-examination in

5    advance, which we are obviously not required to do.  And it's

6    perfectly appropriate to ask a witness questions and create a

7    demonstrative.  And I gave it to Ms. Call before I even started

8    that process so she could see exactly what it was I was doing

9    and there was no objection to it.

10        THE COURT:  Well, yeah.  Ms. Call was being indulgent,

11   but my guess, Mr. Pollack, is you probably wouldn't have done

12   that cross any other way because you wanted him to look at a

13   given contract and for the jury to hear that, so I am not sure

14   that even if it had been provided in advance it would have been

15   shortened.  But Ms. Call can comment on that.

16        MS. CALL:  Well, aside from whether it could have been

17   shortened, the requirements of 611 require the adverse party to

18   have the opportunity to cross-examine the preparer for

19   accuracy, but also to be able to determine, like the defendants

20   have done with the government summaries, whether the charts are

21   misleading.

22        Ms. Fisher who was at RSCS in 2017 was on the stand

23   this week and was not shown these summaries, and she could have

24   seen if there was anything misleading about the information,

25   for example, removing one company altogether, which I

1    understand was in part due to a purchasing, but it makes the

2    differences in volume misleading in nature given that

3    500,000 pounds are not shown on what was actually admitted.

4         So I think there is misleading aspects that the

5    government wasn't able to cross on, and this isn't proper for

6    cross-examination of a witness from one company who knows

7    nothing about these numbers.

8         THE COURT:  Okay.  Well, I would say this, that, you

9    know, obviously, the more that exhibits can be exchanged in

10   advance to help the testimony go smoother, the better, but it

11   seems like we may be past the summary phase with Mr. Bryant, at

12   least from Mr. Pollack.

13        MR. POLLACK:  I think we have one line remaining on

14   the last summary.

15        THE COURT:  One line.

16        Anything else to take up at this time?

17        MR. KOENIG:  The government wonders if the Court would

18   inquire if we might be getting the witness list at 5:00.  This

19   morning it was left at we were going to need some flexibility.

20   I didn't hear the Court rescind its order to produce it by

21   5:00, so I assume that still stands.

22        THE COURT:  Status on the witness list?

23        MS. PREWITT:  Your Honor, we are leaving from the

24   courthouse to have a meeting so we can generate the list.  All

25   we can say is we have been here during testimony all day, and

 1    we are moving right from this to that to give them the list.

 2    There is no delay whatsoever.

 3            THE COURT:  Okay.  What time do you anticipate the

 4    list would be finalized?

 5            MS. PREWITT:  By, like, 8:00, 8:00 p.m., Your Honor?

 6            THE COURT:  All right.  Anything else?

 7            MS. PREWITT:  Do you want to make it 7:30?

 8            THE COURT:  I am not trying to negotiate with you.  I

 9    just wanted to know your estimate.

10            Anything else we should take up, Ms. Johnson?

11            MS. JOHNSON:  Just briefly, defense filed a motion for

12    disclosure of *Brady* materials last night, and I just wondered

13    when the Court wanted to take that up.

14            THE COURT:  Well, the government needs an opportunity

15    to respond to that, so I am not sure when the government will

16    be able to, but I think it would be helpful for me to have --

17    that talks about various things that came up in the course of

18    the notes, and the government may be able to put some of those

19    things in context.  So the government can't do that right just

20    without taking some time to do it.

21            Mr. Koenig, do you have an idea when the government

22    may be able to file a response?

23            MR. KOENIG:  Could we have until Friday?

24            THE COURT:  That seems like a long time.

25            MR. KOENIG:  Okay, tomorrow?

1          THE COURT:  That would be great.

2          MS. JOHNSON:  Thank you.

3          THE COURT:  Anything else?

4          We will be in recess until tomorrow at 8:30.  Thank

5     you.

6       (Recess at 4:40 p.m.)

7                              INDEX

8     WITNESSES

9       Robert Bryant

10          Direct Examination Continued By Ms. Call      2132

11          Cross-examination By Ms. Page                 2186

12          Cross-examination By Mr. Feldberg             2229

13          Cross-examination By Mr. Tubach               2276

14          Cross-examination By Mr. Pollack              2311

15                            EXHIBITS

16    Exhibit      Offered   Received  Refused  Reserved  Withdrawn

17    J-008                    2342

18    E-014                    2272

19    J-018                    2266

20    J-027                    2299

21    J-030                    2279

22    F-065                    2314

23    A-112                    2244

24    A-113                    2245

25

1          INDEX (Continued)

2            EXHIBITS

3    Exhibit       Offered   Received   Refused   Reserved   Withdrawn

4    E-174                     2262

5    C-464                     2247

6    F-743                     2341

7    F-744                     2338

8    H-911                     2263

9    C-938                     2362

10   979                       2178

11   1919                      2137

12   3039                      2169

13   9139                      2167

14   9140                      2165

15          REPORTER'S CERTIFICATE

16       I certify that the foregoing is a correct transcript from

17   the record of proceedings in the above-entitled matter.   Dated

18   at Denver, Colorado, this 26th day of May, 2022.

19

20                              S/Janet M. Coppock

21

22

23

24

25