1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 20-CR-00152-PAB
3  In Re: Penn III

4  UNITED STATES OF AMERICA,

5       Plaintiff,

6  vs.

7  JAYSON JEFFREY PENN,
   MIKELL REEVE FRIES,
8  SCOTT JAMES BRADY,
   ROGER BORN AUSTIN,
9  WILLIAM WADE LOVETTE,

10      Defendants

11 _____

                   REPORTER'S TRANSCRIPT
12                 Trial to Jury, Vol. 2

13 _____

14        Proceedings before the HONORABLE PHILIP A. BRIMMER,

15 Chief Judge, United States District Court for the District of

16 Colorado, commencing at 12:10 p.m., on the 7th day of June,

17 2022, in Courtroom A201, United States Courthouse, Denver,

18 Colorado.

19

20

21

22

23

24 Proceeding Recorded by Mechanical Stenography, Transcription
   Produced via Computer by Janet M. Coppock, 901 19th Street,
25    Room A257, Denver, Colorado, 80294, (303) 335-2106

```
1                         APPEARANCES
2            Kevin Hart, Leslie Wulff, Paul Torzilli and Daniel
3    Loveland, U.S. Department of Justice, 450 Fifth Street N.W.,
4    Washington, DC 20530, appearing for Plaintiff.
5            Anna Tryon Pletcher and Michael Tubach of
6    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
7    San Francisco, CA 94111-3823;
8            Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
9    N.W., Washington, DC 20006, appearing for Defendant Penn.
10           David Beller, Richard Kornfeld and Kelly Page of
11   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
12   CO 80202, appearing for Defendant Fries.
13           Bryan B. Lavine and Laura Anne Kuykendall of Troutman
14   Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite
15   3000, Atlanta, GA 30308;
16           Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,
17   1001 Haxall Point, Richmond VA 23219, appearing for Defendant
18   Brady.
19           Michael Felberg of Reichman, Jorgensen, Lehman,
20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21   10017;
22           Laura F. Carwile of Reichman, Jorgensen, Lehman,
23   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,
24   CA 94065; appearing for Defendant Austin.
25
```

```
1                    APPEARANCES (Continued)

2          Dru Nielsen of Eytan Nielsen, 3200 Cherry Creek Drive

3    South, Suite 720, Denver, CO 80209;

4          John Anderson Fagg, Jr. and Frank Schall of

5    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

6    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

7                    *    *    *    *    *

8                         PROCEEDINGS

9      (Jury selection was sealed.)

10         THE COURT:  Please be seated.

11         Ladies and gentlemen, all of you over on the other

12   side, that means that I am going to go ahead and release you.

13   Thanks so much for being here.  Without you, as you saw all of

14   those replacements, we couldn't necessarily get a jury.  You

15   never know at this time of year with vacations and whatnot.  So

16   thanks so much.  I know you were all paying very careful

17   attention, and I really appreciate your coming in these two

18   days.  So at this time, ladies and gentlemen, you are excused.

19   You don't need to go back to the jury assembly room, all right?

20   Thank you.

21         (Prospective jurors were excused.)

22         THE COURT:  All right.  So, ladies and gentlemen, let

23   me tell you a few things about what we'll be doing.  We are

24   going to take our lunch break in just a little bit, but let me

25   give you some kind of rules and some information about being a
```

1   juror.

2          So from this point forward, you are going to be going

3   in and out of this door right over here because there is a jury

4   room in this hallway.  Ms. Buchanan will give you a key card,

5   and that will enable you to access a secure hallway.  This

6   courtroom, because it's a ceremonial courtroom which is a

7   little bigger, has this serpentine system up the hallway.

8   Hallway goes around here and over here, and it eventually lets

9   you out into the hallway, but that's the way you will be coming

10  in and out.

11         And the other thing that will happen is that anytime

12  you are entering or leaving the courtroom, all of us will rise,

13  and that is out of respect for the jury.  Once you get to your

14  chair, though, you don't need to keep standing.  Once you are

15  at your chair, you can go ahead and sit down.  Once all of you

16  are seated, then I'll instruct everyone else in the courtroom

17  to go ahead and have a seat too.  But, yeah, once you get to

18  your seat, you can go ahead and sit down, and then I will have

19  everyone else take a seat.

20         When you're in the courtroom, you can bring water in,

21  and I know that some of you had.  Don't bring any soda, coffee,

22  or anything like that.  The exception is Mr. Brown.  Mr. Brown,

23  because you are diabetic, if you need to bring in something

24  else or, you know, something to eat or whatever just to make

25  sure that your levels are good, you are perfectly free to do

1    that, okay?

2          And don't worry if your alarm goes off or something.

3    If it goes off, it goes off.  It is important that you

4    obviously get notified in the event that your levels are

5    getting low.

6          No gum chewing, ladies and gentlemen.  Even though we

7    have masks on, I can tell those jaws are working, so I don't

8    allow anyone to chew gum while they are in court.

9          Also with your cellphones, it's a secure hallway.  You

10   can leave your cellphones in the jury room.  That's my

11   recommendation.  If you bring them out into the courtroom, make

12   sure that they are really turned off.  And if they are turned

13   off, why bring them into the courtroom?  You are not going to

14   answer the phone in the courtroom anyway, so best to try to get

15   in that habit or, like, keep them silenced, okay, because

16   obviously if they go off, it will interrupt things.

17         Very important, ladies and gentlemen, as we talked

18   about yesterday, do not look up any information about the case,

19   okay, or terminology or the attorneys or anything that's going

20   on.  All that information has to come through the process.  The

21   Rules of Evidence make sure that that evidence that is admitted

22   and that the jury hears is a fair one; whereas, as you know,

23   the internet is not reliable, and things that you may hear from

24   your next-door neighbor are not reliable and all things like

25   that.

1          So from this point forward, here is what you can tell

2    your family and also your employers, and that is to let them

3    know that you are a juror on a criminal case.  You can let them

4    know that the trial is scheduled to be done no later than

5    July 14th, but the deliberations could go after that.

6          If you need a letter, your employer wants to see

7    basically proof that you're a juror, we can provide one of

8    those for you, so just let Ms. Buchanan know about that, okay?

9          Some of you may be tempted to work in the evening.

10   Well, you can do a little bit of that, you know, if you need

11   to, but what I don't want you to do -- once upon a time, I had

12   a restaurateur, and he was going to go and work until, like,

13   1:00 o'clock once he got back to his restaurant.  I told him,

14   No, you cannot do that.  Your first responsibility is for this

15   trial.  And this goes for all of the jurors.  You have to

16   really focus on the trial, not that you may be depending on

17   your jobs, you could do a little in the evening, but you really

18   have to make sure that you're fresh.

19         Some of you may not be used to just sitting in -- you

20   know, sitting and listening to things, so, you know, you want

21   to make sure that you've got a lot of sleep, you are well

22   rested, can pay careful attention, okay?

23         Same as what I told you yesterday, in the event that

24   you pass the attorneys or the defendants in the hallway, they

25   will not be talking to you.  And you should avoid trying to

1    communicate with them.

2          Similarly, there are a bunch of -- we are about to

3    enter into the phase with the testimony, and so there will be

4    witnesses who will be coming into the courthouse.  They, of

5    course, have not seen any of you.  They don't know who you are.

6    And that's why those yellow juror buttons are really important.

7    That will, you know, warn them they should be careful

8    regardless, but if they see a yellow juror button, that will be

9    a real good signal to them that they've got to be super careful

10   about not talking.

11          The other thing is that, as you know, some of you are

12   alternate jurors.  Any of you could be in an alternate seat.

13   They are not just like the last three or something of that, so

14   keep that in mind, okay?

15          We are going to -- once we come back after lunch, I am

16   going to read to you a preliminary instruction, and then after

17   that, you'll hear the opening statements of the parties.  And

18   then after we finish with the opening statements, I think we

19   will have time and perhaps we'll start the testimony at that

20   time, okay?

21          So, ladies and gentlemen, I am going to go ahead and

22   release you for lunch.  Why don't we plan on reconvening -- did

23   you have enough time yesterday when we had an hour and 15

24   minutes?  Did that work or was that tight?  That worked?  Yeah,

25   just because it's about quarter after, why don't we plan on the

1   following.  Why don't we plan on reconvening at 1:30, okay?  We

2   will plan on reconvening at 1:30.  And then as I said before,

3   when you come back, you'll actually be back in the jury room.

4   And once everyone is assembled back there, Ms. Buchanan will

5   know, and then you will be brought into the courtroom.  I will

6   read that instruction, and then we will proceed with the

7   opening statements, okay?

8           All right.  Ladies and gentlemen, then, at this time,

9   you are excused for the lunch recess.  We will reconvene at

10  1:30.

11          *JUROR:*  May I ask one question?

12          *THE COURT:*  Yes.

13          *JUROR:*  Are we sitting where we are?

14          *THE COURT:*  That's a good question.  So we will all

15  fit into the jury box.  So what we'll have is, like,

16  Mr. Scranton will move over next to Mr. Lee, and we'll have

17  Ms. Petrone then move over to where Mr. Scranton is sitting

18  right now, okay, and everyone will fit in.  That jury box holds

19  18 people, so that's what we'll do, okay?

20          Another thing I should mention, ladies and gentlemen,

21  and that is just anecdotally, I have known and heard about a

22  lot of people coming down with COVID lately.  So I would highly

23  recommend to you that while you are in the jury room that you

24  keep your masks on.  There is this phenomenon that goes on

25  that, you know, once you get into the jury room and, like,

 1    after a very short period of time you think, I know these

 2    people; I trust them and that type of thing.  And as a result,

 3    you may be tempted not to wear your mask.  I would recommend

 4    that you do it just because those new variants are really

 5    contagious, and as a result, I would recommend that you wear

 6    your masks in the jury room.  I know it's a pain, but I would

 7    recommend that you do that, okay?

 8         Ladies and gentlemen, at this time, you are excused

 9    for lunch.

10         (Jury excused.)

11         THE COURT:  Why don't we -- well, we can either talk

12    right now about how we are going to divide up the time and when

13    you would like, assuming that you want a heads-up, when you

14    have reached a certain amount of time, or we could meet, like,

15    five minutes early if you want to keep us in suspense.  It

16    doesn't matter to me.

17         MS. NIELSEN:  I think everyone is just going to take

18    their 20 minutes of the time.

19         THE COURT:  Sure.

20         MS. NIELSEN:  For me, I would request a two-minute

21    warning, please.

22         THE COURT:  Okay.

23         MR. FELDBERG:  Two minutes for me, please, Your Honor,

24    warning.

25         THE COURT:  I was thinking you really had it

1    summarized well.

2              Okay, any of the defendants wish any other time than a

3    two-minute?  Okay.  I will do that.

4              How about the government?  Does the government want to

5    keep time themselves, or would you like a warning?

6              *MR. HART:*  I would appreciate a warning.

7              *THE COURT:*  Two minutes?

8              *MR. HART:*  Yes.

9              *THE COURT:*  That's easy.

10             Anything else we should discuss before we recess for

11   lunch?

12             *MR. FELDBERG:*  I may have missed it, but has the Court

13   advised the jurors of the break in mid June?

14             *THE COURT:*  Not yet.  That is a really good point,

15   Mr. Feldberg.  Once we get them back in, I will do so because

16   that is a good -- a really good point to make to them, so thank

17   you for reminding me of that.

18             Mr. Hart?

19             *MR. HART:*  Yes, real briefly, Your Honor, the

20   government is inquiring whether anyone will be reserving their

21   opening just so we can plan a witness to come.

22             *THE COURT:*  I will let you poll them individually.  I

23   won't force the defendants to disclose yet.  We'll see.  But

24   you can ask them.

25             Anything else we should talk about?

 1           All right.  We will be in recess until 1:30.  Thank

 2    you.

 3        (Recess at 12:25 p.m. until 1:40 p.m.)

 4           THE COURT:  Anything that we should talk about before

 5    we bring the jury in?  Mr. Hart?

 6           MR. HART:  Nothing for the government, Your Honor.

 7           THE COURT:  Thank you.

 8           Anything on behalf of any of the defendants?

 9           MS. NIELSEN:  No, thank you, Your Honor.

10           THE COURT:  Great.  Let's go ahead and bring the jury

11    back in.

12           (Jury present.)

13           THE COURT:  All right.  Good job, ladies and

14    gentlemen, getting in there.  You will notice that with those

15    monitors, when you're going in and out of the jury box, it

16    probably would be frequent that you would have those monitors

17    that are in the jury box out.  You can move them towards you,

18    like if you're getting up, you can move them towards you, and

19    that will allow people a little bit easier ability to get past

20    them.

21           But I do anticipate that the attorneys may be using --

22    displaying things to you during opening, so as a result, it's

23    helpful if you are able to see them.  If for some reason during

24    the course of the trial a monitor is not working or there seems

25    to be something wrong with it, let us know, and we will try to

 1   get that corrected right away.  But you also have the big

 2   monitor, big flat-panel monitor in front of you, and so just in

 3   case your monitor is not working, you may be able to see that.

 4   Some people may have a little bit of a longer distance to see

 5   that than others would.

 6        Also, ladies and gentlemen, keep in mind the

 7   following.  This is when the evidence starts coming in.  There

 8   may be occasions when a witness is testifying from the witness

 9   stand and the witness is looking at something on the screen,

10   and you're thinking, Hey, how come we don't get to see it?

11   That may be because that particular exhibit has not been

12   admitted yet.  So if it hasn't been admitted yet, then

13   obviously you can't see it.  Once it's admitted, then as long

14   as an attorney asks to have it displayed or sometimes we use

15   the term "published" to you, then if I say, Yeah, that's fine,

16   then it will be displayed to you, okay?

17        All right.  Ladies and gentlemen, I told you -- oh,

18   let me talk to you about something I forgot to mention before,

19   and that is the schedule.  So I had mentioned to you that we

20   are not going to have trial on Fridays.  That's true.  But also

21   please note that the week of June 20th we are not going to have

22   trial at all that entire week.  June 20th is Juneteenth, a

23   federal holiday.  We wouldn't be having trial on that day in

24   any event.  But we are not going to have trial that week.  But

25   then the next week, the week of June 27, once again, we will

 1    have our normal 4-day week.  And then, of course, on the Fourth

 2    of July, we won't be having court on Monday, which is the

 3    Fourth of July.  We will just have three days of trial that

 4    week.  And then the next week which is July 11th, that will be

 5    a normal four-day week.

 6            Once the jury begins its deliberations, then the jury

 7    can deliberate on Fridays too, okay?  So, for instance, that

 8    week if the trial went that long and if, say, we ended the

 9    trial on the 14th, the jury could deliberate on the 15th, which

10    is a Friday, so the jury can deliberate on Fridays, not

11    necessarily if all the jurors indicated that they couldn't or

12    something of that nature, but there wouldn't be any reason that

13    the jury could not deliberate on a Friday, all right?

14            Now, ladies and gentlemen, let me go ahead and read to

15    you that preliminary instruction that I mentioned to you.

16            Members of the jury, at the end of the trial, I will

17    give you detailed guidance on the law and on how you will go

18    about reaching your decision, but now I simply want to

19    generally explain how the trial will proceed.

20            This criminal case has been brought by the United

21    States Government.  I will sometimes refer to the government as

22    the prosecution.  The government is represented by Kevin Hart,

23    Leslie Wulff, Paul Torzilli, and Daniel Loveland.

24            Defendant Jayson Penn is represented by Michael

25    Tubach, Anna Pletcher, and Brian Quinn.

1        Defendant Mikell Fries is represented by Richard

2   Kornfeld, David Beller, and Kelly Page.

3        Defendant Scott Brady is represented by Bryan Lavine,

4   Megan Rahman, and Laura Ann Kuykendall.

5        Defendant Austin is represented by Michael Feldberg,

6   Laura Carwile, and Julie Withers.

7        Defendant Lovette is represented by John Fagg, Dru

8   Nielsen, Frank Schall, and Kaitlin Price.

9        The Indictment charges each defendant with a

10  conspiracy to suppress and eliminate competition by rigging

11  bids and fixing prices and other price-related terms for

12  broiler chicken products sold in the United States.  The

13  Indictment is simply the description of the charges made by the

14  government against the defendants.  It is not evidence of guilt

15  or anything else.

16       Each defendant has pleaded not guilty and is presumed

17  innocent.  A defendant may not be found guilty by you unless

18  all 12 of you unanimously find that the government has proved

19  his guilt beyond a reasonable doubt.

20       There are multiple defendants in this case, and you

21  will have to give separate consideration to the case against

22  each defendant.

23       The first step in the trial will be the opening

24  statements.  The government in its opening statement will tell

25  you about the evidence which it intends to put before you.

1    Just as the Indictment is not evidence, neither is the opening

2    statement.  Its purpose is only to help you understand what the

3    evidence will be.  It is a road map to show you what is ahead.

4         After the government's opening statement, each

5    defendant may make an opening statement.

6         Evidence will be presented from what you will have to

7    determine the facts.  The evidence will consist of the

8    testimony of the witnesses, documents and other things received

9    into the record as exhibits, and any facts about which the

10   lawyers agree or to which they stipulate.

11        The government will offer its evidence.  After the

12   government's evidence, each defendant may present evidence, but

13   no defendant is required to do so.  I remind you that each

14   defendant is presumed innocent, and it is the government that

15   must prove each defendant's guilt beyond a reasonable doubt.

16        If the defendants submit evidence, the government may

17   introduce rebuttal evidence.

18        At times during the trial, a lawyer may make an

19   objection to a question asked by another lawyer or to an answer

20   by a witness.  This simply means that the lawyer is requesting

21   that I make a decision on a particular rule of law.  Do not

22   draw any conclusion from such objections or from my rulings on

23   the objections.

24        If I sustain an objection to a question, the witness

25   may not answer it.  Do not attempt to guess what answer might

have been given if I had allowed the answer.  If I overrule the
objection, treat the answer as any other.  If I tell you not to
consider a particular statement, you may not refer to that
statement in your later deliberations.  Similarly, if I tell
you to consider a particular piece of evidence for a specific
purpose, you may consider it only for that purpose.

During the course of the trial, I may have to
interrupt the proceedings to confer with the attorneys about
the rules of law that should apply.  Some of these conferences
may take more time, so I will excuse you from the courtroom.  I
will try to avoid such interruptions whenever possible, but
please be patient even if the trial seems to be moving slowly
because conferences often actually save time in the end.

You are to consider all the evidence received in this
trial.  It will be up to you to decide what evidence to believe
and how much of any witness' testimony to accept or reject.

After you have heard all the evidence, I will instruct
you on the rules of law which you are to use in reaching your
verdict.  The government and each defendant will then be --
each be given time for their final arguments.

Let me give you some information about whether or not
you choose to take notes.  If you would like to take notes
during the trial, you may.  On the other hand, you are not
required to take notes.  If you do decide to take notes, be
careful not to get so involved in note-taking that you become

```
 1    distracted.  And remember that your notes will not necessarily

 2    reflect exactly what was said, so your notes should be used

 3    only as memory aids.

 4          Therefore, you should not give your notes precedence

 5    over your independent recollection of the evidence.  You should

 6    also not be unduly influenced by the notes of other jurors.  If

 7    you do take notes, leave them in the jury room at night and do

 8    not discuss the contents of your notes until you begin your

 9    deliberations.

10          I do not permit jurors to ask questions of witnesses

11    or of the lawyers.  If you are unable to hear a witness or a

12    lawyer, please raise your hand immediately and I will see that

13    this is corrected.

14          Each defendant is charged in the Indictment with a

15    violation of 15, United States Code, Section 1 of the Sherman

16    Act.  This law makes it a crime to unreasonably restrain trade.

17    The Indictment charges the defendants with conspiring to fix

18    prices and rig bids for broiler chicken products beginning at

19    least as early as 2012 and continuing through at least early

20    2019.

21          To find any defendant guilty of this crime, you must

22    be convinced that the government has proved each of the

23    following elements against him beyond a reasonable doubt.

24    First, that the charged price-fixing and bid-rigging conspiracy

25    existed at or about the times alleged; second, that the
```

1    defendant knowingly, that is voluntarily and intentionally,

2    became a member of the conspiracy charged in the Indictment

3    knowing of its goal and intending to help accomplish it; and

4    third, that the conspiracy affected interstate commerce.

5            During the course of the trial, you should not talk

6    with any witness or with any of the defendants or with any of

7    the lawyers at all.  In addition, during the course of the

8    trial, you should not talk about the trial with anyone else

9    whether in person, on a podcast, on the web, or on any social

10   media platform.  Also, you should not discuss this case among

11   yourselves until I have instructed you on the law and you have

12   gone to make your decision at the end of the trial.

13           It is important that you wait until all the evidence

14   is received and you have heard my instructions on the

15   controlling rules of law before you deliberate among

16   yourselves.

