1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 20-CR-00152-PAB
3  In Re: Penn III

4  UNITED STATES OF AMERICA,

5       Plaintiff,

6  vs.

7  JAYSON JEFFREY PENN,
   MIKELL REEVE FRIES,
8  SCOTT JAMES BRADY,
   ROGER BORN AUSTIN,
9  WILLIAM WADE LOVETTE,

10      Defendants
   _____

11                  REPORTER'S TRANSCRIPT
12                  Trial to Jury, Vol. 8
   _____

13

14          Proceedings before the HONORABLE PHILIP A. BRIMMER,

15  Chief Judge, United States District Court for the District of

16  Colorado, commencing at 8:16 a.m., on the 16th day of June,

17  2022, in Courtroom A201, United States Courthouse, Denver,

18  Colorado.

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
       Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

                            APPEARANCES

1

2           Kevin Hart, Leslie Wulff, Paul Torzilli and Daniel

3    Loveland, U.S. Department of Justice, 450 Fifth Street N.W.,

4    Washington, DC 20530, appearing for Plaintiff.

5           Anna Tryon Pletcher and Michael Tubach of

6    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

7    San Francisco, CA 94111-3823;

8           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

9    N.W., Washington, DC 20006, appearing for Defendant Penn.

10          David Beller, Richard Kornfeld and Kelly Page of

11   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

12   CO 80202, appearing for Defendant Fries.

13          Bryan B. Lavine and Laura Anne Kuykendall of Troutman

14   Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite

15   3000, Atlanta, GA 30308;

16          Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,

17   1001 Haxall Point, Richmond VA 23219, appearing for Defendant

18   Brady.

19          Michael Felberg of Reichman, Jorgensen, Lehman,

20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21   10017;

22          Laura F. Carwile of Reichman, Jorgensen, Lehman,

23   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

24   CA 94065; appearing for Defendant Austin.

25

                    APPEARANCES (Continued)

1               Dru Nielsen of Eytan Nielsen, 3200 Cherry Creek Drive

2        South, Suite 720, Denver, CO 80209;

3

4               John Anderson Fagg, Jr. and Frank Schall of

5        Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

6        Charlotte, NC 28202-4003, appearing for Defendant Lovette.

7                         *    *    *    *    *

8                         PROCEEDINGS

9               *THE COURT:*  We are back on the record in 20-CR-152,

10       and we got an e-mail last night.

11              Mr. Kornfeld, do you want to go ahead?

12              *MR. KORNFELD:*  Yes, thank you, Your Honor.  Good

13       morning.

14              As I indicated in the e-mail, unfortunately, Mr. Fries

15       tested positive.  We were able to connect with everybody and

16       really just appreciate everyone's not only their willingness to

17       just deal with the situation collaboratively, but to

18       communicate on the fly.

19              So here is the situation, Your Honor.  Our first

20       question is whether it's even a possibility from the Court's

21       point of view for Mr. Fries to waive his appearance today,

22       mindful of the dimensions of that, mindful of the prior ruling

23       with respect to Mr. Little, although that's a very different

24       situation.  If the answer to that is yes, then we have two

25       concerns.

1       And just, you know, in talking with the government

2   about the concerns, No. 1, Mr. Fries is a very engaged client,

3   as all these men are.  His ability to participate in his

4   defense, I think through technology that's not an issue were he

5   to be on VTC and/or real-time.

6       The second concern --

7       THE COURT:  Sorry to interrupt, Mr. Kornfeld.  Would

8   that be true today as opposed to potentially later?  I mean,

9   one thing about not having trial next week is coincidentally he

10  is hopefully fully recovered, but is he feeling well enough to

11  be able to attend by VTC today?

12      MR. KORNFELD:  He says he is.  I haven't seen him

13  today, obviously.

14      THE COURT:  He could feel worse later during the day.

15      MR. KORNFELD:  Exactly, and that's our concern.  So I

16  appreciate that, Your Honor, but as we speak, he indicates that

17  he could.

18      The second concern, and, frankly, this is our larger

19  concern, is the potential prejudice to him.  We sort of talked

20  through this.  We would be very reticent for the Court to tell

21  the jury that the reason he is not here is because he has got

22  COVID for all the obvious reasons.  Were the Court to say

23  something to the effect of through prior arrangement or prior

24  agreement, he is not here, and he is participating by VTC, we

25  have concern about that prejudice.  We have that concern about

1  some perception of privilege, particularly in light of the fact

2  that we have a juror whose aunt passed away.

3          So what I said to my colleagues and to government

4  counsel is I wanted to raise these issues with the Court

5  wanting to get the Court's, you know, take on what from Your

6  Honor's point of view might be possible, and then, you know, we

7  can make a decision as to our position.

8          We are acutely aware, Your Honor, if this were a

9  one-defendant case, from our perspective this is a pretty easy

10  decision, and the timing couldn't be better, but we are acutely

11  aware of the inconvenience and the attendant effect on the

12  other defendants; and, frankly, obviously, our ethical duty is

13  do what is in the best interest of our client.

14          And one of the things I think is in his best interest

15  is getting this third trial done.  So we are acutely aware of

16  all the competing tensions and the inconveniences, and just,

17  again, I would express our appreciation and Mr. Fries'

18  appreciation to everybody's not only flexibility, but just

19  their graciousness in dealing with this situation, because it's

20  just a lousy situation.

21          *THE COURT:*  Thank you very much, Mr. Kornfeld.

22          So here is the deal.  Mr. Kornfeld alluded to some

23  ruling that I made in regard to Mr. Little.  Mr. Little had

24  requested that he be able to attend the first trial in part by

25  VTC.  He intended to be present during certain stages, but

1    because of a personal situation he had, which didn't have to do

2    with Mr. Little being in ill health at all, he wanted to attend

3    intermittently.  I am not sure if Mr. Byrne shared those

4    orders.  Those orders were restricted because of the personal

5    nature of them.

6         But in those orders, I held that Rule 43 required him

7    to be present during trial.  Rule 43, the wording of it is a

8    little bit odd because it talks about a defendant being

9    voluntarily absent.  That phrase can be misinterpreted.  That

10   means like a defendant shows up the first day of trial, but

11   then takes off or refuses to come to trial, stays in his cell

12   or -- and that would not prevent the trial from going forward.