17           Let me add that during the course of the trial, you

18   will receive all the evidence you properly may consider to

19   decide the case.  Because of this, you should not attempt to

20   gather any information on your own that you think may be

21   helpful.  Do not engage in any outside reading or research on

22   this case, including through the use of the internet,

23   cellphones, smart phones, or paper resources.  Do not attempt

24   to visit any places mentioned in the case, and do not in any

25   other way try to learn about the case outside the courtroom.

1          Now that the trial has begun, you must not listen to

2     or read about it in the media.  The reason for this is that

3     your decision in this case must be made solely on the evidence

4     presented at the trial.

5          The court reporter is making stenographic notes of

6     everything that is said.  This is basically to assist any

7     appeals.  However, a typewritten copy of the testimony will not

8     be available for your use during deliberations.  On the other

9     hand, any exhibits will be available to you during your

10    deliberations.

11         With that introduction, the government may present its

12    opening statement.

13         Mr. Hart?

14                         **OPENING STATEMENT**

15         *MR. HART:*  Thank you.

16         For nearly a decade, Jayson Penn, Bill Lovette, Roger

17    Austin, from a company called Pilgrim's Pride, Mikell Fries and

18    Scott Brady from a competing company called Claxton cheated

19    their customers out of millions of dollars.  They did it by

20    rigging bids and fixing prices for chicken sold to fast-food

21    restaurants, household names like Kentucky Fried Chicken.

22    These five defendants from two companies were part of a larger

23    agreement with other companies.  Together they secretly ganged

24    up to rig the bids for chicken supply contracts.

25         The defendants and their co-conspirators were supposed

1   to compete, but instead of competing against each other, the

2   defendants and their cronies conspired with each other to stack

3   the deck in their favor and give themselves an unfair

4   advantage.  The defendants and their co-conspirators chose to

5   cheat rather than compete.

6         Why?  To increase profits.  You will hear how the

7   defendants and their co-conspirators formed a team.  They

8   formed a united front against their customers.  Rather than

9   duking it out and competing, the defendants and their team

10   agreed in advance how the bidding process would play out at the

11   expense of their customers.  Their scheme was so successful

12   that they imposed historic price increases, the largest ever in

13   the chicken fast-food industry.

14         And you will hear what the defendants and their

15   co-conspirators did was to rig bids and to fix prices, and you

16   will learn that rigging bids and fixing prices is a federal

17   crime, and that's why we are here.

18         The crime that the defendants committed violated the

19   Sherman Act, and you will learn that the purpose of the Sherman

20   antitrust act is to protect competition.  Through competition

21   customers and consumers get the best products at the best

22   price.  But the defendants made sure that didn't happen.

23         And to give you an idea of the scale and the magnitude

24   of the defendants' illegal actions, in 2014 alone KFC entered

25   into contracts to buy 8 million pounds of chicken a week, not

1    for the year, not for a month, but every single week,

2    8 million pounds of chicken.  And if you do the math, the

3    largest price increase ever in memory to hit the chicken

4    fast-food industry translated into somewhere between 50 and

5    $60 million.  And that's just for one customer, for one bid,

6    for one year.

7         Folks, let's start at the beginning.  After Pilgrim's

8    emerged from bankruptcy, it hired Defendant Lovette and

9    Defendant Penn as senior executives.  They ushered in a shift

10   of culture with a focus on the bottom line, profits.  They cut

11   costs, but cutting costs only goes so far.  It's only half the

12   equation.  To increase profits, they also needed to increase

13   the price of chicken they sold to its customers.

14        Now, Pilgrim's, they sold chicken to many customers,

15   including fast-food restaurants, and chief among them was

16   Kentucky Fried Chicken.  But here was the rub, Kentucky Fried

17   Chicken used a competitive bidding process to buy its chicken.

18   Pilgrim's couldn't raise its price alone because other

19   suppliers might come in and undercut them and steal their

20   business.  Raise prices alone, risk losing business.  Cheat and

21   raise prices with your conspirators and you are in the driver's

22   seat.  You get to control how the bid plays out.

23        What Pilgrim's needed, what Defendants Lovette and

24   Penn needed, they needed the whole industry, all the suppliers

25   to get on the same page and submit high prices together.

1          Then in 2012, they caught a break.  Defendant Brady,

2    he left Pilgrim's to go work for Claxton with Defendant Fries,

3    a competitor.  Now Pilgrim's had someone at Claxton who was in

4    charge of the bidding process for these contracts, someone they

5    could trust.  And the trust went both ways.  It was a two-way

6    street.  This meant Claxton was able to team up with Pilgrim's

7    so they didn't have to cheat against each other.  Claxton and

8    Pilgrim's got other competitors in the industry onboard too.

9    They needed to.  They needed to fill out their team and create

10   the united front against their customers.

11         And you will hear how the defendants and their

12   co-conspirators referred to other people on their team with

13   whom they rigged bids.  They called them "friendly

14   competitors."  But competition isn't meant to be friendly.  For

15   the first two years of the conspiracy, it started slowly.

16   Defendants and their co-conspirators worked together to keep

17   prices high, resist price reductions from the customer.

18         But then Mother's Day, Mother's Day 2014.  Mother's

19   Day is a big day for KFC.  In 2014, there wasn't quite enough

20   chicken to go around.  KFC panicked.  To make sure they didn't

21   run out of chicken again, KFC changed its usual practice of

22   bidding out the annual contract to switching to a three-year

23   contract.  KFC wanted to lock in supply for three years to make

24   sure it had enough chicken for its franchisees.  Defendants and

25   their crew had their big opportunity.  They had had a

1    three-year contract, a team ready, willing, and able, and a

2    customer who had to buy chicken.  Their plan was to rig bids

3    for KFC's flagship product, its famous eight-piece chicken on

4    the bone.

5           Defendants now had the motive, the means, and the

6    opportunity.  They swung for the fences, and they knocked it

7    out of the park, exploiting KFC's fears.  Defendants and their

8    co-conspirators worked together to force through the historic

9    price increases three to four times what the customer expected.

10          They knew their customers' feared shortages.  They

11   knew their customers were worried, but, ladies and gentlemen of

12   the jury, they didn't leave a good crisis.  Because teams'

13   collective effort, Pilgrim's alone nearly doubled its profit

14   for every pound of chicken sold to KFC in the 2015 contract,

15   nearly doubled its profits for three years.

16          After the defendants jacked up prices in 2015, KFC was

17   prepared to insist on price reductions the next time the

18   contract came up for bid.  But you will hear that the

19   defendants and their crew got the band back together, and they

20   didn't miss a beat.  The defendants were back on the phones

21   calling each other, coming together to resist price decreases

22   and keep prices high.

23          And then you will hear how this conspiracy ended.

24          Now that we talked about the conspiracy, let's talk

25   about the bids themselves.  When fast-food companies want to

1    purchase chicken for their local franchisees, they enter into

2    contracts with suppliers to get the best price.  These

3    contracts are competitively bid.  This means the customers

4    place the bidders in a competition with each other.

5         Because customers like KFC required far more chicken

6    than a single supplier could provide, they entered into

7    contracts with six or seven suppliers.  No single supplier won

8    the whole contract.  Suppliers knew that they would be getting

9    part of the business, but customers like KFC would award a

10   bigger piece of the pie, more business to the supplier with the

11   best bid price.

12        KFC designed a bid process that would compare each

13   submission from each bidder to each other to get the best

14   price, meaning KFC's whole process relied on submitting

15   independent bids.

16        Let's take a look at the bidding process.  You'll

17   learn that there are essentially three phases of the bidding

18   process.  First, customers like KFC would send out a request

19   for bid to the chicken suppliers.  The bid detailed the terms

20   the contract such as the type of chicken product, the quality,

21   and the amount.

22        Second, each chicken supplier would determine its

23   costs and its profits to generate a price for its bid.  Each

24   supplier was supposed to independently calculate its bid it

25   would offer to the customer, not coordinate with competitors.

54

1          And third, the chicken supplier was to submit this

2     independently determined confidential bid back for the

3     customer.

4          Customers didn't usually accept the first bid price.

5     They might repeat this process in additional rounds to get a

6     lower price before they signed the final contract.  And you'll

7     learn that this is supposed to be a blind bidding process,

8     meaning bidders were not supposed to know what each other were

9     doing.  And you will hear that KFC created this this way to get

10    the best price, but that didn't happen.

11         Let's talk about how this crime took place.  The

12    defendants and their co-conspirators corrupted the bidding

13    process, and here is how they did it.  You will hear about the

14    time of the bidding, defendants and their co-conspirators

15    worked on the phones calling each other trying to tell each

16    other where they are going to be on their bids.  Defendants

17    aligned their bid strategy.  They coordinated on bid pricing,

18    and in some instances defendants provided the exact bid prices

19    they planned on submitting to the customer.

20         The defendants and their co-conspirators got on the

21    same page before submitting their final bid.  And you will hear

22    that when customers like KFC received these bids, these rigged

23    bids, they tried to push back.  They tried to negotiate, but

24    they couldn't.  They were met by the team's united front.

25    Defendants and their co-conspirators would get back on the

1    phone telling each other to stay firm, hold on price, working

2    together at the expense of the customer.

3            Defendants didn't have to submit a better price.

4    Defendants didn't have to worry about competition because they

5    had already fixed the game.  The bidding process was like a

6    game of poker, and each bidder knew each other's cards.  And

7    all along, all along the customers had no idea of the scheme

8    among the defendants and their team.

9            The agreement wasn't for a specific price.  It didn't

10   need to be as long as they worked together.  Sometimes they

11   worked together to drive prices up.  Other times they worked

12   together to resist price reductions, but in both instances,

13   it's bid-rigging, it's price-fixing, and that's exactly the

14   crime for which they are charged.

15           Because the defendants and their co-conspirators

16   worked together as a united front, the customers had nowhere to

17   go.  The defendants had rigged the system.  And when you boil

18   it all down, that's what this case is about.

19           Members of the jury, now that you've heard what the

20   defendants and their co-conspirators did, let's talk about how

21   the government is going to prove its case, the defendants'

22   corruption of the bidding process.  You will hear and see

23   evidence about a broad conspiracy involving other

24   co-conspirator supply companies affecting other fast-food

25   restaurants.  This trial, this trial will focus on the

1   defendants' crimes as they cheated Kentucky Fried Chicken.  You

2   will hear specific examples of corrupted bids.

3          You will hear from witnesses who purchased chicken for

4   KFC, and they will walk you through the bidding process, how is

5   this supposed to happen.  And then we will show you how it

6   actually happened.

7          We'll pull back that curtain and show you the

8   defendants' and their co-conspirators' course of dealings on

9   bid after bid when they corrupted the bidding process.  The

10  government will show you the evidence the defendants tried to

11  keep secret.  Because the defendants played different roles in

12  the conspiracy, the evidence of each defendant will be

13  different.  Let's take a look.

14         Defendants Austin and Brady, they were the foot

15  soldiers on the front lines of the conspiracy.  They had the

16  day-to-day responsibility for bidding, and importantly they had

17  the relationships with the other co-conspirator bidders.

18  Evidence against them can be seen by phone calls between the

19  conspirators during key times of the bidding process.  They

20  told each other where they were going to be with their bids.

21  They aligned their strategy keeping each bidder on the same

22  page was how this bid-rigging conspiracy worked.

23         Your Honor, may I approach the screen?

24         THE COURT:  Yes, you may.

25         MR. HART:  This is how the conspiracy worked.  When

1    the customers send out a bid, the foot soldiers would talk to

2    each other.  They would align on their strategy.  And after

3    they did that, they would check with their bosses, and they

4    would report up, so they would go from the bottom up to the top

5    of the bosses.  So one competitor would contact another

6    competitor during key points of the conspiracy, and then they

7    would report up.

8         And many of these internal communications back and

9    forth were e-mails and texts, and you'll see the defendants'

10   own words in these e-mails and text messages.  You will see

11   their words in black and white as the crime is being committed,

12   as they were conspiring to cheat their customers.  And when you

13   read them, you'll see that the defendants' words were those of

14   collusion, not competition.  And when you compare them to the

15   bids submitted, you'll see that their actions match their

16   words.

17        Defendants Penn, Lovette, and Fries, well, they were

18   the bosses.  They worked behind the scenes.  You won't see as

19   many communications between them and their competitors.  They

20   had Defendants Austin and Brady to do most of the dirty work

21   for them.  But you'll see their calls, their texts, and e-mails

22   approving and providing guidance to Defendants Austin and

23   Brady.  But make no mistake about it, members of the jury, from

24   day one Defendants Penn, Lovette, and Fries directed,

25   encouraged, facilitated, and approved Defendant Austin and

1    Brady's actions.  They were active participants in this

2    conspiracy.  They operated from on high getting in the trenches

3    when needed to help the conspiracy.

4         Because this conspiracy was a secret, much of the

5    evidence will be presented without a witness, and it will speak

6    for itself.  You will see it for yourself in the screens in

7    front of you.  Some of the evidence will be organized in

8    summary charts.  This evidence will provide you a play by play

9    of the conspiracy.  You will see calls made between the

10   defendants and their co-conspirators during key parts of the

11   bidding process.  You will see a pattern develop.

12        As you read the evidence, look to the number of calls,

13   look to the timing of calls, look who called.  Use these three

14   things as a tool kit to access the information contained on the

15   summary charts, to see the defendants' crime.

16        Now, in addition to this evidence that you'll see on

17   your screens, you'll also hear from an eyewitness to the

18   defendants' crimes.  This eyewitness worked at Pilgrim's.  He

19   is going to tell you how this crime operated from the inside as

20   only an insider could.  He'll tell you how he and the

21   defendants corrupted the bidding process, working the phones,

22   texting, and e-mailing each other to fix prices and rig bids.

23   And he'll tell you how the defendants' team manipulated the

24   outcome of the bids, and he'll walk you through specific

25   examples on how the defendants cheated customers.

1          He'll explain to you why he did it.  He'll explain why

2     they did it.  And he will also explain why he is here and why

3     he is cooperating.  We will ask you to scrutinize his testimony

4     carefully.  And when you do, you will see what he says doesn't

5     stand alone.  It will be supported by the evidence.

6          Members of the jury, the evidence will show that the

7     defendants and their co-conspirators knew what they were doing,

8     and they didn't want to get caught.  Because of this, they took

9     measures to cover up, conceal their act of conduct.  You will

10    hear defendants purposefully didn't bid the same amount because

11    they didn't want to tip off the customers.

12         You will hear not once, not once did the defendants

13    and their co-conspirators ever tell their customers what they

14    were actually doing.  They did it behind their backs.  That's

15    not how the market is supposed to work.  They stacked the deck

16    in their favor because it was far easier for them to make money

17    through collusion than the rough and tumble of competition.

18         As the trial progresses, I know you're going to listen

19    to the evidence very carefully, and I know that you'll closely

20    follow Chief Judge Brimmer's instructions, but even though we

21    are in this formal, serious setting, it doesn't mean you check

22    your common sense at the door.

23         Use your common sense that you use in your everyday

24    life.  Use your common sense to see that even though some

25    aspects of the chicken supply market might appear complex, the

1   crime here was simple.  And once you review all the evidence,

2   you will come to one and only one conclusion, Defendants Jayson

3   Penn, Bill Lovette, Roger Austin, Mikell Fries, and Scott Brady

4   are all guilty as charged.

5           THE COURT:  Thank you, Mr. Hart.

6           We will now hear the opening statements of the

7   defense.  Is someone going first?  Ms. Nielsen, go ahead.

8                         **OPENING STATEMENT**

9           MS. NIELSEN:  Thank you, Your Honor.

10          The prosecution's case against these men is nothing

11  but a conspiracy theory, a conspiracy theory without facts,

12  without reliable witnesses, and without proof beyond a

13  reasonable doubt that a conspiracy existed at all because it

14  didn't.  There was no conspiracy to fix prices, meaning there

15  was no agreement amongst these men who worked at different

16  chicken supply companies to fix the price of chicken.

17          Did the price of chicken go up in some years?  Of

18  course, it did.  Did the price of chicken go down in some

19  years?  It sure did.  This graph shows you how the price of

20  chicken changed, how it went up and down from year to year, not

21  at all what we would expect to see if there was a conspiracy,

22  an agreement among competitors to fix or raise the price of

23  chicken.

24          And in this trial, you will hear the reason why prices

25  changed, simple supply and demand.  The prosecution wants you

1    to ignore the logical and established law of supply and demand.

2    And the prosecution wants you to ignore supply and demand even

3    though the prosecution's own witnesses will show you that the

4    prices went up in some years and the prices went down in some

5    years because of supply and demand.

6         Despite their own witnesses, the prosecution will

7    argue to you that the only reason why chicken prices were

8    substantially more in some years was because of a conspiracy,

9    but the prosecution's argument is based on assumptions and

10   guesses, conjecture and theory, not evidence and not proof

11   beyond a reasonable doubt.

12        I represent Bill Lovette.

13        And, Bill, if you could stand up so the jury could see

14   you.

15        Bill Lovette worked in the chicken business for 40

16   years working his way up from catching chickens on his family

17   farm to the CEO of Pilgrim's Pride.  He was the CEO of

18   Pilgrim's from 2011 to 2019 when he retired from the company.

19   Bill never knew of any price-fixing conspiracy, much less

20   participate in one.  He did not cheat.

21        Bill Lovette was a serious and dedicated CEO who

22   achieved success by earning it through very hard work and an

23   intensely competitive desire to be the best.  Bill worked day

24   and night leading the company by example and motivated to make

25   Pilgrim's Pride the most respected company in the industry.  By

1   hard work and innovation, Bill did what he set out to do, to

2   make Pilgrim's a well-respected and successful company.

3        During the time that Bill Lovette was the CEO,

4   Pilgrim's had over 50,000 employees.  Bill had a dozen people

5   who directly reported to him.  His responsibilities of CEO --

6   as CEO were weighty, and he dealt with high-level issues on a

7   daily basis.  For example, Bill worked on expanding Pilgrim's

8   business globally, to Mexico, to Europe.  He worked on

9   acquiring other companies.

10        Bill Lovette was the CEO of a huge global public

11   company, a company that not only had chicken processing plants

12   all over the United States, but thousands and thousands of

13   customers not only in the United States, but in 95 different

14   countries around the world.

15        Pilgrim's business with fast-food restaurants was just

16   one slice of Pilgrim's overall business, so Pilgrim's business

17   with KFC was just one tiny slice of Pilgrim's vast and global

18   business.  Besides selling chicken to fast-food restaurants

19   like KFC, Chick-fil-A, Popeye's, and Church's, Pilgrim's sold

20   chicken to many very large customers who were not fast-food

21   restaurants, large retail grocery stores like Kroger, which

22   means King Soopers, Safeway, Wal-Mart, and Costco.

23        Pilgrim's sold to all these customers and thousands

24   and thousands of other customers, which means a couple of

25   things in the context of this trial.  Pilgrim's had a lot of

1    customers that wanted to buy the chicken that they were

2    selling.  And because they had a lot of customers who wanted to

3    buy their chicken, Pilgrim's made independent business

4    decisions to figure out which customers and what price were in

5    the best interests of Pilgrim's business and Pilgrim's

6    stakeholders.

7          When you think about the evidence that the prosecution

8    will present to you in this case, remember that right now the

9    starting point is that you are all required to presume all of

10   these men innocent, and they remain innocent, and that never

11   changes unless the prosecution proves their conspiracy theory

12   beyond a reasonable doubt.

13         So let's talk about what evidence the prosecution will

14   present to you to try to prove this conspiracy theory of theirs

15   and move these men, try to move these men from innocent to

16   being convicted of a federal crime.

17         In the trial, the majority of the evidence comes from

18   there.  That, of course, is the witness stand.  And there is

19   one in every courtroom in the United States because that's

20   where evidence comes from, from witness' testimony, from

21   witnesses who have knowledge and information about the alleged

22   crime.

23         The prosecution here alleges a far-reaching

24   conspiracy, not just involving the five men charged in this

25   case, but involves dozens and dozens of other people who worked

1   at different chicken companies.

2          You see, in addition to Pilgrim's and Claxton, the

3   prosecution alleges that people who worked at other big public

4   companies like Tyson Foods and other lesser-known chicken

5   companies were all in this and that they all agreed with one

6   another to fix prices.  So the prosecution's theory is that all

7   these dozens and dozens of people were involved in this alleged

8   conspiracy to fix prices.

9          And if you think about all of the dozens and dozens of

10  people that the prosecution claims were involved, they all have

11  dozens of friends and family.  People would know about the

12  conspiracy.  People would have information.  People would have

13  things to say.  People would have details about the alleged

14  conspiracy.  And yet when we think about what witnesses the

15  prosecution will present as to Bill Lovette, with all of the

16  dozens and dozens of people that the prosecution claims knew of

17  and participated in the alleged conspiracy to fix prices, how

18  many witnesses will the prosecution call to that witness stand

19  who have any knowledge or any information that Bill Lovette

20  participated in a conspiracy to rig bids and fix prices?  None,

21  zero.