13   If the defendant did something like that, the trial could

14   continue.  Of course, I would issue an arrest warrant but

15   probably -- so that phrase could be a little misleading.

16        So the bottom line is I held in the case of Mr. Little

17   despite some strong reasons that Mr. Little had for wanting to

18   do that intermittent personal attendance that Rule 43 simply

19   did not allow for it, and I don't believe that it does.  So

20   even assuming that Mr. Fries felt well enough today,

21   unfortunately, I don't believe there is any provision

22   whatsoever for him to simply attend by VTC.

23        One of those orders also mentions the CARES Act.  This

24   seems like a CARES Act situation.  The CARES Act does not carve

25   out any exception for trial.  The CARES Act carves out

1    exceptions for changes of plea, sentencings, but not for

2    trials.  So I will give the government an opportunity to

3    comment, but I believe that our option today would -- it really

4    would be -- we'll have to continue the trial.  We'll have to

5    excuse the jury.  It's unfortunate they had to come in.

6         So why don't we do this.  I will hear from the

7    government first in terms of what I think of Rule 43, and then

8    after that if I still believe that we need to let the jury go

9    today, then we will talk about what we should tell the jury.

10        Mr. Loveland, go ahead.

11        *MR. LOVELAND:*  Sure, Your Honor.  We had a chance to

12   look at Rule 43 last night.  What I would say is there is no

13   world in which without the full consent of Mr. Fries we think

14   it would be appropriate.  I do believe that Rule 43(c) allows

15   for voluntarily being absent.  Obviously, the CARES Act does

16   not have any provision for trial.  It's limited to sentencing,

17   arraignment, re-arraignment and things like that.

18        I do think that the 10th Circuit's *Edmonson* case from

19   1992 sets forth a very clear two-part test.  The first is

20   whether the defendant was initially present at trial, and the

21   second is whether he subsequently waived his right.

22        I also think those earlier cases are dealing with a

23   defendant who is completely absent, not one who is able to

24   participate by VTC.  So I would say that the government's

25   position would be if and only if Mr. Fries makes a fully

1  knowing representation to the voluntariness of the situation,

2  the government would be open, subject to the Court's views of

3  the matter, to allow the trial to proceed.  I do think we share

4  the Court's views of health coming and going and things like

5  that.  We obviously hope that Mr. Fries makes a speedy and full

6  recovery during the off week, but it just is something that's

7  very difficult to predict and it's a very difficult situation.

8         I am happy to give the Court the citation for the

9  *Edmonson* case.  We have briefed it, Your Honor.  At the end of

10  the day, this is something that would be an abuse of

11  discretion review at the appellate level, so we think it's

12  within the sound discretion of the Court.  I have said this

13  twice before, but the most important thing from the

14  government's perspective is Mr. Fries having a voluntary,

15  knowing record of what he is doing.

16         THE COURT:  Here is another.  Why don't you give me

17  the cite right now, Mr. Loveland.  Why don't we take a brief

18  recess.  You guys -- people can look that up.  Here is another

19  case to look at too.  This is a more recent case, a pandemic

20  case, *United States v. Lindsey*, L-I-N-D-S-E-Y, 2020 WL 6937720,

21  District of Hawaii case, saying that -- denying the defendant's

22  request to participate in a trial by video teleconference, to

23  make an appearance by video teleconference.

24         MR. LOVELAND:  The *Edmonson* citation is 962 F.2d 1535.

25  The pin cite for the two-step test is at one -- I can't read my

1    own handwriting so I can't -- it's a 10th Circuit 1992 case,

2    Your Honor.

3         THE COURT:  Let's take a recess.  People can look at

4    the *Edmonson* case or look at that Hawaii case as well.  Let's

5    try to maybe hold the break, because we don't want to go too

6    late for the jury, especially if the jury came in, and then

7    let's reconvene.  And in the meantime, let's think about what

8    we would tell the jury in the event that we send them home

9    today.

10        Mr. Kornfeld?

11        MR. KORNFELD:  Your Honor, just in connection with

12   that, if the jury is sent home, we do have some concerns with

13   the jury being brought into the courtroom and seeing that

14   Mr. Fries is absent.  So I might be putting the proverbial

15   horse before the cart, but it would be our request that if

16   that's what happens, that that be communicated to the jury

17   outside of the courtroom so that there is no chance of any

18   prejudice to Mr. Fries attaching from them being -- coming in

19   as they diligently do every day on time and then being sent

20   away.

21        THE COURT:  Right, especially depending on what was

22   said to them, they might quickly try to do a nose count, and

23   that could for some of them point out who is not here.  There

24   is ways to control that.  I could clear the courtroom.  I could

25   have the attorneys here if you wanted to.  There are various

1    ways to do it.  To have them all come in and then to have

2    Ms. Grimm say, Oh, by the way, you can go home, they may be

3    like, what?  So it might be a little bit more official to have

4    it come from me, but --

5            MR. KORNFELD:  Obviously, however you want to do it,

6    but I appreciate the Court's consideration of our sensitivity

7    on that.

8            THE COURT:  No, I agree.  I agree with you totally.

9    So we'll take a brief recess.  Take a look at those cases.

10           (Recess at 8:30 a.m. until 8:42 a.m.)

11           THE COURT:  So we are back on the record in 20CR152.

12           I have had a chance to look at the Edmonson case.  I

13   don't think it answers the question.  The Edmonson case is

14   distinguishable because that was a question of whether or not

15   the defendant had basically voluntarily absented himself not

16   with permission of anyone, but without permission of people, so

17   I don't think that that answers the question.

18           It is amazing that there aren't good answers to this

19   question.  You know, that's what law students rack their brains

20   to try to figure out an original topic, but then when you're in

21   court, you find juicy legal topics that are unanswered all the

22   time.  But anyway, I will -- I am open to any other arguments

23   that anyone wants to make.

24           Okay, yeah.  Go ahead, Mr. Loveland, take a shot.

25           MR. LOVELAND:  No shot to be taken.  I think Footnote

1 of the *Lindsey* opinion makes it clear that if the defendant

were to consent after appearing on the first day, we would be

squarely within the rules test.  However, this is law school

academic moot because Mr. Kornfeld, I believe, will represent

his client is not in a position to consent.

   *THE COURT:*  I think that that's true.

   *MR. KORNFELD:*  That's correct.