22          In fact, in this trial, the prosecution will call only

23  one single witness, the so-called eyewitness who claims to have

24  any knowledge whatsoever about this alleged conspiracy.  His

25  name is Robbie Bryant.  And I predict that when Robbie Bryant

1    takes that witness stand, he will tell you he's a liar, that he

2    lied to the prosecution and he lied to federal agents.

3          Beyond that, you're going to hear what the prosecution

4    has done to shape and to mold Mr. Bryant's testimony to try to

5    fit their conspiracy theory.  But -- and this is really

6    important, even if you were to believe Robbie Bryant's tale of

7    a price-fixing conspiracy, Robbie Bryant, the so-called

8    eyewitness, will not put Bill Lovette in the conspiracy at all.

9    Mr. Bryant will testify about the people he claims were

10   involved in this price-fixing conspiracy.  He does not name

11   Bill.

12         So as you listen to Robbie Bryant's testimony, you

13   will see that none of it really matters for Bill Lovette.  Why?

14   Because Robbie Bryant, the so-called eyewitness, will say he

15   has no personal knowledge whatsoever that Bill Lovette was

16   involved in a conspiracy, none, zero, which gets us back to the

17   question, what will the prosecution present as to Bill Lovette?

18   Since they don't have a single witness who places Bill in this

19   alleged conspiracy to fix the price of chicken, the prosecution

20   had to go looking, looking for something, looking for anything

21   to try to prove their conspiracy against Bill.

22         You'll see what they try to do.  They will try to fill

23   this Bill void with noise, with nonsense, with e-mail snippets

24   without any context, snippets that may look suspicious to you

25   at first look, but don't prove in any way, shape, or form

1   Bill's involvement in this alleged conspiracy.

2            What do I mean by that?  I mean the prosecution will

3   show you e-mails and government-created charts, meaning charts

4   that they made, without a witness to explain what they actually

5   mean.  The prosecution wants to create their own narrative to

6   fit their false theory.  They will show isolated snippets

7   pulled from scouring years and years of e-mails and texts from

8   dozens and dozens of people who worked in the chicken industry,

9   but without any meaning, without any witness, without any

10  explanation.

11           And as you listen to the evidence, keep this in mind.

12  The prosecution charges Bill with an 8-year-long conspiracy to

13  fix the price of chicken.  The prosecution collected and

14  scoured over millions of documents, thousands and thousands of

15  e-mails and texts from dozens and dozens of people.  Yet with

16  all of the e-mails and all of the texts that the prosecution

17  and the federal agents scoured over, how many e-mails or texts

18  show Bill Lovette actually participating in a conspiracy to rig

19  bids and fix the price of chicken?  None, zero.

20           And you won't have to take my word for it.  You will

21  see for yourself that none of these e-mails prove that Bill

22  Lovette knew of or participated in a price-fixing conspiracy.

23  Some of what you're going to see in the e-mails is evidence

24  that his -- Bill's co-workers would forward him or copy him on

25  an e-mail.  Well, of course, Bill Lovette was copied and

1   forwarded on thousands and thousands of e-mails.  He was the

2   CEO of a public company with over 50,000 employees.

3           The other thing that you're going to see are

4   references to Bill in e-mails such as, I will discuss with Bill

5   or come to Bill's office, even though what is being discussed

6   was Pilgrim's ordinary and legal business, that's it.  Because

7   this is all the prosecution can come up with as to Bill

8   Lovette, they will ask you to speculate and to make the worst

9   possible assumptions about these e-mails.  They will ask you to

10  twist and to turn and assume ordinary business e-mails are

11  something that they are not.  But asking you to speculate and

12  asking you to make assumptions about e-mail snippets without a

13  witness, without context, and without explanation is most

14  certainly not proof beyond a reasonable doubt.  These few

15  e-mails that involve Bill show the ordinary course of business,

16  not a conspiracy.

17          You will hear that not only is discussing market

18  intelligence including pricing information common in this

19  industry, but knowing, receiving, and sharing pricing

20  information is 100 percent legal.  There is nothing unusual or

21  illegal in the e-mails that Bill Lovette was forwarded or

22  copied on even if we assume he reviewed every single e-mail he

23  ever received.

24          Another thing you are going to see in this case are

25  phone calls, and the prosecutor just stood up here and said,

1    Look at the number of calls.  Well, as to Bill Lovette, the

2    prosecution will point to one single call, not a call that Bill

3    had with a competitor, but a call that Bill had with a fellow

4    Pilgrim's employee.  The Pilgrim's employee was Roger Austin,

5    and Roger was leading the Pilgrim's sales team in the contracts

6    with KFC.

7          You will hear that in 2014 when the contract

8    negotiations with KFC were going on, all of the chicken

9    suppliers who sold chicken to fast-food restaurants from the

10   big companies like Tyson and Pilgrim's to the smaller companies

11   like Claxton, they were all in a very strong position.  The

12   reason that the chicken suppliers were in a strong position in

13   2014 was not because of some made-up conspiracy theory, but

14   because of the market, supply and demand.  Demand was very high

15   for this chicken, and supply was very low.

16         One fast-food restaurant in particular was upset about

17   the price of chicken in 2014, and you probably guessed it, that

18   was KFC.  And KFC was in big of trouble at the time, really

19   struggling to maintain business, struggling to compete with

20   growing chains like Chick-fil-A.  Still, even in 2014 with low

21   supply and high demand, KFC wanted to buy cheap chicken.

22         Now, let me take a moment and explain how KFC buys

23   their chicken.  KFC outsources its chicken purchasing to a

24   company called RSCS.  So when RSCS couldn't get cheap chicken

25   from Roger Austin at Pilgrim's, the CEO of RSCS wanted to talk

1    to Bill Lovette about Pilgrim's price, a CEO-to-CEO call.

2          And so before the CEO-to-CEO call, Roger Austin from

3    Pilgrim's, who was doing these negotiations, and Bill Lovette

4    had a conversation to fill Bill in on what was happening with

5    the KFC negotiations.

6          THE COURT:  Two minutes, Ms. Nielsen.

7          MS. NIELSEN:  Two minutes?

8          THE COURT:  Yeah.

9          MS. NIELSEN:  And as you listen to the evidence, ask

10   yourself, how is this conversation between two Pilgrim's

11   employees to prepare Mr. Lovette for a call with a customer any

12   evidence of a conspiracy?

13         Now, after Roger and Bill talked, Bill did, in fact,

14   have a conversation with the RSCS CEO.  And you are going to

15   hear from a witness in this case who listened to that

16   conversation, and he will tell you about what Bill said about

17   Pilgrim's pricing.  Pete Suerken will tell you that what Bill

18   said in 2014 about Pilgrim's pricing made sense, and it was a

19   very methodical economic case for Pilgrim's pricing.

20         Yes, Bill Lovette was the CEO of Pilgrim's, but that

21   title, his position in the company isn't evidence of anything.

22   This is not a case about corporate responsibility or whether a

23   company is going to be fined.  This is a trial where these

24   men's liberty is at stake.  Bill is charged as an individual on

25   trial for committing a crime as an individual, a crime that he

1    did not commit.

2          And in this courtroom where all of these individuals

3    are presumed innocent, they are to be judged individually,

4    judged based on the actual evidence that the prosecution

5    presents as to each individual.  In Bill's case, there is an

6    absolute lack of evidence that he had any knowledge of, any

7    participation in, or directed any conspiracy to fix the price

8    of chicken.  He absolutely did not do that.

9          The prosecution will present a theory, a conspiracy

10   theory.  A conspiracy theory without facts is just a theory.  A

11   theory is not evidence, and a theory is most certainly not

12   proof beyond a reasonable doubt.  Bill Lovette is an innocent

13   man.  Because the prosecution's case against Bill is based on

14   theories and assumptions which the prosecution cannot prove

15   beyond a reasonable doubt, at the end of this trial you must

16   find Bill Lovette not guilty.

17         Thank you.

18         *THE COURT:*  Thank you, Ms. Nielsen.

19         Let's see, who is next?

20         Mr. Tubach.

21                        **OPENING STATEMENT**

22         *MR. TUBACH:*  Thank you, Your Honor.

23         Two phone calls, a handful of documents, and no

24   witnesses, that's the prosecution's entire case against Jayson

25   Penn.  That's what they came up with after combing through

1   15 million documents and conducting hundreds of witness

2   interviews.  And when I say no witnesses, I am not

3   exaggerating.  After searching high and low for someone,

4   anyone, who could support their story, they will not have a

5   single witness who gets on that witness stand and tells you

6   that Jayson Penn agreed or conspired with anyone to fix prices

7   or rig bids.

8         Instead, the government is just going to dump into

9   evidence hundreds of documents without any witness to explain

10  what they mean, and they are going to pick a few cherry-picked

11  sound bites from those documents that relate to Jayson.  These

12  little tidbits will not come close to meeting the government's

13  burden to prove beyond a reasonable doubt that Jayson Penn

14  agreed with anyone to fix prices or rig bids.

15        Why would the government charge Jayson with a

16  conspiracy to fix prices when the evidence just isn't there?

17  There is a simple explanation.  The prosecution didn't do its

18  homework.  Before charging Jayson who had recently become the

19  CEO of Pilgrim's Pride before he was charged, they didn't

20  interview anyone who was on any of those texts or e-mails

21  involving Jayson, and they didn't talk to a single person who

22  worked at Pilgrim's Pride where Jayson Penn worked for the

23  entire time this supposed conspiracy was going on.

24        They just filed these charges and then went looking

25  for witnesses to support their story.  But that didn't pan out.

1   And so that's why they are now stuck relying on little snippets

2   from a few e-mails and texts.  This kind of trial by

3   cherry-picked sound bites is, frankly, beneath the Department

4   of Justice or it should be, but here we are.

5          So even though we don't have the burden to do

6   anything, the burden is on the government the whole time, we

7   are going to bring you witnesses they won't.  And we will show

8   you the context of the e-mails and texts from Jayson that the

9   government doesn't want you to see.  And once you have heard

10  all of the evidence in this case, a few things will be crystal

11  clear.  Jayson Penn never fixed prices with anyone.  Jayson

12  Penn never told anyone to fix prices.  Jayson Penn didn't know

13  of anyone fixing prices.

14         The evidence will show that every decision Jayson made

15  at Pilgrim's was his own decision about what he thought was in

16  Pilgrim's own best interests.  That's not price-fixing.  That's

17  competition.  Jayson gave his heart and soul to a vital food

18  industry in this country for decades, and he did so with honor

19  and with integrity, and he never fixed prices with anyone.

20         My name is Michael Tubach, and I along with my

21  colleague Anna Pletcher and Brian Quinn are proud to represent

22  Jayson Penn.

23         Before I dig into the details of this case, let me

24  give you a critical distinction to keep in mind as you hear the

25  evidence in this trial.  It's quite simple.  Information

1    sharing does not equal price-fixing.  In its opening statement,

2    the government talked a lot about individuals at the companies

3    talking with each other.  The government wants you to

4    believe -- and sharing information.  And the government wants

5    you to believe that that's a crime.  It's not.  Let me be

6    perfectly clear.  It's 100 percent legal for competitors to

7    talk to each other and exchange information as long as they

8    don't have an agreement about what price to charge.

9         As you will hear, that's what good companies do.  In

10   fact, companies would be foolish not to gather as much

11   information as they can about the market.  If a hotel is trying

12   to decide what to charge for its rooms, it wants to know what

13   other hotels are charging for their rooms.  The more

14   information you have about the market, the better decision you

15   can make for yourself.  It's just that simple.

16        So when employees at Pilgrim's sent Jayson pricing

17   information about competing suppliers, he was absolutely

18   entitled to get and use that information to make his own

19   decision.  Sometimes that meant reducing the price.  Sometimes

20   that meant increasing the price.  But at all times, it meant

21   making his own decision about what was best for Pilgrim's.

22   That's not price-fixing.  It's 100 percent legal conduct.

23        Now, before I get into the evidence, let me tell you

24   just a little bit about Jayson.  Jayson is not just some

25   maskless person in a suit out here -- in a suit behind a mask.

1   He is a real human being, and he is sitting right over there,

2   and his family is out here.  He is facing one of the most

3   serious moments of his life.

4         Jayson, would you please stand so the jury can see

5   you?  Thank you.

6         Jayson is 53 years old.  He has spent his entire

7   career in the chicken business, most of it on the operations

8   side.  Jayson's strength has always been to crunch the data and

9   to figure out how chicken company can get better at creating

10  products and value.  So when Bill Lovette became the CEO of

11  Pilgrim's Pride in 2011, he asked Jayson to join him, and

12  together they set about trying to make Pilgrim's into the most

13  respected company in the industry.

14        Another thing you should know about Jayson, he is a

15  tough competitor, always has been.  He doesn't settle for

16  second best.  He wants to be the best.  Let me give you just

17  one example.  It's an e-mail he wrote in 2014 right in the

18  middle of when the government wants you to believe he was

19  conspiring with his competitors.  The weekly financial results

20  had just come out, and Jayson forwarded them to his boss, Bill

21  Lovette.  And here is what Jayson had to say about his two

22  biggest competitors, Tyson and Sanderson Farms.

23        Best week as a company as we have ever had.  And we

24  have much, much more to get.  Personal mission is to send

25  Sanderson Farms into a tailspin.  No need to mess with Tyson

1    because they have taken their own poison pill with their new

2    structure.  Foot on the throat.  Both of these boys will be

3    going down.  Our team is far from being good.  Teams need to

4    commit to being the best in our industry or hit the door.

5            Tough language?  You bet.  But this is the chicken

6    business, not a garden party.  It's tough language from a tough

7    competitor.  These are not the words of a man who conspires

8    with his competitors to fix prices.

9            Okay, let's talk about the evidence.  The government

10   has to prove to you beyond a reasonable doubt that there was a

11   conspiracy to fix the price of chicken and that Jayson Penn

12   knowingly and intentionally joined that conspiracy.  The

13   government won't be able to prove either of those things.  I

14   want to talk to you first about this supposed conspiracy.

15           The government has charged a conspiracy for broiler

16   chicken products between 2012 and 2019, but apparently they

17   don't even believe that because what we have just heard in the

18   opening statement is they are only going to prove something

19   about KFC and most likely for just one year or maybe a few

20   years.  But let me address the 2014 negotiations head on

21   because that's what the government focused most on.

22           The prices to KFC in 2015 went up and they went up

23   quite a bit.  There is no dispute about that.  But it was

24   market forces that drove up those prices, not any conspiracy or

25   agreement among competitors.  It was the basic law of supply

 1    and demand.  You see, long before those negotiations began, the

 2    supply for small birds was shrinking.  Small birds are the

 3    birds that are the birds that fast-food restaurants like KFC

 4    bought.  But big birds, which KFC doesn't buy, had become much

 5    more profitable to raise, so not surprisingly chicken suppliers

 6    had switched from raising small birds to raising big birds.

 7    Supply was going down.

 8         At the same time, demand for small birds was going up.

 9    Many of us started buying more of those rotisserie chickens at

10    supermarkets, and Chick-fil-A, as many of us know, was opening

11    stores right and left.  So the supply of small birds was going

12    down while the demand was going up.  You don't need a degree in

13    economics to know what's going to happen.  Prices are going to

14    go up.

15         Everyone in the industry, including KFC and its

16    negotiator, RSCS, saw this coming a mile away.  And then came

17    Mother's Day in 2014.  Mother's Day, which is in May, is the

18    busiest day of the year for KFC.  And on that day, the

19    unthinkable happened.  KFC ran out of chicken.  Stores

20    literally had to close.  This was a panic situation over at

21    KFC.

22         So with buyers, RSCS frantically went out into the

23    market to try to buy more chicken.  They couldn't find it.  And

24    when they could find it, they had to pay a huge premium to get

25    it.  At this point, RSCS knew it was in deep trouble unless

77

1    things changed, KFC risked running out of chicken again.

2         So before they send out the requests for bids, they

3    met with their suppliers and asked them what profit margin they

4    needed to keep selling small birds to KFC.  Here is an e-mail

5    from Bob Lewis, he was one of the buyers at RSCS, to Roger

6    Austin at Pilgrim's.  He says, Roger, as we mentioned, we will

7    schedule a conference call sometime within the next two weeks

8    to discuss the following:  Profit margin needed and how that

9    compares to big-bird profitability.

10        In other words, what do you need?  What profit do you

11   need to stay in this small-bird business?  And when Pilgrim's

12   employees, not Jayson, but others, met with RSCS, they told

13   RSCS to expect a 10-cent-per-pound profit increase, 10 cents

14   per pound.  In August 2014, a month later after this e-mail,

15   when it was time for Pilgrim's to submit its bid to RSCS, the

16   analysts at Pilgrim's put together a detailed draft bid.

17        They sent it to Jayson, and that draft bid included a

18   recommendation to increase the price, the margin by 10 cents

19   per pound.  They sent that recommendation to Jayson and backed

20   it up with data and analysis.  Jayson reviewed the bid, spoke

21   with those who had made the recommendation, and ran it by Bill

22   Lovette.  That 10-cent margin increase was what Pilgrim's

23   employees had told RSCS to expect in the prenegotiation

24   meetings.

25        As one of the analysts put it in recommending the

1    10-cent margin increase to Jayson, I believe we should do the

2    10 cents per pound because we have been prepping them for that

3    for the last few meetings.  So that was the bid that Pilgrim's

4    submitted to RSCS.

5         RSCS had asked Pilgrim's what additional margin it

6    needed and that was Pilgrim's answer.  Did Pilgrim's look at

7    what other companies might be doing to help them make their own

8    decision?  Of course, they did.  You always want to keep an eye

9    on your competition, because the more information you have, the

10   better decisions you can make.  So when the Pilgrim's analysts

11   worked up that draft bid, they included in that recommendation

12   information about what other companies might be bidding.  As

13   you'll here, some of that information was accurate, some of it

14   was inaccurate.

15        Here is what you won't see in that recommendation, any

16   evidence of an agreement.  There is nothing in there like, Here

17   is the deal we've reached; here is the wink and nod about our

18   conspiracy.  There is not even a hint of an agreement in that

19   recommendation.  It just says, Here is what I think others are

20   doing, and here is what I think we should do.  That is using

21   market intelligence to make your own decision, and it's

22   100 percent legal.

23        So that's what happened at Pilgrim's.  What about the

24   other suppliers?  This is supposed to be a price-fixing case,

25   so you would expect the suppliers to end up at about the same

1    price.  Well, here is a chart showing the suppliers' final

2    prices to KFC.  You see the suppliers' names on the left there.

3    And the right is the eight-piece COB, that stands for chicken

4    on the bone.  This is a per pound price.  And what does this

5    chart tell you?  The prices for 2015 were low of $1.03 per

6    pound to high of a $1.08 per pound.  These prices aren't the

7    same.  They aren't even close to the same.  In fact, as you

8    will learn, these prices are farther apart in 2015 than they

9    had been the year before.

10          Now the government pointed out that all the suppliers'

11   prices went up a lot in 2015 from the 2014 prices, but the

12   prices for the suppliers went up because they were all in the

13   same small-bird market facing the same market forces.  The

14   market was like the wind.  It blew all the prices in the same

15   direction.  They didn't end up in the same place.  In fact,

16   they ended up farther apart than they had before, but they were

17   all blown in the same direction by the same market, the basic

18   law of supply and demand.

19          Now, what about the amount of chicken the suppliers

20   each sold to KFC in 2015?  One sure fire sign that there is no

21   price-fixing conspiracy is when suppliers are stealing business

22   from each other, and that makes sense, right?  Why would

23   anybody enter into an agreement to fix prices, one part of

24   which is your competitor is going to steal away your business?

25   So did the chicken suppliers take business away from each other

1   in 2015?  Take a look at this chart.  It shows you how the

2   chicken sales changed to KFC from 2014 to 2015.

3        You can see the suppliers on the bottom there.  What

4   does this chart show you?  What it shows you is that in the

5   2015 contract, the contract the government wants you to believe

6   was part of a price-fixing conspiracy, Pilgrim's lost more than

7   500,000 pounds of chicken sales to KFC every week.  That is

8   millions and millions in lost sales, sales that went instead to

9   Pilgrim's competitors who sold to KFC at lower prices.  So

10  while the government wants you to believe that the suppliers

11  fixed prices to KFC, the actual evidence will show that the

12  prices were different and that suppliers stole a huge amount of

13  business away from Pilgrim's.  These indisputable facts destroy

14  this made-up conspiracy theory.

15       I have now given you a preview of why the government

16  won't be able to show that there was any conspiracy to fix

17  prices or rig bids.  The government also won't be able to show

18  that Jayson joined any made-up conspiracy.  Why?  Because there

19  is no evidence that he did.  I am going to talk briefly about

20  phone calls, texts, and e-mails and witnesses.