   *THE COURT:*  I don't think we have a real clear consent

issue here.

   Mr. Tubach?

   *MR. TUBACH:*  Your Honor, just for the record, I

understand what the Court is going to do, but for the record, I

guess I would have to object on behalf of Mr. Penn.  We have

witnesses who are ready to go today.  They are with great

inconvenience to them able to come back starting the week of

the 27th.  My only concern is if something happens between now

and then and we can't get them, then I have lost a witness.  So

for the record, I do object to not proceeding today.

   *THE COURT:*  Understood.

   Mr. Fagg, go ahead.  You don't have to come up to the

podium if you want.  At your discretion, Mr. Fagg.

   *MR. FAGG:*  These witnesses are important to

Mr. Lovette's defense, so we would object to a continuance.

   *THE COURT:*  Okay.

   *MR. FELDBERG:*  I have to join for the record the

1   objection, Your Honor.  We have a witness here today, and hope

2   he is able to come back just in case.

3           THE COURT:  Of course, any type of scheduling issues

4   come with risks, so there is a background risk for witness

5   scheduling regardless, but nevertheless, I understand the

6   positions of Mr. Penn, Mr. Lovette, and also Mr. Austin.  I

7   will overrule those objections.  As Mr. Loveland pointed out,

8   we don't have a situation here where there has been a clear

9   waiver by Mr. Fries of his right to personally attend.

10  Moreover, even if there was, I would still deny it.  I would

11  still go ahead and continue the trial today, because, as I

12  ruled, and let me just -- even though this is a restricted

13  order, my reasoning is set forth in two orders, Docket No. 612

14  and Docket No. 675 where I set forth my reasoning on whether a

15  defendant could choose to attend the trial by video

16  teleconference.

17          I don't believe that Rule 43 allows that.  So I will

18  be bringing the jury into the courtroom.  I think that probably

19  what we'll do, audience members can stay, but what I was

20  thinking is having just one attorney for each defendant and for

21  the government be present, and that way we won't have a

22  head-counting problem.  And then the question remains what we

23  should say to the jury.  I am open to suggestion, but I would

24  propose the following:  That a critical person necessary for

25  the trial is unfortunately unavailable today, and as a result,

1    the rules require that we continue the trial, and for that

2    reason that I am excusing the jury for today, but we'll be back

3    on the 27th same time as usual.

4         Any other ideas or any issues with that?

5    Mr. Kornfeld?

6         *MR. KORNFELD:*  Your Honor, I think the critical

7    person, I don't think you have to be a genius to figure out who

8    one of the five critical people may be.

9         *THE COURT:*  Not necessarily.  It could be -- for

10   instance, you know, lead counsel or something.  I don't know

11   what the jury would think, but you're right, they could infer

12   that, but ...

13        *MR. KORNFELD:*  I think just to mitigate my

14   overthinking on this issue, if the Court would be willing to

15   say something to the effect a critical person is unavailable

16   through no fault of his or her own.

17        *THE COURT:*  Okay.  Reaction from the government or

18   other defendants?

19        *MR. HART:*  That would be acceptable to the government.

20        *MR. LAVINE:*  No objection, Your Honor.

21        *THE COURT:*  Then you can draw lots or do what you

22   wish.  Otherwise, why don't we go ahead and have one attorney

23   remain, and we'll get ready to bring the jury back in.

24        The record should reflect that just one attorney for

25   each of the defendants and Mr. Hart on behalf of the United

1    States have remained behind, so are we ready at this time to

2    bring the jury back in?

3              MR. FAGG:  Your Honor.

4              THE COURT:  Yes.

5              MR. FAGG:  I don't believe there is a solution to this

6    problem, but I do have a concern about the jury being in the

7    courtroom and us having a proceeding without Mr. Lovette here,

8    so I understand what the Court is going to do but did want to

9    just lodge that objection.

10             THE COURT:  Right.  I overrule that objection.  This

11   is going to take us about two minutes, and we're doing it for a

12   reason to avoid prejudice which I think has a distinct basis,

13   namely, you know, if the jury could tell that Mr. Fries was not

14   here, they might infer that that's the person.  With the other

15   defendants absent for this very brief proceeding, that not only

16   will alleviate the prejudice to Mr. Fries, but I can't imagine

17   it having any prejudice to Mr. Lovette.

18             Now, I understand a prejudice analysis is not

19   necessarily the issue when it comes to his right to be present,

20   but simply excusing the jury under these circumstances I don't

21   think is a critical phase that he would have the right to be

22   present for in any event, so I will overrule that objection.

23             Let's go ahead and bring the jury in.  And by the way,

24   as I indicated, the public has a right to attend.  We have a

25   few members, a few people attending.  Some people left.  They

1     may have been connected with the trial teams, but we are not

2     closing the courtroom for this.

3               (Jury present.)

4               *THE COURT:*  Good morning, ladies and gentlemen.  So

5     here is what is going on.  A person whose presence is critical

6     to the trial through no fault of his or her own is unavailable

7     today.  And as a result, pursuant to rules, we can't continue

8     today.  So as a result, I am going to excuse you today at this

9     time, and I'll have you -- we are not going to have trial

10    tomorrow, obviously, and we are not going to have trial again

11    because we are off next week until the 27th.

12              Let me assure you, ladies and gentlemen, that in terms

13    of our schedule, I don't anticipate that this is going to have

14    any adverse effect on it.  As a matter of fact, based upon

15    estimations, I think that we are in very good shape to be able

16    to finish everything on time, so don't worry about that.  But

17    we do need to have you -- we can't continue today.  So as a

18    result, I am going to excuse you.

19              During this rather large block of time that you won't

20    be here, once again, not that you have to think about the

21    trial, but think about being vigilant in case people try to

22    talk to you, okay?  And also maintain your vigilance in terms

23    of don't start looking up information or relaxing -- if you

24    read or see something that you think may be connected with the

25    case, avert your eyes, change the channel.  Don't do it.  Don't

1    let people drag you into conversations, all those same

2    admonitions as before, if you would keep those in mind.  And

3    otherwise, I will see you, ladies and gentlemen, back on

4    Monday, June 27th, 8:30, all right, we will resume.  So the

5    jury is excused at this time.  Thank you.

6           Now I would suggest that we -- you can tell your

7    colleagues that they can come back in, the defendants too.