21       First, the phone calls.  Out of the millions of phone

22  calls in this case spanning an eight-year period, the

23  government has pulled out two between Jayson and a competitor.

24  The government has no recordings of these calls, and they are

25  not going to call any witness to say what was said on those

1    calls.  That is not evidence of price-fixing.  That's

2    speculation.  And the handfuls of e-mails and texts as I

3    mentioned at the beginning, the government is going to dump a

4    bunch of exhibits into evidence without calling a witness to

5    explain them.  Some of those relates to Jayson.

6         Now, let me be clear.  You're going to see a couple

7    e-mails and texts that Jayson wrote that don't look great.  And

8    the government was absolutely justified in investigating

9    further to see if they were actually a problem.  But that's not

10   what they did.  We'll show you that this handful of documents

11   in no way shows that Jayson was fixing prices with anyone.  Let

12   me give you one example now.

13        The government will introduce an e-mail which Jayson

14   wrote, quote, Do not forward, not exactly a legal conversation.

15   It doesn't sound great, right?  But what exactly was this

16   e-mail about?  Jayson was describing an e-mail written by

17   another Pilgrim's employee about a phone call he wasn't on

18   about a product he had nothing to do with.  And he was just

19   wrong in describing it as not exactly legal.  It was a

20   perfectly legal conversation.  How will you know that?  Because

21   we will call Brenda Ray to that witness stand.  She is the one

22   that was on the phone call.  She is the one who wrote the

23   e-mail.  And she will tell you exactly what that phone call was

24   about, and it had nothing to do with fixing prices, and it had

25   nothing to do with Jayson Penn.

1           And the worst part of it, the prosecution knows this.

2     After they had charged Jayson, they interviewed Brenda Ray,

3     afterwards, and she told them exactly what this conversation

4     was about.  But rather than just admit that this e-mail doesn't

5     help prove their case, they are just going to dump it into

6     evidence like all the others, not call a witness about it, and

7     try to hide the truth from you.

8           Finally, what about the witnesses?  You will hear from

9     two types.  First, the government plans to call a number of

10    chicken buyers, those on the other side of the negotiating

11    table.  Those witnesses barely know Jayson Penn if they know

12    him at all.

13          THE COURT:  Two minutes.

14          MR. TUBACH:  They have no information whatsoever about

15    Jayson joining any conspiracy to fix prices.

16          The second type of witness they are going to call is

17    this supposed conspiracy insider they talked about.  They are

18    only going to call one, Robbie Bryant.  Now, let's be clear.

19    The government has alleged a vast conspiracy involving many

20    chicken suppliers, Tyson, Koch Foods, Tyson, Koch Foods,

21    Claxton, George's, Mar-Jac, Case Farms and others.  As

22    Ms. Nielsen pointed out, this would have included dozens and

23    dozens of people.  But out of all these chicken suppliers and

24    all the employees supposedly involved in this vast conspiracy,

25    the only one they are going to call is Robbie Bryant?

1          You will hear many reasons why Mr. Bryant is not a

2     witness whose testimony can be believed, and he will tell you

3     one himself.  He is a liar.  He will admit to you that he lied

4     repeatedly to the FBI, lies that had nothing to do with this

5     case or any of these men.

6          But even Mr. Bryant, the government's star witness and

7     supposed conspiracy insider, will say even though he worked at

8     Pilgrim's where Jayson worked, for the entire time of this

9     made-up conspiracy, he has no knowledge whatsoever of Jayson

10    Penn participating in any conspiracy to rig bids or fix prices,

11    none.

12         The government bears the burden to prove beyond a

13    reasonable doubt that Jayson Penn committed the crime with

14    which he has been charged.  This is the highest burden in the

15    law.  Jayson Penn is presumed innocent.  You have heard that a

16    lot.  And as he sits here right now, he is innocent, and he

17    remains innocent unless the government can prove to each of you

18    beyond a reasonable doubt that Jayson entered into a

19    price-fixing agreement.

20         And there will be many reasons to doubt the

21    government's case against Jayson, the undisputed evidence that

22    it was market forces that drove prices up and down, not any

23    agreement among competitors; the fact that competing chicken

24    suppliers took business away from Pilgrim's over and over

25    again; the fact that there won't be any witness who says that

1    Jayson fixed prices; the prosecution's cherry-picking of

2    e-mails and texts with no explanation about what they mean.

3    All of these will be reasonable doubt.

4         At the end of the case after you have heard and seen

5    all of the evidence, I will have an opportunity to come back

6    and speak to you again.  And at that time, I am going to ask

7    you to return the only verdict that the facts and the evidence

8    will support, a verdict of not guilty.

9         Thank you.

10        *THE COURT:*  Thank you, Mr. Tubach.

11        Mr. Feldberg?

12                    **OPENING STATEMENT**

13        *MR. FELDBERG:*  Your Honor, thank you.

14        Members of the jury, this is a criminal case.  This is

15   as serious as it gets.  This is not a civil case against some

16   big companies seeking to change their actions.  This is a

17   felony charge against individual human beings who are charged

18   with committing a crime.  For Roger Austin, this is the most

19   frightening, terrifying thing that has ever happened to him

20   because Roger is an innocent man.

21        I am Michael Feldberg.  My colleagues, Julie Withers,

22   Laura Carwile, and I have the honor and we have the privilege

23   to represent Roger.

24        Roger, can you stand up for a moment, please?

25        As the judge has instructed you, Roger and all of the

1   men here are presumed innocent, and that presumption remains

2   until the end of the case.  That presumption of innocence is

3   only overcome by the prosecution if it is able to prove beyond

4   a reasonable doubt that Roger knowingly, voluntarily, and

5   intentionally entered into a conspiracy to agree to fix prices

6   and rig bids.  The presumption of innocence and the requirement

7   that the prosecution prove its case beyond a reasonable doubt

8   are fundamental principles of American justice.  They protect

9   us all.

10          So how could it be that the prosecution has charged an

11  innocent man?  Here's how.  The prosecution found a handful of

12  texts and e-mails they didn't like, and instead of conducting a

13  thorough investigation, instead of asking what was meant, they

14  stormed right ahead and filed criminal charges before they

15  interviewed a single employee of Pilgrim's.  It was ready,

16  fire, and only then aim.  And then it gets even worse.

17          Only after charges were already filed, the prosecution

18  started interviewing people, more than a hundred, but they're

19  not going to call most of those people as witnesses because

20  those people don't support the prosecution's theory.  This

21  became for the prosecution a theory in search of evidence.

22  Ready, fire, aim.

23          The charge in this case is that Roger and the other

24  defendants conspired to agree to fix prices and rig bids from

25  2012 to 2019.  The critical question is whether there was an

1    agreement, a conspiracy.  The question is not whether various

2    suppliers who sold chicken communicated with each other.  As

3    the judge will instruct you, it is legal for competitors to

4    communicate with each other and to share information about

5    prices as long as there is no agreement to fix prices.

6    Communication with competitors is not a conspiracy.  The issue

7    you have to focus on is whether there was an agreement, whether

8    Roger knowingly and intentionally conspired to enter into an

9    agreement to fix prices and rig bids.

10         The evidence will show there was no conspiracy, no

11   agreement.  The suppliers' prices to KFC were different, their

12   margins were different, and their strategies were different.

13   We have an exhibit up before you.  I apologize, it's a very

14   busy chart, but you'll see the evidence underlying it during

15   the course of the trial.

16         This case involves the sale of hundreds of pounds of

17   chicken -- hundreds of thousands of pounds of chicken every

18   week.  Even a difference of a fraction of a penny per pound

19   amounts to a huge difference.  And the suppliers' prices were

20   all different every year.  Pilgrim's Pride, the company Roger

21   worked for, made independent decisions on what bids to make and

22   prices to charge, prices based on its own strategy.

23         There was competition.  The suppliers took business

24   from each other.  Look at what happened in 2015 as Mr. Tubach

25   showed you a few moments ago.  Pilgrim's lost 560,000 pounds of

87

1   sales to KFC per week.  Its competitors gained that business

2   and even more.  The prosecution focuses on the 2015 contract,

3   the one year in which there was a price increase.  If there was

4   an agreement to fix prices and rig bids, you would expect the

5   suppliers' prices to be the same or very close.

6          The opposite happened.  The range of suppliers' prices

7   grew from 84 cents in the prior year, 2014, to almost 5 and a

8   half cents, more than a five-fold increase in 2015.  And at the

9   end of the so-called conspiracy, prices were lower than they

10  were at the start.  What kind of conspiracy is this?

11         The evidence will also show that Roger had no

12  authority to set prices or bids.  He did not decide what to

13  bid.

14         And finally, there will be no evidence that Roger had

15  any motive to enter into an agreement to fix prices or rig

16  bids.  He had nothing to gain from it.  Does it make sense to

17  you that a man toward the end of his long career, a career

18  devoted to selling chicken to Kentucky Fried Chicken, would

19  suddenly and for no reason voluntarily and intentionally decide

20  to commit a felony?  Of course, it doesn't.

21         So what does the prosecution have to offer?  They will

22  tell you there were communications among the suppliers, phone

23  calls, texts, e-mails.  Those communications are a hundred

24  percent legal.  Communications are only illegal if there was an

25  agreement to fix prices and rig bids.  And the evidence will

1    show there were good business reasons the suppliers

2    communicated with each other ranging from trying to gather

3    market intelligence, trying to figure out what the other

4    companies were charging so they could figure out what they

5    wanted to charge, in other words, to compete, to covering for

6    each other when one had a shortage of supply and needed help

7    delivering product.  With one exception, the witnesses the

8    prosecution will call will not tell you there was an agreement

9    to fix prices and rig bids.  They were customers, buyers of

10   chicken, not in a position to know.

11           Some of them will tell you that they were unhappy that

12   prices went up in 2015.  Fine, no customer likes price

13   increases.  But increasing prices is not a crime.  Some will

14   tell you that they would prefer that the suppliers not

15   communicate with each other.  Of course, they would.  If the

16   suppliers communicated with each other and got market

17   intelligence, they would have more leverage in their

18   negotiations with a customer.  Every side would like exclusive

19   control of the information, but, again, as long as there is no

20   agreement to fix prices and rig bids, that communication is

21   perfectly legal.

22           Now, as the prosecution's lawyer told you in his

23   opening, they will bring you one eyewitness, Robbie Bryant, a

24   mid-level Pilgrim's employee who first became involved in

25   national sales at Pilgrim's in 2014.  They've interviewed

1    Mr. Bryant dozens of times, and in multiple interviews,

2    Mr. Bryant lied to the prosecutors and the FBI agents.  His

3    lies had nothing to do with this case.  They didn't involve the

4    actions of any of the men on trial here, but he lied to the

5    prosecutors about his own activities multiple times on multiple

6    occasions.

7           Why is that important?  After he lied to the

8    prosecutors, they had him.  Lying to federal prosecutors and

9    FBI agents is a federal crime, a felony.  Mr. Bryant committed

10   that crime, has admitted that crime, and the prosecutors can

11   charge Mr. Bryant with that crime.  They haven't yet, but they

12   could, and Mr. Bryant knows that.  It's solely within the

13   prosecutor's discretion.

14          So please, as you listen to Mr. Bryant's testimony,

15   consider his incentive to say exactly what he thinks the

16   prosecution wants him to say in the hope that he will not be

17   charged with a felony.

18          Mr. Bryant will tell you he overheard a few snippets

19   of people talking and drew conclusions, opinions really what

20   they were talking about.  He will tell you his understanding of

21   what other people were doing without really being in a position

22   to know.  He will claim, for example, he walked into Roger's

23   office twice in one day in August 2014 and overheard Roger

24   saying exactly the same words on one phone call to Mr. Brady of

25   Claxton and on another phone call to an employee of Koch Foods,

another supplier.  The story is completely implausible.  When

we get into the evidence and detail, you will see that it makes

no sense.  But even if you believe it, it's not evidence of any

agreement.

All Mr. Bryant claims is he heard Roger say to other

suppliers that he, Mr. Austin, had told RSCS, Pilgrim's KFC's

purchasing agent that the price is the price, and the only

question was how much chicken they wanted to buy.  But listen

to what Mr. Bryant does not say.

Mr. Bryant does not claim that Roger told anyone what

Pilgrim's price was.  Mr. Bryant does not claim that Roger

asked anyone to agree to anything.  And he does not claim he

heard anything the person on the other end of the line said.

Mr. Bryant will also give some testimony about negotiations in

2017 for the contract beginning 2018, but that testimony is

also completely unbelievable.  He will claim that Roger told

him what other companies were going to bid, and he wrote those

bids down in his notebook.

But you will see when you look at those numbers and

compare them with the current prices suppliers were then

charging that what Roger actually told him were current prices,

not future bids.  And there is nothing conspiratorial about

that, because knowing another company's current prices has

nothing to do with any alleged conspiracy to fix prices.  It's

nothing more than a gas station looking across the street to

1    see what the gas station on the other side is charging.

2         In that testimony, Mr. Bryant is either flat out wrong

3    or lying about the numbers that he wrote down.  Mr. Bryant's

4    testimony is completely unreliable.  It's not corroborated by

5    any other witness, and it is contradicted by the evidence.

6    This is a serious case with serious consequences.  To make a

7    decision relying on the testimony of an admitted liar who has

8    every incentive to craft his testimony to try to please the

9    prosecution so he doesn't get indicted for his lies would be

10   irresponsible, illogical, and just plain wrong.

11        What else does the prosecution have?  Sound bites,

12   snippets from e-mails and texts taken out of context with no

13   witness called to explain the context or meaning.  Like many

14   people, people involved in this case wrote hundreds, thousands

15   of texts and e-mails between 2012 and 2019.  The prosecution

16   has taken little bits and pieces from a handful of those texts

17   and e-mails over an eight-year period without calling witnesses

18   to give context or explain what was meant.  That's trial by

19   sound bite, not by evidence, and that's not how we try people

20   in criminal cases in this country.

21        The prosecution's case makes no sense.  It ignores

22   what actually happened in the market where prices were

23   determined by the law of supply and demand.  Prices went down

24   when the supply was abundant, and they went up one year when

25   the supply of chicken was much lower than the demand.  The case

1    makes no business sense because these supposed conspirators

2    actually took business away from each other by taking more

3    volume of sales of chicken from each other.

4           Who would knowingly and intentionally make an

5    agreement to lose business and lose money to their competitors?

6    The case makes no sense factually because the communications

7    were legal.  The information communicated was often incorrect

8    either because the suppliers were bluffing as part of their

9    effort to compete or they were just guessing about what their

10   competitors were doing or because the information came from the

11   customer and the customer was bluffing.

12          If there was an agreement, how come so much of the

13   information communicated was wrong?  The prosecution's theory

14   is contradicted by the facts.  The alleged conspiracy was

15   supposed to protect each supplier's volume, but the suppliers

16   competed and took business from each other.  And the alleged

17   conspiracy was supposed to raise prices, but the prices went

18   down more often than they went up and were lower at the end of

19   the alleged conspiracy than they were at the beginning.

20          Now, let me tell you a little bit about Roger.  He is

21   65 years old.  He retired in 2018, years before these charges

22   were brought.  He lives on a farm in Georgia.  He is married

23   with two kids and five grandkids.  He spent 40 years in the

24   chicken business, most of it selling chicken to KFC.  Whatever

25   company he worked for, Pilgrim's or the companies he worked for

1   earlier in his career, Roger was the KFC guy.  He loved KFC.

2   He cared about KFC, its franchisees and its customers.  And as

3   you will hear, he would never do anything to hurt KFC.

4          During the years in question in this case, 2012 until

5   his retirement in 2018, he moved to Louisville, Kentucky, so he

6   could be close to KFC.  He even set up and operated a test

7   kitchen for KFC in Louisville.  He fought to keep prices for

8   KFC as fair as possible.  Simply put, his customer, KFC, was

9   his business life.

10          But Roger was not a decision-maker at Pilgrim's.  He

11  had no authority to set prices or rig bids.  He was located in

12  Louisville close to KFC, but far from Pilgrim's headquarters

13  here in Greeley.  He communicated with KFC, and KFC told him

14  what they wanted.  He reported up to his superiors who made

15  decisions and decided what bids could be made.

16          You will hear evidence that KFC was a tough customer

17  and often told Roger and other suppliers what prices it

18  demanded.  And KFC usually got what it wanted.

19          This is an internal document from RSCS's, the buying

20  co-op for KFC, after one year's round of contract negotiations.

21  As RSCS wrote, We had anticipated there may be a need to have

22  follow-up calls with a couple of suppliers, Tyson and

23  Pilgrim's.  However, they have come back generally in line with

24  where we asked them to get on their best and final numbers.

25  That's the so-called victim of this so-called conspiracy.

1          *THE COURT:*  Two minutes, Mr. Feldberg.

2          *MR. FELDBERG:*  In that case, I want to show you one

3    other example.  In Roger's own words that demonstrates his

4    actual state of mind, an e-mail from Roger in which he's

5    discussing both Pilgrim's prices and competition prices written

6    contemporaneously to his superiors.  We don't want them, his

7    superiors, to think we are suggesting meeting those competitor

8    prices.  This is Roger's actual state of mind.

9          This case has more questions than answers.  If the

10   prices were fixed, why were they all different?  If the purpose

11   of the so-called conspiracy was to protect each supplier's

12   business, how come they competed and took business from each

13   other?  And how come Pilgrim's Pride lost more than half of its

14   sales to KFC?

15         Why would Roger intentionally join a conspiracy that

16   caused him to lose half his sales to his most important

17   customer?  Why would Roger knowingly, voluntarily, and

18   intentionally join a conspiracy when he had no motive to join

19   and nothing to gain from it?  How could Roger conspire to agree

20   to fix prices when he had no authority to set prices?  And

21   isn't what happened here simply a case of the law in supply and

22   demand?  In one year, prices went up; in other years, there was

23   more supply and prices went down.  And at the end of the

24   conspiracy, the prices were lower than they were at the start.

25         When you review the evidence and consider all the

 1  questions this case raises, you will conclude that the

 2  prosecution has not met its burden of proving beyond a

 3  reasonable doubt that Roger knowingly and intentionally entered

 4  into a conspiracy to fix prices and rig bids.  And when I come

 5  back to you at the end of the case, I will ask you to return

 6  the only verdict that a fair review of the evidence can lead

 7  to.  Roger is not guilty.

 8          Thank you.

 9          THE COURT:  Thank you, Mr. Feldberg.

10          Ladies and gentlemen, why don't we go ahead and take

11  our mid-afternoon break at this time.  So we will plan on

12  reconvening at 35 minutes after 3:00, all right?  The jury is

13  excused.  Keep the admonitions in mind about not conferring

14  with each other, obviously.  The jury is excused for the

15  mid-afternoon break.

16          (Jury excused.)

17          THE COURT:  We will be in recess.  Thank you.

18      (Recess at 3:20 p.m. until 3:40 p.m.)

19          THE COURT:  Mr. Tubach.

20      MR. TUBACH:  Briefly, I want to apologize to the

21  Court.  I am told you gave me a 2-minute warning.  I did not

22  hear the 2-minute warning, so I did not realize I had gone over

23  my time.

24          THE COURT:  I try to time my blurting out two minutes

25  when there is a gap, but I did not time that well.  And all of

1    the sudden you said something, but I could see your notes, and

2    I knew that you were getting towards the end, so I didn't

3    figure you needed a 1-minute warning.

4            *MR. TUBACH:*  Thank you very much.

5            *THE COURT:*  Yeah, no problem.

6            Are we ready to bring the jury back in?  Silence is

7    golden.  We will go ahead and bring the jury back in.

8            (Jury present.)

9            *THE COURT:*  Ladies and gentlemen, of course a few of

10   you were in different seats that I explained to everyone we

11   have reseated you in numerical order.

12           It looks like Mr. Kornfeld is ready at this time.  Go

13   right ahead.

14                          **OPENING STATEMENT**

15           *MR. KORNFELD:*  Thank you, Your Honor.

16           The person who holds the pen gets to write the story.

17   In this case, the prosecutors hold the pen.  They also hold the

18   scissors.  Creative license allows them to tell the story they

19   want to tell in the way they want to tell it.  Creative license

20   allows them to use the scissors to leave everything else on the

21   cutting room floor.

22           Make no mistake, the prosecutors are the authors of

23   this fictional story.  Sure, they sometimes use the voices of

24   these five men, these five defendants, but they are the

25   creative authors.  The government's theory is full of leaps in

1    logic and plot holes that are better suited for a made-for-TV

2    movie than for a United States federal district court where

3    real lives are on the line.  But that's not going to stop the

4    prosecutors from begging you to read from their script-selected

5    chapters, half paragraphs, sliced and diced sentence fragments

6    and asking you to accept their theory as the truth.