8    Hopefully they haven't left.  But assuming that everyone is

9    still around, why don't we gather everyone up, and then we'll

10   talk about whether we should do some other business today or

11   whether in the absence of Mr. Fries, you know, we should kind

12   of adjourn for the day as well.  So once you get people back

13   in, Ms. Grimm will let people know.

14           MR. FAGG:  Can I speak on that point, Your Honor?

15           THE COURT:  Yes.

16           MR. FAGG:  Because of the concerns that were raised

17   about the jury seeing who is here and who wasn't here, I

18   believe that most everyone has actually left the courthouse.

19           THE COURT:  Yeah, I can understand why you would not

20   want the jury to file past a bunch full of people necessarily.

21           MR. FAGG:  I just wanted to state that, that it would

22   take us a little to reconvene on that.

23           THE COURT:  Why don't you figure that issue out one

24   way or the other.  If it so happens that people have gone back

25   to their respective camps, you know, it's not going to cause a

1    huge problem today.  And if it's hard to gather people back up,

2    we can deal with it.  I see some people poking their heads in

3    right now.  Why don't you let them know, just so the jurors

4    don't all file past a couple people like up in the galleries,

5    all right?  So just let me know when we're ready.  That may not

6    mean when everyone is here, just when you think we should talk

7    more, okay?

8            We will be in recess.  Thank you.

9        (Recess at 8:58 a.m. until 9:15 a.m.)

10           *THE COURT:*  So it looks like -- well, here Ms. Page

11   comes.  It looks like we've reassembled with the exception of

12   Mr. Fries, of course, so the question now becomes whether we

13   should do what we had talked about perhaps this afternoon if we

14   had only had a half day of testimony today, which I would

15   propose would be to take up the motion -- the government's

16   motion regarding the defendants' summaries.  I think that's one

17   thing.

18           I would propose not to talk about the jury

19   instructions.  I really haven't had a chance to go through

20   those yet.  I don't think that will take too long, so I would

21   propose that we hold off on that.

22           Mr. Kornfeld, what's Mr. Fries' position about whether

23   we could take up that motion of the government 1307 in his

24   absence.

25           *MR. KORNFELD:*  Thank you, Your Honor.  We are

1    comfortable proceeding on that issue and appreciate you asking.

2            THE COURT:  Yeah.  Anyone else have other topics that

3    they believe we should take up in lieu of or in addition to?

4            MR. FELDBERG:  Not another topic, Your Honor, but if

5    we are going to take up the government's motion with respect to

6    the defense summary charts, may the clients' appearances be

7    excused for that?

8            THE COURT:  I think that that would be fine.  And we

9    had done that in past trials where we were talking about

10   evidentiary issues, some admissibility things.  Of course, they

11   are only going to be admitted in court when the defendants

12   would actually be present, but I am comfortable with that.

13           Mr. Hart, any different position for the United

14   States?

15           MR. HART:  No objection, Your Honor.

16           THE COURT:  Yes.  So if the defendants wish, they may

17   be excused at this time.  If they want to remain, they, of

18   course, are free to do so as well.

19           MR. FELDBERG:  Thank you, Your Honor.

20           THE COURT:  All right.  Then why don't we go ahead and

21   I will turn it over to the government, Mr. Torzilli.

22           MR. TORZILLI:  Yes, thank you, Your Honor.

23           So first, if I could, I would like to list off some

24   summary exhibits that we'll withdraw objections on.

25           THE COURT:  Okay.

1      *MR. TORZILLI:*  So we would like to withdraw objections

2   to I-859-1.  We would like to withdraw our objections to J-236,

3   J-250, J-252, J-253, J-254, J-255, J-257, J-258, J-264.

4      *THE COURT:*  264?

5      *MR. TORZILLI:*  264, yes, and J-265.

6      *THE COURT:*  Okay, great.

7      *MR. TORZILLI:*  And for J-266, we have no objection if

8   the typo is corrected, which I am not sure whether we've gotten

9   a copy of that.  I don't have that in my notes.  But if that's

10  corrected, we would no longer have an objection.

11     *THE COURT:*  All right.  We'll find out.  So do you

12  want to start with H-684-1?

13     *MR. TORZILLI:*  Yes, H-684-1, and our objection here is

14  one that the logic of which applies to a number of others.

15     If we could have that displayed.  Thank you,

16  Mr. Fronzaglia.

17     So this is our objection to this one, and then this

18  carries over to some others that we can look at, but here it's

19  actually two things, and it relates to the vertical axis.  So

20  first, there is no indication of the vertical axis in terms of

21  numbers on here, but also -- which is one.  But also two is

22  there is no scale.  The scale is misleading because it doesn't

23  seem to start at zero, so the difference that's being displayed

24  between the numbers being compared is misleading.  It looks

25  like a bigger drop than it really is if it were scaled properly

1   all the way to zero.  And so for that reason, the depiction of

2   the numbers on here is argumentative and misleading, and that's

3   the basis of our objection.

4        THE COURT:  Okay.  But no claim by the government that

5   the scale as between different suppliers is not proportionately

6   reflected.  In other words, if there is a 3-cent increase,

7   that's correctly shown in terms of the relative height of --

8   for different suppliers.  In other words, it doesn't vary as

9   between suppliers in terms of how the bars are depicted, right?

10  It's just that you would prefer that it start at zero, and as a

11  result there be very tall bars.

12       MR. TORZILLI:  Correct, if I am understanding Your

13  Honor correctly, we are not saying that across suppliers there

14  are different deltas, so a 3-cent difference for, say, Claxton

15  is being depicted similarly to, for example, a 3-cent

16  difference for Koch or for George's, et cetera.  So our

17  objection is simply the scaling the way it was done, not only

18  is it not depicted, you know, what the scaling actually is, but

19  also it wasn't started at zero so the deltas look very large,

20  which is the argument that, of course, the defendants want to

21  make is that the difference between the initial bids and

22  contract prices were significant, and so, therefore, the way

23  the scaling was done enhances that and is, therefore,

24  argumentative.

25       THE COURT:  I am going to overrule that objection

 1    without hearing from the defendants because bar graphs like

 2    this, I think jurors would just naturally know that a lot of

 3    bar graphs of this nature don't start at zero, but it would be

 4    oftentimes very awkward, particularly with really small

 5    incremental differences like this to depict the entirety of the

 6    axises as Mr. Torzilli referred to it.