7         It's not going to stop them from leaving out

8    characters completely, characters, witnesses who could bring

9    the whole story to you, who could bring the whole truth to you.

10    And the whole truth is this.  There was no conspiracy.  There

11    was no illegal agreement.

12         The prosecution is asking you to believe that my

13    client, Mikell Fries of Claxton Poultry, and Mr. Scott Brady,

14    his colleague at Claxton Poultry, which is a small, single

15    plant, chicken plant in southeastern Georgia, entered into a

16    conspiracy to fix the price of chicken with an industrial

17    giant, Pilgrim's Pride.  They are asking you to believe that

18    Pilgrim's Pride, a company, a publicly traded company with 30

19    plants worth billions of dollars, had an incentive to conspire

20    with Claxton, a single plant regional producer.

21         They are asking you to believe that Pilgrim's, which

22    is at least 20 times larger than Claxton, had an incentive to

23    conspire with Claxton which controls less than 1 percent of the

24    chicken market in this country, less than 1 percent.  And they

25    are asking you to believe that Claxton and Pilgrim's conspired

1  together when the evidence will show that time and time again

2  Claxton undercut Pilgrim's and in the process stole volume from

3  Pilgrim's.

4          What a story.  At best, it's a fairy tale.  At worst,

5  it's a manufactured narrative cut and pasted together by a

6  deficient government investigation that ignored facts, ignored

7  evidence, ignored witnesses that don't support their fable.

8  Either way the story requires you to look away from the facts,

9  to turn a blind eye to unanswered questions, to ignore the lack

10  of evidence, lack of witnesses, lack of investigation, as well

11  as basic principles of law and economics, a story that says,

12  Hey, we're the Department of Justice; we're the government; we

13  never get it wrong; trust us.

14          Mikell Fries is not guilty.  Scott Brady is not

15  guilty.  All of these five defendants in this courtroom, all of

16  these five men are innocent.

17          Now, there are two big questions you are going to need

18  answered and you're going to ultimately need to answer at the

19  end of this case, and these are questions that the government

20  will not be able to prove to you beyond a reasonable doubt.

21  The first is whether a conspiracy to price-fix existed in the

22  chicken industry, and the second question is whether each of

23  these men considered by you individually knowingly joined that

24  conspiracy.

25          But instead of answering or trying to answer or bring

1    evidence to you to support those two key questions, the

2    government's going to devote its case, and they hinted at it at

3    their opening, they are going to devote their case to try to

4    prove facts to you that turn out to be completely uncontested.

5    So let's be clear on some important and essential legal and

6    factual truths in this case.

7          First, suppliers can and do talk to each other.  And

8    second, it is perfectly legal for them to exchange pricing

9    information unless they agree to fix a price.  You will hear

10   that suppliers working together in the supply chain, working

11   with each other in the supply chain is how the chicken business

12   works whether the Department of Justice likes it or not.

13         In the chicken industry, just like in any other supply

14   chain, suppliers talk, and they talk a lot.  They talk about

15   product specs.  They talk about supply.  They talk about

16   covering loads for each other when one of them is short.  They

17   talk about quality assurance.  They talk about customers.  And

18   they talk about prices.  Discussions are year round.  Americans

19   have almost an insatiable appetite for chicken, and the supply

20   chain keeps producing it 24/7, 365 days a year.

21         They talk on Christmas.  They talk on holidays, on

22   Thanksgiving.  They talk on weekends, Saturdays, Sundays.  They

23   even talk to each other during negotiations with customers.

24   Sometimes they tell each other the truth about their prices,

25   and sometimes they bluff.  But make no mistake, all of this is

1  done in the interests of maximizing profits for their

2  companies.  They do not put friendship ahead of profit.

3          So why do they talk?  Because they can, because it's

4  legal to do so, because it's part of the chicken business.

5          The prosecution must prove to you beyond a reasonable

6  doubt that there is an illegal agreement, that Mikell Fries

7  intended to break the law, that Scott Brady agreed to break the

8  law, that all of the defendants, all of these men in this

9  courtroom agreed to join a conspiracy.  There was no meeting in

10  a dark smoke-filled room where they got together and decided to

11  raise prices.  There was no quid pro quo.  There was no, I'll

12  raise my prices if you raise yours too.

13          You will never hear or read, I'll do it if you'll do

14  it.  There was no wink and nod as the suppliers submitted their

15  pricing models to the customer.  There were no unspoken signals

16  of a conspiracy.  One supplier never agreed not to bid on a

17  contract so a competitor could get that business.  Not a single

18  witness will come into this courtroom, walk up to that witness

19  stand, raise his or her hand and swear to tell the truth and

20  tell you, Hey, I was in the room when Mikell Fries or Scott

21  Brady or anybody else agreed to price-fix.  Not a single

22  witness will tell you that.

23          Not a single witness will tell you they have personal

24  knowledge of Mikell Fries or Scott Brady agreeing to be part of

25  a price-fixing conspiracy.  Those witnesses do not exist.  Why?

1    Because a conspiracy never existed.  I'll do it if you'll do

2    it.  You won't see it.  You won't read it.  It's not in an

3    e-mail.  It's not in a text message.  It's not in a voicemail.

4    And it is certainly, certainly, certainly not coming out of a

5    witness' mouth because it doesn't exist.  It didn't happen.

6    I'll do it if you'll do it never ever happened.

7           So let's be clear about the facts of Claxton and

8    Mikell Fries and Scott Brady because the Claxton chapter is one

9    of the chapters that ended up on the cutting-room floor.

10          Claxton was started by Mikell's grandfather, Norman

11   Fries, in 1949 in the small town of Claxton, southeastern

12   Georgia.  By focusing on customer service, their niche,

13   small-bird product, and a simple business philosophy where

14   their strategy is to price the product in the middle of the

15   competition as determined by their customers, Mr. Norman Fries

16   turned Claxton into a major regional supplier, supplying to

17   national fast-food chains, the ones you have heard about,

18   Chick-fil-A, Popeye's, KFC, and many others.

19          Mikell started working at his grandpa's plant when he

20   was 14 years old with a mop in his hand and rubber boots on his

21   feet, and he has worked practically every job in that plant,

22   and there are a lot of them.

23          Eventually he became a salesman, one of several.  And

24   by 2016, he had lost both his father and his grandfather, and

25   that's when his grandmother and the board decided to make him

1    the president.

2           In their opening, the prosecution called Mikell a

3    boss, but watch the facts, read the messages, listen to the

4    witnesses.  Will the prosecution admit there are no allegations

5    against Mr. Fries after 2015?  It's one of those hidden

6    chapters.  He wasn't the president in the time period we're

7    talking about.

8           Scott Brady has also been in the chicken business for

9    decades.  Long before this story began, he did work at

10   Pilgrim's Pride, and he moved to Claxton in 2012 to be a

11   national account salesman working with and for Mikell.

12   Together they worked for the head of sales, a guy named Tom

13   Scarborough, and Mr. Scarborough in turn reported to the

14   president, Jerry Lane.  Every morning Mr. Brady picks up the

15   phone and calls customers and other suppliers to help sell all

16   of the chicken that the plant produces that day.  Every time he

17   gets in his car and drives from his home in Alabama to the

18   plant in Claxton, Georgia, he is on the phone using his

19   six-hour drive to sell chicken, deal with customer issues, and

20   ensure that everything runs smoothly.

21          When he is not at home or in Claxton, he is driving up

22   and down the East Coast visiting customers and providing the

23   type of customer service that they have come to expect from

24   Claxton Poultry.  Scott racks up hundreds and hundreds of phone

25   calls every single month doing what he does best, which is

1    selling chicken.

2          But pricing decisions, pricing discretion are above

3    Mr. Brady's pay grade.  His job is to sell chicken, not to

4    price it.  To determine a fair price for its small bird,

5    humanely grown, antibiotic-free chicken, Claxton looks at a

6    number of factors.  It looks at current-year pricing, at

7    economic variables like demand and the cost of feed for the

8    birds.  It looks at freight, the cost of gas for its delivery

9    trucks, the price of labor, lots of factors, dozens of them in

10   fact.

11         And like any good business, it considers the price of

12   other suppliers.  And after assessing all those factors, it

13   independently comes up with its own price for its chicken and

14   communicates that price to its customers.  Why does Claxton

15   look at competitors' pricing?  Because doing so is legal,

16   because factoring in your competitors' price and setting your

17   own price is basic business.  It's business 101.  It's why a

18   cup of coffee at your local coffee shop costs around the same

19   as a cup of coffee at Starbucks.

20         The prosecution's story ignores basic principles of

21   supply and demand, and it also fails to consider even a general

22   understanding both of the chicken business at large, but also

23   the relationship between Claxton and Pilgrim's.  Pilgrim's

24   wanted to charge the highest price.  It's a huge company.  If

25   Pilgrim's loses volume, it's got thousands of customers

1    standing by willing to pay for its chicken, willing to buy its

2    chicken, sometimes for even more money than the fast-food guys

3    are willing to pay.

4          If Claxton loses volume, their chicken rots on the

5    southern Georgia dock.  Claxton is the scrappy little guy,

6    happy to undercut competitors and take fractions of volume as a

7    reward.  And that strategy has allowed Claxton to grow slowly

8    over the years, but grow nonetheless.  But remember, the

9    government holds the pen, and they didn't want to write the

10   Claxton chapter.

11         Instead, the prosecutors, as you have heard a little

12   bit, hurriedly put this case together, piecing together a

13   theory and charging Mikell, Scott and these other three men.

14   But in their hurry to throw together their fictional tale, they

15   forgot to write a character in, an insider, an eyewitness.

16         So a year after charging, they find Robbie Bryant, a

17   man interviewed more than 30 times for countless hours,

18   multiple days in a row, a man who you have heard is an admitted

19   and repeated liar.  But here is the thing about Robbie Bryant,

20   their eyewitness, their so-called insider.  He is going to get

21   up on that stand, but he still isn't going to be able to

22   provide you with the missing chapter, the illegal agreement

23   among these defendants, the "I'll do it if you'll do it."

24         Without a credible witness to fill in the gaps and the

25   plot holes, the prosecution knew it had a problem with its

1   story.  So how does it try to solve that problem?  They are

2   going to bury you in documents, day after day, document after

3   document, hundreds of them.  Sometimes they are going to just

4   introduce them, no witness, nobody to explain what's going on,

5   and you are going to sit there silently as the documents roll

6   by.  Not a word will be said, not an effort will be made to

7   explain them to you.

8          And sometimes they are just going to introduce them

9   and not even going to show them to you, but they will be in

10  evidence.  Then they are going to take out the cut-and-paste

11  feature of their computer and distill all these documents down

12  into these fancy color-coded charts, their so-called summary

13  charts.  Now, the prosecutor in his opening said these summary

14  charts are a play-by-play.  Members of the jury, they are not a

15  play-by-play.  A play-by-play has every single name, hence, the

16  play-by-play.  These have gaps, huge gaps, conversations that

17  occurred days apart, weeks apart, sometimes months apart,

18  hundreds of documents and phone records and other things

19  completely omitted.  They are not a play-by-play, and they

20  certainly are not a fair summary at all.

21         And the government is going to hope and it's going to

22  pray that you don't try to fill in the gaps yourself or, more

23  importantly, that you don't ask yourselves, How come they are

24  not filling in the gaps because that's their job.  They are

25  going to show you text messages between Mikell and Scott that

1    include pricing information of other suppliers.  And here is

2    where your work really begins.  Here is where you're going to

3    have to ask the questions that the government doesn't want you

4    to ask, questions like, How did Mikell and Scott use that

5    information?  What happened before and after they got that

6    information and exchanged that information?  And most

7    importantly, where is the "I'll do it if you'll do it"?

8         The prosecution will say, Well, look, they had pricing

9    information from a competitor.  That's not what you're being

10   asked to decide in this case.  The prosecution has to prove an

11   illegal agreement to you beyond a reasonable doubt.  I'll do it

12   if you'll do it.  Out of context, you are going to see a text

13   message, Mr. Brady tells Mr. Fries that another supplier,

14   Mr. Austin of Pilgrim's, wants Claxton to raise its prices, and

15   Mr. Fries texts, Tell him we're trying.

16        And the Federal Government nine years after that

17   four-word text will point to it and say, See, there's the

18   agreement.  That's the prosecution's version of the story.

19        But what do they leave on the cutting room floor?

20   What happened immediately after telling him we're trying?

21   Well, first, there wasn't a single communication between

22   anybody at Claxton and Mr. Austin, not an e-mail, not a text,

23   not a phone call.  And if there were, the government would

24   present it, but there are no such communications, no

25   communication whatsoever.

1          But most importantly, the very next day Claxton

2     lowered the price of its chicken.  The very next day it lowered

3     the price of its chicken and in the process stole business from

4     Mr. Austin and from Pilgrim's Pride.  This is the opposite,

5     it's the polar opposite of a price-fixing agreement.  When one

6     competitor undercuts another competitor to take away volume,

7     there cannot be an agreement to raise prices.

8          This is just one example of how far the prosecution

9     will take a sentence fragment out of context, parade it in

10    front of you as evidence against Mikell and Scott with no

11    explanation, zero context.

12         What else is missing from the government's case?

13    Their story has major plot holes, and no amount of cutting and

14    pasting can fill in the gaps and answer these questions.

15         *THE COURT:*  Two minutes.

16         *MR. KORNFELD:*  In this alleged agreement where the

17    goal is to fix a price, that the prices never align, who

18    decides to be the lowest bidder and make less money?  Who got

19    to be the highest bidder and make more money, and who got to

20    lose business and make no money all in the name of this

21    supposed illegal conspiracy?  How can there possibly be a

22    conspiracy to raise prices when suppliers bluffed each other

23    about their prices?  How was undercutting each other's price

24    and stealing business in the process somehow consistent with an

25    agreement to fix prices?  And who is policing this -- and

1  enforcing this illegal agreement?  When Mikell and Scott

2  continually lower their prices at the direction of customers

3  like KFC, and you will hear that they did that, who is slapping

4  them on the wrist?

5  Where is the angry e-mail or the phone call saying,

6  Hey, wait a second, guys, that's not what we agreed to; you are

7  making us look bad; you are not a very good partner in crime;

8  we are supposed to raise prices, and you are lowering prices.

9  Ask yourself, how is lowering your price consistent with a

10  conspiracy to raise prices?  It makes no sense.

11  The prosecution won't be able to answer these and many

12  other questions.  Instead, it will spend its case trying to

13  convince you that the sharing of prices instantly creates an

14  illegal agreement, that it creates a conspiracy.  But suppliers

15  can both work together in the supply chain and be competitors,

16  that's the chicken business.  Communications do not equal an

17  illegal agreement.

18  For Claxton, it allowed them to lower their prices and

19  undercut the competition.  It allowed Claxton to succeed as a

20  small regional supplier.

21  So how does the government's fictional story end?  It

22  ends with you.  You're the ones who can put an end to Mikell

23  and Scott's nightmare.  You're the ones that can tell the

24  government, Hey, your story is not ready for prime time, let

25  alone for federal district court.

1          And this is both your sworn duty and your task, to

2   consider all of the evidence, all of the story, not just what

3   the prosecutors highlight for you, and to hold the prosecutors

4   to their burden of proof.  This is what justice requires and

5   demands, for you as jurors, for Mikell Fries, for Scott Brady,

6   for all of the men in this courtroom.

7          At the end of this trial, we will stand up in front of

8   you again and ask you to render the only verdict that embraces

9   the facts, holds the government to its burden and speaks the

10  truth.  Mikell Fries is not guilty.  Scott Brady is not guilty.

11         Thank you.

12         *THE COURT:*  Thank you, Mr. Kornfeld.

13         Mr. Lavine?

14         *MR. LAVINE:*  Your Honor, on behalf of Mr. Brady, we

15  would like to reserve our opening statement.

16         *THE COURT:*  Yes, you may.

17         So, ladies and gentlemen, a defendant, as Mr. Brady

18  just did, if he chooses to, can defer his opening statement

19  until the beginning of the defense case.  Once again,

20  defendants don't have any burden to put on a case, but I will

21  ask at that time if Mr. Brady wishes to make an opening

22  statement.

23         So, ladies and gentlemen, we finished now the opening

24  statements.  And at this point in time, we begin the evidence

25  in this case.  The United States goes first and has the burden

1   of proof.  And the United States may call its first witness.

2          MR. LOVELAND:  Thank you, Your Honor.  The United

3   States will call Sara Fisher.

4          Your Honor, permission to approach Ms. Buchanan.

5          THE COURT:  Yes, you may.

6       (**Sara Fisher** was sworn.)

7          THE WITNESS:  I do.

8          COURT DEPUTY CLERK:  Please state your name and spell

9   your first and last name for the record.

10          THE WITNESS:  Sara Fisher, S-A-R-A, F-I-S-H-E-R-

11          THE COURT:  Mr. Loveland, go ahead.

12          MR. LOVELAND:  Thank you, Your Honor.

13                      **DIRECT EXAMINATION**

14  BY MR. LOVELAND:

15  Q.  Ms. Fisher, good afternoon.

16  A.  Good afternoon.

17  Q.  Could you please introduce yourself for the jury?

18  A.  Yes.  My name is Sara Fisher.

19  Q.  And, Ms. Fisher, the microphones and the mask make

20  everything a little bit difficult, so if you could pull that

21  close and speak up for us.  Thank you.

22          Where are you from, Ms. Fisher?

23  A.  Louisville, Kentucky.

24  Q.  Did you say Louisville, Kentucky?

25  A.  Yes.

Sara Fisher - Direct

1   Q.  And where do you live now?

2   A.  Louisville, Kentucky.

3   Q.  Ms. Fisher, are you employed?

4   A.  Yes, I am.

5        THE COURT:  Ms. Fisher, if you want, take your mask

6   off.  It's totally up to you.  If you want to leave it on,

7   leave it on.  It's at your discretion.  I just wanted to make

8   sure you knew that just in case.

9   BY MR. LOVELAND:

10  Q.  And where do you live now?

11  A.  Louisville, Kentucky.

12  Q.  And, Ms. Fisher, I think you just testified that you're

13  employed.  Where do you work?

14  A.  Restaurant Supply Chain Solutions.

15  Q.  And does Restaurant Supply Chain Solutions also go by RSCS?

16  A.  Yes.

17  Q.  And if I call your employer RSCS, will you know what I am

18  talking about?

19  A.  Yes, I will.

20  Q.  And this may not be a surprise to the jury, but where is

21  RSCS located?

22  A.  Louisville, Kentucky.

23  Q.  Have you lived in Louisville, Kentucky, your whole life?

24  A.  Yes, outside of college.

25  Q.  Where did you go to college?

Sara Fisher - Direct

1   A.   Western Kentucky University.

2   Q.   Did you earn a degree?

3   A.   I did.

4   Q.   What's your degree in?

5   A.   Finance.

6   Q.   How long have you worked at RSCS for?

7   A.   A little over 14 years.

8   Q.   Now, Ms. Fisher, if you could at a high level, please

9   summarize for the jury, what does RSCS do?

10  A.   We are responsible for all of the supply-chain function for

11  Yum Brands.

12  Q.   Let's unpack that for the jury.  When you say "supply-chain

13  functions," what are you referring to?

14  A.   We are responsible for the contract negotiations for all of

15  the food packaging and equipment and just really making sure

16  that all of that product gets to our restaurants.

17  Q.   All right.  And you mentioned Yum Brands.  First, how do

18  you spell Yum for the jury?

19  A.   Y-U-M, exclamation point.

20  Q.   What are the Yum Brands?

21  A.   KFC, Taco Bell, Pizza Hut, and the Habit Burger Grill.

22  Q.   And focusing on KFC, Kentucky Fried Chicken specifically,

23  you mentioned supply-chain factors like food.  Would that

24  include meat like chicken?

25  A.   Yes.

Sara Fisher - Direct

1  Q.  And was RSCS responsible for the chicken for Kentucky Fried

2  Chicken?

3  A.  Yes.

4  Q.  Now, Ms. Fisher, who owns Restaurant Supply Chain

5  Solutions?

6  A.  The franchisees and Yum.

7  Q.  Would you please for the jury break down Restaurant Supply

8  Chain Solutions' role with respect to Kentucky Fried Chicken?

9  A.  We were responsible for the contract negotiations for all

10  of the food, the packaging and equipment that went to the

11  restaurants, as well as just ensuring that all of that product

12  actually was received by the restaurants.

13  Q.  Okay.  So focusing in on the chicken for Kentucky Fried

14  Chicken, what did RSCS do there at a high level?

15  A.  We negotiated the contracts for the pricing and the volume

16  and the plant locations that we purchased -- that the

17  restaurants purchased, I am sorry.

18  Q.  Excuse me, Ms. Fisher.

19       Now, for fresh chicken from 2016 to 2020, who were the

20  major supplier companies that KFC would get bids from?