 7            And as pointed out in the second trial, it wouldn't

 8    prevent the government from offering an alternative version of

 9    the chart that did include the axis which would put the real

10    relative differences in a different visual perspective to give

11    the jury the view, but I think that there is nothing inherently

12    misleading about H-684-1 that would make it excludable.

13            Next one, Mr. Torzilli?

14            *MR. TORZILLI:*  Next one on my list is J-228.

15            *THE COURT:*  Go ahead.

16            *MR. TORZILLI:*  So for this one this is just -- it's

17    being tendered as a -- or at least was listed as a summary

18    exhibit, and, frankly, it's not a summary exhibit.  It's an

19    organizational chart or at least the first page is, which is it

20    seems like copied from another exhibit, copied and then given

21    nicer formatting.  And the exhibit that it's copied from

22    appears to be I-995.

23            And if we could switch control of the display over to

24    the government's control, and we can potentially show that,

25    J-228.  Could you show that side by side, Mr. Ackaouy, with

1    I-995?

2         MR. FAGG:  Your Honor, if I might take the mic from

3    Mr. Torzilli for a moment, maybe that will save us some time.

4         THE COURT:  Go ahead.

5         MR. FAGG:  We withdraw J-228.

6         THE COURT:  Okay.

7         MR. TORZILLI:  If I may just ask a point of

8    clarification.  As a summary exhibit or as an exhibit entirely?

9         THE COURT:  In other words, will it be offered during

10   the trial?

11        MR. FAGG:  We will not offer it in the defense.  The

12   only time it might be offered would be if we did through the

13   government's rebuttal case, and so we don't have -- we will not

14   offer it in the defense case.

15        THE COURT:  Okay.  What do you want to do in that

16   event, Mr. Torzilli?

17        MR. TORZILLI:  That's acceptable to the government, as

18   long as it's not being offered for -- as a summary exhibit.  I

19   understand if it's used for demonstrative purposes, or if the

20   issue of it being a summary reemerges in rebuttal case, we

21   could take it up then.

22        THE COURT:  Yeah, I don't think that Mr. Fagg is

23   waiving any of those issues on behalf of Mr. Lovette, but on

24   the other hand, given the fact that it's not going to be

25   introduced in the defendants' case and given the fact that it

1    shouldn't take too long to talk about in the event that it is

2    used in some fashion in the rebuttal case, I think that we can

3    probably postpone consideration of that.

4            MR. TORZILLI:  That makes sense, Your Honor.

5            THE COURT:  Go ahead and take up the next one.

6            MR. TORZILLI:  Next on my list is J-235.  And J-235 is

7    another -- our objection is based on the vertical axis, again.

8    The same issues, same arguments.  I won't repeat them unless

9    Your Honor wants to hear them again.

10           THE COURT:  I will overrule those objections for the

11   same reason as I ruled on H-684-1.

12           MR. TORZILLI:  Actually, J-239 is another one that the

13   government will withdraw objection to.

14           THE COURT:  Okay.

15           MR. TORZILLI:  If we can go to J-240 is next on my

16   list.

17           THE COURT:  Go ahead, Mr. Torzilli.

18           MR. TORZILLI:  Sure.  This is a slide that was used I

19   believe in the prior trial, it was used in at least one, maybe

20   more than one defendants' closing.  It's argumentative.  It's

21   not a summary exhibit.  It doesn't really summarize much of

22   anything and contains in the text a number of argumentative

23   claims in there, so we would -- and interprets hearsay

24   statements on top of that.  So we would say certainly I

25   understand it being used for demonstrative purposes and in a

 1   jury address and so forth, but it's not a summary exhibit to be

 2   admitted into evidence and sent back with the jury.

 3           THE COURT:  All right.  Argument, Mr. Quinn?  Go

 4   ahead.

 5           MR. QUINN:  Thank you, Your Honor.

 6           I think, Your Honor, we would be willing to redact the

 7   title of J-240, but other than that, I think this summarizes

 8   material in the same way that many of the government's summary

 9   charts do.  We have got two bids going in.  You have got an

10   e-mail from Mr. Austin that is already evidence, I believe, and

11   then a third bid.  We would offer this not only under Rule 1006

12   but also under Rule 611 as a pedagogical aid that can help the

13   jury understand what's going on.

14           THE COURT:  I think if you took the title away, the

15   jury wouldn't have any idea what it was.

16           MR. QUINN:  Your Honor, we can probably work on the

17   title too.

18           THE COURT:  Undoubtedly would because in and of

19   itself -- I mean, if you had a witness who would explain it

20   all, but that's why it would almost seem like there is going to

21   be some type of title, but I agree with Mr. Torzilli that for

22   purposes of a closing argument this is perfectly fine, but for

23   purposes as an admissible exhibit, it would be argumentative

24   with the title, so I am not sure exactly what it may look like

25   at the time it could be offered.  But you would propose,

1    Mr. Quinn, to leave in that light blue box that marks a

2    particular event.

3         MR. QUINN:  We would, Your Honor.  We don't think

4    that's argumentative at all.  That's just a fact of what

5    happened, the transmittal e-mail from Mr. Austin to Mr. Penn.

6         THE COURT:  Mr. Torzilli, what do you want to do about

7    this one given the fact that there could be a new version of

8    this with a different title?

9         MR. TORZILLI:  Even if the title is changed in a way

10   that makes it non-argumentative, so put that aside, our

11   position is still this really isn't a summary exhibit under

12   1006 because it doesn't come close to summarized voluminous

13   material whatsoever.  There is far less material being

14   summarized in here than I think probably any other exhibit

15   that's been in the realm of summary exhibits in this case, both

16   government and defense side, so we would still have the lack of

17   a voluminous, summary of voluminous objection.

18        THE COURT:  Mr. Quinn, on that point?

19        MR. QUINN:  Your Honor, we are offering it both under

20   1006 but also 611, and 611 doesn't necessarily have to

21   summarize voluminous subject matter.  There have been

22   government summary charts in this case that don't, in fact,

23   summarize voluminous matter, and they are quite short, so I

24   think the same applies here to this chart.