21  A.  We got bids from Pilgrim's, Tyson, Case Farms, Claxton,

22  Koch Foods, George's, Mar-Jac, and OK Foods.

23  Q.  And how do you spell the word "Koch" for the jury?

24  A.  K-O-C-H.

25  Q.  And how do you spell the word "Claxton"?

114
Sara Fisher - Direct

1   A.   C-L-A-X-T-O-N.

2   Q.   What's the full name of Pilgrim's?

3   A.   Pilgrim's Pride Corporation.

4   Q.   Now, does Restaurant Supply Chain Solutions actually buy

5   the chicken that Kentucky Fried Chicken stores need?

6   A.   No, we don't.

7   Q.   And how does that process work if RSCS is not actually

8   buying the chicken?

9   A.   We are responsible for the actual contract negotiations.

10   And then we -- based on the specification that the KFC brand

11   has provided to us, and then we direct the distributors to

12   purchase from the approved suppliers that we award business to.

13   And then the restaurants purchase from the approved

14   distributors.

15   Q.   Let's unpack that.   But first you mentioned the word

16   "distributor."   How does the chicken actually get from the

17   supplier to a KFC store?

18   A.   So the distributors, they are approved by KFC and RSCS,

19   order or place orders with the approved suppliers, and then the

20   suppliers either ship to the distributors or the distributors

21   pick up from suppliers.   And then the restaurants then place

22   orders with the distributors, and the distributors ship to the

23   restaurants.

24   Q.   So let's break it down phase by phase.   Is the first phase

25   handled by RSCS?

Sara Fisher - Direct

1  A.  Yes.

2  Q.  And what's RSCS's phase 1 for sort of purchasing chicken?

3  A.  We negotiate the contracts and award business to the

4  suppliers, and then from there, we direct the distributors who

5  they should purchase from.

6  Q.  So what's phase 2 in this process, then?

7  A.  The distributors then placing the orders with the

8  suppliers.

9  Q.  All right.  And what would phase 3 be?

10  A.  The restaurants placing orders with the distributors.

11  Q.  Okay.  Do you have a sense roughly of how many Kentucky

12  Fried Chicken stores there are in the United States?

13  A.  I think it should be around 4,000.

14  Q.  Now, in this process you just described with RSCS and

15  distributors and the KFC stores, are KFC stores allowed to buy

16  chicken through any other process?

17  A.  No.

18  Q.  And why not?

19  A.  There is an approved specification that the brand provides,

20  and it's to provide consistent product to the customers and

21  also to provide from a food safety standpoint, make sure that

22  all of the product that's going to the customers is food safe.

23  Q.  And could you unpack -- you mentioned some factors that

24  you're focused on.  Could you unpack some of the reasons behind

25  meeting a specification that KFC has?

Sara Fisher - Direct

1    A.  It's really from a food safety, as I mentioned a food

2    safety standpoint.  There is -- in the restaurants, there is

3    certain -- they are called set points with fryers and how long

4    the product should be cooked to make sure it's food safe to the

5    restaurants -- to the customers and then also delivering a

6    consistent product to the customers.

7    Q.  Now, you testified earlier that you had worked at RSCS for

8    14 years.  What's your current position?

9    A.  I am currently senior director of distribution, Habit

10   Burger Grill and A&W.

11   Q.  How long have you been the senior director of distribution?

12   A.  Since April of 2021.

13   Q.  At a high level, what does that job entail for you?

14   A.  I am responsible for the contract negotiations for

15   distribution partners.

16   Q.  And what does being responsible for those contract

17   negotiations look like?

18   A.  We negotiate the contract terms and then also responsible

19   for making sure that our distributors are servicing our

20   restaurants as they should per the contracts.

21   Q.  Before you were senior director for distribution, what was

22   your role?

23   A.  I was a director of food procurement.

24   Q.  And when did you have that job?

25   A.  It was two years, so 2019 to 2021.

Sara Fisher - Direct

1    *Q.*  This is the one we are going to focus on.  Before you were

2    director of food procurement, what was your role?

3    *A.*  Senior manager of poultry procurement.

4    *Q.*  How long were you in the role of senior manager for poultry

5    procurement?

6    *A.*  About three years.

7    *Q.*  And what was the time period of those three years?

8    *A.*  It was March of 2016 through March, April of 2019.

9    *Q.*  Now, in that role, were you responsible for -- did you have

10   any responsibility for the negotiation process for Kentucky

11   Fried Chicken chicken contracts?

12   *A.*  Yes.

13   *Q.*  And at a high level, could you tell the jury what your role

14   was?

15   *A.*  I was new to the role then, so the contract negotiations

16   were just starting, so I was -- kind of did all of the

17   communication throughout the bidding process and also the

18   behind-the-scenes analysis.

19   *Q.*  And I don't want you to go through all of your 14 years in

20   that much detail, but could you just at a high level summarize

21   some of the other positions you had at Restaurant Supply Chain

22   Solutions before you were senior manager of poultry

23   procurement?

24   *A.*  Sure.  So I came in in the accounting and credit department

25   and worked there for about four years and then moved over to

Sara Fisher - Direct

1  the KFC program management team and worked there for about four

2  years.

3  Q.  We will dive into your role in a moment, but based on your

4  years at RSCS, did you gain an understanding about how the

5  market for purchasing chicken worked?

6  A.  Yes.

7  Q.  And did you learn about the various chicken supplier

8  companies in the industry?

9  A.  Yes.

10 Q.  I believe you mentioned this name earlier, but are you

11 familiar with the company Koch Foods?

12 A.  Yes.

13 Q.  Briefly could you summarize for the jury what type of

14 company Koch Foods is?

15 A.  A poultry supplier.

16 Q.  And Ms. Fisher, do you know who the CEO of Koch Foods is?

17 A.  Yes.

18 Q.  And how do you know who the CEO of Koch Foods is?

19 A.  Just from my day-to-day job when I was a poultry manager.

20 Q.  Who is the CEO of Koch Foods?

21 A.  Joe Grendys.

22 Q.  Let's turn back to your career and focus on the senior

23 manager of poultry procurement job.  Who did you report to

24 there?

25 A.  Rich Eddington.

Sara Fisher - Direct

1    Q.  And what were your responsibilities in that role from 2016

2    to 2019?

3    A.  I was responsible for the contract negotiations, the

4    supplier relationship management, and just the day-to-day

5    assurance of supply.

6    Q.  And could you break down for the jury what that meant in

7    terms of your day-to-day responsibilities?

8    A.  I was responsible for making sure that the cases of chicken

9    that were ordered got to the restaurants as ordered.

10   Q.  And could you give at a high level what that meant in terms

11   of the contract negotiation process?

12   A.  So I was responsible for the contract negotiations, and

13   that was -- a part of that was establishing pricing, volumes,

14   plant locations, and I was responsible for the execution of

15   that.

16   Q.  And who else at RSCS did you work with in that role?

17   A.  Steve Campisano was also in that department.

18   Q.  And you mentioned Mr. Eddington as well?

19   A.  Yes.

20   Q.  What about Mr. Pete Suerken?

21   A.  Yes.

22   Q.  And what was Mr. Suerken's role?

23   A.  He was responsible for the entire food and packaging

24   department at that time.

25   Q.  And so was he several steps above you?

120

Sara Fisher - Direct

1    A.   Yes.   He was Rich's boss.

2    Q.   And by "Rich," you mean Mr. Eddington?

3    A.   Yes.

4    Q.   So let's talk about the bidding process for procuring

5    chicken and RSCS.  Could you walk us through what you would do

6    step by step in that process?

7    A.   So we set up a blind-bid process, so we reached out to each

8    of our suppliers that we wanted to be included in the bid

9    process individually and just let them know we were ready to

10   kick off the negotiations.  And then after that consisted of

11   several rounds of negotiations until contracts were awarded.

12   Q.   When you say "several rounds of negotiations," how many

13   rounds of bidding was there typically?

14   A.   Probably two to three depending on the supplier.

15   Q.   Was there any type of negotiation or outreach that happened

16   in between the bid-submission rounds?

17   A.   Yes.   We would provide feedback to the suppliers.

18   Q.   How would the feedback be provided?

19   A.   Typically e-mail or a phone conversation.

20   Q.   Now, when you're soliciting bids from companies like

21   Pilgrim's Pride, Claxton, and others, how would you reach out

22   to these companies to get bids from them?

23   A.   Via e-mail typically.

24   Q.   And did you send an e-mail to the entire industry, or did

25   you send one e-mail to each company?

Sara Fisher - Direct

1   A.  One e-mail to each supplier that we wanted to participate.

2   Q.  Why did you take the time to do it one e-mail at a time?

3   A.  Because we wanted it to remain a blind bid, and we didn't

4   want the suppliers knowing who else was a part of that -- the

5   bidding process.

6   Q.  When companies sent you their bids back, did they send it

7   just to you; or did they include other companies on the bid

8   submission?

9   A.  Just to RSCS.

10  Q.  Now, let's zoom out.  I want to ask you, why was the

11  process structured that way?

12  A.  To create competition and so that we were able to --

13          MS. CARWILE:  I am going to object.  Can I be heard on

14  side bar?

15          THE COURT:  You may.

16      (At the bench:)

17          THE COURT:  Ms. Carwile, go ahead.

18          MS. CARWILE:  Thank you.

19          I am concerned that this is going to start veering

20  into testimony involving what the customer expected or wanted

21  or informed the competitors.  And my understanding is that's

22  been excluded from prior trials.  It was to be excluded in this

23  trial as well.  And I want to make sure that there is no

24  testimony that's about to come out that -- involving what

25  Ms. Fisher says is a blind bid, which is they wanted the

Sara Fisher - Direct

1   process to be competitive and didn't want -- or had some sort

2   of testimony that the customer required that the competitors

3   not speak to each other.

4          THE COURT:  Mr. Loveland, go ahead.

5          MR. LOVELAND:  Your Honor, in reviewing the Court's

6   previous rulings, we are focused on what Ms. Fisher did and why

7   she did it.  We are not going to ask vague questions about

8   expectations or things like that, but how the process was

9   designed, how she ran the process, and why the process was run

10  that way is squarely relevant evidence that the jury should be

11  able to consider.  And that wasn't anything that was excluded

12  at either of the prior two trials.

13         THE COURT:  Ms. Carwile, anything else?

14         MS. CARWILE:  It's the why the process was run this

15  way that I am concerned about.  I think that's a back-door way

16  to get in the evidence that's been excluded.  If she wants to

17  explain how the process was set up, which she has, she e-mailed

18  competitors individually, she received bids back individually,

19  she can say that.  But her expectation why some process that

20  she was not a part of during this time except to be behind the

21  scenes and the communication, why it was designed that way has

22  been excluded, it's a problem testimony.

23         THE COURT:  The objections will be overruled.  The

24  problematic aspect of the testimony would be anything that has

25  to do with a violation by certain companies of the rules of the

Sara Fisher - Direct

1    game and some suggestion that that was, you know, improper.

2    But it's perfectly appropriate for the government to introduce

3    evidence about how the bid system worked.  And so far that's

4    the only thing that I have been hearing is that -- an

5    explanation about how that system works.  And the fact that it

6    was a blind-bid system, there is testimony that came out in

7    previous trials.  In any event, but at least at this point, I

8    don't see any danger that it's veering off into some tangent

9    which the Court has previously ruled would be inappropriate, so

10   I will overrule the objection at this time.

11          (In open court:)

12          *MR. LOVELAND:*  Thank you, Your Honor.

13          *THE COURT:*  Go ahead.

14   *BY MR. LOVELAND:*

15   *Q.*  Yes, Ms. Fisher, I am going to ask the question again.  I

16   am going to ask you to zoom out and explain -- you just

17   testified about how the process was set up.  Would you tell the

18   jury why it was set up that way?

19   *A.*  We set up as a -- it was a blind-bidding process so we

20   could deliver the lowest or the best price to our franchisees

21   and our restaurants, so if the suppliers don't know who they

22   are bidding against and, you know, what's being bid, then that

23   makes it more advantageous to get the lowest landed cost to our

24   restaurants.

25   *Q.*  Did a chicken seller ever tell you that it was sharing its

Sara Fisher - Direct

1   bid with another competitor?

2   A.   No.

3   Q.   I want to focus on KFC specifically and the bidding process

4   you have been discussing.  What products were you responsible

5   for procuring?

6   A.   The chicken-on-the-bone products, so the eight-piece

7   chicken, supplemental dark meat, split breasts, wings, and

8   livers and gizzards.

9   Q.   I want to talk about what's supplemental and what's not in

10  a second, but could you explain to the jury what's chicken on

11  the bone?

12  A.   It's what you would think of as fried chicken.

13  Q.   Is chicken on the bone a big deal for KFC?

14  A.   Yes.

15  Q.   Why is it a big deal?

16  A.   It's their main product, their highest mover.

17  Q.   Okay.  And what type of products specifically at KFC are

18  made from the chicken-on-the-bone product?

19  A.   I am sorry, could you repeat the question?

20  Q.   Absolutely, excuse me.  What types of products that you

21  would buy at KFC are made from the chicken-on-the-bone product

22  that you were responsible for procuring?

23  A.   So the fried chicken, so the buckets of chicken or

24  individual meals.

25  Q.   And what differentiates chicken on the bone, if anything,

Sara Fisher - Direct

1  from supplemental products?

2  A.  They are all considered chicken on the bone, but the

3  eight-piece is the largest product because that's what goes in

4  kind of the buckets of chicken.  The supplemental items are

5  just extras of each type of the eight-piece for different

6  regions of the country that had -- their customers preferred

7  dark meat over white meat as an example.

8  Q.  Was KFC focused on purchasing a specific size chicken?

9  A.  Yes.

10  Q.  And what size chicken was that?

11  A.  It was small bird.  I think the weight target was

12  2.8 pounds.

13  Q.  And why was KFC focused on 2.8-pound small-bird chicken?

14  A.  That was the specification that was set by KFC.

15  Q.  And what's the significance of the -- strike that and

16  excuse me.

17          What is the significance of setting that specification

18  for small bird?  Why does it matter?

19  A.  It goes back to the consistent product and food safety.

20  Q.  What is split breast?

21  A.  It's supplemental white meat, so there is regions of the

22  country that prefer white meat more than the dark meat, so we

23  have supplemental product that those areas of the country,

24  those restaurants are able to order so they can provide it to

25  their guests.

Sara Fisher - Direct

1   Q.  And could you explain what supplemental dark meat is for

2   the jury?

3   A.  Same as the supplemental split breast, it's the dark meat

4   of the fried chicken, and certain areas of the country prefer

5   dark meat over white meat.  So we had supplemental that the

6   restaurants could order to provide to their guests.

7   Q.  Does KFC also purchase wings as a supplemental item?

8   A.  Yes.

9   Q.  What about gizzards and livers?

10  A.  Yes.

11  Q.  What are gizzards and livers used for?

12  A.  They are fried and served as an option on the menu.

13  Q.  When you were senior manager of poultry procurement, did

14  KFC only purchase small-bird products, or did they purchase

15  other size bird products?

16  A.  For the chicken-on-the-bone category, it was small bird.

17  Q.  And of the chicken products you have talked about, which

18  was the largest by volume?

19  A.  The eight-piece.

20  Q.  When you were senior manager for poultry procurement, about

21  how much chicken did KFC purchase per year?

22  A.  I believe it was roughly 450 million pounds.

23  Q.  We will talk about the bidding process in a moment, but

24  when you are purchasing 450 million pounds of chicken a year,

25  could you give the jury an understanding of how important a

Sara Fisher - Direct

1    minor difference like a penny could be?

2    A.   So with that volume, if you had even a penny higher in your

3    cost, that would be $4.5 million annually impact.

4    Q.   Ms. Fisher, are you familiar with the term "shortage"?

5    A.   Yes.

6    Q.   What's a shortage?

7    A.   A shortage would be if suppliers were supposed to be

8    shipping a certain amount of product in a particular day and

9    they weren't able to cover that.

10   Q.   And is a shortage something you were responsible for

11   handling in your role as senior manager?

12   A.   Yes.

13   Q.   Could you give the jury an example of what a shortage would

14   look like?

15   A.   Sure.  So if we were working with a supplier, Tyson Foods

16   for example, and they were supposed to ship three truckloads of

17   chicken to a distribution center, and they called and said they

18   were only able to cover one of the three, I would then have to

19   reach out to other suppliers that are approved to try to find

20   those two loads that were short to try to get those loads

21   covered into that distribution center.

22   Q.   What type of things could cause a shortage like what you

23   described?

24   A.   I would say -- I mean, there could be several reasons.

25   Bird weight could be an issue because we have a specification

Sara Fisher - Direct

1    that's a certain weight, so if birds came in heavy or light

2    into the plant that day, that could cause an issue.  You could

3    have, you know, production line issues, a number of things.

4    Q.   And how would you typically learn about a shortage?

5    A.   Either from the suppliers or the distributors.

6    Q.   Walk the jury through just what you would do once you found

7    out there was a shortage.

8    A.   I would reach out to the other approved suppliers to see

9    who could cover that product, and if I was able to find a

10   supplier that could cover the product, I would then reach out

11   to that particular distribution center and tell them that, you

12   know, Tyson as an example could not cover those two loads, but

13   Claxton can and to place the orders with Claxton.

14   Q.   When you're handling a shortage, how do you determine what

15   price to pay?

16   A.   The distributors order at the price of the supplier that's

17   covering the product.

18   Q.   So in the example you just gave when Tyson couldn't meet

19   its requirements and there was a shortage so you went to

20   Claxton, what price would you be paying there?

21   A.   The distributors would order from Claxton at the

22   Claxton-contracted price.

23   Q.   Is that a price that's predetermined, or is that a price

24   that's negotiated during each shortage?

25   A.   It's based to the contract that's in place.

Sara Fisher - Direct

1    *Q.* Now, in that roughly three years when you were in this

2    role, how often did you experience shortages occurring?

3    *A.* I would say it was pretty often.  It could be once a week,

4    or if it was a bad week, it could be seven to eight times.

5    *Q.* But typically at least once a week?

6    *A.* I would say that's probably pretty fair, yes.

7    *Q.* Now, why did you jump in and handle the shortage yourself

8    rather than have the chicken suppliers work together?

9    *A.* Because we didn't want them communicating amongst each

10   other and talking about pricing.

11   *Q.* Are there instances that you remember when chicken

12   suppliers did, in fact, work together to cover a shortage?

13   *A.* Yes, there were a few.

14   *Q.* How many times in your three years in that job did you

15   experience that happening?

16   *A.* I would say maybe two to three.

17   *Q.* And what did you do those two to three times when you

18   realized this was happening?

19   *A.* I reached out to the supplier and let them know that we did

20   not want them managing it themselves and to reach out to me in

21   the future and I would cover the shortages.

22   *Q.* Why did you do that?

23   *A.* Because we didn't want them communicating directly about

24   pricing.

25   *Q.* Do shortages have anything to do with the contract bidding

Sara Fisher - Direct

1   process?

2   A.   No.

3   Q.   Let's talk about the contract bidding process.  What was

4   the time duration of contracts that KFC entered into for

5   chicken typically?

6   A.   When we -- the previous contract before my time was a

7   long-term contract, I believe three to four years, and then the

8   contract that I was involved in, the bidding process was a

9   three-year contract.

10  Q.   When you say the contract you were involved in, what time

11  period are you speaking about for the jury?

12  A.   It was the 2018, '19, and '20 contract.

13  Q.   How were you involved in that contract?

14  A.   That was the contract where I was new to the role, so I

15  was -- did all of the communication, setting up of meetings and

16  kind of behind-the-scenes analysis.

17  Q.   So in -- during that process, how did the contracting

18  process actually work, and what did you do step by step?

19  A.   We sent out kickoff e-mails in late December 2016 just

20  letting each supplier know that we were ready to start the

21  bidding process and just to let them know we wanted to have

22  each of them come in for an initial meeting to talk through

23  initial bids, and then we went through several rounds of

24  negotiations and then ultimately awarded contracts.

25  Q.   And were you there every step of the way?

Sara Fisher - Direct

1    A.   Yes.

2    Q.   How many suppliers ultimately signed final contracts?

3    A.   Eight.

4    Q.   Given Kentucky Fried Chicken's need to buy

5    450 million pounds of chicken a year, were you able to avoid

6    buying from any major supplier?

7    A.   No.   We bought from several large suppliers, yes.

8    Q.   What companies were the biggest chicken suppliers?

9    A.   Pilgrim's and Tyson were the two largest that we purchased

10   from.

11   Q.   And the bidding process you described, was Pilgrim's Pride

12   someone who submitted a bid in that process?

13   A.   Yes.

14   Q.   Who at Pilgrim's Pride did you e-mail?

15   A.   Roger Austin.

16   Q.   Did you send an e-mail to Claxton to kick off the bidding

17   process you testified about?