25        THE COURT:  I am going to reserve ruling because we

1464

1    will see what the title is, but I do agree with Mr. Quinn that

2    under 611 this would be admissible.  It's not a voluminous

3    record that is coming in under 1006 because it -- there is

4    not -- it's just not voluminous.  However, that does not

5    prevent an exhibit being admitted if there are -- if, No. 1,

6    there is no issue as to its accuracy; and, No. 2, the exhibits

7    are noted on this particular exhibit too.  So I do think it

8    would be admissible under 611, and I will reserve ruling as to

9    whatever title.  We will take it up at that time it's offered.

10            MR. QUINN:  Thank you, Your Honor.

11            THE COURT:  Mr. Torzilli, go ahead.

12            MR. TORZILLI:  Our next one on my list is J-249.  And

13   our only objection here is in the footnote under Sources, it

14   says, Pilgrim's Pride sales data and then USDA.  And that gives

15   a false impression that somehow the USDA has somehow approved

16   this as opposed to what it really is which is or purports to be

17   USDA data that's being sourced for inclusion in this depiction

18   just like the Pilgrim's Pride sales data is being used to

19   present the graph in the depiction here.

20            THE COURT:  I think -- wasn't that used in the last

21   trial?  I think so.

22            MR. TORZILLI:  Yes.

23            THE COURT:  And then just to refresh my memory, you

24   may have just said this, Mr. Torzilli, but so the wholesale

25   beef index and the wholesale pork index is data that was

1  derived from USDA information, but the red line is not, and

2  that's just Pilgrim's sales data.  So the objection is that the

3  sources may unfairly imply that the red line is derived from

4  some type of government source?

5       MR. TORZILLI:  Yes, that the USDA somehow put this

6  graph together or approved it and so forth, so we would -- our

7  objection is just that the word "data" should be included in

8  the sources after USDA.

9       THE COURT:  Okay.  Ms. Pletcher?

10      MS. PLETCHER:  Your Honor, this came in in the last

11 trial as it is.  The only thing that we modified I believe was

12 the title in response to the discussion we had about that last

13 trial.  The government was able to fully examine Professor

14 Snyder as to the sources of the data and how he compiled the

15 chart.  I don't believe there is any confusion on that point

16 and the examination was fulsome.  But if the Court would like

17 us to add the word "data," we are happy to do so.

18      THE COURT:  Is the intent to introduce this once again

19 through Professor Snyder?

20      MS. PLETCHER:  Yes, that's right.

21      THE COURT:  Anything else on this one, Mr. Torzilli?

22      MR. TORZILLI:  No, not from me.

23      THE COURT:  I am going to overrule the objection.  I

24 don't think that that lack of notation as to the sources is,

25 even if this exhibit didn't have any other context, would be

1    somehow misleading or prejudicial to the United States, but

2    especially given the fact that it will come in through

3    Professor Snyder and to the extent that the government wishes

4    to make a clarification as to what the data -- what data was

5    used to compile it or to produce this particular graph, I think

6    that that would eliminate any prejudice, so I will overrule the

7    objection.

8             Next, Mr. Torzilli.

9             MR. TORZILLI:  Next up on my list is J-251, another

10   slide that was used in the previous trial during the

11   examination of Professor Snyder.  This slide purports to

12   compare prices for big bird against KFC prices for chicken on

13   the bone that it purchased from Pilgrim's.  Our objection here

14   is, frankly, we can't replicate the analysis that leads to the

15   numbers depicted here, in particular the industry-wide big bird

16   price increase that's depicted there of 32 percent based on --

17   and the only information we really have to go on here is what's

18   depicted in the footnote, USDA, EMI, and we can't determine,

19   you know, what was used to be able to get to that 32 percent

20   number so we can verify its accuracy.

21            THE COURT:  Was Professor Snyder asked about that in

22   the second trial?

23            MR. TORZILLI:  Well, we asked him about this slide on

24   cross-examination.  We didn't -- the examination did not

25   include a recitation of how he got to the 32 percent number.

1    *THE COURT:*  Okay.  Ms. Pletcher?

2    *MS. PLETCHER:*  Thank you, Your Honor.

3    As discussed, Professor Snyder was cross-examined

4    about this chart.  It came in at the last trial as it is I

5    believe with the modification to the title which we made, and

6    he will be again fully available for cross-examination to

7    explain what data he used and how he used it at this trial, so

8    this chart will not be coming in without any witness or without

9    any context.  Professor Snyder will be prepared to discuss how

10   he created it and the sources of the data.

11   *THE COURT:*  Okay.  And, Ms. Pletcher, do you believe,

12   though, that Professor Snyder if asked how he arrived at that

13   figure of 32 percent would be able to explain it as opposed to

14   saying, I used my consultants, I forget the name of the

15   consultant that he used to kind of crunch the numbers, but you

16   anticipate that he could explain it as to just say, They gave

17   me the number, and they are good guys.

18   *MS. PLETCHER:*  Professor Snyder will be prepared to

19   explain how he arrived at this number and how he and his staff

20   arrived at that number.

21   *THE COURT:*  Mr. Torzilli, anything else on this

22   particular exhibit?

23   *MR. TORZILLI:*  Nothing further, Your Honor.

24   *THE COURT:*  I am going to overrule the objection for

25   now.  We shall see.  If it's something that Professor Snyder

1    can explain that number, the mere fact that the government at

2    this point in time can't figure out how he derived it is not

3    necessarily preclusive of the slide before he testifies.  We'll

4    see what happens and whether, in fact, he can establish a

5    sufficient basis under Rule 702 for that number.

6           Next, Mr. Torzilli?

7           MR. TORZILLI:  Next one on my list is J-256, another

8    slide that was used during the examination of Professor Snyder.

9    This is what he calls his benchmark analysis, and a similar

10   objection to what we just talked about in the previous slide.

11   We're able to replicate or come very, very close to replicating

12   the first number that appears here, so all the way on the left

13   the $1.0308 that represents Pilgrim's sales of chicken on the

14   bone to KFC, but are unable to replicate the numbers that

15   appear on the other bars to the right of that.  So for that

16   reason -- and he was asked on cross-examination about this and

17   was not fully informed of the underlying basically product

18   descriptions and product codes that were used to derive the

19   numbers, particularly on the darker blue, the darker blue bars,

20   which is obviously the non-Pilgrim's or non-conspiracy chicken

21   suppliers that were selling products to customers during 2015.