18   A.   Yes.

19   Q.   And who at Claxton did you e-mail?

20   A.   Scott Brady.

21   Q.   Ms. Fisher, I am going to ask you, there should be a binder

22   in front of you.

23        MR. LOVELAND:   Thank you, Ms. Buchanan.

24   BY MR. LOVELAND:

25   Q.   And for the record, I am going to ask you, Ms. Fisher, to

Sara Fisher - Direct

1    look at tabs 1 through 8 of your binder.

2          MR. LOVELAND:  For the record, these are Government

3    Exhibits 1921, 1922, 1923, 1924, 1926, 1927, 1928, and 1929.

4    BY MR. LOVELAND:

5    Q.  Ms. Fisher, take your time.  When you have had a moment, if

6    you could just look up and let me know.  Now, Ms. Fisher, did

7    you review those documents in advance of your testimony today

8    to be ready for the jury?

9    A.  Yes.

10   Q.  Do you recognize them?

11   A.  Yes, I do.

12   Q.  What type of documents are they?

13   A.  E-mails.

14   Q.  And who wrote those e-mails?

15   A.  I did.

16   Q.  Do they relate to the formal bidding process that you have

17   been testifying about?

18   A.  Yes.

19         MR. LOVELAND:  Your Honor, I move to admit

20   Government's Exhibit 1921, 1922, 1923, 1924, 1926, 1927, 1928,

21   and 1929.

22         THE COURT:  Any objection to the admission of Exhibits

23   1921 through 1924, 1926 through 1929?

24         MS. CARWILE:  No objection, Your Honor.

25         THE COURT:  All right.  Any other objection or any

Sara Fisher - Direct

1   other -- defendants have any separate one?  And by the way, for

2   efficiency's sake, one objection will work for all of the

3   defendants.  I want the jury to know that too.  Just for

4   efficiency sake, we will have that be a rule for purposes of

5   the trial.

6           All right.  Each of those exhibits will be admitted.

7           Go ahead, Mr. Loveland.

8           *MR. LOVELAND:*  Thank you, Your Honor.  And may I have

9   permission to please publish Government's Exhibit 1921.

10          *THE COURT:*  Yes, you may.

11          So, ladies and gentlemen, once again, that's the term

12  that's occasionally used in court.  So when something is

13  published to the jury, it means displayed to the jury.

14  *BY MR. LOVELAND:*

15  *Q.*  Okay, Ms. Fisher.  What are we looking at here?

16  *A.*  An e-mail from me to Tyson Foods that was the related -- it

17  was the kickoff e-mail for the bidding process.

18  *Q.*  When did you send this e-mail?

19  *A.*  December 9, 2016.

20  *Q.*  And is there anyone on this e-mail chain from a customer

21  other than Tyson or RSCS?

22  *A.*  No.

23  *Q.*  Why not?

24  *A.*  We sent all of the e-mails separately to each supplier to

25  keep it a blind bidding -- or a blind bid.

Sara Fisher - Direct

1    Q.  Who at Tyson are you e-mailing here?

2    A.  Carl Pepper, Tim Mulrenin, and Tim Scheiderer.

3    Q.  Who is -- what was Carl Pepper's role at Tyson?

4    A.  Carl was our main account contact for the KFC chicken on

5    the bone.

6    Q.  What about Tim Mulrenin?

7    A.  Tim was Carl's boss.

8    Q.  And could you just summarize the substance.  What are you

9    saying to Tyson in this e-mail?

10   A.  We are basically just saying that we are ready to kick off

11   the bidding process and that we were targeting late January to

12   have initial meetings for them to come in and walk us through

13   their initial bid.  And then we provided some details on what

14   we were looking for from a pricing, volume, and plant

15   perspective.

16   Q.  Thank you, Ms. Fisher.

17          MR. LOVELAND:  Your Honor, may I please have

18   permission to publish Government's Exhibit 1923?

19          THE COURT:  You may.

20   BY MR. LOVELAND:

21   Q.  Ms. Fisher, are you able to see that?

22   A.  Yes.

23   Q.  When did you send this e-mail?

24   A.  December 9, 2016.

25   Q.  What company are you e-mailing here?

Sara Fisher - Direct

1   *A.* Pilgrim's.

2   *Q.* Is there anyone on this e-mail other than from Pilgrim's

3   and RSCS?

4   *A.* No.

5   *Q.* And who at Pilgrim's are you e-mailing?

6   *A.* Roger Austin.

7   *Q.* What was Roger Austin's role at Pilgrim's at this time?

8   *A.* He was our main contact for the KFC chicken on the bone.

9         *MR. LOVELAND:* Ms. Golshanara, would you please put

10  Exhibits 1921 and 1923 on the screen side by side?

11        For the record, 23 is on the right and 21 is on the

12  left.

13        Ms. Golshanara, could you zoom in on just the text,

14  please.

15  *BY MR. LOVELAND:*

16  *Q.* All right.  Now, for Exhibit 1923, Ms. Fisher, would you

17  please take a moment to review everything under "Hi Roger."

18  *A.* Okay.

19  *Q.* And for the other exhibit, would you please review

20  everything under "Good morning Tyson Team."

21  *A.* Okay.

22  *Q.* How does the text of the e-mail after the greeting, these

23  two e-mails compare?

24  *A.* It's the same.

25  *Q.* And how does the timing of when these two e-mails were sent

Sara Fisher - Direct

1    compare?

2    *A.*   They were about two minutes apart.

3    *Q.*   Why wouldn't you just e-mail the two companies at the same

4    time?

5          *MS. CARWILE:*   Your Honor, I am going to object.

6    That's been asked and answered.

7          *THE COURT:*   Overruled.

8    *A.*   Because we wanted to send the -- all of the kickoff e-mails

9    out to the suppliers individually so they didn't know who all

10   was participating in the bid.

11         *MR. LOVELAND:*   Your Honor, may I please have

12   permission to publish Government's Exhibit 1928.

13         *THE COURT:*   You may.

14   *BY MR. LOVELAND:*

15   *Q.*   Ms. Fisher, what are we looking at here?

16   *A.*   An e-mail from me to Scott Brady.

17         *MR. LOVELAND:*   Ms. Golshanara is going to zoom in on

18   that for us if she can.

19   *BY MR. LOVELAND:*

20   *Q.*   And you said this e-mail was to Scott Brady.  Is that what

21   I heard?

22   *A.*   Yes, that's correct.

23   *Q.*   And what company does Scott Brady work for?

24   *A.*   Claxton Poultry.

25   *Q.*   Is there anyone else on this e-mail other than your boss

Sara Fisher - Direct
137

1    and Scott Brady?

2    A.   No.

3    Q.   At this point, Ms. Fisher, I am going to ask you to look at

4    in your binder what's been marked as tabs 9 through 17.

5         MR. LOVELAND:   And for the Court's record, these are

6    Government's Exhibit 1941, 1942, 1943, 1944, 1945, 1946, 1947,

7    1957, and 1958.

8    BY MR. LOVELAND:

9    Q.   And once you have had a moment to look at those, if you can

10   just look up and let me know, please.   I see you looking at me,

11   Ms. Fisher.   Are you ready?

12   A.   Yes.

13   Q.   Excuse me on that.   What types of documents are these?

14   A.   They are e-mails for a -- that I sent out to each of the

15   suppliers for a meeting invite.

16   Q.   Do you recognize them?

17   A.   Yes, I do.

18   Q.   And you already told me you wrote them.   Do these relate to

19   the same bidding process you have been testifying about?

20   A.   Yes.

21        MR. LOVELAND:   Your Honor, I move to admit these

22   exhibits.

23        THE COURT:   All right.   Any objection to the admission

24   of Exhibits 1941 through 1947 and 1957 and 1958?

25        MS. CARWILE:   No, Your Honor.

138

Sara Fisher - Direct

1          THE COURT:  And each of those exhibits will be

2    admitted.

3    BY MR. LOVELAND:

4    Q.   I am going to ask you some general questions first, please,

5    Ms. Fisher.  Would you please explain who was invited to these

6    meetings that you have described?

7    A.   We invited each supplier that we were wanting to

8    participate in the bid.

9    Q.   And did you send an invitation to each chicken supplier?

10   A.   Yes.

11   Q.   Did these meetings, in fact, happen after you sent the

12   invitation?

13   A.   Yes, they did.

14   Q.   And did the meetings actually happen at or near the times

15   listed?

16   A.   Yes.

17   Q.   Where were the meetings located?

18   A.   At RSCS headquarters.

19          MR. LOVELAND:  Your Honor, may I please have

20   permission to publish Government's Exhibit 1946?

21          THE COURT:  You may.

22          MR. LOVELAND:  If we could zoom in on just the text,

23   please.

24   BY MR. LOVELAND:

25   Q.   Ms. Fisher, are you able to see that?

Sara Fisher - Direct

1    A.   Yes.

2    Q.   What are we looking at here?

3    A.   It's the meeting invite that I sent out to Roger Austin for

4    the meeting that we just discussed.

5    Q.   Is Roger Austin the only one from Pilgrim's Pride --

6    actually, strike that.

7            What company was this meeting invitation aimed at?

8    A.   Pilgrim's Pride.

9    Q.   Was anyone from Pilgrim's Pride other than Roger Austin

10   invited to this meeting?

11   A.   No.

12   Q.   Is anyone other than folks from Pilgrim's and RSCS on this

13   meeting invitation?

14   A.   No.

15   Q.   Did Roger Austin, in fact, attend this meeting?

16   A.   Yes.

17   Q.   Could you summarize for the jury what types of things --

18   strike that.

19           Did you, in fact, attend this meeting, Ms. Fisher?

20   A.   I did.

21   Q.   And would you please describe for the jury what types of

22   things you discussed with Roger Austin at this meeting?

23   A.   We asked Pilgrim's to --

24           MS. CARWILE:   Your Honor, I am going to object, and

25   maybe we can go to side bar on this.

Sara Fisher - Direct

1          *THE COURT:*  We may.

2       (At the bench:)

3          *THE COURT:*  Ms. Carwile, go ahead.

4          *MS. CARWILE:*  So I have two objections.  One is that I

5     don't have -- I obviously don't know what the witness is going

6     to say, which is my actual first objection.  I don't know if

7     she is going to make statements that my client made which

8     haven't been discovered.  And the second objection is to the

9     extent she is testifying to, quote, types of things, it's a bit

10    vague, and I am concerned about that type of testimony as well.

11    If he wants to ask a targeted question, perhaps that's more

12    appropriate, but I also don't want to get into conversations

13    that haven't been discovered.

14         *THE COURT:*  Right.  I mean, I can understand the

15    objection to the first issue, you know, we would want to know

16    whether any statement that she might describe by Mr. Austin has

17    been part of the *James* log or other things.

18         The second one, you know, could be potentially subject

19    matter areas that may not be a problem, but let's hear from

20    Mr. Loveland first.

21         Go ahead, Mr. Loveland.

22         *MR. LOVELAND:*  Well, Your Honor, first, to the extent

23    that she was going to testify about specifics of what

24    Mr. Austin said, they are straightforward party admissions.

25    But the anticipated testimony here is the nature of the

Sara Fisher - Direct

1    meetings and what was discussed in terms of why these meetings

2    happened, price, volume, all those sorts of things.  I don't

3    expect Ms. Fisher to get into specific sentences that she

4    remembers Roger Austin saying.  Of course, if she did, they

5    would be opposing party admissions.

6            THE COURT:  Well, the issue -- the first issue that

7    Ms. Carwile brought up was whether Ms. Fisher would be, you

8    know, testifying about statements that were made to her by

9    Mr. Austin.  And then the issue would be whether those have

10   been disclosed in the past.  They may be party admissions, but

11   if they weren't on the *James* log, then, I mean, they could be

12   separately admissible, but, you know, that's a concern that she

13   has.  So that's one issue.

14           In terms -- but it may be that what you are really

15   just trying to ask the witness is to describe, have the witness

16   describe what topics that she brought up to Mr. Austin as

17   opposed to trying to elicit statements that were made to her by

18   Mr. Austin, in which case it might be better to ask a more

19   targeted question.

20           MR. LOVELAND:  Certainly, Your Honor.  And to the

21   extent that the government has recorded statements under Rule

22   16 of any of the defendants, those have been turned over.  The

23   defendants have access to the substance of every interview that

24   has been conducted of Ms. Fisher other than the last-minute

25   prep sessions, you know, that will be distributed as soon as we

Sara Fisher - Direct

1   have them, including over lunch today, but I don't -- I don't

2   know of any recorded statements the government has in its

3   possession.  If Ms. Fisher remembers something different today,

4   that would be something different.  I do think it's

5   hypothetical, though, Your Honor.  I expect her to say they

6   were talking about volume, price, and things of that nature.

7           THE COURT:  Okay.  Once again, if what you're really

8   trying to do is just have Ms. Fisher describe the subject

9   matters that she brought up as part of these meetings, which

10  apparently went on with various suppliers, perhaps a more

11  targeted question could accomplish that too, just so that

12  Ms. Fisher doesn't stray into areas that you didn't intend to

13  ask her about.

14          MR. LOVELAND:  Okay, Your Honor.  I will plan to lead

15  the witness a little more through this line of questioning with

16  the Court's permission.

17          THE COURT:  And I don't mean to try to limit your

18  exam.  It just sounds like that's what you are trying to get

19  at.  And maybe if that's true, then helping Ms. Fisher

20  understand that through a little bit differently worded

21  question might help her.

22          MR. LOVELAND:  Certainly, Your Honor.  Thank you.

23          THE COURT:  Thank you.

24          MS. CARWILE:  Thank you.

25          (In open court:)

Sara Fisher - Direct

1   *BY MR. LOVELAND:*

2   *Q.*  Okay, Ms. Fisher, so the question pending that I am going

3   to ask you is what topics did you cover during your meeting

4   with Roger Austin?

5   *A.*  We asked them to come in and talk through initial bid for

6   the bidding process that would have included pricing and volume

7   and plant location.

8   *Q.*  Can you give the jury a sense of how that type of

9   conversation went with Roger Austin?

10  *A.*  I don't recall the exact conversation.

11  *Q.*  Now, what were the items that you said you discussed with

12  Roger Austin?  Excuse me, Ms. Fisher.

13  *A.*  We asked them to come in and talk to us about initial

14  pricing, volumes they were offering, and plant locations and

15  products.

16  *Q.*  Why is volume important to KFC?

17  *A.*  Because we -- with 450 million pounds annually, it's

18  obviously a large amount.  We want to make sure that we have

19  enough -- we have procured enough product to be able for our

20  restaurants to sell that to customers.

21  *Q.*  I won't ask why price is important, but why is plant

22  location important?

23  *A.*  Our job is to get the lowest landed cost to our restaurants

24  or our franchisees, and plant location ties into that because

25  we have restaurants across the country.

1  *Q.*  Ms. Fisher, have you had occasion to see Roger Austin in

2  person during your career?

3  *A.*  Yes.

4  *Q.*  How many times, approximately?

5  *A.*  I would say at least 10.

6      *MR. LOVELAND:*  Your Honor, I am about to ask the

7  witness to identify Mr. Austin.

8      *MS. CARWILE:*  Your Honor, we will stipulate that this

9  witness can identify my client, Roger Austin.

10      *THE COURT:*  Mr. Loveland, do you accept the

11  stipulation?

12      *MR. LOVELAND:*  Your Honor, we do.  Maybe to save the

13  Court's trouble, there would be a series of questions leading

14  up to this, but I was also going to ask if Ms. Fisher could

15  identify Defendant Mikell Fries and Defendant Scott Brady.

16      *THE COURT:*  Do you want to pose that question now?

17      *MR. LOVELAND:*  I can do it, and I can lead up to it,

18  but if everyone knows where we are going with this.

19      *MS. PAGE:*  We are willing to stipulate that the

20  witness can identify Mr. Fries.

21      *MR. LAVINE:*  Your Honor, for the record, we will

22  stipulate for the record the witness can identify Mr. Scott

23  Brady.

24      *THE COURT:*  Mr. Loveland, do you accept those

25  stipulations?

1          *MR. LOVELAND:*  Absolutely, Your Honor.

2          *THE COURT:*  Go ahead.

3          *MR. LOVELAND:*  Your Honor, may I please have

4    permission to publish Government's Exhibit 1947?

5          *THE COURT:*  Yes, you may.

6          *MR. LOVELAND:*  If we could zoom in on just the text,

7    please.

8    *BY MR. LOVELAND:*

9    *Q.*  What are we looking at here, Ms. Fisher?

10   *A.*  This was the e-mail for the meeting invitation for Claxton.

11   *Q.*  And who was invited from Claxton to this meeting?

12   *A.*  Scott Brady, Jeramie Martin, and Mikell Fries.

13   *Q.*  Did Mikell Fries, in fact, attend this meeting?

14   *A.*  Yes.

15   *Q.*  Did Scott Brady, in fact, attend this meeting?

16   *A.*  Yes.

17   *Q.*  Now, what sorts of things did you discuss with Claxton,

18   including Mikell Fries and Scott Brady, at this meeting?

19   *A.*  We asked them to come in and discuss their initial bid for

20   the bidding process.  It would have included pricing and volume

21   and product.  They only have one location.

22         *MR. LOVELAND:*  Your Honor, I am mindful of time.  This

23   would be a very convenient place to stop, but I am happy to

24   push through as well.

25         *THE COURT:*  We are pretty close, so why don't we go

1   ahead and break for the day.

2           So, ladies and gentlemen, we will go ahead and adjourn

3   for the day.  We will reconvene tomorrow, so if you could be in

4   the court -- in the jury room, actually, ready to go so that we

5   can start at 8:30.

6           You will remember at the end of the day yesterday I

7   had mentioned to you those things that you could tell people at

8   home.  Same things.  Keep it really limited.  You know, you can

9   tell them what the duration of the trial is expected to be, but

10  in particular, just don't get dragged into conversations about

11  what the trial is about.  Just don't mention that.

12          It could be that over the course of the trial, even

13  people who, like, tonight or this week, you know, they don't

14  have any idea, but all of the sudden someone may hear

15  something, someone may be exposed to some publicity, who knows,

16  and all of the sudden they think, aha, and they want to talk to

17  you about that.  You know, they want to show what they know.

18  They want to get a rise out of you.  And it's really so

19  important that you just cut that off.  Don't even listen to it.

20  Because the danger is that even though you're not talking, they

21  may be talking and in effect exposing you to the type of

22  information that I told you you should not be exposed to, okay?

23          So you have to exercise some discipline in doing that,

24  but it's very important that you do.  So make sure that you

25  don't get dragged into that type of a conversation.

147

1              Also, on your own, make sure that you don't look up

2    any information.  And as I have told you before, but when you

3    are back in the jury room, don't start talking about witnesses

4    or anything or make little comments about people.  You can talk

5    about anything else.  Just don't talk about things that are

6    going on in the courtroom, because it's not until you have

7    heard all of the evidence, you have listened to me read the

8    jury instructions, and you have heard the closing arguments

9    that I will release you to commence your deliberations.  At

10   that point, you can talk it all through, but not before, okay?

11             I hope you have a pleasant evening, ladies and

12   gentlemen, and I will see you back tomorrow 8:30.

13             The jury is excused.

14             (Jury excused.)

15             THE COURT:  Let me -- Ms. Fisher, how can I forget

16   about you?  Ms. Fisher, you are excused for the evening.  I

17   will see you back tomorrow at 8:30 too.

18             THE WITNESS:  Thank you.

19             THE COURT:  All right.  Just so that we're clear, in

20   terms of the alternates, we'll consider the juror in seat No. 4

21   to be the first alternate, the juror is seat No. 9 to be the

22   second alternate, the juror in seat No. 13 to be the third

23   alternate.  So they will be replaced in that numerical order,

24   okay, if we need to.

25             One thing I wanted to mention to you because we have

 1    more room at the tables now, if there are some chairs that

 2    aren't being used that you want to get out of the way, back in

 3    that little area over there by the document viewer there may be

 4    some -- I haven't looked back there, but there may be some

 5    room.  So if you want to move a chair back there or if you want

 6    to let Ms. Buchanan know that there are certain chairs that

 7    could be moved back there just to clear up the clutter a little

 8    bit, you are certainly free to do that.  Or if you want to

 9    leave the chair there for convenient placing of your clothing

10    or your overcoat or something, you can do that as well,

11    whatever you want to do, but I wanted to mention that.

12            And then obviously the parties have briefed the --

13    some issues regarding Mr. Bryant, and it sounds like Mr. Bryant

14    will probably be called tomorrow.  I am not going to make any

15    advanced rulings about that.  Of course, the government

16    entitled that a notice, so we'll basically be taking that as it

17    comes.  But just as a general proposition, I just would note

18    that he would have to have some foundation for believing, you

19    know -- for interpreting some e-mail, and it would have to be

20    relevant.