22          THE COURT:  Thank you.

23          Ms. Pletcher?

24          MS. PLETCHER:  Thank you, Your Honor.

25          It's the same situation with this chart.  Professor

1    Snyder will be prepared to describe how these numbers were

2    arrived at.  There is quite a bit of detail that went into

3    this, and Professor Snyder is -- he will be prepared to

4    describe it on cross-examination.

5         *THE COURT:*  Understood.  Thank you, Ms. Pletcher.

6         Mr. Torzilli, anything more on J-256?

7         *MR. TORZILLI:*  Nothing further, Your Honor.

8         *THE COURT:*  I am going to overrule the objection for

9    now, but in the event that Professor Snyder is not able during

10   testimony to establish an adequate basis for it, then, of

11   course, the government would have the ability to renew its

12   objection or make a new one, but as long as Professor Snyder is

13   able to articulate in this trial a basis for J-256 and the

14   darker blue bars, that then would be sufficient.

15        Mr. Torzilli, next?

16        *MR. TORZILLI:*  Next on my list, Your Honor, is J --

17   might actually take three at once, J-259, also J-260, which is

18   two summary exhibits in that one, and J-261, which is similarly

19   two summary exhibits in that one.  All of those we have the

20   same vertical axis objection that we talked about at the top of

21   the oral argument, so I won't repeat those unless Your Honor

22   has follow-up questions or wants to hear anything further from

23   that.

24        *THE COURT:*  No, I'll overrule each of those objections

25   as to each of those exhibits based upon the axis argument for

1    the same reason I denied them as to H-684-1.

2          Additional objections on these, Mr. Torzilli?

3          *MR. TORZILLI:*  Not on those.

4          *THE COURT:*  Okay.

5          *MR. TORZILLI:*  I think we talked about this at the

6    top, J-266 was corrected, so our typo objection there has been

7    resolved, so there is nothing further on that.

8          And then our next objection is to J-268, and really

9    that one can be taken with J-270 side by side.

10          Thank you, Mr. Ackaouy.

11          And so these are, it appears, exhibits that will be

12    used during or may be used during the examination of Professor

13    Snyder.  They are just not summary exhibits.  I understand they

14    may be demonstratives, but they just don't summarize anything.

15          *THE COURT:*  Let's find out.

16          Ms. Pletcher, go ahead.

17          *MS. PLETCHER:*  Thank you.

18          Those two exhibits are purely for demonstrative

19    purposes only in the same way that we had some others that we

20    used in the second trial that just helped Professor Snyder

21    explain his conclusions, for demonstrative purposes only.

22          *THE COURT:*  And the government doesn't object to their

23    use as demonstratives; is that right?

24          *MR. TORZILLI:*  It sounds like they won't be offered,

25    they won't be going back to the jury.  They will only be used

1    for demonstrative purposes, so we don't have an objection to

2    that.

3         THE COURT:  Right.  And I think something very similar

4    was used in his testimony last time but, once again, just for

5    demonstrative purposes.

6         MR. TORZILLI:  Yes, yes.

7         THE COURT:  Go ahead, Mr. Torzilli.

8         MR. TORZILLI:  Last is J-271.  One moment, Your Honor.

9         THE COURT:  Sure.

10        MR. TORZILLI:  J-271, I am happy to repeat the

11   arguments or answer any follow-up questions, but it's a similar

12   argument to what was raised with the other benchmarking

13   analysis we discussed a moment ago, is we just don't have

14   enough information to be able to replicate the results that are

15   depicted here.

16        THE COURT:  Okay.

17        MR. TORZILLI:  And to be clear, this is -- part of it

18   appears part of Professor Snyder's benchmarking analysis that

19   he'll be talking about on direct exam.

20        THE COURT:  Right.

21        Ms. Pletcher?

22        MS. PLETCHER:  Yes, Your Honor.  It's the same

23   situation for this slide as with the previous benchmark slide.

24   Professor Snyder will be prepared to describe how it was

25   created and the source of the data on cross-examination.

1    THE COURT:  Okay.  Mr. Torzilli, anything else?

2    MR. TORZILLI:  Nothing further, Your Honor.

3    THE COURT:  So I will overrule the objection at the

4  present time, but once again, that is without prejudice to the

5  government being able to explore Professor Snyder's basis for

6  this particular exhibit.  And in the event that the government

7  does not believe that he has offered a sufficient explanation

8  or if the government thinks that some of the data is inaccurate

9  on the slide, whatever, then the government can, of course,

10  renew or make new objections as to it.

11    Mr. Schall?

12    And just to close that out, Mr. Torzilli, any other

13  summaries or demonstratives of that nature that the government

14  wishes to object to at this time?

15    MR. TORZILLI:  No, Your Honor.

16    THE COURT:  Thank you.

17    MS. PLETCHER:  Your Honor, before we go on past that,

18  I would ask the government to clarify that J-269 is not on

19  their list to object to it?  I have that on my list.

20    MR. SCHALL:  We have three others, Your Honor, as

21  well.

22    MR. TORZILLI:  For J-269, we are not going forward

23  with our objections.  We are withdrawing.

24    THE COURT:  Mr. Schall, go ahead.

25    MR. SCHALL:  The three others I think were mentioned

1    only in a footnote in the government's motion were J-262,

2    J-263, and J-267.  I don't think there were any specific

3    objections entered in the motion.  We wanted to make sure they

4    were addressed.

5              MR. TORZILLI:  Your Honor, if you will allow me just

6    one minute to look at them on the display.

7              THE COURT:  Of course.  Go ahead.

8              MR. TORZILLI:  Thank you, Your Honor.  I've had a

9    chance to look those over.  We're not going forward with any

10   objections on any of those three.

11             THE COURT:  Thank you, Mr. Torzilli.

12             Mr. Schall, does that address your concern?

13             MR. SCHALL:  Yes, Your Honor.

14             THE COURT:  Okay, great.

15             Other business that we should take up at this time?

16             MR. LOVELAND:  Your Honor, we just wanted to address

17   one brief housekeeping point.  I guess two points.  First, we

18   were hoping we could do -- obviously, due to the obvious

19   rescheduling that had to take place today, get a date certain

20   from the defense as to an updated witness list and schedule so

21   that we can plan to proceed on the Monday when we resume trial.