21            So, for example, if Mr. Bryant received an e-mail but

22    didn't do anything -- didn't have to do anything in response to

23    it, he just simply got an e-mail, it may not be relevant what

24    he thought the person who wrote it thought.  It could be if he

25    had to respond to it or he had to do something in response to

1   it, but it may not necessarily be relevant that he knows about

2   it.  And in any event, he would have to have some foundational

3   belief to interpret it.  And that could very well exist, but it

4   may not exist.  Anyway, those are just some of the general

5   things to think about when it comes to Mr. Bryant in terms of

6   those topics.

7           Anything else that the parties would like to bring up?

8   I have several takers.  I think Mr. Feldberg beat Mr. Loveland

9   to the punch, so ...

10          MR. FELDBERG:  A rare moment, Your Honor.

11          I just wanted to give the Court an update on

12   Exhibit 63, which is the purported summary of phone calls

13   between Mr. Austin and Mr. Brady, which the government produced

14   to us Sunday afternoon.  We've had a couple discussions with

15   the government on it, and I anticipate that the issue will

16   become ripe when Ms. Evans is on the stand.

17          The problem from our perspective is it was only

18   produced to us Sunday.  It is extraordinarily time consuming to

19   try to review it for accuracy and verify the information.  We

20   have reviewed sample months.

21          THE COURT:  Remind me, is that a new one?

22          MR. FELDBERG:  New, yeah, as of Sunday afternoon.  We

23   found some errors.  It looks like there are both errors in

24   overcounting in some instances and undercounting in some

25   instances, but we just had the time and the bandwidth to look

1  at a couple months.  There are 38 I think reported phone calls

2  on it.

3          The second issue is some of the calls just from a

4  review of a couple months' samples are less than a minute.  I

5  think one is as short as 18 seconds and suggesting there is no

6  connection.  I have been in discussions with the government.

7  The ball is I think in the prosecution's court in terms of

8  coming up with a proposal, but I did want to alert the Court

9  that is where we are at the moment in case it doesn't get

10 resolved.

11         THE COURT:  Sure.  And, Mr. Feldberg, do you believe

12 that we should resolve those issues before Ms. Evans testifies?

13         MR. FELDBERG:  Unless the government is not going to

14 use the document, we think they should be resolved because we

15 think evidence presented to the jury should be both accurate

16 and verifiably accurate.

17         THE COURT:  Let's hear from the government on that

18 issue, Ms. Wulff?

19         MS. WULFF:  I am just going to move this back so we

20 don't trip on this cord here.

21         THE COURT:  We don't want anyone to trip.

22         MS. WULFF:  Thank you, Your Honor.

23         Certainly the government agrees with Mr. Feldberg that

24 evidence presented should be accurate and verifiable.  One

25 point of clarification, Exhibit 63 is intended solely as a

1    demonstrative.  The government is not going to seek to

2    introduce it into evidence.  And we understood the April

3    deadline, I can't recall the specific date in April, but the

4    April deadline to apply to summary exhibits that would be

5    submitted to the jury for evidence.

6              We appreciate Mr. Feldberg and Ms. Carwile bringing

7    their concerns to our attention, and we are having ongoing

8    discussions, and we also hope to have those resolved before

9    Ms. Evans takes the stand.

10         THE COURT:  When do you anticipate that Ms. Evans

11   would take the stand?

12         MS. WULFF:  Tomorrow certainly at some time.  She is

13   the next witness after Ms. Fisher.

14         THE COURT:  Yeah, I am wondering if we need to have --

15   if we need to talk about it outside of the presence of the

16   jury, and it sounds like we could, I think that we need to

17   figure out when because I don't want that to take place during

18   a time that the testimony would otherwise take place, so those

19   options are basically first thing tomorrow morning or over the

20   lunch hour, but I am not sure that Ms. Fisher's testimony is

21   going to last that long.  And if then Ms. Evans is next, it

22   sounds like what we should perhaps do is plan on meeting

23   sometime before 8:30 tomorrow.

24         MS. WULFF:  That's fine, Your Honor.  I anticipate I

25   will be in touch with Ms. Carwile at some point this evening as

1    well.

2            THE COURT:  Do you think that that's probably the

3    safest to plan, Mr. Feldberg?

4            MR. FELDBERG:  I think that's fine if we plan to meet

5    at 8:15 if necessary.  If we come to some kind of resolution --

6            THE COURT:  Do you think 8:15 would be reasonable so

7    that we can still start on time with Ms. Fisher at 8:30?

8            MR. FELDBERG:  We do, Your Honor.

9            THE COURT:  Yeah, why don't we do this.  Why don't we

10   plan on 8:15, but of course we can call that off if overnight

11   some type of resolution is worked out.

12           MR. FELDBERG:  Should we send a notice to the court

13   deputy?

14           THE COURT:  Or you can call chambers just leaving a

15   message at chambers, not necessarily a telephonic message at

16   midnight but an e-mail would work better then, but if it's,

17   like, in the morning, we get there pretty early, but you could

18   just call chambers if it's later.

19           MS. WULFF:  May I talk to Ms. Carwile also about the

20   summary charts?  There is another issue we could bring to the

21   Court's attention.

22           THE COURT:  Sure.

23           MS. CARWILE:  There was an outstanding objection by

24   the defendants to the inclusion what we will call origination

25   data on the charts, and I spoke with Ms. Wulff last night and

1    conferred with the other defense team, and the government has

2    agreed to remove that data and to revert time entries in the

3    charts where the change was made using that origination data

4    back to the data on the face of the document as was the case in

5    prior -- in the prior trial's exhibits and then reorder -- they

6    have already done all of this, but I am just for the record

7    noting to the Court and reordering entries based on the new

8    time.  And we have seen those, and I told Ms. Wulff in return

9    we will not be cross-examining Ms. Evans about origination data

10   because it won't be on the chart, so just to put that on the

11   record.

12        THE COURT:  And I think the new piece of that is you

13   won't be cross-examining Ms. Evans about that origination data,

14   because I think otherwise the government gave us notice that an

15   agreement had been reached on that.

16        MS. WULFF:  You are right.  We sent notice of that

17   this morning via e-mail, and we just wanted to put that on the

18   record that Ms. Carwile had been able to work that out.

19        MS. CARWILE:  And I should be clear so that there is

20   no confusion.  The agreement is that there will be no

21   cross-examination of Ms. Evans regarding the inclusion and then

22   removal of origination data to the charts.  There was no

23   agreement, for instance, that I won't be cross-examining

24   Ms. Evans about the fact that there is not accurate time zone

25   information, but I was explaining to Ms. Wulff that I won't try

1    to surprise Ms. Evans and say, Didn't you just erase the

2    origination data.

3         THE COURT:  I see.  I understand.  That's a helpful

4    clarification.  I wasn't quite sure whether there would be

5    testimony from Ms. Evans about some of those topics even though

6    the summaries will not reflect that information.

7         MS. CARWILE:  Yes, thank you.

8         MS. WULFF:  One final thing, Your Honor, for the

9    summary charts, although we will see you at 8:15 tomorrow, the

10   government had agreed not to seek to introduce Exhibits 54 and

11   55 unless they become relevant in our rebuttal case, and I just

12   wanted to be up front with the Court that we will have

13   Ms. Evans authenticate them during her testimony on direct exam

14   so that it's not necessary to call her back in the rebuttal

15   case in the event that we do need to introduce them, and I am

16   doing that for efficiency purposes.  And we continue to abide

17   by the representation that we will not introduce them during

18   our case in chief.

19        THE COURT:  Okay.  Yeah, that makes sense.  She lives

20   in Washington, I think.

21        MS. WULFF:  She lives in San Francisco, but we thought

22   that would promote efficiency.

23        THE COURT:  Mr. Loveland is up next.

24        MR. LOVELAND:  I wanted to address exhibits and

25   specifically witness list exhibits.  So the government entered

1    its notice in advance of trial, and then after hearing Your

2    Honor's expression that we should plan to admit anything with a

3    limiting instruction that doesn't have a witness and publish it

4    at that time, we filed something which I guess crossed over

5    into today.  Ms. Carwile pointed out an error in that, and we

6    sought to correct that error during lunch.  But the long and

7    short of it is we will seek to probably bulk admit most of the

8    things that were on the original notice save for those few

9    dozen that have limiting instructions.  And for those, we

10   reserve the right to admit or not admit them on a case-by-case

11   basis, but if we do admit them, we will publish them at the

12   time we admit them.

13          THE COURT:  Yeah, I looked briefly at the government's

14   filing which did come today.  I thought that seemed helpful and

15   undoubtedly helps give the defendants some clue about how it's

16   going to be done.

17          MR. LOVELAND:  Thank you, Your Honor.

18          THE COURT:  Thank you, Mr. Loveland.

19          Mr. Fagg?

20          MR. FAGG:  Thank you, Your Honor.

21          I just wanted to alert the Court that for tomorrow

22   morning there may be another issue that we would want to

23   discuss about the summary exhibits.  We raised an objection

24   prior to the pretrial conference in our motion regarding GX-60,

25   which is a -- one of the government's summaries that deals with

1    communications between August 29th of 2014 and September 3rd.

2    And I don't know if we can pull that up.

3         This summary chart, and if you could just highlight

4    the last entry, Brian, I appreciate it, on page 2.  The last

5    entry on here, Your Honor, it says, Told Bob we would go down 2

6    cents, and he said someone moved down 4.  It has to be George's

7    or he is bluffing.  Roger and Bill are not moving.

8         And our concern here, Your Honor, is with respect to

9    that last sentence, particularly given the fact that the second

10   witness in this trial will be Ms. Evans.  And we are concerned

11   that there would be confusion by the jury that Roger and Bill

12   refers to Bill Lovette, and I don't think the government

13   intends to argue at any point that that Bill is Bill Lovette.

14   They have acknowledged in prior trials that that relates to

15   Bill Kantola who we have heard nothing about and the jury has

16   heard nothing about.  So we have asked the government to just

17   insert some brackets in there clarifying that that Bill is Bill

18   Lovette.  We haven't been able to reach an agreement yet, so I

19   just wanted to flag it for the Court that this may be another

20   issue that we wish to raise tomorrow.

21        It was in our motion prior to the pretrial hearing,

22   and it wasn't something that was specifically addressed at the

23   hearing.

24        THE COURT:  Okay.

25        MR. FAGG:  So I just wanted to flag it.

1          *THE COURT:*  Thanks, Mr. Fagg.

2               Ms. Wulff, anything at this point as to that issue?

3          *MS. WULFF:*  Sure, thank you, Your Honor.

4               Mr. Fagg is correct, it was in their briefing and not

5     discussed at the pretrial hearing.  Our proposal back to

6     Mr. Fagg is that were we to annotate this entry to clarify

7     which Bill we are talking about, there are a number of other

8     instances in the summary charts that refer to a Bill and that

9     we would need to annotate all of them in order to make it

10    clear.  And furthermore, many of these charts refer to -- well,

11    most of them refer to individuals by their first name or even

12    initials.  There is one example of come to BL office, that

13    being Bill Lovette.  So modifying or annotating only this entry

14    on this chart would be inconsistent with the fact that we have

15    not modified them to specify who any of these people are in any

16    way.  I mean, this very entry alone, you know, we could clarify

17    who the Bob is, who the Roger is, and who the Bill is, but we

18    have done none of that because they are taken directly from the

19    face document.

20         *THE COURT:*  Right.  And you would not intend to ask

21    Ms. Evans who that Bill is because that's outside of the scope

22    of her personal knowledge?

23         *MS. WULFF:*  That's correct, Your Honor.

24         *THE COURT:*  Mr. Fagg, anything more?  Why don't we do

25    the whole kit and kaboodle with this one, whatever objections

1  you would have made tomorrow, for instance, had this came up at

2  that time.  Do you want to make them now so we can deal with

3  this issue tonight?

4      MR. FAGG:  Sure.  I think the point here, Your Honor,

5  is I am not sure what the prejudice or the harm is to the

6  government in making this clarifying statement on this

7  particular chart when there is going to be virtually no

8  testimony about Bill Kantola in this case.

9      But there is going to presumably be testimony about

10  Mr. Lovette who is the only Bill remaining as a defendant in

11  this case.  There is not going to be any confusion about who

12  the Bob is or who the Roger is in this nor is there any

13  confusion about who the Bill is or who BL is in the other

14  messages that Ms. Wulff is discussing.

15      And we have never argued that those are not Bill

16  Lovette.  This is simply one where right on the heels of the

17  government's opening we have this chart that is going to be

18  displayed with their second witness talking about Roger and

19  Bill are not moving.  And I respectfully suggest that there is

20  a high likelihood that this jury right out of the gate will

21  believe that that is Roger and Bill Lovette, and there is no

22  way for us to cross-examine anyone about it as they are not

23  going to elicit that testimony from Ms. Evans.

24      THE COURT:  I can't remember, maybe we can pull up

25  1238.  Does 1238 explain it?  I mean, the jury could take a

1    look at that exhibit -- here we go.

2          *MR. FAGG:*  It says Koch is not moving either is the

3    entry several lines up above.  I don't believe Ms. Wulff is

4    planning on displaying underlying documents, but I honestly

5    don't know the answer to that question.

6          *THE COURT:*  Okay.  Let's hear from Ms. Wulff.  The

7    issue would be do we anticipate -- because obviously Exhibit 60

8    is a summary.  It refers to -- it does not clarify the issue.

9    Will there be some evidence that the government presents that

10   would identify who the Bill being referred to in that text

11   entry is?

12         *MS. WULFF:*  Your Honor, if we go back to the summary

13   chart, and it seems like Mr. Fronzaglia has the controls the

14   row right above this, is a call from Scott Brady to Bill

15   Kantola, Your Honor.

16         I just --

17         *THE COURT:*  And I am wondering, so but this is the

18   form that will be admitted tomorrow with that origination

19   information on it or --

20         *MS. WULFF:*  They probably hadn't had time to update

21   their Trial Director yet.  I gave it to them very late last

22   night.

23         *THE COURT:*  I just wanted to clarify that.

24         *MS. WULFF:*  I actually am not sure.  I will need to

25   confer with Mr. Loveland, but to assuage Mr. Fagg's concerns, I

1    am not sure Exhibit 60 will come into evidence tomorrow because

2    I am not sure that all of the underlying exhibits will have

3    already been admitted by tomorrow.  So I certainly for one do

4    not plan to discuss Exhibit 60 specifically with Ms. Evans.

5            Two, in either event as I already represented to the

6    Court, Ms. Evans is not going to characterize or describe any

7    of the substance of the communications.

8            And third, I am not sure -- I do not believe this

9    chart -- we will even seek to admit this chart tomorrow

10   immediately after Ms. Evans' testimony.  So to the extent that

11   Mr. Fagg is concerned that by tomorrow morning the jury won't

12   yet know who Mr. Kantola is, that concern is premature or not

13   yet ripe.

14           And, again, there is a reference to Bill Kantola in

15   the entry immediately before this which gives context to who

16   the Bill is here.

17           And finally, the point we have made before, which is

18   just that annotating these charts and including -- and

19   clarifying who any of the Bills or not Bill -- any of the other

20   gentlemen in these charts are would be argumentative, and I

21   believe that the defendants would certainly object were we to

22   annotate all of them to clarify who all the other Bills are to

23   the extent that they are Bill Lovette.

24           THE COURT:  Okay.  I don't like to kick cans down the

25   road, but I would say, Mr. Fagg, given the fact it may not be

161

1    admitted tomorrow and because we may perhaps at the time that

2    it is have a little bit more context, perhaps it would -- we

3    wouldn't sacrifice too much in terms of efficiency to take up

4    any objection that Mr. Lovette has at that time.  Reaction to

5    that?

6           MR. FAGG:  Sure.  Very briefly, Your Honor.  My only

7    concern is that if the -- if GX-60 is displayed to the jury

8    tomorrow, then the prejudice is done.

9           THE COURT:  I don't get that impression.  I get the

10   impression that maybe foundation could be laid for it, but it

11   wouldn't be displayed.

12          MR. FAGG:  I just wasn't sure if we were drawing a

13   distinction between admitted and published.

14          THE COURT:  Well, ultimately it sounds like this is --

15   yeah, I am not sure about that, but it doesn't sound like it

16   would be published.

17          MS. WULFF:  I believe I said I am planning on having

18   Ms. Evans authenticate and lay the foundation for all the

19   charts, but I believe I said I am not planning on discussing

20   Exhibit 60 in any sort of particularity with her besides to the

21   extent she is talking about all of them, and I am not planning

22   on displaying it for the jury during that time.

23          THE COURT:  Given that, Mr. Fagg, any problem with

24   taking that -- taking up your objection at the time that 60 may

25   be offered?

162

1          MR. FAGG:  No, Your Honor.

2          THE COURT:  Okay.  Why don't we do that, and we'll see

3     what type of factual context may exist by that time.

4          MR. FAGG:  Thank you.

5          THE COURT:  Ms. Wulff, another issue?

6          MS. WULFF:  May I be heard on that, Your Honor?

7          THE COURT:  Yeah.

8          MS. WULFF:  The government's only concern there is

9     that to the extent that 60 comes into evidence after, for

10    example, Exhibit 58 which has another reference to Bill, it

11    would be too late for the government to then go back and modify

12    that the reference to Bill in Exhibit 58 is Bill, bracket,

13    Lovette.  So there is some concern about kicking the can too

14    far down the road.

15         THE COURT:  I guess I don't quite understand that.

16    Let's assume that I would -- but I think you have a really good

17    point, you know, the point you start annotating, you would also

18    pick up objections because it is kind of your -- government's

19    view of the evidence or something of that nature.

20         But even if I were to do so and say, Just for this

21    one, you have got to put a bracket in there, it seems like it

22    simply would be an issue of that could be added.

23         MS. WULFF:  It certainly could be added to Exhibit 60,

24    and the government's point is only that to the extent that we

25    need to add it to Exhibit 60, we would request to clarify that

163

 1    the Bill in Exhibit 58 is Bill, bracket, Lovette or that the

 2    BL, and I believe it's 62, is B, bracket, Bill, L, bracket,

 3    Lovette.  So if we are waiting to rule on whether 60 can be

 4    annotated, the government's concern is just that 58 and 62 may

 5    already have been admitted at that time without the annotations

 6    that would make this balanced.

 7              THE COURT:  Yeah, I understand your point.

 8              MS. WULFF:  Thank you.

 9              THE COURT:  Mr. Fagg, on that point?

10              MR. FAGG:  The issue with 58 and 62 is there is no 403

11    prejudice or risk of confusion of the jury with those exhibits.

12    They don't require annotation.  This is the one where the jury

13    has the real possibility of being confused about who the Bill

14    is, so I think that respectfully Ms. Wulff is sort of turning

15    403 on its head here.  We are arguing that this particular

16    exhibit has the tendency to and the potential to mislead the

17    jury.

18              There is not any potential to mislead the jury, and

19    we're happy to stipulate that we're not going to argue that BL

20    is not Bill Lovette or will review with Bill in the morning

21    doesn't mean Bill Lovette.

22              THE COURT:  Well, once again, I think let's wait until

23    it actually is -- the admission of it is moved.  I would

24    comment that typically the government doesn't have a

25    responsibility -- no party has a responsibility to try to make

164

1    sure that its evidence is readily understandable or clarified

2    or things of that nature.  It would have to be a fairly

3    extraordinary situation.

4            This, I do agree with you, though, that when you see a

5    document that says Roger and Bill, Roger and Bill, you would

6    probably -- there could be an association with Bill Lovette,

7    and that's not the case, and the government isn't arguing that

8    that's the case either, so I understand that point.  The

9    question would be whether at the time its admission is moved,

10   the danger of some type of jury misunderstanding would be so

11   great that it would overcome the fact that the government

12   normally would not have to annotate evidence to make sure it's

13   not something misleading, especially when it's coming from some

14   type of text message.

15           Any other issues we should take up at this time?

16           So 8:15 unless the word goes out that we don't need to

17   meet at that time.

18           We will be in recess.  Thank you.

19        (Recess at 5:29 p.m.)

20

21

22

23

24

25

1                                  INDEX

2      OPENING STATEMENTS

3          By Mr. Hart                                        48

4          By Ms. Nielsen                                     60

5          By Mr. Tubach                                      70

6          By Mr. Feldberg                                    84

7          By Mr. Kornfeld                                    96

8      WITNESSES

9          Sara Fisher

10             Direct Examination By Mr. Loveland            110

11                               EXHIBITS

12     Exhibit      Offered   Received  Refused  Reserved  Withdrawn

13     1921-1924              133

14     1926-1929              133

15     1941-1947              138

16     1957-1958              138

17                        REPORTER'S CERTIFICATE

18         I certify that the foregoing is a correct transcript from

19     the record of proceedings in the above-entitled matter.   Dated

20     at Denver, Colorado, this 7th day of June, 2022.

21

22                              S/Janet M. Coppock

23

24

25