22             And then the second thing was just confirm with the

23   Court our understanding of the length of time allotted for jury

24   addresses.  So at the previous trial, the government was

25   allotted two and a half hours, and we would ask and feel it

1    would be appropriate to have another two and a half hours to

2    split between closing and rebuttal.

3         THE COURT:  Okay.  Why don't we take up the first

4    issue first, and that is because of the unforeseen event today,

5    I would imagine that the defendants will have to work on, and I

6    am sure they haven't done so right now, try to figure out the

7    schedule.  So I think it would be helpful, obviously, to

8    everyone to get a new schedule, but the defendants are going to

9    need an opportunity to figure that one out.  But I would -- why

10   don't we -- let me know if this sounds impractical, but perhaps

11   by 5:00 p.m. tomorrow if the schedule has been determined, the

12   defendants could file a new witness list.  If, of course, there

13   are reasons that they can't, they can let us know, but why

14   don't we shoot for that.  I think that that would be helpful

15   and that would give the government plenty of notice about that.

16        MR. TUBACH:  With the Court's indulgence, just one

17   moment.

18        THE COURT:  No problem.

19        Mr. Lavine, go ahead.

20        MR. LAVINE:  We had filed a revised witness list last

21   night, which I think is pretty accurate.  We would like until

22   Monday at close of business.  The reason is we have got people

23   traveling now.  We have to try to get ahold of them to see

24   where we are going to slot them the week of the 27th or right

25   after the 4th if that's necessary, Your Honor.

1    THE COURT:  Any problem with that, Mr. Loveland?

2    MR. LOVELAND:  No, Your Honor.  That's understandable,

3    and we appreciate it.

4    THE COURT:  That's fine.  We will say Monday 5:00 p.m.

5    Mountain?

6    MR. LAVINE:  That will be fine, Your Honor.

7    THE COURT:  Thank you.

8    MR. LOVELAND:  So the remaining point was jury

9    addresses and also thought of and should have thought of

10   earlier if now would be a convenient time to talk about the

11   scheduling of the Rule 29 filings.

12   THE COURT:  That is one on our list too.  By jury

13   addresses, are you talking about closing arguments?

14   MR. LOVELAND:  Yeah, for defense closings and then the

15   government's closing and rebuttal together.  At the last trial,

16   the government was allotted two and a half hours, and we feel

17   that would be appropriate in this case as well.

18   THE COURT:  And the length -- remind me.  The length

19   of each defendant's close, was it --

20   MR. TUBACH:  The length was 45 minutes, Your Honor, so

21   our proposal was that we should, as with the openings, they

22   should get 45 minutes just like we get 45 minutes, but

23   certainly they shouldn't get anything near the two and a half

24   hours that they got when there were 10 defendants.  So our

25   proposal would be they get 45 minutes and in the same way they

 1    got the same amount of time in openings that we got to open.

 2         THE COURT:  Let me think about that one.  I am going

 3    to crunch the numbers a little bit on that.  On the one hand,

 4    there are fewer defendants, and to some extent as the

 5    government had previewed, it's been streamlined, not as many

 6    exhibits entered this go-around, but the government is still --

 7    I mean, the government is still working off of somewhat the

 8    same evidence, so I'll consider that.  I don't think we need to

 9    figure it out right away, but I'll probably, whatever I decide,

10    the government won't be limited to 45 minutes, but perhaps I

11    will think about whether they should be trimmed down a bit.

12         MR. TUBACH:  Thank you, Your Honor.

13         For purposes of the Rule 29 motion, our thought was

14    somewhat to save time both for the Court and for the parties

15    that we would propose we would file our Rule 29 motions on

16    July 11th.  We are unlikely to get this briefed and resolved --

17         THE COURT:  I can see the logic behind that.  Any

18    objection on behalf of the United States to that being the

19    deadline?

20         MR. LOVELAND:  No, Your Honor.  We would just ask for

21    a similar amount of time to respond to the motion.

22         THE COURT:  Yeah, we can take that up later, but I

23    think not coming up with some unrealistic and unnecessarily

24    tight deadline makes sense for both sides.

25         MR. TUBACH:  That would be fine with the defense, Your

1  Honor, thank you.

2          THE COURT:  Any other matters that we should take up

3  today?

4          MR. LOVELAND:  No, Your Honor.  I would just mention

5  that we would look -- as we get the updated witness list on

6  Monday, we would look to think about when charging conference

7  and jury instructions would take place as well.

8          THE COURT:  Right.  The issues that are out there are

9  not too complicated, and I don't anticipate too many changes to

10  the jury instructions, but I think as I mentioned before, we

11  should have plenty of time to resolve those issues without

12  cutting into testimony time.  So I am not worried about, you

13  know, the fact that we're not going to talk about them today,

14  okay?

15          MR. LOVELAND:  Thank you, Your Honor.

16          THE COURT:  Anything else we should talk about today?

17          Mr. Feldberg.

18          MR. FELDBERG:  One administrative point, Your Honor.

19  I want to remind the Court I am going to be late on Monday, the

20  27th.  Mr. Austin and my colleagues will be here.

21          THE COURT:  Thank you for reminding me.  I forgot

22  that.  And you will be covered by the rest of the team, right?

23          MR. FELDBERG:  Yes.

24          THE COURT:  Thank you for reminding me about that,

25  Mr. Feldberg.  Then I hope everyone has a good next week and

1    hope everyone stays well.  I hope that Mr. Fries recovers.  And

2    I'll see you back on Monday, June 27.

3              Mr. Feldberg, anything else?

4              MR. FELDBERG:  Just one question.  May Mr. Brian leave

5    his equipment in the courtroom?

6              THE COURT:  Ms. Grimm, I don't think anybody is using

7    the courtroom next week.  He may.

8              MR. FELDBERG:  Thank you, Your Honor, and have a

9    wonderful week.

10             THE COURT:  Thank you.  The Court will be in recess.

11         (Recess at 9:58 a.m.)

12                    REPORTER'S CERTIFICATE

13    I certify that the foregoing is a correct transcript from

14   the record of proceedings in the above-entitled matter.  Dated

15   at Denver, Colorado, this 16th day of June, 2022.

16

17                              S/Janet M. Coppock

18

19

20

21

22

23

24

25